UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

        Plaintiffs,

- against -

BRIDGEPORT PORT AUTHORITY,

        Defendant.
_____/

CASE NO. 3:03 CV 599 (CFD)

February 26, 2004

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO COMPEL**

HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

    *and*

COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

February 26, 2004

## Table of Contents

**Page**

Factual and Procedural Background ...................................................................................1

    Pending Motions ........................................................................................................4

    The Present Discovery Motion ..................................................................................5

ARGUMENT

1.    Interrogatory No. 5 (efforts to identify individual plaintiffs) ..................................5

2.    Interrogatory No. 11 and document requests no. 14 and 15 (the retainer letter) ...7

3.    Interrogatory no. 12 (passenger complaints) ...........................................................8

4.    Interrogatory no. 20 (damages calculation) ............................................................9

5.    Document request no. 3 (tax returns and financial information) ..........................10

6.    Document request no. 11 (documents concerning Port Jefferson lease) .............12

Conclusion .........................................................................................................................13

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO COMPEL**

Plaintiff Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company") submits this memorandum of law in opposition to the motion of defendant, Bridgeport Port Authority (the "Port Authority"), to compel the Ferry Company to disclose certain disputed items.

### Factual and Procedural Background[1]

Plaintiffs – the Ferry Company and two of its passengers – challenge the legality of a tariff imposed by defendant, the Bridgeport Port Authority (the "Port Authority").

The Ferry Company provides ferry service for vehicles and passengers between Bridgeport, Connecticut and Port Jefferson, Long Island. It has provided such service continuously since 1883. The Port Authority first imposed the tariff in 1993, shortly after it was established. The tariff is a fee on vehicles and passengers. The Ferry Company collects the tariff from passengers at the time they pay their fares, and remits the collected funds to the Port Authority each month (less a nominal service charge).

The tariff has been a constant source of rancor and dispute between the Port Authority and the Ferry Company, and has been very unpopular with ferry passengers, because it drives up the cost of using the ferry. No such tariff is imposed on ferry passengers on the Long Island side, nor is such a tariff imposed on passengers of a competing ferry service between New London, Connecticut and Orient Point, Long Island.

---

[1] The following references are used herein: "**Motion**" means the Port Authority's Motion to Compel; "**McAllister Decl.**" means the accompanying Declaration of Brian A. McAllister, dated February 26, 2004; and "**Domb Decl.**" means the accompanying Declaration of Martin Domb, dated February 26, 2004. The factual and procedural background portion of this memorandum is based on the Amended Complaint in this action and the proceedings to date, as supplemented by the cited declarations and exhibits thereto.

{NY020282.1}

Total tariff collections have increased steadily and significantly each year. In the first full year (1994) they totaled about $450,000. Last year (2003), they reached about $1.3 million. Total collections have increased principally because of: (1) steady increases in the number of vehicles and passengers, (2) the replacement of older ferry boats with newer and larger boats, (3) the addition of one ferry boat to the service, and (4) increases in tariff rates.

Apart from the tariff, the Ferry Company pays rent to the Port Authority for the ferry's non-exclusive use of the dock and terminal at the Water Street Dock (the current rent is $120,500 per year). In addition, an affiliate of the Ferry Company ("Concessions"), which operates a food concession at the Bridgeport terminal, pays rent for its use of a part of the terminal (currently about $23,000 per year). These rentals are at or above the market value of the facilities leased.

The tariff (paid by ferry passengers) and the rentals (paid by the Ferry Company and Concessions) account for essentially all of the Port Authority's operating revenue, but the Port Authority spends most of that revenue on projects completely unrelated to the ferry. In other words, the Ferry Company and its passengers are forced to pay for and subsidize activities of the Port Authority wholly unrelated to ferry operations.

