UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

CASE NO. 3:03 CV 599 (CFD)

Plaintiffs,

- against -

BRIDGEPORT PORT AUTHORITY,   February 26, 2004

Defendant.
_____/

### DECLARATION OF BRIAN A. McALLISTER

BRIAN A. McALLISTER declares as follows under penalty of perjury:

1. I am the President of plaintiff Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company"). I am also the President and sole shareholder of McAllister Towing and Transportation Company, Inc. ("McAllister T&T"), which in turn owns 100 percent of the shares of the Ferry Company. Therefore, I am (indirectly) the sole owner of the Ferry Company.

2. I submit this declaration in opposition to the motion by defendant, Bridgeport Port Authority (the "Port Authority"), to compel the Ferry Company to disclose certain matters. In this declaration I address only the Port Authority's demand for <u>financial information of the Ferry Company</u>. The other items raised by the motion are addressed in the accompanying declaration of our attorney, Martin Domb, and the memorandum of law in opposition to the motion.

3. As stated below, the Ferry Company's financial information is private and highly confidential (¶¶ 6-8, 14, below). Its disclosure would be extremely harmful to the Ferry Company, particularly its disclosure to the Port Authority, which has repeatedly harmed the

Ferry Company and its passengers, not only through its illegal and extortionate tariff at issue in this case, but also through fraudulent bid rigging activities and broken promises in conjunction with the corrupt administration of the former mayor of Bridgeport, Joseph Ganim (¶¶ 9-12 below). In addition, the Ferry Company's financial information is irrelevant to any issue in this case, including the damages to be claimed by the Ferry Company (¶ 17 below). I am convinced that the Port Authority is now seeking this information in order to harass and hurt the Ferry Company, and not because it legitimate needs it for this case.

4. The Port Authority's request for financial information (served with 36 other requests on August 5, 2003) and the Ferry Company's response (served on September 19, 2003, with its responses to the other requests) were as follows:

> **REQUEST NO. 3**: Each and every tax return, financial report, profit and loss statement, expense record and shareholder's report of the Ferry Company from January 1, 1993 to the present.
>
> **RESPONSE**: The Ferry Company objects to this request on the grounds that: (a) it is unreasonably cumulative, duplicative, overbroad and burdensome, (b) it seeks documents that are not relevant to the claim or defense of any party and that do not appear to be reasonably calculated to lead to the discovery of admissible evidence, and (c) the Ferry Company is a privately owned company whose tax returns, financial statements and reports are highly private and confidential.

5. <u>The Ferry Company strenuously objects to releasing any of its financial information to the Port Authority</u>.

6. The Ferry Company is privately owned. As stated above, the Ferry Company is wholly-owned by McAllister T&T, and I am the sole owner of McAllister T&T. The desire for confidentiality concerning these companies' financial position and results is one of the principal reasons why both companies have chosen to remain privately-owned and funded.

7. We have several specific concerns about releasing financial information in this case. <u>First</u>, the Ferry Company faces competition from the Cross Sound Ferry, which is

unaffiliated with the Ferry Company, and which provides ferry service between New London, Connecticut and Orient Point, Long Island.  There is a significant amount of overlap between passengers serviced by the two ferries, and it would be extremely harmful to the Ferry Company's competitive position if its internal cost and other financial information became known to a competing ferry service.

8.     Second, the Ferry Company would be severely harmed if its financial information were released to the public, including its customers and potential customers in the communities it serves.  The cost of a ferry ticket, which includes the fare payable to the Ferry Company and the tariff paid to the Port Authority, is an extremely sensitive topic (as is the case with respect to subway fares, train fares, and bridge, tunnel and road tolls).  Each year, the Ferry Company's top management struggles to set a price of the ticket that will (a) be as low as possible and stay competitive, not only with that of the New London-Orient Point ferry, but also with the cost of "driving around" instead of taking the ferry, and (b) provide us with a fair rate of return on the massive investments we have made in the Ferry Company.  For example, in the last four years we have added two new ferry boats, one to add a third boat to the fleet and another to replace an older one, at a total cost of about $30 million (about $15 million for each new boat).  Our customers may or may not agree with us as to what is a fair rate of return on our investment; requiring us to release this type of information to the public would be harmful to our public relations with our customers and the communities we serve.

9.     Third, and most importantly, we are extremely concerned about releasing our private financial information to the Port Authority.  We have been at odds with the Port Authority over the tariff at issue in this case, and related matters, since the Port Authority was formed in 1993 and decided to fund all of its activities – whether related to the ferry or not –

through a tariff on our passengers. The relationship has been highly adversarial and acrimonious. Even though the ferry tariff has accounted for essentially all of the Port Authority's revenues, the Port Authority has used most of such revenues for purposes <u>unrelated</u> to the ferry operation and has treated the Ferry Company with utter contempt and without regard to its needs or those of its customers.

10. In 1993, we objected to the initial imposition of the tariff and sued to challenge it. We agreed to dismiss the suit shortly after it was filed upon the agreement by then Mayor Joseph Ganim to find a more suitable location for the ferry terminal. The Port Authority and the City later refused to honor their part of that agreement.

