UNITED STATES DISTRICT COURT  **FILED**
DISTRICT OF CONNECTICUT

2004 MAR -1  A 8: 42

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

U.S. DISTRICT COURT
HARTFORD, CT.
CASE NO. 3:03 CV 599 (CFD)

    Plaintiffs,

- against -

February 27, 2004

BRIDGEPORT PORT AUTHORITY,

    Defendant.
_____/

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

*and*

COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

{NY020323.1 }

## Table of Contents

|  | Page |
|---|---|
| Factual Background | 1 |

ARGUMENT

I. STANDARD FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION .................................................................5

II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM AND ARE LIKELY TO SUCCEED ON THE MERITS..................................................6

    A. Plaintiffs will be irreparably harmed if the Port Authority is not enjoined from imposing the surcharge because the Port Authority is insolvent and thus any monetary judgment entered against it will be uncollectible.................................................................................................6

    B. Plaintiffs are likely to succeed on the merits because the Port Authority's own audited records establish that the amount of the tariff imposed by the Port Authority far exceeds the reasonable cost of the services the Port Authority provides to the ferry, in violation of applicable law .............................................................................................9

Conclusion ...........................................................................................................................14

{NY020323.1}

Plaintiffs, the Bridgeport Port Jefferson Steamboat Company (the "Ferry Company"), Greg Rose and Frank C. Zaharadka, submit this memorandum of law in support of their motion for a temporary restraining order and order to show cause why a preliminary injunction should not issue enjoining the defendant, Bridgeport Port Authority (the "Port Authority"), from imposing a 50-cent surcharge (the "Surcharge"), beginning on March 1, 2004, on all tickets bought by passengers of the Ferry Company's ferry between Bridgeport, Connecticut and Port Jefferson, Long Island.

**Factual Background**[1]

In this action, plaintiffs – the Ferry Company and two of its passengers – challenge the legality of the Port Authority's ferry tariff. In this motion, plaintiffs seek a temporary retraining order and preliminary injunction to prevent the Port Authority from adding the illegal Surcharge to the existing illegal tariff.

The Ferry Company provides ferry service for vehicles and passengers between Bridgeport and Port Jefferson. It has provided such service continuously since 1883. The Port Authority first imposed the tariff in 1993, shortly after it was established. The tariff is a fee on vehicles and passengers. The Ferry Company collects the tariff from passengers at the time they pay their fares, and remits the collected funds to the Port Authority each month (less a nominal service charge).

The tariff has been a constant source of rancor and dispute between the Port Authority and the Ferry Company, and has been very unpopular with ferry passengers, because it drives up

---

[1] The following references are used herein: "**Hall Decl.**" means the accompanying Declaration of Frederick A. Hall, dated February 26, 2004; and "**Domb Decl.**" means the accompanying Declaration of Martin Domb, dated February 26, 2004. The factual background portion of this memorandum is based on the Amended Complaint in this action (Domb Decl. Ex. A) and the proceedings to date, as supplemented by the cited declarations and exhibits thereto.

{NY020323.1 }

the cost of using the ferry. No such tariff is imposed on ferry passengers on the Long Island side, nor is such a tariff imposed on passengers of a competing ferry service between New London, Connecticut and Orient Point, Long Island.

Total tariff collections have increased steadily and significantly each year. In the first full year (1994) they totaled about $450,000. Last year (2003), they reached about $1.3 million. Total collections have increased principally because of: (1) steady increases in the number of vehicles and passengers, (2) the replacement of older ferry boats with newer and larger boats, (3) the addition of one ferry boat to the service, and (4) increases in tariff rates.

Apart from the tariff, the Ferry Company pays rent to the Port Authority for the ferry's non-exclusive use of the dock and terminal at the Water Street Dock (the current rent is $120,500 per year). In addition, an affiliate of the Ferry Company ("Concessions"), which operates a food concession at the Bridgeport terminal, pays rent for its use of a part of the terminal (currently about $23,000 per year). These rentals are at or above the market value of the facilities leased.

The tariff (paid by ferry passengers) and the rentals (paid by the Ferry Company and Concessions) account for essentially all of the Port Authority's operating revenue (*see, e.g.*, Domb Decl. Ex. B, p. 3), but the Port Authority spends most of that revenue on projects completely unrelated to the ferry. In other words, the Ferry Company and its passengers are forced to pay for and subsidize activities of the Port Authority wholly unrelated to the ferry.

