UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*

2004 MAR 17 P 2: 24

U.S. DISTRICT COURT
HARTFORD, CT.

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

          Plaintiffs,

    - against -

BRIDGEPORT PORT AUTHORITY,

          Defendant.

_____/

CASE NO. 3:03 CV 599 (CFD)

March 17, 2004

**PLAINTIFFS' PRE-HEARING PROPOSED FINDINGS OF FACT, PROPOSED
CONCLUSIONS OF LAW, AND LISTS OF WITNESSES AND EXHIBITS**

HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

*and*

COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

[[NY020706.1]]

## **Table of Contents**

**Page**

I.  PROPOSED FINDINGS OF FACT ...................................................................................1

- Parties........................................................................................................................1
- The Water Street Dock and the Ferry Terminal.......................................................2
- The Leases ................................................................................................................3
- The Tariff..................................................................................................................4
- The 2003 Tariff Increase..........................................................................................6
- The 50-Cent Surcharge ............................................................................................6
- The Port Authority's Activities, Generally..............................................................7
- Port Authority's Activities Related to the Ferry ......................................................8
- Port Authority's Activities *Not* Related to the Ferry .............................................9
- The Port Authority's Operating Revenues and Other Sources of Funding ...............14
- The Port Authority's Operating Expenses ................................................................16
- The Port Authority's Computations of Its Net Operating Income from the Water Street Dock .........................................................................................18
- Effect of the Surcharge on Passengers and the Ferry Company ...............................21
- The Port Authority's Insolvency and Inability to Pay Damages ..............................22

II.  PROPOSED CONCLUSIONS OF LAW .........................................................................23

A.  The Standard for Issuing a Preliminary Injunction..................................................23

B.  Likelihood of Success on the Merits.........................................................................24

C.  Irreparable Harm .......................................................................................................31

III.  WITNESSES AND SUMMARY OF THEIR ANTICIPATED TESTIMONY...................32

IV.  LIST OF EXHIBITS..........................................................................................................38

{NY020706.1}

Pursuant to the Court's Order dated March 3, 2004, plaintiffs submit the following proposed findings of fact, proposed conclusions of law, list of witnesses to be examined, and list of exhibits to be offered, in connection with the hearing to be held on March 24, 2004, with respect to plaintiffs' request for a preliminary injunction.

## I.    PROPOSED FINDINGS OF FACT[1]

### Parties

1.    Plaintiff Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company") is a corporation organized under the laws of Connecticut, with a principal place of business at 102 West Broadway, Port Jefferson, New York 11777. The Ferry Company operates a public ferry service for passengers and vehicles between Bridgeport, Connecticut and Port Jefferson, Long Island, New York. The Ferry Company was formed in 1883 to operate such ferry service and has continued to do so through the present. Currently, the ferry operates every day throughout the year according to published schedules. (Hall.)

2.    Plaintiffs Gregory C. Rose and Frank C. Zahradka are natural persons who reside in the State of New York. Mr. Rose and Mr. Zahradka have been, and continue to be, regular users of the Ferry Company's service. (Rose dep. 4:5-6; 8:12 to 16:8; Zahradka dep. 4:5-6; 7:3-6; 8:13 to 12:5.)

3.    Defendant, Bridgeport Port Authority (the "Port Authority"), is a port authority created and existing pursuant to Connecticut law, Conn. Gen. Stat. §§ 7-329a to 7-329u, with a principal place of business at 330 Water Street, Bridgeport, Connecticut 06604.

---

[1]    References in this section are as follows: "**Ex. ___** " refers to the exhibit and number in the List of Exhibits in Section IV below; "**[Name] dep. ___ [page:lines]**" refers to that witness's deposition transcript and the relevant page(s) and line number(s) (the cited deposition excerpts are Exhibits 51-56); "**[Name]**" refers to that witness's anticipated testimony, as summarized in Section III below.

**The Water Street Dock and the Ferry Terminal**

4.      Since at least the 1960's, the Ferry Company's ferryboats have docked in the Port of Bridgeport at a docking facility located at the Water Street Dock (formerly known as the Union Square Dock).  (Hall.)

5.      In 1995, construction of a ferry terminal building (the "Ferry Terminal") was completed at the Water Street Dock (Ex. 3, at p. 7, note 11).

