**Effect of the Surcharge on Passengers and the Ferry Company**

60.     The Surcharge, if implemented, would have an immediate and adverse effect on the Ferry Company and its passengers (Hall).

61.     First, the Surcharge would increase the overall cost of each ticket, by 50 cents. The increase would apply equally, and therefore disproportionately, to all ticket categories. For example, the cost to an "auto and driver," currently $37.75 for the fare plus the existing $2 Tariff, or $39.75 in total, would rise to $40.25. The cost to a "child foot passenger," currently $6.40 for the fare plus the existing 60-cent Tariff, or $7.00 in total, would rise to $7.50. The Surcharge thus represents a Tariff increase of 25% to an auto and driver (from $2.00 to $2.50), and an 83% increase to a child foot passenger (from 60 cents to $1.10).

62.     Second, the existing fares and Tariffs have been published in a widely disseminated schedule, which states that it is effective from October 14, 2003 through May 20, 2004 (Ex. 50). The Surcharge would change the published rates. Many passengers purchase their tickets and pay for them in advance. Requiring such passengers to pay an additional 50 cents, after they have pre-paid the full cost, would seriously inconvenience the Ferry Company and such passengers, engender ill will, and inevitably lead to the loss of some customers.

63.     Third, if the Court determined that the Surcharge is illegal, after the Ferry Company started collecting it, it would be logistically and economically impossible for the Ferry Company or the Port Authority to return the 50 cents to each of the passengers who paid for it.

64.     Fourth, if the Court determined that the Surcharge is illegal, after the Ferry Company started collecting it, the Port Authority would be unable to refund the amounts collected to the Ferry Company or its passengers (*see* ¶¶ 65-72 below).

{NY020706.1}

- 21 -

**Port Authority's Inability to Pay Damages**

65.    In the Connecticut Post article of February 14, 2004, Mr. Riccio was correctly quoted as saying that the Surcharge ". . . is a matter of survival for the Bridgeport Port Authority" (Ex. 34; Riccio dep. 42:19 to 43:7).

66.    If it does not collect the Surcharge, the Port Authority will be unable to pay its obligations as they come due (Riccio dep. 43:15 to 44:1).

67.    Although it is an agency of the City of Bridgeport, the Port Authority has not asked the City of Bridgeport for financial assistance to enable the Port Authority to pay its legal costs in this case or to pay other of its expenses (Riccio dep. 44:11 to 45:7; 46:2-9).

68.    The Port Authority has not considered raising funds to pay for the legal cost of this action from any sources other than the Tariff (Riccio dep. 46:2 to 47:19).

69.    If the Court determined that Tariff collections in past years have been excessive, in whole or in substantial part, and the Court ordered the Port Authority to pay damages in the amount of the excessive collections, the Port Authority would be unable to pay such a judgment (Riccio dep. 43:2-10; 54:2-13).  Plaintiffs contend that the amount of the excess Tariff collections reaches well into the millions of dollars (*see* chart at ¶ 53 above).

70.    According to the audited financial statements of the Port Authority, the Port Authority is indebted to the City of Bridgeport, in respect of the Cartech acquisition, in the amount of $2.7 million.  However, after litigation over the price payable to the former owner of the Cartech property, in connection with its acquisition by condemnation by the Port Authority, the acquisition price was established at about $11 million.  The City has paid the full acquisition price and has demanded that the Port Authority give the City a promissory note for $11 million, to replace the existing $2.7 million note.  (Ex. 10, p. 7, Note 2)

71.     The Port Authority would be unable to provide the City an $11 million note.  The Executive Director of the Port Authority has stated that, if the City insisted on the Port Authority providing such a note, the Port Authority would not do it, but instead, would relinquish the Cartech property to the City.  (Riccio dep. 98:3-18.)

72.     The audited annual financial statements of the Port Authority state that "Substantially all tariff revenues were generated from one user of the port facility [the Ferry Company] and the loss of this customer would significantly affect the operations of the authority" (*e.g.*, Ex. 12, p. 12, Note 12).  Therefore, a significant reduction in Tariff revenue, which would occur if the Court determines that the Tariff is substantially excessive, would also significantly affect the operations of the Port Authority.

