UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, *et al.*,

Case No. 03-CV-599 (CFD)

2004 MAR 1 ⌣ A 11: 15
U.S. DISTRICT COURT
HARTFORD, CT.

Plaintiffs,

v.

March 17, 2004

BRIDGEPORT PORT AUTHORITY,

Defendant.

_____/

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANT BRIDGEPORT PORT AUTHORITY

COMES NOW Defendant Bridgeport Port Authority (the "Port Authority"), pursuant to the Court's March 4, 2004 Order, and for its Proposed Findings of Fact and Conclusions of Law, states as follows:

### Proposed Findings of Fact

**A.    The Parties**

1.    Plaintiff Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company") is a corporation organized under the laws of Connecticut, with a principal place of business at 102 West Broadway, Port Jefferson, New York 11777.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 1).

2.    The Ferry Company operates a public ferry service for passengers and vehicles between Bridgeport, Connecticut and Port Jefferson, Long Island, New York.  The ferry operates every day throughout the year according to published schedules.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 2).

3.    Brian A. McAllister is the sole shareholder of McAllister Towing and

2284686

Transportation, Inc., which in turn is the sole shareholder of the Ferry Company.  (Ferry Company's Answer to Interrogatory No. 3; Testimony (live or by deposition) of B.A. McAllister).

4.      Fredrick A. Hall is the General Manager and Vice President of the Ferry Company.  (Testimony (live or by deposition) of F. Hall).

5.      Louis Rinaldo is the Manager of Operations of the Ferry Company.  His responsibilities include only the operations in Bridgeport, Connecticut.  (Testimony (live or by deposition) of L. Rinaldo).

6.      Plaintiff Greg Rose is a natural person.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 4).

7.      Plaintiff Frank C. Zahradka is a natural person.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 5).

8.      The Port Authority is a port authority created and existing pursuant to Connecticut law, Conn. Gen. Stat. §§ 7-329a to 7-329u, with a principal place of business at 330 Water Street, Bridgeport, Connecticut 06604.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 6; Bridgeport City Code chap. 2.28).

**B.      The Bridgeport Port Authority**

9.      Although small by comparison to other deep water port facilities on the east coast, the Port of Bridgeport is a significant port of entry for the import of fruits and oil, and is an export point for certain commodities including used vehicles shipped to South and Central America for resale.  (Testimony of J. Savino and/or J. Riccio).

10.      The Port of Bridgeport is situated on the northern side of the Long Island Sound in close proximity to New York City.  (Testimony of J. Savino and/or J. Riccio).

11.     As created by the City of Bridgeport, the purpose of the Port Authority is to:

foster and stimulate the shipment of freight and commerce through the ports of
Bridgeport, Connecticut; to develop and promote part facilities with the district in
order to create jobs, increase the city's tax based and provide special revenues to
the city; to work with the government of the city to maximize the usefulness of
available public funding by consolidating and coordinating private efforts to assist
the city's waterfront and industrial development program, to cooperate with the
state and federal agencies in the maintenance, development, improvement and use
of district harbors, waterways and industrially zoned properties.

(Bridgeport City Code § 2.28.010).

12.     The Port Authority is governed by an unpaid Board of Commissioners: the
director of economic development of the City of Bridgeport, the harbor master of the City, and
three at large members appointed by the mayor and approved by the city council.  (Bridgeport
City Code § 2.28.030).

13.     Joseph C. Savino is currently the harbor master of the City of Bridgeport, and
currently serves as the Chairman of the Board of Commissioners of the Port Authority.
(Testimony of J. Savino).

14.     Day-to-day activities of the Port Authority are directed by Joseph A. Riccio, its
Executive Director, who was hired by and reports to the Board of Commissioners.  Two
administrative staff persons, Martha Klimas and Charmaine Johnson, assist Mr. Riccio in his
day-to-day duties.  (Testimony of J. Riccio, J. Savino and/or M. Klimas).

15.     In the more than 10 years it has existed, the Port Authority has proven to be both
fiscally reliable and responsible.  It is subject to regular audits, both in its regular finances and in
the grants that it administers, and no problem has ever been discovered with its finances.
(Testimony (live or deposition) of J. Verrilli).

16.     As part of its charge from the City of Bridgeport to "to develop and promote part
facilities with the district in order to create jobs" (Bridgeport City Code § 2.28.010), the Port

Authority has made significant improvements to the facilities and services for the Ferry passengers in the Bridgeport harbor. For example, the Port Authority provides security and lighting for the passengers, and is currently working with the federal Transportation Security Administration for the development of a security plan for the Port of Bridgeport. (Testimony of J. Ricco and/or J. Savino).

17.    The Port Authority regularly works with state and federal governmental agencies to provide services and amenities to the companies and persons that use the Port. The Port Authority has applied for and administered numerous monetary grants which it has used over the years to better the Port for the benefit of all who use it. Many of those projects are directed specifically to the passengers on the Ferry. (Testimony of J. Riccio, J. Savino and/or M. Klimas).

18.    One of the Port Authority's earliest projects was a terminal building (the first ever built for the comfort and convenience of the Ferry passengers) which now houses the Port Authority's offices, the offices of the harbormaster and others, and a cafeteria/snack bar and tourist information stand used primarily by persons that work at the Port and the passengers from the Ferry. (Testimony of J. Riccio, J. Savino and/or M. Klimas; photographs Exhibits J, K, M).[1]

19.    Construction of the terminal building was financed at least in part by a grant provided by the U.S. Department of Transportation, Federal Highway Administration, as part of its Ferry Boat Discretionary Program. The Ferry Boat Discretionary Program was established pursuant to federal legislation which authorizes federal funding for the construction of ferry boats and ferry terminal facilities. (Report of Parties' Planning Meeting, Statement of

---

[1]    All exhibits referred to herein are from the Port Authority's preliminary injunction hearing exhibits.

