UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**FILED**

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, *et al.*,

2004 MAR 18  A 11: 13

Case No. 03-CV-599 (CFD)
U.S. DISTRICT COURT
HARTFORD, CT.

Plaintiffs,

v.

March 17, 2004

BRIDGEPORT PORT AUTHORITY,

Defendant.

_____/

### MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

### I.  Introduction

Defendant Bridgeport Port Authority (the "Port Authority") opposes the request of

Plaintiffs for preliminary injunctive relief seeking to prevent the Port Authority from collecting a

50¢ administrative surcharge from the passengers on the Ferry operated by Plaintiff Bridgeport

and Port Jefferson Steamboat Company (the "Ferry Company"), and on which Plaintiffs Greg

Rose and F. Charles Zahradka claim to be regular passengers.[1]  The Court should decline to

address the merits of Plaintiffs' pending motions in deference to the primary jurisdiction of the

Federal Maritime Commission (the "FMC") and because the Ferry Company, who is not subject

to the administrative surcharge in question, lacks standing both to dispute its validity and to ask

that its collection be enjoined.

Should the Court reach the merits of Plaintiff's motion, it should be denied.  Plaintiffs'

fail to demonstrate immediate and irreparable harm, they fail to demonstrate the inadequacy of

---

[1]    Simultaneously with its request for preliminary injunctive relief, Plaintiffs sought a temporary
restraining order.  The Court denied that motion on March 4, 2004.

2274907

money damages, they lack any probability of success on the merits, the balance of equities favors the Port Authority, and denying the injunctive relief sought is in the public interest.

## II.  Statement of Facts

This case arises from the claim of the Ferry Company and two of its passengers that a modest passenger wharfage charge (that is collected by the Port Authority in consideration of the services and facilities that it makes available to all ferry passengers) is invalid.  The motion currently pending before the Court concerns only a 50¢ administrative surcharge per ticket adopted by the Port Authority's governing Board of Commissions at their regularly scheduled meeting on February 5, 2004.  The administrative surcharge was to become effective on March 1, 2004.[2]

### A.     The Bridgeport Port Authority

The Port Authority is a local governing body that was created in 1992 by the City of Bridgeport, Connecticut pursuant to Connecticut General Statutes §§ 7-329a – 7-329u.  *See generally* Bridgeport City Code chap. 2.28, Exhibit 1.[3]  Although small by comparison to other deep water port facilities on the east coast, the Port of Bridgeport is a significant port of entry for the import of fruits and oil, and is an export point for certain commodities including used vehicles shipped to South and Central America for resale.  It is situated on the northern side of the Long Island Sound in close proximity to New York City.

As created by the City of Bridgeport, the purpose of the Port Authority is to:

> foster and stimulate the shipment of freight and commerce through the ports of
> Bridgeport, Connecticut; to develop and promote part facilities with the district in

---

[2]     To date, the Port Authority has not collected the administrative surcharge from any passenger.

[3]     All exhibits referred to herein are included in the Port Authority's Appendix of Exhibits filed contemporaneously herewith.

2274907

order to create jobs, increase the city's tax based and provide special revenues to the city; to work with the government of the city to maximize the usefulness of available public funding by consolidating and coordinating private efforts to assist the city's waterfront and industrial development program, to cooperate with the state and federal agencies in the maintenance, development, improvement and use of district harbors, waterways and industrially zoned properties.

*Id.* § 2.28.010.

The Port Authority is governed by an unpaid Board of Commissioners: the director of economic development of the City of Bridgeport, the harbor master of the City, and three at large members appointed by the mayor and approved by the city council. *See id.* § 2.28030. The mayor and city council, of course, are elected by the citizenry of the City of Bridgeport. Day-to-day activities of the Port Authority are directed by Joseph A. Riccio, its Executive Director, who was hired by and reports to the Board of Commissioners. Two administrative staff persons, Martha Klimas and Charmaine Johnson, assist Mr. Riccio in his day-to-day duties. In the more than 10 years it has existed, the Port Authority has proven to be both fiscally reliable and responsible. It is subject to regular audits, both in its regular finances and in the grants that it administers, and no problem has ever been discovered with its finances.

As part of its charge from the City of Bridgeport to "to develop and promote part facilities with the district in order to create jobs," Bridgeport City Code § 2.28.010, the Port Authority has made significant improvements to the facilities and services for the Ferry passengers in the Bridgeport harbor. For example, the Port Authority provides security and lighting for the passengers, and is currently working with the federal Transportation Security Administration for the development of a security plan for the Port of Bridgeport. *See* Deposition of J. Riccio Vol. II at 268-69, Exhibit 2. The Port Authority regularly works with state and federal governmental agencies to provide services and amenities to the companies and persons that use the Port. The Port Authority has applied for and administered numerous monetary

- 3 -

2274907

grants which it has used over the years to better the Port for the benefit of all who use it. Many of those projects are directed specifically to the passengers on the Ferry.

For example, one of the Port Authority's earliest projects was a terminal building (the first ever built for the comfort and convenience of the Ferry passengers) which now houses the Port Authority's offices, the offices of the harbormaster and others, and a cafeteria/snack bar and tourist information stand used primarily by persons that work at the Port and the passengers from the Ferry. The terminal building was funded through both grant money and through the Port Authority's general operating budget. *See* Deposition of J. Riccio Vol. I at 88-90, Exhibit 3. This terminal building provides shelter and a comfortable place for the passengers to wait for the Ferry.

The Port Authority has also worked with federal and state agencies to receive grant funding for the construction of a secondary access road to the terminal for the Ferry passengers. *See* Deposition of J. Riccio Vol. II at 253-55. In addition to the oversight services of its personnel, the Port Authority paid for the design, architectural and engineering fees for the access road. *See id.* at 255.

In addition, at the time this litigation was commenced, the Port Authority was working with the federal Department of Transportation and other agencies on the construction of a modern, multi-level parking facility, primarily for the benefit of ferry passengers who stage their vehicles in Bridgeport. In fact, in 1999 the Port Authority received 19% of the federal government's grant budget ($3,550,700) for the Federal Highway Administration for the construction of the parking facility. *See* Deposition of J. Riccio Vol. II at 244-45. Construction of that parking facility is now indefinitely delayed as a result of this litigation. *See id.* at 246-47. Despite the significant federal grant monies received, the litigation may prevent the parking

- 4 -

facility from ever being constructed.[4]

The Port Authority is currently working with the local, state and federal governments for the development of an intermodal transportation facility near the Ferry terminal. As planned, this intermodal facility will put the Amtrack train station, the bus terminal and the Ferry terminal within a localized, concentrated area for the convenience of all transportation passengers in Bridgeport.

The grants that the Port Authority has obtained for the development of the Bridgeport harbor and for the provision of services to the Ferry passengers can only be given to government agencies, such as the Port Authority (such as the Ferry Boat Discretionary Fund and Federal Highway Administration grants). Privately-owned companies such as the Ferry Company are ineligible for these grants.

The Port Authority has also been responsible for the development of several blighted areas in the Port of Bridgeport. Many of those development projects are currently on-going. For example, on the East side of Bridgeport Harbor (across the harbor from the Ferry terminal), the Port Authority has been instrumental in the planning of the Bridgeport Regional Maritime Complex (the so-called former "Cartech Property"), which when completed will have many commercial and industrial uses, in an area that sat empty for many years.

To develop this land, the Port Authority and the City of Bridgeport had to condemn the land. That condemnation involved litigation in this Court, and which resulted in a condemnation

---

[4]     This is despite the fact that the Ferry Company currently has no permanent parking in Bridgeport for its walk-on passengers. *See* Deposition of L. Rinaldo at 31-32, Exhibit 4. As Lou Rinaldo, the local Bridgeport manager of the Ferry Company testified during his deposition, the Ferry passengers currently use the parking lot for the players of the Bluefish, the local professional baseball team. *See id.* at 32-33. Mr. Rinaldo explained, however, that when baseball season begins in just a few weeks, the passengers will no longer be able to use the parking. The Ferry Company has no definite plan in place for parking for its passengers at that time. *See id.* at 65-66.

