UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

        CASE NO. 3:03 CV 599 (CFD)

Plaintiffs,

- against -

March 23, 2004

BRIDGEPORT PORT AUTHORITY,

Defendant.
_____/

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

*and*

COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

{NY020856.1 }

# Table of Contents

**Page**

Introduction ...........................................................................................................................1

1. Jurisdiction ....................................................................................................................1

2. Standing ........................................................................................................................2

3. The Legal Standard for Preliminary Injunctions ..........................................................3

4. Timeliness .....................................................................................................................4

5. The Rivers and Harbors Act .........................................................................................6

6. The Port Authority's Own Cost Allocations ................................................................7

7. The Excessiveness of the Tariff and Surcharge
   Greatly Surpasses Any Local Discretion ....................................................................8

8. The Surcharge Cases Cited by the Port Authority Are Inapposite ..............................9

Conclusion ..........................................................................................................................10

## Introduction

Plaintiffs submit this reply memorandum in further support of their motion for a preliminary injunction enjoining the Port Authority from imposing a 50-cent Surcharge on all tickets bought by Ferry Company passengers.[1]

On March 17, 2004, the parties served their respective proposed findings of fact, conclusions of law, and lists of witnesses and exhibits in connection with the hearing on this motion, which is currently scheduled for April 1, 2004 (*see* Order dated March 3, 2004).

On March 17, 2004, the Port Authority also served papers in opposition to this motion, consisting of: (a) a memorandum of law (the "Opp. Memo."), and (b) a motion to strike the Declaration of Frederick Hall, which plaintiffs submitted (among other papers) in support of their motion.

Plaintiffs reply herein to the Opp. Memo. Plaintiffs are not filing an opposition to the motion to strike the Hall declaration. As Mr. Hall is expected to testify in person at the hearing, the Court will be in a better position to determine at that time the weight (if any) it should give to his declaration and his testimony.

### 1.    Jurisdiction

The Court's jurisdiction is not at issue in this motion. That issue was the subject of a prior motion to dismiss or stay, filed by the Port Authority, that was fully briefed, was argued on December 12, 2003, and is *sub judice* (*see* Court Docket entries dated Dec. 12, 2003). In that motion, the Port Authority argued that the Court should dismiss or stay this action under the doctrine of primary jurisdiction, as the issue of whether the Tariff is illegal should be decided by

---

[1]    Capitalized terms herein have the same meaning as in plaintiffs' initial memorandum. "**Ex.** ___" refers to the exhibits in plaintiffs' list of exhibits for the hearing on this motion.

the Federal Maritime Commission ("FMC").  In the present motion, the Port Authority re-hashes at length its arguments from the prior motion (Opp. Memo. at 11-17).  Plaintiffs have already shown, in their papers in opposition to the earlier motion, that the doctrine of primary jurisdiction is inapplicable in this case, principally because <u>the FMC lacks jurisdiction</u> over the Port Authority and its Tariff, and in any event, because the FMC does not have any special expertise in reviewing <u>ferryboat tariffs</u> (Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss or Stay, dated June 20, 2003, Court Docket # 20) ("Plaintiffs' June 20, 2003 Memo.").  Plaintiffs will not burden the Court by repeating their arguments here.[2]

2. **Standing**

As with jurisdiction, the Port Authority's argument that the Ferry Company supposedly lacks standing to challenge the legality of the Tariff (Opp. Memo. at 18-20) has already been fully briefed, argued and submitted, as part of the same motion that addressed jurisdiction.  In its re-statement of its previously made arguments, the Port Authority omits any mention of the Ferry Company's prior showing of its standing, including the Declaration of Professor Steven Shapiro, filed on June 23, 2003 (Court Docket # 21), in which Professor Shapiro states that the Ferry Company clearly has been monetarily damaged by the Tariff.  Plaintiffs will not burden the

