UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

          CASE NO. 3:03 CV 599 (CFD)

       Plaintiffs,

  - against -

BRIDGEPORT PORT AUTHORITY,       February 1, 2005

       Defendant.

_____

## PROPOSED JOINT TRIAL MEMORANDUM

*Jointly Filed by*

Martin Domb (ct 09544)
Eric M. Underriner (ct 26020)
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

*and*

Jonathan Bowman (ct 08526)
Stewart I. Edelstein (ct 06021)
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

Edward Sheppard, #CT24760
THOMPSON COBURN
1909 K Street, N.W., Suite 600
Washington, D.C. 20005-2010
Tel. (202) 585-6917
Fax (202) 585-6969

*and*

Timothy F. Noelker, #CT26291
Jason C. Rahoy, #CT26290
THOMPSON COBURN
One US Bank Plaza
St. Louis, Missouri 63101
Tel. (314) 552-6091
Fax (314) 552-7091

*and*

John W. Roberts, #CT05947
ROBERTS, ROSE & BATES, P.C.
17 Hoyt Street
Stamford, Connecticut 06905
Tel. (203) 324-6755
Fax (203)348-5802

*Attorneys for Defendant*

## Table of Contents

**Page**

Introduction and list of attachments................................................................1

1.    Trial Counsel................................................................................2

2.    Jurisdiction.................................................................................2

3.    Jury/Non-Jury..............................................................................3

4.    Nature of Case:

    (a)    Plaintiffs' Statement................................................................4

    (b)    Defendant's Statement.............................................................8

5.    Stipulations:

    (a)    Stipulations of Fact................................................................21

    (b)    Stipulations of Law................................................................27

6.    Plaintiffs' Contentions......................................................................30

7.    Defendant's Contentions....................................................................39

8.    Legal Issues

    (a)    Framed by plaintiffs...............................................................47

    (b)    Framed by defendant..............................................................48

9.    *Voire Dire* Questions:  Omitted (Court trial)

10.    List of Witnesses:

    (a)    Plaintiffs' Fact Witnesses .........................................................51

    (b)    Plaintiffs' Expert Witnesses......................................................56

    (c)    Defendant's Witnesses............................................................59

    (d)    Defendant's Expert Witnesses ...................................................60

    (e)    Defendant's Objections to Plaintiffs' Anticipated Testimony...................66

11.   Exhibits:

    (a)   Plaintiffs' Exhibits .................................................................................67

    (b)   Defendant's Exhibits ...........................................................................81

11.   Deposition Testimony:

    (a)   Plaintiffs' Deposition Testimony ........................................................95

    (b)   Defendant's Deposition Testimony .....................................................96

13.   Requests for Jury Instructions:  Omitted (Court trial)

14.   Anticipated Evidentiary Problems .........................................................98

15.   Proposed Findings of Fact and Conclusions of Law:  Omitted (Court Trial)

16.   Trial Time ..............................................................................................98

17.   Further Proceedings ..............................................................................98

18.   Election for Trial by Magistrate............................................................98

The parties jointly file this Proposed Joint Trial Memorandum pursuant to the Court's order in this case dated December 22, 2004 (docket entry # 113) (which set the January 31, 2005 deadline), the parties' joint motion for a two-day extension of such deadline, until February 2, 2005, the Local Rules of Civil Procedure's Standing Order Regarding Trial Memoranda in Civil Cases (the "Standing Order"), and the Court's standard Trial Memorandum Order (Non-Jury Cases) (the "Trial Memorandum Order").  The following documents are attached hereto:

| Tab | Document |
|-----|----------|
| 1 | Curriculum vitae of plaintiffs' expert, Alan A. Schachter |
| 2 | Materials considered by Alan A. Schachter |
| 3 | Qualifications of plaintiffs' expert, George M. Shawah |
| 4 | Curriculum vitae of defendant's expert, Edward J. Deak |
| 5 | Curriculum vitae of defendant's expert, John H. Arnold |
| 6 | Plaintiffs' motion in limine as to Ferry Company financial information, John H. Arnold and Edward J. Deak |
| 7 | Port Authority's motion in limine as to Alan A. Schachter |
| 8 | Port Authority's motion in limine as to George M. Shawah |

1.    **Trial Counsel**

For Plaintiffs:

Martin Domb (ct 09544)
Eric M. Underriner (ct 26020)
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

Jonathan Bowman (ct 08526)
Stewart I. Edelstein (ct 06021)
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

For Defendant:

Edward J. Sheppard, #CT24760
THOMPSON COBURN LLP
1909 K Street, NW, #600
Washington, DC 20006
Tel. (202) 585-6900

Timothy F. Noelker, #CT26291
Jason C. Rahoy, # CT26290
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
Tel. (314) 552-6000

2.    **Jurisdiction**

(a)    **Plaintiffs' statement**

This Court has:  (a) original jurisdiction over this action with respect to Claims I through

IV of the Amended Complaint, pursuant to 28 U.S.C. § 1331, in that such claims arise under the

Constitution or laws of the United States, and (b) supplemental (or pendent) jurisdiction with

respect to the remaining claims (V, VI and VIII) (plaintiffs withdraw claim VII), pursuant to 28

U.S.C. § 1367, in that such claims are so related to the claims within the Court's original

jurisdiction that they form part of the same case or controversy under Article III of the United

States Constitution.

**(b)    Defendant's statement**

On September 8, 2004, this Court ruled that it "has subject matter jurisdiction over the plaintiffs' claims, as the case arises under the United States Constitution and the laws of the United States within the meaning of 28 U.S.C. § 1331."  (Docket #88, p. 6)  As a result, the Court found that the Federal Maritime Commission ("FMC") "does not have jurisdiction over this action…."  Id. at 11.

Nonetheless, it remains the position of the Bridgeport Port Authority ("Port Authority") that this Court should decline jurisdiction of this case in favor of the FMC under the doctrine of primary jurisdiction, as discussed more fully in the Port Authority's Motion to Dismiss (Docket #13) and Memorandum in Support (Docket #14).  This case presents complex maritime economic regulatory issues, including the validity and reasonableness of the passenger wharfage charge imposed by the Port Authority, that require the resolution of issues identical to those that have been placed within the special competence of the FMC.  See Port of Boston Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 68 (1970).  Therefore, the validity of the passenger wharfage charge should be decided by the FMC.

Because this Court should decline from exercising subject matter jurisdiction over the federal claims raised in Plaintiffs' Amended Complaint, the Port Authority respectfully submits that this Court should also not exercise its supplemental jurisdiction over the state law claims.  See 28 U.S.C. § 1367(c).

