**The Port Authority's Revenues**

2.      The proceeds of the Passenger Fee collected by the Port Authority are stated in its annual audited financial statements (Ex's 1-11) and are included in the chart in paragraph 6 below.

3.      The Port Authority also receives revenues under two leases relating to the ferry operation:  (a) a lease with the Ferry Company for use of the Water Street Dock and facilities (the lease currently in effect is referred to herein as the "Current Lease") (Exs. 28-29), and (b) a lease with Concessions, an affiliate of the Ferry Company, for use of part of the terminal building as a food concession (the "Food Services Lease") (Ex. 30).

4.      The proceeds from the Passenger Fee and the rentals from the Current Lease and the Food Services Lease account for substantially all of the Port Authority's operating revenues.

5.      The Port Authority's revenue from other sources has been minimal.  In 2004, the Port Authority began to receive some rental income under a long-term lease with Derecktor Shipyards (Ex. 66).  Such rental receipts are in relatively small amounts during the lease's early years (*id.* at p. 4) and do not contribute substantially to the Port Authority's operating revenues at present or over the next several years.  For example, receipts from the Derecktor lease in 2004 totaled $16,667 (Ex. 11 [2003 audited financials], note 12 at p. 12).

6.      According to the Port Authority's audited financial statements for the fiscal years ended December 31, 1993 through 2003, during each of those years the Passenger Fee collected from the Ferry Company's passengers and other revenues were as follows:

[chart appears on next page]

| Fiscal Year | Passenger Fee | Rental Income | Grant Income | Other Income | Total Operating Revenues |
|---|---|---|---|---|---|
| 1993 | $261,342 | | | $1,195 | $262,537 |
| 1994 | 449,682 | $56,666 | | 4,503 | 510,851 |
| 1995 | 461,396 | 82,584 | | 16,006 | 559,986 |
| 1996 | 649,015 | 85,000 | | 11,200 | 745,215 |
| 1997 | 678,134 | 95,000 | $6,727 | 14,053 | 793,914 |
| 1998 | 712,190 | 97,911 | 30,273 | 56,969 | 896,969 |
| 1999 | 804,287 | 90,672 | 4,850 | 19,309 | 919,118 |
| 2000 | 901,518 | 114,167 | | 23,522 | 1,039,207 |
| 2001 | 947,591 | 110,421 | | 16,253 | 1,074,265 |
| 2002 | 984,926 | 114,507 | | 54,649 | 1,154,082 |
| 2003 | 1,292,383 | 338,623 [3] | | 38,811 | 1,669,817 |

7.      As these figures show, total collections of the Passenger Fee have increased significantly since 1993.  The principal reasons for this increase are:  (1) steady increases in the number of vehicles and passengers, (2) the replacement of older ferry boats with newer and larger boats, (3) the addition of one ferry boat to the service, and (4) increases in Passenger Fee rates.

### The Port Authority's Activities

8.      Since its formation in 1993, the Port Authority has performed numerous activities, some of which have been directly related to the ferry operation, and many of which have not been so related.

---

[3]      $220,430 of this amount represents rental income from the Derecktor lease which the Port Authority recognized as income in 2003 (under an accounting rule applicable to leases with scheduled rent increases) even though its actual rental receipts from Derecktor in 2003 were zero.  In 2004 the Port Authority received rental payments from Derecktor totaling $16,667 but again recognized $220,430 in rental income from that lease (see Ex. 11, note 12, at pp. 11-12).

9.    The Port Authority's principal activities relating to the ferry operation have included:

(a)    Construction of a terminal building (the "Terminal"), which was completed in or about 1995.

(b)    Repairs to the dock.

(c)    Construction of a secondary access road to the Terminal and dock.

(d)    Operation and maintenance of the Terminal, dock and road.

10.    The capital costs of these ferry related activities were funded substantially or entirely by grants from federal, state or local governments.

11.    The Port Authority's principal activities not relating to the ferry operation have included:

(a)    Planning and development with respect to the Steel Point peninsula on Bridgeport harbor.

(b)    Acquisition by condemnation of approximately 47 acres of land formerly owned by Carpenter Technologies (the "Cartech site") and resulting litigation over the price of such land.

(c)    Planning and development with respect to the Cartech site (now also known as the Bridgeport Regional Maritime Complex, or "BRMC").

(d)    Development and leasing of a 23-acre portion of the Cartech site to Derecktor Shipyards.

(e)    Research, planning and development of a project to ship container trucks by barge from New York to Bridgeport (the "barge feeder project").

    (f)    Research and planning with respect to a project to operate a high-speed ferry (for passengers, not vehicles) between Bridgeport and other ports.

12.    The <u>capital</u> costs of these <u>non</u>-ferry related activities were funded substantially or entirely by grants from federal, state or local governments.  The costs of <u>managing and operating</u> these activities were and are being funded substantially or entirely from the Port Authority's operating revenues.

13.    Since 1993, the Port Authority and its personnel have performed or been involved in numerous other activities not related to the ferry operation, as evidenced by (among other things) the minutes of meetings of the Port Authority's Board of Commissioners; such activities have included (among many others):

    (a)    Management of a Foreign Trade Zone.

    (b)    Operation of a marine sewage pump-out service for vessels (but not the Ferry Company ferries) in and around Bridgeport harbor.

    (c)    Negotiations to purchase Captain's Cove.

    (d)    Condemnation of land for Sikorsky Aircraft.

    (e)    Management of the Hitchcock Marina.

    (f)    Review and pursuit of plans for developing casinos and theme parks.

    (g)    Supervision of the Cilco ship terminal.

    (h)    Review, approval of and/or involvement in numerous other projects within the Port Authority's jurisdiction, including a commercial laundry, a dog kennel for the dog track, a gas emission testing facility, a paper recycling plant, docking of luxury cruise ships, an automobile service facility, and an asphalt plant.

14.    The costs of reviewing, operating and managing these other non-ferry related activities were or are being funded substantially or entirely from the Port Authority's operating revenues.

15.     The Port Authority has devoted substantial resources to the performance of the non-ferry related activities, including those referred to in ¶¶ 11 and 13 above.  Such resources include (a) the time of Port Authority personnel, who receive salaries, health insurance, pension contributions and other benefits, and (b) overhead expenses, including office space, office equipment and supplies, telephone and utilities, insurance, travel expenses, advertising and marketing.

16.     The Port Authority has paid for the resources it has devoted to its non-ferry activities from its operating revenues, which consist principally of the proceeds of the Passenger Fee.

17.     Thus, the proceeds of the Passenger Fee have substantially exceeded the cost of the Port Authority's ferry related activities (such excess is referred to herein as the "Overcharge").

