**Exhibit D**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - x
BRIDGEPORT PORT JEFFERSON        :  Docket Number
STEAMBOAT COMPANY, ET AL.,       :  3:03 CV 599 (CFD)
            Plaintiffs,          :
                                 :
        vs.                      :
                                 :
                                 :
BRIDGEPORT PORT AUTHORITY,       :  October 27, 2004
            Defendant.           :
- - - - - - - - - - - - - x

DEPOSITION OF EDWARD J. DEAK, Ph.D.

Taken before Ellen Szamier, LSR #162,
Court Reporter and Notary Public within
and for the State of Connecticut, pursuant
to the Rules of Federal Procedure, at the
offices of Bridgeport Port Authority,
330 Water Street, Bridgeport, Connecticut,
on Wednesday, October 27, 2004, commencing at
9:34 a.m.

BEECHER & HORVATH
REPORTING ASSOCIATES
73 Millbrook Road,
North Haven, Connecticut   06473
(203) 230-0010
Fax (203) 281-3429

1    because it's consistent with what Professor Shapiro
2    wrote.  I was not necessarily quibbling with whether
3    in fact it was between zero and one or greater than
4    one.  It's my determination that it's not the right
5    test that the ferry is injured.
6        Q    Well, Professor Shapiro used some
7    hypothetical numbers that he got from studies in, I
8    believe, Scotland and Australia, and he used some
9    hypothetical examples, and I think he determined the
10   elasticity was point 2.  So that's why you are going
11   along and saying, let's assume it's inelastic; is that
12   what you're saying?
13       A    If you refer back to the report -- I can
14   refer back to the exact pages if you want.  But one of
15   the problems is that he just simply took those
16   numbers.
17       Q    So let me ask you, based on what you know of
18   this case, as you sit here today, do you have any
19   information as to whether the price elasticity of
20   demand for ferry service is greater or less than one?
21       A    If you take a look at the studies that he
22   went to, some of them were greater than one, some of
23   them were less than one.  There was no effort on his
24   part to be able to estimate what the elasticities were

1    here.  He simply assumed that Sidney, Australia and

2    Scotland back in the '90s, and I think the other one

3    was done in 2000, could be applied to some of the

4    conditions here in Bridgeport and Port Jeff.

5        Q    Now I'm not asking you what

6    Professor Shapiro did.  What he did was a

7    hypothetical -- in my view, what he did was a

8    hypothetical analysis to see what would happen

9    hypothetically.

10            I'm asking you aside from what Shapiro did,

11   do you have any basis for saying whether the price of

12   elasticity of ferry service is in this case greater or

13   less than one?

14       A    Apart from what material was presented in

15   there, I have no independent calculation of what the

16   elasticity is.

17       Q    Have you read the report of John Arnold

18   submitted in this case?

19       A    No, I have not.

20       Q    You know who Mr. Arnold is?

21       A    I have met Mr. Arnold once.

22       Q    You met him in connection with this case?

23       A    Yes.

24       Q    And you are aware that the Port Authority

1    has submitted his report as an expert, I believe, in

2    the area of transport economics?

3        A    I assumed that he had, but nobody

4    specifically told me that he had.

5        Q    You have not read his report?

6        A    No, I have not.

7        Q    Could you tell me under what circumstances

8    you met Mr. Arnold?

9        A    I met Mr. Arnold at a breakfast meeting back

10   in July, I believe it was.  I can check my records and

11   give you the exact date.

12       Q    July of this year?

13       A    July of this year.  And at that meeting was

14   Attorney Sheppard, Attorney Kellogg, and I believe

15   Attorney Rose, if I remember correct.  Attorney Rose.

16       Q    What was the subject of your conversation?

17       A    I believe there were to be some depositions,

18   and I was asked to read two reports.  And I think one

19   was by a fellow by the name -- it could be Schachter.

