EXHIBIT 5

Expert Report of Alan A. Schachter
June 30, 2004
Page 40

Page 1 of 4

## Exhibit 5

### Tariff overcharge calculated according to the reasonable expense of providing facilities and services to the ferry operation at the Water Street Dock

| ($000s) | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 [a] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ferryboat Tariffs | $ 261.3 | $ 449.7 | $ 461.4 | $ 649.0 | $ 678.1 | $ 712.2 | $ 804.3 | $ 901.5 | $ 947.6 | $ 984.9 | $ 1,292.4 | |
| Less: | | | | | | | | | | | | |
| Credit Card fees | 5.8 | 11.3 | 12.1 | 18.9 | 19.4 | 20.0 | 24.0 | 22.5 | 25.2 | 27.0 | 34.7 | |
| Collection Fees | 11.2 | 22.5 | 22.5 | 22.5 | 22.5 | 22.5 | 22.5 | 22.5 | 22.2 | 22.5 | 29.2 | |
| | 17.0 | 33.8 | 34.6 | 41.4 | 41.9 | 42.5 | 46.5 | 45.0 | 47.4 | 49.5 | 63.9 | |
| Net Ferryboat Tariffs Collected | 244.3 | 415.9 | 426.8 | 607.7 | 636.3 | 669.7 | 757.8 | 856.5 | 900.2 | 935.4 | 1,228.5 | |
| **Reasonable Expenses for Operating the Ferry Service at the Water Street Dock:** | | | | | | | | | | | | |
| Real Property [b] | | | | | | | | | | | | |
| Fair market rental value of dock, staging area and first floor of terminal building | 75.0 | 78.6 | 82.6 | 85.0 | 95.0 | 97.9 | 90.7 | 114.2 | 110.4 | 114.5 | 118.2 | |
| Lease payments by Ferry Company | (14.4) | (78.6) | (82.6) | (85.0) | (95.0) | (97.9) | (90.7) | (114.2) | (110.4) | (114.5) | (118.2) | |
| Operating Expenses | | | | | | | | | | | | |
| Building services [c] | | | | | | | | | | | | |
| Utilities [d] | - | - | - | 34.4 | 35.3 | 64.3 | 70.1 | 74.9 | 84.5 | 73.2 | 71.5 | |
| Outside services [e] | | | | 16.7 | 12.5 | 15.9 | 17.5 | 23.6 | 21.1 | 25.4 | 20.7 | |
| Wages - additional dock hands [f] | | | | 13.4 | 7.8 | 3.9 | 0.4 | 12.8 | 6.1 | 9.0 | 8.2 | |
| Health Insurance [g] | | | | 22.5 | 23.2 | 47.7 | 49.2 | 50.6 | 52.2 | 53.7 | 55.3 | |
| Workers' Compensation Insurance (dock hands) [h] | | | | 1.5 | 1.6 | 3.3 | 3.4 | 3.5 | 3.6 | 3.7 | 3.8 | |
| Taxes, payroll [i] | | | | 2.4 | 2.5 | 5.1 | 5.3 | 5.4 | 5.6 | 5.7 | 5.9 | |
| Pension expense [j] | | | | 1.7 | 1.8 | 3.7 | 3.8 | 3.9 | 4.0 | 4.1 | 4.2 | |
| Salaries - additional administrative support [k] | | | | 1.0 | 1.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | |
| Insurance - general [l] | | 8.0 | 8.2 | 8.5 | 8.7 | 9.0 | 9.3 | 9.6 | 9.9 | 10.2 | 10.5 | |
| Security - building and grounds [m] | | 0.6 | 0.6 | 0.6 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | |
| Taxes - other [n] | | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | |
| Office supplies and expense [o] | | | | | | | | | | | | |
| Equipment rental [p] | | | | | | | | | | | | |
| Telephone [q] | | | | | | | | | | | | |
| Advertising [r] | | | | | | | | | | | | |
| Marketing and promotion [s] | | | | | | | | | | | | |
| Travel and Entertainment [t] | | | | | | | | | | | | |
| Automobile expense [u] | | | | | | | | | | | | |
| Contributions [v] | | | | | | | | | | | | |
| Professional fees - accounting [w] | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | |
| Professional fees - legal [x] | | | | | | | | | | | | |
| Interest [y] | | | | | | | | | | | | |
| Depreciation and amortization [z] | | | | | | | | | | | | |
| Reasonable Operating Expenses for the Water Street Dock | 65.6 | 14.1 | 14.4 | 108.3 | 100.6 | 161.1 | 167.1 | 192.6 | 195.2 | 193.4 | 188.5 | |
| Tariff Overcharge According to Reasonable Expense of Providing facilities and services to the Ferry Operation at the Water Street Dock | $ 178.7 | $ 401.8 | $ 412.4 | $ 499.4 | $ 535.7 | $ 226.3 | $ 249.5 | $ 285.3 | $ 319.9 | $ 217.4 | $ 1,040.0 | $ 4,365.5 |

a - 2003 amounts from Bridgeport Port Authority general ledger.
b-2 See Exhibit 5, page 2 for explanations.

Source: Bridgeport Port Authority's audited financial statements, general ledgers, Net Revenue Report, and Willamette Management
Associates calculations

## Willamette Management Associates

Expert Report of Alan A. Schachter
June 30, 2004
Page 41

**Exhibit 5**
**Endnotes**

---

b) <u>Real Property</u>: My analysis assumes that the real property used in connection with the ferry operation (the dock, the staging areas and the first floor of the terminal building) have been leased by the Ferry Company at a fair rental value. I reviewed the lease between the ferry company and the Port Authority as well as an appraisal of the rental value of the property prepared by Mr. George Shawah of Baldwin Pearson, Inc. For 1993, I assumed a $75,000 lease payment was the fair market value at that time.

c) <u>Building services</u>: Building services represents janitorial, maintenance, and repair services related to the terminal building and grounds. I have been asked to assume for purposes of this analysis that the real property would be leased by the Ferry Company under a "triple net" lease, whereby the Ferry Company would pay for building services related to the portion of the property it leases. I reviewed the general ledger accounts representing the expenditures made by Port Authority for building services. I am not aware of any basis to question whether these expenditures are reasonable and properly categorized, based on the available information provided. Therefore, I have accepted the amount of the expense as well as the 80 percent allocation of the expenses to the ferry operation. In my opinion, the 80 percent allocation is reasonable considering the fact that the Ferry Company would only be required to rent the first floor of the terminal building. The second floor is used by the Port Authority, the Bridgeport Harbormaster and the Connecticut World Trade Organization. These expenses have been included in my analysis commencing in 1996 when the terminal building was first occupied.

d) <u>Utilities</u>: Under a triple net lease scenario, the Ferry Company would be required to pay for the utilities used in the first floor of the terminal building and the grounds. I reviewed the general ledger accounts representing the expenditures made by Port Authority for utilities. I am not aware of any basis to question whether these expenditures are reasonable and properly categorized, based on the available information provided. Therefore, I have accepted the amount of the expense as well as the 50 percent allocation of the expenses to the ferry operation. In my opinion, the 50 percent allocation is reasonable considering the fact that the ferry company would only be responsible for the utilities on the first floor of the terminal building and the grounds and dock. The Ferry Company would not be responsible for the utilities on the second floor of the terminal building. These expenses have been included in my analysis commencing in 1996 when the terminal building was first occupied.

e) <u>Outside services</u>: Expenditures for outside services included items for both maintenance and consulting. I have determined that only the maintenance items are related to the ferry company. Based upon a review of the general ledger, I have determined that the amounts spent on consulting services, such as dock erosion studies, new parking garage designs, riverfront mixed use studies, dredging studies and lobbyist, either were not related to the ferry operation or were related to governmental grants, and would not be a necessary expenditure for the Ferry Company under this scenario. As such, I have removed the consulting fees from this account and accepted a 50 percent allocation of the remaining maintenance items as used by the Port Authority in the net revenue reports to the City. These expenses have only been included in my analysis beginning in 1996 when the terminal building was first occupied.

f) <u>Salaries</u>: I have been advised by the management of the Ferry Company that the employees of the Port Authority (Mr. Riccio, Ms. Klimas and Ms. Johnson) are not necessary to the operation of the ferry (see note k). Management has advised me that absent the security

**Willamette Management Associates**

Expert Report of Alan A. Schachter
June 30, 2004
Page 42

**Exhibit 5**
**Endnotes**

Page 3 of 4

provided by the Port Authority, the Ferry Company would employ two additional dock hands to provide day-time security. My analysis includes one additional dock hand for 1996 (the first full year of the terminal building operation) because, prior to 1996, no security personnel were provided by the Port Authority for the dock. Once the additional entrance to the property was completed (following the Interstate 95 construction project), the Port Authority began providing a security guard at the gate. As such, beginning in 1998, I include two additional dock hands. The dock hands' salaries are calculated at $11.25 per hour in 1993, increasing by three percent per year for inflation.

g) <u>Health insurance:</u> I have been advised by the management of the Ferry Company that the cost of medical insurance for its Bridgeport non-management employees is 6.82 percent of wages. I have applied this percentage to the necessary wages.

h) <u>Workers' Compensation insurance:</u> I have been advised by the management of the Ferry Company that the cost of workers' compensation insurance for its dock hands is 10.7 percent of wages. I have applied this percentage to the necessary wages.

i) <u>Payroll taxes:</u> I have calculated payroll taxes at 7.65 percent of necessary wages. This is the combined employer contribution for social security (FICA) and medicare taxes.

j) <u>Pension expense:</u> I have been advised by the management of the Ferry Company that it offers a 401K plan to its dock hands and administrative employees. Under this plan, the Ferry Company is required to match the first $1,000 of contributions for its employees (additional matching contributions are discretionary). As such, I have included $1,000 of pension expense for each full-time equivalent employee.

k) <u>Salary – additional administrative support:</u> I have included a portion (50 percent) of an administrative office employee to compensate for the bill-paying and contracting of services that would be required at the Bridgeport terminal absent the Port Authority. These administrative functions would be carried out at the Ferry Company's Port Jefferson offices under supervision of the existing Port Jefferson accounting personnel. The Ferry Company management has advised me that it currently pays administrative personnel such as an assistant bookkeeper approximately $21,500 per year. I reduced this salary by a three percent annual inflation rate for 2002 and previous years.

l) <u>Insurance:</u> I have been advised by the management of the Ferry Company that that it currently maintains $2.5 million in personal liability and property insurance coverage related to the ferry operation at the Water Street Dock. This coverage is dictated by the lease with the Port Authority. I have been asked to assume that no additional insurance would be required under a triple net lease scenario with a third party.

m) <u>Security:</u> The Ferry Company management has advised me that day-time security can be provided more economically and just as effectively by the dock hands, that I have included under [f] above.

n) <u>Taxes – other:</u> This category includes small miscellaneous expenses related to tax charges that will not be otherwise incurred by the Ferry Company.

# Willamette Management Associates

Expert Report of Alan A. Schachter
June 30, 2004
Page 43

**Exhibit 5**
**Endnotes**

o) <u>Office Supplies</u>: The Port Authority included items such as: (1) bank service charges, (2) dues and subscriptions, (3) computer expense, (4) miscellaneous, (5) office expense, and (6) repairs to office equipment in its office supplies expense. These expenses as incurred by the Port Authority are not necessary to the operation of the ferry and duplicate expenses already incurred by the Ferry Company.

p) <u>Equipment rental</u>: Equipment rental includes the expense incurred by the Port Authority to lease office equipment (fax machine, copier, etc.). The Ferry Company maintains all the necessary equipment at its administrative offices at Port Jefferson and in its smaller office in Bridgeport.

q) <u>Telephone</u>: The Ferry Company maintains phone service at its Port Jefferson office and in its smaller office in Bridgeport.. Since all of the administrative functions would be handled from its existing offices in Port Jefferson, no additional phone service would be required.

r) <u>Advertisement</u>: I have been advised by Ferry Company management that it currently provides all of the advertisement necessary for the ferryboat operation. No additional advertising would be necessary.

s) <u>Marketing and promotion</u>: The Port Authority included meals and entertainment (including season tickets to local sports teams) in its marketing and promotional expense. I have been advised by Ferry Company management that the Ferry Company already incurs and pays these kinds of expenses for its own operation and would not incur any additional costs.

t) <u>Travel and entertainment</u>: The Ferry Company management has advised me that no out-of-town travel would be needed for the operation of the ferry at the Water Street Dock, beyond what it already incurs and pays itself.

u) <u>Automobile</u>: I have been advised by Ferry Company management that it would not require the use of an automobile for the operation of the ferry at the Water Street dock.

v) <u>Contributions</u>: I have been advised by Ferry Company management that the Ferry Company already incurs a significant expense for charitable contributions and would not incur any additional expense related to the operation of the ferry at the Water Street Dock..

w) <u>Professional Fees - accounting</u>: The operation of the Water Street Dock would not require a separate audit or any additional accounting or audit expenses beyond those already provided to the ferry company.

x) <u>Professional Fees – legal</u>: I have been advised by Ferry Company management that any additional legal expenses would be minimal. The ferry boat company would not incur the types of legal fees currently paid by the Port Authority. For example, there would be no fees related to the tariff dispute, government grants, condemnation of property, etc. I have, however, included $5,000 as a contingency. I believe this is a reasonable provision under the circumstances.

y) <u>Interest</u>: The Ferry Company management has advised me that the Ferry Company would not incur any interest expense beyond that which it currently incurs.

z) <u>Depreciation</u>: The Ferry Company should not incur the cost of Port Authority depreciation, since depreciation is included in the cost of the fair market rental value.

