8

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, *et al.*,                   )
                                               )      Case No. 03-CV-599 (CFD)
                                               )
                    Plaintiffs,                )
                                               )
v.                                             )
                                               )
BRIDGEPORT PORT AUTHORITY,                     )
                                               )      February 1, 2005
                    Defendant.                 )
                                               )
_____            )

## MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT WITNESS, GEORGE M. SHAWAH

Defendant Bridgeport Port Authority ("Port Authority"), pursuant to Rule 702 of the Federal Rules of Evidence, moves this Court to exclude the testimony and report of Plaintiffs' expert, Mr. George M. Shawah, under the standards set forth in Rule 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

As detailed in the Port Authority's accompanying Memorandum of Law in Support, Mr. Shawah openly acknowledged that his proffered 1997 report does not represent current market or rental valuations for the Port Authority's property. As a result, Mr. Shawah's report is not relevant to any issue before this Court and should be excluded as a matter of law. The Port Authority requests an evidentiary hearing as such would assist this Court in resolving the issues presented by this Motion.

Defendant Bridgeport Port Authority respectfully requests this Court exclude the testimony and report of George M. Shawah, award the Port Authority its costs associated with this motion, and any additional relief this Court deems just and proper.

3064015

**ORAL ARGUMENT REQUESTED**

Respectfully submitted,

THOMPSON COBURN LLP

Edward J. Sheppard, #CT24760
1909 K Street, NW, #600
Washington, DC 20006
202-585-6900
Fax 202-585-6969
esheppard@thompsoncoburn.com

By _____

Timothy F. Noelker, #CT26291
Jason C. Rahoy, #CT26290
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
Fax 314-552-7000
tnoelker@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port
Authority

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was

served, via electronic mail and U.S. Mail, postage prepaid on the following counsel of record,

this _____ day of February, 2005:

Jonathan Bowman (CT# 08526)
Stewart I. Edelstein (CT# 06021)
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

Martin Domb (CT# 09544)
Eric M. Underriner
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

_____

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIDGEPORT AND PORT JEFFERSON STEAMBOAT COMPANY, *et al.*, | ) ) ) | Case No. 03-CV-599 (CFD) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BRIDGEPORT PORT AUTHORITY, | ) ) | February 1, 2005 |
| Defendant. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT WITNESS, GEORGE M. SHAWAH

Plaintiffs have offered the report and testimony of Mr. George Shawah to estimate the market and rental value of 1.77 acres of land and the rental value of the first floor of the Port Authority's terminal building. However, Mr. Shawah issued his report in 1997, approximately eight years ago. Since that time, neither Plaintiffs nor Mr. Shawah have offered any evidence that the proffered appraisal accurately represents or reflects current property valuations. Accordingly, this Court should exercise its gatekeeping responsibility and exclude the testimony and report of Plaintiffs' expert Mr. George Shawah under the standards set forth in Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

### A.    Standard For Admissibility Of Expert Testimony

In Daubert v. Merrell Dow Pharm., Inc., the Supreme Court held that under Rule 702 of the Federal Rules of Evidence, a district court must serve as a gatekeeper to ensure that proffered expert testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. 579, 597 (1993); Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358 (2nd Cir.

2004); <u>Zuchowicz v. United States</u>, 140 F.3d 38, 386 (2nd Cir. 1998). This obligation extends to all expert testimony based on "technical" or "other specialized" knowledge. <u>Zaremba</u>, 360 F.3d at 358, citing <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999). The standards of Rule 702 also apply to purported expert witnesses proffering real estate appraisals. <u>See e.g.</u>, <u>United States v. 14.38 Acres of Land</u>, 80 F.3d 1074, 1078-79 (5th Cir. 1996); <u>Hebbler v. Turner</u>, No. Civ.A. 03-388, 2004 WL 414821, at *4 (E.D. La. Mar. 3, 2004); <u>Cayuga Indian Nation of New York v. Pataki</u>, 83 F.Supp.2d 318 (N.D.N.Y. 2000).