For example, since its establishment the Port Authority has devoted very significant resources, including funds, personnel time and facilities, to the acquisition and development of a 47-acre parcel of land across the harbor from the Water Street Dock, formerly known as the Carpenter Technology property, including the development of a privately-owned shipyard (Derecktor Shipyards). The Port Authority also has been involved in numerous other projects, such as relocating occupants of another parcel on the harbor (the Steel Point Peninsula); trying to purchase a marina; operating a "pump out" boat; promoting a high speed ferry; promoting a container barge project; promoting a casino; and reviewing and approving countless other

development projects. None of these projects, which have consumed enormous amounts of the Port Authority's time and resources, relate or have conferred any benefit to the ferry.

In December 2002, the Port Authority announced an increase of approximately 33% in its tariff rates. The tariff for "auto and driver," for example, increased from $1.50 to $2.00. The Ferry Company disputed the propriety of this increase, and of the tariff itself. In February 2003, the Ferry Company and the Port Authority agreed to terms on which the Ferry Company would continue to collect the tariff on behalf of the Port Authority, at the increased rates, but without waiving the Ferry Company's right to challenge the tariff's legality.

The Ferry Company and a few of its passengers commenced this action a few weeks later, in April 2003. They allege claims under a federal statute, the United States Constitution, and Connecticut statutory and common law. The essence of the claims is that the tariff is illegal in whole or in part because, contrary to law, the tariff proceeds far exceed the reasonable value of the benefits that the Port Authority actually provides to the Ferry Company passengers or operations. In fact, <u>the Port Authority devotes only a small portion of the tariff proceeds for activities that benefit ferry operations, and spends the great bulk of such proceeds mostly for its own purposes, unrelated to the ferry</u>.

Plaintiffs seek three kinds of relief. First, they seek an injunction barring the Port Authority from continuing to impose the tariff in whole or in part. Second, they seek a declaratory judgment that the tariff is illegal in whole or in part. Third, both the Ferry Company and the individual plaintiffs seek compensatory damages for their respective losses caused by the illegal tariff.

**Pending Motions**

There are two pending motions. On May 7, 2003, the Port Authority moved (a) to dismiss the entire action, under the doctrine of primary jurisdiction, on the ground that the Federal Maritime Commission ("FMC") supposedly has jurisdiction over the claims and that the district court should defer to the FMC's expertise in relation to these claims; and (b) to dismiss the claims of the Ferry Company on the ground that it lacks standing to assert claims, because the tariff is paid by the passengers rather than the Ferry Company.

Plaintiffs opposed the motion, arguing principally that (a) the FMC lacks jurisdiction over the claims, because the Port Authority is not a "marine terminal operator" as defined in the Shipping Act of 1994 (as the Port Authority does not collect any fees with respect to vessels operating "on the high seas"), and thus the FMC has no jurisdiction over the tariff, (b) in any event, the central issue in this case – whether the tariff proceeds exceed the reasonable cost of the services provided to the ferry – does not require the FMC's special expertise, and (c) the Ferry Company <u>does</u> have standing to challenge the tariff because (as stated by Professor Steven J. Shapiro, Chair of the Department of Economics and Finance at the University of New Haven) the tariff increases the cost of ferry passage, thereby reducing demand for the ferry and reducing the Ferry Company's revenue and profit.

On August 5, 2003, the Port Authority moved for partial summary judgment dismissing the claims of plaintiff Greg Rose, on the ground that he does not pay the tariff personally, but rather, that it is paid by his flower business, D & D Wholesale Flowers Inc. ("D&D"). Plaintiffs opposed the motion on the grounds that, as the sole owner of D&D, Rose does have standing to assert the claims, and even assuming that D&D should have been named as plaintiff instead of

Rose, the appropriate remedy would not be to dismiss the claims, but rather, to allow D&D to ratify the claims of Rose or to be substituted in his place.

Both motions were orally argued on December 12, 2003, and are *sub judice*.

**The Present Discovery Motion**

The Port Authority served its document requests and interrogatories on August 5, 2003, and the Ferry Company served its responses (including production of responsive documents) on September 19, 2003 (Motion Ex's A and B). The Port Authority waited <u>more than four months</u> to raise any discovery disputes concerning those responses, by its letter of January 27, 2004 (Motion Ex. D). The Ferry Company promptly responded to that letter, on February 3, 2004 (Motion Ex. E). The disputed items raised by the Port Authority are addressed in the Argument, below.[2]

**ARGUMENT**

1. **Interrogatory No. 5 (efforts to identify individual plaintiffs)**. Initially, the Port Authority did not mention this interrogatory in its pre-motion letter (*see* Motion Ex. D), and mentions it for the first time in this motion – a violation of the Court's local rules.