11. In 1996, we again sued the Port Authority for fraudulent bidding practices, after we learned that the Port Authority awarded the food concession at the terminal to another company whose bid was submitted two weeks after the deadline and which obviously had obtained a copy of our bid from the Port Authority. That suit, which involved clear fraud by the Port Authority, again was settled through the intervention of former Mayor Ganim, who once again agreed, in exchange for our dropping the suit, to move the ferry terminal to a more suitable location. The Port Authority did withdraw the offer to the other company and awarded the contract for the food concession to our affiliate. However, the Port Authority, although a party to the settlement, thereafter refused to discuss the relocation of the terminal, despite the former mayor's agreement. This bid rigging episode demonstrated that the Port Authority was acting in conjunction with the former mayor, whose corruption has now been established.

12. Given this acrimonious relationship, we are extremely fearful of the Port Authority obtaining the Ferry Company's very sensitive financial information. I am afraid that the Port Authority will use that information for its own improper purposes, including, for

example, raising the tariff yet again, and/or improperly disseminating the information to public and non-public entities not involved in this action.

13. The Port Authority unilaterally raised the tariff by a whopping 33 percent only 14 months ago, to continue funding its non-ferry-related operations. We and some of our passengers commenced this action shortly thereafter, in April 2003. Now the Port Authority has notified us that it plans to impose a 50-cent surcharge per ferry ticket on March 1, 2004, which would generate hundreds of thousands of dollars in additional revenue to the Port Authority from our passengers, and further limit the Ferry Company's ability to set its own prices. The Port Authority's explanation for the surcharge, which we read in the newspapers, was that it needed the additional funds to pay the legal costs of this suit. The Port Authority thus is requiring our passengers to pay a surcharge to defend the lawsuit in which we and passengers are challenging the legality of the tariff in the first place.

14. The Ferry Company is extremely careful about disseminating its own financial information. Within our company, we circulate it only to a handful of the top executives. Outside our company, we provide it <u>only</u> to the banks that extend credit to us.

15. The Court should be aware that the Port Authority already has detailed information concerning the Ferry Company's <u>revenues</u>. Each month the Ferry Company provides a summary of all its traffic on the ferry, broken down by category (e.g., auto and driver, adult passenger, etc.). Attached as Exhibit A are copies of such monthly statements for 2002. The Ferry Company's fares are (of course) public. Therefore, the Port Authority knows the Ferry Company's <u>revenues</u>. What the Port Authority now wants to find out is the Ferry Company's <u>cost structure and profit</u>. That is precisely the kind of information that the Ferry Company holds highly confidential.

16.   With respect to the specific items listed in the Port Authority's request (quoted in ¶ 3 above), the Court should know that:

(a)   there are no federal tax returns for the Ferry Company only; our federal tax returns are filed on a consolidated basis including McAllister T&T and some 25 subsidiaries involved in the tug boat business and other businesses completely unrelated to the Ferry Company;

(b)   we do have separate state income tax returns for the Ferry Company only for each of the two states in which it operates, Connecticut and New York;

(c)   the annual financial statements (including profit and loss statements) also are consolidated; however it would be possible to produce <u>redacted</u> versions of such statements that reveal the financial statements of the Ferry Company only;

(d)   we do not have "reports to shareholders" (as I mentioned, I am the sole owner of McAllister T&T); and

(e)   I don't know what is meant by "expense record"; it is both vague and overly broad – would it include, for example, a petty cash voucher for local travel expense?

17.   Thus, some of the information requested is available (to the extent stated in ¶ 16 above). However, <u>the Ferry Company's financial information is not relevant to the issues in this case</u>. As our counsel has informed the Port Authority's counsel (Motion Ex. E, ¶ 5), <u>the Ferry Company does not intend to rely on its financial statements in order to prove any element of its case, including its compensatory damages</u>. Instead, the Ferry Company intends to prove its compensatory damages in terms of the excessive, and therefore illegal, portions of the ferry tariff

collected by the Port Authority. Thus, it is the <u>Port Authority's</u> financial statements, not the Ferry Company's, that are at issue in this case.

18. In sum, for the reasons stated above, I strenuously object to the request that we produce any of the Ferry Company's financial information to the Port Authority.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on February 26, 2004.

_____
Brian A. McAllister

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of February, 2004, a copy of the foregoing was served via e-mail and U.S. mail upon the following (except that the mailing to Ms. Montgomery was by overnight courier):

| | |
|---|---|
| John W. Roberts. Esq.<br>Roberts, Rose & Bates, P.C.<br>17 Hoyt Street<br>Stamford, CT 06905 | Edward J. Sheppard, IV, Esq.<br>Thompson Coburn<br>1909 K Street, N.W., Suite 600<br>Washington, D.C. 20005-2010 |
| Suzanne L. Montgomery, Esq.<br>Thompson Coburn<br>One US Bank Plaza<br>St. Louis, MO 63101 | Jonathan S. Bowman<br>Stewart I. Edelstein<br>COHEN AND WOLF, P.C.<br>1115 Broad Street<br>P.O. Box 1821<br>Bridgeport, Connecticut 06601-1821 |

By: _____
Martin Domb
Federal Bar No. ct 09544
E-mail: mdomb@hillbetts.com
HILL, BETTS & NASH LLP
99 Park Avenue, 20th Floor
New York, New York 10016-1601
Tel. (212) 589-7577
Fax (212) 466-0514