For example, since its establishment the Port Authority has devoted very significant resources, including funds, personnel time and facilities, to the acquisition and development of a 47-acre parcel of land across the harbor from the Water Street Dock, formerly known as the Carpenter Technology (or "Cartech") property, including the development of a privately-owned shipyard (Derecktor Shipyards). The Port Authority also has been involved in numerous other

projects, such as developing and relocating occupants of another parcel on the harbor (the Steel Point Peninsula); negotiating to purchase a marina; operating a "pump out" boat; promoting a high speed ferry; promoting a container barge project; promoting a casino; and reviewing and approving countless other development projects. None of these projects, which have consumed enormous amounts of the Port Authority's time and resources, relate or have conferred any benefit to the ferry.

Only 14 months ago, in December 2002, the Port Authority announced an increase of approximately 33% in its tariff rates. The tariff for "auto and driver," for example, increased from $1.50 to $2.00. The Ferry Company disputed the propriety of this increase, and of the tariff itself. In February 2003, the Ferry Company and the Port Authority agreed to terms on which the Ferry Company would continue to collect the tariff for the Port Authority, at the increased rates, but without waiving the Ferry Company's right to challenge the tariff's legality.

The Ferry Company and a few of its passengers commenced this action a few weeks later, in April 2003. They allege claims under a federal statute, the United States Constitution, and Connecticut statutory and common law. The essence of the claims is that the tariff is illegal in whole or in part because, contrary to law, the tariff proceeds far exceed the reasonable value of the benefits that the Port Authority actually provides to the Ferry Company or its passengers. In fact, <u>the Port Authority devotes only a small portion of the tariff proceeds for activities that benefit ferry operations, and spends the great bulk of such proceeds mostly for its own purposes, unrelated to the ferry</u>.

In their Amended Complaint, plaintiffs seek three kinds of relief. First, they seek an injunction barring the Port Authority from continuing to impose the tariff in whole or in part. Second, they seek a declaratory judgment that the tariff is illegal in whole or in part. Third, both

the Ferry Company and the individual plaintiffs seek compensatory damages for their respective losses caused by the illegal tariff.

On February 10, 2004, the Port Authority informed the Ferry Company that the Port Authority would impose the 50-cent Surcharge beginning on March 1, 2004 (Hall Decl. ¶ 3 and Ex. A). The letter gave no explanation for the Surcharge. The letter stated that the Port Authority had informed this Court of its intention to implement the Surcharge; however, plaintiffs received no copy of any such pleading or communication. The explanation for the Surcharge appeared in the newspapers; the Port Authority's executive director explained that the Port Authority needs the Surcharge in order to pay for the cost of this litigation, and that the Surcharge is "a matter of survival for the Bridgeport Port Authority" (Hall Decl. Ex. B).

The Surcharge, like the existing tariff, is illegal. As shown in Point II.A below, the Ferry Company and its passengers would be irreparably harmed if the Court allowed the Port Authority to impose the Surcharge. As evidenced by the admission of its own executive director, its audited financial statements, and the lack of financial support from the City of Bridgeport, the Port Authority is insolvent, and any judgment for money damages that the Court might render, as to the Surcharge or the tariff, would be uncollectible. Furthermore, if the Surcharge were implemented and the Court later found that it was illegal, it would be impossible to restore the funds to the passengers who were improperly forced to pay it. In addition, the Surcharge would drive away ferry customers, which also would irreparably harm the Ferry Company.

There is no doubt that the Surcharge, like the tariff, is illegal, and therefore, that plaintiffs are likely to succeed on the merits of their claims. The law clearly provides that a user fee, such as the tariff, must be reasonably related to the cost of the services provided. As shown in Point II.B, the tariff's illegality is evidenced by the Port Authority's own annual calculations since

1993, audited by their outside accountants, of the Port Authority's costs allocated to the Water Street Dock, where the ferry dock and terminal are located. Those calculations constitute admissions that the Port Authority spends no more than approximately 50% of its costs on activities relating to the ferry. Even that estimate is inflated, as the evidence in this action will show; but it nevertheless establishes right now that tariff revenues grossly exceed the cost of the benefits provided to ferry passengers. The only remaining question is by how much. A precise quantification of the excess amount is not needed at this time in order to establish a likelihood of success on the merits on the issue of liability.