6.      The Ferry Terminal consists of two floors, each with an area of 5,593 square feet. The ground floor contains:  (a) a waiting area for ferry passengers, (b) an information desk staffed by Ferry Company personnel, (c) a food counter and kitchen, (d) an area with tables and chairs suitable for eating, (e) a small office (approximately 150 square feet) used by the Ferry Company, (f) separate men's and women's restrooms, (g) utility and storage space, and (h) an outdoor deck.  (Ex. 23, p. 9; Ex. 26, § 1.02 and pages BPA 64-76; Riccio.)

7.      Except for the Ferry Company office, the kitchen, and the utility and storage space, the ground floor of the Ferry Terminal is accessible to and is used by ferry passengers and the general public (Riccio dep. 138:19 to 139:7).

8.      The second floor of the Ferry Terminal contains:  (a) offices and conference rooms of the Port Authority, (b) an office used by the Connecticut World Trade Association ("CWTA"), (c) an office used by the City of Bridgeport Harbormaster (the "Harbormaster"), (d) a reception area, (e) a kitchen, and (f) a restroom (Riccio dep. 139:8 to 140:22).

9.      The second floor of the Ferry Terminal is not open to the general public or to ferry passengers, except upon invitation of the Port Authority, the Harbormaster or the CWTA. Access to the second floor is by elevator and internal stairwell (Freimuth dep. 58:9-23; Riccio dep. 138:10-13).

{NY020706.1 }

- 2 -

**The Leases**

10.    **The Ferry Company's Lease**.  The Ferry Company leases facilities at the Water Street Dock pursuant to a lease between the Port Authority and the Ferry Company dated as of December 1, 1998 (Ex. 24), as supplemented by a first amendment to such lease dated as of July 29, 2002 (Ex. 25) (together, the "Current Lease").

11.    The Current Lease provides for rental payments in amounts that increase each year through the term of the lease.  The current rental is $121,963 per year (Ex. 25, ¶ 5(F)).

12.    In consideration for the rental paid by the Ferry Company, the Port Authority provides to the Ferry Company:

(a)    "a non-exclusive preferential use" of the dock at the Water Street Dock, for use by the Ferry Company's ferryboats;

(b)    the right to stage vehicles in staging areas at the Water Street Dock;

(c)    "such office space and waiting room space at the Premises [the Ferry Terminal] as the Port Authority may from time-to-time make available to the Company"; and

(d)    up to four parking spaces which the Port Authority may make available to the Company's employees.

(Ex. 24, pp. 2-3.)

13.    Under the Current Lease, the Port Authority is required to maintain and perform routine repairs with respect to the facilities it leases to the Ferry Company (Riccio dep. 73:2-17).

14.    **The Food Services Lease**.  A restaurant and food services facility is operated at the Ferry Terminal by Steamboat Concessions, Inc. ("Concessions"), an affiliate of the Ferry

Company, pursuant to a Lease and Food Services Agreement entered into in August 1996 between the Port Authority and Concessions (the "Food Services Lease") (Ex. 26).

15.     Pursuant to the Food Services Lease, Concessions pays to the Port Authority:  (a) a monthly rent of $1,000 per month; plus (b) additional rent based on percentages of Concessions' annual gross receipts; plus (c) additional rent of $700 per month in respect of cleaning expenses (Ex. 26, Section 2, pp. 3-5).

16.     Pursuant to the Food Services Lease, Concessions also is required to pay for its use of electricity, gas and telephone and to clean, maintain and make repairs to the portion of the Ferry Terminal it occupies (Ex. 26, § 3.02(d), at p. 7).

17.     In consideration for the rental paid by Concessions, the Food Services Lease requires the Port Authority to maintain and perform routine repairs with respect to the premises occupied by Concessions (Riccio dep. 82:7-14).

**The Tariff**

18.     Since 1993, the Port Authority has imposed a tariff on all passengers (including foot passengers and passengers in vehicles) who have purchased tickets for transportation, in either direction, on the Ferry Company's ferryboats (the "Tariff").

19.     The procedure for collecting the Tariff is as follows:  (a) the Ferry Company collects the Tariff from passengers at the time they pay for their tickets; (b) the Ferry Company remits the proceeds to the Port Authority monthly (by the tenth day of the following month), along with an accounting of the number and categories of tickets purchased that month and the amount of the Tariff collected; and (c) the Port Authority pays the Ferry Company a "collection fee" for performing this service.  (Hall.)