73.     Thus, the Port Authority is insolvent now, and would be unable to pay a judgment for money damages in respect of either (a) the Surcharge, or (b) the Tariff.

## II.       PROPOSED CONCLUSIONS OF LAW

A.     Standard for Issuance of Preliminary Injunction

1.     Generally, "[a] preliminary injunction may be granted only when the party seeking the injunction establishes that '1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.'" Statharos v. N.Y. City Taxi & Limousine Comm'n, 198 F.3d 317, 321 (2d Cir. 1999).

2.     When a plaintiff seeks to enjoin a governmental action taken in the public interest pursuant to a statutory or regulatory scheme, plaintiff must show irreparable injury and

likelihood of success on the merits.  <u>Fair Housing in Huntington Committee, Inc. v. Town of Huntington</u>, 316 F.3d 357, 365 (2d Cir. 2003).

      3.      Therefore, in order for the Court to issue a preliminary injunction enjoining implementation of the Surcharge, plaintiffs must demonstrate (1) irreparable injury, and (2) a likelihood of success on the merits.[5]

**B.**      <u>**Likelihood of Success on the Merits**</u>

      4.      Plaintiffs have alleged claims under a federal statute, several clauses of the United States Constitution, and Connecticut statutory and common law.  As liability under the federal claims is established, there is no need to discuss the pendent state law claims in connection with this request for a preliminary injunction.

<u>**The Rivers and Harbors Act**</u>

      5.      In Claim I of the Amended Complaint, plaintiffs allege that the Tariff violates the Rivers and Harbors Appropriation Act of 1884, as amended, 33 U.S.C. § 5(b).  That subsection provides:

> (b)      No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for --
>
> (1)      fees charged under section 208 of the Water Resources Development Act of 1986 (33 U.S.C. 2236);
>
> (2)      <u>reasonable fees charged on a fair and equitable basis that --</u>

---

[5]    Although the Tariff and Surcharge clearly are "governmental action," plaintiffs dispute that the Port Authority has imposed them "in the public interest" or "pursuant to a statutory or regulatory scheme."  Nevertheless, for purposes of this request for a preliminary injunction, plaintiffs assume that the higher standard applicable to governmental action applies.

      (A)    <u>are used solely to pay the cost of a service to the vessel or water craft;</u>

      (B)    enhance the safety and efficiency of interstate and foreign commerce; and

      (C)    do not impose more than a small burden on interstate or foreign commerce; or

    (3)    property taxes on vessels or watercraft, other than vessels or watercraft that are primarily engaged in foreign commerce if those taxes are permissible under the United States Constitution.

6.    The Ferry Company operates its ferries only on the Long Island Sound and the harbors of Bridgeport, Connecticut and Port Jefferson, Long Island, all of which are navigable waters subject to the authority of the United States and under the right to freedom of navigation on those waters. *See* <u>Weaver v. Hollywood Casino-Aurora, Inc.</u>, 255 F.3d 379, 382-85 (7th Cir. 2001) (discussion of what constitutes "navigable waters").

7.    The Tariff is not imposed under section 208 of the Water Resources Development Act of 1986, 33 U.S.C. 2236, and it is not a property tax on vessels. Therefore, the Tariff must comply with § 5(b)(2).

8.    Section 5(b)(2) requires that any fees imposed on the Ferry Company or its passengers <u>both</u> (a) "be reasonable fees charged on a fair and equitable basis," <u>and</u> (b) satisfy <u>each</u> of the three elements stated in subsections (A) through (C).

9.    Plaintiffs have presented compelling evidence that the Tariff amounts collected in the past and currently being collected by the Port Authority (a) do not constitute reasonable fees charged on a fair and equitable basis; and (b) are not used solely to pay the cost of services provided to the Ferry Company's vessels or the ferry passengers.

10.    Plaintiffs thus are likely to succeed in proving that the Tariff, and therefore the Surcharge, violate the Rivers and Harbors Appropriation Act of 1884, as amended, 33 U.S.C. § 5(b).