Undisputed Facts ¶ 12).

20.     The terminal building was also funded in part from the Port Authority's general operating budget. (Testimony of J. Riccio, J. Savino and/or M. Klimas).

21.     The Port Authority has also worked with federal and state agencies to receive grant funding for the construction of a secondary access road to the terminal for the Ferry passengers. In addition to the oversight services of its personnel, the Port Authority paid for the design, architectural and engineering fees for the access road. (Testimony of J. Riccio, J. Savino and/or M. Klimas).

22.     At the time this litigation was commenced, the Port Authority was working with the federal Department of Transportation and other agencies on the construction of a modern, multi-level parking facility, primarily for the benefit of walk-on ferry passengers who park their vehicles in Bridgeport. In 1999 the Port Authority received 19% of the federal government's grant budget ($3,550,700) for the Federal Highway Administration for the construction of the parking facility. (Testimony of J. Savino, J. Ricco and/or M. Klimas).

23.     The Ferry Company currently has no permanent parking in Bridgeport for its walk-on passengers. The temporary arrangement for parking for the passengers will be unusable soon. (Testimony (live or by deposition) of L. Rinaldo and/or F. Hall).

24.     The Port Authority is currently working with the local, state and federal governments for the development of an intermodal transportation facility near the Ferry terminal. As planned, this intermodal facility will put the Amtrack train station, the bus terminal and the Ferry terminal within a localized, concentrated area for the convenience of all transportation passengers in Bridgeport. (Testimony of J. Savino, J. Ricco and/or M. Klimas).

25.     The grants that the Port Authority has received for the development of the

Bridgeport harbor and for the provision of services to the Ferry passengers can only be given to government agencies, such as the Port Authority (such as the Ferry Boat Discretionary Fund and Federal Highway Administration grants). Privately-owned companies such as the Ferry Company are ineligible for these grants. (Testimony of J. Savino, J. Ricco and/or M. Klimas).

26.    The Port Authority has also been responsible for the development of several blighted areas in the Port of Bridgeport. Many of those development projects are currently on-going. For example, on the East side of Bridgeport Harbor (across the harbor from the Ferry terminal), the Port Authority has been instrumental in the planning of the Bridgeport Regional Maritime Complex (the so-called former "Cartech Property"), which when completed will hold many commercial and industrial uses, in an area that sat empty for many years. (Testimony of J. Savino, J. Ricco and/or M. Klimas).

27.    To develop this land, the Port Authority and the City of Bridgeport had to condemn the land. That condemnation involved litigation in this Court, and which resulted in a condemnation award of $11 million. There is currently a dispute between the City of Bridgeport and the Port Authority over who is responsible for the $11 million award. However, that dispute will not impact the Port Authority's finances, because if the City required the Port Authority to pay it, the Port Authority would simply return the property. (Testimony of J. Savino, J. Ricco and/or M. Klimas).

28.    The Ferry Company's assertion that the condemnation dispute with the Cartech property renders the Port Authority insolvent is thus factually incorrect. (Testimony of J. Savino and/or J. Ricco)

29.    The description from Mr. Riccio, the Executive Director of the Port Authority, of the benefits of the development of these blighted is particularly apt:

It's about redeveloping a site that's been environmentally contaminated for twenty years. It speaks of the awful conditions that exist in the city of Bridgeport economically.

And I think those passengers benefit a couple of ways: One, that the city of Bridgeport and its port is developing in a manner that is -- as you see in ports all over the country. And people all over the country know the condition of the city of Bridgeport has the highest effective tax rate in the country. It's the laughingstock of the country. And I think people generally want to see Bridgeport progress. And I think that that's one of the ways it can progress, is developing these parcels of property that are so visible to people from the ferry, from the highway, and the train.

I think we all benefit from the rising tides theory. So the better Bridgeport is, the better people will feel about Bridgeport, and more people will want to come to Bridgeport, and more people will use the ferry.

And secondly, the economic opportunities from these projects, such as the barge service where we're taking trucks off the highway -- and one of the worst links of highway in the entire United States is from northern New Jersey right through Bridgeport, Connecticut. We are alleviating traffic and taking trucks off the highway.

(Deposition Testimony of J. Riccio, Vol. I at 26-28).

### C.     The Bridgeport and Port Jefferson Steamboat Company

30.     The Ferry Company leases dock facilities in Bridgeport at the Water Street Dock pursuant to a lease agreement between the Port Authority and the Ferry Company dated December 1, 1998, as amended by a first amendment to such lease agreement dated July 29, 2002 (the "Current Lease"). (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 7).

31.     Under paragraph 1(a) of the Current Lease, the Port Authority conveys to the Ferry Company "a non-exclusive preferential use" of certain port facilities and related rights. Said paragraph provides in relevant part:

The Port Authority hereby conveys to the [Ferry] Company a nonexclusive preferential use of the dock on the Premises during the times regularly scheduled for arrivals and departures of the [Ferry] Company's ferry boats, for the embarking and debarking of passengers and vehicles between its ferry boats and

the Premises, together with the appurtenant right to permit the [Ferry] Company's
passengers to stage their vehicles in adjacent staging areas owned by the Port
Authority and designated for their use solely while such passengers are waiting to
embark on such regularly scheduled ferry boats . . . .

(Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 8).

32.    The "Premises" which are the subject of the Current Lease are described therein
as follows:

WHEREAS, the Port Authority is the owner of the dock designed for the docking
of vessels and loading and unloading of cargo and passengers, and the shoreline
of premises at 330 Water Street, Bridgeport, Connecticut, known as the Water
Street Dock (the "Premises"); . . . .

(Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 9).

33.    The term of the Current Lease commenced on December 1, 1998, and extends
until November 30, 2011, and may be extended by the Ferry Company for two additional terms
of ten years each.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 15).

34.    The Current Lease requires the Ferry Company to pay rent to the Port Authority at
annual rates in equal monthly installments.  (Report of Parties' Planning Meeting, Statement of
Undisputed Facts ¶ 16).

35.    A restaurant and food services facility is operated in the terminal building by
Steamboat Concessions, Inc. ("Concessions"), a wholly-owned subsidiary of the Ferry Company.
(Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 18; Ferry Company's
Answer to Interrogatory No. 3).

36.    Prior to the creation of the Port Authority, there was little, if any, government
oversight over the Ferry Company's operations in Bridgeport.  Services for Ferry passengers
were non-existent.  The loading ramp (over which passengers drove their vehicles or walked to
board the Ferry) was in a serious state of disrepair.  There was no security.  Access to the Ferry

dock by passengers was difficult and treacherous. (Testimony of J. Riccio, J. Savino and/or B.A. McAllister (live or by deposition)).

37.    Prior to the Port Authority's erection of the terminal building, walk-on Ferry passengers had no shelter from the elements during inclement weather other than a small, three-walled lean-to, which could hold no more than a handful of persons, and had no heat in winter and no air conditioning in summer. (Testimony of J. Riccio, J. Savino and/or B.A. McAllister (live or by deposition)).

38.    In the 11 years since the creation of the Port Authority, the number of passengers have increased significantly. In fact, in the past decade, the Ferry Company has likely seen its best increase in passengers and profits in its history. (Testimony of B.A. McAllister and/or F. Hall (live or by deposition); David Bell Reports, Exhibits R, S, T).

**D.    The Port Authority's Passenger Wharfage Fee**

39.    The Port Authority receives no regular funding from the federal government, the State of Connecticut, or the City of Bridgeport. In addition to state and federal grants that it receives (which it must apply for and which are typically only granted for specific projects), the Port Authority's expenses are financed from a modest passenger wharfage fee that it collects from the Ferry passengers. (Testimony of J. Riccio and/or J. Savino).

40.    Since 1993, the Port Authority has imposed a fee on passengers and vehicles embarking on or disembarking from the Ferry Company's ferries at the Water Street Dock (the "Fee"). (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 20).

41.    This is the second action brought by the Ferry Company against the Port Authority regarding the validity of the Fee. The first action was commenced in Connecticut state court in 1993, and removed to this Court. The removed action was styled *Bridgeport & Port*

*Jefferson Steamboat Company v. Bridgeport Port Authority*, No. 93-CV-745.  This prior litigation terminated in a settlement agreement dated April 8, 1993.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 21).

42.     From the time of the settlement in 1993 until late 2002, the Ferry Company collected the Fee from its passengers on behalf of the Port Authority.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 22).

43.     Since 1993, the Port Authority has paid the Ferry Company more than $200,000 to collect the Fee from its passengers on behalf of the Port Authority.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 23).

44.     The fee that the Port Authority pays to the Ferry Company for collecting the Fee was increased in 2003 by $10,000 per year.  (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 24).

45.     Paragraph 7 of the Current Lease requires the Ferry Company to collect the Fee from ferry passengers and remit the proceeds thereof to the Port Authority.  That paragraph provides in full:

> The [Ferry] Company will continue to act as the agent of the Port Authority in collecting tariff charges imposed upon users of the ferry service under the same terms and conditions as heretofore in effect.

(Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 25).

46.     By letter dated December 10, 2002, the Port Authority informed the Ferry Company that the Port Authority intended to increase the Fee charges as set forth in the table below, and requested that the Ferry Company begin collecting the increased Fee on January 15, 2003:

| Categories | Passenger Wharfage Fee 1996-2002 | Increase | Passenger Wharfage Fee 2003 |
|---|---|---|---|
| Senior citizens and children, walk-on | $0.50 | $0.10 | $0.60 |
| Adult, walk-on | 0.75 | 0.25 | 1.00 |
| Auto including driver | 1.50 | 0.50 | 2.00 |
| Trucks over 25 feet | 2.00 | 0.25 | 2.25 |
| Cars with unlimited passengers | 2.50 | 0.25 | 2.75 |
| Monthly passes | 5.00 | 0.25 | 5.25 |

(Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 27).

47.     At a meeting on February 21, 2003, the Port Authority and the Ferry Company agreed on terms under which the Ferry Company would begin to collect the Fee at the increased rates. (Report of Parties' Planning Meeting, Statement of Undisputed Facts ¶ 29). Since May 2003, the Ferry Company has been collecting the Fee at the increased rates. (Testimony of J. Riccio, J. Savino and/or F. Hall).

48.     The wharfage charge is a substantial portion of the budget for the Port Authority. Without that charge, the Port Authority will be unable to continue providing any services for the Ferry passengers and the other users of the Port of Bridgeport and might be forced out of existence. If the charge is reduced, the services provided by the Port Authority will be significantly reduced. (Testimony of J. Riccio, J. Savino and/or E. Deak).

49.     The wharfage charge imposed by the Port Authority is modest compared to the significant tolls and other charges imposed on commuters that make use of other transportation facilities in the New York City metropolitan area. For example, the tolls on most of the bridges connecting Manhattan to either Long Island or upstate New York are at least $4.00 for a single passenger vehicle going one direction. The passengers on the railroads connecting New York City to these areas are also subject to significant transportation taxes for the benefit of those transportation facilities.