2274907

award of $11 million. *See* <u>Deposition of J. Riccio</u> Vol. I at 96-97. There is currently a dispute between the City of Bridgeport and the Port Authority over who is responsible for the $11 million award. *See id.* at 97-98. However, that dispute will not impact the Port Authority's finances, because if the City required the Port Authority to pay it, the Port Authority would simply return the property.[5] *See id.* at 98.

The description from Mr. Riccio, the Executive Director of the Port Authority, of the benefits of the development of these blighted areas is particularly apt:

> It's about redeveloping a site that's been environmentally contaminated for twenty years. It speaks of the awful conditions that exist in the city of Bridgeport economically.
>
> And I think those passengers benefit a couple of ways: One, that the city of Bridgeport and its port is developing in a manner that is -- as you see in ports all over the country. And people all over the country know the condition of the city of Bridgeport has the highest effective tax rate in the country. It's the laughingstock of the country. And I think people generally want to see Bridgeport progress. And I think that that's one of the ways it can progress, is developing these parcels of property that are so visible to people from the ferry, from the highway, and the train.
>
> I think we all benefit from the rising tides theory. So the better Bridgeport is, the better people will feel about Bridgeport, and more people will want to come to Bridgeport, and more people will use the ferry.
>
> And secondly, the economic opportunities from these projects, such as the barge service where we're taking trucks off the highway -- and one of the worst links of highway in the entire United States is from northern New Jersey right through Bridgeport, Connecticut. We are alleviating traffic and taking trucks off the highway.

<u>Deposition of J. Riccio</u> Vol. I at 26-28.

---

[5]     In its moving papers, the Ferry Company uses this condemnation dispute to assert that the Port Authority is insolvent. That is factually incorrect. As Mr. Riccio explained during his deposition, should the Port Authority be required to pay the money, its plan is to turn the land over to the City and not to pay the $11 million. The Port Authority will never be required to pay this amount.

2274907

**B.    The Bridgeport and Port Jefferson Steamboat Company**

The Ferry Company owns and operates a passenger ferry service that operates between Bridgeport, Connecticut, and Port Jefferson, Long Island, New York. *See* Amended Complaint ¶ 5. The testimony in the depositions that have been taken to date is that the Ferry Company has operated from Bridgeport continuously since 1882. It currently has a non-exclusive lease with the Port Authority for certain docking space for the Ferry on real property which was conveyed from the City of Bridgeport to the Port Authority around the time of the creation of the Port Authority. *See* Lease Agreement for Docking at Water Street Dock dated December 1, 1998, Exhibit 5; First Amendment to Lease Agreement for Docking at the Water Street Dock dated July 29, 2002, Exhibit 6.

Prior to the creation of the Port Authority, there was little, if any, government oversight over the Ferry Company's operations in Bridgeport. Services for Ferry passengers were non-existent. The loading ramp (over which passengers drove their vehicles or walked to board the Ferry) was in a serious state of disrepair. There was no security. Access to the Ferry dock by passengers was difficult and treacherous. Prior to the Port Authority's erection of the terminal building, walk-on Ferry passengers had no shelter from the elements during inclement weather other than a small, three-walled lean-to, which could hold no more than a handful of persons, and had no heat in winter and no air conditioning in summer. The Ferry Company has also never constructed parking facilities of any kind for its passengers. At that time, the passengers were forced to park in an abandoned non-paved lot owned by the Bridgeport Housing Authority and were forced to walk a long distance to the Ferry Dock. The Ferry Company providing absolutely no security for its passengers, and damage to and theft from passenger vehicles was a recurring

problem.[6]

      In the 10 years since the creation of the Port Authority, the number of passengers have increased significantly.  In fact, in the past decade, the Ferry Company has likely seen its best increase in passengers and profits in its history.  The documents that the Ferry Company produced during discovery show that its passengers increased significantly from 1992 to 2002 (the last year for which total numbers are available).  *See* David Bell Reports, Exhibits 7-9.  In fact, the Ferry Company's ridership has increased so significantly that it has gone from three roundtrips per day to 13-16 roundtrips.  It also was able to add a third ferry boat recently, and other than when the vessels are under going routine maintenance, the three boats operate continuously throughout the day.

**C.**    **The Passenger Wharfage Charge**

      The Port Authority receives no regular funding from the federal government, the State of Connecticut, or the City of Bridgeport.  In addition to state and federal grants that it receives (which it must apply for and which are typically only granted for specific projects), the Port Authority's expenses are financed from a modest passenger wharfage charge that it collects from the Ferry passengers.  Currently, the wharfage charge ranges from 60¢ to $2.75 depending on whether the payor is a walk-on passenger to the Ferry, a vehicle, a vehicle with passengers, or some other classification.  This wharfage charge was first instituted in 1993.  The passenger wharfage charge is collected on behalf of the Port Authority by the Ferry Company from its

---

[6]     Even now, security for passengers is provided only by the Port Authority.  The Ferry Company does pay for one shift for a security guard (from 10 pm to 6 am), but Lou Rinaldo (the operations manager of the Ferry Company) admitted during his deposition that the security guard is to protect the Ferry boat that berths overnight in Bridgeport, and is not to protect the passengers.  No passengers are at the terminal or dock facility during the hours when the Ferry Company provides security.  *See* Deposition of L. Rinaldo at 80-81.

passengers as part of their ticket payment. Since 1993, the Port Authority has paid the Ferry Company more than $200,000 for that service. This fee was increased in 2003 by nearly 50% of its prior amount.

The wharfage charge was increased in January 2003; this is only the second time the charge has been increased since it was instituted in 1993 (the first increase was in 1996). The current amount of the wharfage charge is only slightly higher than when it was first instituted ten years ago. This increase is significantly less than the rate of inflation over the same period of time.[7] By stark comparison, the Ferry Company's charge for the Ferry service has increased steadily over the past 10 years, and in fact has out-paced inflation and upon information and belief, the Ferry Company's costs.[8] The wharfage charge is a substantial portion of the budget for the Port Authority.[9] Without that charge, the Port Authority will be unable to continue providing any services for the Ferry passengers and the other users of the Port of Bridgeport and might be forced out of existence. If the charge is reduced, the services provided by the Port

---

[7]     The minimal amount of the increase is easily seen when charted:

| Categories | Passenger Wharfage Fee 1996-2002 | Increase | Passenger Wharfage Fee 2003 |
|---|---|---|---|
| Senior citizens and children, walk-on | $0.50 | $0.10 | $0.60 |
| Adult, walk-on | 0.75 | 0.25 | 1.00 |
| Auto including driver | 1.50 | 0.50 | 2.00 |
| Trucks over 25 feet | 2.00 | 0.25 | 2.25 |
| Cars with unlimited passengers | 2.50 | 0.25 | 2.75 |
| Monthly passes | 5.00 | 0.25 | 5.25 |

[8]     Thus far, the Ferry Company has refused to produce any information relating to its finances. A motion to compel that information is currently pending before the Court.

[9]     It also receives income from the Ferry Company for the lease of the docking facilities, income form the Steamboat Concessions, Inc. (a wholly-owned subsidiary of the Ferry Company) for the lease of the concession area on the first floor of the terminal building, and miscellaneous income from boat owners that use its dock.

2274907

Authority will be significantly reduced.