---

[2]   In its 6-page re-hash of its prior argument (Opp. Memo. at 11-17), the Port Authority (a) continues to state, incorrectly, that this Court lacks jurisdiction (*id.* at 11), even though it is well-established that primary jurisdiction is a discretionary doctrine that does not implicate a court's subject matter jurisdiction; and (b) continues to cite *only* <u>Plaquemines Port, Harbor and Terminal Dist. v. Federal Maritime Commission</u>, 838 F.2d 536 (D.C. Cir. 1988) (FMC had jurisdiction over tariff imposed by Plaquemines port authority because authority was a "marine terminal operator" as defined in the Shipping Act), without citing the more recent and factually more relevant <u>Puerto Rico Ports Authority v. Federal Maritime Commission</u>, 919 F.2d 799, 802 (1st Cir. 1990) (FMC lacked jurisdiction over tariff imposed by Puerto Rico ports authority because authority was not a marine terminal operator with respect to its activities at the Port of Ponce).

Court with further argument on this issue, but respectfully refer the Court to the previously submitted motion (*see* Plaintiffs' June 20, 2003 Memo. at 21-28).

> 3. **The Legal Standard for Preliminary Injunctions**

The Port Authority misstates the standard for preliminary injunctions applicable to this case, by conflating the standard applicable to cases involving, and those not involving, government action.

In cases not involving government action, the movant must show (1) irreparable harm, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships that tips decidedly in favor of the moving party. Statharos v. N.Y. City Taxi & Limousine Comm'n, 198 F.3d 317, 321 (2d Cir.1999); Karen L. v. Health Net of the Northeast, 267 F. Supp. 2d 184, 190-91 (D. Conn. 2003) (cited in Initial Memo. at 5-6).

In cases involving government action (as in this case), the movant must prove elements (1) and (2)(a) – irreparable harm and likelihood of success on the merits; the movant does not have the option of making the lesser showing under (2)(b) – a serious question on the merits and a balance of hardships tipping in its favor. Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 149 (2d Cir. 1999) ("where a preliminary injunction is sought against government action taken in the public interest pursuant to a statutory or regulatory scheme, the less-demanding 'fair ground for litigation' standard is inapplicable, and therefore a 'likelihood of success' must be shown"), *citing* International Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 70 (2d Cir.1996) (*see also* Initial Memo. at 5-6, to the same effect).

Therefore, a balancing of hardships, which is part of the less-demanding "fair ground for litigation" prong, is not required in this case. Yet, the Port Authority improperly seeks to impose

on plaintiffs the burden of showing <u>both</u> a likelihood of success on the merits (which plaintiffs submit is present in this case), <u>and</u> that the balance of hardships tips in their favor (*see* Opp. Memo. at 17-18, 20-26, 30-32).

In any event, the balance of hardships does tip in favor of plaintiffs, because <u>the supposed hardship that the Port Authority would suffer if the Court enjoined the Surcharge is a creature of its own making</u>. The Port Authority concedes that, absent the Surcharge, and/or absent its ability to continue collecting the Tariff substantially at current levels, "the Port Authority would lose the bulk of its income and would for all practical purposes cease to exist" (Opp. Memo. at 31). This establishes that the Port Authority would be unable to pay a judgment or to return the Surcharge, and thus that <u>plaintiffs</u> would be irreparably harmed in the absence of a preliminary injunction. <u>The Port Authority created its own precarious position</u>, by collecting "the bulk" of its operating revenue <u>only</u> from ferry passengers (through the Tariff), and using the Tariff proceeds to fund <u>all</u> of the Port Authority's activities, both those related and those not related to the ferry. The non-ferry related activities account, by the Port Authority's own cost allocations, to about 50% of its operating expenses (*see* Point 6 below). Thus, the only hardship the Port Authority faces, in the event the Court determines that the Tariff and Surcharge are illegal and enjoins the Surcharge, is that <u>the Port Authority will have to finance its non-ferry related activities with funds generated from sources other than the ferry</u>. That is not a "hardship," but rather, it is the proper way in which the Port Authority should fund its activities, and should have done so in the past.