**3.    Jury/Non-Jury**

This is a non-jury trial, as neither plaintiffs nor defendant have requested a jury.

**4.**    **Nature of Case**

**(a)**    **Plaintiffs' Statement**

**Nature of case generally**.  The nature of this case was summarized by the Court in its

September 8, 2004, ruling in this case:

> The subject of this action is the validity of a passenger wharfage fee
> ("Passenger Fee") that the Port Authority imposes on all ferry passengers.
> This Passenger Fee – which has been in effect since 1993 – is collected by
> the Ferry Company and then turned over to the Port Authority.
>
>     The plaintiffs' amended complaint challenges the legality of the
> Passenger Fee, claiming that it violates the Rivers and Harbors
> Appropriation Act of 1884, the Commerce Clause of the U.S.
> Constitution, the right to travel under the U.S. Constitution, the Tonnage
> Clause of the U.S. Constitution, and several Connecticut Statutes.  The
> basis for those claims by the Ferry Company is its contention that the Port
> Authority uses only a portion of the Passenger Fee proceeds to support
> activities related to ferry operations, and "spends the great bulk of such
> proceeds mostly for its own purposes, unrelated to the ferry."  The
> Amended Complaint also asserts a claim for unjust enrichment.

Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 335 F. Supp.2d 275,

276 (D. Conn. 2004) (footnotes omitted).

Stated differently, the essential factual basis for all of the alleged causes of action is that,

since 1993, when the Port Authority imposed the Passenger Fee, and through the present, the

proceeds of the Passenger Fee consistently have exceeded by a substantial amount the reasonable

cost to the Port Authority of the facilities and services that the Port Authority actually has

provided to the ferry operation.

**Authority for each affirmative claim**.  The principal authority for each affirmative

claim is summarized as follows:

| Affirmative Claim | Principal Authority |
|---|---|
| I.  Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5(b) | Text of statute. |
| II.  Commerce Clause, U.S. Const., art. I, § 8, clause 3 ("The Congress shall have Power . . . To regulate Commerce among the several States . . . .") | Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 370, 114 S.Ct. 855 (1994) (user fees may not be excessive in relation to the cost of the governmental benefit conferred).<br><br>Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc., 405 U.S. 707, 719, 92 S.Ct. 1349 (1972) (same).<br><br>Commonwealth Edison Co. v. Montana, 453 U.S. 609, 622 n. 12, 101 S.Ct. 2946 (1981) (fees must not appear to be manifestly disproportionate to the services rendered).<br><br>American Trucking Associations, Inc. v. Scheiner, 483 U.S. 266, 290, 107 S.Ct. 2829 (1987) (fees imposed by state on trucks using its highways violated Commerce Clause because, *inter alia*, the fees "do not even purport to approximate fairly the cost or value of the use of Pennsylvania's roads").<br><br>Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439 (1937) ($15 per vehicle fee was excessive and violated Commerce Clause, as state's cost of providing services for which fee was imposed was one-third of the fee proceeds).<br><br>Clark v. Paul Gray, Inc., 306 U.S. 583, 599, 59 S.Ct. 744 (1939) (user fee may not be manifestly disproportionate to the cost of the services rendered).<br><br>New Orleans S.S. Ass'n v. Plaquemines Port, Harbor and Terminal Dist., 874 F.2d 1018, 1021 (5th Cir. 1989) ("Plaquemines") (to satisfy Commerce Clause, port fee "must be used to pay for the service [provided]"). |

| | | |
|---|---|---|
| III. | Constitutional Right to Travel (under various constitutional provisions) | Jones v. Helms, 452 U.S. 412, 419, 101 S.Ct. 2434 (1981) ("a State may neither tax nor penalize a citizen for exercising his right to leave one State and enter another").<br><br>Zobel v. Williams, 457 U.S. 55, 66, 102 S.Ct. 2309 (1982) (Brennan, J. concurring) (freedom to travel throughout the United States has long been recognized as a basic right under the Constitution). |
| IV. | Tonnage Clause, U.S. Const., art. I, § 10, clause 3 ("No State shall, without the Consent of Congress, lay any Duty of Tonnage. . . .") | Clyde Mallory Lines v. State of Alabama ex rel. State Docks Commission, 296 U.S. 261, 264, 56 S.Ct. 194 (1935) (user fee complies with Tonnage Clause if it is "a reasonable charge for a service").<br><br>Plaquemines, *supra*, 874 F.2d at 1023 (fees pass muster under Tonnage Clause if they are imposed for "services rendered to and enjoyed by the vessel").<br><br>Hawaiian Navigable Waters Preservation Soc. v. State of Hawaii, 823 F. Supp. 766, 776 (D. Hawaii 1993) (Tonnage Clause does not prohibit a state "from charging reasonable fees in return for services rendered"), *aff'd*, 42 F.3d 1185 (9th Cir. 1994). |
| V. | Duplication of Charges, Unjust Enrichment | Jewell v. Medical Protective Co., 2003 WL 22682332, at *2 (D. Conn. 2003), *quoting* Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283, 649 A.2d 518 (1994) (elements of claim for unjust enrichment under Connecticut law). |
| VI. | State port authorities enabling statute, Conn. Gen. Stat. §§ 7-329a to 7-329u | Text of statute. |
| VII. | Unlawful Tax or User Fee Under Connecticut Law | This claim is withdrawn. |

| VIII. Connecticut Unfair Trade Practices Act ("CUPTA"), Conn. Gen. Stat. § 42-110a *et seq.* | Text of statute; see especially §§ 42-110a (definitions of "person" and of "trade" and "commerce"); 42-110b (unfair trade practices prohibited); 42-110g (action for damages, punitive damages, attorneys' fees). |
|---|---|
| | Frillici v. Town of Westport, 2001 WL 1330008, at *4 (Conn. Super., Oct. 12, 2001) (rejected claim that all municipalities and their agencies are exempt from CUTPA as a matter of law). |
| | Town of Manchester v. United Stone America, Inc., 2000 WL 872459 (Conn. Super., Jun. 15, 2000) (same). |

**Relief sought**.  Plaintiffs seek the following relief:

With respect to each claim (except Claim VII, which plaintiffs withdraw):

(i)     The Ferry Company seeks compensatory damages for the period 1993 to date, consisting of the difference between (A) the actual net proceeds of the Passenger Fee to the Port Authority and (B) the reasonable cost to the Port Authority of the facilities and services that the Port Authority actually has provided to the ferry operation (such difference is referred to herein as the "Overcharge");

(ii)    Plaintiffs D & D Wholesale Flowers Inc. ("D&D") and Zahradka seek compensatory damages for the period 1993 to date consisting of the amount of the Overcharge that they have actually paid;

(iii)   All plaintiffs seek (1) a permanent injunction enjoining the Port Authority from imposing or collecting the Passenger Fee to the extent that it results in an Overcharge, and (2) a declaratory judgment that the Port Authority is barred from imposing or collecting the Passenger Fee to the extent that it results in an Overcharge;

(v)     The costs of this action; and

With respect to Claim VIII (under CUTPA):

(vi)    All plaintiffs seek punitive damages, pursuant to Conn. Gen. Stat. § 42-110g(a), against the Port Authority in an amount to be determined at trial, as well as recovery of plaintiffs' reasonable attorneys' fees, pursuant to Conn. Gen. Stat. § 42-110g(d).