### Amount of the Overcharge

18.     Plaintiffs have measured the amount of the Overcharge in three different ways: (a) based on the Port Authority's own allocation of its operating expenses to the Water Street Dock, as reviewed each year by the Port Authority's outside auditors (¶¶ 19-25 below); (b) based on those same allocations but adjusted to correct for over-allocations of certain cost categories (¶¶ 26-28 below); and (c) based on an independent analysis of the reasonable cost of the facilities and services that the Port Authority actually has provided to the ferry operation (¶¶ 29-31 below).

19.     **Method 1:  The Port Authority's allocations**.  All of the facilities and services that the Port Authority provides to the ferry operation are provided at the Water Street Dock.

20.     The Port Authority is a party to a Property Management Agreement with the City of Bridgeport (Ex. 14).  Paragraph 5 of that agreement requires the Port Authority to pay to the City each year 15% of the Port Authority's net operating income from the Water Street Dock.

21.     Since 1993, the Port Authority has calculated the amount payable to the City each year in accordance with that provision, by calculating its net operating income from the Water Street Dock, and multiplying it by 15% (Exs. 15-25) (the "Net Income Calculation(s)").

22.     In making the Net Income Calculation each year, the Port Authority has allocated a portion of its operating expenses to the Water Street Dock (*id.*).

23.     The Port Authority's outside auditors have reviewed the Net Income Calculations as part of their audits of the Port Authority's annual financial statements (*id.*).

24.     According to the Port Authority's own Net Income Calculations, reviewed by its outside auditors, the proceeds of the Passenger Fees exceeded the Port Authority's costs that it allocated to the Water Street Dock by more than $2.7 million for the period 1993 through 2003.

25.     As all ferry related facilities and services that the Port Authority provides to the ferry operation are provided at the Water Street Dock, the Overcharge from 1993 through 2003, measured by this method, is at least $2.7 million (or more than $4.1 million with pre-judgment interest).

26.     **Method 2:  the Port Authority's allocations, adjusted**.  The Port Authority's allocations of costs to the Water Street Dock, in its Net Income Calculations, overstate the portion of its operating costs that are properly allocable to the ferry operation.

27.     For example, the Port Authority allocated 50% of its advertising, marketing, promotion and travel expenses to the Water Street Dock.  However, a review of those costs shows that they were incurred overwhelmingly in activities that did not relate to the ferry

operation.  A more appropriate allocation of such costs to the ferry operation would be 10%.  As a further example, the Port Authority generally allocated 100% of its legal and accounting costs to the Water Street Dock.  However, a very substantial portion of such costs was incurred on legal and accounting services that had no relation to the ferry operation.  A more appropriate allocation of such costs to ferry operation would be 50%.

28.    When the allocations in the Net Profit Calculations are adjusted to correct such overstatements, the Overcharge for the period 1993-2003, measured by this second method, is at least $4.3 million (or more than $6.3 million with pre-judgment interest).

29.    **Method 3:  Independent analysis of reasonable costs**.  The Port Authority has operated with a level of staffing and overhead that is not needed for purposes of the ferry operation.  The first two methods of calculating the Overcharge (¶¶ 19-28 above) result in an allocation to the ferry operation of bureaucratic, duplicative and/or unreasonable costs.

30.    For example, the Port Authority has incurred costs for the following items (among others), and has paid for such costs from proceeds of the Passenger Fee, even though these items had little or no relation to the ferry operation:

(a)    The cost of an automobile for the Executive Director, including monthly lease payments, gasoline purchases, and even car washes.

(b)    Repeated out-of-town travel by the Executive Director.

(c)    Charitable contributions.

(d)    Office space, supplies and equipment at the terminal building used by the Connecticut World Trade Association.

(e)    Season tickets to the Bridgeport minor league baseball and hockey teams.

31.     Based on an independent assessment of the reasonable cost of providing the facilities and services to the ferry operation that the Port Authority has provided, the Overcharge for the period 1993-2003 is more than $6.2 million (or more than $9 million with pre-judgment interest).

**Damages**

32.     Plaintiff Zahradka has taken the ferry and paid the fare, including the Passenger Fee, on several occasions between 1993 and the present, sometimes accompanied by other members of his family.  He has been damaged by the amount of the Overcharge with respect to such trips.

33.     Greg Rose has taken the ferry and paid the fare, including the Passenger Fee, on numerous occasions between 1993 and the present, usually while on business for his wholesale flower business, D&D, of which he is the sole owner.  D&D has reimbursed Mr. Rose for such payments.  D&D has been damaged by the amount of the Overcharge with respect to such trips.

34.     The Ferry Company has been damaged by the Overcharge because it has limited the ability of the Ferry Company to raise its own fares and/or has reduced demand for and use of the ferry service by increasing overall cost to the passengers.  If there had been no Overcharge, then the Ferry Company would have been able to (a) raise its fares by the full amount of the Overcharge without changing overall cost to the passengers, thereby increasing its revenue and profit by the full amount of the Overcharge, or (b) raise its fares by a portion of the Overcharge, thereby also increasing its revenue and profit by virtue of both (i) the higher fares and (ii) increased ridership due to lower overall cost to the passengers, or (c) maintain its fares as they were in fact and thereby increase its revenue and profit by virtue of increased ridership due to lower overall cost to the passengers.

35.     In sum, since 1993 and continuing at present, the Port Authority has forced the ferry operation to bear essentially the entire cost of the Port Authority's operations – by way of the Passenger Fees and the rentals paid by the Ferry Company and Concessions – while the Port Authority has used those funds to pay the operating costs of all of its activities, whether or not the activities have related to or benefited the ferry operation.

**7.     Defendant's Contentions** [4]

**A.     The Bridgeport Port Authority**

The Port Authority was established in 1992 for the purpose of enhancing port-related activities and developing commerce in the Bridgeport harbor.  The Port Authority has jurisdiction over the entire Port of Bridgeport Harbor, and owns and operates the Water Street Dock.  It is also a significant port of entry for the import of fruits and oil, and is an export point for various commodities.

The City of Bridgeport created the Port Authority to foster commerce within the port, develop and promote port facilities, increase the city's tax based and revenues, and cooperate with the state and federal agencies in the maintenance, development, improvement and use of district harbors, waterways, and industrially zoned properties.  (Bridgeport City Code § 2.28.010).

In the more than 12 years since it has existed, the Port Authority has consistently proven to be both fiscally reliable and responsible.  It is subject to regular audits, both in its regular finances and with respect to the grants that it administers, and no problem has ever been discovered with its finances.  Notably, this Court has specifically found that "the Port Authority

---

[4]  See note 2 at p. 32 above.

has proven to be fiscally reliable and responsible." (Docket #76, p.3)

As part of its charge from the City of Bridgeport "to develop and promote port facilities with the district in order to create jobs," the Port Authority has made significant improvements to the facilities and services for ferry passengers in the Bridgeport harbor. For example, the Port Authority provides security and lighting for the passengers, and it is currently working with the federal Transportation Security Administration for the development of a security plan for the Port of Bridgeport. The Port Authority has also constructed a terminal building which houses the waiting room for ferry passengers, Port Authority's offices, the offices of the harbormaster and others, and a cafeteria/snack bar and tourist information stand used primarily by persons that work at the Port and the passengers from the Ferry.