20       Q    Right.

21       A    And Shawah.

22       Q    Those are expert reports submitted by

23   plaintiff in this case.

24       A    And I had also been asked to attend the

1       If the ferry company right now raised its

2 rates from roughly $40 to $60, do you know whether

3 that would have a positive or negative or no impact on

4 the revenue and profitability of the ferry company?

5       MR. NOELKER:  Object to the form.

6   A   And I, too -- I think it's a somewhat of an

7 unfair question.  I'll tell you why.

8       In the hypothetical sense, if you carried

9 forward the assumptions of Professor Shapiro, or in a

10 way, your own use of a hypothetical example, that's

11 the sort of result that you wind up with.

12 BY MR. DOMB:

13   Q   I'm asking you for your opinion.

14   A   I understand.  But now you're asking me to

15 go from a hypothetical to what I think is actually

16 true, and that was not necessarily what was part of

17 Professor Shapiro's report.  I understand.

18       So I'm going to answer it, but I want to

19 qualify it and say I would expect in reality that

20 there would be more than that kind of point 2 response

21 to the change in price as a result of a 50 percent

22 increase, but that's not what was in the report that I

23 was asked to look at.  I want to make sure you

24 understand that.

1    Q    So your report is simply a critique of

2    Professor Shapiro, and you haven't really gone beyond

3    to express your opinions?

4    A    I was asked to take a look at

5    Professor Shapiro's report in terms of the application

6    of economics to the question of economic injury to the

7    ferry company, and I believe I did that, and I did

8    that to the extent of the information that was

9    available in the Shapiro report.

10   Q    So apart from what Professor Shapiro said,

11   you have no view of what would happen?  You can't

12   predict with any certainty what would happen if the

13   ferry company right now raised its prices by

14   50 percent, can you?

15   A    Apart from using that as an example of what

16   the extreme would be in the Shapiro report, the answer

17   to your question is no, I have no firsthand

18   information.

19   Q    When you said in Paragraph 6 of your report

20   that the ferry company has raised prices without

21   apparent limit, you don't mean that whatever price

22   increase has in fact occurred that the ferry company

23   could have raised them to a much larger extent, do

24   you?

1    A    I believe, if we look back at my answer, I

2    said in the context of the increases from May of '97

3    to May of '03, there doesn't appear to be any limit.

4    That's all the tangible evidence that I have.

5                (Recess taken:  11:35 to 11:39 a.m.)

6    BY MR. DOMB:

7    Q    In Paragraph 22 of your report, Pages 13 to

8    14, you state generally that in your view there was a

9    shift in demand; is that correct?

10    A    The evidence that's contained in the Bell

11    reports is consistent with an upward shift in the

12    demand, that's true.

13    Q    Part of what you say is that it's your view

14    that nonprice factors contributed to that shift or

15    increase in demand?

16    A    Correct.

17    Q    And that's between the years 2000 and 2002?

18    A    No.  That would actually go back as far as I

19    had data for out of the Bell reports.

20    Q    In your chart you -- your chart begins with

21    1997?

22    A    One of them begins with '97; that is autos

23    carried.  And another one goes back as far as '93 --

24    '92 and '93.

Bridgeport and Port Jefferson Steamboat Company
et al.

Vs.

Bridgeport Port Authority

Expert Report
prepared by:

Edward J. Deak, Ph.D.
Economic Consultant

August 26, 2004



PLAINTIFF'S
EXHIBIT

## Introduction and Qualifications

1      My name is Edward J. Deak, Ph.D. I have an earned Doctorate in the field of economics granted by the University of Connecticut in 1974. I am a Professor of Economics and currently hold the Roger M. Lynch Chair in Economics at Fairfield University. I have held a full-time teaching and research position at the University starting with the fall semester of 1970. From 1987 to 2000 I served as the Chairperson of the Economics Department. I have included a copy of my *curriculum vitae* as Exhibit A to this report.