**Willamette Management Associates**

**EXHIBIT B**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Case No. 03-CV-599 (CFD)

- - - - - - - - - - - - - - - -X
BRIDGEPORT AND PORT JEFFERSON      :
STEAMBOAT COMPANY, ET AL.,         :
                  PLAINTIFFS       :
                                   :
VS.                                :
                                   :
BRIDGEPORT PORT AUTHORITY,         :
                  DEFENDANT        :
- - - - - - - - - - - - - - - -X

Deposition of ALAN SCHACHTER
taken at the offices of Bridgeport Port
Authority, 330 Water Street, Bridgeport,
Connecticut, before Clifford Edwards, LSR,
Connecticut License No. SHR.407, a
Professional Shorthand Reporter and Notary
Public, in and for the State of
Connecticut on July 29, 2004, at 9:30 a.m.



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT  06443
HARTFORD                          STAMFORD

---

A P P E A R A N C E S :

ON BEHALF OF THE DEFENDANT:

STEVE E. KELLOGG, ESQ.
THOMPSON COBURN, LLP
One US Bank Plaza
St. Louis, Missouri  63101

EDWARD J. SHEPPARD, ESQ.
THOMPSON COBURN, LLP
700 14th Street, N.W.
Washington, D.C.  20005

RICHARD L. ROSE, ESQ.
ROBERT ROSE & BATES, PC
17 Hoyt Street
Stamford, CT  06905

ON BEHALF OF THE PLAINTIFFS:

MARTIN DOMB, ESQ.
HILL, BETTS & NASH, LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, NY  10281

---

1     ALAN A. SCHACHTER,
2  residing at 33 Riverside Avenue, Westport,
3  Connecticut, having first been duly sworn, deposed
4  and testified as follows:
5
6              DIRECT EXAMINATION
7
8  BY MR. KELLOGG:
9     Q    Good morning, Mr. Schachter.  My name is
10 Steve Kellogg, and I represent the Port Authority in
11 this case.
12          I take it you've had your deposition taken
13 before.
14    A    Yes.
15    Q    Okay.  Just a couple rules that I always
16 go by.  First of all, whenever I ask the questions
17 I'm by no means an accounting expert so there's a
18 good chance I may ask some questions that don't make
19 sense to you.
20          If that's the case, please advise me that
21 it doesn't make sense or you don't understand the
22 question because, otherwise, I'm going to assume
23 that you understood all the questions that I asked
24 at the end of the day.
25    A    I understand.

---

1     Q    Fair enough.
2          Can you tell us how you got involved in
3  this case?
4     A    That's a good question.  I had done some
5  work for a firm in Bridgeport in a matter totally
6  unrelated to this matter, and I believe my name was
7  given to Mr. Domb from a lawyer at that firm that I
8  worked at -- not that I worked at, but worked with
9  on a matter.
10    Q    Okay.
11    A    I think that's how I got involved in the
12 case.
13    Q    So Mr. Domb contacted you?
14    A    I was contacted by the lawyer at the firm
15 in Bridgeport that said somebody would be calling me
16 and Mr. Domb did call me.
17    Q    And how many conversations did you all
18 have at the beginning?
19    A    As I recall -- we have an office in New
20 York City as well as Westport.  As I recall,
21 Mr. Domb came to my office in New York.
22          And we had maybe a 45-minute meeting, an
23 hour meeting basically, you know, going over my
24 background and seeing whether I would be suitable
25 for this matter.

1    Q    Okay.  At that point did he discuss kind
2    of the basics of the case?
3    A    He gave me a general outline.  He didn't
4    want to be too specific.
5        We have a conflicts procedure where we
6    determine whether we have a conflict before we take
7    on a matter, so I don't like to know too much before
8    we clear conflicts.  But he gave me some idea.
9    Q    I assume it cleared conflicts?
10    A    Yes.
11    Q    Did he fill you in more specifically about
12    the nature of the case?
13    A    You know, there wasn't -- yeah.  I mean,
14    we had some phone conversations about it, but
15    nothing of any great substance.  My initial
16    retention was basically to consult with Mr. Domb.
17    Q    And what did he tell you about the nature
18    of the case?
19    A    He told me -- as I recall, you know, he
20    indicated that it related to the tariff matter and
21    related to the Bridgeport Port Jeff ferry, and that
22    there were I think it was a class action matter.
23        And that, basically, he wanted us to
24    determine that, you know, the -- what the difference
25    was between the revenues collected through the

1    A    Okay.  He wasn't sure as to what documents
2    to look at, what issues would be significant on an
3    accounting basis in preparing an analysis of the
4    kind he had in mind.
5        We assisted him in identifying the areas
6    of our interests when he took depositions of
7    witnesses that might prove -- might provide input to
8    our analysis.
9    BY MR. KELLOGG:
10    Q    Did you all -- during the time that you've
11    been retained up until now, did you correspond via
12    letters or e-mail?
13    A    I would say that I'm not aware of any
14    e-mails.  As far as letters go, other than the
15    engagement letter and perhaps a transmittal letter
16    saying here are the documents, I personally don't
17    recall any correspondence of any kind.
18        Most of our discussions have either been
19    in person or over the phone.
20    Q    What kind of file do you keep when you are
21    putting together an expert report like this?
22    A    We have a detailed file with the documents
23    we relied on.  And I think those documents are
24    outlined in one of my exhibits.
25    Q    Yeah.  I think it's Exhibit 2.

6

1    tariff as opposed to the costs of the Port Authority
2    related to the ferry.  And in our discussions he
3    asked me to assume that there was liability and make
4    the calculation.
5        I want to take that back.
6        Initially when he talked with me before we
7    got to that point, as you had earlier said, you are
8    not an accounting expert.  I don't think Mr. Domb is
9    either.
10        And he recognized that this was a -- a
11    heavily involved financial analysis and accounting
12    concepts and perhaps governmental accounting and so
13    forth.  So initially he had asked me to assist him
14    in the discovery process.  That was the initial --
15    Q    Did you help him in the discovery process?
16    A    Yeah, I did.
17    Q    How so?
18    A    I -- in that -- at that point in time, I
19    was engaged by him as an adjunct to his services as
20    counsel.  And I don't know whether I can testify to
21    that or not.  You have to tell me.
22        MR. KELLOGG:  There's no privilege
23    here.
24        MR. DOMB:  I think you can say what
25    you did and those discussions.

8

1    A    And I think most of the documents that we
2    relied on other than the two that are here are
3    documents that have been produced during the course
4    of this litigation.
5    Q    Would there be anything else in your file
6    such as notes, earlier drafts, things of that
7    nature?
8    A    I don't believe so.  You know, we don't --
9    our process is we have a master on the computer, we
10    make changes as we go along.
11        And the two drafts or the two reports that
12    you've got, you've got the original one and one that
13    was corrected for computer error.  Those are the
14    only ones I'm aware of out there.
15    Q    So you save them on your hard drive?
16    A    I don't even know if they are saved, to be
17    honest with you.
18    Q    All right.  Who would know?
19    A    I suppose one of my administrative people.
20    Q    Okay.
21    A    But my understanding is that when we
22    prepare a report and there are changes, it's made
23    right to the master.
24        Whether those are saved or not -- I don't
25    believe that originals are saved, but I'm not a

11

```
 1   computer expert, you know.
 2       Q   Sure. What about handwritten notes, do
 3   you make handwritten notes whenever you are working
 4   up a report like this?
 5       A   I personally didn't and I don't believe
 6   there are any handwritten notes of any substance
 7   because we prepared the report from most of the --
 8   mostly from the documents that are, as far as I
 9   understand, from the documents that are listed in
10   the documents relied on.
11       Q   When you say as far as I understand we
12   prepared the report, are there other people that
13   assisted you in preparing this report?
14       A   Sure. In my firm we have a number of
15   people on the matter.
16       Q   And who would have assisted you in
17   preparation of this report?
18       A   Jim O'Sullivan, William Murray. Those are
19   the two that I can remember.
20       Q   And who are they? Go with Jim O'Sullivan
21   first.
22       A   Jim's an analyst with our firm, manager.
23       Q   Okay. And what did he do to assist you in
24   preparing this report?
25       A   We worked on it together. He prepared --
```

```
 1       Q   You charge by the hour?
 2       A   Yeah.
 3       Q   What about William Murray?
 4       A   William Murray came later on. And he
 5   really got involved in quality control and looking
 6   at the report and proofing it.
 7       Q   What --
 8       A   He pulled together -- he assisted me in
 9   pulling together the backup documents supporting the
10   report.
11       Q   Who actually did the physical writing of
12   the report?
13       A   I'd say jointly myself and Jim.
14       Q   Okay. Is Mr. O'Sullivan an accountant?
15       A   He's both an accountant and a lawyer.
16       Q   Is he a CPA?
17       A   Yes.
18       Q   And what about William Murray?
19       A   Bill is an accountant. He's not
20   certified. Spent most of his career in internal
21   accounting positions and finance positions in
22   industry.
23       Q   Okay. And do you know whether or not he's
24   got any handwritten notes?
25       A   I don't think he does.
```

10

```
 1   pulled together some of the financial documents,
 2   prepared some of the schedules. I mean, we worked
 3   hand in hand on this matter.
 4       Q   I mean, how -- do you know whether or not
 5   he keeps a separate file?
 6       A   I don't believe he does.
 7       Q   So you don't know whether he's got any
 8   handwritten notes?
 9       A   I don't think he does, but, you know, to
10   my knowledge, no.
11       Q   Did he spend -- just to put all of this in
12   context, did he spend more time on this report than
13   you did or vice versa?
14       A   I don't know what the break-out of time
15   is. My role was to supervise, develop the
16   methodology. He was more -- for instance, he
17   attended a deposition when I couldn't be present
18   when the other side, your accountant testified.
19       Q   Okay.
20       A   So I'm not sure what the split-out in time
21   was. He worked under me, but he's fairly
22   experienced.
23       Q   Okay. That would be in your billing
24   records, though, I assume?
25       A   I assume so, yeah.
```

12

```
 1       Q   What about e-mail correspondence between
 2   yourself and Mr. O'Sullivan and Mr. Murray, do you
 3   all e-mail each other?
 4       A   We do, but I'm sort of a fossil in that
 5   respect.
 6       Q   Yeah.
 7       A   My feeling is I would rather -- with my
 8   people I would rather correspond -- not correspond,
 9   rather, communicate directly with them. We are not
10   that big a firm where we can't pick up the phone.
11       Q   But you do have internal e-mail?
12       A   Yeah, we do.
13       Q   And you just don't know one way or the
14   other whether or not there's e-mail correspondence?
15       A   I'm not aware of any.
16       Q   Is there a possibility of it?
17       A   There may be. But it's not something we
18   would -- the three of us when we worked on a project
19   at our premises, we were always at the same
20   location.
21       Q   Okay.
22       A   So there would be no need for me to e-mail
23   him.
24       Q   All right.
25       A   We're just not -- we're not that spread
```

15

1  out.
2      Q   I understand. And, to your knowledge,
3  there are absolutely no handwritten notes whatsoever
4  of the three of you putting together this expert
5  report?
6      A   I'm not aware of any. I'm just telling
7  you I'm not aware of any and I reviewed the file,
8  so --
9      Q   Did you discuss the matter with
10  Mr. O'Sullivan or Mr. Murray as to whether or not
11  they had any?
12      A   That's not something I would say do you
13  have notes.
14      Q   Sure.
15      A   No. No.
16      Q   All right. How did you prepare for the
17  deposition today?
18      A   Last night I had a good dinner, read the
19  report.
20      Q   Good for you.
21      A   Watched the Mets lose.
22      Q   It's a common occurrence these days?
23      A   It's -- breaking my heart. I didn't
24  really do much preparation because I'm so familiar
25  with it.