As <u>Daubert</u> explained, Rule 702 "requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue." <u>Daubert</u>, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Id</u>. The court must analyze whether the expert's testimony "ha[s] a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." <u>United States v. Cruz</u>, 363 F.3d 187, 192 (2nd Cir. 2004); <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 265 (2nd Cir. 2002). Thus, testimony that is not relevant to any issue before this Court should be excluded as a matter of law.

### B.  The Outdated Report Of Mr. George Shawah Is Not Relevant To Any Issue Currently Before This Court

On June 3, 1997, Mr. George Shawah submitted the real estate appraisal at issue in this matter. <u>See</u> Report of Shawah, attached as <u>Exhibit</u> A. In that report, Mr. Shawah estimated the market value and rental value of 1.77 acres of land owned by the Bridgeport Port Authority and the rental value of the first floor of the Port Authority's terminal building (the "Property") for use in a then-pending lawsuit between the Port Authority and the Ferry Company. <u>Id</u>.

Approximately seven (7) years after Mr. Shawah issued his appraisal of the Property,
counsel for Plaintiffs contacted Mr. Shawah and requested that he confirm that his valuation of
the Property *for that date* was accurate.  See Shawah Depo., p. 21 (emphasis added), attached as
Exhibit B.  By letter dated June 18, 2004, Mr. Shawah confirmed that his "conclusions *as to the*
*value dated February 1, 1997* were correct and remain unchanged."  See letter to M. Domb,
6/18/04 (emphasis added), attached as Exhibit C.  What Mr. Shawah did not confirm was that his
1997 report represents the current market and rental value of the Property.

When asked to explain this, Mr. Shawah testified:

*Question*:     "So are you saying that your appraisal is only for the value – the value of
the land back in 1997?"

*Answer*:     "I'm confirming the fact that my valuations in the 1997 appraisal still
remain unchanged as far as that date is concerned."

*Question*:     "As far as that date is concerned?"

*Answer*:     "That's right."

*Question*:     "So you are not saying that the value of – let me go back to your words
here.  You are not saying that the market value of 1.7 acres of land today
is 530,000?"

*Answer*:     "No, I'm not."

*Question*:     "And you are not saying that the rental value of 1.77 acres of land is
53,000 as of today?

*Answer*:     "No."

*Question*:     "And you are not saying that the rental value of the first floor as of today
is 34,000?"

*Answer*:     "No, I'm not."

*Questions*:     "Is it fair to say that you don't know what those values are as of today?"

*Answer*:     "I have given it no consideration."

*Question*:    "You've done no appraisal, a current appraisal?"

*Answer*:    "That's correct."

See Shawah Depo., pp. 32-33.

By his candid admission, Mr. Shawah acknowledged that his 1997 appraisal bears no relevance to the current market or rental value of the Property; in fact, he implicitly stated that his report is limited to 1997 – not current – valuations.  As a result, the 1997 report cannot assist or aid in understanding any current issue now pending before this Court.  Therefore, since Mr. Shawah's appraisal does not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable," this Court should exclude the report and testimony of Mr. Shawah as a matter of law.  See United States v. Cruz, 363 F.3d 187, 192 (2nd Cir. 2004); Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2nd Cir. 2002).

### Conclusion

For the foregoing reasons, the Bridgeport Port Authority respectfully requests that this Court exclude the report and testimony of Plaintiffs' expert Mr. George M. Shawah.

3064104                              - 4 -

Respectfully submitted,

THOMPSON COBURN LLP

Edward J. Sheppard, #CT24760
1909 K Street, NW, #600
Washington, DC 20006
202-585-6900
Fax 202-585-6969
esheppard@thompsoncoburn.com

By _____
Timothy F. Noelker, #CT26291
Jason C. Rahoy, #CT26290
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
Fax 314-552-7000
tnoelker@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port
Authority

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was

served, via electronic mail and U.S. Mail, postage prepaid on the following counsel of record,

this __1st__ day of February, 2005:

Jonathan Bowman (CT# 08526)
Stewart I. Edelstein (CT# 06021)
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

Martin Domb (CT# 09544)
Eric M. Underriner
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

_____

EXHIBIT A

Appraisal of Land & Rental Value
of Terminal Building
Bridgeport Harbor foot of Wall Street
(Union Square Dock)
**Bridgeport Port Authority**