Furthermore, the Port Authority's interrogatories were defective as a whole, because they far exceeded the limit of 25 interrogatories agreed to by the parties and set by the Court in the

---

[2] In its February 23, 2004 letter, the Ferry Company raised three items as to which the Port Authority's disclosure had been deficient (see Motion Ex. E, ¶¶ 9-11). Since then, the Port Authority has produced <u>some</u> additional board minutes (responsive to ¶ 10), stated that it would produce additional board minutes, and stated that it would produce some documents responsive to item 9 (general ledgers and other accounting records). The Port Authority has not corrected its seriously deficient response to interrogatory no. 4 (¶ 11, use of the Water Street Dock by common carriers). The Ferry Company reserves the right to raise these items at oral argument of this motion, or alternatively, if no oral argument is held, then the Court should compel the Port Authority to comply fully with respect to these three items (Motion Ex. E, ¶¶ 9-11).

Rule 26(e) Report. Counting the sub-parts of the 23 numbered paragraphs (and not counting the introductory portion of each multi-part paragraph), the Port Authority's first set of interrogatories consisted of approximately 100 questions. *See* <u>Security Ins. Co. of Hartford v. Trustmark Ins. Co.</u>, 2003 WL 22326563 (D. Conn., Mar 7, 2003) (distinct sub-parts are counted as separate interrogatories for purposes of the presumptive limit of 25 interrogatories) (citing cases).

Turning to this specific interrogatory, it sought information concerning the Ferry Company's efforts to identify individual passengers who might be interested in joining this action as plaintiffs. The Ferry Company fully answered <u>most</u> of the questions posed. It stated that two Ferry Company representatives (Frederick Hall and Louis Rinaldo) "spoke to several passengers" about this, approximately between December 2002 and March 2003. The Ferry Company also referred, in its response, to the written responses and the depositions of the three individual plaintiffs, by which <u>the Port Authority already had thoroughly questioned and obtained considerable information as to how these three individuals came to join as plaintiffs, including their conversations with Mr. Hall or Mr. Rinaldo</u>. Copies of such written responses and deposition transcripts are submitted herewith (Domb Decl. Ex's A-E), so that the Court may see the extent of the information already provided to the Port Authority concerning the circumstances that led to certain individuals joining in this action as plaintiffs.

The <u>only</u> information the Ferry Company declined to provide in response to this request was: (a) the names of passengers with whom the Ferry Company representatives spoke but who were not named as plaintiffs, and (b) the substance of the conversations with those persons. The Ferry Company respectfully submits that this limited information is protected as work product. The conversations were held following discussions between the Ferry Company and its counsel in this action, and in anticipation of litigation. See <u>Draus v. Healthtrust, Incorporated-The Hosp.</u>

Co., 172 F.R.D. 384, 391-92 (S.D. Ind. 1997) (attorney-client and work product privileges extended to pre-litigation communications between eventual defendant and non-party that shared a common interest). It was also proper for the Ferry Company to withhold this limited information in order to protect the privacy of those few individuals who were not named as plaintiffs. *See* In re Grand Jury Subpoena Dated Oct. 22, 2001, 282 F.3d 156, 160 (2d Cir. 2002) ("The work product privilege establishes a zone of privacy for an attorney's preparation to represent a client in anticipation of litigation"). Compelling the Ferry Company to disclose the identities of the three individuals who were not joined as plaintiffs would serve no purpose except to invade the plaintiffs' work product and the privacy of those individuals.