## ARGUMENT

### I. STANDARD FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION[2]

Generally, "[a] preliminary injunction may be granted only when the party seeking the injunction establishes that '1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.'" Statharos v. N.Y. City Taxi & Limousine Comm'n, 198 F.3d 317, 321 (2d Cir.1999); Karen L. v. Health Net of the Northeast, 267 F.Supp2d. 184, 190-91 (D. Conn. 2003).

When a plaintiff seeks to enjoin a governmental action taken in the public interest pursuant to a statutory or regulatory scheme, plaintiff must show irreparable injury and likelihood of success on the merits. Fair Housing in Huntington Committee, Inc. v. Town of

---

[2] As the "standards which govern consideration of an application for a temporary restraining order '... are the same standards as those which govern a preliminary injunction,'" Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc., 965 F.2d 1224, 1228 (2d Cir.1992), they are discussed together herein.

Huntington, 316 F.3d 357, 365 (2d Cir. 2003); Karen L. v. Health Net of the Northeast, 267 F. Supp. 2d. at 190-91. The more lenient alternative to the second prong of the test is not sufficient.

Accordingly, in order for the Court to enjoin the Surcharge, plaintiffs must demonstrate (1) irreparable injury, and (2) a likelihood of success on the merits.[3]

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM AND ARE LIKELY TO SUCCEED ON THE MERITS

### A.  Plaintiffs will be irreparably harmed if the Port Authority is not enjoined from imposing the surcharge because the Port Authority is insolvent and thus any monetary judgment entered against it will be uncollectible.

A plaintiff will suffer irreparable harm if, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action, the parties cannot be returned to the positions they previously occupied." Brenntag International Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249-50 (2d Cir. 1999), citing American Hosp. Supply Corp. v. Hospital Prods. Ltd., 708 F.2d 589, 594 (7th Cir. 1971) ("The premise of the preliminary injunction is that the remedy available at the end of the trial will not make the plaintiff whole").

Monetary damages alone generally do not constitute irreparable injury. Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 974-75 (2d Cir.1989). However, because an insolvent defendant would be unable to pay monetary damages, "courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents." Brenntag, 175 F.3d at 250, citing American Hosp., 708 F.2d at 596 (insolvency supports finding of irreparable harm).

---

[3]  While the tariff and Surcharge clearly are "governmental action," plaintiffs dispute that they are taken "in the public interest" or "pursuant to a statutory or regulatory scheme." Nevertheless, for purposes of this motion plaintiffs assume that the higher standard applicable to such governmental actions applies, as the higher standard is easily met in this case.

The Port Authority clearly is insolvent. Only 14 months ago, it increased its tariff by about 33 percent, bringing its total tariff collections in 2003 to about $1.3 million (Hall Decl. ¶ 5), compared to just under $1 million in 2002 (Amended Complaint ¶ 39). Despite this very substantial recent increase, the Port Authority now seeks to impose another substantial increase by way of the Surcharge, which would enable it to collect another $425,000 from ferry passengers per year (Hall Decl. ¶ 5). The Port Authority's executive director announced publicly that collecting the Surcharge is "a matter of survival" (Hall Decl. Ex. B), an admission that, without the Surcharge, the Port Authority cannot meet its obligations as they come due. The Port Authority's explanation that it needs the Surcharge in order to pay the legal costs of this action does not change the fact that it is insolvent. The real reason for its insolvency and inability to pay its own legal costs is that the Port Authority has spent or committed the tariff proceeds for all sorts of activities that neither relate to nor confer a benefit to the ferry. In short, the Port Authority extorts money from the ferry passengers, uses most of that money for other purposes, and when the Ferry Company and passengers complain (*i.e.*, challenge the tariff in Court), the Port Authority extorts additional funds to defend itself.