20.     This procedure for collecting the Tariff is "without prejudice to either party's position regarding the Port Authority's right or power to impose the Tariff (including any increases in the rates thereof) or the validity or reasonableness of the Tariff in whole or in part" (Ex. 27, ¶ 6).

21.     From 1993 through 2002, the Port Authority received the following revenues from Tariff collections, according to the annual audited financial statements of the Port Authority (Ex's 1-10, income statements):

| Year | Revenue from Ferryboat Tariff |
|------|-------------------------------|
| 1993 | $261,342 |
| 1994 | 449,682 |
| 1995 | 461,365 |
| 1996 | 649,015 |
| 1997 | 678,134 |
| 1998 | 712,190 |
| 1999 | 804,287 |
| 2000 | 901,518 |
| 2001 | 947,591 |
| 2002 | 984,926 |

22.     The audited financial statements of the Port Authority for 2003 have not yet been issued (Verrilli dep. 27:24 to 28:5; Riccio dep. 84:8-11).

23.     According to the Port Authority's General Ledger as of December 31, 2003, the Port Authority's revenue from the Tariff in 2003 was $1,292,383 (Ex. 28, pp. 112-13; Riccio dep. 105:9 to 106:5).

24.     The Tariff is imposed pursuant to a general tariff, published by the Port Authority, which applies, not only to the Ferry Company's ferryboats, but also to other vessels that use the Water Street Dock (Ex. 29, handwritten page numbers 13-14).  However, the Port Authority has collected fees from such other only rarely, and in negligible amounts (Ex. 30, requests 6-8; Ex. 31; Riccio dep. 65:14 to 66:3).

**The 2003 Tariff Increase**

25.     In December 2002, the Port Authority notified the Ferry Company that the Tariff rates would increase, effective January 15, 2003, as follows (Ex. 32):

| Categories | Tariff in 2002 | Increase | Tariff in 2003 |
|---|---|---|---|
| Senior citizens and children, walk-on | $0.50 | $0.10 | $0.60 |
| Adult, walk-on | 0.75 | 0.25 | 1.00 |
| Auto including driver | 1.50 | 0.50 | 2.00 |
| Trucks over 25 feet | 2.00 | 0.25 | 2.25 |
| Cars with unlimited passengers | 2.50 | 0.25 | 2.75 |
| Monthly passes | 5.00 | 0.25 | 5.25 |

26.     The Tariff for "auto and driver" – which accounts for well over one-half of all Tariff proceeds – increased by 33% (from $1.50 to $2.00).

27.     In February 2003, the parties entered into a Memorandum of Understanding (Ex. 27), under which the Ferry Company agreed to collect the Tariff at the increased rates, without prejudice to its right to challenge the legality of the Tariff in whole or in part.

28.     On April 2, 2003, plaintiffs commenced this action, challenging the legality of the Tariff.

**The 50-Cent Surcharge**

29.     On February 10, 2004, the Port Authority sent the Ferry Company a letter informing it that the Port Authority would implement "an administrative surcharge of $0.50 per ticket for each ticket purchased on the Bridgeport Port Jefferson Ferry, effective March 1, 2004" (the "Surcharge") (Ex. 33). The letter did not explain the reason for the Surcharge.

30.     According to a newspaper article in the <u>Connecticut Post</u> on February 14, 2004, Mr. Riccio was correctly quoted as saying that the Port Authority needs the Surcharge in order to pay for its costs of defending this action (Ex. 34; Riccio dep. 42:3-18).

31.     Based on the approximate number of tickets sold yearly, the Surcharge would increase Tariff collections by an additional $425,000 per year (Hall).

32.     The Ferry Company has not collected the Surcharge.  The Ferry Company has continued to collect the Tariff at the existing rates and to remit the proceeds to the Port Authority in accordance with the existing arrangement.  (Hall.)

## The Port Authority's Activities, Generally

33.     From 1993 through the present, the Port Authority has engaged in many projects and activities.  Some of these projects and activities have related to ferry operations and have conferred some benefits upon the Ferry Company and/or its passengers.  However, many other of its projects and activities have <u>not</u> related to ferry operations and have <u>not</u> conferred any benefits upon the Ferry Company or its passengers.[2]  Nevertheless, the Port Authority has funded its operating expenses for all of its activities principally from the proceeds of Tariff, regardless of whether its activities have related to or conferred any benefit to the Ferry Company or its passengers.