**The Commerce Clause**

11.    In Claim II of the Amended Complaint, plaintiffs allege that the Tariff violates the Commerce Clause of the United States Constitution, U.S. Const., art. I, § 8, clause 3, which provides in relevant part: "The Congress shall have Power … To regulate Commerce among the several States . . . ."

12.    In order to comply with the Commerce Clause, a tax or fee imposed by a state or subdivision thereof must, among other requirements, (a) not discriminate against interstate commerce, and (b) be "fairly related to the services provided by the State." Oklahoma Tax Com'n v. Jefferson Lines, Inc., 514 U.S. 175, 183, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (*emphasis added*).

13.    Plaintiffs have presented compelling evidence that the Tariff amounts collected by the Port Authority are not fairly related to the services that the Port Authority has provided and provides to Ferry Company or its passengers.

14.    Plaintiffs therefore are likely to succeed in proving that the Tariff, and therefore the Surcharge, are excessive and otherwise violate the Commerce Clause of United States Constitution.

**Right to Travel**

15.    In Claim III of the Amended Complaint, plaintiffs allege that the Tariff violates the right to travel, which is a fundamental right under the Commerce Clause of the United States Constitution, U.S. Const., art. I,  § 8, clause 3, and/or under the Privileges and Immunities

Clause, U.S. Const., Amend. XIV, § 1.  *See* <u>Evansville-Vanderburgh Airport Authority v. Delta</u> <u>Airlines, Inc.</u>, 405 U.S. 707, 723-24 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) (Douglas, J., *dissenting*) (discussing nature and source of constitutional right to travel).

      16.    A head tax or similar charge imposed on passengers engaged in interstate travel violates their right to travel if it (a) discriminates against interstate commerce, (b) is not based upon a fair approximation of use, or (c) <u>is excessive in relation to the cost to the government of</u> <u>the benefits conferred</u>.  <u>Evansville-Vanderburgh Airport Authority v. Delta Airlines, Inc.</u>, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).[6]

      17.    Plaintiffs have presented compelling evidence that the Tariff amounts collected and being collected by the Port Authority are excessive in relation to the cost to the Port Authority of the benefits conferred to the Ferry Company or its passengers.

      18.    Plaintiffs therefore are likely to succeed in proving that the Tariff, and therefore the Surcharge, violate the right to travel, which is a fundamental right as well as a privilege and immunity of national citizenship under the United States Constitution.

**The Tonnage Clause**

      19.    In Claim IV of the Amended Complaint, plaintiffs allege that the Tariff violates the Tonnage Clause of the United States Constitution, U.S. Const., art. I, § 10, clause 3, which provides in relevant part:  "No State shall, without the Consent of Congress, lay any Duty of Tonnage . . . ."

---

[6]    <u>Evansville-Vanderburgh</u> was superseded by the Anti Head Tax Act, 49 USC App. § 1513, but only as to air passengers.  It continues to be cited in other contexts, *e.g.*, <u>Commonwealth Edison Co. v. Montana</u>, 453 U.S. 609, n.12, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) ("user charges," as distinguished from general revenue taxes, must be proportionate to the services rendered).

20.    The constitutional prohibition against tonnage duties embraces all taxes and duties regardless of their name or form, even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port. Clyde Mallory Lines v. State of Alabama ex rel. State Docks Commission, 296 U.S. 261, 265-66, 56 S.Ct. 194, 80 L.Ed. 215 (1935).

21.    The Tariff constitutes a charge for the privilege of entering, trading in, or lying in a port and, thus, is a duty of tonnage.

22.    A tonnage duty may be permissible under the Tonnage Clause only to the extent that (a) the proceeds of such duty are used for services rendered to and enjoyed by the vessel, such as pilotage, (b) such services enhance the safety and efficiency of interstate commerce, and (c) the duty places at most a small burden on interstate commerce. Clyde Mallory Lines v. State of Alabama ex rel. State Docks Commission, 296 U.S. 261, 265-66, 56 S.Ct. 194, 80 L.Ed. 215 (1935).

23.    Plaintiffs have presented compelling evidence that the Tariff proceeds greatly exceed the value of the facilities and services rendered to and enjoyed by the Ferry Company or its passengers.