**E.    The Administrative Surcharge**

50.    Most of the Port Authority's operating budget is used to provide services that directly benefit the Ferry passengers and for overhead expenses. The Port Authority did not anticipate the significant costs of this litigation in its projected expenses for 2003 or 2004 (or beyond). The cost of federal court litigation is extremely expensive, and has significantly cut into the Port Authority's budgets for 2003 and 2004. It has come to the point that absent a further influx of funds, the Port Authority will be unable to continue providing any services to the Ferry passengers or the other users of the Port of Bridgeport. It anticipates that its litigation expenses will account for one-third to one-half of its operating budget for 2004. (Testimony of J. Riccio and/or J. Savino).

51.    To offset these expenses, and to continue providing services to the Ferry passengers at the level they have come to expect in the past eleven years, on February 5, 2004, the Board of Commissioners voted unanimously to adopt a temporary administrative surcharge of 50¢ per passenger ticket. (Testimony of J. Riccio and/or J. Savino).

52.    The administrative surcharge was included on the Board of Commissioners' agenda which was submitted to the City Clerk's office for the City of Bridgeport, which is the procedure for all agendas. The Port Authority has amended its Tariff to reflect this temporary increase. (Testimony of J. Riccio and/or J. Savino; Board of Commissioners' Agenda for Feb. 5, 2004, Exhibit B; Port Authority Tariff, Exhibit A).

53.    The Port Authority intends for the administrative surcharge to stay in effect only for a limited time to offset the extraordinary expenses it is currently experiencing, so that there will be no loss or decrease in services to the public that it services. (Testimony of J. Riccio and/or J. Savino).

54.     Neither the Ferry Company nor the individual plaintiffs are harmed by the Port Authority's passenger Fee, nor will they be harmed by the administrative surcharge.  (Testimony of E. Deak).

### Proposed Conclusions of Law

1.     Preliminary injunctive relief is an extraordinary and drastic remedy that should be rarely, if ever, granted.  Plaintiffs bear the burden of establishing that they are entitled to such extraordinary relief.

**B.     Jurisdiction to Rule on Preliminary Injunction Motion**

2.     Before the Court rules on the pending preliminary injunction motion, it must determine if it has subject matter jurisdiction over the claim and the pending motion.  *See, e.g.*, *Scelsa v. City University of N.Y.*, 76 F.3d 37 (2d Cir. 1996) (affirming denial of preliminary injunction motion on basis of lack of subject matter jurisdiction); *Avitts v. Amoco Prod. Co.*, 53 F.3d 690 (5th Cir. 1995) (reversing grant of preliminary injunction because district court lacked subject matter jurisdiction over case).

3.     Pending before the Court is the motion of the Port Authority to dismiss the case for lack of subject matter jurisdiction under the primary jurisdiction doctrine, in deference to the jurisdiction of the Federal Maritime Commission (the "FMC").  If the Court finds that the primary jurisdiction for this matter is within the FMC, it is akin to finding that the Court lacks subject matter jurisdiction over this case.  *See Ocean Logistics Mgmt., Inc. v. NPR, Inc.*, 38 F. Supp. 2d 77, 78 n.1 (D.P.R. 1999).

4.     For the reasons stated in the Port Authority's papers, the Court finds that the primary jurisdiction doctrine does apply and thus finds that it lacks subject matter jurisdiction over this case.  The FMC has significant expertise in the intricate maritime issues presented in

this case, and the Court believes that it should defer to that expertise. *See Plaquemines Port,*
*Harbor & Terminal Dist. v. Federal Mar. Comm'n*, 838 F.2d 536 (D.C. Cir. 1988).

5.     Determining the validity of fees and surcharges imposed by marine terminal
operators such as the Port Authority is at the heart of the FMC's statutory responsibilities.
Congress placed that function in the hands of the FMC to ensure uniformity in the regulation of
such fees.  The FMC routinely and regularly evaluates marine terminal fees, tariffs and
surcharges of all kinds to determine their reasonableness within the meaning of the Shipping Act
of 1984.  *See, e.g., International Packers, Ltd. v. Federal Maritime Comm'n*, 356 F.2d 808 (D.C.
Cir. 1966), *aff'g Imposition of Surcharge on Cargo to Manila, Republic of Philippines*, 8 F.M.C.
395 (1965); *Matson Navigation Co. — Proposed Bunker Surcharge in the Hawaii Trade*, 22
F.M.C. 276 (I.D. 1979), *adopted* 19 S.R.R. 1065 (F.M.C. 1979); *Imposition of Surcharge at*
*United States Atlantic & Gulf Ports on Cargo Moving Between Said Ports and Latin American*
*Ports*, 7 S.R.R. 405 (F.M.C. 1966); *Imposition of Surcharge on Cargo to Manila, Republic of*
*Philippines*, 8 F.M.C. 395 (1965); *Surcharge — Matson Navigation Co.*, 2 U.S.M.C. 622 (1942)
(decision by United States Maritime Commission, predecessor to the FMC).

6.     A premature ruling by the Court on the issue of the validity of the administrative
surcharge would frustrate Congress' desire for uniform regulation in this area by the FMC.  *See,*
*e.g., Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1092 (5th Cir. 1973) (recognizing
importance of uniformity especially in cases involving the reasonableness of rates).  The Court
therefore agrees that this case, including the claim for relief in the Ferry Company's preliminary
injunction papers, should be decided in the first instance by the FMC.