The wharfage charge imposed by the Port Authority is modest compared to the significant tolls and other charges imposed on commuters that make use of other transportation facilities in the New York City metropolitan area. For example, the tolls on most of the bridges connecting Manhattan to either Long Island or upstate New York are at least $4.00 for a single passenger vehicle going one direction. The passengers on the railroads connecting New York City to these areas are also subject to significant transportation taxes for the benefit of those transportation facilities.

This is the second lawsuit the Ferry Company has brought against the Port Authority relating to the passenger wharfage charge. The first was filed in 1993 soon after the passenger wharfage charge was first instituted. It ended in a settlement in the Spring of 1993 in which the Ferry Company agreed voluntarily to collect the charge from its passengers on behalf of the Port Authority. In fact, the Ferry Company is contractually obligated to collect the charge under its lease with the Port Authority for the docking facilities.

**D.    The Administrative Surcharge**

As noted, the Port Authority operates on a very limited budget, and with very limited income. Most of its money is used for overhead expenses and to provide services that directly benefit the Ferry passengers. The Port Authority did not anticipate the significant costs of this litigation in its projected expenses for 2003 or 2004 (or beyond). The cost of federal court litigation is extremely expensive, and has significantly cut into the Port Authority's budgets for 2003 and 2004. It has come to the point that absent a further influx of funds, the Port Authority will be unable to continue providing any services to the Ferry passengers or the other users of the Port of Bridgeport. It anticipates that its litigation expenses will account for one-third to one-half

- 10 -

of its operating budget for 2004.

To offset these expenses, and to continue providing services to the Ferry passengers at the level they have come to expect in the past eleven years, on February 5, 2004, the Board of Commissioners voted unanimously to adopt a temporary administrative surcharge of 50¢ per passenger ticket. *See* Deposition of J. Riccio Vol. I at 36, 41. The administrative tariff was included on the Board of Commissioners' agenda which was submitted to the City Clerk's office for the City of Bridgeport, which is the procedure for all agendas. *See* Agenda for February 5, 2004 Meeting of Board of Commissioners of Bridgeport Port Authority, Exhibit 10, Deposition of J. Riccio Vol. I at 35. The Port Authority has amended its Tariff to reflect this temporary increase. *See* Tariff of Bridgeport Authority, Exhibit 11. The Port Authority intends for the administrative surcharge to stay in effect only for a limited time to offset the extraordinary expenses it is currently experiencing, so that there will be no loss or decrease in services to the public.

### III. Argument

Preliminary injunctive relief is an extraordinary and drastic remedy that should be rarely, if ever, granted. Plaintiffs bear the burden of establishing that they are entitled to such extraordinary relief. They have utterly failed to do so in their moving papers and their motion should be denied. Even more fundamentally, the Court should not rule on their motion because it lacks subject matter jurisdiction over this case, which as discussed at length in the Port Authority's papers on its motion to dismiss on primary jurisdiction grounds, more properly belongs in the FMC.

**A.**    **The Court Lacks Subject Matter Jurisdiction to Rule on Plaintiffs' Motion for Preliminary Injunctive Relief**

If the Court finds that primary jurisdiction of this matter is properly in the FMC it should

2274907

not reach the merits of Plaintiffs' pending motion. A finding that primary jurisdiction for this matter is within the FMC goes directly to this Court's subject matter jurisdiction over this case. *See Ocean Logistics Mgmt., Inc. v. NPR, Inc.*, 38 F. Supp. 2d 77, 78 n.1 (D.P.R. 1999). It is, of course, axiomatic that the Court must determine whether it has subject matter jurisdiction before it can rule on any substantive motions before it. *See Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 99 (2d Cir.1990) ("The question of subject matter must be confronted at the threshold of the case.").

When a federal district court lacks subject matter jurisdiction over a case, any temporary restraining order or preliminary injunction is improvidently granted and should be vacated. *See, e.g., Scelsa v. City University of N.Y.*, 76 F.3d 37 (2d Cir. 1996) (affirming denial of preliminary injunction motion on basis of lack of subject matter jurisdiction); *Avitts v. Amoco Prod. Co.*, 53 F.3d 690 (5th Cir. 1995) (reversing grant of preliminary injunction because district court lacked subject matter jurisdiction over case); *Knopp v. Magaw*, 9 F.3d 1478 (10th Cir. 1993) (same); *Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control & Ecology*, 999 F.2d 1212 (8th Cir. 1993) (same); *National Mar. Union v. Aquaslide 'N' Dive Corp.*, 737 F.2d 1395, 1398-99 (5th Cir. 1984) (same); *Aladdin Hotel Corp. v. Nevada Gaming Comm'n*, 637 F.2d 582, 584-85 (9th Cir. 1980) (same); *McLucas v. Palmer*, 309 F. Supp. 1353 (D. Conn. 1970) (denying temporary restraining order because court lacked jurisdiction over plaintiffs' claims); *Johnson v. Lee*, 281 F. Supp. 650 (D. Conn. 1968) (same).

1.    **The case should be dismissed in its entirety under the primary jurisdiction doctrine**

Currently pending before the Court is the Port Authority's motion to dismiss on the basis

- 12 -

2274907

of the primary jurisdiction of the FMC.[10]  That motion has been fully briefed and argued by the parties and is fully submitted for the Court's consideration; therefore, the Port Authority will not repeat in full here its arguments made therein.[11]

As the federal agency charged with oversight over marine terminal operators such as the Port Authority, the FMC has jurisdiction over the claims raised in Plaintiffs' Amended Complaint and its pending motion for preliminary injunctive relief.  The FMC has significant expertise in the intricate maritime issues presented in this case, and the Court should properly defer to that expertise.

The decision from the D.C. Circuit in *Plaquemines Port, Harbor and Terminal District v. Federal Maritime Commission*, 838 F.2d 536 (D.C. Cir. 1988), confirms that the FMC has jurisdiction to address in the first instance the validity and reasonableness of the ferry passenger fee imposed by the Port Authority, including the validity of the administrative surcharge currently before the Court.  The primary issue in *Placquemines* was whether a series of tariff charges imposed by the port district to subsidize its fire and emergency services violated the anti-discrimination and reasonableness standards imposed by the Shipping Act.  In upholding the FMC's exercise of jurisdiction, the court explained that "the critical issue for jurisdiction is that the degree of the Port's involvement enables the Port to discriminate in the fees it charges by

---

[10]    The doctrine of "primary jurisdiction" serves as a means of coordinating administrative and judicial machinery, and it comes into play whenever enforcement of the claims in a Complaint requires the resolution of issues which have been placed within the special competence of an administrative body. *See Port of Boston Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970).  In such case, the Supreme Court instructs that "the judicial process should be suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956); *see also Maddock & Miller, Inc. v. United States Lines*, 365 F.2d 98, 100 (2d Cir. 1966).

[11]    The Port Authority expressly incorporates by reference herein its pleadings on its motion to dismiss and renewed motion to dismiss on the basis of primary jurisdiction.

- 13 -

2274907

controlling access to private terminal facilities." *Id.* at 543.

Here, Plaintiffs have alleged that through its passenger fee and the administrative surcharge, the Port Authority has improperly discriminated against interstate commerce and against the ferry passengers in favor of the other vessels and cargo companies that use the port's facilities. Like the port in *Plaquemines*, here, the Port Authority uses the passenger wharfage charge Plaintiffs complain of to provide services and facilities for those passengers. The new administrative surcharge is a necessary temporary measure to ensure that the Port Authority can continue providing those services and facilities at the same high standard that the passengers have come to expect. It is appropriate that those issues be decided by the FMC.