    **4.**    **Timeliness**

The Port Authority cynically argues that plaintiffs waited too long to seek a preliminary injunction. Plaintiffs first learned of the proposed Surcharge on <u>February 10, 2004</u>, during the course of a previously scheduled deposition. The Port Authority then sent the Ferry Company a

letter, also on February 10, which set <u>March 1, 2004</u>, as the date on which the Ferry Company was to begin collecting the Surcharge. Plaintiffs served this motion on <u>February 27, 2004</u>, three days before the March 1 deadline set by the Port Authority and only 17 days after plaintiffs received notice of the Surcharge (which was only 12 business days after such notice, omitting weekends and Presidents' Day). In its papers, the Port Authority never mentions the actual 17 days elapsed, but instead, exaggeratingly describes that period as "several weeks" and "nearly three weeks" (Opp. Memo. at 27). The only case the Port Authority cites to support its argument that plaintiffs delayed inordinately in making this motion, <u>Central Point Software Inc. v. Global Software & Assessories, Inc.</u>, 859 F. Supp. 640 (E.D.N.Y. 1994) (Opp. Memo. at 27), involved a delay of "just over two years." *Id.* at 644.

Furthermore, during that 17-day period, in addition to preparing the papers seeking a preliminary injunction, plaintiffs had to (a) appear at three previously scheduled depositions in this case,[3] (b) file papers in opposition to a discovery motion (*see* Court Docket ## 46-48), (c) prepare and file a joint motion to extend the discovery deadlines (*see* Court Docket # 45), and (d) deal with an abusive documentary subpoena served by the Port Authority on a non-party bank on February 23, which the Ferry Company and three non-parties subsequently moved to quash (*see* Court Docket ## 55-59). In short, the Port Authority's claim that this motion was untimely is frivolous.

---

[3] The Port Authority deposed William Merritt and Brian Buckley McAllister, Ferry Company representatives, on February 11, and plaintiffs deposed Martha Klimas, a Port Authority employee, on February 24.

**5.    The Rivers and Harbors Act**

Notably absent from the Port Authority's 35-page opposition memorandum is any mention of this federal statute, which provides in relevant part that:

> (b)    No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected <u>from any vessel</u> or other water craft, <u>or from its passengers</u> or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for – . . .
>
>> (2)    <u>reasonable fees charged on a fair and equitable basis</u> that –
>>
>>> (A)    <u>are used solely to pay the cost of a service to the vessel or water craft</u>;
>>>
>>> (B)    enhance the safety and efficiency of interstate and foreign commerce; <u>and</u>
>>>
>>> (C)    do not impose more than a small burden on interstate or foreign commerce; . . . .

33 U.S.C. § 5(b) (*emphasis added*).

The very first claim alleged by plaintiffs in the Amended Complaint (Court Docket # 19) is under this statute, and it is also the first one cited in plaintiffs' initial memorandum in support of this motion (Initial Memo. at 9). By omitting any discussion of this statute, the Port Authority concedes that it applies to the Tariff. Indeed, the words of the statute could not be clearer: to be legal, the Tariff proceeds would have to be used by the Port Authority "solely to pay the cost of a service to the vessel or water craft" (*i.e.*, the ferryboats). The Port Authority concedes that it uses a substantial portion of the Tariff proceeds on activities whose only claimed benefit to the Ferry Company or its passengers is that the activities benefit <u>the community at large</u> (Ex. 53 [Riccio dep.] at 24:6-20; 26:18 to 29:7; 31:1-23; 264:8 to 265:4; 291:11 to 292:10). Accordingly, the Tariff is excessive, and therefore illegal, under the Rivers and Harbors Act.

### 6.     The Port Authority's Own Cost Allocations

Also conspicuously absent from the Port Authority's opposition papers is any mention whatsoever of the Port Authority's own yearly calculations, reviewed and approved by its outside auditors, of the amounts it owed (and owes) to the City of Bridgeport under the 1993 agreement by which the City transferred the Water Street Dock to the Port Authority. That agreement requires the Port Authority to pay to the City 15% of the Port Authority's net operating income from the Water Street Dock (Ex. 12, ¶ 5). In calculating the amounts of such payments, the Port Authority has allocated 50% of its operating costs (except in a few cost categories) to the Water Street Dock (Ex's 12-22). The Port Authority provides no services to the Ferry Company or its passengers at any location other than the Water Street Dock (Ex. 51 [Verrilli dep.] at 36:4-7). Therefore, the Port Authority's own calculations constitute admissions that it spends no more than about 50% of its operating costs on activities relating to the ferry.