**(b)    Defendant's Statement**

**A.    The Port Authority's Passenger Wharfage Charge**

This action is about the validity of a modest passenger wharfage charge that the Port Authority collects from ferry passengers for the purpose of recouping the reasonable and necessary expenses it incurs in operating and administering the Ferry terminal.

The Port Authority is authorized under Connecticut Statute, Supreme Court precedent, and relevant case law to impose the passenger wharfage charge on passengers of the Ferry Company to defray the cost of providing facilities and services necessary to operate and administer the Ferry terminal.  In result, the passenger wharfage charge is reasonable, appropriate and legally valid.  It enables the Port Authority to provide numerous services and excellent facilities for the benefit of the Ferry Company, its passengers, and other users of the Port of Bridgeport that are both reasonably related to the cost of the benefits and services offered by the Port Authority and necessary to the Port Authority's continuing operation.

When a fee or charge is imposed by a local transportation agency, like the Port Authority here, courts generally defer to the local transportation agency's determination of what fee is necessary and appropriate for the services that it provides; so long as a charge is constitutional, federal courts will defer to the local governing body.  <u>Evansville-Vanderburgh Airport Auth.</u>

Dist. v. Delta Airlines, 405 U.S. 707, 713 (1972)[1]; see also Wallach v. Brezenoff, 930 F.2d 1070 (3d Cir. 1991) (rejecting argument that toll increase on bridges and tunnels over the Hudson River was a violation of constitutional right to travel); New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist, 874 F.2d 1018, 1023 (5th Cir. 1989) (rejecting claim that charge imposed on ships entering port as means of financing services violated the Tonnage Clause of the U.S. Constitution); Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y. & N.J., 571 F. Supp. 576, 583 (E.D.N.Y. 1983) (cautioning plaintiffs that federal courts will not substitute their judgment for the specialized experience and expertise of the state or local government by conducting an extensive cost-benefit analysis of the agency's decision-making process).

Port authorities traditionally have been permitted to charge reasonable fees in return for services rendered to and enjoyed by vessels using its facilities. See Clyde Mallory Lines v. Alabama, 296 U.S. 261, 265-66 (1935); see also Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n, 390 U.S. 261, 281 (1968) (A "relatively small charge imposed uniformly for the benefit of an entire group can be reasonable . . . even though not all members of the group receive equal benefits"); Plaquemines Port, Harbor and Terminal Dist. v. Federal Mar. Comm'n, 838 F.2d 536, 544-46 (D.C. Cir 1988) (upholding "reasonable charge for general services" rendered by the port); Cargill, Inc. v. Federal Mar. Comm'n, 530 F.2d 1062, 1066, 1068-69 (D.C. Cir 1976) (recognizing that marine terminal operator can impose reasonable charges for the use of terminal facilities and services); Hawaiian Navigable Waters Preservation Soc'y v. Hawaii, 823 F. Supp. 766, 776 (D. Haw. 1993) (holding that mooring and anchoring fees

---

[1] In response to the Court's decision in Evansville-Vanderburgh, Congress enacted the Anti-Head Tax Act, 49 U.S.C. § 1513(a). However, the Court continues to apply the three-part Evansville-Vanderburgh test to determine whether a charge is reasonable. See Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 369 (1994).

charged by Hawaii for the "use of restroom facilities, parking, trash disposal, and security" valid under the Tonnage Clause). Fees imposed by port authorities for pilotage, wharfage, for the use of locks on navigable rivers, or for medical inspections have been held to be valid. See Clyde Mallory, 296 U.S. at 265-66. Reasonable fees for services which inure to the benefit of all who enter the port are not constitutionally prohibited. See id. at 266-67.

In this regard, local governmental bodies, such as public port authorities, are permitted to impose reasonable, non-discriminatory regulations upon trade. See Indiana Port Comm'n v. Bethlehem Steel Corp., 534 F. Supp. 858, 864 (N.D. Ind. 1981); see also New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist., 690 F. Supp. 1515, 1522 (E.D. La. 1988) ("[P]laintiff's challenge ignores the clear principle of the commerce clause that only unreasonable burdens on interstate commerce by a state will be struck down."). Local port charges imposed to defray the cost of facilities used in the aid of interstate commerce "have consistently been held to be permissible." New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist., 874 F.2d 1018, 1021-22 (5th Cir. 1989) (citing Clyde Mallory, 296 U.S. at 267).

An exact and precise correlation between the services offered and the wharfage charge collected by a local transportation authority is not necessary. The U.S. Supreme Court has held that a fee can be valid even when the revenues generated from the charge exceed the outlays. See Massachusetts v. United States, 435 U.S. 444, 470 n.25 (1978). The resultant surplus can be offset against deficits from previous years, or against projected future deficits. See id.; see also Evansville-Vanderburgh, 405 U.S. at 719-20. Future development plans can also be taken into account when setting fees given the long-term nature of maintaining and developing a facility; to hold otherwise would increase rather than mitigate the burden on interstate commerce. See

<u>Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority</u>, 906 F.2d 516, 522 (11th Cir. 1990).

The Port Authority's wharfage charge does not make it more difficult for the Ferry Company to increase its profits because the charge does not restrict its ability to impose greater fees on its passengers, or to attract larger numbers of passengers, as is demonstrated by the steady increase in ferry traffic notwithstanding annual ferry ticket price increases. The Ferry Company's ability to squeeze a larger profit out of its passengers is irrelevant to the issue of whether a fee imposed by a local governing body is reasonable and valid. <u>See, e.g.</u>, <u>Toye Bros. Yellow Cab Co. v. Irby</u>, 405 F. Supp. 911, 914 (E.D. La. 1969).