The Port Authority has corroborated with federal and state agencies to receive grant funding for the construction of a secondary access road to the terminal for the ferry passengers. A modern, multi-level parking facility, primarily for the benefit of walk-on ferry passengers who park their vehicles in Bridgeport is currently under development. The Port Authority is also working with the local, state and federal governments for the development of an intermodal transportation facility near the Ferry terminal which will put the Amtrack train station, the bus terminal and the Ferry terminal within a localized, concentrated area for the convenience of all transportation passengers in Bridgeport.

The Port Authority regularly works with state and federal governmental agencies to provide services and amenities to the companies and individuals who use the Port. The Port Authority has applied for and administered numerous monetary grants which it has used over the years to better the Port for the benefit of all who use it. Many of those projects are intended to (and indeed do) benefit the Ferry Company and its passengers.

The grants that the Port Authority has received for the development of the Bridgeport harbor and for the provision of services to ferry passengers (such as the Ferry Boat Discretionary Fund and Federal Highway Administration grants) can only be given to government agencies, such as the Port Authority. The Ferry Company is ineligible for such grants and would not benefit from these federal funds without the support of the Port Authority.

The Port Authority has also been responsible for the rehabilitation of several blighted areas in the Port of Bridgeport such as the East side of Bridgeport Harbor and the Bridgeport Regional Maritime Complex (the so-called former "Cartech Property").

### B.    The Bridgeport and Port Jefferson Steamboat Company

The Ferry Company operates a public ferry service for passengers and vehicles between Bridgeport, Connecticut and Port Jefferson, Long Island, New York. Prior to the creation of the Port Authority, there was little, if any, government oversight over the Ferry Company's operations in Bridgeport. Services and facilities for ferry passengers were non-existent; the ferry loading area was in a serious state of disrepair, there was no security, and access to the Ferry dock by passengers was difficult and treacherous. The facilities and services provided by the Port Authority substantially benefit the Ferry Company and ferry passengers, as well as other users of the Port of Bridgeport.

Since the creation of the Port Authority, the total volume of ferry passengers and vehicles has increased significantly. Every year since 1997 total passenger and vehicle activity has increased. Most recently, the December 2004 Ferry Company tariff activity report (provided to the Port Authority by the Ferry Company) indicates that overall ridership of passengers and vehicles utilizing the Bridgeport Port Jefferson Ferry Service has increased by an average of 4.7% over 2003. Ferry activity from trucks, passenger vehicles, monthly passes, and walk on

passengers has also increased steadily and dramatically since 1997.

In addition to the substantial increases in the number of ferry passengers and vehicles,

annual operating revenues[5] of the Ferry Company have increased as well as set forth in the

following table:

| Year | Ferry Company Operating Revenues | Percent Increase |
|------|----------------------------------|------------------|
| 1992 | $9,774,666 | |
| 1993 | $10,511,787 | 7.5% |
| 1994 | $11,385,376 | 8.3% |
| 1995 | $11,784,365 | 3.5% |
| 1996 | $13,144,918 | 11.5% |
| 1997 | $13,627,372 | 3.7% |
| 1998 | $14,667,617 | 7.6% |
| 1999 | $16,867,142 | 15.0% |
| 2000 | $20,173,217 | 19.6% |
| 2001 | $22,419,228 | 11.1% |
| 2002 | $23,595,012 | 5.2% |
| 2003 | $24,109,912 | 2.3% |

Total revenue of the Ferry Company continues to increase even with the imposition of the

passenger wharfage charge and the nearly annual increase in ferry ticket prices.  The Ferry

Company has enjoyed tremendous profitability evidenced by its substantial profit margin, return

on capital, and over-all increase in total revenues from passengers and vehicles.

### C.    The Port Authority Passenger Wharfage Charge

The Port Authority receives no regular funding from the federal government, the State of

Connecticut, or the City of Bridgeport.  The Port Authority's expenses are financed, in part, from

a modest passenger wharfage charge that it collects from the ferry passengers.  Since 1993, the

Port Authority has imposed the passenger wharfage charge on passengers and vehicles

---

[5] Source:  Audited Financial Statements of the Bridgeport and Port Jefferson Steamboat Company, Inc., 1993 through 2003.

embarking or disembarking at the Water Street Dock.

From 1993 until late 2002, the Ferry Company collected the wharfage charge from its passengers on behalf of the Port Authority. Under the terms of the parties' lease agreement, the Ferry Company then remits the wharfage charge, less a fee paid by the Port Authority to the Ferry Company to collect the charge, to the Port Authority.

No significant administrative expenses are incurred by the Ferry Company for the collection of the passenger wharfage charge or subsequent remittance of the funds to the Port Authority. Yet, since 1993, the Port Authority has paid the Ferry Company more than $200,000 to collect the wharfage charge on behalf of the Port Authority. That fee was increased in 2003 by $10,000 per year.

The Port Authority has adjusted the wharfage charge only twice since 1993, excluding the recent surcharge that was the subject of the Court's ruling denying the Ferry Company's motion for a preliminary injunction. In sharp contrast, the Ferry Company has increased passenger ticket prices almost every year since 1997.

The wharfage charge is a substantial portion of the Port Authority's budget. Without that charge, the Port Authority will be unable to continue providing services for the ferry passengers and the other users of the Port of Bridgeport and might be forced out of existence. If the charge is reduced, the services provided by the Port Authority will be similarly reduced.

The wharfage charge imposed by the Port Authority is modest compared to the significant tolls and other charges imposed on commuters that make use of other transportation facilities in the New York City metropolitan area. The wharfage charge is also modest in relation to the Ferry Company's published ticket prices. For example, a one-way ticket for a vehicle and one passenger from the Water Street Dock to Port Jefferson is $37.75; the

corresponding wharfage charge is merely $2.00; only 5.6% of the total Ferry charge.  In keeping

with this arraignment, the Port Authority has structured the wharfage charge in similar

proportion to Ferry Company ticket prices reflecting other passenger and vehicle configurations.

The imposition of the passenger wharfage charge has no negative impact, or at most a

short-term negligible impact, on the volume of passengers or vehicles that debark from the Water

Street Dock.  In addition, the wharfage charge has no adverse impact on customer demand for

ferry services.  Even the nearly annual increase in ferry ticket prices generally does not cause a

reduction in the annual volume of vehicle ridership.