2      I have been retained by the Bridgeport Port Authority, through their counsel Thompson Coburn, to review material relating to the matter of <u>Bridgeport and Port Jefferson Steamboat Company, et al., vs. Bridgeport Port Authority</u>, and to provide my expert opinion as an economist. My principal responsibility has been to review and comment on the evidence in support of the plaintiff's contention that the Steamboat Company has been economically injured as a result of the imposition of a tariff by the Bridgeport Port Authority upon the users of the Bridgeport Port Jefferson ferry service.[1] I am being compensated at a rate of $250 per hour, plus the reimbursement of expenses at cost, for all services related to this case. Payment of my fee is not contingent upon the outcome of this case.

## Conclusions and Opinions

3      After a review of the material listed in Exhibit B, I have reached the conclusion that the Plaintiff has failed to demonstrate that the imposition of the tariff on

---

[1] This claim is contained within a report prepared by the Steamboat Company's economic expert Dr. Steven J. Shapiro, June 20, 2003 and hereafter referred to as Shapiro report.

7

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIDGEPORT AND PORT JEFFERSON STEAMBOAT COMPANY, *et al.*, | ) ) ) | Case No. 03-CV-599 (CFD) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BRIDGEPORT PORT AUTHORITY, | ) ) | February 1, 2005 |
| Defendant. | ) ) | |

**MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT WITNESS, ALAN A. SCHACHTER**

Defendant Bridgeport Port Authority ("Port Authority"), pursuant to Rule 702 of the Federal Rules of Evidence, moves this Court to exclude the testimony and report of Plaintiffs' expert, Mr. Alan A. Schachter, under the standards set forth in Rule 702 and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993). In the alternative, the Port Authority requests this Court exclude those portions of Mr. Schachter's testimony and report that are not admissible.

In support of this Motion, the Port Authority files contemporaneously herewith its Memorandum of Law setting forth the facts and legal authorities on which this Motion is based. The Port Authority requests an evidentiary hearing as such would assist this Court in resolving the issues presented by this Motion.

Defendant Bridgeport Port Authority respectfully requests this Court exclude the testimony and report of Alan A. Schachter, award the Port Authority its costs associated with this motion, and any additional relief this Court deems just and proper.

**ORAL ARGUMENT REQUESTED**

Respectfully submitted,

THOMPSON COBURN LLP

Edward J. Sheppard, #CT24760
1909 K Street, NW, #600
Washington, DC 20006
202-585-6900
Fax 202-585-6969
esheppard@thompsoncoburn.com

By _____
Timothy F. Noelker, #CT26291
Jason C. Rahoy, #CT26290
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
Fax 314-552-7000
tnoelker@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port
Authority

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was

served, via electronic mail and U.S. Mail, postage prepaid on the following counsel of record,

this ____ day of February, 2005:

Jonathan Bowman (CT# 08526)           Martin Domb (CT# 09544)
Stewart I. Edelstein (CT# 06021)      Eric M. Underriner
COHEN AND WOLF, P.C.                  HILL, BETTS & NASH LLP
1115 Broad Street                     One World Financial Center
P.O. Box 1821                         200 Liberty Street, 26th Floor
Bridgeport, Connecticut 06601-1821    New York, New York 10281-1003
Tel. (203) 368-0211                   Tel. (212) 589-7577
Fax (203) 576-8504                    Fax (212) 466-0514

_____

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

                Plaintiffs,

    - against -

BRIDGEPORT PORT AUTHORITY,

                Defendant.