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

BY MR. KELLOGG:
2      Q   Did you have any phone conversations with
3  Mr. Domb in preparation for your testimony today?
4      A   No phone conversations.
5      Q   Any other conversations that we haven't
6  discussed between you and Mr. Domb in preparation
7  for your testimony today?
8      A   Yes.
9      Q   And what is that?
10      A   We met about a week ago.
11      Q   Okay.
12      A   Went over the report with him.
13      Q   And what was discussed during that
14  meeting?
15      A   Just issues -- I mean the report. And we
16  reviewed the contents of it. I don't have any
17  recollection specifically of anything other than
18  this is what we did and we went over the contents of
19  the report, but I don't have any specific
20  recollections or caveats that he gave me.
21      Q   Okay. And that was a week ago?
22      A   That was approximately a week ago. Yes.
23      Q   And how long did you all meet?
24      A   A couple of hours.
25      Q   And you don't recall any of the things you

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

14

1      Q   When you went to dinner, did you go to
2  dinner with anybody?
3      A   Yes.
4      Q   With who?
5      A   My wife.
6      Q   So she prepped you on this?
7      A   Yes. She's a lawyer.
8      Q   Is that right?
9      A   She's a matrimonial lawyer. Every time we
10  go to dinner I hope she finds a client. Invariably
11  if we have a few drinks at the bar she does.
12      Q   That's great.
13      A   That's her marketing campaign.
14      Q   Anybody else at the dinner besides your
15  wife?
16      A   No.
17      Q   Okay. Did you meet with Mr. Domb before
18  your testimony today?
19      A   Coincidentally we met walking into the
20  terminal and I had a roll and an orange juice. And
21  he said, "Do you want to come up now or do you want
22  to come up later?" I said, "I'd rather come up
23  now." And he bought me a Pepsi cola."
24      MR. KELLOGG: Funny, you didn't bring
25  one for everybody, Marty.

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

16

1  all discussed in any particular detail?
2      A   I don't have a recollection of
3  specifically what was discussed in terms of a
4  particular item. We read the report together. We
5  went over the allocations and the revenue reports,
6  went over some of the detail behind it, and just
7  discussed the contents of the report.
8      But there wasn't any specific area that
9  stands out in my mind as something that was
10  discussed that would have caused me to recollect a
11  specific item on the report.
12      Q   All right. When did you -- well, let me
13  just -- you have revised your reports since you
14  originally submitted it on June 30.
15      Is that right?
16      A   Yes.
17      Q   And why did you revise the report?
18      A   Well, in preparing for my deposition today
19  exactly last Sunday -- Sunday, this past Sunday, I
20  was in the comfort of my home and I said, you know,
21  I never proofread the report and I just -- there was
22  certain things I was testing.
23      And lo and behold, at the end of the day,
24  I noticed that certain of the cells in one of the
25  methodology didn't make sense and the addition was

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

19

1  incorrect.

2      Q   Who would have put together that initial

3  spreadsheet?

4      A   That --

5      Q   That's what it was.  It was a spreadsheet

6  that was --

7      A   What happened was there are two -- there

8  are three methodologies cited in the report.

9      Q   Right.

10     A   On the second methodology there is a

11 spreadsheet that was then copied to be used for the

12 third methodology.  When the -- I'm not sure whether

13 it was Bill or Jim.  It was one of them.

14         When they copied the spreadsheet and they

15 put the formula in the cells to do the addition, it

16 was purely -- all of this change was only an

17 addition mistake.  Not any of the contents changed.

18     Q   I understand.

19     A   When they put the formulas across, I think

20 there were eleven columns, for some reason the

21 formula only replicated going out six columns.

22     Q   Okay.

23     A   And this would have never happened but for

24 people's reliance on Excel.  You know, you get to be

25 a little lazy and you assume that certain things are

---

1      A   Maybe I do.  I don't know.

2          Yeah, I do.  I have the old report, my

3  copy, and I penned in the changes which are now in

4  the new report.

5      Q   All right.  I'd like you, if you could, to

6  walk me through the actual changes from the old

7  report to the new report.  I want to make sure I

8  understand which ones have changed.

9      A   Okay.  Do you have the individual pages,

10 too?  It would be easier to start with that.

11     Q   I bet Marty just gave those to me.

12     A   Okay.

13     Q   One moment, please.

14         Before we go to that, you mentioned all of

15 these spreadsheets.

16         MR. KELLOGG:  Marty, do we have

17 copies of all of the spreadsheets they put

18 together?

19         MR. DOMB:  Here in the report.

20         MR. KELLOGG:  Those are the

21 spreadsheets?

22         THE WITNESS:  Yeah.

23 BY MR. KELLOGG:

24     Q   Those are the spreadsheets.  Gotcha.

25         Did you make any other Excel spreadsheets

---

18

1  going to be done.  Particularly when it was done

2  correctly in the first few columns.

3          When I noted that on Sunday night, I

4  called both Bill and Jim to make sure that I wasn't

5  wrong.  Maybe there was some reason for it.  I

6  forget who it was, they have -- they told me that

7  they couldn't think of a reason, and they went in

8  early Monday morning and pulled it up and saw that

9  the formulas were incorrect.

10     Q   Okay.

11     A   They made the change on the formula and

12 then we immediately -- we contacted -- Jim contacted

13 Mr. Domb.  In fact, I think I was with him.  When we

14 made the phone call first it was a voice mail to

15 him.

16         And then I believe Mr. Domb called Jim

17 back who apprised him of the nature of the problem.

18 And we told him that we would revise the pages and

19 then issue revised reports which I've given you a

20 copy of.

21     Q   All right.  Do you have a copy of the old

22 report and the new report?

23     A   I don't think I have the old report with

24 me.

25     Q   All right.

---

20

1  that are not reflected in the report?

2      A   No.

3          MR. KELLOGG:  And Marty, what are

4  these?

5          MR. DOMB:  These are items -- if you

6  look at the report, Exhibit 2 is a list of

7  16 items in Mr. Schachter's file.

8          MR. KELLOGG:  Yes.

9          MR. DOMB:  These are items 13, 14 and

10 15.

11         MR. KELLOGG:  Gotcha.

12         MR. DOMB:  I went through and

13 determined that those you didn't have or,

14 to my knowledge, were not previously

15 produced.  So I put them on the table this

16 morning.

17         MR. KELLOGG:  I think we are going to

18 have to go ahead and mark those as

19 exhibits if that's okay with everybody.

20         MR. DOMB:  Of course.

21         Off the record.

22         (THEREUPON, THERE WAS A DISCUSSION

23         OFF THE RECORD.)

24

25

1       (THEREUPON, DEFENDANT'S EXHIBIT NO.
2  200, ANALYSIS OF PHONE CALLS, WAS
3  MARKED FOR IDENTIFICATION.)
4       (THEREUPON, DEFENDANT'S'S EXHIBIT NO.
5  201, ANALYSIS OF CELL PHONE CALLS,
6  WAS MARKED FOR IDENTIFICATION.)
7       (THEREUPON, DEFENDANT'S'S EXHIBIT NO.
8  202, ANALYSIS OF CREDIT CARD
9  TRANSACTIONS, WAS MARKED FOR
10  IDENTIFICATION.)
11       (THEREUPON, DEFENDANT'S'S EXHIBIT NO.
12  203, REVISIONS OF EXCEL SPREADSHEETS,
13  WAS MARKED FOR IDENTIFICATION.)
14       MR. KELLOGG:  Back on the record.
15  All right.
16  BY MR. KELLOGG:
17    Q    Mr. Schachter, can you identify this
18  document that we've got marked as Defendant's
19  Exhibit 200?
20    A    This is an analysis provided to me from
21  counsel of phone calls from the Port Authority land
22  line ten minutes or more.
23    Q    Okay.  And is that listed as item 13 on
24  your Exhibit 2 of your report?
25    A    Is it 13 or 14?  I don't remember.  You

---

1  may be right.  Hold on a second.
2       Yup.
3    Q    Okay.  All right.  And can you identify
4  that document, please.
5    A    These are an analysis of cell phone calls.
6  I believe it's Mr. Riccio's cell phone number 203 --
7  these are an analysis of cell phone calls.
8    Q    And is this the document that's reflected
9  in item 14 to Exhibit 2 to your report?
10    A    Yes.
11    Q    All right.  And then I want to show you
12  Exhibit 202.
13    A    Yeah.
14    Q    And please identify that.
15    A    This is an analysis of credit card
16  transactions.  I believe it's Mr. Riccio's credit
17  card related to the Port Authority.
18    Q    And is that item 15?
19    A    Yes.
20    Q    On Exhibit 2?
21    A    Yes.
22    Q    To your report?
23    A    Yes.
24    Q    And these three exhibits were all prepared
25  by legal counsel and not you.

---

1       Is that correct?
2    A    I did not prepare them.  No.
3    Q    And is this something you would normally
4  prepare?
5    A    It's possible, but I would have had -- you
6  know, it's something I could prepare using a reverse
7  phone directory, but I don't normally do it.
8       Normally in cases I've been involved with
9  either private investigators or telephone
10  consultants do that type of work, I don't.
11    Q    Okay.  And then I want to hand you
12  Exhibit 203 and if you could identify that full
13  exhibit for me.
14       MR. DOMB:  Objection.  For the
15    record, I think this wasn't sent to or
16    from Mr. Schachter, but he can describe
17    it.
18    A    I never saw this letter, so --
19       MR. KELLOGG:  Okay.
20       MR. DOMB:  Are you directing him to
21    the attachments to it.
22       MR. KELLOGG:  Exactly.
23       MR. DOMB:  Okay.
24    A    Okay.  These are the pages that were
25  affected by the computer glitch that I spoke about

---

1  earlier.
2  BY MR. KELLOGG:
3    Q    Those are the revisions?
4    A    Those are revised pages.  Right.
5    Q    Okay.  All right.  If I could have that
6  back.
7       Thank you.
8       Now, if you will, kind of, walk -- not
9  kind of but actually walk through the changes that
10  were made as a result of the spreadsheet error.
11    A    Do you have your original report there?
12    Q    I do.
13       Do you want me to go off of that or off
14  of --
15    A    Let's go back to your original report and
16  then --
17    Q    That's fine.
18    A    -- you can trace it back to this.
19       If you go to Exhibit 5 of your original
20  report.
21    Q    Exhibit 5?
22    A    Yes.
23    Q    Okay.
24    A    The summary schedule, not the text.
25       If you look at years '98 through 2002.