# BALDWIN PEARSON

**& COMPANY, INCORPORATED**

*Realtors*

REPLY TO:          P.O. BOX 744

10 MIDDLE ST. • BRIDGEPORT, CT 06604 • (203) 335-5117 • FAX (203) 335-5119

June 3, 1997

Attorney Jonathan S. Bowman
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT 06601-184

> Re:    Appraisal of Land and
> Rental Value of Terminal Building
> Bridgeport Harbor foot of Wall Street
> (Union Square Dock)
> **Bridgeport Port Authority**

Dear Mr. Bowman:

In accordance with your request I have inspected the subject and also the survey entitled "Ferry Terminal Building" for the purpose of estimating market value and rental value of 1.77 acres of land area and also rental value of the first floor of the new terminal building.

Based upon analysis of the facts and data contained in the report that follows, my conclusions are:

|  |  |  |
|---|---|---|
| Market Value of 1.77 Acres of Land | – | $530,000 |
| Rental Value of 1.77 Acres of Land | – | $ 53,000 |
| Rental Value of the Terminal Building First Floor | – | $ 30,000 |

Rental value of the land and building combined is $83,000 per year, tenant to pay for their own utilities and operating expenses.

I call your attention to the survey, pictures, zoning regulations, and Economic Profile which are all made a part of the report that follows.

Respectfully submitted,

George M. Shawah, President
SIOR, MAI

GMS/ag
Encl.

INDIVIDUAL MEMBERSHIPS:
*Society of Industrial Realtors*
*Appraisal Institute*



BALDWIN PEARSON
& COMPANY INCORPORATED

View from
North End
Facing
South





View from
South End
Facing
North

Terminal
Building
East &
North
Side



BALDWIN PEARSON
& COMPANY INCORPORATED



Terminal Building-South Side



Ferry Docking Area

# BALDWIN PEARSON
& COMPANY INCORPORATED



Terminal Building-South Side



Ferry Docking Area

# BALDWIN PEARSON
### A COMPANY INCORPORATED

## I. Identification

0 Bridgeport Harbor, foot of Wall Street (Union Square Dock), Bridgeport, Connecticut Section 9, Map 14, Block 963, Lot 15A.

Owner of Record:  Bridgeport Port Authority

## II. Legal Description

| | |
|---|---|
| West by land N/F New York, New Haven, and Hartford Railroad, | |
| North by land N/F Railroad, | 603.75 feet; |
| West again by Railroad, | 30.17 feet; |
| North again by Railroad, | 148.86 feet; |
| East by the Bulkhead and Pier Line, | 12.60 feet; |
| South by land N/F U.I. Co., | 828.55 feet; |
| | 242.11 feet. |

This description is based on a Property Survey Plan entitled "Ferry Terminal Building - Union Square Dock Bridgeport, Connecticut" prepared for Bridgeport Port Authority by Fletcher Thompson and dated February 10, 1995.

## III. Assessment and Taxes

| Land | $ 92,988 |
|---|---|
| Building | 310,429 |
| | $403,417 |

Mill Rate:  67.5          Annual Taxes:  $27,230

The Bridgeport Port Authority is tax exempt.

## IV. Property Rights Appraised

The Fee Simple Estate as of February 1, 1997.  The Fee Simple Estate involves an absolute ownership unencumbered by any other interest or estate subject only to the limitations of eminent domain, escheat, police power and taxation.  (The Dictionary of Real Estate Appraisal).

## V. Purpose of the Appraisal

To estimate the market value and rental value of the subject land and also the first floor terminal area as of February 1, 1997 for use in conjunction with a pending law suit between the Bridgeport and Port Jefferson Steamboat Company and the Bridgeport Port Authority.

-1-

BALDWIN PEARSON
& COMPANY INCORPORATED

## VI. Definition of Market Value

Market Value is defined as "the most probable price which a property should bring in competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus."

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

2. both parties are well informed or well advised and each acting in what they consider their best interests;

3. a reasonable time is allowed for exposure in the open market;

4. payment is made in cash, in U.S. dollars or in terms of financial arrangements comparable thereto, and;

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with this sale.