    **2.** **Interrogatory No. 11 and document requests no. 14 and 15 (the retainer letter)**. All three of these items relate to a single document, a retainer letter among the two law firms representing plaintiffs in this case, the Ferry Company and the individual plaintiffs. Plaintiffs produced a redacted copy of that letter (a copy of which, in the form produced, is attached as Ex. F to the Domb Decl.). The unredacted portions of the letter disclose (among other things): (a) the fact of the retainer, (b) the parties to the retainer, and (c) the terms of the retainer.

    The redacted portions of the letter consist of (a) the names of the three other individuals, to whom the letter was addressed, who did not become plaintiffs (*see* Section 1 above), and (b) portions of the text of the letter concerning the nature of and grounds for the litigation and anticipated contingencies in the litigation. This textual discussion constitutes attorney-client communications, as well as work-product. The Port Authority is entitled to disclosure as to the existence and terms of a legal representation (which information is fully provided in the redacted letter); it is not entitled to disclosure of a discussion between counsel and clients (or potential

clients), in the retainer letter, concerning the merits and strategy of the litigation.  As one court has aptly stated:

> The privilege does not foreclose inquiry into the fact of representation itself or the dates upon which services are rendered <u>as long as the substance of the attorney-client relationship is shielded from disclosure</u>.  Thus, while the "structural framework" of the attorney-client relationship may be discovered, the substance of that relationship must remain confidential.

<u>Condon v. Petacque</u>, 90 F.R.D. 53, (N.D. Ill. 1981) (*emphasis added, citing cases*).  *See also* <u>Vingelli v. U.S., Drug Enforcement Agency</u>, 992 F.2d 449, 452 (2d Cir. 1993) ("<u>client identity and fee arrangements</u> do not fall within the attorney-client privilege") (*emphasis added*); <u>Real v. Continental Group, Inc.</u>, 116 F.R.D. 211, 214 (N.D. Cal. 1986) (although fee information is generally discoverable, court declined to order disclosure of fee statements which "would reveal information protected by the attorney-client privilege").

We respectfully submit that the letter in question has been properly redacted to withhold <u>only</u> material that is protected by the attorney-client privilege and the work-product doctrine.  We are prepared, of course, to submit an unredacted copy of the letter to the Court for *in camera* inspection, so that the Court may determine whether the redaction was properly done, should the Court deem it necessary to do so.

      **3.**    **<u>Interrogatory no. 12 (passenger complaints)</u>.**  It is difficult to comprehend why the Port Authority would burden the Court with this item.  This seven-part question asked for detailed information concerning passenger complaints about the cost of riding the ferry.  Although the Ferry Company objected to the interrogatory, it nevertheless provided <u>all of the information available to it in response to all seven sub-parts</u> (Motion Ex. A, interrogatory 12 and response thereto).  We simply repeat verbatim our response to the Port Authority's pre-motion letter:

> We disagree with your statement that the Ferry Company's responses to this interrogatory are "utterly unresponsive." The responses state, among other things, that the complaints are too numerous to itemize; that they are usually made on board the ferry boat; that the vast majority of the complaints are oral; that the Ferry Company has not kept track of the identities of persons making such complaints; that the Ferry Company has neither solicited nor originated communications with passengers concerning such complaints; that the complaints usually are made to the ferry pursers (who collect payment from passengers), including the head purser, Sharon St. Louis (whom you are scheduled to depose in the near future); and that it is impossible to describe with particularity each and every complaint. The responses are signed under oath by Frederick Hall, the Ferry Company's general manager (whom you also are scheduled to depose in the near future). The Ferry Company also has produced one document responsive to this interrogatory. We maintain that the Ferry Company has more than adequately responded to this interrogatory, and in any event, you will have the opportunity to inquire further at the forthcoming depositions.

(Motion Ex. E, ¶ 2.)