Proof of the Port Authority's insolvency is also found in its audited financial statements. The statements for the year 2002 (the latest that have been issued) report that the City of Bridgeport and the Port Authority dispute the Port Authority's indebtedness to the City. The City has demanded that the Port Authority deliver a promissory note to the City for $11 million, in connection with the Port Authority's condemnation and acquisition of the Cartech property some years ago. The Port Authority carries that indebtedness on its books at $2.7 million. The note to the financial statements bluntly states:

> [S]hould the Port Authority and the City fail to settle on the approximate indebtedness on the property, the Port Authority could incur approximately $8.3 million of additional indebtedness or the property will revert to the City.

(Domb Decl. Ex. B, p. 7, note 2.) As the balance sheet shows (*id.*, p. 2), an additional indebtedness of $8.3 million would give the Port Authority a negative net worth of several million dollars.

It is also noteworthy that the Port Authority is a City agency (its commissioners are appointed by the Mayor), yet the City is unwilling to fund its operations. If it did, then there would be no need for the Port Authority to impose a Surcharge in an effort to preserve its "survival."

Thus, there is no doubt that the Port Authority is insolvent and would be unable to pay a judgment for money damages. It is equally clear that the potential judgment in this case would be in the range of several million dollars – given current tariff collections of $1.3 million per year which would increase to about $1.7 million including the Surcharge (*see also* Point II.B below concerning the merits).

The Ferry Company has sustained its own damages by reason of the tariff, even though the tariff is paid by the passengers. As Professor Steven J. Shapiro, Chair of the Department of Economics and Finance at the University of New Haven, has stated in an affidavit previously submitted in this case,[4] the Ferry Company is harmed by the tariff because it (a) limits the fare that the Ferry Company can charge, and (b) increases the cost of the ferry ticket to the passenger, thereby reducing demand for the ferry and reducing the Ferry Company's revenue and profit.

---

[4] The Shapiro Declaration was filed on June 23, 2003 (Court's docket no. 21), among other papers in opposition to the Port Authority's motion to dismiss (which motion was orally argued on December 4, 2003, and is *sub judice*).

Accordingly, plaintiffs have shown that they would be irreparably harmed if the Court did not temporarily and preliminarily enjoin the Surcharge.

**B.   Plaintiffs are likely to succeed on the merits because the Port Authority's own audited records establish that the amount of the tariff imposed by the Port Authority far exceeds the reasonable cost of the services the Port Authority provides to the ferry, in violation of applicable law.**

In the Amended Complaint, plaintiffs allege that the tariff is illegal under a federal statute, several clauses of the United States Constitution, and Connecticut statutory and common law (Domb Decl. Ex. A, ¶¶ 62-116). The essence of each of the federal claims[5] is the same, as the following summaries of their elements show – a user fee such as the tariff is illegal if it exceeds the reasonable cost of the services provided to the users:

- **Rivers and Harbors Act, 33 U.S.C. § 5(b)**. Any fees imposed by "non-Federal interests" on vessels <u>or their passengers</u> operating on navigable waters must be: "reasonable fees charged on a fair and equitable basis that (A) <u>are used solely to pay the cost of a service to the vessel or water craft</u>; (B) enhance the safety and efficiency of interstate and foreign commerce; and (C) do not impose more than a small burden on interstate or foreign commerce" [*emphasis added*].

- **Commerce Clause (U.S. Const., art. I, § 8, clause 3)**. A fee imposed by a state or subdivision thereof must (a) not discriminate against interstate commerce, and (b) <u>be fairly related to the services provided by the state</u>. <u>Oklahoma Tax Com'n v. Jefferson Lines, Inc.</u>, 514 U.S. 175, 183, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) [*emphasis added*].

- **Right to Travel (under Commerce and Privileges and Immunities Clauses of U.S. Constitution)**. A fee imposed on passengers engaged in interstate travel violates their right to travel if it: (a) discriminates against interstate commerce, (b) is not based upon a fair approximation of use, or (c) <u>is excessive in relation to the cost to the government of the benefits conferred</u>. <u>Evansville-Vanderburgh Airport Authority v. Delta Airlines,</u>

---

[5] As liability under the federal claims is easily shown, there is no need to discuss the pendent state law claims for purposes of this motion.