---

[2]     The Port Authority contends that its activities not related to ferry operations nevertheless benefit ferry passengers because any activities that improve commerce and infrastructure in the Bridgeport area benefit <u>the community at large</u> (Riccio dep. 24:6-20; 26:18 to 29:7; 31:1-23; 264:8 to 265:4; 291:11 to 292:10).  Plaintiffs submit that any such remote benefit does not justify requiring only the ferry passengers and the ferry operation to fund improvements to the community at large.  *See* Section II below (Proposed Conclusions of Law), ¶¶ 30-35.

**Port Authority Activities Related to the Ferry**

34.    Since 1993, the Port Authority has engaged in the following principal activities related to ferry operations or that conferred some benefits upon the Ferry Company and/or its passengers:

(a)    **Construction of the Ferry Terminal**.  The Port Authority managed and oversaw the construction of the Ferry Terminal.  However, the cost of construction was substantially financed by federal and state government grants.  Because of cost overruns, the Port Authority had to contribute approximately $200,000 from its own funds to the cost of construction, out of total construction costs of about $2.5 million to $3 million. (Riccio dep. 89:3 to 91:11; Freimuth dep. 33:22 to 34:16)  The Ferry Terminal is of benefit, not only to the ferry operation, but also to the Port Authority, the Harbormaster, the CWTA, and the many other groups that the Port Authority has allowed to use the facilities at no cost (*see* ¶¶ 6-9 above).

(b)    **Repairs to the dock**.  The Port Authority has managed and overseen repairs to and/or expansion of the dock at the Water Street Dock.  The Port Authority obtained the funds for the capital costs of these projects under federal and state grants. (Riccio dep. 252:4 to 256:8.)

(c)    **Plans for a garage**.  In 1999, the Port Authority was awarded one or more grants from federal and/or state agencies, to be used for the construction of a parking garage at the Water Street Dock.  The grants provide for the Port Authority to finance a small percentage (about 20%) of the overall cost of the project.  The Port Authority has developed plans for such a garage, but construction has not yet begun, because the Port Authority has not been able to obtain financing for its share of the cost of the project.

The garage, if and when completed, would be open to the general public and would be used largely by ferry "walk-on" passengers. (Riccio dep. 22:5-20; 244:5 to 247:24; Freimuth dep. 104:18 to 107:17.)

(d)    **Secondary access road**. Due to a long-term construction project on Route I-95 by the Connecticut Department of Transportation, which would have affected access to the Water Street Dock, the Port Authority participated in the planning and management of the construction of a secondary access road, which provides vehicular access to and from the Water Street Dock. Construction of this road was financed principally or entirely by government grants. (Riccio dep. 22:5-20; 254:19 to 256:8.)

(e)    **Day-to-day maintenance of Ferry Terminal and Water Street Dock**. The Port Authority generally maintains the Ferry Terminal and Water Street Dock, by providing, *e.g.*, heat and air conditioning, cleaning and repairs, and security in the form of guards and video surveillance (Riccio dep. 13:22 to 14:7; 82:7-14). The Port Authority is required to provide a substantial portion of these services and facilities pursuant to its leases with the Ferry Company and Concessions (*see* ¶¶ 10-17 above). In addition, as noted above, the maintenance of the Ferry Terminal benefits, not only ferry operations, but also the Port Authority, the Harbormaster, the CWTA, and others.

**Port Authority Activities *Not* Related to the Ferry**

35.    Since 1993, the Port Authority has engaged in the following major projects and activities not related to ferry operations, which have not conferred any benefits upon the Ferry Company and/or its passengers:

(a)    **Acquisition of Cartech property**. The Port Authority acquired this parcel of land (the "Cartech" property) by condemnation in 1999. It consists of

approximately 47 acres and is located on the eastern side of the harbor, across the water from the Water Street Dock.  Pursuant to an agreement between the Port Authority and the City of Bridgeport, the City advanced all or most of the cost of acquiring the property (Ex. 6, p. 10, Note 14).  Upon condemnation, the Port Authority set the price of this property at about $2.7 million, but following litigation over the price, a settlement was reached which set the price of the property, plus acquisition costs, at about $11 million.  The Port Authority spent a considerable amount of time and resources in connection with the acquisition of this property.  (Freimuth dep. 68:1 to 70:20; Riccio dep. 96:6 to 97:6.)