24.    Plaintiffs therefore are likely to succeed in proving that the Tariff, and therefore the Surcharge, violate the Tonnage Clause of United States Constitution.

**The Shipping Act**

25.    The Shipping Act of 1916, 46 U.S.C. § 1701 *et seq.* (the "Shipping Act") prohibits a "marine terminal operator" from enforcing unreasonable regulations and practices and from imposing any undue or unreasonable prejudice or disadvantage with respect to any person. 46 U.S.C.A.§ 1709(d)(1), (4).

26.     In determining whether a tariff or other charge imposed by a marine terminal operator violates the Shipping Act, "[t]he proper inquiry . . . is, in a word, whether the charge levied is reasonably related to the service rendered." Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 282, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

27.     Plaintiffs have not alleged a claim under the Shipping Act because, they contend, the Shipping Act only covers activities involving international shipping, and the Port Authority is not a "marine terminal operator" as defined in the Shipping Act. See 46 U.S.C. App. § 1702(14) (definition of "marine terminal operator"), and § 1702(6) (definition of "common carrier"). See also Plaintiffs' Memorandum in Opposition to Motion to Dismiss or Stay, filed June 23, 2003 (Court Docket # 20), at pp. 6-15. The Port Authority contends, to the contrary, that it is a "marine terminal operator" within the meaning of the Shipping Act, over which the Federal Maritime Commission ("FMC") has jurisdiction, and to which this Court should defer, as a matter of discretion, under the doctrine of primary jurisdiction. See Memorandum of Law in Support of Motion to Dismiss or Stay, filed May 8, 2003 (Court Docket # 13).

28.     The Court need not resolve this dispute for purposes of this motion. Even if the Port Authority were a marine terminal operator, and thus subject to the Shipping Act, the test of whether its Tariff is legal, under Volkswagenwerk, is materially the same as that under the Rivers and Harbors Act and the constitutional clauses discussed above, namely, whether the amount of the Tariff is reasonably related to the cost of the facilities and services that the Port Authority actually provides to the ferry operation.

29.     Therefore, even if the Shipping Act applied in this case, the Tariff would also be illegal under that act.

**The Fifth Amendment and Limits on Agency User Fees**

30.     The last clause of the Fifth Amendment to the United States Constitution states:
"nor shall private property be taken for public use, without just compensation."

31.     The Supreme Court has consistently held that, under that clause, user fees must
amount to a "fair approximation of the cost of the benefits supplied." Massachusetts v. United
States, 435 U.S. 444, 463, n.19, 89 S.Ct. 1153,1165, n. 19, 55 L.Ed. 2d 403 (1978). *See also*
United States v. Sperry Corporation, 493 S.Ct 52, 60, 110 S.Ct. 387, 394, 107 L.Ed. 2d 290
(1989).

32.     As the Supreme Court has stated, in words that are starkly applicable to this case:

> The Fifth Amendment's guarantee that private property shall not be taken
> for public use without just compensation was designed to bar Government
> from forcing some people alone to bear public burdens which, in all
> fairness and justice, should be borne by the public as a whole.

Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)
(*emphasis added*).

33.     Thus, it is an unconstitutional "taking" for a government to exact a user fee in
excess of the cost of the benefits supplied and to retain or use the excess to fund unrelated
expenses.  FCC v. Florida Power Corp., 480 U.S. 245, 253, 107 S.Ct. 1107, 1113, 94 L.Ed.2d
282 (1987); Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66
L.Ed.2d 358 (1980).

34.     The Port Authority claims that its activities unrelated to the ferry benefit society
as a whole, and therefore benefit the ferry passengers (*see* n.2 at p. 7 above).  That position, far
from justifying the Tariff, is legally (as well as logically) untenable.  A user fee may be imposed
by a government agency only to recoup the cost of the benefits it provides to the user; it may not
be imposed for the purpose of funding projects for the benefit of the community at large.

{NY020706.1 }                                    - 30 -

National Cable Television Association, Inc. v. U.S., 415 U.S. 336, 340-41, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974). "[F]ees cannot be charged based on a perceived furthering of public policy goals if those fees are unrelated to a specific service provided by the agency to an identifiable recipient." Seafarers International Union of North America v. United States Coast Guard, 81 F.3d 179, 183 (Cir. D.C. 1996).