7.     The Court agrees that when primary jurisdiction over a case properly lies within a
federal administrative agency, it is appropriate for the Court to deny Plaintiffs' motion for

preliminary injunctive relief on the grounds that the case should be properly adjudicated within the primary jurisdiction of the FMC. *See, e.g., DeBruce Grain, Inc. v. Union Pac. R.R. Co.*, 149 F.3d 787 (8th Cir. 1998) (affirming denial of motion for preliminary injunction and dismissal on primary jurisdiction grounds in favor of jurisdiction in Surface Transportation Board); *Total Telecommunications Servs., Inc. v. American Tel. & Tel. Co.*, 99 F.3d 448 (D.C. Cir. 1996) (table decision, text available in Westlaw), *aff'g* 919 F. Supp. 472 (D.D.C. 1996) ("Because the [Federal Communications] Commission . . . has primary jurisdiction, it was appropriate for the district court to dismiss the case, without addressing appellants' application for preliminary injunction.") (citations omitted); *Hanna Mining Co. v. Escanaba & Lake Superior R.R. Co.*, 664 F.2d 594, 596-97 (6th Cir. 1981) (affirming denial of preliminary injunction on grounds that district court should defer to primary jurisdiction of Interstate Commerce Commission); *Carter v. American Tel. & Tel. Co.*, 365 F.2d 486 (5th Cir. 1966) (affirming denial of preliminary injunction on grounds that case properly belonged before primary jurisdiction of the Federal Communications Commission); *Digital Communications Network, Inc. v. AT&T Wireless Servs.*, 63 F. Supp. 2d 1194, 1202-03 (C.D. Cal. 1999) (denying request for preliminary injunction on grounds that case belonged in the Federal Communications Commission under its primary jurisdiction); *Railway Labor Executives' Ass'n v. Guilford Transp. Indus., Inc.*, 653 F. Supp. 643 (D. Me. 1987) (denying temporary restraining order because case belonged within the primary jurisdiction of the Interstate Commerce Commission); *Legal Aid Soc'y v. Association of Legal Aid Attorneys of City of N.Y.*, 554 F. Supp. 758, 762-63 (S.D.N.Y. 1982) (denying preliminary injunction because case fell within the primary jurisdiction of the National Labor Relations Board); *Brotherhood of Ry. & Airline Clerks, Consol. System Bd. of Adjustment 46 v. Burlington N. Inc.*, 513 F. Supp. 1023 (D. Minn. 1981) (denying preliminary injunction because to do so

would encroach on the primary, exclusive jurisdiction of the Interstate Commerce Commission); *Greater N.Y. Health Care Facilities Ass'n, Inc. v. Ottley*, 499 F.Supp. 279 (S.D.N.Y. 1980) (vacating order granting preliminary injunction because case belonged within primary jurisdiction of National Labor Relations Board); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO (IAM) v. Compagnie Nationale Air France*, 433 F. Supp. 1087 (S.D.N.Y. 1977) (denying preliminary injunction in favor of primary jurisdiction of National Mediation Board); *Cavanagh Communities Corp. v. New York Stock Exchange, Inc.*, 422 F. Supp. 382 (S.D.N.Y. 1976) (vacating preliminary injunction granted by bankruptcy court because case belonged within the primary jurisdiction of the Securities and Exchange Commission); *United Transp. Union, General Committee of Adjustment, Switchmen-Burlington N., Inc. v. Burlington N., Inc.*, 344 F. Supp. 659 (D. Minn. 1972) (denying preliminary injunction because case should be decided within primary jurisdiction of National Railroad Adjustment Board); *Elgin Coal Co. v. Louisville & Nashville R.R. Co.*, 277 F. Supp. 247 (E.D. Tenn. 1967) (denying temporary restraining order and preliminary injunction in favor of primary jurisdiction of Interstate Commerce Commission).

> **B.      Plaintiffs Have Not Met Their Burden of Proof on Their Request for Preliminary Injunctive Relief**

8.      Alternatively, on the substantive issues raised in Plaintiffs' preliminary injunction papers, the Court finds that Plaintiffs have failed to meet their burden of persuasion that a preliminary injunction enjoining the Port Authority from collecting the administrative surcharge is appropriate here.  Injunctive relief is an extraordinary and drastic remedy that should not be granted unless the movants carry the burden of persuasion by a clear showing.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *The Media Group, Inc. v. Ontel Prods. Corp.*, No. CIVA300CV2034 (JCH), 2001 WL 169776, *2 (D. Conn. Feb. 14, 2001) (noting that

preliminary injunctive relief is an "extraordinary and drastic remedy which should not be routinely granted").

9.    In deciding whether to grant Plaintiffs' request for a preliminary injunction, the Court weighs the following factors: (1) the probability that Plaintiffs will succeed on the merits of their claims; (2) the threat of irreparable harm to Plaintiffs; and (3) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties involved in the litigation. *See Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 19999); *Edwards v. Tarascio*, No. 3:97CV2410 (CFD), 1999 U.S. Dist. LEXIS 22613, *4 (D. Conn. Aug. 10, 1999).  As the movants, Plaintiffs bear the burden of proving these factors. *See Edwards*, 1999 U.S. Dist. LEXIS at *4.

10.    Here, Plaintiffs are seeking to enjoin the conduct of a governmental body, and as such, have a much higher burden than in a typical preliminary injunction case.  Plaintiffs must show both irreparable harm and a likelihood of success on the merits to prevail on their pending motion. *See Forest City*, 173 F.3d at 149.

11.    For the reasons set forth below, the Court finds that Plaintiffs fail to meet their burden of proof on these factors, and therefore denies their request for a preliminary injunctive relief.

> 1.    Plaintiffs Have Failed to Show that They Have a Likelihood of
> Succeeding on the Merits

12.    To prevail on their request for preliminary injunctive relief, Plaintiffs must show that there is a strong likelihood of success on the merits of their claim that the administrative surcharge is invalid. *See Forest City*, 173 F.3d at 149.  The Court finds that there is an overwhelming probability that Plaintiffs will fail on the merits.