Determining the validity of fees and surcharges imposed by marine terminal operators such as the Port Authority is at the heart of the FMC's statutory responsibilities. Congress placed that function in the hands of the FMC to ensure uniformity in the regulation of such fees. The FMC routinely and regularly evaluates marine terminal fees, tariffs and surcharges of all kinds to determine their reasonableness within the meaning of the Shipping Act of 1984. *See, e.g., International Packers, Ltd. v. Federal Maritime Comm'n*, 356 F.2d 808 (D.C. Cir. 1966), *aff'g Imposition of Surcharge on Cargo to Manila, Republic of Philippines*, 8 F.M.C. 395 (1965);[12] *Matson Navigation Co. — Proposed Bunker Surcharge in the Hawaii Trade*, 22 F.M.C. 256 (I.D. 1979), *adopted* 19 S.R.R. 1065 (F.M.C. 1979); *Imposition of Surcharge at United States Atlantic & Gulf Ports on Cargo Moving Between Said Ports and Latin American Ports*, 7 S.R.R. 405 (F.M.C. 1966); *Imposition of Surcharge on Cargo to Manila, Republic of Philippines*, 8 F.M.C. 395 (1965); *Surcharge — Matson Navigation Co.*, 2 U.S.M.C. 622 (1942)

---

[12]    For the convenience of the Court, copies of cases cited from the FMC and other federal administrative agencies are included in the Appendix filed contemporaneously herewith.

2274907

(decision by United States Maritime Commission, predecessor to the FMC).

A premature ruling by the Court on the issue of the validity of the administrative surcharge would frustrate Congress' desire for uniform regulation in this area by the FMC. *See, e.g., Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1092 (5th Cir. 1973) (recognizing importance of uniformity especially in cases involving the reasonableness of rates).

2.  **The primary jurisdiction doctrine requires that Plaintiffs' pending motion for a preliminary injunction be denied**

Whether the Court views the primary jurisdiction of the FMC as going to its subject matter jurisdiction or merely reflecting a prudential standard of deference to agency expertise, it is appropriate for the Court to deny Plaintiffs' motion for preliminary injunctive relief on the grounds that the case should be properly adjudicated within the primary jurisdiction of the FMC. *See, e.g., DeBruce Grain, Inc. v. Union Pac. R.R. Co.*, 149 F.3d 787 (8th Cir. 1998) (affirming denial of motion for preliminary injunction and dismissal on primary jurisdiction grounds in favor of jurisdiction in Surface Transportation Board); *Total Telecommunications Servs., Inc. v. American Tel. & Tel. Co.*, 99 F.3d 448 (D.C. Cir. 1996) (table decision, text available in Westlaw), *aff'g* 919 F. Supp. 472 (D.D.C. 1996) ("Because the [Federal Communications] Commission . . . has primary jurisdiction, it was appropriate for the district court to dismiss the case, without addressing appellants' application for preliminary injunction.") (citations omitted); *Hanna Mining Co. v. Escanaba & Lake Superior R.R. Co.*, 664 F.2d 594, 596-97 (6th Cir. 1981) (affirming denial of preliminary injunction on grounds that district court should defer to primary jurisdiction of Interstate Commerce Commission); *Carter v. American Tel. & Tel. Co.*, 365 F.2d 486 (5th Cir. 1966) (affirming denial of preliminary injunction on grounds that case properly belonged before primary jurisdiction of the Federal Communications Commission); *Digital Communications Network, Inc. v. AT&T Wireless Servs.*, 63 F. Supp. 2d 1194, 1202-03 (C.D.

- 15 -

2274907

Cal. 1999) (denying request for preliminary injunction on grounds that case belonged in the Federal Communications Commission under its primary jurisdiction); *Railway Labor Executives' Ass'n v. Guilford Transp. Indus., Inc.*, 653 F. Supp. 643 (D. Me. 1987) (denying temporary restraining order because case belonged within the primary jurisdiction of the Interstate Commerce Commission); *Legal Aid Soc'y v. Association of Legal Aid Attorneys of City of N.Y.*, 554 F. Supp. 758, 762-63 (S.D.N.Y. 1982) (denying preliminary injunction because case fell within the primary jurisdiction of the National Labor Relations Board); *Brotherhood of Ry. & Airline Clerks, Consol. System Bd. of Adjustment 46 v. Burlington N. Inc.*, 513 F. Supp. 1023 (D. Minn. 1981) (denying preliminary injunction because to do so would encroach on the primary, exclusive jurisdiction of the Interstate Commerce Commission); *Greater N.Y. Health Care Facilities Ass'n, Inc. v. Ottley*, 499 F. Supp. 279 (S.D.N.Y. 1980) (vacating order granting preliminary injunction because case belonged within primary jurisdiction of National Labor Relations Board); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO (IAM) v. Compagnie Nationale Air France*, 433 F. Supp. 1087 (S.D.N.Y. 1977) (denying preliminary injunction in favor of primary jurisdiction of National Mediation Board); *Cavanagh Communities Corp. v. New York Stock Exchange, Inc.*, 422 F. Supp. 382 (S.D.N.Y. 1976) (vacating preliminary injunction granted by bankruptcy court because case belonged within the primary jurisdiction of the Securities and Exchange Commission); *United Transp. Union, General Committee of Adjustment, Switchmen-Burlington N., Inc. v. Burlington N., Inc.*, 344 F. Supp. 659 (D. Minn. 1972) (denying preliminary injunction because case should be decided within primary jurisdiction of National Railroad Adjustment Board); *Elgin Coal Co. v. Louisville & Nashville R.R. Co.*, 277 F. Supp. 247 (E.D. Tenn. 1967) (denying temporary restraining order and preliminary injunction in favor of primary jurisdiction of Interstate Commerce Commission).

2274907

In fact, if the Court grants Plaintiffs' motions despite the Port Authority's pending motion to dismiss on primary jurisdiction grounds, the decision will likely be reversed. *See, e.g., Detroit, Toledo and Ironton R.R. Co. v. Consolidated Rail Corp.*, 727 F.2d 1391, 1399 (6th Cir. 1984) (finding that district court erred in granting preliminary injunction because it should have declined subject matter jurisdiction in favor of the primary jurisdiction of the Interstate Commerce Commission); *Spence v. Baltimore & Ohio R.R. Co.*, 360 F.2d 887, 890 (7th Cir. 1966) (reversing grant of preliminary injunction because case belonged within primary jurisdiction of the Interstate Commerce Commission).

**B.    Plaintiffs' Fail to Meet the Burden Necessary for Obtaining Preliminary Injunctive Relief**

Injunctive relief is an extraordinary and drastic remedy that should not be granted unless the movants carry the burden of persuasion by a clear showing. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *The Media Group, Inc. v. Ontel Prods. Corp.*, No. CIVA300CV2034 (JCH), 2001 WL 169776, *2 (D. Conn. Feb. 14, 2001) (noting that preliminary injunctive relief is an "extraordinary and drastic remedy which should not be routinely granted").

In deciding whether to grant Plaintiffs' request for a preliminary injunction, the Court must weigh each of the following factors: (1) the probability that Plaintiffs will succeed on the merits of their claims; (2) the threat of irreparable harm to Plaintiffs; and (3) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties involved in the litigation. *See Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999); *Edwards v. Tarascio*, No. 3:97CV2410 (CFD), 1999 U.S. Dist. LEXIS 22613, *4 (D. Conn. Aug. 10, 1999). Some federal courts also apply a fourth factor, the public interest. *See Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). As the movants, Plaintiffs bear the burden of proving these factors. *See Edwards*, 1999 U.S. Dist.

- 17 -

LEXIS at *4.

In addition, here, Plaintiffs are seeking to enjoin the conduct of a governmental body, and as such, have a much higher burden than in a typical preliminary injunction case. Plaintiffs must show both irreparable harm and a likelihood of success on the merits to prevail on their pending motion. *See Forest City*, 173 F.3d at 149.

Plaintiffs fail to meet their burden of on these factors, and their request for a preliminary injunctive relief should be denied.