Even that is an overstatement, however, because many of the Port Authority's operating costs at the Water Street Dock are incurred on matters unrelated to the ferry, such as: (a) salaries and benefits to the Port Authority's staff, who spend much of their time on non-Water Street Dock activities, including the Cartech property and the BRMC, Derecktor Shipyards, the high speed ferry, the barge feeder project and the development of Steel Point; (b) office equipment, supplies and utilities devoted to these activities; (c) free office space for the CWTA and the Harbormaster (who spends much of his time overseeing non-ferry shipping activity in Bridgeport harbor); and (d) other overhead (legal, accounting, contributions, etc.), which should fairly be allocated between ferry and non-ferry related activities (*see* Plaintiffs' proposed findings of fact, ¶¶ 35-37, 46-47).

When questioned at deposition about the Port Authority's cost allocations, the Port Authority's Executive Director, Joseph Riccio, testified that they "are flawed"; that the 1993 agreement under which the Port Authority pays a percentage of its income from the Water Street Dock is also "flawed"; that he determined soon after he became Executive Director in 1996 that the agreement and allocations were flawed; that he and the Port Authority's Commissioners did not want to change these allocations because they did not wish to "rock the boat" with the City; that the yearly calculations were not accurate but were merely a means to transfer some of the Port Authority's Water Street Dock revenue (*i.e.*, Tariff proceeds) to the City; and that a true allocation of operating costs to the Water Street Dock would be 100% rather than 50% (Ex. 53 at 157:1 to 163:18). Yet in 1998, Mr. Riccio changed one allocation – for security expenses – from 50% to 80%; he did not change any others, then or at other times (*id.* at 159:4 to 163:18). These actions by Mr. Riccio and the Port Authority – continuing to allocate 50% to most cost categories from 1993 to the present, with only minor adjustments – speak louder than their present words in attempting to explain away their own allocations.

The Port Authority's failure to address this entire topic in its long opposition papers, even though it was the centerpiece of plaintiffs' motion for a preliminary injunction, is inexplicable. It amounts to an admission that the Port Authority in fact has used a substantial portion of the Tariff proceeds for its non-ferry related activities.

> 7. **The Excessiveness of the Tariff and Surcharge Greatly Surpasses Any Local Discretion**

The Port Authority argues that "an exact and precise correlation between the services offered and the fee collected is not necessary" (Opp. Memo. at 20), and that "courts generally defer to the local transportation agency's determination of what fee is necessary and appropriate for the services that it provides" (*id.* at 21).

{NY020856.1}                                          - 8 -

These principles make sense when there is a reasonably close relation between the services provided and the fees collected; plaintiffs agree that, in such cases, a <u>precise</u> correlation between the two is not required.  In this case, however, Tariff proceeds exceed the cost of the services provided at least <u>by about 100 percent</u>, and probably more.  If the Court credits the Port Authority's own allocation of its costs attributable to the Water Street Dock, at approximately 50% of its overall costs, and considering also that many of these Water Street Dock costs are unrelated to the ferry, then it follows that the Tariff proceeds exceed the cost of the Port Authority's services to the ferry operation by about 100%.  The courts' willingness to defer to local government in close cases does not immunize excessive fees when the disparity between the fees collected and the services rendered is as great as it is in this case.[4]

### 8.     The Surcharge Cases Cited by the Port Authority Are Inapposite

Finally, all of the cases the Port Authority cites concerning surcharges (Opp. Memo. at 24-26) are factually dissimilar and therefore inapplicable.  Those cases involved surcharges added to tariffs to recoup higher operating expenses, such increased fuel costs, insurance premiums or taxes.  In none of those cases was the legality of the underlying tariff at issue.  In