**B.    Count I - Rivers and Harbors Appropriation Act of 1884, as Amended, 33 U.S.C. § 5(b)**

The passenger wharfage charge imposed by the Port Authority does not violate the Rivers and Harbors Act of 1884 ("RHA"), as amended by the Maritime Transportation Security Act of 2002, Pub. L. 107-295, 116 Stat. 2064 ("MTSA"). The Rivers and Harbors Appropriation Act was recently amended by MTSA, which added the following subsection:

(b)    No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for

(1)    fees charged under section 2236 of this title; or

(2)    reasonable fees charged on a fair and equitable basis that—

(A)    are used solely to pay the cost of a service to the vessel or water craft;

(B)    enhance the safety and efficiency of interstate and foreign commerce; and

(C)     do not impose more than a small burden on interstate or foreign commerce.

33 U.S.C. § 5(b).

In this case, the Port Authority imposes the passenger wharfage charge on a fair and equitable basis in relation to the services and benefits provided to the Ferry Company and ferry passengers.  The passenger wharfage charge is applied to the costs of facilities and services provided to the Ferry Company and ferry passengers.

In addition, the revenues generated from the passenger wharfage charge facilitate the safety and efficiency of interstate and foreign commerce.  For example, the Port Authority has been able to provide with wharfage charge funds increased security, a comfortable terminal building, and better roadway access to the terminal.  The modest passenger wharfage charge does not place a burden on interstate or foreign commerce, especially in light of the overall cost of a Ferry ticket.

Moreover, the RHA does not prohibit the Port Authority from imposing a passenger wharfage charge on transportation services across the Long Island Sound and in the harbors of Bridgeport, Connecticut and Port Jefferson, Long Island.  Generally, the MTSA was enacted to ensure greater security for our Nation's seaports, not to regulate the ability of a port to impose modest fees.  As a result, the MTSA has no impact on the Port Authority's ability to implement the wharfage charge or the validity of such a charge.

## C.     Count II - Commerce Clause of the United States Constitution

The passenger wharfage charge does not violate the Commerce Clause of the United States Constitution.  The Commerce Clause provides:  "The Congress shall have Power . . . [t]o regulate Commerce . . . among the several states."  U.S. Const. art. I, § 8, clause 3.  Plaintiffs

claim that the wharfage charge discriminates against interstate commerce and is unrelated to the services provided to Plaintiffs.

The passenger wharfage charge does not violate the Commerce Clause. The charge constitutes a user fee in that it provides revenue for the purpose of seeking reimbursement for the benefits and services provided to the Ferry Company and ferry passengers. See Center for Auto Safety, Inc., v. Athey, 37 F.3d 139, 142-43 (4th Cir. 1994). The passenger wharfage charge is not a tax designated to raise money for a general operating fund of the Port Authority. See id. at 142.

There is no requirement that a user fee "be precisely calibrated to the use that a party makes of Government services." United States v. Sperry Corp., 493 U.S. 52, 60 (1989). A user fee is valid if it: (1) reflects a fair, if imperfect, approximation of the cost of using state facilities for the user's benefit; (2) does not discriminate against interstate commerce; and (3) is not excessive in relation to the cost incurred by the charging authorities. See id. (citing Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, 405 U.S. 707, 716-20 (1972)); see also Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n, 390 U.S. 261, 281 (1968) (A "relatively small charge imposed uniformly for the benefit of an entire group can be reasonable . . . even though not all members of the group receive equal benefits."); Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 906 F.2d 516, 518 (11th Cir. 1990).

The passenger wharfage charge – a user fee – reflects a fair approximation of the costs of operating and maintaining services provided by the Port Authority for the benefit and enjoyment of the Ferry Company and ferry passengers. Moreover, a fee that charges different amounts to different users is not a *per se* violation of the Commerce Clause. Evansville-Vanderburgh, 405 U.S. at 715-19.

The amount of the wharfage charge is primarily left to the determination of the state or local government imposing the fee; so long as the charge is reasonable and fixed according to some fair standard, the charge does not violate the Commerce Clause and courts will generally defer to the local governing body. See id. at 713. In this case, the Port Authority has established the wharfage charge to closely approximate the costs incurred by the Port Authority for operating and administering the Ferry terminal. In fact, Port Authority expenditures that are attributable solely to Ferry operations actually exceed revenues obtained from the passenger wharfage charge and rental agreement income.

The passenger wharfage charge does not discriminate against interstate commerce. On the contrary, the charge provides revenue that allows the Port Authority to ensure the efficient operation of an adequate port facility thereby facilitating the flow of transportation. This, in turn, permits passengers to travel to various locations in furtherance of interstate commerce, and has an obviously beneficial impact upon the flow of interstate commerce.

### D.     Count III - Right to Travel under the United States Constitution

The passenger wharfage charge imposed by the Port Authority does not violate Plaintiffs' right to travel under the Commerce Clause, U.S. Const., art. I, § 8, clause 3, and Privileges and Immunities Clauses of the U.S. Constitution, U. S. Const., Amend. XIV, § 1.

The right to travel "has been firmly established and repeatedly recognized by the federal courts." United States v. Guest, 383 U.S. 745, 757 (1966). Federal courts apply a three-prong test to determine if a fee violates the passenger's constitutional right to travel: (1) whether the charge discriminates against interstate travelers; (2) if it represents a fair approximation of the use conferred on those who pay the fee; and (3) if it is excessive in relation to the costs incurred. Evansville-Vanderburgh, 405 U.S. at 712-22; Wallach v. Brezenoff, 930 F.2d 1070, 1072 (3rd

Cir. 1991).

The passenger wharfage charge does not discriminate against interstate travelers. The U.S. Supreme Court has found that a charge that imposes on an interstate traveler such traveler's fair share of the government costs in maintaining a public facility for that traveler's use is valid and does not violate the right to interstate travel. See Evansville-Vanderburgh, 405 U.S. at 714-17.

Moreover, the passenger wharfage charge represents a fair approximation of the use conferred on those ferry passengers who pay the fee. In addition, the passenger wharfage charge is not excessive in relation to the Port Authority's costs to provide the benefits and services; rather, the fee collected by the Port Authority from ferry passengers is reasonably related to the services and facilities provided by the Port Authority and benefits conferred upon the Ferry Company and its passengers.

### E.     Count IV - Tonnage Clause of the United States Constitution

The passenger wharfage charge does not violate the Tonnage Clause of the United States Constitution, U. S. Const., art. I, § 10, clause 3. The Tonnage Clause "prohibits reliance on tonnage duties to raise general revenues, to regulate trade, or to charge for the privilege of entering, lying in, or trading in a port." New Orleans S.S. Ass'n, 874 F.2d at 1020, 1023.

The Port Authority does not impose the passenger wharfage charge for raising general revenues, regulation or a payment for the use of the port. Instead, the wharfage charge is imposed to defray the costs of services and benefits provided to ferry passengers, and is therefore valid under the Tonnage Clause. Id.