On the other hand, any decrease in the volume of ferry passenger or vehicle traffic,

demand for ferry services, or Ferry Company profits is caused by inadequate ferry capacity,

infrequent ferry scheduling, or the price of the ferry tickets.  Any reduction in demand is not

attributable to the imposition of the passenger wharfage charge.  Recognizing this, this Court has

already found that Plaintiffs have failed to persuade the Court that a "modest" increase in the

passenger tariff "will result in a reduction in the quantity of ferry tickets demanded."

(Conclusions of Law, Docket #76)

Moreover, the facilities, benefits, and services funded by revenues generated from the

passenger wharfage charge have actually contributed to the substantial increase in ferry

passenger and vehicle ridership over the past decade.

An increase in the combined cost of the Ferry tariff and the passenger wharfage charge

does not reduce ferry passenger and vehicle ridership or customer demand for ferry services in

relation to the cost of the Ferry tariff alone.  Further, imposition of the wharfage charge on ferry

passengers has absolutely no negative impact on the profitability of the Ferry Company, nor does

the charge adversely affect the Ferry Company's ability to generate additional revenues.  Any

increase in the passenger wharfage charge does not proportionally reduce Ferry Company revenues.

The revenues generated by the passenger wharfage charge fairly and accurately reflect the value of the facilities and services provided to the Ferry Company and ferry passengers. These revenues enable the Port Authority to provide numerous services and excellent facilities for the benefit of the Ferry Company, its passengers, and other users of the Port of Bridgeport that are both reasonably related to the cost of the benefits and services offered by the Port Authority and necessary to the Port Authority's continuing operation.

### D.     The Port Authority's Operation and Investment Costs

Prior to 1993, the City of Bridgeport owned the Water Street Dock.  After the Port Authority was created, the City transferred the land to the Port Authority in exchange for 15% of a designated portion of net operating revenues that the Port Authority generates from the facility.

Pursuant to an agreement between the City and the Port Authority, the revenues subject to the City's 15% fee are calculated based on certain Port Authority expenditures labeled "operating expenses."  The designation of "operating expenses" is not based on a precise mathematical calculation.  In fact, this allocation has no relation to the Port Authority's actual expenditures necessary to operate and administer the Port terminal.  In other words, an allocation of 50% "operating expenses" for purposes of calculating the City's 15% fee does not imply that only 50% of the monies expended by the Port Authority actually relate to the operation of the Water Street Dock.

The Port Authority incurs significant costs associated solely with the direct operation and administration of the Ferry terminal.  To defray these costs, the Port Authority collects revenue from three principal sources:  (1) an annual fee paid by the Ferry Company under the preferential

use agreement to access the Ferry birth; (2) the passenger wharfage charge collected by the Ferry Company; and (3) a fee paid by Concessions to utilize the ferry terminal under the current lease agreement.

The revenues collected by the Port Authority fairly reflect the value of the facilities and services provided to the Ferry Company and ferry passengers. In fact, the combined revenues from these three sources are less than the minimum annual expenses necessary to provide services related exclusively to the operation and administration of the Ferry Terminal. In other words, the Port Authority's capital costs and costs for operations, maintenance, and administration of the Ferry terminal that are attributable solely to Ferry operations exceed revenues generated by the Port Authority from the passenger wharfage charge and rental income. This demonstrates that the passenger wharfage charge imposed by the Port Authority is reasonable given the expenses incurred by the Port Authority for providing the facilities and services to the Ferry Company and ferry passengers, and is necessary for the Port Authority to continue providing such services and benefits.

In addition to the expenses attributable solely to the direct operation and administration of the Ferry terminal, the Port Authority expends funds for the development of businesses and facilities surrounding the Bridgeport harbor in accordance with the Port Authority's enacting statute. The costs for developing these businesses and facilities are funded almost entirely through federal, state and local grants.

**8.    Legal Issues**

**(a)    Framed by plaintiffs** [6]

1.    What legal limits exist with respect to the Port Authority's right to impose a user fee on Ferry Company passengers (*i.e.*, the Passenger Fee), under:

> (a)    The Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5(b).
>
> (b)    The Commerce Clause, U.S. Const., art. I, § 8, clause 3.
>
> (c)    The Constitutional Right to Travel.
>
> (d)    The Tonnage Clause, U.S. Const., art. I, § 10, clause 3.
>
> (e)    Connecticut common law barring unjust enrichment and duplication of charges.
>
> (f)    Connecticut's port authorities enabling statute, Conn. Gen. Stat. §§ 7-329a to 7-329u.
>
> (g)    Connecticut's Unfair Trade Practices Act ("CUPTA"), Conn. Gen. Stat. §§ 42-110a, *et seq.*

2.    What legal standard applies with respect to any such limits on user fees under each of the provisions cited in the above paragraph?

3.    Has the Passenger Fee been excessive, and therefore unlawful, from 1993 to the present?

4.    Have the passenger plaintiffs, Mr. Zahradka and D&D, sustained legally recoverable damages as a result of the excessive and unlawful Passenger Fee, and if so, in what amounts?

5.    Has the Ferry Company sustained legally recoverable damages as a result of the excessive and unlawful Passenger Fee, and if so, in what amounts?

---

[6]    With respect to legal issues raised in motions in this case as to which the Court has already issued rulings, plaintiffs respectfully rely on such rulings as the law of the case.

6.      Does the imposition of an excessive and unlawful Passenger Fee subject the Port Authority to CUPTA?

7.      Are plaintiffs entitled to declaratory and injunctive relief barring the Port Authority from imposing excessive and unlawful Passenger Fees in the future?

**(a)      Framed by defendant**

The following legal issues are presented by the factual contentions of the Bridgeport Port Authority:

1.      The passenger wharfage charge imposed by the Port Authority is reasonable, appropriate, and legally valid.

2.      The passenger wharfage charge is reasonably related to the services and facilities provided by the Port Authority to the Ferry Company and ferry passengers, and is necessary for the Port Authority to continue providing such services and benefits.

3.      An exact correlation between the revenues generated from the passenger wharfage charge and the benefits and services provided to the Ferry Company and ferry passengers is not necessary.

4.       Courts generally defer to the local transportation agency's judgement of the amount of a charge necessary and appropriate for the services it provides.

5.       The Port Authority is authorized by statute and permitted to charge a reasonable fee for the services it provides to those who enjoy and benefit from its facilities and services.

6.      The benefits and services received by the Ferry Company and ferry passengers are reasonably related to the revenues generated by the passenger wharfage charge.

7.      The Port Authority is permitted to impose a reasonable, non-discriminatory regulation upon trade.

8.      The passenger wharfage charge reflects a fair approximation of the cost of using Port Authority facilities for the benefit of all users of the Port.