------------------------------------

CASE NO. 3:03 CV 599 (CFD)

February 1, 2005

## MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT WITNESS, ALAN A. SCHACHTER

Plaintiffs have proffered the opinions of Mr. Alan A. Schachter in support of their proposition that revenues generated from the modest passenger wharfage charge imposed by the Port Authority exceed the expenses necessary to operate and administer Port facilities and services. However, Mr. Schachter's conclusions are irrelevant to this case and unreliable under the standards set forth in Federal Rule of Evidence 702 and the Supreme Court's decision in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

In particular, Mr. Schachter's testimony and report are inadmissible because they are based on a false legal assumption provided by Plaintiffs' counsel; any resulting conclusions necessarily do not fit the facts of this case. Moreover, Mr. Schachter's testimony and report are not reliable because they rely on limited and incomplete data which produce speculative and arbitrary conclusions that cannot be verified or tested.

The Bridgeport Port Authority respectfully requests this Court exclude the testimony and report of Mr. Alan A. Schachter for the reasons detailed more fully below.

**ORAL ARGUMENT REQUESTED**

## MR. SCHACHTER'S METHODOLOGY

A brief overview of the methodology by which Mr. Schachter formed his calculations is useful to understand that his opinions are both irrelevant and unreliable. Mr. Schachter was retained by counsel for Plaintiffs to calculate "the amount of the Port Authority's operating expenses that have been devoted to providing facilities and services to the ferry operations, as distinguished from operating expenses devoted to other activities not related to the ferry operation." See Report of Schachter, p.3, attached as Exhibit A. In making this determination, Mr. Schachter attempted to determine the "amount by which the total tariff exceeds the operating expenses devoted to the ferry operations." Id. He labeled this difference the "tariff overcharge." Id. Mr. Schachter calculated the supposed "overcharge" using the following three methods.

### 1.    Method 1 – Net Revenues

The first method calculates the "overcharge" according to the net revenue received by the Port Authority less expenses that the Port Authority allocates to various operations at the Water Street Dock (the "Dock"). Expense allocations are generally either 50% or 100%. For this calculation, Mr. Schachter assumed that the Port Authority provides facilities and services only at the Dock. As a result, Mr. Schachter assumed that those expenditures not allocated to the Dock are not associated with ferry operations.

### 2.    Method 2 – Adjusted Net Revenues

Method two is essentially the same as the first – net revenues less expenses allocated to the Water Street Dock – with an important difference. Specifically, Mr. Schachter decreased certain allocations of operating costs that he determined had been "overstated." Although Mr. Schachter admitted that he did not know the method by which the Port Authority established

these allocations, he re-allocated expenditures based exclusively on his "professional judgment" and then-available data.

### 3. Method 3 – Reasonable Cost of Operation

The final method Mr. Schachter utilized to estimate the "overcharge" was calculated according to what he termed the "reasonable" expense of providing facilities and services for ferry operations.  To support this model, Mr. Schachter reduced "expenses [that] were unrelated to the ferry operations and/or were attributed to the Port Authority's bureaucracy and could be eliminated without affecting the operation of the ferry at Bridgeport."  As with the previous method, these figures were based on Mr. Schachter's "professional judgment."

## ARGUMENT

### A. Standard for Admissibility of Expert Testimony

In <u>Daubert v. Merrell Dow Pharm., Inc.</u>, the Supreme Court held that the trial court must serve as a "gatekeeper" to determine the admissibility of scientific evidence in accordance with the Federal Rules of Evidence, in particular, Rule 702.  509 U.S. 597 (1993).  Rule 702, governing the admissibility of expert witness testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Under this standard, <u>Daubert</u> requires that a district court ensure that expert testimony must "both rest on a ***reliable foundation*** and is ***relevant to the task at hand***." <u>United States v. Cruz</u>, 363 F.3d 187, 192 (2nd Cir. 2004) (emphasis added), citing <u>Daubert</u>, 509 U.S. at 597.  The

purpose of this inquiry is to "make certain than an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd., v. Carmichael, 526 U.S. 137, 152 (1999); Zaremba v. General Motors Corp., 360 F.3d 355, 358 (2nd Cir. 2004).