1     Q  Uh-huh.
2     A  If you look at the tariff overcharge line,
3 the last line which is double underscored.
4     Q  Yes.
5     A  If you just look at '98 you'll see it's
6 669.7 minus 161.1 does not equal 226.3.
7     Q  Uh-huh.
8     A  And that's true from '98, '99, 2000, 2001,
9 and 2002.
10     Q  Okay. And what are the --
11     A  Now, go to the individual pages.
12     Q  Okay.
13     Back in the report itself?
14     A  No.
15     The pages that you got with this
16 transmittal letter that you just gave me.
17     Q  Okay. Terrific.
18     A  If you go to '98 on Exhibit 5, which is
19 included in there, and look at the bottom line and
20 compare it to the bottom line that you have in the
21 original report, you'll see that there are five
22 changes corresponding to years 1998 to 2002 on the
23 last line.
24     And those are the arithmetic mistakes
25 caused by failure to input the total formula across

27

1     Q  I also note that the fourth number down
2 has been changed as well?
3     A  Yes. Correct.
4     Q  Why is that?
5     A  That also was an addition mistake. In one
6 of the cells there was a $30,000 addition mistake.
7     Q  But would this have been on a different
8 spreadsheet than we have looked at so far?
9     A  I think it was just in the -- just take a
10 look at that.
11     Q  And just for the record, the item that we
12 are referring to, it states that "on tariff
13 overcharge calculated according to the net revenue
14 reports prepared by the Port Authority."
15     A  It was not in a -- it was not in one of
16 the spreadsheets.
17     Q  Okay.
18     A  The interest was an offline calculation
19 and there was an addition. I can -- let me just --
20 there wasn't an error in the interest, but in
21 putting the interest and the damage amount in method
22 one, the two added up. There was a $30,000 error.
23 So you'll see that the interest is one --
24     Q  Let me stop there.
25     Where was that calculation made in your

26

1 all columns.
2     Q  All right. Are there any other changes to
3 the report that we should be aware of?
4     A  Well, when you -- let's just go back to
5 the interest line. The interest for --
6     Q  Now, are you looking at -- just to keep
7 the record straight -- Section 3.4 of your report?
8     A  I'm looking at Section 3.4.
9     Q  Okay.
10     A  Okay. The interest line is 2,760,200 in
11 the revised report.
12     Q  Okay.
13     A  And then if you go to Section 4.0 you'll
14 notice that the last line is 9,038,500. That's just
15 the addition of the two.
16     Q  Okay. I notice in that column, the third
17 number down has been revised from the original one
18 as well.
19     Is that correct?
20     A  The -- on 4.0?
21     Q  Yes.
22     A  4.0 the 4,366,500.
23     Q  Yes.
24     A  Is revised to 6,278,300. The sixth number
25 down goes up from 6,510,400 goes up to 9,038,500.

28

1 exhibits?
2     A  That would have been internal in our
3 computer. The interest calculation -- it's not in
4 the computer. I mean it's not in the exhibits.
5     It was simply a formula where when you
6 added the interest on the first method to the damage
7 amount on the first method there was a $30,000
8 addition mistake, but the interest didn't change and
9 the damage amount just didn't change. It was just
10 the addition of the two.
11     Q  I see. And how are those two added? Are
12 they done manually or done --
13     A  I'm not sure whether -- I don't know. I'd
14 have to check the cells on that. But I did notice,
15 and it was called to my attention, that there was a
16 $30,000 difference on me checking it.
17     Q  So there are other spreadsheets not
18 reflected in the report?
19     A  It's not a spreadsheet.
20     Q  Okay. Either other notes or --
21     A  It would have just been a formula, it
22 would have been an addition of the two and somehow
23 that didn't get done right.
24     Q  Where was the formula?
25     Was it handwritten out or was it --

1    A   No. Internal on the computer.
2    Q   Do you have a program for interest or
3  something like that?
4    A   No. We write a formula for it.
5    Q   And it's in a spreadsheet --
6    A   And I want to correct my -- when you asked
7  me if there are any spreadsheets, there is an
8  interest spreadsheet that I have printed out that
9  I'd be happy to give it to you.
10   Q   Is that the only one you have?
11   A   That's the only one I have. I can get a
12  copy.
13   Q   Are there other spreadsheets that we
14  talked about today that you utilized in preparing
15  your report?
16   A   No. No.
17       MR. KELLOGG:  Let's go off the record
18  for just a second.
19       (THEREUPON, THERE WAS A DISCUSSION
20       OFF THE RECORD.)
21       (THEREUPON, DEFENDANT'S'S EXHIBIT NO.
22       204, BACKUP FOR INTEREST CALCULATION,
23       WAS MARKED FOR IDENTIFICATION.)
24  BY MR. KELLOGG:
25   Q   Sir, can you identify what's been marked

---

1       Is it in a program?
2       Is it something that you print out?
3    A   It's nothing we would print out because
4  it's just -- the printout shows the interest and
5  damage amount separately which comes off of --
6  interest comes off of that.
7    Q   204?
8    A   Right.
9       And the damage amount comes off of
10  Exhibits 3, 4 and 5, so it's just a question of
11  adding interest damages to come up to a number.
12   Q   And how is that done?
13   A   I can't tell you specifically because I
14  didn't do it, but I -- there is no worksheet that
15  does it. I don't have -- in my review of the work
16  papers there was no worksheet.
17       It may have been -- it may have been a
18  formula or the staff person may have just taken the
19  two and added it and put it in the file. I don't
20  recall that. I can find that out if you want.
21   Q   I'm sure I'm going to be asking at some
22  point.
23   A   All right.
24   Q   Are there any other changes to your report
25  that we haven't already talked about?

---

30

1  as Exhibit 204?
2    A   Yeah. This is the support backing up our
3  interest calculation.
4    Q   All right. And can you identify where the
5  error occurred on the interest calculation we were
6  just talking about?
7    A   There was no error in the interest
8  calculation.
9    Q   Okay.
10   A   The error occurred in combining let's call
11  it the principal and the interest into one number.
12   Q   Can you show me on this where that
13  occurred on this?
14   A   As I said before, it didn't occur. It
15  didn't occur. It automatically printed out. It was
16  something that was -- it was a calculation that was
17  done internally in the computer.
18       The combination of -- in order to come up
19  with -- on 4.0 in order to come up with line four
20  that would be the combination of line one of 3.4 and
21  line one of 4.0. And in that addition there was a
22  $30,000 error.
23   Q   I guess -- I know I'm being nitpicky here.
24  I'm trying to figure out where that occurred.
25       It occurred on the computer?

---

32

1    A   Not that I'm aware of.
2       MR. KELLOGG:  Off the record.
3       (THEREUPON, THERE WAS A DISCUSSION
4       OFF THE RECORD.)
5  BY MR. KELLOGG:
6    Q   Let's go to the substance of your report.
7    A   Okay.
8    Q   I want to turn you to I guess it would be
9  Section 1 of your report.
10      In it you state -- I believe this is the
11  second sentence -- "In particular I was asked to
12  calculate the amount" --
13   A   Excuse me. Section 1, not Exhibit 1?
14   Q   Yes. Second sentence, "In particular I
15  was asked to calculate the amount, if any, by which
16  the tariff imposed by the defendant on the
17  passengers of the Bridgeport Jefferson ferry exceeds
18  the reasonable costs of the facilities."
19      Do you see that?
20   A   Yes.
21   Q   So you would agree that the tariff is
22  actually imposed on the passengers and not the ferry
23  itself.
24      Is that correct?
25   A   That's my understanding. I've paid it.

1  Q   I'm sure you have.  All right.
2      Within that same sentence it says or you
3  state that you were asked to calculate the
4  reasonable costs of facilities and services that the
5  defendant provides to the ferry operation.
6      Do you see that?
7  A   Yes.
8  Q   How many times have you examined as an
9  accountant the business aspects of a ferry
10 operation?
11 A   This is the one time.
12 Q   The first time?
13 A   Uh-huh.
14 Q   How about the Port Authority?
15 A   First time.
16 Q   Have you done anything professionally, I
17 guess, as an accountant that would be maritime
18 related at all?
19 A   Specifically maritime related, no.
20 Q   Okay.  Do you consider yourself a forensic
21 accountant or how do you consider yourself?
22 A   Well, I'm a certified public accountant.
23 I mean, you've seen my resume.  I'm accredited in
24 business valuation.  I have extensive experience in
25 matters relating to costs that are very similar to

1  designations.
2      But I'm not aware of anybody who would say
3  I'm a specialist in ferry boat accounting or Port
4  Authority accounting.
5  Q   Okay.  So you don't know whether or not
6  there are accountants that specialize in the
7  maritime industries or with the ferry boat business
8  valuations?
9  A   I'm assuming that in any practice there
10 probably are firms which may obtain one client and
11 then perhaps have, you know, as a referral base and
12 in the natural course of things may have others.
13 But I'm not aware of any firm specifically that is a
14 maritime firm.
15 Q   And I take it by your answer you didn't
16 consult with any other accountants that happen to
17 work in the maritime industry in preparing this
18 report?
19 A   No.  The closest I have to come to the
20 maritime industry is my service in the United States
21 Coast Guard.
22 Q   I appreciate that.  I'm just talking about
23 you didn't consult with anybody that works in the
24 maritime industry with respect to the preparation of
25 your report in this case?

34

1  the costs incurred here and the allocation and
2  treatment of those costs.
3      I've had experience in dealing with
4  governmental programs.  I've been retained by
5  governments.  I was a special consultant to the New
6  York State Tax Department on enforcement.
7      I consider myself a certified public
8  accountant who also has an expertise in finance and
9  in providing consulting services relating to
10 economics and finance during the course of either a
11 litigation or to parties who are involved in making
12 business decisions based on the value of things.
13 Q   Okay.  Do you know whether or not there
14 are certified public accountants that routinely work
15 within the maritime industry?
16 A   Well, I'm not a hundred -- I can't say --
17 I'm not aware of any maritime certification for
18 certified public accountants.  I was with a firm
19 that represented a tugboat company.  It was our only
20 client of that nature.
21     I don't know that there are firms that
22 consider themselves specialists.  I know there's no
23 professional maritime designation.  There are
24 designations such as the type I have that are
25 related to valuation and other professional

36

1  A   In my professional opinion I didn't think
2  it was necessary.
3  Q   I understand that.
4  A   The issues --
5      MR. DOMB:  Hold on a second.
6      MR. KELLOGG:  I just want him to
7      answer the question.
8      MR. DOMB:  Don't interrupt him in the
9      middle of an answer.
10 A   I didn't think it was necessary because
11 the issues here are basic cost accounting issues
12 that would really affect any cost accounting.
13     And I can tell you that I have had years
14 of experience in governmental programs requiring
15 statistical data and in-depth cost calculations.
16 BY MR. KELLOGG:
17 Q   Okay.
18 A   So I felt particularly qualified in light
19 of the nature of this engagement.
20 Q   I understand.  But you didn't consult with
21 anybody else?
22 A   No.
23 Q   Thank you.
24     All right.  I believe you noted in your
25 report, I think it's somewhere in Section 2.0 that

1 the authority -- well, just for purposes of
2 clarification you understand that if I refer to the
3 defendant as port or the authority you know who I'm
4 referring to?
5     A    Yes.
6     Q    The defendant in this case?
7     A    Yes.
8     Q    You note that the authority has a fairly
9 broad mandate.
10        Is that right?
11    A    Based on my review of the minutes of the
12 meetings and the review of the legal bills and other
13 documents I've seen, it appears to me that the Port
14 Authority has a broad scope of operations and plans
15 to be involved in things other than the operation of
16 the ferry.
17    Q    All right. On page two of your report you
18 list a number of activities that, in your opinion,
19 do not appear to be related to the ferry operation.
20        Is that right?
21    A    That's what I state in the report.
22    Q    Did you consult with anyone regarding the
23 creation of this list?
24    A    I read the minutes and --
25    Q    I understand.

1 self-evident to me that these projects were of a
2 broad scope.
3     Q    Do you consider yourself an expert in
4 ferry boat operations?
5     A    Other than as a -- my only knowledge in
6 ferry boat operations in terms of the inner workings
7 of a ferry boat is what I've learned on this matter
8 and as a passenger.
9     Q    Do you consider yourself an expert in port
10 operations?
11    A    No.
12    Q    Okay. From my review of the list that
13 you've put here on page two, it would appear that a
14 number of these projects are designed to increase
15 the revenue for the Port Authority.
16        Do you agree?
17        MR. DOMB:  Objection to the form.
18    A    It's quite possible. Yes.
19 BY MR. KELLOGG:
20    Q    Okay. In your opinion, could such
21 additional revenues help offset the authority's
22 overall costs thus allowing them to reduce the
23 tariff?
24        MR. DOMB:  Objection to the form.
25    I find that vague.