## VII. Zoning

Under the new zoning regulations effective August 12, 1996, the subject property is classified at I-HI (Heavy Industrial). There is no minimum lot size and maximum FAR. Maximum building height is 75 feet. Attached are the list of approved uses and development standards.

I believe the existing dock and terminal facility for the Port Jefferson Ferry is a Special Permit Use.

BALDWIN PEARSON
& COMPANY INCORPORATED

## VIII. Highest and Best Use

Highest and Best Use as defined in The Dictionary of
Real Estate Appraisal, published by the Institute of
Real Estate Appraisers, is "that reasonable and probable
use that supports the highest present value as of the
effective date of the appraisal." It is that use which
is physically possible, legally permissive and produces
the highest net return and value.

To estimate the highest and best use, four elements are
considered:

1)  Possible use - What uses of the site are physically
    possible?

2)  Permissible legal use - What uses of the site are
    permitted by zoning and deed restrictions?

3)  Feasible uses - Which possible and permissible uses
    will produce a net return to the owner of the site?

4)  Maximally productive use - Among the feasible
    uses, that use which will produce the highest net
    return or the highest present worth.

The irregular shape and many easements which bisect the
property severely restrict the development potential of
the site. The existing use for the loading and
unloading of the Port Jefferson Ferry is the optimum use
of the property.

## IX. City Data

Attached and made a part of this report is a "Community
Profile" prepared by the Connecticut Department of
Economic and Community development. Bridgeport is
currently listed as the largest city in the state. It
has been seriously impacted by the loss of many
long-time industries over the last ten years and also
the closing of three local banks in more recent years.
Bridgeport Harbor is currently the heart of a major
effort to attract new development to the city.

# BALDWIN PEARSON
& COMPANY INCORPORATED

### X. Neighborhood Data

The immediate neighborhood of the subject is at the easterly fringe of the CBD and is generally dominated by the elevated railroad right of way which acts as the westerly property line. The Connecticut Turnpike (I-95) which is elevated at this point as it crosses over the railroad tracks and Bridgeport Harbor on its way east.

The immediate neighborhood on Water Street, State Street and Frontage Road includes the Railroad Station, Municipal Parking Garage and Bus Terminal, People's Bank Complex and the former Jenkins Valves and Sprague Meter complex to the south. The heart of the Central Business District is a short distance west starting at the junction of Main Street and State Street extending in a northerly direction.

Driving under the Railroad underpass, at the north end of the property reveals a harbor view looking east and the U.I. Company complex facing south. The railroad tracks effectively isolate the site from the neighborhood described as the fringe of the central business district.

### XI. Site Data

A triangular shaped site of 2.6 acres which is bound by the Pequonnock River on the east side and the railroad Right of Way on the west side. The land is level and at grade with Water Street. All utilities and sanitary sewers serve the site. Access to the property is from Water Street at the north end of the site and under the railroad viaduct which has a clearance of 10 feet 7 inches. Prior to 1995 the actual land area used for ferry operations was 1.99 acres. After the terminal building was constructed, the useable acreage for ferry operations was reduced to approximately 1.77 acres. Increasing the number of parking spaces to be reserved for the terminal building would reduce the usable acreage for ferry operations to 1.39 acres.*

A 30 foot wide easement in favor of the U.I. Co. extends the full length of the site. There is also a second easement to the U.I. Co. which covers about 10,000 square feet at the north end of the property along the bulkhead line.

The triangular shape and easements severely restrict the development potential of this site.

*Traffic Study by Simco Engineering, P.C.

# BALDWIN PEARSON
**& COMPANY INCORPORATED**

## XII. Land Value

The study of comparable land sales is generally recognized as the best indicator of land value. Waterfront sales are very limited in the entire Connecticut area. Your appraiser has given consideration to two sales and one offering, all located in the city of Bridgeport, not far from the subject.



**Land Offering #1** - 670 Wordin Avenue and Howard Avenue, Bridgeport, Connecticut. A former Texaco Tank farm with a total land area of 3.224 acres and 400 feet of old wood bulkhead on Cedar Creek. All the tanks have been removed. Asking price is $3,000,000 or $930,521 per acre = $21.35 per square foot of land. A five year lease with an average rental of $84,000 per year all net was agreed upon but never executed. Using a 10% overall cap rate reflects a land value of $260,000 per acre or $6.00 per square foot of land area.