    **4.**    **Interrogatory no. 20 (damages calculation)**. This issue, again, is not worthy of the Court's attention. It presents, at most, a question of timing. The fact is that the Ferry Company has not yet quantified its damages, because such calculation will be based principally on the Port Authority's accounting records, most of which the Port Authority has not yet produced (see footnote 2 at p. 5 above). The damages depend on the Port Authority's records because the claim in this action is that the ferry tariff proceeds far exceed the reasonable cost of services that the Port Authority has actually provided to the ferry. The excess amount of the tariff, which is the starting point for calculating damages, thus depends on an assessment of which of the Port Authority's costs benefited or related to the ferry. The Ferry Company stands by its response to the Port Authority's pre-motion letter concerning this item:

> We disagree with your allegation that the Ferry Company has not sustained damages simply because it has not yet quantified its damages with precision. This issue has already been briefed and argued in connection with the Port Authority's motion to dismiss the Ferry Company's claims for alleged lack of standing; see also the Declaration of

>Economist Steven J. Shapiro, Ph.D., submitted by the Ferry Company in opposition to that motion. Furthermore, in order to calculate its damages, the Ferry Company needs to complete its factual discovery, particularly of documents and information in the possession of the Port Authority and its personnel (see, e.g., item 9 below). The Ferry Company intends to submit its damages calculation at the same time that it submits its experts' reports.

(Motion Ex. E, ¶ 3; *see also id.* ¶ 9.)

5.  **Document request no. 3 (tax returns and financial information)**. This is an extremely broad and intrusive request that seeks all tax returns, financial statements and expense records of the Ferry Company from 1993 to the present.

The Ferry Company strenuously objects to this request on the grounds that (a) it is a privately-owned company whose financial information is highly confidential (McAllister Decl. ¶¶ 6-8, 14), (b) the disclosure of such information, especially to the Port Authority, would be extremely harmful to the Ferry Company, given the extremely acrimonious history between the parties and the improper and harmful conduct of the Port Authority towards the Ferry Company in the past (McAllister Decl. ¶¶ 9-12); and (c) the Ferry Company's financial information is not relevant to the issue of damages, as the Ferry Company does not intend to rely on its own financial statements in proving its compensatory damages, but rather intends to prove damages in terms of the unlawful tariff imposed by the Port Authority (McAllister Decl. ¶ 17; Motion Ex. E, ¶ 5).

It is well established that "the profits (or losses) of a business are generally of a confidential nature," as "[i]nformation of this sort might well be useful to an actual or potential competitor or others." Corbett v. Free Press Ass'n, 50 F.R.D. 179, 180 (D. Vt. 1970) (then District Judge Oakes), *cited with approval*, Palmer v. Reader's Digest Ass'n, Inc., 122 F.R.D. 445, 447 (S.D.N.Y. 1988). Such financial information "is certainly of the same nature as a trade secret." Corbett, 50 F.R.D. at 181.

{NY020282.1 }                                - 10 -

Furthermore, the fact that a plaintiff seeks compensatory damages does not automatically entitle the defendant to obtain the plaintiff's confidential financial statements. U.S. for Use and Benefit of P.W. Berry Co., Inc. v. General Elec. Co., 158 F.R.D. 161, 164 (D. Or. 1994) (contractor's "financial condition from 1989 through 1993" held not relevant to "the method by which [the contractor] plans to prove its claims"); In re Wirebound Boxes Antitrust Litigation, 131 F.R.D. 578 (D. Minn. 1990) (holding that "plaintiffs' financial information is not relevant to any outstanding issue in this litigation" where plaintiffs represented that they 'do not and will not seek to recover lost profits,' and that their damages will be measured in this price-fixing case by 'calculating the extent of unlawful overcharges imposed by defendants'").

The position in this case is essentially the same as in Wirebound. The Ferry Company has stated that it will not use its financial statements in order to prove its compensatory damages; instead, it plans to prove its damages by "calculating the extent of unlawful overcharges imposed by" the Port Authority. Thus, the Ferry Company's profits and losses are not relevant to any issue in the case.