Inc., 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) [*emphasis added*].[6]

- **Tonnage Clause (U.S. Const., art. I, § 10, clause 3).** A tonnage duty (which includes any taxes or duties regardless of their name or form) is permissible under the Tonnage Clause only to the extent that: (a) <u>the proceeds of such duty are used for services rendered to and enjoyed by the vessel, such as pilotage</u>, (b) such services enhance the safety and efficiency of interstate commerce, and (c) the duty places at most a small burden on interstate commerce. <u>Clyde Mallory Lines v. State of Alabama ex rel. State Docks Commission</u>, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935) [*emphasis added*].

Thus, under these provisions, the Port Authority's tariff is illegal if it exceeds the reasonable cost of the services that the Port Authority actually provides to the ferry or its passengers. *See also* <u>Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission</u>, 390 U.S. 261, 282, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968) (applying the same standard under the Shipping Act of 1916, 46 U.S.C. § 816 – "whether the charge levied is reasonably related to the service rendered").

That the Port Authority's tariff violates this standard is graphically proved by the Port Authority's own audited accounts. In 1993, the Port Authority and the City entered into a Property Management Agreement concerning the Water Street Dock (then known as the Union Street Dock) (Domb Decl. Ex. E). Paragraph 5 of that agreement requires the Port Authority to pay the City "15% of the Net Operating Income relative to the Property [the Water Street Dock]" (*id.* at pp. 4-5). Each year since 1993, the Port Authority has calculated the amount payable to the City under this provision (Domb Decl. Ex's G, H and J).

---

[6] The <u>Evansville-Vanderburgh</u> case was superseded by the Anti Head Tax Act, 49 USC App. § 1513, but only as to air passengers. It continues to be cited in other contexts, *e.g.*, <u>Commonwealth Edison Co. v. Montana</u>, 453 U.S. 609, n.12, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) ("user charges," as distinguished from general revenue taxes, must be proportionate to the services rendered).

In the first such calculation, in early 1994, the Port Authority's executive director at that time allocated about 50% of the Port Authority's expenses in 1993 to the Water Street Dock, and explained the basis for that allocation in a letter to the City's Director of Finance (Domb Decl. Ex. F). The calculation attached to his letter shows that, of the $261,341 collected in ferry tariff that year, the Port Authority allocated about $109,704 of its expenses to the Water Street Dock (*id.*). The Port Authority has continued to apply a 50% allocation, with minor adjustments, each year since then until the present. In 2001, for example, total tariff collections were about $950,000, and the Port Authority allocated about $580,000 of its expenses to the Water Street Dock (Domb Decl. Ex. H). In 2002, tariff collections were about $985,000, and the Port Authority allocated about $718,000 of its costs to the Water Street Dock (Domb Decl. Ex. G).

The total costs allocated to the Water Street Dock for these and some other years are more than 50% because the Port Authority allocated more than 50% to the Water Street Dock with respect to certain expense categories, *e.g.*, "contributions" and "legal and accounting," *see* Domb Decl. Ex's G, H and J. Plaintiffs dispute that those allocations are correct, but even accepting them for purposes of this motion, they still prove that the ferry tariff proceeds greatly exceeded the costs allocated to the Water Street Dock.

These calculations were audited and approved each year by the Port Authority's outside auditors (Domb Decl. Ex. I, page 33, lines 8-22 and page 36 lines 20-24). The calculations were not academic; their purpose was to determine the amount payable by the Port Authority to the City under the Property Management Agreement; the higher the costs allocated to the Water Street Dock, the lower the Port Authority's payment to the City. Thus, the Port Authority had an incentive to allocate as <u>high</u> a percentage of its costs to the Water Street Dock as it could justify.

The costs which the Port Authority itself has allocated to the Water Street Dock represent the <u>maximum</u> amount of the costs it has actually spent on services for the ferry.[7] The ferry docks at the Water Street Dock, and the terminal is located there. The Port Authority provides no services to the ferry at any location other than the Water Street Dock (Domb Decl. Ex. I, page 36, lines 4-7).

In short, the Port Authority's own audited accounts prove that the ferry tariff proceeds far exceed the reasonable cost of the services the Port Authority provides to the ferry. How the Port Authority spends those excess funds is no mystery. The Port Authority has pursued numerous projects for developing the Port of Bridgeport that provide no benefit to the ferry. Such projects include: the acquisition and development of the Cartech property; the development of Derecktor Shipyards; development of the Steel Point Peninsula; negotiations to purchase a marina; operating a free sewage "pump out" boat for yachts; promoting a high speed ferry; promoting a container barge project; and promoting a casino.