(b)    **Development of the Cartech property**.  The Port Authority has devoted substantial amounts of time, facilities and operating funds to the development of the Cartech property (which the Port Authority now calls the Bridgeport Regional Maritime Complex, or "BRMC").  This work has included planning and design, environmental studies and clean-up, security, and planning and development of commercial activities on portions of the property, some of which are separately discussed below (*e.g.*, Derecktor Shipyards and the "barge feeder project").  (Freimuth dep. 28:2 to 30:14; 39:9-18; Riccio dep. 22:5-20; 48:24 to 49:1; 171:2-8.)

(c)    **Development of Derecktor Shipyards**.  The Port Authority has managed and overseen the construction and development of this shipyard, which builds and repairs commercial vessels (not for the Ferry Company).  It is located on about 23 acres of the approximately 47-acre Cartech property.  The Port Authority entered into a long-term ground lease with Derecktor (discussed in ¶ 43 below).  (Freimuth dep. 28:2 to 30:14; 39:9-18; Riccio dep. 180:8-18; 192:9 to 193:19.)

(d)    **Steel Point redevelopment project**.  The Port Authority has managed and oversee the planning and development of this peninsula, which is also on the eastern side of the harbor, across the water from the Water Street Dock (to the north of the Cartech property).  Its work has included the relocation of water-borne users on that land, and the selection of private developers pursuant to a public bidding process.  (Freimuth dep. 17:14 to 19:1; 114:8 to 116:23; Riccio dep. 22:5-20; 225:3 to 226:4.)

(e)    **High speed ferry project**.  This is a project to provide high speed ferry service between Stamford, Bridgeport and New York City (for foot passengers only, not for vehicles).  The Bridgeport terminal for this service is to be located on land not adjacent to or near the Water Street Dock.  The Port Authority has paid for a lobbying firm (Ex. 36. pp. 2-3), and the Executive Director has taken several trips to Washington and New York, in connection with this project.  The Port Authority has devoted, and continues to devote, considerable time and other resources to this project.  (Freimuth dep. 20:7 to 22:18; 53:11-19; 97:23 to 99:11; Riccio dep. 22:5-20; 31:1-23; 270:24 to 273:5.)

(f)    **New York-New Jersey barge feeder service**.  This is a project to transport containers from New York City and New Jersey to Bridgeport by barge, thereby reducing the shipments of such containers by truck on Route I-95.  The container terminal is to be located on part of the land in the Cartech property.  The Port Authority has devoted, and continues to devote, considerable time and other resources to this project.  (Freimuth dep. 30:15 to 31:8; 53:11-19; Riccio dep. 22:5-20; 26:9-12; 260:16 to 265:4.)

(g)    **Foreign Trade Zones**.  A Foreign Trade Zone (or "FTZ") is a secured and enclosed area in which foreign and domestic goods may be stored, manufactured,

repackaged, exhibited or combined with other goods, and qualify for favorable and/or deferred customs duties. Administration of the Bridgeport FTZ was transferred to the Port Authority. The Port Authority has devoted considerable time and other resources to this project, including at least one three-day trip to Florida by its employee, Martha Klimas. (Freimuth dep. 31:23 to 33:4; Riccio dep. 32:3-15; 206:5 to 207:5; Klimas dep. 28:4 to 31:3.)

(h)    **Dredging of harbor**. The Port Authority has devoted considerable time and other resources to a project to dredge the harbor. The dredging is not needed for the Ferry Company's ferryboats, which have a shallow draft of about 15 feet. The dredging is needed for the ships that dock at the Cilco and other terminals and have much deeper drafts of 30 to 35 feet. (Riccio dep. 29:8 to 30:18; Hall.)

(i)    **Operation of "pump out" boat**. The Port Authority has operated a "pump-out" boat, which provides free sewage pump-out services for pleasure craft in and around Bridgeport harbor. Up to 75% of the cost of this project is funded by government grants. The Port Authority pays for at least 25% of the costs from its operating funds. The program provides no benefit to the ferry or its passengers. (Riccio dep. 275:13 to 278:7.)

36.    Several of the major projects described in paragraph 35 above are still ongoing, including the continuing development of the Cartech property, the high speed ferry project, the barge feeder project, the dredging project, and the pump-out boat (Riccio dep. 31:1-7; 260:16 to 261:2; 275:18-20; 281:4-17).