35.     The Tariff proceeds in this case greatly exceed the cost of the facilities and services that the Port Authority provides to the ferry and its passengers. Therefore, the Tariff constitutes both an illegal taking under the Fifth Amendment and an illegal agency user fee.

C.     **Irreparable Harm**

36.     Monetary damages alone generally do not constitute irreparable injury. Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 974-75 (2d Cir.1989). However, because an insolvent defendant would be unable to pay monetary damages, "courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents." Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 250 (2d Cir. 1999), *citing* American Hosp. Supply Corp. v. Hospital Prods. Ltd., 708 F.2d 589, 594 (7th Cir. 1971).

37.     The Port Authority has admitted that:

(a)     If it could not impose the Surcharge, it would be unable to pay its debts as they come due;

(b)     If it collected the Surcharge and the Court then determined that it was illegal, it would be unable to repay it; and

(c)     If the Court determined that Tariff collections have been excessive, and ordered the Port Authority to pay damages in the amount of the excess, it would be unable to pay such a judgment.

38.     The evidence also shows that, if the Ferry Company or the Port Authority collected the Surcharge and the Court later determined that it was illegal, neither the Ferry Company nor the Port Authority would be able to return the fund to the ferry passengers who paid the Surcharge.

39.     Collection of the Surcharge, particularly for passengers who have prepaid for their tickets based on the published schedule of rates, also is likely to cause delay, confusion and ill will among passengers, and to cause the Ferry Company to lose some customers.

40.     The above circumstances all constitute irreparable harm to the plaintiffs.

41.     Thus, plaintiffs have demonstrated that they are likely to succeed in proving that (a) the Tariff and the Surcharge are excessive and violate federal law and the United States Constitution; and (b) if implementation of the Surcharge is not preliminarily enjoined pending the outcome of this action, plaintiffs will be irreparably harmed.

C.      **WITNESSES AND SUMMARY OF THEIR ANTICIPATED TESTIMONY**

1.      **Joseph Verrilli**

Mr. Verilli is a principal at DHLS. The Port Authority's outside auditors. Mr. Verilli is expected to testify as follows:

(a)     DHLS has audited the annual financial statements of the Port Authority from 1993 to the present.

(b)     Exhibits 1 through 10 are the audited annual financial statements of the Port Authority for the years 1993 through 2002, respectively.

(c)     The audited financial statements of the Port Authority for the year ended December 31, 2003, have not yet been issued.

(d)     DHLS reviewed the 1993 agreement between the City of Bridgeport and the Port Authority (Ex. 11), including paragraph 5 thereof, which requires the Port Authority to pay to the City 15% of the Port Authority's net operating income from the Water Street Dock.

(e)     In connection with its audit of the 1993 financial statements, DHLS reviewed the Port Authority's calculation of the amount due to the City with respect to that year, as well as the Port Authority's explanation for the way in which that amount was calculated (Ex. 12).

(f)     In connection with its audit of the annual financial statements of the Port Authority from 1994 through 2002, DHLS prepared and approved the calculation of the amount due to the City each year.  Exhibits 13 through 21 are such calculations for the years 1994 through 2002 respectively.

(g)     The Port Authority provides no services to the ferry at any location other than the Water Street Dock.

(h)     In calculating the amount due to the City each year, the Port Authority's management attempts to determine what is a fair and reasonable allocation of the Port Authority's expenses that relate to the ferryboat operations and the Water Street Dock.

2.     **Michael Freimuth**

Mr. Freimuth was a Commissioner of the Port Authority from its inception in 1993 until September 2003, and he was also, during that period, Director of Economic Development for the City of Bridgeport.  Mr. Freimuth is expected to testify as follows:

(a)     The following activities and projects in which the Port Authority has been involved, and to which the Port Authority has devoted resources, do not relate to the

{NY020706.1 }                                         - 33 -

operation of the Bridgeport Port Jefferson ferry: (i) the acquisition and development of the Cartech property (now known as the BRMC); (ii) the development of and other activities relating to the Steel Point peninsula; (iii) the barge feeder project; (iv) the high speed ferry project; (v) the Foreign Trade Zones project.