13.    First, the Court finds that the Ferry Company lacks standing to oppose the

surcharge, because it is not subject to and will not pay the surcharge. The Court agrees with the caselaw cited by the Port Authority and holds that when a case revolves around the validity of a fee, a party that is not subject to and does not pay the fee has no standing to assert a claim that the fee is invalid or unreasonable. *See, e.g., Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 46 (1976) (Stewart, J., concurring); *Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370 (7th Cir. 1997) (state agency lacked standing to see review of an FAA order authorizing a city to levy a "passenger facility charge" at an airport); *Ammex, Inc. v. United States*, No 00-CV-7338, 2002 WL 32065583 (E.D. Mich. July 31, 2002) (store operator does not have standing to bring suit to recover taxes paid by its supplier, even though the store ultimately bore the economic burden of those taxes because the store owner was not the actual taxpayer); *United Artists Theater Circuit, Inc. v. City of New Orleans*, Civ. A. No. 95-17, 1996 WL 46709 (E.D. La. 1996) (holding that move theaters lacked standing to oppose amusement tax levied by city); *County of Oakland v. City of Detroit*, 628 F. Supp. 610, 612 (E.D. Mich. 1986) (county not subject to sewer service fee lacked standing to protest it); *Alcan Aluminum Ltd. v. Franchise Tax Bd.*, 558 F. Supp. 624, 627 (S.D.N.Y. 1983) (parent company has no standing to assert the invalidity of a tax paid by not by the parent company but by subsidiary).

14.    The Court also finds that Plaintiff Greg Rose lacks standing to dispute the passenger wharfage charge and the related administrative surcharge based upon his concession that he does not pay the charges associated with his travel on the Ferry. The Court finds it undisputed that those charges are paid by D & D Wholesale Flowers Inc., a corporation which is not a party to this litigation.

15.    Aside from the standing issue, on the merits of the issues before the Court, the Court finds that it is unlikely that the Plaintiffs will succeed on the merits of their claim that the

Port Authority's passenger fee is invalid.

16.    The Court agrees with the cases cited by the Port Authority that an exact and precise correlation between the services offered and the fee collected by a local transportation authority is not necessary.  When a fee or charge is imposed by a local transportation agency, like the Port Authority here, courts generally defer to the local transportation agency's determination of what fee is necessary and appropriate for the services that it provides.  The Court agrees that the burden of proof is on the Plaintiffs.  The Court also agrees that the standard Plaintiffs must meet to establish that the modest passenger wharfage charge imposed here is not reasonable under the law is extraordinary.  The Court finds it significant that the Port Authority has never been cited for a violation in its regular audits and that its passenger wharfage charge is determined and approved by its governing body of officials locally appointed by an elected official answerable to the public.

17.    Port authorities traditionally have been permitted to charge reasonable fees in return for services rendered to and enjoyed by vessels using its facilities.  *See Clyde Mallory Lines v. Alabama*, 296 U.S. 261, 265-66 (1935); *see also Hawaiian Navigable Waters Preservation Soc'y v. Hawaii*, 823 F. Supp. 766, 776 (D. Haw. 1993) (holding that mooring and anchoring fees charged by Hawaii for the "use of restroom facilities, parking, trash disposal, and security" valid under the Tonnage Clause).  Fees imposed by port authorities for pilotage, wharfage, for the use of locks on navigable rivers, or for medical inspections have been held to be valid.  *See Clyde Mallory*, 296 U.S. at 265-66.  Reasonable fees for services which inure to the benefit of all who enter the port are not constitutionally prohibited.  *See id.* at 266-67.

18.    Local governmental bodies such as public port authorities are permitted to impose reasonable, non-discriminatory regulations upon trade.  *See Indiana Port Comm'n v. Bethlehem*

*Steel Corp.*, 534 F. Supp. 858, 864 (N.D. Ind. 1981); *see also New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 690 F. Supp. 1515, 1522 (E.D. La. 1988) ("[P]laintiff's challenge ignores the clear principle of the commerce clause that only unreasonable burdens on interstate commerce by a state will be struck down."). As the Fifth Circuit has commented, local port charges imposed to defray the cost of facilities used in the aid of interstate commerce "have consistently been held to be permissible." *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1021-22 (5th Cir. 1989) (citing *Clyde Mallory*, 296 U.S. at 267).

19.     A fee will be upheld if it: (1) reflects a fair, if imperfect, approximation of the cost of using state facilities for the user's benefit; (2) does not discriminate against interstate commerce; and (3) is not excessive in relation to the cost incurred by the charging authorities. *See United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989) (citing *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 716-20 (1972)); *see also Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n*, 390 U.S. 261, 281 (1968) (A "relatively small charge imposed uniformly for the benefit of an entire group can be reasonable . . . even though not all members of the group receive equal benefits."); *Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.*, 906 F.2d 516, 518 (11th Cir. 1990).