1.    Plaintiffs Have Not Demonstrated Any Probability of Success On the Merits

To prevail on their request for preliminary injunctive relief, Plaintiffs must show that there is a strong likelihood of success on the merits of their claim that the administrative surcharge is invalid. *See Forest City*, 173 F.3d at 149. As demonstrated below, there is an overwhelming probability that Plaintiffs will fail, rather than succeed, on the merits.

a.    *The Ferry Company lacks standing to oppose the surcharge*

First, the Ferry Company, the only plaintiff to try to present any evidence of a claim of injury to the Court lacks standing to oppose the surcharge, just as it lacks standing to oppose the passenger wharfage charge that is the subject of this litigation.[13] As Brian A. McAllister, the principal of the Ferry Company conceded during his deposition, *see* Deposition of B. A. McAllister at 49-50, Exhibit 12, the Ferry Company is not subject to the passenger wharfage charge; it is also not subject to and is not being asked to pay the surcharge that is the subject of these pending motions. Currently pending before the Court is the Port Authority's motion to

---

[13]    The constitutional and prudential doctrine of "standing" is an essential component of the requirement that there be a "case" or "controversy" be present. *See Allen v. Wright*, 468 F.2d 737, 750 (1984). The Ferry Company has the burden of establishing that it has standing to assert the claims against the Port Authority. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *LaFleur v. Whitman*, 300 F.3d 256, 268 (2d Cir. 2002).

2274907

dismiss the Ferry Company from this litigation for lack of standing. That motion has been fully briefed and argued, and the Port Authority will not repeat those arguments in full here (although it expressly incorporates herein its previously-filed pleadings addressing the Ferry Company's lack of standing to pursue this litigation).

In addition to other requirements, to establish standing, the Ferry Company must show that it will suffer injury-in-fact from the imposition of the surcharge by the Port Authority. *See LaFleur*, 300 F.3d at 269 (quoting *Lujan*, 504 at 560-61). The Ferry Company, however, cannot make that showing. When a case revolves around the validity of a fee, a party that is not subject to and does not pay the fee has no standing to assert a claim that the fee is invalid or unreasonable. *See, e.g., Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 46 (1976) (Stewart, J., concurring); *Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370 (7th Cir. 1997) (state agency lacked standing to see review of an FAA order authorizing a city to levy a "passenger facility charge" at an airport); *Ammex, Inc. v. United States*, No 00-CV-7338, 2002 WL 32065583 (E.D. Mich. July 31, 2002) (store operator does not have standing to bring suit to recover taxes paid by its supplier, even though the store ultimately bore the economic burden of those taxes because the store owner was not the actual taxpayer); *United Artists Theater Circuit, Inc. v. City of New Orleans*, Civ. A. No. 95-17, 1996 WL 46709 (E.D. La. 1996) (holding that move theaters lacked standing to oppose amusement tax levied by city); *County of Oakland v. City of Detroit*, 628 F. Supp. 610, 612 (E.D. Mich. 1986) (county not subject to sewer service fee lacked standing to protest it); *Alcan Aluminum Ltd. v. Franchise Tax Bd.*, 558 F. Supp. 624, 627 (S.D.N.Y. 1983) (parent company has no standing to assert the invalidity of a tax paid by not by the parent company but by subsidiary).

The Ferry Company lacks standing to assert the claims raised in its pending request for

2274907

preliminary injunctive relief and therefore is not likely to succeed on the merits of its claim that the surcharge is invalid.

### b.    *Plaintiff Greg Rose lacks standing to oppose the surcharge*

Plaintiff Greg Rose lacks standing to dispute the passenger wharfage charge and the related administrative surcharge for similar reasons, as discussed at length in the Port Authority's motion for partial summary judgment on Mr. Rose's claims.  Mr. Rose conceded in his answers to the Port Authority's written discovery requests that he does not pay the charges associated with is travel on the Ferry.  Instead, those charges are paid by D & D Wholesale Flowers Inc., a corporation which is not a party to this litigation.  He, therefore, will not pay the administrative surcharge that is the subject of the motion currently pending before the Court.  Like the Ferry Company, because Mr. Rose does not pay the Port Authority's passenger wharfage charge and will not pay the administrative surcharge, he lacks standing to contest the validity of those fees.

### c.    *The Port Authority's passenger wharfage charge is valid*

Prior to addressing the validity of the administrative surcharge, the Port Authority notes that the passenger wharfage charge, the charge at the heart of this litigation, is valid.  Although couched in terms of eight different legal theories, each of Plaintiffs' claims in their Amended Complaint boils down to their position that the wharfage charge is not reasonable on its face, is not reasonably related to the services and facilities provided by the Port Authority to the passengers, is not based upon a fair approximation of use, and is excessive in relation to the cost of the benefits conferred.

Contrary to the position of the Plaintiffs, the applicable caselaw holds that an exact and precise correlation between the services offered and the fee collected is not necessary.  Indeed, when a fee or charge is imposed by a local transportation agency, like the Port Authority here,

- 20 -

courts generally defer to the local transportation agency's determination of what fee is necessary and appropriate for the services that it provides. Of course, the burden of proof is on the Plaintiffs. The standard they must meet to establish that the modest passenger wharfage charge imposed here is not reasonable under the law is extraordinary. Given the facts that the Port Authority has never been cited for a violation in its regular audits and that its passenger wharfage charge is determined and approved by its governing body of officials locally appointed by an elected official answerable to the public, it is unlikely that the Plaintiffs will meet their *prima facie* case, and they therefore fail to show any likelihood of succeeding on the merits.

Local governmental bodies such as public port authorities are permitted to impose reasonable, non-discriminatory regulations upon trade. *See Indiana Port Comm'n v. Bethlehem Steel Corp.*, 534 F. Supp. 858, 864 (N.D. Ind. 1981); *see also New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 690 F. Supp. 1515, 1522 (E.D. La. 1988) ("[P]laintiff's challenge ignores the clear principle of the commerce clause that only unreasonable burdens on interstate commerce by a state will be struck down."). One federal court of appeals, for example, has commented that local port charges imposed to defray the cost of facilities used in the aid of interstate commerce "have consistently been held to be permissible." *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1021-22 (5th Cir. 1989) (citing *Clyde Mallory Lines v. Alabama*, 296 U.S. 261, 267 (1935)).

The caselaw holds that a fee will be upheld if it: (1) reflects a fair, if imperfect, approximation of the cost of using state facilities for the user's benefit; (2) does not discriminate against interstate commerce; and (3) is not excessive in relation to the cost incurred by the charging authorities. *See United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989) (citing

- 21 -

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 716-20 (1972)); *see also Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n*, 390 U.S. 261, 281 (1968) (A "relatively small charge imposed uniformly for the benefit of an entire group can be reasonable . . . even though not all members of the group receive equal benefits."); *Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.*, 906 F.2d 516, 518 (11th Cir. 1990).

For example, more than thirty years ago, the U.S. Supreme Court upheld a one dollar per passenger charge imposed by an airport on passengers boarding flights at the airport to defray costs of construction and maintenance, even though "some other formula might reflect more exactly the relative use of the state facilities by individual users." *Evansville-Vanderburgh*, 405 U.S. at 714-17. In that case, the plaintiffs based their claim that the airport's fee was invalid on the same constitutional provisions the Plaintiffs invoke here. In upholding the fee, the Court explained that the charge was based upon a fair approximation of use and was neither discriminatory against interstate commerce, nor excessive in comparison to the benefit conferred. *See id.* at 716-17. The Court also noted that if the airport charged different rates to different users or even did not charge some users, that fee structure would not be unconstitutional. *See id.* at 715-19. The Court emphasized that the amount of the charge is primarily for determination of the state or local government imposing the fee; so long as a charge is constitutional, the federal courts will defer to the local governing body. *See id.* at 713; *see also Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y. & N.J.*, 571 F. Supp. 576, 583 (E.D.N.Y. 1983) (cautioning plaintiffs that federal courts will not substitute their judgment for the specialized experience and expertise of the state or local government by conducting an extensive cost benefit analysis of the agency's decision-making process).