---

[4]     None of the cases cited by the Port Authority (Opp. Memo. at 20-24) involves such a dramatic disparity between the fees collected and the cost of the services provided, or provides a quantitative analysis of what is a sufficiently "reasonable relationship" between the two.  *E.g.*, <u>Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.</u>, 405 U.S. 707, 720, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) (upholding passenger airport fee where the airlines challenging the fee "failed to offer proof of excessiveness"); <u>Hawaiian Navigable Waters Preservation Society v. State of Hawaii</u>, 823 F. Supp 766 (D. Hawaii 1993) (state agency's fee to defray costs of restroom, parking, trash disposal and security upheld without discussion of the relationship of the fee to the costs of the services); <u>New Orleans Steamship Association v. Plaquemines Port, Harbor & Terminal District</u>, 690 F. Supp. 1515 (E.D. La. 1988) (port authority's tariff to defray costs of emergency services upheld without discussion of the relationship of tariff proceeds to the costs of the services).

this case, plaintiffs challenge the underlying Tariff, as well as the Surcharge. If the Tariff is illegal, it logically follows that the Surcharge is likewise illegal.

The Port Authority incorrectly cites Mr. Sprout v. United States, 8 F.3d 118 (2d Cir. 1993), and G & T Terminals., Inc. v. Consolidated Rail Corp., 830 F.2d 1230 (3d Cir. 1987), for the proposition that the Second and Third Circuits have "upheld a surcharge imposed by a railroad on shipments to recoup costs the railroad incurred in defending lawsuits filed by its shippers" and "that is precisely the type of fee the [Port Authority] . . . is seeking to impose here" (Opp. Memo. at 25-26). Those related cases involved a surcharge imposed by rail carriers on potato shipments to specific customers, to offset the carriers' expense of defending a higher incidence of claims by those customers that potato shipments arrived damaged. Contrary to the Port Authority's description, the surcharge was not imposed to pay for the defense of the litigation in which the surcharge was being challenged.

In this case, by contrast, the Port Authority is not seeking to impose the Surcharge in order to pay for an increase in the cost of services that the Port Authority provides to the ferry. Rather, the Port Authority is increasing its existing Tariff in order to pay for the cost of defending a challenge to that very Tariff. As the Tariff is illegal, so is the Surcharge.

## Conclusion

For the forgoing reasons, the reasons set forth in the motion papers, and the evidence and argument presented at the hearing to be held on April 1, 2004, the Court should enter a preliminary injunction enjoining the Port Authority from imposing the proposed Surcharge, pending a final judgment in this action.

(*Signature on next page*)

Dated:   March 23, 2004

                              BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY,
GREG ROSE, and
FRANK C. ZAHRADKA
*Plaintiffs*


By: _____

Martin Domb
Federal Bar No. ct 09544
E-mail:  mdomb@hillbetts.com
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

Jonathan S. Bowman
Federal Bar No. ct 08526
E-mail:  jbowman@cohenandwolf.com
Stewart I. Edelstein
Federal Bar No. ct 06021
E-mail:  sedelstein@cohenandwolf.com
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

## CERTIFICATE OF SERVICE

I hereby certify that on this 23d day of March, 2004, a copy of the foregoing was served upon the following counsel (a) via e-mail and overnight mail upon Ms. Montgomery, and (b) via e-mail and first class mail upon other counsel:

Suzanne L. Montgomery, Esq.  
Thompson Coburn  
One US Bank Plaza  
St. Louis, MO 63101  

Edward J. Sheppard, IV, Esq.  
Thompson Coburn  
1909 K Street, N.W., Suite 600  
Washington, D.C. 20005-2010  

John W. Roberts. Esq.  
Roberts, Rose & Bates, P.C.  
17 Hoyt Street  
Stamford, CT 06905  

Jonathan S. Bowman  
Stewart I. Edelstein  
COHEN AND WOLF, P.C.  
1115 Broad Street  
P.O. Box 1821  
Bridgeport, Connecticut 06601-1821  

By: _____  
Martin Domb  
Federal Bar No. ct 09544  
E-mail: mdomb@hillbetts.com  
HILL, BETTS & NASH LLP  
One World Financial Center  
200 Liberty Street, 26th Floor  
New York, New York 10281-1003  
Tel. (212) 589-7577  
Fax (212) 466-0514  

{NY020856.1 }