As discussed above, the wharfage charge does not burden interstate commerce, rather it allows the Port Authority to provide benefits and services that facilitate the efficient flow of

passengers and vehicles, thereby fostering the growth of interstate commerce.  Port authorities and other marine terminal operators traditionally have been permitted to charge reasonable fees in return for services rendered to and enjoyed by the vessel.  See Clyde Mallory, 296 U.S. at 265-66; see also Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n, 390 U.S. 261, 281 (1968) (A "relatively small charge imposed uniformly for the benefit of an entire group can be reasonable . . . even though not all members of the group receive equal benefits"); Plaquemines Port, Harbor and Terminal Dist. v. Federal Mar. Comm'n, 838 F.2d 536, 544-46 (D.C. Cir 1988) (upholding "reasonable charge for general services" rendered by the port); Cargill, Inc. v. Federal Mar. Comm'n, 530 F.2d 1062, 1066, 1068-69 (D.C. Cir 1976) (recognizing that marine terminal operator can impose reasonable charges for the use of terminal facilities and services); Hawaiian Navigable Waters Preservation Soc'y v. Hawaii, 823 F. Supp. 766, 776 (D. Haw. 1993) (holding that mooring and anchoring fees charged by Hawaii for the "use of restroom facilities, parking, trash disposal, and security" valid under the Tonnage Clause).

Fees imposed by port authorities for pilotage, wharfage, for the use of locks on navigable rivers, or for medical inspections have been found to be valid.  See Clyde Mallory, 296 U.S. at 265-66.  Reasonable fees for services which inure to the benefit of all who enter the port are not constitutionally prohibited.  See id. at 266-67.  Even a ship that pays a charge merely to ensure that a service is available, but does not use that service, does not have a legitimate claim that the fee in question is unconstitutional.  See New Orleans S.S. Ass'n, 874 F.2d at 1023.

In the instant case, the Port Authority imposes a reasonable and fair charge, and uses the proceeds to defray the cost of providing specific services to the ferry passengers and to operate and maintain facilities that benefit Plaintiffs and other passengers that ride the Ferry.  For example, a few of these services include, port security, parking, restrooms, clean walkways, and

maintenance of facilities. The charge does not exceed the value of the benefits, services and facilities offered to and enjoyed by the Ferry Company and its passengers. These benefits and services provided through revenues generated by the wharfage charge enhance the safety and efficiency of interstate commerce, and do not burden instate commerce.

### F.     Count V - Duplication of Charges; Unjust Enrichment

The Port Authority has not duplicated charges and has not been unjustly enriched by the imposition of the passenger wharfage charge. To establish that the Port Authority was unjustly enriched, the Ferry Company must prove that: (1) the defendant benefits from the transaction; (2) the defendant's failure to compensate the plaintiff for the benefit defendant received is unjust; and (3) the failure to pay is to the plaintiff's detriment. See Hartford Whalers Hockey Club. v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283 (1994); see also Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 752 (2d Cir. 1998) (affirming district court's holding that plaintiff could not recover for unjust enrichment); Weisman v. Kaspar, 233 Conn. 531, 538-39 (1995) (reversing trial court's decision that plaintiff was unjustly enriched). Plaintiffs must prove all three elements to succeed on their claim for unjust enrichment.

First and foremost, the Port Authority itself does not benefit from the revenues generated from the passenger wharfage charge. Instead, the Port Authority uses the funds that it collects from the passenger charge to provide services and facilities that directly benefit all users of the Port. All revenues collected by the Port Authority are, in effect, returned to those who pay the charge. Any reduction in the wharfage charge will result in a proportional reduction in benefits and services offered to users of the Port.

Plaintiffs have suffered no harmed by the Port Authority's imposition of the passenger wharfage charge. In particular, the wharfage charge does not negatively impact the Ferry

Company's ability to generate additional profits.  Any impact on the Ferry Company's revenues is negligible and insignificant compared to the impact of the Ferry Company's business operations; i.e., limitations on the capacity of the ferry boats.

### G.    Count VI - Connecticut General Statue §§ 7-329a to 7-329u

The imposition of the passenger wharfage charge is authorized by the Port Authority's enacting statutes, Conn. Gen. Stat. §§ 7-329a to 7-329u.  Specifically, Conn. Gen. Stat. §§ 7-329c authorizes the Port Authority to develop, operate, and regulate port facilities in its district "with a view to the increase and efficiency of all such facilities and the furtherance of commerce and industry in the district."  Id.  The developments and improvements to the Port of Bridgeport made possible by the Port Authority certainly further commerce and economic development within the district.

In addition, section 7-329i authorizes the Port Authority to "fix, revise, charge and collect rates, rents, <u>fees and charges</u> for the use of and for the services furnished or to be furnished <u>by each project</u> . . . (1) to pay the cost of <u>maintaining, repairing and operating the project</u> and each and every portion thereof, to the extent that the payment of such costs has not otherwise been adequately provided for…."  CONN. GEN. STAT. § 7-329i (emphasis added).  A "project" is defined in section 7-329b(2) as "the acquisition, purchase, construction, reconstruction, improvement or extension of a <u>port facility</u>."  <u>Id</u>. at § 7-329b(2) (emphasis added).

"Port facilities" include:  "<u>properties, buildings, structures or other facilities</u> necessary or desirable for commerce and industry or waterfront development within a district or <u>in connection with the development and operation of port facilities</u>…."  <u>Id</u>. at § 7-329b(4) (emphasis added).

Together, the express language of this statute authorizes the Port Authority to impose the passenger wharfage charge.  The passenger wharfage charge, and any incremental adjustments

thereto, is imposed for the purpose of maintaining, repairing or operating port authority

"projects" for the increase and efficiency of all such "port facilities" that further commerce and

industry which substantially benefit the Bridgeport harbor.

### H.    Count VII - Unlawful Tax or Use Fee Under Connecticut Law

The passenger wharfage charge is not illegal or invalid in so much as the charge is

deemed to be a tax.  Rather, the wharfage charge is a user fee in that the charge collects revenue

for the purpose of seeking reimbursement for the benefits and services that the Port Authority

provides to the Ferry Company and ferry passengers.  See Center for Auto Safety, Inc., v. Athey,

37 F.3d 139, 142-43 (4th Cir. 1994).

In particular, Conn. Gen. Stat. § 7-329c(10) authorizes the Port Authority to "[f]ix fees,

rates, rentals and other charges for such facilities owned by the port authority and collect such

fees, rates, rentals and other charges for such facilities owned by the port authority…."  Further,

section 7-329i permits the Port Authority to "fix, revise, charge and collect rates, rents, fees and

charges for the use of and for the services furnished or to be furnished by each project…."  Id. §

7-329i.