9.      The passenger wharfage charge does not discriminate against interstate commerce.

10.     The passenger wharfage charge is reasonable in relation to the costs incurred by the Port Authority for providing benefits and services enjoyed by the Ferry Company and ferry passengers.

11.     Even if the Port Authority charges different rates to different users of the Port or does not charge some users, the passenger wharfage charge remains constitutionally valid.

12.     The passenger wharfage charge is valid even if the revenues generated from the charge exceed the Port Authority's outlays.

13.     The imposition of the passenger wharfage charge does not make it more difficult for the Ferry Company to increase its profits or generate additional revenue.

14.     The passenger wharfage charge does not violate the Rivers and Harbors Appropriate Act of 1884, 33 U.S.C. § 5 ("RHA"), as amended by the Maritime Transportation Security Act of 2002, Pub. L. 107-295, 116 Stat. 2064 ("MTSA") because it is reasonable, applied to defray the costs of facilities and services provided to users of the Port, enhances the safety and efficiency of interstate commerce, and does not impose more than a small burden on interstate commerce.

15.     The passenger wharfage charge does not violate the Commerce Clause of the United States Constitution.

16.     The passenger wharfage charge constitutes a user fee in that the charge is used to reimburse for the benefits and services provided by the Port Authority.

17.     The passenger wharfage charge is a valid user fee because it reflects a fair approximation of the cost of using state facilities for the users' benefit, does not discriminate against interstate commerce, and is reasonably related to the costs incurred by the Port Authority for providing such benefits.

18.     The passenger wharfage charge does not violate the Right to Travel under the Commerce and Privileges and Immunities Clauses of the United States Constitution because the charge does not discriminate against interstate commerce, represents a fair approximation of the use conferred on those who pay the charge, and is reasonable in relation to the costs incurred by the Port Authority.

19.     The passenger wharfage charge does not violate the Tonnage Clause of the United States Constitution because the charge is not imposed to raise general revenues, regulate trade, or charge for the privilege of entering, lying in, or trading in a port.

20.     The Port Authority has not duplicated charges and has not been unjustly enriched by the imposition of the passenger wharfage charge.

21.     Connecticut General Statute §§ 7-329a to 7-329u authorizes the Port Authority to impose the passenger wharfage charge.

22.     The passenger wharfage charge is not an illegal or invalid tax under Connecticut law.  Rather, the charge is a valid user fee because it reflects a fair approximation of the costs of using Port facilities, does not discriminate against interstate commerce, and is not excessive in relation to the Port Authority's cost to provide such facilities, services, and benefits.

23.     The passenger wharfage charge does not violate the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*.  The imposition of the charge is not an unfair

or deceptive trade practice, and Plaintiffs have no reasonable estimate of damages sustained by

the imposition of the charge.

 24. The passenger wharfage charge does not substantially injure Plaintiffs.

**9.** ***Voire Dire* Questions:  Omitted (Court trial)**

**10.** **List of Witnesses**

 **(a)** **Plaintiffs' Fact Witnesses**

| Name and Address | Brief Statement of Anticipated Testimony |
|---|---|
| 1. **Frank Zahradka**<br>c/o Eagle Control Corp.<br>23 Old Dock Road<br>Yaphank, NY 11980 | Mr. Zahradka is one of the passenger plaintiffs.  He is expected to testify about his use of the ferry and payment of the fare and Passenger Fee. |
| 2. **Gregory Rose**<br>355 Windjammer Drive<br>Southold, NY 11971-2207 | Mr. Rose is the sole owner of D & D Wholesale Flowers Inc. ("D&D"), one of the passenger plaintiffs.  He is expected to testify about D&D's and his use of the ferry and payment of the fare and Passenger Fee. |
| 3. **Brian A. McAllister**<br>c/o McAllister Towing and<br>   Transportation Company,<br>   Inc.<br>17 Battery Place<br>New York, NY 10004 | Mr. McAllister is the President of the Ferry Company and its parent company, McAllister Towing and Transportation Company, Inc. ("MTT"), and is sole owner (indirectly) of the Ferry Company.  He is expected to testify about:<br>(a) the history and operation of the Ferry Company;<br>(b) the effect of the Passenger Fee on the setting of fares and on the Ferry Company, including loss of revenue and profit; and<br>(c) negotiation of the Port Authority's leases with the Ferry Company (for use of the dock facilities) and Concessions (for the food concession at the terminal). |
| 4. **Frederick Hall**<br>c/o Bridgeport & Port<br>   Jefferson Steamboat<br>   Company<br>102 West Broadway<br>Port Jefferson, NY 11777 | Mr. Hall is the Vice President and General Manager of the Ferry Company.  He is expected to testify about:<br>(a) the history and operation of the Ferry Company;<br>(b) the Passenger Fee and the procedure for collecting it;<br>(c) the effect of the Passenger Fee on the setting of fares and |

| | |
|---|---|
| | on the Ferry Company, including loss of revenue and profit; |
| | (d) the nature and cost of the facilities and services provided by the Ferry Company at Port Jefferson and Bridgeport; |
| | (e) the nature of the facilities and services provided by the Port Authority to the ferry operation at Bridgeport since 1993; and |
| | (f) negotiation of the Port Authority's leases with the Ferry Company (for use of the dock facilities) and Concessions (for the food concession at the terminal). |
| 5.  **William Merritt**<br>83 Brookside Road<br>Darien, CT 06820-3505 | Mr. Merritt is the acting chief financial officer of the Ferry Company and its parent company, MTT.  He is expected to testify about:<br><br>(a) negotiation of the Port Authority's leases with the Ferry Company (for use of the dock facilities); and<br><br>(b) the effect of the Passenger Fee on the setting of fares and on the Ferry Company, including loss of revenue and profit. |
| 6.  **Louis Rinaldo**<br>c/o Bridgeport & Port<br>    Jefferson Steamboat<br>    Company<br>Bridgeport Ferry Terminal<br>330 Water Street<br>Bridgeport, CT 06604 | Mr. Rinaldo is the Manager of the Ferry Company at Bridgeport.  He is expected to testify about:<br><br>(a) the nature of the facilities and services provided by the Ferry Company at Bridgeport;<br><br>(b) the nature of the facilities and services provided by the Port Authority to the ferry operation at Bridgeport since 1993; and<br><br>(c) Port Authority activities, including those unrelated to the ferry operation. |
| 7.  **Frank Marino**<br>The Port Jefferson Ferry,<br>    Food & Beverage Service<br>102 West Broadway<br>Port Jefferson, NY 11777 | Mr. Marino is the general manager of Steamboat Concessions, Inc. ("Concessions"), an affiliate of the Ferry Company.  Mr. Marino is expected to testify about:<br><br>(a) The lease between the Port Authority and Concessions; and<br><br>(b) The bid process and other circumstances that led to the Port Authority awarding the food concession to Concessions. |