**B.    Mr. Schachter's Testimony Is Not Relevant**

This Court must "analyz[e] whether [the] proffered expert testimony is relevant, i.e., whether it ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Cruz, 363 F.3d at 192. Evidence is relevant only where the expert's opinion has a "valid scientific connection to the pertinent inquiry" in the case. Daubert, 509 U.S. at 592. "[E]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful," and consequently should be excluded. Id.; see also Blanchard v. Eli Lilly Co., 207 F.Supp.2d 308, 319-20 (D. Vt. 2002). An expert opinion does not "fit" a case when there exists "too great an analytical gap between the data and the opinion proffered." Id.

**1.    Mr. Schachter's testimony should be excluded because it is based entirely on a false assumption provided by Plaintiffs' counsel**

It is well-established that expert testimony based on a false assumption or incorrect data is irrelevant because it does not "fit" the facts of the case for which it is offered. See Lightfoot v. Union Carbide Corp., No. 98-7166, 1999 WL 110424, at *2 (2nd Cir. 1999) (unpublished opinion) (district court properly excluded proffered testimony of an accountant based on "flawed assumption"); Raskin v. Wyatt Co., 125 F.3d 55, 67-68 (2nd Cir. 1997) (affirming summary judgment where expert's statistical report was based on "artificially inflated" data and erroneous assumptions); Elcock v. Kmart Corp., 233 F.3d 734, 756 n.13 (3rd Cir. 2000) (abuse of

discretion to admit testimony of economics expert based on "economic assumptions not present in the plaintiff's case…."). As a result, a trial court should exclude expert testimony based on a false assumption because it lacks any probative value. <u>Wilkinson v. Rosenthal & Co.</u>, 712 F.Supp. 474, 478 (W.D.Penn. 1989).

In this case, counsel for Plaintiffs instructed Mr. Schachter to assume that revenues generated by the passenger wharfage charge cannot legally exceed expenses directly attributable to Ferry operations. In his report, Mr. Schachter explained:

> I've been asked to **assume [by Plaintiffs' counsel] that the ferryboat tariff is legal and proper only to the extent that the tariff proceeds are used to pay the reasonable cost of the facilities and services** that the Port Authority provides to the ferry operation.

<u>See</u> Report of A. Schachter, p. 3 (emphasis added). Mr. Schachter continued:

> I'm assuming going back, and I maybe wrong, but I've been asked to **assume that the overcharge, as I call it, is – that you are only entitled to charge for reasonable costs and you are not entitled to charge us for the overcharge.** If I assume that, then my model assumes also that the Port Authority, even though it's in existence, should do everything it can to be most cost effective to maximize the bottom line and to minimize that cost.

<u>See</u> Deposition of Schachter, p. 90, attached as <u>Exhibit</u> B (emphasis added). This legal assumption, however, is contrary to long-standing Supreme Court precedent.

In this regard, the Supreme Court has stated that revenues generated from passenger fees need not match exactly the corresponding annual outlays. <u>See</u> <u>Massachusetts v. United States</u>, 435 U.S. 444, 470, n.25 (1978). For example, it is appropriate to factor in future development plans for facility construction, development, and maintenance when setting such fees. <u>See</u> <u>Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.</u>, 906 F.2d 516, 521-22 (11th Cir. 1990) (upholding a ten percent fee on gross receipts derived from airport rental car customers).

In <u>Massachusetts</u>, the Commonwealth challenged a fee imposed on all civil aircraft (including those owned by the states) that fly in navigable U.S. airspace. <u>Massachusetts v. United States</u>, 435 U.S. 444, 449 (1978). The Supreme Court rejected the State's challenge to this charge, and acknowledged that such a fee may generate revenues that exceed expenditures noting, "a surplus of revenue over outlays in any one year can be offset against actual deficits of past years and perhaps against projected deficits of future years." <u>Id</u>. at 470 n.25.