38

1     A    And I didn't consult with anybody other
2 than reading the minutes which is what you would
3 normally do to find out what is happening with any
4 business entity if you were conducting an audit or a
5 forensic investigation. That's a good indication of
6 what they're doing.
7     Q    So you did not consult with anyone
8 regarding the creation of this list?
9     A    No.
10    Q    Did you interview anyone regarding the
11 scope or specifics of any of these projects?
12    A    No.
13    Q    Okay. What type of analysis did you
14 perform to determine that the projects were
15 unrelated to ferry operations?
16    A    Well, certain of the projects such as the
17 Cartech site and a number of the other ones are
18 self-evident. I don't think that the moving of two
19 yacht clubs to Captain Cove, you know, relates to
20 the operation of the ferry.
21        To build a commercial laundry doesn't
22 relate to the operation of the ferry. I think if
23 you go through this list -- I want to make it clear
24 that I did not go into each one of these projects
25 other than listing them because it appeared

40

1 BY MR. KELLOGG:
2     Q    Did you understand the question?
3     A    You are saying could additional revenue
4 offset the cost and could that additional revenue
5 offset the tariff?
6     Q    Offset the tariff, the need for the
7 tariff.
8     A    That was certainly beyond the scope of my
9 analysis.
10        If any, in fact, there was additional
11 revenue that was part of the Port Authority pot, I
12 would have included that and I would have said that
13 the overage was even greater and let the ultimate
14 jury or the judge make a decision as to whether
15 there's liability or what the legal issues are.
16    Q    I guess what I'm asking as an accountant,
17 is it possible that if the Port Authority by
18 engaging in these tasks that you've got listed here,
19 if the Port Authority increases its revenue, could
20 it then offset the cost of the tariff? Is that
21 possible, or the price of the tariff?
22        MR. DOMB:  Objection to the form.
23    A    I suppose anything is possible. But if
24 the Port Authority is engaging in other projects
25 then those projects are going to absorb additional

1  overhead costs that are being charged to the ferry
2  and the result of that is that there's going to be
3  less cost charged to the ferry and a greater of
4  overage for my calculation.
5       I'm not in a position to determine legally
6  if they could offset the tariff or not, but that
7  would be the result. So in my way of thinking, I
8  would have a greater bottom line because I think
9  more cost would be shifted out of the ferry boat
10 operation to these other projects.
11 BY MR. KELLOGG:
12      Q   Let's try to take your expert analysis --
13 this particular report out of the equation for just
14 a moment.
15      A   That's all I was asked to do.
16      Q   I understand. The overage and the
17 underage. All I'm asking is whether or not the
18 additional revenues that would be gained or could be
19 gained by engaging in these other activities could
20 therefore allow the port to lower the tariff?
21           MR. DOMB:   Objection to the form.
22      A   Anything is possible. I don't know what
23 the legal ramifications would be.
24 BY MR. KELLOGG:
25      Q   Not even worried about the legal

1  Port Authority provides to the ferry operation.
2       Is that right?
3       A   Yes.
4       Q   Who told you to make this assumption?
5       A   Counsel.
6       Q   Do you have any independent knowledge of
7  whether or not that assumption is correct?
8       A   No.
9       Q   What if the assumption is incorrect, what
10 does that do to the basis of your report?
11           MR. DOMB:   Objection to the form.
12      A   I'm not sure. I'm not aware and I don't
13 know what the legalities of that would be. I was
14 asked to perform this calculation.
15 BY MR. KELLOGG:
16      Q   But if the underlying assumption is
17 incorrect, is your report -- is there any weight or
18 validity to it at that point?
19           MR. DOMB:   Object to the form.
20      A   I really don't know. I would only be
21 guessing in terms of my knowledge of whether that
22 would invalidate the report or not.
23 BY MR. KELLOGG:
24      Q   And what would be your guess?
25      A   I don't know. I mean, it's either a yes

42

1  ramifications?
2       A   Yeah. From an economic point of view, if
3  I have more revenue and I'm covering my costs and if
4  you want to say okay, we don't need tariff anymore,
5  I think that's possible.
6       Q   Okay. All right. I want to go to Section
7  3.0 of your report.
8       A   Sure.
9           MR. KELLOGG:   By the way, any time
10          you need to take a break just let us know.
11          THE WITNESS:   This is a good time to
12          break.
13          MR. KELLOGG:   Yeah. It's a new
14          topic. So it's a great time.
15          (THEREUPON, THERE WAS A RECESS
16          TAKEN.)
17 BY MR. KELLOGG:
18      Q   We were going to Section 3.0 of your
19 report entitled, "Calculation of Tariff
20 Overcharges."
21      In the second paragraph there you write
22 that you have been asked to assume that the ferry
23 boat tariff is legal and proper only to the extent
24 that the tariff proceeds are used to pay the
25 reasonable costs of facilities and services that the

44

1  or a no, so I don't know. I really don't know.
2       Q   All right.
3       A   I don't want to guess.
4       Q   But they wouldn't be considered
5  overcharges, would they?
6           MR. DOMB:   Objection to the form.
7       A   This report was prepared and constructed
8  based on an assumption. If I was asked to make
9  calculations under different assumptions,
10 calculations might be different, but I wasn't, so --
11 BY MR. KELLOGG:
12      Q   I understand, but what I'm asking is if
13 the underlying assumption is incorrect, then would
14 your terminology of tariff overcharges be
15 inaccurate?
16           MR. DOMB:   Objection to the form.
17          I think this is the fourth way you
18          are asking him the same question. I
19          believe Mr. Schachter has answered it.
20          If you have something to add go
21          ahead.
22      A   If I took out the assumption and you had
23 asked me what the terminology would be, I probably
24 would change the terminology and I would say the
25 excess of revenues over expenditures and whatever

1 that means in terms of a profit earned by the Port
2 Authority would have to be then decided by the legal
3 minds to be or the jury or whatever.
4 BY MR. KELLOGG:
5   Q   In your experience, do businesses
6 oftentime have to mirror up the revenues they
7 receive to the expenses that allowed them to achieve
8 those revenues?
9   A   I'm not sure what the term mirror up
10 means. I'm not sure what you are alluding to.
11   Q   All right. In this case what you have
12 done is taken a look at the ferry boat tariff
13 revenues.
14        Is that correct?
15   A   Yes.
16   Q   And then you have tried to determine what
17 the expenses are that the port incurs when trying to
18 achieve that revenue?
19   A   If you talk about mirroring up if you mean
20 matching.
21   Q   Right. That's what I meant.
22   A   All right. Matching would be that under
23 generally accepted accounting principles when
24 accountants are preparing accounting statements, one
25 of the cardinal rules or underpinning of preparation

1 contract that the revenues cannot exceed five to ten
2 percent of the costs.
3        So particularly when you are dealing with
4 public funds, not for profit organizations, you have
5 some -- depending on the program -- there are
6 constraints on the amount of revenue you may be able
7 to generate.
8   Q   Are those legal constraints?
9   A   Those are usually provided for either in
10 the program itself usually legally. Yeah.
11   Q   Okay. All right. I want to go to your
12 three different models that you have. I don't know
13 if that's the right terminology.
14   A   Good terminology.
15   Q   You have essentially three different
16 models.
17        Is that right?
18   A   Yes.
19   Q   Which of those models in your experience
20 is the most accurate?
21   A   Well, after correcting for the computer
22 glitch.
23   Q   As corrected.
24   A   They are all correct mathematically so
25 it's not a question of accuracy.

1 is that the accountant tries to match revenue with
2 the expenditures that generate that revenue.
3   Q   Okay.
4   A   And so that -- in a particular period of
5 time. Whatever the time period in which is
6 prescribed whether it be month, a year, fiscal year.
7   Q   And in your experiences, have businesses
8 generally been precluded from having revenue that
9 exceeds the actual expenditures to achieve those
10 revenues?
11   A   Very frequently in the regulated and
12 governmental area.
13   Q   Can you give me an example.
14   A   Yeah. For instance, in the healthcare
15 field both Medicare, Medicaid programs predicate
16 that revenues cannot exceed the reasonable cost.
17 They don't prohibit the healthcare provider from
18 getting revenues from other sources.
19        But at least in terms of the revenues
20 generated by the governmental programs for the
21 indigent poor or the elderly, they are not allowed
22 to -- their revenues are based on the reasonable
23 cost.
24        In the governmental contracting area it's
25 not infrequent that you would see a cost plus

1   Q   Okay. I guess what I'm asking is which
2 one of these most reflects reality?
3   A   I would say the third method.
4   Q   The third method. Okay.
5        All right. I want to start with Section
6 3.1 and that is, if I've got this right, the tariff
7 overcharge, in your words, calculated according to
8 the revenue reports prepared by the authority.
9        Is that right?
10   A   That is a -- that really wasn't our
11 method, but it was self-evident on the face of the
12 reports --
13   Q   Okay.
14   A   -- that there's an overcharge.
15   Q   And Exhibit 3 of your report is the
16 supporting documentation for your conclusions.
17        Is that right?
18   A   Yeah. Exhibit 3 summarizes the documents
19 that are prepared by -- these are backup documents,
20 actual copies of the revenue reports that are
21 prepared by the Port Authority.
22   Q   Sure. I'm particularly interested in page
23 3 of 11 through page 11 of 11.
24   A   Okay.
25   Q   To begin with there's an allocation --

1  first of all, did you prepare this report?
2      A    Which report?
3      Q    I'm sorry.  You are right.  Page 3 of 11
4  on Exhibit 3 to your report.
5      A    These are copies of reports that we
6  obtained in discovery.
7      Q    So you did not actually prepare these
8  numbers?
9      A    Oh, no.
10     Q    The allocation column, what does that
11 represent?
12     A    That represents the portion of the costs
13 incurred by the Port Authority allocable to, as they
14 see it, to the ferry boat operation.
15     Q    And those numbers generally, they are
16 either 50 percent or a hundred percent.
17         Is that right?
18         MR. DOMB:  Objection to the form.
19         As I look at it, almost all are 50
20     except for two.  One is a hundred and one
21     is --
22         MR. KELLOGG:  Isn't that what I said?
23         MR. DOMB:  You said the numbers are
24     either 50 or 100.
25     A    They are 50, a hundred, later on 80 --

1  do that, but I think they should have it.
2      Q    And why do you think they should have it?
3      A    Because if you are charging costs to a
4  particular entity, if you are charging costs to me
5  as an individual, hypothetically, I would want to be
6  certain that those costs are fairly -- fairly --
7  fairly allocated and substantiated by some type of
8  time study analysis, purchase requisition analysis.
9      Q    Sure.  What kind of system, in your
10 opinion, would the authority need in order to
11 properly -- not properly, how about accurately
12 assess the costs associated with the ferry
13 operations?
14         What system would they need?
15     A    I can only tell you from my experience
16 that I can draw from other --
17     Q    That's all I'm asking you.
18     A    Oh.  It would seem to me that where you
19 have a number of employees that are performing many
20 different duties for different entities, and I don't
21 think there's a dispute to that here particularly
22 based on the depositions, one of the things that we
23 regularly do, and certain programs are actually
24 mandated in doing cost calculations, is that
25 employees will for a representative period of time,

50

1  BY MR. KELLOGG:
2      Q    Late's stay on this page.
3      A    Yes, 50 or 100.
4      Q    Does that seem odd to you that they are
5  either 50 percent or 100 percent?
6      A    Does it seem odd?
7      Q    That was an awful question.  Let me back
8  up.
9          In your opinion, do these numbers -- where
10 did they get these numbers, the Port Authority?  Do
11 you know?
12     A    My understanding is that they were
13 initially prepared the first year at the Port
14 Authority internally and -- I think by the director
15 as I recall, but I'm not sure what my source is for
16 that.
17     Q    Do you know how they arrived at these
18 particular figures?
19     A    No.
20     Q    Do you know whether or not the Port
21 Authority has any cost accounting system to capture
22 these particular costs as it relates to ferry
23 operations?
24     A    Based on my review of the depositions, I
25 don't think they have the cost accounting ability to

52

1  not every day of the week, fill out time reports.
2          Those time reports will be summarized by
3  blocks of times spent at various activities and that
4  time study is then used as a basis for allocating
5  payroll and benefit costs.
6      Q    And is that similar to something you would
7  see on the manufacturing industry, you know, where
8  on government contracts, for example, the workers
9  that are manufacturing, they will determine what
10 line item or what item that they're --
11     A    This is even simpler.
12     Q    Yeah.
13     A    I'm thinking of entities that I've dealt
14 with smaller than this.  Particularly -- I hate to
15 reach into healthcare because basically that's not
16 what I do.  I draw from that experience.
17         They are entities that are not
18 particularly sophisticated.  They have enough
19 trouble getting the job done during the day then
20 clocking in every minute of what they do.
21         But because the allocations have some very
22 real effects on what that entity is going to
23 ultimately receive in that revenue of what they're
24 going to ultimately be charged for, the programs
25 actually mandate that for a month a year or one week