# BALDWIN PEARSON
**& COMPANY INCORPORATED**



**Land Sale #2** - 126 Bostwick Avenue, Bridgeport, Connecticut. A tract of 2.95 acres owned and operated by the Carbone family for many years (Fairfield Scrap). This parcel is in a heavy industrial zone like the subject and has 215 feet of frontage on Cedar Creek with 18 feet at mean low water. Approximately 100 lineal feet of old wood bulkhead had been removed several years ago and replaced by a sheet steel pile bulkhead so that barges can be loaded with scrap metal at the site. On August 3, 1992, O & G, Inc., the asphalt and concrete contractors who are abutting owners, acquired the property by way of a Committee Deed (Volume 3027, Page 193). The deed showed the sum of $5,000 as consideration, however, other documents on record show that O & G bought all of the outstanding mortgages that were in default from Lafayette Bank and also Northeastern Capital Corp. The total of these mortgages was $1,022,455. Using this total as a guide, it appears that O & G acquired 2.95 acres at a cost of about $350,000 per acre will full rights to Cedar Creek and 100 feet of steel bulkhead ($8.00 per square foot of land.)

**BALDWIN PEARSON**
& COMPANY INCORPORATED



**Land Sale #3 – 535 Seaview Avenue, Bridgeport,
Connecticut.** New Haven Terminal, Inc. to Coastline
Terminal Co. Sold July 12, 1996, Volume 3581, Page
1716. This is the former Cilco Terminal which had been
acquired by New Haven Terminal. Faced with bankruptcy
and foreclosure, the former Cilco Terminal, with 19.543
acres and a 700 foot concrete bulkhead, was sold to a
new company formed by the local Teamsters Union with the
help of People's Bank who agreed to assume the existing
mortgages which totaled $10,750,000. Included in the
sale were eight smaller parcels on the east side of
Seaview Avenue and 125,000 square feet of warehouse
buildings. In order to arrive at a unit sale price for
the main parcel of land, your appraiser allocated a
value of $500,000 for the 8 extra lots across the street
from the terminal, $750,000 for the warehouse buildings
($6 per square foot), and $700,000 for the 700 lineal
feet of concrete bulkhead ($1,000 per foot) or a total
adjustment of $1,950,000 for the extra lots and
improvements which reflects a value of $8,800,000 for
the main parcel of 19.543 acres or a unit sale price of
$450,000 per acre for the land ($10.35 per square foot.)

# BALDWIN PEARSON
& COMPANY INCORPORATED

## Analysis of Land Sales and Offering

Land Offering #1 – $260,000 per acre
Land Sale #2 – $350,000 per acre
Land Sale #3 – $450,000 per acre

Land Offering #1 and Sale #2 both have frontage on Cedar Creek with a depth of 18 feet at mean low water. Sale #2 included 100 feet of useable bulkhead.  Sale #3 is a much larger parcel with deep water capability (31 feet at mean low water) and has superior accessibility than Offering #1 and Sale #2.  It should be noted that Sale #3 is almost directly across the harbor from the subject.  Your appraiser has given most weight to Sale #3 because it is a recent sale located on Bridgeport Harbor, not far from the subject.

In comparing Sale #3 with the subject, your appraiser has made negative adjustments for the triangular shape, 18 feet of water depth, U.I. Company easement, which bisects the property, and the low clearance of 10 feet, 7 inches under the railroad underpass. These are subjective adjustments based on your appraiser's 43 years of experience in the Greater Bridgeport Area as an appraiser and broker.  My total negative adjustment is 33 1/3%, which reflects a reduction of $150,000 in value.

Sale #3 –                                                              $450,000
Negative adjustment for shape, easement, water –     150,000
                                                                               $300,000,
                                                                               Call it:

**THREE HUNDRED THOUSAND DOLLARS ($300,000) per acre**
**Estimated Market Value of the Subject Land**

Based on a useable land area of 1.77 acres, the estimated value of the land used by the Port Jefferson Ferry is as follows:

$300,000 per acre @ $1.77 = $531,000, Call it:

**FIVE HUNDRED & THIRTY THOUSAND DOLLARS ($530,000)**
**Estimated Market Value of 1.77 Acres of Land**
**used by the Port Jefferson Ferry**

**BALDWIN PEARSON**
& COMPANY INCORPORATED

XIII.  **Rental Value**

Rental value of land is directly related to the market value and normally based on a percentage of the market value.