Even assuming, *arguendo*, that the Ferry Company's financial information were relevant and subject to disclosure (which the Ferry Company denies), then given the highly sensitive nature of the documents and the Ferry Company's legitimate fears of improper use of the information by the Port Authority (McAllister Decl. ¶¶ 9-12), then at a minimum, the Court should not compel the disclosure of such information except pursuant to the narrowest of confidentiality orders, which would permit disclosure only the Port Authority's attorneys, and not the Port Authority itself. See Palmer, 122 F.R.D. at 447 (compelling disclosure of financial information where the financial status of the company was at issue, but restricting the disclosure to only four attorneys representing plaintiffs); see also Jones v. City of Wilmington, 2004 WL

60268, at *11, n. 16 (D. Del., Jan 8, 2004) (directing disclosure of personnel files on an "attorneys eyes only" basis). However, the Ferry Company submits that disclosure of its financial information, even on an "attorneys eyes only" basis, is not warranted under the circumstances of this case.

      6.    **<u>Document request no. 11 (documents relating to Port Jefferson lease)</u>**. This request is simply a case of overreaching by the Port Authority. In its request no. 10, it requested all leases to which the Ferry Company is a party. Although this case concerns only the <u>Bridgeport</u> side of Bridgeport-Port Jefferson ferry, the Ferry Company produced all its leases <u>anywhere</u>, including some in Port Jefferson. In its request no. 11, the Port Authority asked for all documents <u>concerning</u> all Ferry Company leases. This request is vague, overbroad, burdensome and irrelevant with respect to any leases: does it include, for example, copies of rent checks, wire payments, telephone messages between lessor and lessee?

      Nevertheless, because the <u>Bridgeport</u> leases are at issue and relevant to this case, the Ferry Company took the time to look for correspondence, internal memos and other documents "concerning" all Bridgeport leases. But the Ferry Company cannot be expected to make a similar search for a vaguely and broadly described category of documents for Port Jefferson-related leases, which are neither directly nor indirectly related to any issues in this case. Besides, the Port Authority will soon have the opportunity to depose the Ferry Company's general manager, and may inquire into the Port Jefferson leases already produced. If any legitimately relevant documents are identified at such deposition, the Port Authority would then have the opportunity to frame a proper and specific request. As it stands, the request for "any and all documents concerning" the Port Jefferson leases is a burdensome and unnecessary imposition on

the Ferry Company and the Port Authority has not advanced any explanation of a legitimate need for such documents. (*See also* Motion Ex. E, ¶ 6.)

## Conclusion

For the foregoing reasons, and those set forth in the accompanying declarations of Brian A. McAllister and Martin Domb, the Ferry Company respectfully submits that the Court should (a) deny the Port Authority's motion in all respects, and (b) compel the Port Authority to provide full disclosure and to correct its deficient responses with respect to the three items described in footnote 2 (at page 5) above.

Dated:     February 26, 2004

                                                        BRIDGEPORT AND PORT JEFFERSON
                                                       STEAMBOAT COMPANY, GREG ROSE, and
                                                       FRANK C. ZAHRADKA
                                                       *Plaintiffs*

By: _____
Martin Domb
Federal Bar No. ct 09544
E-mail:  mdomb@hillbetts.com
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

Jonathan S. Bowman
Federal Bar No. ct 08526
E-mail:  jbowman@cohenandwolf.com
Stewart I. Edelstein
Federal Bar No. ct 06021
E-mail:  sedelstein@cohenandwolf.com
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of February, 2004, a copy of the foregoing was served via first class mail and e-mail upon the following (except that the mailing to Ms. Montgomery was by overnight courier):

| | |
|---|---|
| John W. Roberts. Esq.<br>Roberts, Rose & Bates, P.C.<br>17 Hoyt Street<br>Stamford, CT 06905 | Edward J. Sheppard, IV, Esq.<br>Thompson Coburn<br>1909 K Street, N.W., Suite 600<br>Washington, D.C. 20005-2010 |
| Suzanne L. Montgomery, Esq.<br>Thompson Coburn<br>One US Bank Plaza<br>St. Louis, MO 63101 | Jonathan S. Bowman<br>Stewart I. Edelstein<br>COHEN AND WOLF, P.C.<br>1115 Broad Street<br>P.O. Box 1821<br>Bridgeport, Connecticut 06601-1821 |

By: _____
Martin Domb
Federal Bar No. ct 09544
E-mail: mdomb@hillbetts.com
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

{NY020282.1 }