In its answers to interrogatories, the Port Authority has described the services and facilities that it provides to the ferry; all of the services it described are provided <u>at the Water Street Dock</u>:

> **Interrogatory no. 5**. Describe with particularity each and every item of goods, services or facilities that the Port Authority has provided in the past or currently provides to or for the benefit of the Ferry Company or its passengers.
>
> **ANSWER:** In addition to providing the support and services necessary for obtaining the grant funds necessary for the construction of the terminal building and the parking garage (currently under construction) and other interactions with federal, state

---

[7] Plaintiffs will prove that the <u>actual</u> costs incurred by the Port Authority in providing services to the ferry are much lower than the amounts that the Port Authority has been allocating for purposes of its contractual payments to the City, particularly after accounting for the cost of the services that the Port Authority is contractually required to provide under its leases with the Ferry Company and Concessions for the use of the terminal and dock at the Water Street Dock. *See* Hall Decl. ¶ 14.

and local government agencies on behalf of persons that use the Authority's facilities, the Authority provides cleaning, security, maintenance of the grounds and buildings, and parking for the benefit of the passengers and employees of the Ferry Company.

When asked to describe the services or facilities the Port Authority provides to persons other than the Ferry Company or its passengers, the Port Authority, incredibly, mentioned only one of its many non-ferry related projects unrelated to the Water Street Dock (the pump out boat):

> **Interrogatory no. 6.** Describe with particularity each and every item of goods, services or facilities that the Port Authority has provided in the past or currently provides to or for the benefit of any person other than the Ferry Company or its passengers.
>
> **ANSWER:** The Authority contributes not less than 25% of the costs of a pump out boat for local boaters (the balance is funded by the Connecticut Department of Environmental Protection). The Authority has also provided dockage services for local boaters.

This response, woefully inadequate and contrary to the Port Authority's own audited accounts on which its contractual payments to the City have been based, nevertheless constitutes an admission that, at least with respect to one of its projects, the Port Authority spends a portion of the ferry tariff proceeds on activities that do not benefit the Ferry Company or its passengers. In fact, the evidence in this case will show that most of the Port Authority's activities are of no benefit to the ferry, although they are funded by the ferry tariff.

The time has come for the Port Authority to stop extorting money from the ferry passengers in order to finance its wholly unrelated activities that confer no benefit on the ferry operation. As the evidence clearly shows that the tariff greatly exceeds the reasonable cost of the services the Port Authority provides to the ferry, plaintiffs have demonstrated a likelihood of success on the merits, not only with respect to the existing tariff, but also with respect to the Surcharge.

{NY020323.1 }

- 13 -

**Conclusion**

For the forgoing reasons, the Court should enter a temporary restraining order and a preliminary injunction enjoining the Port Authority from imposing the proposed Surcharge, pending a final judgment in this action.

Dated:    February 27, 2004

                BRIDGEPORT AND PORT JEFFERSON
                STEAMBOAT COMPANY,
                GREG ROSE, and
                FRANK C. ZAHRADKA
                *Plaintiffs*

By: _/s/ Martin Domb_
Martin Domb
Federal Bar No. ct 09544
E-mail: mdomb@hillbetts.com
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

Jonathan S. Bowman
Federal Bar No. ct 08526
E-mail: jbowman@cohenandwolf.com
Stewart I. Edelstein
Federal Bar No. ct 06021
E-mail: sedelstein@cohenandwolf.com
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2004, a copy of the foregoing was served via e-mail and overnight mail upon the following:

John W. Roberts. Esq.
Roberts, Rose & Bates, P.C.
17 Hoyt Street
Stamford, CT 06905

Suzanne L. Montgomery, Esq.
Thompson Coburn
One US Bank Plaza
St. Louis, MO 63101

Edward J. Sheppard, IV, Esq.
Thompson Coburn
1909 K Street, N.W., Suite 600
Washington, D.C. 20005-2010

Jonathan S. Bowman
Stewart I. Edelstein
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821

By: _____
Martin Domb
Federal Bar No. ct 09544
E-mail: mdomb@hillbetts.com
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

{NY020323.1}