37.    In addition to the major projects described in paragraph 35 above, the Port Authority also has been engaged and continues to be engaged in numerous other activities <u>not</u>

related to ferry operations.  Such activities include, generally, participation in smaller projects, consideration of development projects that have not gone forward, and review and approval of any commercial proposals that affect land located within 1000 feet from the harbor (Riccio dep. 282:3-21).  To cite just a few examples, since 1993, the Port Authority has devoted time and resources to the consideration of the following matters (among many others), as evidenced by the minutes of the meetings of its Board of Commissioners:

(a)    Condemnation of land for use by Sikorsky Aircraft (Ex. 35, pp. 2-3);

(b)    Ratification of zoning changes for Southern CT Gas and Logistec projects (Ex. 37, p. 2);

(c)    Review of commercial laundry project on Seaview Avenue (Ex. 38, p. 1);

(d)    Purchase of property along Johnson's Creek (Ex. 39, p. 1);

(e)    East End data gathering project (Ex. 40, pp. 4-5);

(f)    Proposed purchase by Port Authority of Captains' Cove Marina (Ex. 40, p. 2);

(g)    Design and registration of new Port Authority logo and service mark (Ex. 41, p. 3);[3]

(h)    Review of asphalt plant project on Seaview Avenue (Ex. 42, p. 5, ¶ 4);

(i)    Review of plans for ocean liner to dock in Bridgeport (Ex. 44, pp. 2-3);

(j)    Review of plan for paper recycling plant on the Cartech property (Ex. 44, p. 2);

(k)    Review of plans for casino (Ex. 45, p. 3).

---

[3]    The change in logos may be seen by comparing the letterheads on Ex's 43 (old logo) and 42 (new logo).

38.     Mr. Riccio and other Port Authority staff have spent considerable time and other resources in connection with these matters, including reviewing project documents, meeting with project proponents, and making recommendations to the Board of Commissioners (Riccio dep. 279:19 to 280:20; Freimuth dep. 25:5 to 26:13).

**The Port Authority's Operating Revenues and Other Sources of Funding**

39.     From 1993 through the present, the Tariff and the lease payments by the Ferry Company and Concessions have accounted for substantially all of the Port Authority's operating revenues.  (Ex's 1-10; Ex. 11; Verrilli dep. 185:8-15; Riccio dep. 99:2 to 101:9; 168:16-24.)

40.     From 1993 through the present, the Port Authority has had two principal sources of funding for its activities – ferry operation and government grants:

(a)     The Port Authority's <u>operating expenses</u> (*e.g.*, salaries, utilities, professional fees, insurance, utilities, etc.) have been funded principally by Tariff proceeds, and to a lesser, though significant, extent, by the lease payments from the Ferry Company and Concessions; and

(b)     Its <u>capital costs</u> (*e.g.*, for construction of the Ferry Terminal, repairs to the dock, development of the Cartech property, Derecktor Shipyards, etc.) have been funded mostly by government grants.

41.     The Port Authority has not charged rent to either the CWTA or the Harbormaster for their use of office space on the second floor of the Ferry Terminal.  The Harbormaster also uses the Port Authority's telephone system, including long-distance calls, and other office supplies and equipment of the Port Authority, at no charge.  (Riccio dep. 140:11 to 141:12; Freimuth dep. 58:24 to 60:19.)

42.    As noted above (¶ 24), the Port Authority has collected tariffs from other vessels using the Water Street Dock very rarely and in negligible amounts.

43.    In December 2000, the Port Authority entered into a ground lease with Derecktor Shipyards (the "Derecktor Lease") (Ex. 46) (the Derecktor project is discussed in ¶ 35(c) above). This lease requires Derecktor to pay to the Port Authority, "beginning with the Commencement Date,"[4] (a) management fee of $15,000 per year; and (b) annual rent in the amounts set forth in the lease.  The rent for the first six years is as follows:

| Period | Annual Base Rent |
|---|---|
| Lease Years 1-3 | $0 |
| Lease Year 4 | $50,000 |
| Lease Year 5 | $75,000 |
| Lease Year 6 | $100,000 |

(Ex. 46, p. 4)

44.    Thus, the Port Authority to date has derived, as revenue for all of its work on the Derecktor Shipyards project and the Derecktor Lease:  (a) not more than $15,000 per year as its management fee (since 2001), and (b) no rental payments.