      (b)     The Port Authority provides no services to the ferry at any location other than the Water Street Dock.

3.    **Joseph Riccio**

Mr. Riccio has been Executive Director of the Port Authority since 1996. Mr. Riccio is expected to testify as follows:

      (a)     Physical description of Ferry Terminal and portions accessible to public.

      (b)     The Port Authority is required to provide facilities and services to the Ferry Company, at the Water Street Dock and the Ferry Terminal, under the Current Lease.

      (c)     The Port Authority is required to provide facilities and services to Concessions, at the Ferry Terminal, under the Food Services Lease.

      (d)     The Port Authority has collected fees for use of the Water Street Dock, from vessels other than the Ferry Company's boats, on very few occasions, and in very small amounts.

      (e)     The article in the February 14, 2004 Connecticut Post accurately quoted Mr. Riccio.

      (f)     The major projects and activities that the Port Authority has undertaken that relate to the Ferry are (i) construction of the Ferry Terminal, (ii) repairs to the dock, (iii) plans for a parking garage, (iv) construction of a secondary access road, and (v) day-

to-day maintenance of the Ferry Terminal and Water Street Dock. The capital costs for the construction and repair projects have been financed by government grants (except for about $200,000 that the Port Authority spent on the Ferry Terminal due to construction overruns). (*See also* Section I, ¶ 34 above.)

      (g)     The major projects and activities that the Port Authority has undertaken that do <u>not</u> relate to the Ferry are (i) acquisition of the Cartech property (now known as the BRMC), (ii) development of the Cartech property, (iii) development of Derecktor Shipyards, (iv) the Steel Point redevelopment project, (v) the high speed ferry project, (vi) the barge feeder project, (vii) the Foreign Trade Zones project, (viii) dredging of the harbor, and (ix) operation of the pump-out boat. Capital costs for these projects have been funded mostly, but not entirely, from government grants. The Port Authority has devoted substantial amounts staff time and other resources in connection with each of these projects. Several of these projects are ongoing. (*See also* Section I, ¶¶ 35-36 above.)

      (h)     Ferry passengers benefit from Port Authority activities <u>not</u> related to the ferry only to the extent that such activities improve commerce and infrastructure in the Bridgeport area and thereby benefit <u>the community at large</u>.

      (i)     Mr. Riccio has not kept track of the time he has spent on various projects; has not allocated his time between projects related to and not related to the ferry; and cannot estimate how much time, or percentage of time, he has spent on each.

      (j)     Mr. Riccio has spent significant time reviewing matters unrelated to the ferry that have been presented at Board of Commissioners meetings and deciding whether to recommend their approval.

(k)     The Port Authority has not charged rent to either the Harbormaster or the CWTA for the office space that each occupies on the second floor of the Ferry Terminal, or for the utilities and supplies of the Port Authority that they use.

(l)     The Port Authority provides no services to the ferry at any location other than the Water Street Dock.

(m)     If it does not collect the Surcharge, the Port Authority will be unable to meet its obligations as they come due.

(n)     The Port Authority has not asked the City of Bridgeport for financial assistance to enable the Port Authority to pay its legal costs in this case or to pay other of its expenses.

(o)     The Port Authority has not considered raising funds to pay for the legal cost of this action from any sources other than the Tariff.

(p)     The Port Authority would be unable to pay a judgment for return of past Tariff collections to the extent that they were determined to have been excessive.

(q)     If the City insisted on the Port Authority giving it a note for $11 million, in connection with the Cartech acquisition, the Port Authority would not do it, but instead, would relinquish the Cartech property to the City.

4.     **Martha Klimas**

Ms. Klimas has been employed by the Port Authority as a government grants specialist since 1998. Ms. Klimas is expected to testify as follows:

(a)     Ms. Klimas has worked on each of the projects and activities that do not relate to the ferry operation (*see* Section I, ¶ 35 above).