20.     For example, the U.S. Supreme Court has upheld a one dollar per passenger charge imposed by an airport on passengers boarding flights at the airport to defray costs of construction and maintenance, even though "some other formula might reflect more exactly the relative use of the state facilities by individual users." *Evansville-Vanderburgh*, 405 U.S. at 714-17. In that case, the plaintiffs based their claim that the airport's fee was invalid on the same constitutional provisions the Plaintiffs invoke here. In upholding the fee, the Court explained

that the charge was based upon a fair approximation of use and was neither discriminatory against interstate commerce, nor excessive in comparison to the benefit conferred. *See id.* at 716-17. The Court also noted that if the airport charged different rates to different users or even did not charge some users, that fee structure would not be unconstitutional. *See id.* at 715-19. The Court emphasized that the amount of the charge is primarily for determination of the state or local government imposing the fee; so long as a charge is constitutional, the federal courts will defer to the local governing body. *See id.* at 713; *see also Wallach v. Brezenoff*, 930 F.2d 1070 (3d Cir. 1991) (rejecting argument that toll increase on bridges and tunnels over the Hudson River was a violation of constitutional right to travel); *New Orleans S.S. Ass'n*, 874 F.2d at 1023 (rejecting claim that charge imposed on ships entering port as means of financing services violated the Tonnage Clause of the U.S. Constitution); *Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y. & N.J.*, 571 F. Supp. 576, 583 (E.D.N.Y. 1983) (cautioning plaintiffs that federal courts will not substitute their judgment for the specialized experience and expertise of the state or local government by conducting an extensive cost benefit analysis of the agency's decision-making process);

21.    The Court notes that the U.S. Supreme Court has also held that a fee can be valid even when the revenues generated from the exceed the outlays. *See Massachusetts v. United States*, 435 U.S. 444, 470 n.25 (1978). The Court reasoned that the resultant surplus can be offset against deficits from previous years, or against projected future deficits. *See id.*; *see also Evansville-Vanderburgh*, 405 U.S. at 719-20. Future development plans can also be taken into account when setting fees given the long-term nature of maintaining and developing a facility; to hold otherwise would increase rather than mitigate the burden on interstate commerce. *See Alamo*, 906 F.2d at 522.

22.    The specifically Court rejects the Ferry Company's argument that the Port Authority's fee makes it more difficult for it to increase its profits because the charge reduces its ability to impose greater fees on its passengers, or to attract larger numbers of passengers. The Court agrees with the case law cited by the Port Authority that company's ability to squeeze a larger profit out of its passengers is irrelevant to the issue of whether a fee imposed by a local governing body is reasonable and valid. *See, e.g., Toye Bros. Yellow Cab Co. v. Irby*, 405 F. Supp. 911, 914 (E.D. La. 1969).

23.    The Court also finds it unlikely that Plaintiffs will succeed on the merits of their claim that the administrative surcharge, which they seek to enjoin is invalid.

24.    The Court finds that in industries subject to economic regulation, and particularly the transportation industry, including the shipping industry, surcharges of limited scope and time to recoup extraordinary, unanticipated expenses are regularly imposed by steamship lines and ports. The FMC, for example, has defined the purpose of a surcharge as a means "to reimburse . . . carriers for additional costs temporarily incurred by the performance of their service, and which costs the carriers are not recovering through their basic freight rates." *Imposition of Surcharge on Cargo to Manila*, 8 F.M.C. at 399.

25.    Courts and federal administrative agencies (including the FMC) have upheld surcharges for traffic on railroad lines that caused increased loading and unloading time;[2] a surcharge to recover costs incurred due to longshoremen strikes;[3] a surcharge to recover the

---

[2]    *Alldredge Grain & Storage Co. v. Interstate Commerce Comm'n*, 720 F.2d 480 (8th Cir. 1983).

[3]    *International Packers, Ltd.*, 356 F.2d 808; *Imposition of Surcharge at U.S. Atlantic & Gulf Ports*, 7 S.R.R. 405.

increased cost of fuel during the fuel crisis of the 1970s;[4] a surcharge to recover increased insurance costs on shipments to Hawaii following the 1941 attack on Pearl Harbor;[5] and, a surcharge to recover gross receipts taxes imposed by a state.[6]

26.     The Court finds it particularly significant that in two cases, the Interstate Commerce Commission and two federal appellate courts (including the Second Circuit) upheld a surcharge imposed by a railroad on shipments to recoup costs the railroad incurred in defending lawsuits filed by its shippers. *See Mr. Sprout, Inc. v. United States*, 8 F.3d 118 (2d Cir. 1993); *G&T Terminal Packaging Co., Inc. v. Consolidated Rail Corp.*, 830 F.2d 1230 (3d Cir. 1987). In *G&T Terminal Packaging Co.*, the Third Circuit specifically rejected the plaintiffs' claims that the surcharge was invalid because it "was made in retaliation for the shippers pursuing valid claims of past damages and delays." *G&T Terminal Packaging*, 830 F.2d at 1232. The Court finds these case directly analogous to the issue presented here, that the Port Authority imposed the administrative surcharge at issue to offset the costs incurred in defending itself in this lawsuit.

### 2.     Plaintiffs Have Failed to Show Irreparable Harm

27.     The Court also finds that Plaintiffs have failed to meet their burden of showing immediate and irreparable harm if the collection of the administrative surcharge is not enjoined. The Court finds it significant that Plaintiffs waited several weeks after learning of the surcharge to file their request for temporary and preliminary injunctive relief. Plaintiffs contend that they

---

[4]     *Matson Navigation Co.*, 22 F.M.C. 276.

[5]     *Surcharge — Matson Navigation Co.*, 2 U.S.M.C. 622.

[6]     *Connecticut Office of Consumer Counsel v. Federal Communications Comm'n*, 915 F.2d 75 (2d Cir. 1990).

are faced with immediate harm. By waiting this length of time after learning of the alleged threatened injury, Plaintiffs have failed to demonstrate immediate and irreparable harm and are not entitled to the extraordinary emergency relief of a temporary restraining order. *See, e.g.*, *Central Point Software, Inc. v. Global Software & Assocs., Inc.*, 859 F. Supp. 640, 644 (E.D.N.Y. 1994) ("Lack of diligence, standing alone, may preclude the granting of preliminary injunctive relief, even though it is, standing alone, insufficient to support a claim of laches.").