In *Wallach v. Brezenoff*, 930 F.2d 1070 (3d Cir. 1991), the plaintiffs argued that a toll

- 22 -

2274907

increase on bridges and tunnels over the Hudson River was a violation of their constitutional right to travel. *See id.* at 1072. The Third Circuit rejected that argument, noting that the toll was not discriminatory because New York and New Jersey residents paid the same amount of money to cross the Hudson River as did residents of other states. *See id.* The court also noted that the toll increase represented a fair approximation of the use conferred and the rate of return was not excessive. *See id.*

Similarly, in *New Orleans Steamship Ass'n*, the port authority imposed charges on ships entering the port to finance emergency services it offered. Persons subject to the fee challenged it, alleging that the charge violated the Tonnage Clause of the U.S. Constitution. The Fifth Circuit disagreed, holding that payment of the fees was merely a transaction and not a revenue device, regulation or a payment for the use of the port. The court therefore held that fees to defray the costs of "services rendered to and enjoyed by the vessel" were found to be valid under the Tonnage Clause. *New Orleans S.S. Ass'n*, 874 F.2d at 1023.

Port authorities traditionally have been permitted to charge reasonable fees in return for services rendered to and enjoyed by vessels using its facilities. *See Clyde Mallory*, 296 U.S. at 265-66; *see also Hawaiian Navigable Waters Preservation Soc'y v. Hawaii*, 823 F. Supp. 766, 776 (D. Haw. 1993) (holding that mooring and anchoring fees charged by Hawaii for the "use of restroom facilities, parking, trash disposal, and security" valid under the Tonnage Clause). Fees imposed by port authorities for pilotage, wharfage, for the use of locks on navigable rivers, or for medical inspections have been held to be valid. *See Clyde Mallory*, 296 U.S. at 265-66. Reasonable fees for services which inure to the benefit of all who enter the port are not constitutionally prohibited. *See id.* at 266-67. It is such a constitutional and valid fee that is at issue here.

2274907

The U.S. Supreme Court has also held that a fee can be valid *even when the revenues generated from the fee exceed the outlays. See Massachusetts v. United States*, 435 U.S. 444, 470 n.25 (1978). The Court reasoned that the resultant surplus can be offset against deficits from previous years, or against projected future deficits. *See id.*; *see also Evansville-Vanderburgh*, 405 U.S. at 719-20. Future development plans can also be taken into account when setting fees given the long-term nature of maintaining and developing a facility; to hold otherwise would increase rather than mitigate the burden on interstate commerce. *See Alamo*, 906 F.2d at 522.

The Ferry Company essentially complains that the passenger wharfage charge makes it more difficult for it to increase its profits because the charge reduces its ability to impose greater fees on its passengers, or to attract larger numbers of passengers. That argument fails. Courts have held that a company's ability to squeeze a larger profit out of its passengers is irrelevant to the issue of whether a fee imposed by a local governing body is reasonable and valid. *See, e.g., Toye Bros. Yellow Cab Co. v. Irby*, 405 F. Supp. 911, 914 (E.D. La. 1969).

        d.     *The administrative surcharge is valid*

The premise of Plaintiffs' pending motion is that the administrative surcharge is invalid. That premise is contrary to the law and does not support granting a preliminary injunction.

In industries subject to economic regulation, and particularly the transportation industry, including the shipping industry, surcharges of limited scope and time to recoup extraordinary, unanticipated expenses are regularly imposed by steamship lines and ports.[14] Courts and federal

---

[14] The FMC, for example, has defined the purpose of a surcharge as a means "to reimburse . . . carriers for additional costs temporarily incurred by the performance of their service, and which costs the carriers are not recovering through their basic freight rates." *Imposition of Surcharge on Cargo to Manila*, 8 F.M.C. at 399. Currently, at least one major East Coast port has a security surcharge under active consideration, a large group of U.S. ports are discussing such a surcharge, and a similar surcharge has recently been imposed in the English port of Felixstowe.

- 24 -

administrative agencies (including the FMC) have upheld surcharges for traffic on railroad lines that caused increased loading and unloading time;[15] a surcharge to recover costs incurred due to longshoremen strikes;[16] a surcharge to recover the increased cost of fuel during the fuel crisis of the 1970s;[17] a surcharge to recover increased insurance costs on shipments to Hawaii following the 1941 attack on Pearl Harbor;[18] and, a surcharge to recover gross receipts taxes imposed by a state.[19]

Significantly, in two cases, the Interstate Commerce Commission and two federal appellate courts (including the Second Circuit) upheld a surcharge imposed by a railroad on shipments to recoup costs the railroad incurred in defending lawsuits filed by its shippers. *See Mr. Sprout, Inc. v. United States*, 8 F.3d 118 (2d Cir. 1993); *G&T Terminal Packaging Co., Inc. v. Consolidated Rail Corp.*, 830 F.2d 1230 (3d Cir. 1987). Through the surcharge, the railroad sought to recover "the cost of processing, defending, and paying damage claims." *G&T Terminal Packaging*, 830 F.2d at 1233. Similarly, the administrative surcharge at issue here is occasioned by the costs incurred by the Port Authority in defending itself in this lawsuit.

In *Mr. Sprout*, Conrail imposed a nearly 10% surcharge on carriage of potatoes to recoup litigation expenses it had incurred in defending claims for damage and spoilage of potato shipments. *See Mr. Sprout, Inc.*, 8 F.3d at 121. Both the Second Circuit and the Interstate

---

[15]    *Alldredge Grain & Storage Co. v. Interstate Commerce Comm'n*, 720 F.2d 480 (8th Cir. 1983).

[16]    *International Packers, Ltd.*, 356 F.2d 808; *Imposition of Surcharge at U.S. Atlantic & Gulf Ports*, 7 S.R.R. 405.

[17]    *Matson Navigation Co.*, 22 F.M.C. 256.

[18]    *Surcharge — Matson Navigation Co.*, 2 U.S.M.C. 622.

[19]    *Connecticut Office of Consumer Counsel v. Federal Communications Comm'n*, 915 F.2d 75 (2d Cir. 1990).

2274907

Commerce Commission held that the litigation surcharge did not violate the Interstate Commerce Act or the federal constitution. *See id.* Significantly, *the court and agency also upheld Conrail's decision to impose the litigation surcharge only on the shippers that had filed damage lawsuits against it.*

The Third Circuit reached a similar decision upholding the same Conrail litigation surcharge in *G&T Terminal Packaging.* In reaching its holding, the Third Circuit specifically rejected the plaintiffs' claims that the surcharge was invalid because it "was made in retaliation for the shippers pursuing valid claims of past damages and delays." *G&T Terminal Packaging,* 830 F.2d at 1232. The court essentially held that so long as the litigation surcharge was imposed to recoup the substantial litigation costs, *any incidental motive of retaliation was irrelevant.*

That is precisely the type of fee the Port Authority's Board of Commissioners have adopted is seeking to impose here. Under *Mr. Sprout* and *G&T Terminal Packaging,* Plaintiffs have no possibility of succeeding on the merits and their request for preliminary injunctive relief should be denied.

2.    <u>Plaintiffs' have failed to demonstrate immediate and irreparable harm</u>

Plaintiffs' failure to demonstrate irreparable injury requires that their request for preliminary injunctive relief be denied. *See Public Serv. Co. v. West Newbury,* 835 F.2d 380, 383 (1st Cir. 1987); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 279 (2d Cir. 1985); *Buckingham Corp. v. Karp,* 762 F.2d 257, 267 (2d Cir. 1985) ("[T]he single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."). "Only if [the plaintiff] will suffer irreparable harm in the interim — that is, harm that cannot be prevented or fully rectified by the final judgment after trial — can he get a preliminary injunction." *Roland*

- 26 -

*Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).