The wharfage charge, as discussed above, is a valid user fee because:  (1) it reflects a fair

approximation of the cost of using state facilities for the port users' benefit; (2) does not

discriminate against interstate commerce; and (3) is not excessive in relation to the cost incurred

by the Port Authority to provide such facilities, services, and benefits.  See Evansville-

Vanderburgh, 405 U.S. at 716-20.

### I.    Count VIII - Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a *et seq*. ["CUTPA']

The imposition of the passenger wharfage charge does not violate the Connecticut Unfair

Trade Practices Act, Con. Gen. Stat. § 42-110a, *et seq.*, ("CUTPA").  A violation of CUPTA

requires that Plaintiffs prove:  (1) that the conduct constitutes an unfair or deceptive trade

practice; and (2) a basis for a reasonable estimate of damages.  See Chem-Tek, Inc. v. General

Motors Corp., 816 F.Supp. 123, 130 (D. Conn. 1993).

      An unfair practice under Connecticut law is offensive to public policy as set forth by

statute, common law, or some other established conduct of unfairness; immoral, unethical,

oppressive, or unscrupulous; and causing substantial injury to consumers, competitors or

businessmen.  See id.; see also Eadie v. McMahon & Titan Sports, Inc., 1997 WL 289679, at *17

(D.Conn., March 12, 1997).  A substantial injury must meet the following criteria:  (1) it must be

substantial; (2) it must not be outweighed by any countervailing benefits to consumers or

competition that the practice produces; and (3) it must be an injury that consumers themselves

could not have reasonably avoided."  Chem-Tech., 816 F.Supp. at 130.

      The business practices of the Port Authority in imposing the passenger fee are proper as

they do not offend public policy, are neither unfair, immoral, unethical, oppressive, nor

unscrupulous, and in fact, provide a substantial benefit to all users of the Port, specifically

including the Ferry Company and its passengers.

      In addition, Plaintiffs are not substantially injured by imposition of the wharfage charge.

Any negligible harm that the Ferry Company or passengers allege in their Amended Complaint is

outweighed by the countervailing significant benefits Plaintiffs receive as a result of the services

and benefits funded by the charge.  This is evidenced by the increasing demand for Ferry

services due in part to the facilities and benefits provided by the Port Authority.  As a result,

Plaintiffs cannot establish a reasonable estimate of damages attributable to the imposition of the

passenger charge.

**5.    Stipulations**

    **(a)    Stipulations of Fact.**  The parties state that the following material facts are undisputed:

    1.    Plaintiff Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company") is a corporation organized under the laws of Connecticut, with a principal place of business at 102 West Broadway, Port Jefferson, New York 11777.

    2.    The Ferry Company operates a public ferry service for passengers and vehicles between Bridgeport, Connecticut and Port Jefferson, Long Island, New York.  The ferry operates every day throughout the year according to published schedules.

    3.    Brian A. McAllister is the President of the Ferry Company and the sole shareholder of McAllister Towing and Transportation, Inc., which in turn is the sole shareholder of the Ferry Company.

    4.    Plaintiff D & D Wholesale Flowers Inc., is a corporation owned by Greg Rose, a natural person, formally named as a plaintiff in this action.  This Court substituted D & D Wholesale Flowers Inc. as plaintiff in place of Mr. Rose.

    5.    Plaintiff Frank C. Zahradka is a natural person.

    6.    Defendant Bridgeport Port Authority ("Port Authority") is a port authority created and existing pursuant to Connecticut law, Conn. Gen. Stat. §§ 7-329a to 7-329u, with its principal place of business at 330 Water Street, Bridgeport, Connecticut 06604.

    7.    Joseph C. Savino currently is the harbor master of the City of Bridgeport and the Chairman of the Port Authority's Board of Commissioners.

    8.    Joseph A. Riccio, the Port Authority's Executive Director, directs the day-to-day activities of the Port Authority.  The Port Authority has two additional employees, Martha

Klimas and Charmaine Johnson, who, among other things, assist Mr. Riccio in his day-to-day duties.

9.     The Ferry Company leases dock facilities in Bridgeport at the Water Street Dock (the "Dock") pursuant to a lease agreement between the Port Authority and the Ferry Company dated December 1, 1998, as amended by a first amendment to such lease agreement dated July 29, 2002 (the "Current Lease").

10.     Under paragraph 1(a) of the Current Lease, the Port Authority conveys to the Ferry Company "a non-exclusive preferential use" of certain port facilities and related rights. Said paragraph provides in relevant part:

> The Port Authority hereby conveys to the [Ferry] Company a nonexclusive preferential use of the dock on the Premises during the times regularly scheduled for arrivals and departures of the [Ferry] Company's ferry boats, for the embarking and debarking of passengers and vehicles between its ferry boats and the Premises, together with the appurtenant right to permit the [Ferry] Company's passengers to stage their vehicles in adjacent staging areas owned by the Port Authority and designated for their use solely while such passengers are waiting to embark on such regularly scheduled ferry boats . . . .

11.     The "Premises" which are the subject of the Current Lease are described as follows:

> WHEREAS, the Port Authority is the owner of the dock designed for the docking of vessels and loading and unloading of cargo and passengers, and the shoreline of premises at 330 Water Street, Bridgeport, Connecticut, known as the Water Street Dock (the "Premises"); . . . .

12.     Under paragraph 1(b) of the Current Lease, the Ferry Company is entitled to make use of the Premises in the following additional respects: (a) a food concession which is the subject of a separate lease between the Port Authority and an affiliate of the Ferry Company, (b) "such office space and waiting room space at the Premises as the Port Authority may from time-

to-time make available to the Company," and (c) up to four parking spaces which the Port

Authority may make available to the Company's employees.

13.     The Premises include a two-story terminal building which was built in 1995 (the

"Terminal").  The food concession, office space and waiting room space referred to in the

preceding paragraph are contained in the Terminal.

14.     Construction of the Terminal was financed at least in part by a grant in the

amount of $1,869,900 from the U.S. Department of Transportation, Federal Highway

Administration, as part of its Ferry Boat Discretionary ("FBD") Program.  The FBD Program

was established pursuant to federal legislation which authorizes federal funding for the

construction of ferry boats and ferry terminal facilities.

15.     The Port Authority sought funding for the Terminal under the FBD Program, and

the federal government provided such funding, on the premise that the funds were to be used for

construction of a ferry terminal and related facilities.

16.     In 1999, the Port Authority received additional federal grants under the FBD

Program in the amounts of (a) $2 million, for *inter alia* construction of a parking garage at the

Terminal, and (b) $1.5 million, for improvements to the Dock.