| | |
|---|---|
| 8. **Sharon St. Louis**<br> c/o Bridgeport & Port<br> Jefferson Steamboat<br> Company<br> 102 West Broadway<br> Port Jefferson, NY 11777 | Ms. St. Louis is the chief purser of the Ferry Company.  She is expected to testify about:<br><br>(a) her responsibilities as chief purser of the Ferry Company;<br><br>(b) her interaction with ferry passengers when collecting fares (including the Passenger Fee); and<br><br>(c) the effect of the Passenger Fee on the setting of fares and on the Ferry Company. |
| 9. **Joseph Verrilli**<br> c/o Dworken, Hillman,<br> LaMorte & Sterczala, P.C.<br> Four Corporate Drive<br> Shelton, CT 06484 | Mr. Verrilli is a principal in the accounting firm Dworken, Hillman, LaMorte & Sterczala, P.C. ("DHLS").  He is expected to testify about:<br><br>(a) the annual audits of the Port Authority's financial statements;<br><br>(b) the computation of the 15% of the Port Authority's net operating income from the Water Street Dock that the Port Authority is contractually bound to pay to the City of Bridgeport each year;<br><br>(c) the auditing of and purpose of government grants received by the Port Authority;<br><br>(d) activities of the Port Authority that do not relate to the ferry operation;<br><br>(e) the allocation of the Port Authority's costs between those relating to the operation of the Water Street Dock and those relating to other activities; and<br><br>(f) the sources of the Port Authority's revenues. |
| 10. **Michael Freimuth**<br> 1959 North Benson Road<br> Fairfield, CT 06824-3445 | Mr. Freimuth was a Commissioner of the Port Authority from its inception, in 1993, until September 2003, and during the same period he was also employed by the City of Bridgeport as Director of the Office of Planning and Economic Development.  He is expected to testify about:<br><br>(a) various activities of the Port Authority during his tenure as Commissioner, including matters discussed during meetings of the Board of Commissioners;<br><br>(b) whether certain activities of the Port Authority – such as the development of the Steel Point peninsula and the Cartech property (now known as the Bridgeport Regional Maritime Complex, or "BRMC"), the high speed ferry project, and the barge feeder project – were directly related to the ferry operation; |

| | |
|---|---|
| | (c) time spent and resources used by Port Authority personnel in performing activities not directly related to the ferry operation; |
| | (d) how the Port Authority paid for activities not related to the ferry operation; |
| | (e) the imposition and purpose of the Passenger Fee; |
| | (f) construction and cost of the terminal building; |
| | (g) his knowledge of and discussions concerning the calculation of the amount due each year from the Port Authority to the City of Bridgeport under the Property Management Agreement, equal to 15% of the net revenues from the Union Square Dock; and |
| | (h) The circumstances concerning the Port Authority's awarding of a food concessions contract for the terminal in 1995-1996. |
| 11. **Joseph Riccio**<br>c/o Bridgeport Port Authority<br>330 Water Street<br>Bridgeport, CT 06604 | Mr. Riccio is the Executive Director of the Port Authority. He is expected to testify about:<br><br>(a) all activities of the Port Authority since he became Executive Director in 1996;<br><br>(b) relation, if any, of various Port Authority activities to the ferry operation;<br><br>(c) description and use of the terminal building;<br><br>(d) matters discussed at meetings of the Port Authority's Board of Commissioners;<br><br>(e) the Port Authority's leases with the Ferry Company and Concessions;<br><br>(f) the Port Authority's ferry related activities, including the construction and operation of the terminal building, improvements to the dock, and the secondary access road;<br><br>(g) the Port Authority's non-ferry related activities, including those relating to the Bridgeport Regional Maritime Complex, Derecktor Shipyards, the Cilco terminal, the high speed ferry project, and the barge feeder project;<br><br>(h) the Port Authority's sources of revenue;<br><br>(i) government grants;<br><br>(j) the Passenger Fee, including its purpose and increases; |

|  | (k) the Port Authority's tariff and its application to vessels other than the ferries; |
|  | (l) Port Authority staff and their responsibilities; |
|  | (m) allocation of time to different activities of the Port Authority; |
|  | (n) Port Authority expenses as reflected in its financial statements, general ledgers and other accounting records; |
|  | (o) the Port Authority's agreements with the City of Bridgeport, including the agreement whereby the Port Authority has paid the City 15% of the net operating income from the Union Square Dock, and the computation of the amounts of such payment; and |
|  | (p) the 50-cent Passenger Fee surcharge that the Port Authority intended to impose in 2004. |
| 12. **Martha Klimas**<br>c/o Bridgeport Port Authority<br>330 Water Street<br>Bridgeport, CT 06604 | Ms. Klimas is an employee of the Port Authority. She is expected to testify about:<br><br>(a) application for and administration of government grants obtained by the Port Authority;<br><br>(b) Port Authority staff and their responsibilities;<br><br>(c) activities of the Port Authority; and<br><br>(d) allocation of time to different activities of the Port Authority. |
| 13. **Charmaine Johnson**<br>c/o Bridgeport Port Authority<br>330 Water Street<br>Bridgeport, CT 06604 | Ms. Johnson is an employee of the Port Authority. She is expected to testify about:<br><br>(a) Port Authority staffing and responsibilities;<br><br>(b) Financial books and records of the Port Authority, including the making of entries, and the types of records made and maintained. |
| 14. **Joseph Savino**<br>c/o Bridgeport Port Authority<br>330 Water Street<br>Bridgeport, CT 06604 | Mr. Savino is a Commissioner, and currently the Chairman, of the Board of Commissioners of the Port Authority, as well as the Harbor Master of Bridgeport. He is expected to testify about:<br><br>(a) all business of the Port Authority that was discussed at meetings of the Board of Commissioners since 1993;<br><br>(b) his responsibilities and activities as Commissioner;<br><br>(c) his responsibilities and activities as Harbor Master; |

|  | (d) the Board's decisions to impose the Passenger Fee and all increases and surcharges thereto; |
|  | (e) construction and funding of the terminal building; |
|  | (f) the Port Authority's ferry related activities, including the construction and operation of the terminal building, improvements to the dock, and the secondary access road; |
|  | (g) the Port Authority's non-ferry related activities, including those relating to the Bridgeport Regional Maritime Complex, Derecktor Shipyards, the Cilco terminal, the high speed ferry project, and the barge feeder project; and |
|  | (h) the operation and financing of the Bridgeport harbor sewage pump-out service. |

(b)    **Plaintiffs' Expert Witnesses**

1.    **Alan A. Schachter, CPA-ABV, CVA, CFE**

Mr. Schachter is a certified public accountant and a principal of Willamette Management Associates, a national independent financial and valuation advisory firm.  His areas of expertise include auditing, forensic accounting, and asset valuation.  His *curriculum vitae* is attached at Tab 1, and the materials and information on which he intends to rely are attached at Tab 2.