Similarly, in <u>Evansville</u>, the Supreme Court upheld a one dollar passenger fee imposed on each passenger emplaning upon an aircraft from any of New Hampshire's publicly owned and operated airports. <u>See</u> <u>Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines</u>, 405 U.S. 707, 709-10 (1972).[1] Appellants alleged, in part, that the enacting statute "belies any legislative intent to impose an exaction based solely on use' because only 50% of its revenue is allocated to the state aeronautical fund while 'the remaining fifty per cent is allocated to the municipalities or airports authorities owning the landing areas....." <u>Id</u>. at 720. The Court rejected this argument, finding "so long as the funds received by local authorities under the statute are not shown to exceed their airport costs, it is immaterial whether those funds are expressly earmarked for airport use." <u>Id</u>.

As the Supreme Court recognized in <u>Massachusetts</u> and <u>Evansville</u>, the passenger wharfage charge imposed by the Port Authority does not have to match dollar for dollar the outlaying expenses directly attributable to the operation of the Port. Yet, Mr. Schachter's calculations ignore this legal precedent. In fact, he opines precisely as to the amount the Port Authority's revenues do not allegedly match Port expenditures. Indeed, his report fails to

---

[1] In response to the Court's decision in <u>Evansville-Vanderburgh</u>, Congress enacted the Anti-Head Tax Act, 49 U.S.C. § 1513(a). However, the Court continues to apply the three-part <u>Evansville-Vanderburgh</u> test to determine if a charge is reasonable. <u>See</u> <u>Northwest Airlines, Inc. v. County of Kent, Mich.</u>, 510 U.S. 355, 369 (1994).

to recognize any costs not at least superficially related to ferry operations which nonetheless fall under the umbrella of the Port Authority.

Federal courts have struck expert opinions in precisely these circumstances. In Wilkinson, defendants challenged the report of plaintiff's expert because the expert relied on incorrect information supplied to him by plaintiff's counsel. 712 F.Supp. at 478. The district court found that the information was "directly contrary to the information supplied to [defendant] by plaintiff" and was "contrary to the facts established by the documentary evidence concerning the account." Id. at 478. The court found that "information which is contrary to the established facts of the case cannot be the type of information 'reasonable relied on' to reach a sound opinion by experts in any field." Id. at 479. The court concluded:

> the notion that a jury should be allowed to rely on expert opinion based on erroneous information is incorrect. The purpose of allowing expert testimony is to assist the jury in understanding the facts of a complicated matter. 'When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time.' **An opinion based on a false assumption is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse.**

Id. at 479 (emphasis added).

Similarly, Mr. Schachter's conclusions – based on a false presumption – have no probative value to any matter at issue before this Court because his opinions do not "fit" this case, and therefore should be excluded as a matter of law.

### 2. The Superior Court of Connecticut has excluded Mr. Schachter's testimony because it is based on unsupported factual assumptions

Mr. Schachter is not a stranger to the courts of Connecticut, and his testimony has been stricken for the same reasons currently before this Court. In Kammerman v. SCB Tech., Inc., counsel for plaintiff offered the testimony of Mr. Schachter on the issue of lost profits damages relating to automobile airbag technology. See Kammerman v. SCB Tech., Inc., No.

X03CV000506464S, 2002 WL 31662367, at *8 (Conn. Supper., Nov. 6, 2002). As in this case, Mr. Schachter offered three models for his calculations, and made three critical assumptions based on data provided by an engineering firm. Id., see Deposition of Schachter, p. 111-112.

Recognizing that Mr. Schachter is an accountant with "no specialized knowledge of the automobile industry," the court excluded Mr. Schachter's testimony finding "the paucity of factual support for any of [Schachter's] assumptions is staggering." Id. The court found "most astonishing" Mr. Schachter's unfounded opinion relating to the worldwide acceptance and profitability of the technology without any historical support. Id. at *9. The court then struck his testimony concluding that it "lacks the requisite tie to objective verifiable facts that bear a logical relationship to projected future profitability." Id. at *9.