55

1  every quarter that some rudimentary time accounting
2  system be set up so that you could tabulate the
3  employees' time and use that as a representative
4  sample say, okay, let's allocate the time and
5  benefits that I identified.
6      Q  In order to track the cost associated with
7  ferry boat operations?
8      A  Any operations.
9      Q  Right, but in this --
10     A  Let's say you had a nurse work in a lab
11 working two or three different positions and you
12 want to allocate her cost. She's not going to count
13 every minute.
14         But she would allocate, you know, a
15 practical solution. An inexpensive practical
16 solution would be to develop some kind of ongoing
17 time analysis to permit that calculation.
18     Q  And that wasn't done in this case?
19     A  No.
20     Q  Would that have been a more accurate
21 method of determining what the actual costs are
22 associated with ferry operations?
23     A  Well, from a time and hours point of view,
24 it would have been more accurate for all of the
25 projects, but, on the other hand, since on payroll

---

1          MR. DOMB:  Thank you.
2  BY MR. KELLOGG:
3      Q  All right. I want to go to Section 3.2 of
4  your report.
5      A  The text?
6      Q  Yes.
7         All right. Are you there?
8      A  Yes.
9      Q  Okay. As I understand it, for each year
10 from 1993 to 2003 what you've done is lowered the
11 allocation for personnel costs, development and
12 promotional costs, professional services and then
13 noncash expenses.
14         Is that right?
15     A  I have to go to my exhibit.
16     Q  Yeah. You might want to go to Exhibit 4
17 and take a look at that.
18     A  Okay. I would say that's a fair summary.
19     Q  Okay. And it appears that you made the
20 identical reduction for each year 1993 to 2003.
21         Is that correct?
22         And I'll give you time to look through
23 that.
24     A  Except in '03 where we eliminated all the
25 professional fees related to the current matter I

---

54

1  and salaries is 50 percent here -- as I said, I
2  don't know how that was arrived at.
3          I didn't see any backup and so maybe
4  somebody did an analysis. I'm suspect of it, as you
5  said before. But what I'm suggesting is a simple
6  way of doing it and I've seen it done regularly.
7      Q  I guess what I'm asking is if that had
8  been done in this case, if the Port Authority had
9  actually instituted some sort of cost accounting
10 tracking system like you just suggested, having that
11 data, would that have provided you with better data
12 in trying to determine what the reasonable costs are
13 associated with the ferry boat operations?
14     A  Sure.
15     Q  Okay. I'm not sure if I asked this
16 question and if I did I apologize.
17         You don't know how they came up with these
18 particular allocations for each of these line items,
19 do you?
20     A  No.
21         MR. DOMB:  Objection to the form.
22         There was some testimony about the
23         executive director. So the record will
24         reflect it.
25         MR. KELLOGG:  Yes.

---

56

1  think your statement is probably correct.
2      Q  Okay. Thank you.
3         Now, is it a fair assumption that -- and
4  this assumption is on my part, but is it fair to
5  state that what you have done, you haven't done a
6  year-by-year analysis to determine whether the
7  salaries, for example, in year 1993 need to be
8  reduced and then done an analysis on year '94 and
9  then done an analysis on year '95, etc., but that
10 you just did an overall global analysis and then
11 applied your results uniformly through each year?
12     A  I would say I did not do a year-by-year
13 analysis because I did not have enough information
14 to do a year-by-year analysis.
15     Q  Okay.
16     A  So what I did was based on the available
17 underlying supporting data that was made available
18 to me, I revised the allocations.
19         And it was very difficult for me to
20 distinguish between years because, for instance, in
21 some of my bases for doing that were deposition
22 transcripts and those people spoke about their job
23 functions and so forth, didn't really indicate
24 whether they changed in '96 or '97 or '98.
25     Q  I understand.

57

1    A    So I did the best I could under the
2  circumstances.  In this method we assume that all of
3  the costs that the Port Authority said were related
4  to the ferry boat operation were, in fact, related
5  and all we did was reallocate based on the
6  information we had.
7    Q    I understand.
8        So is it fair to say, then, that had you
9  had better information, you would probably have done
10  a year-by-year analysis?
11    A    If I had it I would have done it.  Sure.
12    Q    Okay.  All right.  I want to look at the
13  actual narrative that you've got in Exhibit 4.
14    A    Uh-huh.
15    Q    I believe that starts on page 13 of 16.
16    A    Yes.
17    Q    Okay.  And as I understand it, the
18  adjustment that you made to personnel costs is based
19  on your estimation that the equivalent of one
20  full-time person is all that is needed or is all
21  that would relate to ferry operations?
22    A    That was my professional judgment, yes.
23    Q    Okay.  And yet you have already agreed
24  that you are not an expert in ferry operations?
25    A    Well, these people weren't running the

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

1  expert.
2    Q    Interesting tidbit.
3        MR. DOMB:  Off the record.
4        (THEREUPON, THERE WAS A DISCUSSION
5        OFF THE RECORD.)
6  BY MR. KELLOGG:
7    Q    I think you also state somewhere in here
8  that you considered the fact that the authority
9  personnel does not keep time devoted to particular
10  tasks.
11    Is that right?
12    A    I think that's correct and I would
13  further --
14    Q    Page 14 of 16.
15    A    That goes back to the testimony we just
16  talked about.
17    Q    Right.  That would have been the ideal
18  situation had they done that?
19    A    Well, the ideal situation would have been
20  every day as you and I file a time report.
21    Q    Sure.
22    A    But practicalities are that doesn't happen
23  in these type of entities so second level would be a
24  reasonable sample.
25    Q    Okay.  You also reviewed it looks like

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

58

1  ferry.  They weren't -- I don't know how many deck
2  hands you need or how many engineers you need on a
3  ferry, but I am -- I would say that with regard to
4  governmental-type programs I've had sufficient
5  training in that, I have audited governmental
6  entities.
7    So I think that I can say that with some
8  expertise.  I don't think you have to be a ferry
9  boat expert to know.
10    Q    I guess all I'm asking is you don't
11  consider yourself an expert in ferry boat
12  operations?
13    A    Said that right in the outset of my
14  deposition.
15    Q    That's what I thought.  You've never
16  worked on a ferry?
17    A    That's a good question.  I think I was
18  working on a ferry at one point.
19    Q    Did you?
20    A    Yeah.  When I was stationed at Governor's
21  Island for a number of days I assisted in the
22  security port and operation of the ferry that went
23  from lower Manhattan to Governor's Island.
24    Q    Okay.
25    A    I don't think that qualifies me as an

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

60

1  some telephone bills.
2    Is that right?
3    A    Yes.
4    Q    And it looks like those are for the period
5  of January 2003 to April 2004?
6    A    I believe so.
7    Q    Okay.  How was it that you were able to --
8  so you took the 2003/2004 bills and tried to apply
9  them back to years 1993 through 2002?
10    A    I think that the lack of documents, there
11  are certain areas in every governmental operation,
12  maybe in every business operation, that is subject
13  to some type of abuse and that's usually travel and
14  entertainment, promotion, telephone.
15    Those type of items are looked at on a
16  regular basis.  We had a sampling of bills to give
17  us an indication of what is going on in the entity.
18    Q    You would agree you could identify a
19  number of those phone calls, is that right, who they
20  went to, things of that nature?
21    A    It was just an indication to us.
22    Q    And is that the best way to determine
23  whether or not what telephone calls are, in fact,
24  allocable to the ferry boat operations?
25    A    Well, you know, if you take -- it was a

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

1  cumulative effect of looking at the board minutes,
2  looking at the telephone bills, looking at the
3  Master Charge or whatever those charge cards were.
4          Looking at some of the telephone bills and
5  reading the minutes kind of gives you a flavor of
6  whether this is a Port Authority that is feverishly
7  working for the operations of the ferry or they're
8  looking to expand -- develop the port, expand their
9  mandate and so forth. So my feeling was the latter.
10     Q    Okay. So just so that we are clear,
11 there's no real precise mathematical formulation for
12 going to 50 percent to 33 percent with respect to
13 allocating personnel costs, is there?
14     A    Precise saying that there's a formula and
15 you input things and come up with a number, no.
16 It's professional judgment.
17     Q    A judgment call?
18     A    Yeah.
19     Q    Okay.
20     A    I want to make this clear, it's a judgment
21 call based on taking a look at the available data as
22 opposed to pulling a number out of a hat.
23     Q    Sure. And if you had more data you would
24 have done more analysis?
25     A    I would have done more analysis.

---

1  capable of determining that.
2      Q    All right. Thank you.
3          You then look at the expense reports -- is
4  that right -- I think this is still under
5  advertising and marketing.
6      A    Let me take a look at that. I don't think
7  you had expense reports.
8      Q    I think that might have been your point.
9  It's on page 15 of 16, first full paragraph. I
10 think you write "Mr. Riccio does not maintain
11 expense reports indicating the purpose or details of
12 his travel and entertainment expenses nor does he
13 indicate business or personal portions of the
14 charges."
15     A    That really troubled me, very much so.
16     Q    You are not making an opinion as to that?
17         MR. DOMB:  Objection to the form.
18     A    That he didn't file expense reports?
19 BY MR. KELLOGG:
20     Q    No. That there's something improper with
21 respect to that topic.
22     A    I personally feel that when you're dealing
23 with funds like that, in my experience, that area is
24 so subject to abuse that, at a minimum, somebody who
25 is using public funds should absolutely document the

---

62

1      Q    You also adjusted the advertising and
2  marketing promotion --
3      A    Yes.
4      Q    -- from 50 percent down to 10 percent?
5      A    Yes.
6      Q    You don't consider yourself to be an
7  expert in marketing, do you?
8      A    No, but I can read ads and I can read a
9  website. And on the website there was no mention of
10 the ferry. And when I read the ads that were
11 published, the ferry operations were hardly
12 mentioned.
13         That too is not a precise formula, but
14 having sampling of the advertisements that were
15 provided to me over a period of time gave me, again,
16 the flavor of --
17     Q    But you don't have any special expertise
18 in judging whether a particular advertisement is
19 going to impact a particular operation, do you?
20     A    No. I don't -- I'm not a marketing person
21 and I don't know what the psychology of advertising
22 is. I am somebody who reviews advertising bills
23 and, like anybody else in this room, would look at
24 the ad and say is this related to the ferry or is
25 this -- if it's got a subliminal message I'm not

---

64

1  expenses.
2          And I'm really surprised that in the
3  single audit performed by the company's accountants
4  that that wasn't an issue that was brought up.
5      Q    I want to be absolutely clear on this,
6  Mr. Schachter. You are providing opinions as to
7  what in this case? What are the opinions you are
8  going to be testifying to at trial?
9          MR. DOMB:  Objection to the form.
10 BY MR. KELLOGG:
11     Q    You can answer.
12     A    Okay. I'm testifying as to the excess of
13 ferry tariffs over reasonable costs. In determining
14 reasonable costs, I exercise professional judgment
15 commonplace in my professional experience with
16 regard to cost allocations. And the requisite
17 documentation that I think should be there.
18     Q    Okay. And your judgments, then, are based
19 on the calculations that you have in, I guess --
20 really I guess it would be the conclusions in
21 Section 4.0 of your report?
22         MR. DOMB:  I'm sorry. I don't
23 understand.
24     A    I don't either.
25

BY MR. KELLOGG:

Q    Those are your ultimate opinions.
Is that correct?

A    First question was what I'm going to testify to. I think you asked me what my opinions were.

Q    Yes. Are these your ultimate opinions?

MR. DOMB:    Objection to the form.
When you say these, it's vague to me.
I mean, the report contains opinions and you've had that report for a month. Are you asking him to repeat what's in his report or asking him to testify --

MR. KELLOGG:    I'm trying to clarify what his expert opinions are.

A    I'm going to answer your question.

BY MR. KELLOGG:

Q    Thank you.

A    Based on the procedures I performed and the documents I reviewed, I have come up to some ultimate conclusions based on what my -- of what I was requested to do. So that the ultimate conclusions are spelled out in 4.0. The resulting overcharge with the attendant interest.
But in reaching those ultimate

would indicate that I can't substantiate 50 percent allocation of those type of expenditures.

Q    So you are not suggesting that he's done anything improper?

A    All I'm suggesting is the procedures and practices within that organization are such that they need improvement and when one is spending public funds, I think they are required to document that.

Q    Okay. I just -- I'm trying to --

A    I'm not accusing Mr. Riccio of doing anything wrong. I'm just saying that when I can't see documentation for it and I read what the items are and I look at the documentation I've seen, as an auditor I would gravitate towards a lower allocation percentage based on my professional experience.