Data concerning land leases is very limited in our area. The State of Connecticut (DOT) usually pays a land rental based on 10% of market value, e.g., if a piece of land has a market value of $10,000, the annual land rent would be $10,000 x 10% or $1,000 per year on an all net basis.  The land on River Street, Bridgeport, used for the greyhound kennels was also a land lease and the unconfirmed figure was 10% of land value.  Accordingly, your appraiser has estimated rental value of the 1.77 acres used by the Port Jefferson Ferry as follows:

Land Value, $530,000 @ 10% = $53,000 All Net Land Rent per Year

**FIFTY THREE THOUSAND DOLLARS ($53,000)**
**Estimated Rental Value of the 1.77 Acres of Land**
**used by the Port Jefferson Ferry**

XIV.  **Rental Value of the Terminal Building** (First Floor)

About two years ago a two story building was built on the site with an area of 5,593 square feet on each of two floors or a gross building area of 11,186 square feet.  In addition to the new building, the existing dock and bulkhead was rebuilt and also a landscaped scenic promenade along the west shore of the Pequonnock River.  The second floor will be used by the Bridgeport Port Authority and the Connecticut World Trade Association and there will be a large conference room suitable for social functions and meetings.

The first floor, excluding common areas for stairways and elevator lobby, will be rented to the Port Jefferson Ferry for the waiting room, counter, office area, and lavatories.  Your appraiser has estimated the rentable area of the first floor at 5,000± square feet.  The new building has reduced the usable land area to 1.77 acres and has also reduced on-site parking to 18 automobiles to satisfy all the users of the building.  Lack of parking will be an ongoing problem in the utilization of this attractive building.  With such a limited amount of parking, it would be difficult to rent this space to anyone but the ferry boat operation.  Using recent rentals of Class 'B' office space in the CBD, your appraiser has allocated a unit rental of $6 per square foot to the ground floor area, tenant to pay for their

**BALDWIN PEARSON**
& COMPANY INCORPORATED

own heat and utilities.  Our office leased a unit of
8,000 square feet the past year at 945 Main Street at
an average rental of $8 per square foot which includes
all services and parking in the John Street garage.

First Floor Terminal Area, 5,000 s/f @ $6 = $30,000
per s/f plus utilities

**XV.** **Summation**

Land Rent                      $53,000 per year
Terminal Rent                  $30,000 per year
                               $83,000, Call it:

**EIGHTY THREE THOUSAND DOLLARS ($83,000)**
**Estimated Rental Value of 1.77 Acres of Land and**
**5,000 Square Feet of Terminal Building**
**(Tenant will pay for all utilities but no real estate taxes)**

Respectfully submitted,

George M. Shawah, President
SIOR, MAI

# BALDWIN PEARSON
& COMPANY INCORPORATED

## XVI. Assumptions and Limiting Conditions

That no opinion is intended to be expressed for legal matters or that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers, although such matters may be discussed in the report.

That no opinion as to title is rendered. Date on ownership and the legal description were obtained from sources generally considered reliable. Title is assumed to be marketable and free and clear of all liens and encumbrances, easements and restrictions except those specifically discussed in the report.

The property is appraised assuming it to be under responsible and competent management and available for its highest and best use.

That no engineering survey has been made by the appraiser.

Except as specifically stated, data relative to size and area were taken from sources considered reliable, and no encroachment of real property improvements is assumed to exist.

That maps, plats and exhibits included herein are for illustration only as an aid in visualizing matters discussed within the report. They should not be considered as surveys or relied upon for any other purpose.

That no opinion is expressed as to the value of sub-surface oil, gas or mineral rights and that the property is not subject to surface entry for the exploration or removal of such materials except as is expressly stated.