45.    Rental payments under the Derecktor Lease begin in the fourth year at the modest rate of $50,000 and increase gradually thereafter.  Even in the 55th year of the Derecktor Lease (in or about 2056), if it continues that long, the total revenue to the Port Authority from that 23-acre parcel would be slightly more than <u>one-third</u> of the Port Authority's revenue in <u>2003</u> from the ferry operation.

---

[4]    At his deposition, Mr. Riccio could not recall when the Commencement Date occurred (Riccio dep. 171:19 to 172:4); we assume that it occurred some time in 2001.

**The Port Authority's Operating Expenses**

46.     Since 1993, and continuing at present, the Port Authority has incurred operating expenses in connection with all of its activities, many of which, as stated above (¶¶ 35-38), have been unrelated to the ferry operation and have conferred no benefit to the Ferry Company or its passengers.

47.     Because substantially all of the Port Authority's operating revenue has been derived from the ferry operation -- mostly from Tariff proceeds -- the ferry passengers, through the Tariff, have funded many activities of the Port Authority that are not related to the ferry operation and that have conferred no benefit on the Ferry Company or its passengers.  For example:

(a)     **Salaries**.  The Port Authority has a full-time staff of three, as well as some part-time staff.  It has spent considerable sums on salaries and benefits for these employees, including pension payments and health insurance.  Yet these employees have devoted, and continue to devote, a significant part of their time to projects unrelated to the ferry.  Thus, a significant portion of the salaries and other employee expenses incurred by the Port Authority have been, and continue to be, unrelated to the ferry.  The Port Authority staff has not maintained records of the time that they have devoted to various projects; they have not allocated their time between projects and activities that relate to the ferry and those that do not; and they profess to be unable to make any estimate of such an allocation.  (Riccio dep. 32:20 to 33:16; Klimas dep. 177:21 to 180:11.)  Nevertheless, for the purpose of calculating an annual contractual payment to the City of Bridgeport, the Port Authority has consistently allocated 50% of its salary

expense (and of many other categories of expense) to the Water Street Dock (*see* ¶¶ 48-54 below).

(b)    **Office and building expenses and other overhead**.  The Port Authority has spent considerable sums in office supplies and equipment, utilities, security, legal expense, and other administrative and overhead expenses (Riccio dep. 112:11-23; Klimas dep. 115:5 to 116:4).  Yet many of these expenses, paid for with Tariff proceeds, are incurred in connection with activities and projects unrelated to the ferry.

(c)    **Travel, advertising, and marketing**.  The Port Authority's Executive Director (Mr. Riccio) has taken many out-of-town trips, most of which have related to non-ferry projects, such as the high speed ferry and the barge feeder projects (Riccio dep. 54:14 to 57:8).  The Port Authority also has spent considerable sums on advertising, marketing and promotion (Ex's 1-10, income statements).  Most of these expenses are not related to the ferry.  Its advertisements, for example, have focused on commercial activity in Bridgeport, and have not mentioned the ferry service to and from Port Jefferson (*see* Ex's 47-48).

(d)    **Auto expense**.  The Port Authority pays for Mr. Riccio's use of a car, including (i) all lease payments, (ii) gasoline purchases, (iii) insurance, and (iv) even car washes.  Not only does Mr. Riccio use the car, in substantial part, for Port Authority activities underlined unrelated to the ferry, but he also uses it, in part, for personal use.  (Ex. 28, pp. 119-20; Riccio dep. 124:1 to 127:21.)

(e)    **Cartech expenses**.  The Port Authority's audited financial statements contain a separate category for costs incurred in connection with Cartech (*e.g.*, Ex. 10, p. 3; Ex. 9. p. 3).  None of these expenses is related to ferry operations.

(f)    **Contributions**.  The Port Authority has made and continues to make cash contributions to various entities of its own choosing, funding such contributions from its operating funds (*e.g.*, Ex. 1, p. 3 [$31,113]; Ex. 10, p. 3 [$4,050]; Riccio dep. 200:3 to 204:1; Ex. 51).

(g)    **Sports tickets**.  The Port Authority purchases season tickets to the Bridgeport minor league baseball and ice hockey teams, funding such contributions from its operating funds (Ex. 43, p. 2, ¶ 2; Ex. 49; Riccio dep. 297:11-18).

**The Port Authority's Computations of its Net
Operating Income from the Water Street Dock**

48.    In 1993, the Port Authority and the City entered into a Property Management Agreement concerning the transfer of the Water Street Dock (then known as the Union Street Dock) from the City to the Port Authority (Ex. 12).  Paragraph 5 of that agreement requires the Port Authority to pay the City "15% of the Net Operating Income relative to the Property [the Water Street Dock]" (*id.* at pp. 4-5).

49.    Each year since 1993, the Port Authority has calculated the amount payable to the City under this provision.  The calculations have been reviewed and approved each year by the Port Authority's outside auditors, Dworkin, Hillman, LaMorte & Sterczala, P.C. ("DHLS").  In making these calculations, the Port Authority's management attempts to determine what is a fair and reasonable allocation of the Port Authority's expenses that relate to the ferryboat operations and the Water Street Dock.  (Ex's 13-22; Verrilli dep. 36:8 to 44-17; 64:20 to 65:23.)

50.    In the first such calculation, in early 1994, the Port Authority's executive director at that time allocated about 50% of the Port Authority's expenses in 1993 to the Water Street Dock, and explained the basis for that allocation in a letter to the City's Director of Finance (Ex. 13).

51.     The calculation attached to that letter shows that, in 1993, the Port Authority collected $261,341 in Tariff proceeds; it had total operating expenses of $200,531; and it allocated $109,704 of its expenses to the Water Street Dock (*id.*).

52.     The Port Authority has continued, each year to date, to allocate about 50% of its operating expenses to the Water Street Dock, with only minor adjustments (Ex's 14-22; Riccio dep. 159:4 to 163:5).

53.     The following chart shows, for each year from 1993 to 2002, the Port Authority's (a) total Tariff revenue, (b) total operating expenses, (c) total of the operating expenses that the Port Authority allocated to Water Street Dock, and (d) the difference between (b) and (c) (source:  Ex's 13-22):

| Year | (a)<br>Tariff Revenue | (b)<br>Total Operating Expenses | (c)<br>Operating Expenses Allocated to Water Street Dock | (d)<br>Difference Between (b) and (c) |
|---|---|---|---|---|
| 1993 | $261,342 | $200,531 | $109,704 | $90,827 |
| 1994 | 449,682 | 351,597 | 172,354 | 179,243 |
| 1995 | 461,396 | 442,531 | 229,149 | 213,382 |
| 1996 | 649,015 | 600,525 | 361,979 | 238,546 |
| 1997 | 678,134 | 532,737 | 307,429 | 225,308 |
| 1998 | 712,190 | 671,289 | 433,338 | 227,951 |
| 1999 | 804,287 | 768,975 | 508,339 | 260,636 |
| 2000 | 901,518 | 866,215 | 571,166 | 295,049 |
| 2001 | 947,591 | 884,326 | 580,283 | 304,043 |
| 2002 | 984,926 | 1,131,834 | 717,997 | 413,837 |

54.     The total expenses allocated to the Water Street Dock for most years are more than 50% of the total operating expenses because the Port Authority allocated more than 50% to the Water Street Dock with respect to certain expense categories, *e.g.*, "contributions" and "legal and accounting" (Ex's 13-22).

55.     The Port Authority provides no services to the ferry operation at any location other than the Water Street Dock (Verrilli dep. 36:4-7; Hall).

56.     The Port Authority's own audited calculations show that, each year, the Tariff proceeds have greatly exceeded the expenses that the Port Authority allocated to the Water Street Dock.

57.     Some of the operating costs that the Port Authority incurs at the Water Street Dock do not relate to and do not confer a benefit to the ferry operation (*see* ¶¶ 35 above). Therefore, the portion of the Port Authority's operating expenses that relate to or confer a benefit to the ferry operation is lower than that allocated by the Port Authority to the Water Street Dock.

58.     For purposes of this motion and hearing, it is not necessary to establish with precision the amount by which Tariff collections have exceeded the Port Authority's expenses that relate to or confer a benefit to the ferry operation. It is sufficient to show, as the evidence shows, that Tariff collections consistently have exceeded such costs by very substantial amounts.

59.     As the Tariff, at the existing rate as increased in 2003, is excessive in relation to the cost of the facilities and services that the Port Authority provides to the ferry operation, it follows that the Surcharge – which would increase Tariff proceeds by about 33 percent (an annual increase of about $425,000 on top of the approximately $1.3 million collected in 2003) – also is excessive.

{NY020706.1}                                    - 20 -