(b)    Ms. Klimas, like Mr. Riccio, has not kept track of the time she has spent on various projects; has not allocated her time between projects related to and not related to the ferry; and cannot estimate how much time, or percentage of time, she has spent on each.

5.    **Frederick Hall**

Mr. Hall has been employed by the Ferry Company since 1976 and has been its Vice President and General Manager since 1985.  Mr. Hall is expected to testify as follows:

(a)    Nature and history of Bridgeport Port Jefferson ferry service, generally.

(b)    Procedure for collecting Tariff (*see* Section I, ¶ 19 above).

(c)    The Port Authority provides facilities and services to the ferry operation only at the Water Street Dock.

(d)    The Surcharge would raise Tariff collections by approximately $425,000 per year.

(e)    The Surcharge, if implemented, would have an immediate and adverse effect on the Ferry Company and its passengers.

(f)    Some passengers purchase ferry tickets in advance.  Collection of the Surcharge would cause disruption, ill will and loss of customers.

(g)    It would be logistically and economically impossible to refund the Surcharge, if it were declared illegal, to passengers who had already paid it.

## D.    LIST OF EXHIBITS

| Hearing Ex. No. | Description of Exhibit | | Other Reference No. |
|---|---|---|---|
| 1. | Audited financial statements of the Port Authority, 1993 | | Dep. Ex. 504 |
| 2. | Audited financial statements of the Port Authority, 1994 | | Dep. Ex. 505 |
| 3. | Audited financial statements of the Port Authority, 1995 | | Dep. Ex. 506 |
| 4. | Audited financial statements of the Port Authority, 1996 | | Dep. Ex. 507 |
| 5. | Audited financial statements of the Port Authority, 1997 | | Dep. Ex. 508 |
| 6. | Audited financial statements of the Port Authority, 1998 | | Dep. Ex. 509 |
| 7. | Audited financial statements of the Port Authority, 1999 | | Dep. Ex. 510 |
| 8. | Audited financial statements of the Port Authority, 2000 | | Dep. Ex. 511 |
| 9. | Audited financial statements of the Port Authority, 2001 | | Dep. Ex. 512 |
| 10. | Audited financial statements of the Port Authority, 2002 | | Dep. Ex. 513 |
| 11. | Compilation of audited income statements, 1993-2002 (Source: Ex's 1-10) | | |
| 12. | Cover letter dated February 4, 1993 and attached Property Management Agreement | | Dep. Ex. 516 |
| 13. | Letter dated February 25, 1994, from Edward Oppel Jerry Baron, with attachment | | Dep. Ex. 517 |
| 14. | 1994 Net Operating Income from Union Square Dock | | Dep. Ex. 519 |
| 15. | 1995 Net Operating Income from Union Square Dock | | Dep. Ex. 520 |
| 16. | 1996 Net Operating Income from Union Square Dock | | Dep. Ex. 521 |
| 17. | 1997 Net Operating Income from Union Square Dock | | Dep. Ex. 522 |
| 18. | 1998 Net Operating Income from Union Square Dock | | Dep. Ex. 523 |
| 19. | 1999 Net Operating Income from Union Square Dock | | Dep. Ex. 525 |
| 20. | 2000 Net Operating Income from Union Square Dock | | Dep. Ex. 526 |

{NY020706.1}

| 21. | 2001 Net Operating Income from Union Square Dock | Dep. Ex. 527 |
|-----|--------------------------------------------------|--------------|
| 22. | 2002 Net Operating Income from Union Square Dock | Dep. Ex. 528 |
| 23. | Appraisal of Ferry Terminal, 1997 | BPJ 868-95 |
| 24. | Lease between Port Authority and Ferry Company, 1998 | Dep. Ex. 563 |
| 25. | First amendment to lease between Port Authority and Ferry Company, 2002 | Dep. Ex. 564 |
| 26. | Food Services Lease between Port Authority and Concessions | Dep. Ex. 565 |
| 27. | Memorandum of Understanding, dated February 21, 2003 | BPA 81-82 |
| 28. | General ledger of Port Authority as of December 31, 2003 | Dep. Ex. 567 |
| 29. | Terminal Tariff for the Port of Bridgeport, CT | Ex. C to Riccio 4/24/03 Decl. |
| 30. | Port Authority's responses to plaintiffs' first document request, dated September 4, 2003 | |
| 31. | Port Authority records of fees collected from other vessels | BPA 317-21 |
| 32. | Letter dated December 10, 2002, from Joseph Riccio to Frederick Hall | BPA 434-35 |
| 33. | Letter dated February 10, 2004, from Joseph Riccio to Frederick Hall | Dep. Ex. 561 |
| 34. | Article in Connecticut Post, February 14, 2004 | Dep. Ex. 562 |
| 35. | Minutes of meeting of Board of Commissioners, June 27, 2002 | BPA 369-73 |
| 36. | Minutes of meeting of Board of Commissioners, April 25, 2002 | Dep. Ex. 574 |
| 37. | Minutes of meeting of Board of Commissioners, March 14, 2002 | Dep. Ex. 575 |
| 38. | Minutes of meeting of Board of Commissioners, June 21, 2001 | BPA 392-96 |
| 39. | Minutes of meeting of Board of Commissioners, Nov. 21, 2000 | BPA 403-06 |
| 40. | Minutes of meeting of Board of Commissioners, May 20, 1999 | Dep. Ex. 577 |
| 41. | Minutes of meeting of Board of Commissioners, March 18, 1999 | BPA 470-74 |

| 42. | | Minutes of meeting of Board of Commissioners, Jan. 23, 1998 | BPA 507-12 |
|---|---|---|---|
| 43. | | Minutes of meeting of Board of Commissioners, Oct. 23, 1997 | BPA 513-16 |
| 44. | | Minutes of meeting of Board of Commissioners, Sept. 12, 1996 | Dep. Ex. 571 |
| 45. | | Minutes of meeting of Board of Commissioners, Sept. 14, 1995 | Dep. Ex. 572 |
| 46. | | Ground Lease Agreement between the Port Authority and Derecktor Shipyards | Dep. Ex. 568 |
| 47. | | Port Connecticut 1994, selected pages (showing Port Authority advertisement and article at pp. 6-20) | |
| 48. | | Port Connecticut 1994, selected pages (showing Port Authority advertisement and article at p. 9) | |
| 49. | | 2003 Season Ticket Renewal Form/Contract | Dep. Ex. 540 |
| 50. | | Current Bridgeport Port Jefferson ferry schedule and rate card | Dep. Ex. 9 |
| 51. | | Partial list of Port Authority donations | Dep. Ex. 569 |
| 52. | | Selected pages of transcript of deposition of Joseph Verrilli | |
| 53. | | Selected pages of transcript of deposition of Joseph Riccio | |
| 54. | | Selected pages of transcript of deposition of Martha Klimas | |
| 55. | | Selected pages of transcript of deposition of Michael Freimuth | |
| 56. | | Selected pages of transcript of deposition of Gregory Rose | |
| 57. | | Selected pages of transcript of deposition of Frank Zahradka | |

Dated: March 17, 2004

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, FRANK C.
ZAHRADKA and GREGORY C. ROSE,
*Plaintiffs*

By: _Stewart I Edelstein_

Martin Domb, Federal Bar No. ct 09544
E-mail: mdomb@hillbetts.com
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

Jonathan S. Bowman, Federal Bar No. ct 08526
E-mail: jbowman@cohenandwolf.com
Stewart I. Edelstein, Federal Bar No. ct 06021
E-mail: sedelstein@cohenandwolf.com
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2004, a copy of the foregoing was served upon the following, as follows: (a) upon Mr. Roberts, by hand before 5:00 p.m., and (b) upon the other counsel, by e-mail and overnight mail:

John W. Roberts. Esq.
Roberts, Rose & Bates, P.C.
17 Hoyt Street
Stamford, CT 06905

Edward J. Sheppard, IV, Esq.
Thompson Coburn
1909 K Street, N.W., Suite 600
Washington, D.C. 20005-2010

Suzanne L. Montgomery, Esq.
Thompson Coburn
One US Bank Plaza
St. Louis, MO 63101

By: _____

Stewart I. Edelstein
(See contact information on prior page)

{NY020706.1}