28.    Moreover, because the administrative surcharge is purely monetary in nature, the Court finds that economic damages would be sufficient to compensate Plaintiffs if the surcharge is later found to be invalid.

29.    The Court does not find this to be an exceptional case where mere monetary loss justifies the unusual step of granting injunctive relief because there has been no showing that the Ferry Company will be forced into bankruptcy if the administrative surcharge is collected from its passengers. *See, e.g., Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 11-12 (2d Cir. 1981) (confirming that "a preliminary injunction is inappropriate were the potential harm is strictly financial"). There is no basis for finding that the limited administrative surcharge will cause the Ferry Company or either of the individual plaintiffs to experience "financial distress" if injunctive relief is not granted, or that the surcharge will "threaten" their "viability." *Air Transport Int'l LLC v. Aerolease Fin. Group, Inc.*, 993 F. Supp. at 123 (D. Conn. 1998).

30.    Based upon the facts found above, the Court rejects Plaintiffs' primary argument on irreparable harm is that it believes that Port Authority is insolvent based upon the $11 million in dispute involving the Cartech Property. The Court agrees with the testimony of the witnesses from the Port Authority that there is no dispute over $11 million that would effect the Port Authority's finances.

31.     Plaintiff F. Charles Zahradka, the only plaintiff who arguably has standing to dispute the validity of the administrative surcharge, has have not shown that he does not have an adequate remedy at law or that money damages would not be sufficient.  Any amount the Port Authority may collect from Mr. Zahradka during this period of the limited amount of the administrative surcharge (at most 50¢ per ride) is negligible.

32.     The Court rejects the Ferry Company's argument that it is potentially irreparably harmed because it will be impossible to return the administrative surcharge to the Ferry passengers, should that surcharge be found invalid.  Those passengers are not before the Court, and the Ferry Company lacks standing to make arguments on their behalf.

### 3.    The Balance of the Equities Supports Denying the Preliminary Injunction

33.     The Court also finds that the balance of equities weights in favor of the Port Authority, and in favor of denying the Plaintiffs' request for preliminary injunctive relief.  The balance of hardships must take into account the different economic impact upon the moving party compared to the non-moving party.  *See Geritrex Corp. v. Dermarite Indus., L.L.C.*, 910 F. Supp. 955 (S.D.N.Y. 1996).

34.     The Court finds that in contrast to the lack of harm that Plaintiffs will suffer by the imposition of the surcharge, the Port Authority would be significantly damaged should it be prevented from collecting the surcharge.  The Port Authority operates on a limited budget every year.  This litigation was not anticipated or planned for in its budgets for 2003 and 2004; in fact, the very increase in the passenger wharfage charge that sparked this litigation was occasioned by the fact that the Port Authority could not meet its expenses based upon its prior budget.

35.     The Court understands that litigation is expensive and is becoming cost-prohibitive to the Port Authority.  Absent this surcharge, the Port Authority will likely not be

able to continue in this litigation. If the Court must then grant a default judgment for Plaintiffs on their Amended Complaint and the Port Authority is permanently enjoined from collecting the passenger Fee by default, the Port Authority would lose the bulk of its income and would for all practical purposes cease to exist.

36.    The Court finds that there is no similar danger that the Ferry Company will cease to exist by virtue of this small fee. Moreover, the small amount of the fee — merely 50¢ per person — is *de minimis* as applied to each of the two individual plaintiffs' remaining in the case, and therefore is not cost-prohibitive for them to pay, pending ultimate resolution of the validity of the fee after a full trial on the merits.

### 4.    Denying the Preliminary Injunction is in the Public Interest

37.    The Court also finds that the public interest weighs in favor of the Port Authority. The Court finds that in the eleven years it has existed, the Port Authority has done a significant amount of good for the passengers on the Ferry, as well as the public at large in the greater Bridgeport area. It is significant that during the more than one hundred years the Ferry Company existed with essentially no government oversight of its operations in Bridgeport, it provided no services and no protections to its passengers.

38.    The Court's denial of Plaintiffs' request for preliminary injunctive relief is supported by caselaw. In *Federal Maritime Commission v. Atlantic & Gulf/Panama Canal Zone*, 241 F. Supp. 766 (S.D.N.Y. 1965), the FMC sought an injunction to enjoin a 10% surcharge on ocean shipments between the United States and Latin American Ports. Although the court initially entered a temporary restraining order, following a hearing on the related motion for preliminary injunction, the court found that the temporary restraining order was improvidently granted. It therefore vacated the temporary restraining order and denied the request for a

2284686                              - 26 -

preliminary injunction. *See id.* at 782.

39.    For the foregoing reasons, the Court denies Plaintiffs' request for a preliminary

injunction enjoining the Port Authority's administrative surcharge on its passenger Fee.

Dated:  March 17, 2004

Respectfully submitted,

THOMPSON COBURN LLP
    Edward J. Sheppard, #CT24760
    1909 K Street, NW, #600
    Washington, DC 20006
    202-585-6900
    Fax 202-585-6969
    esheppard@thompsoncoburn.com

By_____
    Suzanne L. Montgomery, #CT24761
    One US Bank Plaza
    St. Louis, Missouri 63101
    314-552-6000
    Fax 314-552-7000
    smontgomery@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port
Authority

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served, via electronic mail and Federal Express overnight delivery, on the following counsel of record, this 17th day of March, 2004:

Jonathan S. Bowman
Stewart I. Edelstein
Cohen and Wolf, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, CT  06601-1821

Frank H. Loomis
Martin Domb
Hill, Betts & Nash LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281