By seeking preliminary injunctive relief, Plaintiffs contend that they are faced with immediate harm. The facts directly contradict that assertion. The Ferry Company learned of the Port Authority's attempt to begin collecting the 50¢ administrative surcharge on February 10, 2004 during the deposition of its principal, Brian A. McAllister. (A letter was faxed to Fred Hall, the Ferry Company's General Manager, that day, too.) The individual plaintiffs constructively learned of the surcharge at that same time through their counsel, who was present at the deposition and who also represents the Ferry Company.

Plaintiffs waited nearly three weeks, until the eve of the date the surcharge was to become effective, to file their motions. By waiting this length of time after learning of the alleged threatened injury, Plaintiffs have failed to demonstrate immediate and irreparable harm and are not entitled to the extraordinary emergency relief of a temporary restraining order. *See, e.g., Central Point Software, Inc. v. Global Software & Assocs., Inc.*, 859 F. Supp. 640, 644 (E.D.N.Y. 1994) ("Lack of diligence, standing alone, may preclude the granting of preliminary injunctive relief, even though it is, standing alone, insufficient to support a claim of laches."). Plaintiffs sat on their rights for several weeks, until the eve of when the surcharge was to become effective, to file their motion for a temporary restraining order and preliminary injunction.

Because the administrative surcharge is purely monetary in nature, economic damages would be sufficient to compensate Plaintiffs if the surcharge is somehow found to be invalid. In that case, the Court can simply order the Port Authority to repay the money paid by Plaintiffs as a damage award at the end of the lawsuit. This is not an exceptional case where mere monetary loss justifies the unusual step of granting injunctive relief because there has been no showing that the Ferry Company will be forced into bankruptcy if the administrative surcharge is collected

- 27 -

2274907

from its passengers. *See, e.g., Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 11-12 (2d Cir. 1981) (confirming that "a preliminary injunction is inappropriate were the potential harm is strictly financial"). There is simply no basis for finding that the limited administrative surcharge will cause the Ferry Company or either of the individual plaintiffs to experience "financial distress" if injunctive relief is not granted, or that the surcharge will "threaten" their "viability." *Air Transport Int'l LLC v. Aerolease Fin. Group, Inc.*, 993 F. Supp. at 123 (D. Conn. 1998).

Plaintiffs' primary argument on irreparable harm is that it believes that Port Authority is insolvent based upon the $11 million in dispute involving the Cartech Property. As Mr. Riccio testified during his deposition, there is no dispute over $11 million that would affect the Port Authority's finances. If the Port Authority were somehow put into a position of being required to pay that amount, it would simply return the property to the City. There is no note, contract or court decision requiring the Port Authority to pay that amount, and it has no intention of doing so. *See generally* Deposition of J. Riccio Vol. I at 96-98.

Plaintiff F. Charles Zahradka, the only plaintiff who arguably has standing to dispute the validity of the administrative surcharge, has have not shown that he does not have an adequate remedy at law or that money damages would not be sufficient. Even if Plaintiffs are correct that the Port Authority is insolvent (which is not true), any modest amount the Port Authority may collect from Mr. Zahradka during this period of the limited amount of the administrative surcharge (at most 50¢ per ride) is negligible. Indeed, Mr. Zahradka testified during his deposition that he only rides the Ferry 5-10 times per year. *See* Deposition of F. Zahradka at 8, Exhibit 13. At most then, Mr. Zahradka will pay $5.00 in a year, and regardless of the Ferry Company's opinion about the Port Authority's solvency, Mr. Zahradka will be able to recoup

- 28 -

2274907

that amount.[20]

The Ferry Company makes the argument that it is potentially irreparably harmed because it will be impossible to return the administrative surcharge to the Ferry passengers, should that surcharge be found invalid. Those passengers are not before the Court, and the Ferry Company lacks standing to make arguments on their behalf. This case has not been certified as a class action, and the Ferry passengers that are before the Court have not been designated as "class representatives" of the Ferry passengers. Whether the Ferry Company will be able to return the administrative surcharge to the passengers is simply not a proper legal consideration before the Court.

In support of their unsupported position that the Port Authority is insolvent and their claim that alleged insolvency justifies the extraordinary remedy of a preliminary injunction, Plaintiffs cite several cases where irreparable harm existed because plaintiffs would be unable to collect monetary damages at the end of trial due to the defendant's insolvency.[21] Each of the cases cited by Plaintiffs contain substantial evidence that the defendants in those cases were insolvent to the point that bankruptcy was imminent. No such evidence exists in this case.

In *Brenntag International Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999), for example, the Second Circuit first acknowledged the general rule that mere monetary damages do not support a finding of irreparable harm, and then affirmed the District Court's injunction

---

[20]     If necessary, the Port Authority will deposit that amount into the Court's registry pending a final decision on the merits of this case.

[21]     Interestingly, in each of the other cases cited by Plaintiffs in support of its motion for a temporary restraining order, the court actually denied injunctive relief. *See Karen L. v. Health Net of the Northeast*, 267 F.Supp.2d 184 (D. Conn. 2003); *Fair Housing in Huntington Committee, Inc. v. Town of Huntington*, 316 F.3d 357 (2d Cir. 2003); *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317 (2d Cir. 1999).

1274907

against execution of a letter of credit by the plaintiff's bank in favor of the defendant based on evidence that the defendant's bank was not entitled to payment under a letter of credit from the plaintiff and the defendant's insolvency. *See id.* at 247. The defendant seller of chemicals had an involuntary liquidation proceeding initiated against it by another creditor and had failed to deliver the contracted-for chemicals to the plaintiff. *See id.* at 248. It was also found that the plaintiff would have difficulty litigating against the defendant seller once the letter of credit was executed. *See id.* at 250. The facts in *Brenntag* clearly supported a finding of insolvency. This case is devoid of any similar evidence indicating that the Port Authority is insolvent.

Similarly, the court in *American Hospital Supply Corp. v. Hospital Products Ltd.*, 708 F.2d 589 (7th Cir. 1971), affirmed a preliminary injunction against the defendant, a supplier of surgical products, because it had been in a "perilous financial state" prior to the injunction and actually filed for bankruptcy after the injunction had been issued. *Id.* at 593. In *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir.1989), the Second Circuit clearly limited the application of the insolvency exception to cases of bankruptcy, stating "monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation. Bankruptcy is such a case." *Id.* at 975. The court then cited "ample evidence of plaintiffs' imminent bankruptcy." *Id.* Unlike *American Hospital,* and *Tucker,* Plaintiffs in this case have provided no evidence that the Authority is insolvent, much less facing a bankruptcy proceeding or "imminent bankruptcy."

        3.      <u>The Balance of Equities Weighs in Favor of the Port Authority</u>

The balance of hardships must take into account the different economic impact upon the moving party compared to the non-moving party. *See Geritrex Corp. v. Dermarite Indus., L.L.C.*, 910 F. Supp. 955 (S.D.N.Y. 1966). In denying the preliminary relief sought in *Geritrex*

- 30 -

*Corp.*, the court explained that the plaintiff "offered evidence that it sales have declined roughly 20% from approximately $2.2 million during 1994 . . . . By contrast, the effect of a preliminary injunction on [the defendant] would be devastating. It is a fledgling company, . . . [a] preliminary injunction prohibiting him from competing with [the plaintiff] might well put [the defendant] out of business . . . . The balance of hardships, therefore, weighs sharply in defendants' favor." *Id.* at 965.

In contrast to the lack of harm that Plaintiffs will suffer by the imposition of the surcharge, the Port Authority would be significantly damaged should it be prevented from collecting the charge. The Port Authority operates on a limited budget every year. This litigation was not anticipated or planned for in its budgets for 2003 and 2004; in fact, the very increase in the passenger wharfage charge that sparked this litigation was occasioned by the fact that the Port Authority could not meet its expenses based upon its prior budget. Litigation is expensive and is becoming cost-prohibitive to the Port Authority. Absent this surcharge, the Port Authority will likely not be able to continue in this litigation. That would cause a ruling to be made granting Plaintiffs all the relief sought in their Amended Complaint, including prohibiting the Port Authority from collecting any fees from the passengers. The testimony at the hearing on the preliminary injunction motion will establish that in such an event, the Port Authority would lose the bulk of its income and would for all practical purposes cease to exist. There is no similar danger that the Ferry Company will cease to exist by virtue of this small fee. Moreover, the small amount of the fee — merely 50¢ per person — is *de minimis* as applied to each of the two individual plaintiffs' remaining in the case, and therefore is not cost-prohibitive for them to pay, pending ultimate resolution of the validity of the fee after a full trial on the merits.

4.    <u>The Public Interest Weighs in the Port Authority's Favor</u>

If the Court chooses to follow the federal courts that consider the public interest in ruling on a request for preliminary injunctive relief, that factor also favors denying Plaintiffs' pending motion. In the eleven years it has existed, the Port Authority has done a significant amount of good for the passengers on the Ferry, as well as the public at large in the greater Bridgeport area. During the more than one hundred years the Ferry Company existed with essentially no government oversight of its operations in Bridgeport, it provided no services and no protections to its passengers.

The Ferry Company had one hundred years to prove its ability to provide for its passengers. It miserably failed to do so. Granting the temporary and preliminary relief sought by the Plaintiffs will likely result in the Port Authority ceasing to exist as it is known today. It is likely that in a short time, that services to the passengers will return to the abysmal state in which they existed prior to the formation of the Port Authority. That is clearly not within the public interest.

5.    <u>Plaintiff's Request for Preliminary Injunctive Relief should be Denied</u>

It is particularly appropriate that the Court deny Plaintiffs' request for preliminary relief here, where they ask that the Court enjoin the Port Authority from imposing and collecting a surcharge (ie., a temporary fee increase) in the shipping and maritime industry. Plaintiffs cite no on-point legal authority in support of their motions supporting their position. The Port Authority could only locate two cases on the issue raised in Plaintiffs' pending motion — and in both cases the court determined that temporary and preliminary relief was not warranted. Plaintiffs' failure to acknowledge these cases in its moving papers is telling of the weakness of its position.

In *Federal Maritime Commission v. Atlantic & Gulf/Panama Canal Zone*, 241 F. Supp.

- 32 -

766 (S.D.N.Y. 1965), the FMC sought an injunction to enjoin a 10% surcharge on ocean shipments between the United States and Latin American Ports.  Although the court initially entered a temporary restraining order, following a hearing on the related motion for preliminary injunction, the court found that the temporary restraining order was improvidently granted.  It therefore vacated the temporary restraining order and denied the request for a preliminary injunction.[22]  *See id.* at 782.  In denying the preliminary relief, the court denied the request because the plaintiffs were unable to show any hardship from the surcharge that was any different than the fee in question.  *See id.* at 778-79.  The court focused on the following weaknesses in the affidavits submitted by the plaintiffs:

> The affidavit of Murphy discusses increased freight cost in general and sets forth the obvious fact that an increase in cost is burdensome, and it is preferable if goods could be shipped at reduced rates.  He at no point, however, relates his views specifically to the surcharge involved in the instant case and at no point demonstrates the main issue before the Court . . ..
>
> \*      \*      \*
>
> Similarly, the affidavit of Daniel Goldy states that 'imposition of surcharges upon freight shipped from Latin American ports to the United States may increase the price of bulk commodities. . . .  Finally, the affidavit generally discusses price increases but at no point relates the broad statements made to the specific problem here involved . . ..

*Id.* at 778.  The Declaration of Frederick A. Hall is similarly infirm.  For example, he states the following in paragraph 12:

> In addition, the Surcharge would add to the cost of the ferry ticket and cause the Ferry Company to lose riders.  Every day our customers weigh the benefits and higher cost of riding the ferry against the hardship of "driving around" in heavy traffic at lower cost.  The Surcharge will tip the scale, for at least some customers,

---

[22]     The court reached a similar holding in *C. Tennant & Sons, Inc. v. New York Terminal Conference*, 299 F. Supp. 796 (S.D.N.Y. 1969), when it denied a request for a preliminary injunction to enjoin a rate increase and temporary surcharge on services offered at a marine terminal, pending a resolution by the FMC on the validity of the increase.

2274907

away from the Ferry.

Hall Declaration ¶ 12.[23] Thus, there is no valid basis for granting Plaintiffs' request for preliminary injunctive relief, and the pending motion should be denied.

### IV.  Conclusion

The Port Authority is a small, independent agency of the City of Bridgeport.  It does not itself benefit from the charge it collets from the Ferry's passengers.  It is a non-profit governmental agency whose Board of Commissioners are unpaid and whose staff members receive modest salaries.  Instead of profiting from the charge, the Port Authority uses the funds for the benefit of all users of the Port, including the Ferry passengers.  The Port Authority imposes the charge to defray the cost of providing services to those passengers and to maintain facilities for their benefit and therefore for the benefit of the Ferry Company, which profits with each passenger riding the Ferry.  That certain individual plaintiffs feel that they would rather forgo the benefits than pay the charge is irrelevant — their proper remedy is to lobby the Board of Commissioners or the mayor of Bridgeport.

In any event, the Port Authority anticipates that the evidence at trial will be that the majority of passengers prefer the benefits granted by the Port Authority.  In this regard, it is significant that the number of passengers riding the Ferry has increased significantly in recent years and in fact, correlates with the extension of benefits offered by the Port Authority.  The proceeds of the passenger wharfage charge are used to provide financing for services such as security, parking, restrooms, clean walkways, and maintenance of facilities for the benefit of the passengers.

---

[23]     There are numerous evidentiary and foundation problems with Mr. Hall's Declaration. Contemporaneously herewith, the Port Authority is moving to strike paragraphs 4-15 from that Declaration.

2274907

Because of the extraordinary expenses incurred in defending this litigation that borders on being frivolous, the Port Authority has seen its limited budget being wasted and is becoming unable to provide necessary services to its passengers. The administrative surcharge is necessary on a temporary basis to accomplish that goal and there is no valid basis to enjoin its collection.

For the foregoing reasons, the pending preliminary injunction motion should be denied.

2274907

Dated: March 17, 2004

Respectfully submitted,

THOMPSON COBURN LLP
    Edward J. Sheppard, #CT24760
    1909 K Street, NW #600
    Washington, DC 20006
    202-585-6900
    Fax 202-585-6969
    esheppard@thompsoncoburn.com


By _____
    Suzanne L. Montgomery, #CT24761
    One US Bank Plaza
    St. Louis, Missouri 63101
    314-552-6000
    Fax 314-552-7000
    smontgomery@thompsoncoburn.com


    Attorneys for Defendant Bridgeport Port
    Authority

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served, via electronic mail and Federal Express overnight delivery, on the following counsel of record, this 17th day of March, 2004:

| | |
|---|---|
| Jonathan S. Bowman | Frank H. Loomis |
| Stewart I. Edelstein | Martin Domb |
| Cohen and Wolf, P.C. | Hill, Betts & Nash LLP |
| 1115 Broad Street | One World Financial Center |
| P.O. Box 1821 | 200 Liberty Street, 26th Floor |
| Bridgeport, CT 06601-1821 | New York, New York 10281 |

_____

- 36 -

2274907