17.     The term of the Current Lease commenced on December 1, 1998, and extends

until November 30, 2011, and may be extended by the Ferry Company for two additional terms

of ten years each.

18.     The Current Lease requires the Ferry Company to pay rent to the Port Authority at

annual rates in equal monthly installments.  The annual payments increase each year, ranging

from $100,000 for the initial year (December 1, 1998 to November 30, 1999) to $158,956 for the

final year prior to any extensions (December 1, 2010 to November 30, 2011).

19.     Under the Current Lease, the Ferry Company is granted "a non-exclusive preferential use" of the Dock and related facilities and the Port Authority "reserves for itself all other uses" thereof.

20.     The Current Lease also requires the Ferry Company to (among other things):

    (a)     purchase and maintain insurance covering the Premises;

    (b)     indemnify the Port Authority with respect to any claim arising from the activities of the Ferry Company; and

    (c)     undertake snow removal.

21.     A restaurant and food services facility is operated in the Terminal by Steamboat Concessions, Inc. ("Concessions"), a wholly-owned subsidiary of the Ferry Company, pursuant to a Lease and Food Services Agreement entered into in August 1996 between the Port Authority, as landlord, and Concessions, as tenant (the "Food Services Lease").  Pursuant to the Food Services Lease, Concessions is required to pay to the Port Authority:

    (a)     a basic monthly rent of $1,000 per month

    (b)     additional rent equal to (i) 1% of Concessions' annual gross receipts above $100,000 and up to $200,000, plus (ii) 2% of its annual gross receipts above $200,000; and

    (c)     additional rent of $700 per month to defray the Port Authority's cost of regular cleaning of the Terminal premises.

22.     Pursuant to the Food Services Lease, Concessions also is required to pay for its use of electricity, gas and telephone and to clean, maintain and make repairs to the premises it occupies at the Terminal.

23.     Since 1993, the Port Authority has imposed a fee on passengers and vehicles (the "Fee") embarking on or disembarking from the Ferry Company ferries at the Dock.

24.     This is the second action brought by the Ferry Company against the Port Authority regarding the validity of the Fee.  The first action was commenced in Connecticut state court in 1993, and removed to this Court.  The removed action was styled *Bridgeport & Port Jefferson Steamboat Company v. Bridgeport Port Authority*, No. 93-CV-745.  This prior litigation terminated in a settlement agreement dated April 8, 1993.

25.     From the time of the settlement in 1993 until late 2002, the Ferry Company collected the Fee from its passengers on behalf of the Port Authority.

26.     The Port Authority compensates the Ferry Company for collecting the Fee.  Since 1993, the Port Authority has paid the Ferry Company more than $200,000 to collect the Fee from its passengers.

27.     The fee that the Port Authority pays to the Ferry Company for collecting the Fee was increased in 2003 by $10,000 per year.

28.     Paragraph 7 of the Current Lease provides in full:

> The [Ferry] Company will continue to act as the agent of the Port Authority in collecting tariff charges imposed upon users of the ferry service under the same terms and conditions as heretofore in effect.  The tariff charges collected by the Company shall be remitted to the Port Authority not later than the tenth day of the month succeeding their collection.

29.     The Fee charges which were in effect at the time the Current Lease became effective, on December 1, 1998, are set forth in the table in paragraph 32 below.

30.     By letter dated December 10, 2002, the Port Authority informed the Ferry Company that the Port Authority intended to increase the Fee as set forth in the table below, and requested that the Ferry Company begin collecting the increased Fee on January 15, 2003:

| Categories | Fee 1996-2002 | Increase | Fee 2003 |
|---|---|---|---|
| Senior citizens and children, walk-on | $0.50 | $0.10 | $0.60 |
| Adult, walk-on | 0.75 | 0.25 | 1.00 |
| Auto including driver | 1.50 | 0.50 | 2.00 |
| Trucks over 25 feet | 2.00 | 0.25 | 2.25 |
| Cars with unlimited passengers | 2.50 | 0.25 | 2.75 |
| Monthly passes | 5.00 | 0.25 | 5.25 |

31.     By letter dated January 13, 2003, the Ferry Company informed the Port Authority that it would not begin collecting the increased Fee amounts on January 15, 2003.

32.     At a meeting on February 21, 2003, the Port Authority and the Ferry Company agreed on terms under which the Ferry Company would begin to collect the Fee at the increased rates.  Such agreement was confirmed in a Memorandum of Understanding signed by the representatives of the Port Authority and the Ferry Company.  The Memorandum of Understanding provided (among other things):

> This Memorandum of Understanding is without prejudice to either party's position regarding the Port Authority's right or power to impose the Tariff (including any increases in the rates thereof) or the validity or reasonableness of the Tariff in whole or in part.

33.     Since May 2003, the Ferry Company has been collecting the Fee at the increased rates identified in paragraph 32 above.

34.     This was the second time that the Port Authority increased the Fee since its inception in 1993, the other increase being in 1996.

35.     Only the ground floor of the two-story Terminal is used for ferry operations, including the food concession.  The entire second floor is occupied by the Port Authority and/or or licensees other than the Ferry Company.

36.     The tariff published by the Port Authority provides for the imposition and collection of (a) the Fee, with respect to ferry passengers and vehicles, and (b) a fee on all other vessels which use the Dock, calculated on a daily pro-rata basis according to the length of such vessels.

**(b)     Stipulations of Law**

The parties state that Chapter 2.28 of the Bridgeport City Code provides as follows:

PORT AUTHORITY

Sections:
2.28.010     Purpose and intent of chapter.
2.28.020     Definitions.
2.28.030     Board of commissioners.
2.28.040     Board officers, committees and voting procedures.
2.28.050     Powers and duties of the authority.
2.28.060     District properties.
2.28.070     Regulations by the authority.
2.28.080     Investigations.
2.28.090     Acquisition of property.
2.28.100     Bylaws, rules and regulations.
2.28.110     Financial restriction.
2.28.120     Reporting requirement.

**2.28.010     Purpose and intent of chapter.**

In accordance with Chapter 105, Sec. 7-329a to 7-329f of the Connecticut General Statutes, the city establishes the Bridgeport port authority within its confines, to be created and operated according to procedures set forth in Chapter 105, Sec. 7-329a to 7-329f, Connecticut General Statutes.  The purpose of the authority shall be: to foster and stimulate the shipment of freight and commerce through the ports of Bridgeport, Connecticut; to develop and promote port facilities with the district in order to create jobs, increase the city's tax base and provide special revenues to the city; to work with the government of the city to maximize the usefulness of available public funding by consolidating and coordinating private efforts to assist the city's waterfront and industrial development program, to cooperate with the state and federal agencies in the maintenance, development, improvement and use of district harbors, waterways and industrially zoned properties.  (Ord. dated 7/6/92 (part): prior code § 31)

**2.28.020        Definitions.**

In the interpretation of this chapter the following words and terms shall be taken to include the following meanings when context shall require or permit:

"Authority" means the body politic and corporate created by the ordinance codified in this chapter known as the Bridgeport port authority.

"Board" means the board of commissioners, the five members of the executive body appointed by the mayor of the city.

"City" means the city of Bridgeport.

"City officials" means the mayor of the city, the president of the common council of the city, the director of economic and community development of the city, the chairman of the harbor commission of the city, and the harbor master for the city, or his designee, who is an official appointed by a state agency.

"Commissioner" means any single member of the board of commissioners.

"Connecticut General Statutes" means the revision of 1958, as amended.

"District" means the port district as outlined in the Schedule A map attached to the ordinance codified in this chapter and found on file in the office of the city clerk and approved by the common council of the city; map will exclude residential and recreationally zoned properties from port authority jurisdiction except those that are water-related or water-dependent.

"Ex officio" means nonvoting member.

"Federal agency" means the United States of America, and any department of, or corporation, agency or instrumentality thereof, heretofore, or hereafter created, designated or established by the United States of America.

"Port facilities" means wharves, docks, piers, air or bus terminals, railroad tracks or warehouses, elevators, freight handling of freight, passengers and vehicles, and the establishment and operation of a port and any other works, properties, buildings, structures or other facilities necessary or desirable in connection with the development and operation of port facilities.

"State agency" means the state of Connecticut, and any department of, or corporation, agency or instrumentality thereof, or hereafter created, designated or established by the state of Connecticut. (Ord. dated 7/6/92 (part): prior code § 31-31)

**2.28.030        Board of commissioners.**

A.        The board of commissioners of the Bridgeport port authority shall consist of five voting members.  The voting members shall include two city officials, the director of economic development and the harbor master, and three at-large members who shall be electors of the city and who shall be appointed by the mayor and approved by the common council.  There shall be three ex officio city official members, the mayor, common council president, and harbor commission chairman.  The commissioners shall serve without compensation, except for reasonable and necessary expenses.

B.        City officials who are members of the board of commissioners shall retain this responsibility through their tenure as city officials.  At-large members of the board of commissioners shall be appointed for terms of three years, except that of those first appointed,

one shall be appointed for a term ending December 31, 1993, one for a term ending December 31, 1994 and one for a term ending December 31, 1995. (Ord. dated 7/6/92 (part): prior code § 31-32)

**2.28.040        Board officers, committees and voting procedures.**

The board shall elect one of their number chairman, and one vice-chairman.  The secretary and treasurer do not necessarily have to be a commissioner.  The board shall meet upon the call of the chairman and a majority of its members shall constitute a quorum.  Any action of the board must have at least three votes in favor or against to be considered valid.  The chairman shall appoint committee chairman from its ranks.  Except for the committee chairman, committee members do not necessarily have to be commissioners, but must be approved by he chairman of the board.  Committees shall only serve as an advisory role to the board.  (Ord. dated 7/6/92 (part): prior code § 31-33)

**2.28.050        Power and duties of the authority.**

The powers and duties of the authority are those set forth in Connecticut General Statutes Chapter 105, Sec. 7-329c. (Ord. dated 7/6/92 (part): prior code § 31-34)

**2.28.060        District properties.**

The properties included with the district shall be bounded and described as set forth in the Schedule A map attached to the ordinance codified in this chapter and found on file in the office of the city clerk, annexed hereto and made a part hereof.  The boundaries should include the Schedule A map attached to the ordinance codified in this chapter and found on file in the office of the city clerk and exclude all residentially zoned and recreationally zoned areas except those that are water-dependent, and industrially zoned sites deemed necessary to support the port facilities.  (Ord. dated 7/6/92 (part): prior code § 31-35)

**2.28.070        Regulations by the authority.**

The authority may make and enforce any reasonable regulations which it may determine to be necessary relating to the construction, equipment repair, maintenance, use and rental of any dock, wharf, slip, bus or air terminal, rail tracks or terminal or warehouse owned or leased by any individual or corporation within the district. (Ord. dated 7/6/92 (part): prior code § 31-36)

**2.28.080        Investigations.**

The authority may make any investigation which it may deem necessary to enable it to effectively carry out the provisions of Connecticut General Statutes Chapter 105, Sec. 7-329a to 7-329f, inclusive.  The authority may enter upon any lands as in its judgment may be necessary for the purpose of making surveys and examinations to accomplish any purpose authorized by said section.  (Ord. dated 7/6/92 (part): prior code § 31-37)

**2.28.090        Acquisition of property.**

The authority may lease or acquire title to real or personal property and may condemn real property located within the district which it deems necessary for the development of port facilities in the district, subject to the provisions of Connecticut General Statutes, Sec. 48-12. (Ord. dated 7/6/92 (part): prior code § 31-38)

**2.28.100        Bylaws, rules and regulations.**

The authority shall have the power to adopt, alter or repeal its own bylaws, rules and regulations governing the manner in which its business may be transacted, in which the power granted to it may be enjoyed, and may provide for the appointment of such committees, and the functions thereof, as the authority may deem necessary or expedient in facilitating its business. (Ord. dated 7/6/92 (part): prior code § 31-39)

**2.28.110        Financial restriction.**

No indebtedness of any kind incurred or created by the authority shall constitute an indebtedness of the city, or any political subdivision thereof, and no such indebtedness shall involve or be secured faith, credit or taxing of the city, or any political subdivision thereof. (Ord. dated 7/6/92 (part): prior code § 31-40)

**2.28.120        Reporting requirement.**

The authority shall issue a report to the common council of the city within six months at which time the authority shall request the transfer of city asset(s) deemed necessary for the purpose of developing port facilities and to recommend the method of payment for said asset(s). (Ord. dated 7/6/92 (part): prior code § 31-41)

**6.        Plaintiffs' Contentions** [2]

1.        Since 1993 and continuing through the present, the proceeds of the Passenger Fee imposed by the Port Authority have far exceeded the reasonable cost of the facilities and services that the Port Authority has provided to the Ferry Company and its passengers (the "ferry operation").

---

[2]  Plaintiffs herein, and defendant in section 7 below, state their respective factual contentions underlined generally (see Standing Order, ¶ 6).  They will submit their detailed proposed findings of fact within 30 days after the transcripts of the trial become available (see Trial Memorandum Order, ¶ 1, p. 2).  Exhibit references are to plaintiffs' proposed exhibits as listed in section 11 below.