Following is a summary of the opinions, and the reasons for such opinions, to which Mr. Schachter is expected to testify, as more fully set forth in his report:

(a)    The amounts collected by the Port Authority from the Passenger Fee have exceeded by a significant amount the reasonable cost of the facilities and services that the Port Authority has provided to the ferry operation, each year from 1993 through 2003.

(b)    Mr. Schachter calculated the excess of Passenger Fee collections over the Port Authority's ferry-related costs (the "overcharge") under three different scenarios:

(i)    In the first scenario, Mr. Schachter adopted the figures used by the Port Authority in its own calculations of the amount it is contractually bound to pay to the City of Bridgeport each year, equal to 15% of the net operating

revenue from the Water Street Dock.  The overcharge, so calculated, totals $2,732,200 for the period 1993 through 2003.

(ii)    In the second scenario, Mr. Schachter began with the Port Authority's calculations as in the first scenario, and then adjusted certain of the allocations between ferry related and non-ferry related expenses, based on his review of the available financial records and the deposition testimony of Port Authority staff.  The overcharge, calculated in this manner, totals $4,360,700 for the period 1993 through 2003.

(iii)    In the third scenario, Mr. Schachter made his own calculation of the overcharge by comparing the proceeds of the Passenger Fee each year with the reasonable costs necessary to provide the facilities and services that the Port Authority actually provided to the ferry operation that year. The overcharge, calculated in this manner, totals $6,278,300 for the period 1993 through 2003.

(c)    Mr. Schachter also calculated pre-judgment interest on the overcharge amounts under each scenario, at the rate of 10% per year (not compounded), with interest commencing, for each year, on January 1st of the following year, through the date of the report (see Conn. Gen. Stat. § 37-3a).  The overage amount, interest, and total under each scenario, as set forth in Mr. Schachter's report, are as follows:

|  | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Overage | $2,732,200 | $4,360,700 | $6,278,300 |
| Interest | 1,393,600 | 1,999,500 | 2,760,200 |
| Total | $4,125,800 | $6,360,200 | $9,038,500 |

## 2.    <u>George M. Shawah, SIOR, MAI</u>

Mr. Shawah is President and sole owner of Baldwin Pearson & Co., Inc., a real estate firm located in Bridgeport, Connecticut.  His areas of expertise include appraising and valuation of industrial and commercial real property, especially in the Bridgeport area.  His *curriculum vitae* is attached at Tab 3.  The materials and information on which he intends to rely are as

described in his 1997 appraisal of the Water Street Dock property that is attached to his report (and are summarized in sub-paragraph (b) below).

Following is a summary of the opinions, and the reasons for such opinions, to which Mr. Shawah is expected to testify, as more fully set forth in his report:

(a)    In 1997, Mr. Shawah performed an appraisal of the market value of the 1.77 acres of land at the Wall Street Dock (also known as the Union Square Dock) and the rental value of the land and the first floor of the terminal building located at the dock, as of February 1, 1997. By letter-report dated June 3, 1997, he reported his conclusions as follows:

| | |
|---|---|
| Market value of 1.77 acres of land | $530,000 |
| Rental value of 1.77 acres of land (per year) | $53,000 |
| Rental value of the terminal building's first floor (per year) | $30,000 |
| Rental value of land and terminal building (first floor) combined (per year), with tenant to pay for utilities and operating expenses | $80,000 |

(b)    Mr. Shawah's conclusions as to the value of the land were based on his analysis of two properties sold and one property offered for sale, and on other factors such as size and shape of the land, taxes, zoning, the concept of "highest and best use," and data relating to the city, the neighborhood and the site.  Mr. Shawah concluded that the rental value of the land would be 10% of its market value, based on his review of land leases in the area.  He appraised the rental value of the building based on recent rentals of "class B" office space in the area.

(c)    In 2004, Mr. Shawah reviewed his 1997 appraisal and confirmed that his conclusions as to the property's value as of February 1, 1997, were correct and remain unchanged.

**(c)     Defendant's Witnesses**

The Bridgeport Port Authority anticipates calling the following witnesses at trial:

**1.     Joseph Savino** (Chairman of the Board of Commissioners of the Port Authority). Mr. Savino will likely testify as to Defendant's responses to Plaintiffs' allegations as well as the history and operation of the passenger wharfage charge and the services and benefits provided by the Port Authority to the Ferry Company, passengers, and the other users of the Port of Bridgeport.

**2.     Judge William Holden** (a former member of the Port Authority Board of Commissioners) will likely testify about port operations and policy during his tenure on the Board.

**3.     Dennis O'Malley** (a recent appointee to the Board of the Port Authority) will likely testify about current port operations and policy.

**4.     Patrick Crossin** (a recent appointee to the Board of the Port Authority) will likely testify about recent developments in port operations and policy.

**5.     Joseph Riccio** (Executive Director of the Port Authority). Mr. Riccio will likely testify as to Defendant's responses to Plaintiffs' allegations as well as the history and operation of the passenger wharfage charge as well as the services and benefits provided by the Port Authority to the Ferry Company, passengers and the other users of the Port of Bridgeport.

**6.     Joseph Verrilli, CPA** (outside auditor of the Port Authority). Mr. Verrilli will likely testify as to the audited financial statements of the Port Authority as well as the fiscal responsibility of the Port Authority. Mr. Verrilli may also testify as to the finances and financial operations of the Ferry Company.

**7.     Martha Klimas** (administrative staff employee of the Port Authority). Ms.

Klimas may testify as to the services and benefits the Port Authority provides to the Ferry

Company and ferry passengers, and may also testify as to the grants received by the Port

Authority from other governmental entities for the provision of those services and benefits.

8.    **Brian A. McAllister** (President of the Ferry Company)  Mr. McAllister will

likely testify as to the operations of the Ferry Company, and passenger and vehicle ridership as

well as the finances of the Ferry Company.

9.    **Fred Hall** (General Manager and Vice President of the Ferry Company)  Mr. Hall

will likely testify as to the day-to-day operations, passenger and vehicle ridership, and finances

of the Ferry Company.

10.    **William Merritt** (Chief Financial Officer of McAllister Transportation of

Towing)  Mr. Merritt will likely testify as to the operation and finances of the Ferry Company.

In addition, the Port Authority specifically reserves the right to question any witness

named by the Ferry Company on its witness list.

**(d)    Defendant's Expert Witnesses**

The Bridgeport Port Authority anticipates calling the following expert witnesses at trial:

1.    **Edward Deak, Ph.D.** (Professor of Economics, Fairfield University).  Dr. Deak

is an expert in the field of economics.  His curriculum vitae is filed contemporaneously herewith.

Dr. Deak will testify as to the lack of economic damages incurred by the Ferry Company

as a result of the passenger wharfage charge imposed by the Port Authority upon users of the

Ferry service.  Dr. Deak will offer the following opinions:

▪    There is no evidence that supports the Ferry Company's position that its

profits are reduced by the imposition of the wharfage charge.  Plaintiffs have failed to

demonstrate that the imposition of the passenger wharfage charge on the users of ferry

services has resulted in economic harm to the Ferry Company.

- The imposition of the wharfage charge has not reduced demand for ferry services. Any change in the price of a ferry ticket does not decrease demand for ferry service. In fact, the facilities, services, and benefits provided by the Port Authority with funds generated by the passenger wharfage charge have contributed to the increase in demand for ferry services and have thereby increased revenues and potential profits of the Ferry company.

- An examination of the customer usage, Ferry Company revenues, and profit behavior has resulted in an increase in passenger and vehicle traffic that are sufficient to overcome an increase in Ferry tickets and the wharfage charge.

- The Ferry Company's ability to increase its tariffs is not limited by the imposition of the passenger wharfage charge. This is supported by fact that the Ferry Company has successfully increased all or most of its fares on an almost annual basis, while at the same time, the volume of passenger and vehicle ridership has increased almost every year and each year subsequent to the wharfage charge and tariff increases.

- The passenger wharfage charge is reasonably related to the services and facilities provided by the Port Authority to the Ferry Company and ferry passengers, and is necessary for the Port Authority to continue providing such services and benefits.

In support of his opinions, Dr. Deak may rely on the following materials:

- Steven J. Shapiro, Ph.D., Expert Report, June 20, 2003.

- Alan A. Schachter, Expert Report, June 30, 2004.

- George M. Shawah, report, June 3, 1997, affirmed, June 18, 2004.

- Financial Statements: The Bridgeport and Port Jefferson Steamboat

Company, Inc., 1992-2003.

- Federal Tax Returns: The Bridgeport and Port Jefferson Steamboat Company, Inc., 1996-2001.

- State Tax Returns: The Bridgeport and Port Jefferson Steamboat Company, Inc., 1993-2002.

- "Supplemental Reponses of Bridgeport and Port Jefferson Steamboat Company to Defendant's First Set of Interrogatories," June 30, 2004.

- Martha Klimas, spreadsheet, "Ferry Fare Rates (w/o tariff)" May 1997 and as published thru May 20, 2004, revised March 19, 2004.

- David Bell, "The Bridgeport and Port Jefferson Steamboat Company M/V Grand Republic, M/V Park City and M/V PT Barnum 1995-1999."

- David Bell, "The Bridgeport and Port Jefferson Steamboat Company M/V Grand Republic, M/V Park City and M/V PT Barnum 1998-2003 YTD."

- Port Jeff Ferry, (2003-2004 Schedule).

- "The Bridgeport and Port Jefferson Steamboat Company M/V Grand Republic and M/V Park City, 1992-1996."

- The Scottish Executive, "Final Report: Options for the Ferry Services Between Gourock and Dunoon," Deloitte and Touche, 2000.

- Independent Pricing and Regulatory Tribunal, "Estimation of Public Transport fare Elasticities in the Sydney Region," Research Paper No. 7, New South Wales, October 1996.

- Bridgeport Municipal Code, Chapter 2.28, Port Authority.

- State of Connecticut Statute, Sec. 7-329c, "Powers and duties of port authority."

- Joseph Riccio, PowerPoint Presentation, "Bridgeport Ferry Terminal and Water Street Dock", January 2004.

- Simco Engineering, P.C., "Traffic Study: Water Street Dock, Bridgeport Connecticut", January 1996.

- Tritec Marine Consultants Ltd, "Bridgeport & Port Jefferson Steamboat Company: Study and Recommendations for an Improved Ferry Service",

March 13, 2003.

2.    **John Arnold** (Transport economist).  Mr. Arnold is an expert in the field of transportation economics.  His curriculum vitae is filed contemporaneously herewith.

Mr. Arnold will testify as to the lack of damages incurred by the Ferry Company as a result of the passenger wharfage charge imposed by the Port Authority.  Mr. Arnold will offer the following opinions:

▪    The passenger wharfage charge is reasonably related to the services and facilities provided by the Port Authority to the Ferry Company and ferry passengers, and is necessary for the Port Authority to continue providing such services and benefits.

▪    The imposition of the passenger wharfage charge by the Port Authority on ferry passengers does not have a negative impact on the profitability of the Ferry Company.  This opinion is based on a comparison between the volume of passenger and vehicle ridership to the demand for ferry Services which is dependant on the total cost of ferry tariffs.  This analysis demonstrates that any increase in the price of a ferry ticket (the published tariffs plus the passenger wharfage charge) has not reduced gross revenues of the Ferry Company, and therefore its ability to generate profits.

▪    The imposition of the passenger wharfage charge by the Port Authority on ferry passengers has a negligible effect on the demand for ferry services and volume of ferry traffic.  Rather, any negative fluctuation in demand is cause solely by the lack of ferry capacity and infrequency of ferry services.  Data indicate that demand for ferry services is relatively inelastic at the current prices.  This is supported by the Ferry Company's almost annual increase in ferry tariffs.

▪    The reports and testimony of the Plaintiffs' experts do not corroborate its

belief that the imposition of the passenger wharfage charge denies them revenue.  The Ferry Company could earn greater revenues if they increase the price of ferry tickets.

▪       The facilities and services provided by the Port Authority with revenue generated from the passenger wharfage charge provide a significant benefit to the Ferry Company.  In particular, the Port Authority has engaged in numerous activities and developments in the harbor that have improved passenger services by increasing access to the Ferry terminal and providing shelter and security, thereby facilitating an increase in the frequency of Ferry Company services.

▪       The revenue generated by the passenger wharfage charge does not exceed the Port Authority's expenditures necessary for the operation and administration of the Ferry terminal.  An analysis of the Port Authority's capital costs and costs for operations, maintenance, and administration of the Ferry terminal demonstrates that the expenditures related to the costs attributable solely to Ferry operations actually exceed revenues generated by the Port Authority from the passenger wharfage charge and income from rental agreements.

▪       To the extent that the Port Authority engages in developing businesses and facilities unrelated to the Ferry terminal, the costs associated with such developments are funded almost entirely through various government grants.  This is evidenced by reviewing the federal, state, and local grants received and administered by the Port Authority in relation to how the Port Authority is using these funds to improve the Port of Bridgeport.  These businesses are expected to generate revenues, thus reducing their dependence on Port Authority funds.

▪       The revenues generated from the wharfage charge would have been