Mr. Schachter committed the same error again: his testimony, opinions and report are based entirely on a false legal assumption that are not relevant to the instant case.

**C.    Mr. Schachter's Testimony And Report Are Not Reliable**

Daubert requires that expert testimony must also be reliable -- that is "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." United States v. Cruz, 363 F.3d 187, 192 (2nd Cir. 2004). The district court must "make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Zuchowicz v. United States, 140 F.3d 381, 386 (2nd Cir. 1998). Indeed, "[p]roposed testimony must be supported by appropriate validation - i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. As a result, "expert testimony should be excluded if it is speculative or conjectural." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2nd Cir. 1996); see also Pugliano v. United States, 315 F.Supp.2d 197, 199 (D.Conn. 2004).

1.    **Mr. Schachter's testimony and report should be excluded because he arbitrarily reduced Port Authority operating expenses without any evidentiary support**

To be admissible, expert testimony must be based on a sufficiently reliable methodology and a sound foundation. Pugliano, 315 F.Supp.2d at 199. This "reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." Id. This Court must, therefore, "undertake a rigorous examination of the data on which the expert relies, the method by which he draws this opinions . . . and the application of the data and methods to the case at hand." Id., see also, Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2nd Cir. 2002). Because Mr. Schachter's reasoning lacks "good grounds" and is the product of subjective belief and unsupported speculation, it should be excluded.

In this case, Mr. Schachter reduced allocations for certain designated Port Authority expenditures to estimate the alleged "reasonable" cost of Port operations. In particular, Mr. Schachter decreased allocations for: (1) personnel costs; (2) development and promotional costs; (3) professional services; and (4) other expenses. See exhibit 4 to Report of Schachter, p.16. He then used these reduced cost allocations to decrease Port operation expenditures by which he estimated the alleged "tariff overcharge." Id.

When questioned about his methodology, Mr. Schachter explained:

*Question*:    "Okay. So just so that we are clear, there's no real precise mathematical formulation for going to 50 percent to 33 percent with respect to allocating personnel costs, is there?"

*Answer*:    "Precise saying that there's a formula and you input things and come up with a number, no. It's a professional judgment."

*Question*:    "A judgment call?"

*Answer*:    "Yeah."

| | |
|---|---|
| *Question*: | "Okay." |
| *Answer*: | "I want to make this clear, it's a judgment call based on taking a look at the available data as opposed to pulling a number out of a hat." |
| *Question*: | "Sure. And if you had more data you would have done more analysis?" |
| *Answer*: | "I would have done more analysis." |

See Deposition of Schachter, p. 61.

These arbitrary calculations are precisely the unreliable and unverifiable conclusions Rule 702 and Daubert are deigned to exclude from the courtroom. Mr. Schachter's conclusions cannot be tested – they are based solely on speculation and conjecture; there exists no analysis to support these calculations. If the re-allocations suffer any rate of error, it is simply unknown. Mr. Schachter's conclusions are mere speculation, and accordingly should be excluded.

### 2. Mr. Schachter's testimony and report should be excluded because they are based on the application of incomplete and limited data

Mr. Schachter did not perform a year-to-year analysis before reducing annual Port Authority expense allocations. Instead, he applied data from a limited number of years to those years that he did not analyze. For example, Mr. Schachter used Port Authority telephone bill data for the years 2003/2004 to reduce expense allocations for the preceding decade; he did not review data from those previous years. When asked to explain this, Mr. Schachter testified:

| | |
|---|---|
| *Question*: | "Okay. How was it that you were able to – so you took the 2003/2004 bills and tried to apply them back to years 1993 through 2002?" |
| *Answer*: | "I think that the lack of documents, there are certain areas in every governmental operation, maybe in every business operation, that is subject to some type of abuse and that's usually travel and entertainment, promotion, telephone. Those types of items are looked at on a regular basis. **We had a sampling of bills to give us an indication of what is going on in the entity.**" |

See Deposition of Schachter, p.60 (emphasis added).

Mr. Schachter further testified that he reduced certain allocations uniformly for the years 1993 to 2003 without any supporting evidence. See Deposition of Schachter, p. 55. He explained:

| | |
|---|---|
| *Question*: | "Okay. As I understand it, for each year from 1993 to 2003 what you've done is lowered the allocation for personnel costs, development and promotional costs, professional services and then noncash expenses. Is that right?" |
| *Answer*: | "I have to go to my exhibit" (Section 3.2 of Report of Schachter) |
| *Question*: | "Yeah. You might want to go to Exhibit 4 and take a look at that." |
| *Answer*: | "Okay. I would say that's a fair summary. |
| *Question*: | "And it appears that you made the identical reduction for each year 1993 to 2003. Is that correct? And I'll give you time to look through that." |
| *Answer*: | "Except in '03 where we eliminated all the professional fees related to the current matter I think your statement is probably correct." |
| *Questions*: | "Okay, Thank you. Now is it a fair assumption that – and this assumption is on may part, but is it fair to state that what you have done, **you haven't done a year-by-year analysis to determine whether the salaries, for example, in year 1993 need to be reduced and then done an analysis on year '94 and then done an analysis on year '95, ect.,** but that you just did an overall global analysis and then applied your results uniformly through each year? |
| *Answer*: | "I would say **I did not do a year-by-year analysis** because I did not have enough information to do a year-by-year analysis." |

See Deposition of Schachter, p. 55-56.

In addition, Mr. Schachter reduced the allocation for Port Authority advertising, marketing and promotions, and travel and entertainment expenses to 10 percent, cut professional fees in half, and reduced to one-third all expenses related to total salaries, payroll taxes, and health benefits based on the same conjectural reasoning. See exhibit 4 to Report of Schachter, p.14. These unsupported and unreliable estimations fail under Daubert.

The Second Circuit has expressly held that expert testimony, such as this, is not admissible simply because the expert opines that the data support his conclusions. See Amorgianos v. National R.R. Passenger Corp, 303 F.3d 256, 266 (2nd Cir. 2002). In Amorgianos, plaintiff challenged the district court's exclusion of its treating physician asserting that any defects in the proffered testimony effect its weight rather than admissibility. Id. at 268. The Second Circuit rejected this argument finding "the analytical gap between the studies on which she relied and her conclusions was simply too great and that her opinion was thus unreliable." Id. at 270. As court explained:

> [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony.

Id. at 266.

In this case, Mr. Schachter reduced allocations for each category of expenditures without analyzing appropriate data from each year; neither he nor Plaintiffs have produced any evidence warranting such uniform reductions. Thus, Mr. Schachter's calculations are not reliable and inadmissible under Daubert and Rule 702.

## CONCLUSION

For all the aforementioned reasons, the Bridgeport Port Authority respectfully requests this Court exclude the testimony, report, and opinions of Plaintiffs' expert, Mr. Alan A. Schachter.

Respectfully submitted,

THOMPSON COBURN LLP

> Edward J. Sheppard, #CT24760
> 1909 K Street, NW, #600
> Washington, DC 20006
> 202-585-6900
> Fax 202-585-6969
> esheppard@thompsoncoburn.com

By _____

> Timothy F. Noelker, #CT26291
> Jason C. Rahoy, #CT26290
> One US Bank Plaza
> St. Louis, Missouri 63101
> 314-552-6000
> Fax 314-552-7000
> tnoelker@thompsoncoburn.com

> Attorneys for Defendant Bridgeport Port
> Authority

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was

served, via electronic mail and U.S. Mail, postage prepaid on the following counsel of record,

this __1st__ day of February, 2005:

Jonathan Bowman (CT# 08526)
Stewart I. Edelstein (CT# 06021)
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

Martin Domb (CT# 09544)
Eric M. Underriner
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

_____