Q    Do you know whether or not the port's accounting reports are audited by any agency, state or federal?

A    I think that some of the grants are -- that the independent auditors for the port, and I forget their name, I know they are in Bridgeport, I know they testified, do perform audits.

Q    Just with respect to the grants?

A    And the Port Authority.

66

conclusions, as you are aware I'm sure, they were the result of my reviewing a whole host of documents including accountant's work papers, permanent files and the documents I relied on in the actual preparation of the report as spelled out in Exhibit D and the procedures that I performed on those documents.
So when I say to you that I allocated a low amount with regard to those costs that I felt need to be documented, I feel that in my professional experience I can say that when somebody is in a public organization, a public entity, when they are taking trips out of the continental United States and to other cities or they are making purchases from Fredericks of Hollywood, I would think that those documents -- those purchases should be adequately documented and supported as related to the entity they are being charged with.

Q    Are you making an opinion as to whether or not Mr. Riccio has done something improper with respect to that?

A    All I'm saying to you is when I see those type of procedures it raises as a former auditor and a former auditor of government programs that the cumulative effect of all the evidence that I've seen

68

Q    Okay. So the annual --

A    Their concern is not with the allocation, their prime concern is that the financial statements are fairly prepared. Their concerns are not focused necessarily on the allocation between the port but for that one 15 percent liability.

Q    Have you communicated with any of those auditors at all?

A    I attended -- I didn't attend. I'm sorry. Jim O'Sullivan attended their deposition and I think we have their deposition transcript.
I know we do. And I was present at their counsel's office when both Mr. Domb and I examined their work paper file and we obtained copies of their files.

Q    Okay. So did you talk to them about the procedures they used to audit the authority?

A    The procedures are self-evident. They are documented in the file. I had no conversations with them with regard to that.

Q    Okay. Thank you.
All right. Back to that particular section in Exhibit 4. And I believe that's on page 15 of 16 of Exhibit 4.

A    Fifteen of sixteen.

1    And it's fair to say with my limited
2 understanding of depreciation that the asset is
3 currently being used up. That's kind of how
4 depreciation is considered.
5    Is that right?
6    A    Right.
7    Q    And it's being used up, at least a portion
8 of it, with respect to the operations of the ferry?
9    A    Right.
10    Q    Okay. Why, then, is it improper for us to
11 be able to allocate that cost to ferry operations?
12    A    Because from an economic point of view the
13 authority had no cost to do this. These dollars
14 came from outside government grants. They weren't
15 generated from the operations of the authority
16 and --
17    Q    How does that -- and I don't mean to stop
18 you there. That's the point I'm trying to get at.
19 How does that make any difference whatsoever as to
20 whether or not we can actually apply that cost to
21 ferry operations?
22    A    Because there are a number of other
23 government programs that I'm familiar with where
24 depreciation expense is offset by specific grants
25 related to that asset.

---

1    Q    Is that a cost?
2    A    It's an accounting cost, but it's one that
3 we shouldn't pay for because you didn't pay for it.
4 You didn't lay out cash for it. You wouldn't have
5 gotten that cash but for the fact that you were
6 building this building for both purposes.
7    If you had gotten the cash -- if you had
8 generated these funds internally, I would have
9 thought differently about it from an economic point
10 of view.
11    Q    When you say from an economic point of
12 view --
13    A    I'm talking about a cost reimbursement
14 point of view. A cash type of item. I just don't
15 feel we should be charged on depreciation on an
16 asset that you didn't pay for.
17    Q    Even though the asset is ours and it's
18 being used up?
19    A    It's yours and it's being used up and
20 perhaps when it gets used up your track record has
21 been you go out and get other grants.
22    Q    So I just want to make sure I'm clear on
23 this, you don't think it's proper for us to charge
24 you for an asset that you all are utilizing and
25 using up?

---

1    Q    What do you mean by that?
2    A    In other words, what we are talking about
3 here, in effect, is a reimbursement program where
4 we're trying to get back from an entity that
5 benefits from these facilities, the ferry operation.
6    And I'm saying it's commonplace in some of
7 the programs I've been familiar with that to the
8 extent that there's a depreciation expense it's
9 offset and not charged to the program to the extent
10 that those funds come from grants and gifts.
11    Q    Is it improper to do that, though?
12    A    There is no -- it's not improper to do it.
13 There are two types of accountings here. We are
14 talking about you are looking at the depreciation
15 expense from generally accepted accounting
16 principles and financial statement purposes.
17    This intracost allocation where, in fact,
18 you are charging us for services rendered and
19 whatever based on your cost -- based on your costs,
20 in my opinion, you don't have a cost because
21 somebody else paid for it.
22    Q    Okay. But the asset that is ours is being
23 used up?
24    A    It may be being used up and when it gets
25 used up you may get another grant.

---

1    MR. DOMB: Objection to the form.
2    MR. KELLOGG: I'm just trying to make
3 sure I've got it clear in my mind.
4    MR. DOMB: You're summarizing
5 testimony.
6    MR. KELLOGG: Right.
7    A    I'm saying that you can charge us for it,
8 but then you should offset that charge
9 correspondingly with the benefit that you received
10 of grants.
11 BY MR. KELLOGG:
12    Q    How would we do that?
13    A    The two would offset each other.
14    Q    How would we do that?
15    A    To the extent that you actually laid
16 out -- let's say the building cost five million and
17 you laid out six million for it. It's a noncash
18 expense.
19    If you are depreciating, let's say, the
20 extra million, I wouldn't have a problem with that.
21 But to the extent it's fully grant financed I do
22 have a problem with that. I think it's an offset.
23    Q    You would agree that -- and, again, using
24 this example as the building -- you would agree that
25 the ferry company is utilizing or using up this

**[Page 77]**

```
 1   asset?
 2            MR. DOMB:  Objection to the form.
 3            It's been asked several times
 4   already.
 5            Go ahead.
 6       A   I would say that not only the ferry
 7   company but Connecticut World Trade Association,
 8   whoever they are, the harbor master and the ferry
 9   company are using the building.
10   BY MR. KELLOGG:
11       Q   Using up the asset?
12       A   Right.
13       Q   Thank you.
14       A   By using the building.  I don't know if
15   they are using it up.  I don't know -- there's a
16   difference between the depreciable life and the life
17   of the building.
18       Q   I meant that in the context of the
19   depreciable life.
20       A   Okay.  I don't disagree with you.
21       Q   Okay.  Thank you.
22           On item -- going back to the narrative for
23   this particular exhibit, item little N again on page
24   16 of 16 we are dealing with interest.
25       A   Really is very little interest because
```

**[Page 78]**

```
 1   most of it, as I say in there, it's capitalized and
 2   then depreciated.
 3       Q   And, again, very similar to the question I
 4   asked before, last sentence you state "There is no
 5   evidence that any of the remaining interest charges
 6   incurred by the port relate to ferry operation.
 7       A   They were nominal.  There was no evidence.
 8       Q   Either way.
 9       A   And this one I can say either way.
10       Q   All right.  Either way.  Thank you.
11           I want to go to Section 3.3.
12           MR. KELLOGG:  Do you all want to take
13       another break because this is a new
14       section?
15           THE WITNESS:  Yeah.
16       (THEREUPON, THERE WAS A RECESS
17       TAKEN.)
18   BY MR. KELLOGG:
19       Q   I want to go to I guess it's your third
20   model.
21       A   Yes.
22       Q   Which is reflected in Section 3.3 of your
23   report.
24       A   Uh-huh.
25       Q   And let me just tell you what my take of
```

**[Page 79]**

```
 1   it is and then you tell me if I've got it right.
 2           My take is that you are trying to
 3   determine what reasonable expenses are necessary for
 4   the port to actually support the ferry operations.
 5           Do I have that right?
 6       A   My -- my -- let me see what I wrote so I
 7   don't --
 8           The tariff charges of course are the same
 9   in that method.
10       Q   Yes.
11       A   And this would be what costs would be
12   incurred if there were no Port Authority.  In other
13   words, the method before we assumed that the costs
14   incurred as stated in the revenue reports, at least
15   in category, were appropriate and revised the
16   allocations.
17       Q   Okay.
18       A   Here we are assuming, in essence, that
19   bureaucratic entity, the Port Authority, doesn't
20   exist under what we know today what would be the
21   actual costs of the ferry boat company to run that
22   operation.
23       Q   All right.
24       A   As it relates to the tariff being
25   collected.
```

**[Page 80]**

```
 1       Q   I understand.  I think I got a little
 2   ahead of myself.  I had written a note before on the
 3   depreciation thing.  I just wanted to go back to
 4   that real quick.
 5           You had mentioned a couple times that you
 6   thought that once this building was, for example,
 7   depreciated fully or used up that we would go out
 8   and get another grant to build a new one.
 9           You don't know if we would do that.  It's
10   just speculation?
11       A   No.  No.  I'm just looking at the past
12   history of how the hard assets have been financed
13   here.
14       Q   Okay.  Theoretically, back on Section 3.3,
15   you are trying to construct a cost system that's I
16   guess, in essence, independent of the existence of
17   the Port Authority.
18       A   A model.
19       Q   A model.
20       A   Cost system is not a term I think is
21   appropriate.
22       Q   Okay.
23       A   A model based on -- assuming that we have
24   the ferry boat operation.  If we took out the
25   bureaucratic -- and I don't mean to say that in a
```

1 negative fashion.
2 Q Sure.
3 A I don't know how to say it any other
4 way -- the bureaucratic layer, it would be -- and
5 it's not uncommon and we all know that sometimes
6 governments and their entities don't run as
7 profitable because of either reporting requirements
8 or restrictions that they are under -- as profitable
9 as a private entity.
10 Q Okay.
11 A So what I tried to do is construct a model
12 and say if we took out the bureaucratic layer, we
13 have a ferry boat company that's in operation that
14 right now is incurring a lot of expense.
15 For instance, if we didn't have a
16 governmental entity, the ferry boat operation would
17 become part of the ferry boat owner's annual audit.
18 There wouldn't be a need for a separate audit of
19 that operation.
20 All of that would be combined into the
21 audit report that's done for the company that owns
22 and operates that ferry. And you wouldn't have to
23 have all the specialized compliance testing and all
24 of the other ramifications of a governmental audit.
25 So your accounting fees would go down

---

1 A I'm not saying that's what the Port
2 Authority should do. This model is created to show
3 what we believe to be an overcharge and this model
4 is an independent build-up apart from the revenue
5 reports based upon what the actual costs would be if
6 the ferry boat company operated without the layer of
7 bureaucracy between it and the customer.
8 Q So are you saying that's what the tariff
9 should reflect then?
10 A I'm saying that that is -- that the tariff
11 should support those expenses. I don't -- the
12 tariff -- I guess the theme here would be that the
13 tariff -- if you are going to -- if you are going to
14 raise the tariff, then, to spend specifically for
15 items that you wouldn't necessarily need to but for
16 the Port Authority that are not related to the
17 operation of the ferry, would make a meaningful
18 comparison.
19 But I'm not suggesting that the Port
20 Authority put themselves out of business, but it may
21 very well be that this analysis suggests that. But
22 I'm not suggesting that.
23 Q I guess what I'm trying to figure out is
24 because you said that model three is the one that
25 you think suggests -- is most accurately reflective

---

1 substantially because we have an operation that's
2 being audited so what would happen is auditors would
3 come in and do a little more testing, but basically
4 your audit fees are not going to double or be
5 tremendously greater, if any.
6 Postage meters, and we have a whole
7 operation in Port Jeff, we are doing our own
8 promotion. We are doing our own advertising. We
9 are not going to advertise for the Barnum Circus or
10 the Barnum Festival.
11 We are going to do stuff that's focused on
12 the ferry. Although there will be some costs that
13 are not going to change. Building services and
14 utilities and what have you.
15 But there are a number of costs where we
16 are incurring similar costs in Port Jefferson and if
17 we didn't have this authority we would realize some
18 cost efficiencies and that is the basis.
19 Q So that's what this model is?
20 A Yes.
21 Q So are you suggesting that what the Port
22 Authority should do is simply try to -- let's see if
23 I can phrase this right. In determining its tariff
24 prices should assume what your cost would be if it
25 didn't exist?

---

1 of what it should be?
2 A We argued over accurately. I think it's
3 probably the most appropriate because it shows how
4 this operation could operate but for the imposition
5 of the bureaucratic layer.
6 Q Okay. But the Port Authority doesn't --
7 A It's the real cost of, in a hypothetical
8 world, of what it would take to run this operation.
9 The Port Authority is not taking advantage of the
10 economies that exist for whatever reason that we
11 can -- that we have available because of our
12 existence as an ongoing operation. And so --
13 Q So in -- for the Port Authority ideally
14 what you would like them to do to figure out what
15 the tariffs should be is to essentially follow your
16 model number three, assume their nonexistence --
17 A We don't need a full-time bookkeeper. We
18 don't need a full-time development person. We don't
19 need a full-time executive director to run around
20 the country trying to develop the port and all these
21 other ancillary things when we are looking at the
22 ferry operation.
23 What I'm doing is saying, okay, can this
24 operation operate without these people, without
25 going to tremendous expense to replace them? Do we

85

87

1  have to replace --

2      (THEREUPON, THE COURT REPORTER

3      REQUESTS CLARIFICATION.)

4      A    -- Klimas, Klimas?  Do we have to replace

5  Ricchio?  Do we have to replace them to make this

6  operation function in an ideal world?

7      And my analysis here says we have enough

8  people already at the operation in Port Jefferson

9  and we have enough overhead and we have enough

10  structure and stuff that a good portion of these

11  expenses are redundant.  That's what this analysis

12  is trying to show.

13  BY MR. KELLOGG:

14      Q    But the practical realty is that the Port

15  Authority does exist?

16      A    Well, the practical reality -- the

17  practical -- it does exist.

18      Q    Okay.

19      A    And I don't know what the ultimate outcome

20  of this lawsuit is going to be.  Maybe the ultimate

21  outcome is that the Port Authority says it can't

22  exist without the tariff.

23      There's not enough money from what I

24  gather that -- I read it somewhere it would go out

25  of business.  And so it just seems --

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

1      A    All time -- I'll tell you when we do that.

2  For instance, we get retained in other engagements

3  outside of litigation to advise boards on mergers

4  and acquisitions.

5      So when we make a determination or a

6  feasibility analysis as to whether this acquisition

7  makes sense, you know, the type of analysis we do,

8  okay, we have got two controllers, two EVPs, two

9  vice presidents, two plants making the same thing,

10  what are we going to cut to make this operation work

11  efficiently?

12      And are we going to buy this because on

13  the face of it they don't make a hell of a lot more

14  money, they don't add much to us, but we can realize

15  some tremendous cost savings based on having a

16  higher revenue base and based on the fact we don't

17  have to incur, we can strip their overhead out.  And

18  we will develop models regularly to see if that

19  makes sense.

20      My accounting firm was acquired years ago

21  by another accounting firm.  I was struggling along,

22  I was making X.  The other firm came in.  They were

23  really hot to do it.  I was in their line of

24  business and I could get rid of all of my staff and

25  everything would flow to the bottom line.

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

86

1      Q    But the State of Connecticut set up the

2  Port Authority.

3      A    Well, I don't know.  It was set up through

4  some legal --

5      Q    The legislature.

6      A    I assume you're correct, but I'm not a

7  hundred percent knowledgable of how it was set up.

8      Q    Okay.

9      A    It is set up.  But I think that that's

10  well and good, but should the ferry boat company be

11  charged with all those expenses in my analysis.  In

12  my analysis.

13      All I'm doing is trying to analyze

14  expenses versus revenues.  You said it earlier,

15  matching.  Reasonable, necessary and proper

16  expenditures to revenues.  So I created a model.

17  The one I like best and most comfortable with is

18  model three.

19      Q    Have you done this in the past where you

20  in a model tried to assume away the existence of a

21  party?

22      A    I'm not assuming it away.

23      Q    Well, to create the model you are.

24      A    Well, if I'm --

25      Q    Am I right?

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

88

1      Q    I understand the point you are making.

2      A    Okay.  So I do that.

3      Q    This is clearly not an acquisition

4  scenario, our case?

5      A    No, it's not an acquisition scenario, but

6  we are looking at, from an equitable point of view,

7  what would be left if we collected the tariff.

8      Q    We have two parties that are at arm's

9  length transactions here, do we not, the Port

10  Authority and your client?

11      MR. DOMB:   Objection to the form.

12  BY MR. KELLOGG:

13      Q    Do you know what I mean --

14      A    Yeah.  They are not related to each other.

15      Q    Exactly.  They negotiate terms, do they

16  not?

17      MR. DOMB:   Objection to the form.

18  BY MR. KELLOGG:

19      Q    As to the lease --

20      A    Well, obviously, this is a lawsuit.  And

21  there have been a number of lawsuits over time.

22      Q    Right.  But they negotiated a lease, for

23  example.  They're at arm's length transactions.

24      Would you agree with that?

25      A    I would.

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

1  Q    And what you are trying to do in this
2  model is assume away the very existence of my client
3  to try to determine that the tariff that's being
4  charged is too much.
5        Is that right?
6  A    I'm not assuming away the Port Authority.
7  I'm telling the Port Authority to cut back your
8  expenses. You don't need it. That's what I'm
9  saying.
10       In looking at it from us, my opinion is we
11 have enough resources that you are not capitalizing
12 on where you could cut your costs. I'm not telling
13 you get rid of the Port Authority per se legally
14 because I'm not in a position to do that.
15       But governmental entities have a way of
16 prolonging themselves. And I can name a number of
17 them that I've been involved with, special
18 prosecutors where --
19 Q    That's okay.
20 A    -- the agency continues its existence
21 when -- it becomes an entity onto itself where there
22 may not necessarily be a need for it. I'm saying
23 that if you look at this, keep the Port Authority.
24 You want to have a Port Authority. Fine.
25       We just don't want to pay for it in terms

1  Q    Okay.
2  A    It could conceivably happen.
3  Q    Okay. Let's talk about specifics of
4  Section 3.3. And here we're actually going to go to
5  your Exhibit 5 because that's where the meat of the
6  analysis is.
7  A    The amended Exhibit 5 you should go to.
8        Oh, you have it in the --
9  Q    Is it different?
10 A    That's the one that had the
11 mathematical --
12 Q    I'm just talking about the end notes.
13 Were the end notes revised at all?
14 A    No. No.
15 Q    Okay. I notice that in all of these
16 little subsections, and it goes from sub B or little
17 B to little Z, there are a number of assumptions you
18 have to make.
19       Is that correct?
20 A    I'm not sure what you are alluding to.
21 Q    Let's go, for example, to sub F, salaries.
22 A    Right.
23 Q    You state "I have been advised by
24 management of the ferry company that the employees
25 of the Port Authority are not necessary to the

1  of the allocation of costs to us. And if, in fact,
2  I'm assuming going back, and I may be wrong, but
3  I've been asked to assume that the overcharge, as I
4  call it, is -- that you are only entitled to charge
5  us for reasonable costs and you are not entitled to
6  charge us for the overcharge.
7        If I assume that, then my model assumes
8  also that the Port Authority, even though it's in
9  existence, should do everything it can to be most
10 cost effective to maximize the bottom line and to
11 minimize that cost.
12 Q    Let me ask you this: Does the ferry
13 company have to port here? Do they have to dock
14 here? Could they go elsewhere?
15 A    I think they probably could. I don't
16 know -- let me say this. I don't know what their
17 logistics are in terms of do they need to be here
18 for Port Jeff. I don't know.
19 Q    In an ideal free market situation if they
20 considered their costs too high, could they not
21 simply go to another port?
22 A    I'm not sure. I don't know what the
23 feasibility of that would be in terms of what would
24 have to be done at another port. I'm not sure, but
25 hypothetically that could conceivably happen.

1  operation of the ferry."
2        Is that right?
3  A    Certain employees.
4  Q    Well, the three. The three employees,
5  Mr. Riccio, Ms. Klimas and Ms. Johnson.
6  A    And I think we added back a half employee,
7  a hypothetical employee, so half -- maybe one of
8  them could serve in a half role.
9  Q    Okay. But with respect to this you are
10 making an assumption that these employees are not
11 necessary to the operation of the ferry.
12       Is that right?
13 A    Correct.
14 Q    Okay. And I mean, I could go through --
15 A    Except for half, as I said. Yes.
16 Q    And I could go through every single one of
17 these and show you the assumption or is it fair to
18 say that you have to make a lot of those assumptions
19 that you have been advised by management that?
20 A    In this case, in this model we sat down
21 with Mr. Hall and went through that.
22 Q    All right. Let's go through each one of
23 these, then. So it was Mr. Hall that advised that
24 Mr. Riccio, Ms. Klimas and Ms. Johnson were not
25 necessary to the operation of the ferry?

1    A    Well, that in conjunction with my review
2  of the depositions and the fact that we did factor
3  in a half of an administrative person.
4    Q    So you were relying upon primarily
5  Mr. Hall in making this assumption?
6    A    Well, in this one I was probably relying
7  on that as well as my review of their depositions.
8    Q    What in their depositions revealed they
9  were no longer necessary to the operation?
10    A    Well, a substantial portion of Klimas's
11  salary related -- she was the director of
12  development.
13    Riccio was the executive director and
14  traveling around and developing new projects and, in
15  fact, I think Klimas -- I don't think it's in here,
16  but she says that she only met with Hall once and
17  met with the -- I forget his name -- the on-site
18  manager just several times over the period they have
19  been here.
20    So it seems to me, based on that testimony
21  and the fact that a lot of the work that is being
22  done in the accounting area is done to comply with
23  governmental accounting standards because this
24  entity's operations is based within that type of
25  entity, I felt that, for the most part, they

94

1  wouldn't be needed for a free-standing ferry
2  operation and that there would be some
3  administrative time which would then be supported by
4  people over in Port Jefferson who are doing similar
5  tasks.
6    Q    But it was Mr. Hall who specifically
7  stated that you wouldn't need these three
8  individuals?
9    MR. DOMB:  Objection to form.
10    This is the second or third time
11    you've asked him and Mr. Schachter has
12    answered and also referred to the
13    deposition testimony so the record speaks
14    for itself.  If you have something to add
15    to that go ahead.
16  BY MR. KELLOGG:
17    Q    Is that right?
18    A    I think Mr. Domb's -- I did speak with
19  Mr. Hall, I read the depositions.  I don't know
20  which one I read.
21    Q    I guess the reason I'm saying it is
22  because you don't refer to the depositions in this
23  particular analysis in this particular section.  You
24  simply rely on the fact that you've been advised by
25  management of the ferry company that the employees

of the Port Authority are not necessary?
2    A    I did have discussions with them about the
3  depositions.  I didn't put everything in here.  This
4  was kind of a cryptic --
5    Q    That is Mr. Hall that you were referring
6  to?
7    A    Yes.
8    Q    I want to go up to outside services for
9  just a moment.  That's Subsection E.
10    You state -- I think we are on the third
11  sentence -- that you have determined the amount
12  spent on consulting services such as dock erosion
13  studies, new parking garage designs, riverfront
14  mixed use studies and dredging studies are not
15  related to the ferry operation.
16    A    Right.
17    Q    How did you make that determination?
18    A    I asked.
19    Q    Who?
20    A    I asked Hall.
21    Q    So Mr. Hall determined that --
22    A    I don't know that he determined it.  I
23  asked Mr. Hall and I raised questions to counsel who
24  have, you know -- I think he may have asked Hall
25  some questions about it and I got answers back.  But

96

1  when we talk about -- and I remember one in
2  particular dealing -- because I was concerned about
3  the dredging.
4    Q    Before we get to the dredging because I'm
5  going to get to every one of these.  Let's take them
6  in order.
7    Dock erosion studies.  Why wouldn't the
8  dock erosion study relate at all to ferry
9  operations?
10    MR. DOMB:  Objection to the form.
11    I think you read only a part of that
12    sentence which says, quote, "either were
13    not related to the ferry operation or were
14    related to government grants," so by
15    cutting that off I think you've got a
16    misleading question.
17  BY MR. KELLOGG:
18    Q    Okay.  Or related to -- you can add that
19  in.
20    What is it about the dock erosion study
21  that makes it unrelated to ferry boat operations?
22    A    Well, I don't know that --
23    Q    And if you don't know that's fine.  We can
24  move on.  I'm just trying to get an idea.
25    A    As I recall the entire dock is not related