That no detailed studies covering the subject property were available to the appraiser. Therefore, premises as to soil qualities employed in this report are not conclusive but have been considered consistent with information available to the appraiser.



## ARTICLE 7.    INDUSTRIAL ZONES

### Section 7-1    Industrial Base Zones

**7-1-1**   **Purpose**: The industrial base zones established by these Regulations are: Industrial Heavy (I-HI) Zone and Industrial Light (I-LI) Zone. Each of these zones is intended to reserve appropriately located areas for predominantly industrial uses and to protect these areas from intrusion by dwellings and other inharmonious uses. The zones are intended to promote the economic viability of the City's industrial areas and to provide standards to assure safe, functional, efficient and environmentally sound operations. Differentiation among the zones is intended to provide appropriate areas for industrial uses of different character, intensity or impact while minimizing potential conflicts among land uses.

**7-1-2**   **Use Regulations**: Use regulations for the Industrial Base Zones are set forth on the Use Tables as follows: I-HI Zone, Table 7-2-3 and I-LI Zone, Table 7-3-3.

     **a.**    **Permitted uses**: Uses listed on the Use Tables with a "Y" are permitted as of right.

     **b.**    **Conditional**: Uses listed on the Use Tables with a "C" are permitted if they meet the conditions set forth or referenced in the Use Tables. Some conditional uses, as indicated on the Use Tables, may also require a Special Permit.

     **c.**    **Special permit uses**: Uses listed on the Use Tables with an "SP" require a Special Permit, as described at Section 14-4.

     **d.**    **Prohibited uses**: Uses listed with an "N" in the Use Tables, and any uses not listed in the Use Tables, are prohibited.

**7-1-3**   **Industrial Use Classification**: For purposes of this Article the Industrial Use categories are further classified into High Impact Uses and Low Impact Uses as follows:

     **a.**    **High impact uses**:

         1.    In both the Heavy Industrial Zone and the Light Industrial Zone, High Impact Uses are those uses which exceed one or more of the following performance thresholds or match the following performance descriptions:

            (a)    *Dust Generation*: Establishments engaged in a primary use of mining, quarrying, crushing, grinding or pulverizing of hard organic and inorganic materials to produce bulk quantities of granulated material; or establishments engaged in the regular handling, mixing or processing of materials from stockpile-sized quantities of soil, coal, gravel, sand, granulated materials, or materials of similar character.

            (b)    *Heat Intensive Uses*: Establishments employing large volume industrial process furnaces or ovens.

            (c)    *Hazardous Materials*: Establishments engaged in the manufacture or processing of Hazardous Materials (See Section 2-2) at the bulk plant level. Bulk plant level means

the manufacture, collection, repackaging, storage, or distribution of Hazardous Materials in quantities larger than amounts transported in or out in a single shipment. Materials are generally stored in large, permanent tanks. Processors of Hazardous Materials will generally be included at this level, but not uses which produce Hazardous Materials as a by-product or accessory to another product. Any Hazardous Material that would violate state or federal guidelines.

2.    In the Light Industrial Zone only, High Impact Uses include those uses which exceed one or more of the following performance thresholds or match the following performance descriptions:

(a)    *Truck Traffic Generation*:  Uses with more than 10 Average Daily Weekday Trips (ADWT) of Heavy Trucks.  ADWT is the average daily one-way trips in both directions for a weekday (Monday - Friday).

(b)    *Visual Impacts*:  Uses containing exposed pipelines, utility towers, conveyors and mechanical equipment to an extent greater than that which is reasonably necessary for the heating and cooling of on-site buildings.

b.    Low Impact Uses are those uses that do not meet the definition of High Impact uses.

Section 7-2    Industrial Heavy Zone

7-2-1    Purpose:  The Industrial Heavy (I-HI) Zone is intended to reserve appropriate areas of the City for those industries which due to impacts in terms of such characteristics as dust, traffic, hazards, appearance or intensity of industrial development are not desirable in or adjacent to non-industrial areas.  Development standards are intended to recognize the operational needs of high impact industries while setting minimum standards to promote safe, functional, efficient and environmentally sound development and operation.

7-2-2    Permissible Uses:  The uses permissible in the I-HI Zone are set forth in Table 7-2-2 below: