**TABLE 7-2-2**
**INDUSTRIAL HEAVY ZONE USES**

| Use Category | I-HI | Requirements |
|---|---|---|
| **RESIDENTIAL USES** | N | |
| **OFFICE USES** | C | Limited to 10,000 sf (exclusive of office space directly supporting on-site industrial uses) |
| **TRADE USES** | | |
| Retail Sales and Services | SP | See Section 14-4 |
| Automotive and Marine Craft | Y | |
| Entertainment, Restaurant and Recreation | SP | See Section 14-4 |
| Wholesale Trade | Y | |
| **INDUSTRIAL USES** | | |
| Manufacturing/ Processing | | |
| o High Impact | SP | See Section 14-4 |
| o Low Impact | SP* | See Section 14-4 |
| *Except Major Industrial Groups 28 & 29 | SP | See Section 14-4 |
| o Major Industrial Groups 28 & 29[2] | | |
| Resource Production/Extraction | | |
| o High Impact | C/SP | See Sections 12-11, 14-4 |
| o Low Impact | C | See Section 12-11 |

---

[2] Major Industrial Groups 28 & 29 of the Standard Industrial Classification Manual.  Major Group 28 is Chemicals and Allied Products.  Major Group 29 is Petroleum Refining and Related Industries.

7.3

| | | |
|---|---|---|
| Warehousing/ Freight Storage | | |
| o High Impact | Y | |
| o Low Impact | Y | |
| Industrial Service | | |
| o High Impact | Y | |
| o Low Impact | Y | |
| Waste-Processing and Transfer | | |
| o High Impact | N | |
| o Low Impact | SP | See Section 14-4 |
| **INSTITUTIONAL USES** | N | |
| **TRANSPORTATION, COMMUNICATIONS, AND ESSENTIAL SERVICES** | Y* | |
| *Except Passenger Terminals | SP | See Section 14-4 |
| **MISCELLANEOUS USES** | | |
| Adult Entertainment Facilities | C/SP | See Section 14-4 |
| Commercial Outdoor Recreation | N | |
| Detention Facilities | Y | |
| Major Event Entertainment | C/SP | |
| Vehicle Service Facilities | Y | See Sections 12-9, 14-4 |

**7-2-3**    <u>Zone Development Standards</u>:  The zone development standards applicable in the I-HI Zone are set forth in Table 7-2-3 below:

### TABLE 7-2-3
### I-HI DEVELOPMENT STANDARDS

| STANDARDS | I-HI |
|---|---|
| Maximum FAR | No limit |
| Minimum Lot Area | No minimum |
| Minimum Frontage | No minimum |
| Minimum Building Setbacks | |
|   o  Street lot line | 5 feet |
|   o  Lot line abutting an MU, OR, or I-zoned lot | 0 feet |
|     •  High Impact industrial use | 10 feet |
|     •  Other uses | 0 feet |
|   o  Lot line abutting an R zoned lot | 15 feet |
| Landscaping in Setbacks Abutting an R-Zoned Lot | 10 feet @ Lot Line |
| Maximum Building Coverage | 100% of site area |
| Minimum Landscaped Area | None |
| Maximum Height | 75 feet |
| Parking Allowed Between Building and Streets | Yes |
| Drive-Through Facilities Permitted | Yes |
| Outdoor Storage Permitted | Yes |
| Outdoor Display Permitted | Yes |
| Trucks and Equipment Permitted | All categories |

**Section 7-3**    <u>Light Industrial Zone</u>

**7-3-1**    <u>Purpose</u>:  The Light Industrial (I-LI) zone is intended to promote a concentration of industrial uses having minimal off-site impacts.  The zone is intended to be an area where most industrial uses may locate, but where development and performance standards which are stricter than those of the Industrial Heavy Zone will promote uses which are more compatible with non-industrial areas.  The development and performance standards are designed to promote a viable and attractive industrial area and to minimize potential land use conflicts.  Non-industrial uses are intended to be limited to uses that are most directly supportive of industry.

# Bridgeport
## Connecticut

Town Hall
45 Lyon Terrace
Bridgeport, CT 06604

(203) 576-7201

*Belongs to*
Fairfield County
Bridgeport Labor Market Area
Greater Bridgeport Economic Development
Region
Greater Bridgeport Planning Area



Incorporated in May 1821

## Demographics

| Population | Town | County | State |
|---|---|---|---|
| 1990 | 141,686 | 827,645 | 3,287,116 |
| 1995 | 138,010 | 828,220 | 3,289,090 |
| 2000 | 137,860 | 832,420 | 3,316,120 |
| 2005 | 139,880 | 843,190 | 3,364,080 |
| '95-'05 Growth | 1.4% | 1.8% | 2.3% |
| Land Area | 16.0 | 625.9 | 4,845.4 |
| Population per square mile | 8,623.3 | 1,323.3 | 678.8 |
| Households | 51,671 | 307,772 | 1,237,000 |

| Race/Ethnicity (1990) | Town | County | State |
|---|---|---|---|
| White | 82,945 | 700,350 | 2,859,353 |
| Black | 37,684 | 81,519 | 274,269 |
| Asian Pacific | 3,288 | 17,332 | 50,698 |
| Native American | 405 | 1,226 | 6,654 |
| Other | 17,364 | 27,218 | 96,142 |
| Hispanic origin (may be of any race) | 37,547 | 70,818 | 213,116 |

*Educational Attainment (1990)*

| Persons age 25 or older | Town | State |
|---|---|---|
| High school graduate | 27,510 | 648,366 |
| Some College | 15,925 | 495,696 |
| Bachelors or more | 10,922 | 597,693 |

*Age Distribution (1995)*

| | 0-4 | 5-14 | 15-34 | 35-49 | 50-64 | 65+ | Total |
|---|---|---|---|---|---|---|---|
| Male | 10% | 16% | 33% | 20% | 11% | 10% | 66,072 |
| Female | 9% | 14% | 31% | 19% | 12% | 16% | 71,938 |
| State Total | 7% | 13% | 27% | 24% | 14% | 14% | 3,289,090 |

## Economics

*Number of Establishments (1995)*

| | Town | County | State |
|---|---|---|---|
| Manufacturing | 275 | 1,480 | 6,068 |
| Services | 1056 | 12,870 | 39,011 |
| Trade - Retail | 544 | 5,427 | 20,251 |
| Trade - Wholesale | 197 | 2,689 | 9,858 |
| Finance, Insurance and Real Estate | 215 | 2,997 | 8,809 |
| Total Establishments | 2,726 | 30,755 | 104,409 |
| Per Capita Income | $20,599 | $41,082 | $30,303 |
| Retail Sales (thousands) | $731,074 | | $27,231,413 |

*Top Ten Assessments (1994)*

| | |
|---|---|
| 1. United Illuminating | $105,224,879 |
| 2. People's Bank | 56,032,294 |
| 3. Sikorsky Aircraft (UTC) | 17,709,327 |
| 4. Bridgeport Hydraulic | 15,942,274 |
| 5. Southern Connecticut Gas Company | 13,516,213 |
| 6. General Electric Company | 12,454,567 |
| 7. Southern New England Telecom. | 10,637,802 |
| 8. Bridgeport Jai Alai | 9,773,353 |
| 9. American Telephone & Telegraph | 8,948,791 |
| 10. Harvey Hubbel Inc. | 7,187,228 |
| As % of Grand List | 5.7 |

## Education

Grade organization (number of schools): Elementary (29), 9-12 (4)

*1994-1995 School Year*

| | |
|---|---|
| Total students | 20,878 |
| Total expenditures per pupil | $7,785 |
| Average teacher's salary | $45,291 |
| Students attending public school | 83.7 % |
| Students in extended day kindergarten | 802 |
| Graduates attending four year college | 41.8% |

*Connecticut Mastery Test  Percent Above Goal*

| | Grade 4 | Grade 6 | Grade 8 |
|---|---|---|---|
| Reading | 14.3 | 21.0 | 27.2 |
| Math | 21.2 | 11.2 | 11.7 |
| Writing | 12.8 | 19.1 | 17.3 |

*Average Class Size*

Kindergarten 22.7   Grade 5   25.1   High School   17.7
Grade 2   23.5   Grade 7   26.2

Connecticut Town Profiles 1996-1997
is a publication of the Connecticut Department of
Economic and Community Development; Research
Division 865 Brook Street Rocky Hill, CT 06067-3405
Phone (860) 258-4235.

# Bridgeport
## Connecticut

## Government

Government Form    Mayor- Council

1993-1994

| | | | | | |
|---|---|---|---|---|---|
| Total revenue | $326,440,167 | Total Expenditures | $300,545,081 | Equalized Grand List | $4,484,882,400 |
| Tax revenue | $154,516,066 | Education | $121,547,987 | Per capita | $32,810 |
| Non-tax revenue | $171,924,101 | Other | $178,997,094 | As % of state average | 41.9 |
| Intergovernmental | 46.8% | Total Indebtness | $166,986,673 | Date of last revaluation | 10/1/83 |
| | | As % of expenditures | 55.6 | Moody's Bond Rating | Ba |
| Per capita tax | $1,130 | Per capita | $1,222 | Actual mill rate | 67.80 |
| As % of state average | 56.7 | As % of state average | 63.4 | Equalized mill rate | 35.71 |
| | | Annual Debt Service | $24,885,111 | Voting districts | 32 |
| | | As % of expenditures | 8.3 | | |

## Housing

1994

| Housing Stock | Town | County | State |
|---|---|---|---|
| Existing Units (total) | 56,516 | 329,899 | 1,351,825 |
| % Single unit detached | 29.5 | 63.8 | 62.4 |
| New Permits Authorized (total) | 48 | 2,327 | 9,439 |
| % Single unit detached | 4.2 | 66.0 | 80.6 |
| As % of Existing Units | 0.1 | 0.7 | 0.7 |

| Residential Sales | | | |
|---|---|---|---|
| Number | 1794 | 15,346 | 50,087 |
| Average price | $61,087 | $271,408 | $171,382 |
| Median price | $57,941 | $190,000 | $126,000 |

Sales Price Distribution

| Number of Sales | Town | County | State |
|---|---|---|---|
| Less than $75,000 | 1183 | 2,408 | 11,328 |
| $75,001-$150,000 | 579 | 3,295 | 19,828 |
| $150,001-$250,000 | 27 | 4,028 | 11,132 |
| $250,001-$400,000 | 3 | 3,009 | 4,662 |
| $400,001 or more | 2 | 2,606 | 3,137 |

## Labor Force

| 1994 | Town | County | State |
|---|---|---|---|
| Labor Force | 62,493 | 440,485 | 1,726,000 |
| Employed | 57,004 | 419,062 | 1,630,000 |
| Unemployed | 5,489 | 21,423 | 96,000 |
| Unemployment Rate | 8.8% | 4.9% | 5.6% |
| Total Employment | 51,170 | 400,440 | 1,538,980 |
| Manufacturing | 10,380 | 82,090 | 270,250 |

Commuters (1990)

| Commuters into Town from | | Town Residents Commuting to | |
|---|---|---|---|
| 1. Bridgeport | 28,411 | Bridgeport | 28,411 |
| 2. Stratford | 5,883 | Fairfield | 5,457 |
| 3. Fairfield | 3,986 | Stratford | 5,307 |
| 4. Trumbull | 3,447 | Norwalk | 3,691 |
| 5. Shelton | 3,075 | Stamford | 2,987 |
| 6. Milford | 2,708 | Trumbull | 2,336 |
| 7. Monroe | 1,552 | Westport | 2,044 |
| 8. West Haven | 1,021 | Milford | 1,901 |
| 9. New Haven | 822 | Shelton | 1,513 |
| 10. Norwalk | 809 | New York | 999 |

## Quality of Life

| 1995 | Town | State |
|---|---|---|
| Miles to State Capitol | 54 | |
| Visitor Attractions | 9 | 488 |
| Banks | 30 | 1,188 |
| Lodging | 2 | 467 |
| Number of units | 310 | 26,540 |
| Day Care Facilities | 42 | 1,669 |

| Library (1993-1994) | Town |
|---|---|
| Total books and serials | 555,600 |
| Weekly hours open | 44 |
| Circulation per capita | 1.9 |

| Crime rate (1994) | |
|---|---|
| per 1,000 residents | 79.4 |

| Hospitals in county (1995) | 9 |
|---|---|
| Total beds | 2,537 |

Residential Utilities (1995)

Electric Company

United Illuminating

Typical basic rate

$9.50 +11.7257c/kwh

Typical  heat rate

$14.00 + 14.300c/kwh

Gas Company

Southern CT Gas

Typical rate

$8.25 + 98.18c/Ccf

**BALDWIN PEARSON**
& COMPANY INCORPORATED

## CERTIFICATION OF APPRAISER

I certify that, to the best of my knowledge and belief, ....

The statements of fact contained in this report are true and correct.

The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal unbiased professional analyses, opinions and conclusions.

I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

My compensation is not contingent on an action or event resulting from the analyses, opinions or conclusions in, or the use of, this report.

The use of this report is subject to the requirements of The Appraisal Institute relating to review by its duly authorized representatives.

As of the date of this report, George M. Shawah has completed the requirements of the continuing education program of The Appraisal Institute.

I have made a personal inspection of the property that is the subject of this report.

No one provided significant professional assistance to the person signing this report.

I have the knowledge and experience to complete this appraisal assignment competently.

The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

George M. Shawah, President
SIOR, MAI

**BALDWIN PEARSON**
& COMPANY INCORPORATED

## QUALIFICATIONS

### George M. Shawah

**Experience**
President and sole owner of Baldwin Pearson & Co., Inc.
Have been actively engaged in industrial and commercial
brokerage and property management for the past 42 years.

For the past 35 years, have accepted appraisal assignments for
industrial and commercial property for various purposes such as
sale, foreclosure, acquisition, tax appeal, condemnation and
financing.

Clients for appraisal of real estate have been individuals,
attorneys, banks and various business firms and industrial
corporations.

**Memberships**
Greater Bridgeport Board of Realtors - President 1964; Society
of Industrial Realtors, President, Connecticut Chapter, 1974.

The Appraisal Institute (MAI Certificate #4196)

Connecticut Association of Real Estate Boards, President, 1971;
National Association of Realtors - Served as a Director from
Connecticut.

Industrial Real Estate Brokers Association of New York.

State of CT -
Certified General Real Estate Appraiser's License #0000043

Broker's License #528100

Bridgeport Rotary

**Education**
University of Connecticut, Class of 1951, B.A. Degree
Real Estate Management Course, Boston, 1957
The American Institute of Real Estate Appraisers:
        Courses I, II, IV and VI

**Appraiser's Certification**
The Appraisal Institute conducts a voluntary program of
continuing education for its designated members.  MAIs and RMs
who meet the minimum standards of this program are awarded
periodic educational certification.  I am certified under this
program.

**EXHIBIT B**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Case No. 03-CV-599 (CFD)

- - - - - - - - - - - - - - - -X
BRIDGEPORT AND PORT JEFFERSON         :
STEAMBOAT COMPANY, ET AL.,            :
                    PLAINTIFFS        :
                                      :
VS.                                   :
                                      :
BRIDGEPORT PORT AUTHORITY,            :
                    DEFENDANT         :
- - - - - - - - - - - - - - - -X

Deposition of GEORGE SHAWAH
taken at the offices of Bridgeport Port
Authority, 330 Water Street, Bridgeport,
Connecticut, before Clifford Edwards, LSR,
Connecticut License No. SHR.407, a
Professional Shorthand Reporter and Notary
Public, in and for the State of
Connecticut on July 27, 2004, at 9:36 a.m.



COPY.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT  06443
HARTFORD                        STAMFORD

---

A P P E A R A N C E S:

ON BEHALF OF THE DEFENDANT:

STEVE E. KELLOGG, ESQ.
THOMPSON COBURN, LLP
One US Bank Plaza
St. Louis, Missouri  63101

EDWARD J. SHEPPARD, ESQ.
THOMPSON COBURN, LLP
700 14th Street, N.W.
Washington, D.C.  20005

RICHARD L. ROSE, ESQ.
ROBERT ROSE & BATES, PC
17 Hoyt Street
Stamford, CT  06905


ON BEHALF OF THE PLAINTIFFS:

MARTIN DOMB, ESQ.
HILL, BETTS & NASH, LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, NY  10281


ALSO PRESENT:          JOE RICCIO

---

3

GEORGE M. SHAWAH
office address 109 Middle Street, Bridgeport,
Connecticut, having first been duly sworn, deposed
and testified as follows:


DIRECT EXAMINATION


BY MR. KELLOGG:

    Q    All right.  My name is Steve Kellogg, and
I'll be taking your deposition today.

         Have you ever had your deposition taken
before?

    A    On occasion.

    Q    Let me just go over a few ground rules.
I'm going to be asking you questions and you are
going to be answering the questions.  If at any time
you don't understand any of my questions or it
doesn't make any sense, by all means, interrupt me
and tell me to rephrase the question or what you
didn't understand.

         Because at the end of the day, if you
don't ask, I'm going to assume that you understood
every single one of my questions that I asked and
every single one of your responses was responsive to
those questions.

---

4

         Is that fair enough?

    A    Yes.

    Q    Any time you need to stop for a restroom
break, soda, coffee, water, just speak up and let us
know.

    A    That's a distinct possibility.

    Q    I think it will be for me, too.

         To start off with, how many times have you
been expert witness?

    A    Over the last 40 years many times.

    Q    Okay.  How many is many?

    A    I would -- I would -- I haven't been very
much over the last two years, but over the 40 some
odd years I've been appraising I would say a few
hundred times.

    Q    Okay.  And, generally, what's the nature
of your testimony on those cases?

    A    Relative -- relates to real estate values.

    Q    Okay.  And is it -- primarily -- what kind
of properties?

         Is it commercial?

    A    My case it is primarily industrial or
commercial.

    Q    What's the most recent case that you were
designated an expert in?

5

1    A    As far as court testimony I have one
2 pending now for the City of Bridgeport at 480
3 Bunnell Street. I think that's part of Bedco's
4 Underwood -- East Side Underwood plan.
5    Q    What can you tell me about that case?
6         Who retained you, first of all?
7    A    The City of Bridgeport.
8    Q    Okay.
9    A    Bridgeport Economic Developers Society, I
10 guess.
11    Q    What did they ask you to do?
12    A    Appraise the property market value as of a
13 specific date. As of date of condemnation, I think.
14    Q    Which property is that?
15    A    480 Bunnell Street.
16    Q    What's on there right now?
17         Is there structures on there?
18    A    There were. I think about demolishing.
19 Not all multi-story mill-type factory buildings,
20 years ago, were part of the old Underwood typewriter
21 people.
22    Q    Is it currently -- is that building
23 currently being used or has it been abandoned?
24    A    The building has been --
25         (THEREUPON, THE COURT REPORTER

7

1    A    I don't know. I couldn't say.
2    Q    Okay. All right. What's the -- can you
3 tell me what your next most recent designation, the
4 case that you worked on as an expert witness.
5    A    I have one now that's pending in Stratford
6 as an operating gas station.
7    Q    Stratford?
8    A    Yes.
9         MR. SHEPPARD:  Steve, I'm unfamiliar
10 with any appraiser privilege.
11         MR. ROSE:  No. There is none.
12         MR. SHEPPARD:  Just for the record.
13         MR. DOMB:  Well, if the basis -- if I
14 retain someone and the agreement provides
15 that it's confidential then it's
16 confidential.
17         It doesn't rely on any privilege. I
18 think Mr. Shawah has testified
19 appropriately.
20         MR. ROSE:  There is no privilege
21 under Connecticut law for appraisal.
22         MR. SHEPPARD:  If we want to press it
23 we would. We're not.
24         MR. DOMB:  Okay.
25         MR. SHEPPARD:  Unless Steve wants to.

6

1         REQUESTS CLARIFICATION.)
2    A    -- demolished.
3 BY MR. KELLOGG:
4    Q    Oh, it's been demolished?
5    A    Part of the assemblage by the city.
6    Q    So there's no structures on that property?
7    A    Not right now.
8    Q    And have you given them an opinion as to
9 the value of the property?
10    A    I did, yes.
11    Q    And how many acres was that property?
12    A    I don't remember.
13    Q    When will you be testifying in that case?
14    A    Sometime in August, I believe.
15    Q    So in the next month or so?
16    A    Yeah, I would say.
17    Q    What was the overall value of that
18 property?
19    A    I couldn't remember. If I did I wouldn't
20 tell you anyway. But I don't remember.
21    Q    Why wouldn't you tell me?
22    A    Because it's privileged information
23 between myself and my client.
24    Q    Okay. I didn't know if the report had
25 already been given to the other side.

8

1 BY MR. KELLOGG:
2    Q    Was your testimony accurate that you don't
3 recall the value at this time?
4    A    No. I don't recall.
5    Q    But you kept notes of that, you have a
6 report?
7    A    Standard procedure, I start a file and all
8 the pertinent data is in my file.
9    Q    Okay.
10    A    Until I get a copy of my finished report.
11    Q    Okay. You were telling us about the
12 Stratford property. What can you tell us about
13 that?
14    A    It was an operating gas station. They had
15 a revaluation there couple, two or three years ago,
16 and the owners through their attorney decided to
17 challenge the new assessment.
18    Q    Okay.
19    A    I was called in as an appraiser after the
20 new owners.
21    Q    What method did you use to appraise the
22 value of that operating gas station?
23    A    In that particular case I remember there
24 were three sales not too old in the general area.
25    Q    Three sales of what?

9

1      A    Operating gas stations.
2      Q    Did the fact that there was an ongoing
3   business on the property impact your analysis?
4      A    Yes. I would say it probably did.
5      Q    Does it usually increase the value of the
6   market value?
7      A    It varies particularly with gas stations,
8   the capability of the operator varies tremendously.
9      Q    Sure.
10     A    And I try to avoid taking consideration of
11  personalities because one operator can make a very
12  successful deal. Another one come in and doesn't do
13  so well.
14     Q    Would you agree, I guess just as a general
15  premise, that a piece of property that has an
16  ongoing business is probably more valuable than a
17  piece of property that does not have an ongoing
18  business?
19     A    No. I wouldn't agree with that.
20     Q    Why is that?
21     A    There are so many circumstances that come
22  into play depending on the individual property, its
23  location, its characterization, etc. I would take
24  every property individual case by case.
25     Q    Well, that Stratford property did not have

11

1      Q    And which ones are those?
2      A    That I can't remember. Some in Norwalk.
3   One in Bridgeport. Several -- many years have gone
4   by since I've done one.
5      Q    Is that right? And how many years?
6      A    I can't tell you.
7      Q    More than ten?
8      A    I don't know. I can't remember that.
9      Q    Do you keep those files?
10     A    Yes, I do.
11     Q    So you would have copies of those
12  appraisal reports?
13     A    That's right. I'd have to find them, but
14  yeah.
15     Q    Okay. And did you testify in those cases?
16     A    I don't think -- let's see. I think I may
17  have testified in one, but I can't remember which
18  one it was.
19     Q    Whenever you testify in a case, do you get
20  a copy of your testimony?
21     A    No.
22     Q    No? Have you ever gotten a copy of your
23  testimony?
24     A    I don't recall ever having a copy.
25     Q    What about when you have your deposition

10

1   an ongoing business on there.
2      A    Yes, it did.
3      Q    But if it didn't, would your assessment
4   have been less or more?
5      A    I couldn't say. Depending on what we
6   could project as the highest best use. In this
7   particular case I felt that the existing use was the
8   highest best use.
9      Q    And I take it you do have copies of those
10  reports as well?
11     A    Yes.
12     Q    You've prepared a report for that?
13     A    Yes.
14     Q    Okay. And when are you scheduled to
15  testify in that case?
16     A    It was postponed several times. I'm not
17  sure. Probably sometime in August.
18     Q    Okay. All right. You say that you
19  primarily have worked on commercial and industrial
20  properties?
21     A    Yes, sir.
22     Q    How many marine terminal facilities have
23  you appraised?
24     A    Over the years I would say four or five.
25  I'm just guessing.

12

1   taken like you are having here, do you maintain
2   copies of your depositions?
3      A    If I was supplied with one I keep it in
4   the file.
5      Q    Okay.
6      A    But I don't remember ever having -- I
7   haven't done that many depositions over the years.
8      Q    For example, on the first property that we
9   talked about when you were retained by the City of
10  Bridgeport, have you had your deposition taken in
11  that case?
12     A    No. I don't think so.
13     Q    And the Stratford case?
14     A    No.
15     Q    But if you did have your deposition taken
16  it would be in your file?
17     A    If they supplied me with a copy.
18     Q    Okay.
19     A    I never was --
20     Q    What generally do you retain in your file
21  for each appraisal, what documents are in there?
22     A    Well, basically all the tax assessors'
23  information, usually field cards, anything that
24  would pertain to physical information.
25         If there are floor plans or maps, I would

13

```
 1   have them.  And usually all of my rough notes and of
 2   course the finished appraisal, copy of the finished
 3   appraisal.
 4       Q   Anything else?
 5       A   I think that's basically it.
 6       Q   So I take it you made a file for this case
 7   as well?
 8       A   Yes.  I have a file for this case.
 9       Q   Okay.  What's in that file?
10       A   Copy of my report, copy of the assessor's
11   field cards, correspondence pertaining to the job
12   and some rough notes.
13       Q   And you relied on those documents whenever
14   you are putting together your final report?
15       A   Yes.  I've -- wherever it was necessary.
16           MR. KELLOGG:  I think we are going to
17       have to have copies of that.  And I think
18       that was part of the -- you know, this was
19       before I got into the case, but there was
20       a document request to that fact.
21           MR. DOMB:  I don't remember a
22       document request.  And I think this
23       deposition came on by an exchange of
24       e-mails.  I don't remember a request
25       specifically for the file.
```

14

```
 1           MR. KELLOGG:  Okay.
 2           MR. DOMB:  We'll take your request
 3       under advisement.
 4           You didn't bring your file with you
 5       today, did you?
 6           THE WITNESS:  No, I did not.
 7           MR. DOMB:  Okay.
 8           MR. SHEPPARD:  I think, Marty, it's
 9       in the original interrogatories, request
10       for documents.
11           MR. KELLOGG:  Yeah.  I'm just going
12       to draw your attention to what would
13       appear to be your responses to Defendant's
14       First Request for Production.  And I think
15       this is dated June 30, 2004.
16           And we had specifically requested,
17       for example, any exhibit using the --
18       presenting expert's opinions and any notes
19       made by the expert relating to this suit.
20       And I would think that --
21           MR. DOMB:  What request number are
22       you reading from?
23           MR. KELLOGG:  I'm reading from
24       request 34.  But it would appear that
25       request 31 through 36 all apply to his
```

15

```
 1   file, what would be contained in his file.
 2           MR. DOMB:  Do you mind if I take a
 3       look?
 4           MR. KELLOGG:  Absolutely.  And I just
 5       note that for the record so that we might
 6       be able to get a copy of those notes.
 7           MR. DOMB:  Would you just give me a
 8       moment to quickly read them over.
 9           MR. KELLOGG:  Sure.  I just wanted to
10       make my point for the record.
11           MR. DOMB:  Go ahead.
12           MR. KELLOGG:  So that we can get a
13       copy of those notes.
14           And I would also state that, to the
15       extent we get those and it reveals further
16       information, we would obviously want to
17       redepose Mr. Shawah based on the
18       information contained in his file.
19           MR. DOMB:  Okay.  Give me a moment,
20       please.
21           MR. KELLOGG:  Off the record.
22       (THEREUPON, THERE WAS A DISCUSSION
23       OFF THE RECORD.)
24           MR. KELLOGG:  All right.  Mr. Domb,
25       would you agree that these requests --
```

16

```
 1           MR. DOMB:  I've read the requests.  I
 2       find several of them to be somewhat
 3       ambiguous, but you've stated your
 4       position.
 5           We'll take your request under
 6       advisement.  We don't necessarily agree
 7       with it or disagree with it at this time.
 8           MR. KELLOGG:  When will we hear from
 9       you with respect to getting Mr. Shawah's
10       file?
11           MR. DOMB:  As promptly as we can give
12       you the answer.
13           MR. KELLOGG:  All right.  I'll go
14       ahead and I guess just draft a letter to
15       that effect and get something out to you.
16           MR. DOMB:  If you would like you can
17       keep it informal.  You can make a -- you
18       can confirm your request that we have all
19       heard here.
20           MR. SHEPPARD:  The problem is, Marty,
21       that we are under the gun to get the
22       reports done.
23           MR. DOMB:  We won't delay.
24   BY MR. KELLOGG:
25       Q   All right.  Mr. Shawah, I want to talk
```

17

1 about your report obviously. What's been provided
2 to us is first -- do you have a copy of your report,
3 sir?
4     A    Not with me, no.
5         MR. KELLOGG:   Do you have a clean
6     copy of the report?
7         MR. DOMB:   I have one clean copy with
8     me.
9         MR. KELLOGG:   Can we make a photocopy
10    of that?
11        Can we go off the record for a
12    moment?
13        (THEREUPON, THERE WAS A DISCUSSION
14        OFF THE RECORD.)
15 BY MR. KELLOGG:
16    Q    When were you first approached to provide
17 this appraisal report that's dated June 3, 1997?
18    A    I think it was around late -- probably
19 early of '97, probably December -- January,
20 February.
21        We had some conversations and meetings and
22 so forth, and I think I got the final go ahead maybe
23 sometime in April.
24    Q    Who did you have meetings and
25 conversations with?

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

18

1     A    I think my recollection was Jonathan
2 Bowman the letter was addressed to -- the appraisal
3 was addressed to and some people from the port --
4 the ferry people.
5     Q    And who at the ferry company?
6     A    I don't remember. I only remember one
7 name. I think it's Paul.
8     Q    Okay.
9     A    That's the only name I remember from the
10 ferry company.
11    Q    What was discussed, what was said? Why
12 did they come to you?
13    A    I guess they were told they needed an
14 appraisal and I suspect that Jonathan Boman probably
15 recommended me.
16    Q    Had you worked with Mr. Bowman before?
17    A    Oh, yes. I have over the years.
18    Q    You provided him with appraisals?
19    A    On occasion, yes.
20    Q    How many do you think?
21    A    I don't have the slightest idea.
22    Q    More than five?
23    A    I would guess more than five.
24    Q    More than ten?
25    A    That I couldn't say.

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

19

1     Q    Okay. Did they discuss the case that they
2 were in at that point in time with you?
3     A    Not with me, no.
4     Q    Did they discuss the fact that they were
5 in a lawsuit with the authority?
6     A    Yes. I state -- cite that in the purpose
7 of the appraisal.
8     Q    Sure. And did they tell you what the
9 theory of the case was, why they were bringing a
10 lawsuit?
11    A    That I don't remember.
12    Q    Do you know why they were bringing a
13 lawsuit?
14    A    No. I just cut out a few articles in the
15 paper recently. The last thing I looked at was
16 something to do with the tariffs they were charging,
17 but other than that I'm not familiar.
18    Q    So how many --
19        MR. DOMB:   For clarification your
20        question was his familiarity with the
21        lawsuit back in '97?
22        MR. KELLOGG:   1997. Yes. Not the
23        current one.
24 BY MR. KELLOGG:
25    Q    Am I correct, sir, that you prepared this

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

20

1 report, the June 3, 1997, report for a piece of
2 litigation that's now no longer going?
3     A    I don't know if it's going or not, but at
4 that time that's what I was told they needed a
5 report for.
6     Q    Okay. And are you aware that there's now
7 a new lawsuit?
8     A    I know there's apparently some litigation
9 going on. I don't know whether it's a new lawsuit
10 or an old lawsuit.
11    Q    I see. Did they explain to you
12 why -- this is back in 1997, early 1997 when you had
13 your first meetings with Mr. Bowman and Mr. Hall.
14        Did they explain why they needed your
15 report?
16    A    I don't -- only the fact that there was
17 some litigation between them and opinion as to the
18 value of the real estate would be needed.
19    Q    And why was the value of the real estate
20 needed?
21    A    That I don't remember.
22    Q    They didn't explain that to you at all?
23    A    They may have, but seven years have gone
24 by. I don't remember the details.
25    Q    All right. Let's talk about your most

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

1  recent letter here that's on top of your report, the
2  June 18, 2004, letter.
3          And this is addressed to Mr. Domb.
4          Is that correct?
5      A   That's correct.
6          MR. KELLOGG:  Am I pronouncing that
7  correctly, Domb?
8          MR. DOMB:  Yeah.  Off the record.
9          (THEREUPON, THERE WAS A DISCUSSION
10         OFF THE RECORD.)
11 BY MR. KELLOGG:
12     Q   Did Mr. Domb contact you about this
13 report?  How did you get reinvolved with your old
14 appraisal?
15     A   I received a phone call from Mr. Domb.
16     Q   Okay.  And you have copies of those
17 letters in your file, I assume?
18     A   Yup.
19     Q   And what did they want you to do?
20     A   Well, as stated in the report, they wanted
21 me to review my original report and tell them if my
22 opinion of value for that date was still correct.
23 And of course I did so.
24     Q   How many -- have you had a lot of -- how
25 many personal meetings have you had with Mr. Domb or

1      A   About an hour.  A little less than an
2  hour.
3      Q   And did you discuss what your testimony
4  would be?
5      A   Discussed the fact of what the possible
6  questions would be raised.  I think he wanted to be
7  sure that I would be probably prepared.
8      Q   Sure.  What kind of questions did he think
9  that I would be asking you?
10     A   I don't remember a specific question.
11     Q   Just generally.
12     A   I can't -- I'm trying to remember what --
13 it was nothing extraordinary that I can recall that
14 stands out in my mind.
15     Q   You obviously talked about your appraisal?
16     A   That's right.
17     Q   What kind of things did you talk about
18 with respect to your appraisal?
19     A   Raised a couple questions that I recall.
20     Q   And what were they?
21     A   I'm trying to think.  I think he
22 reiterated about those two cases that I cited in my
23 letter.
24     Q   Okay.
25     A   For one thing.  And the format of my

1  anybody from his law firm?
2      A   I think one.  I think yesterday was the
3  first time I met the man.
4      Q   But you talked with him over the phone a
5  few times?
6      A   Yes.
7      Q   What did you all talk about?
8      A   What's covered in this letter.  I tried to
9  answer his questions in writing.  I did.
10     Q   Was there anything else that you all
11 talked about?
12     A   I don't think so.
13     Q   All right.  Did you discuss why they
14 needed you to review your old appraisal?
15     A   No.  As I recall, he told me there was
16 litigation between the two parties and they wanted
17 this information.  And I gave it to them.
18     Q   Did they tell you why?
19     A   I don't think so.
20     Q   Okay.  What did you discuss yesterday?
21     A   Discussed this meeting.
22     Q   Okay.  What did you all talk about?
23     A   Basically --
24     Q   How long was the meeting?  Let me start
25 there.

1  report.  That was basically it.
2      Q   What was it about the format of the report
3  that you all talked about?
4      A   Well, he went through -- let me see this
5  one thing.  There's one statement here that he asked
6  me about.
7          I think it was this statement under my
8  certification appraiser concerning my continuing
9  education.
10     Q   Okay.  You are talking about this is
11 almost the very last page of your report?
12     A   Yeah.
13     Q   The qualifications of George M. Shawah?
14     A   The certification.
15     Q   What was the question about that?
16     A   I think in this case I think my -- because
17 I remember the Appraisal Institute there are certain
18 things I must put in.  And one of them state that I
19 completed the requirements of the continuing
20 education for the Appraisal Institute.
21     Q   Okay.
22     A   Now, as of this date because of my -- I'm
23 a life member and have been so many years, I no
24 longer have to maintain that continuing education
25 program.

1  Q   Okay.
2  A   Pardon?
3  Q   Okay.
4  A   But I have to so state in my report. This
5  one I was apparently still doing my continuing
6  education.
7  Q   And it's called the Appraisal Institute?
8  A   That's right.
9  Q   And at what point do you no longer have to
10 obtain continuing education credit?
11 A   I think it was sometime in '97 when I
12 received my life member designation. But I still
13 have to maintain so many hours for the State of
14 Connecticut each year.
15 Q   And have you done that?
16 A   Oh, yes. I can't get my license renewed
17 if I do not.
18 Q   So you are current with the state of
19 Connecticut right now under your continuing
20 education credit?
21 A   Yup.
22 Q   How many hours do you have to --
23 A   I think it's 28 -- our renewals are every
24 two years as I recall. And I think it's 28 hours.
25     MR. KELLOGG:  I wish lawyers had this

1  Q   And here you are saying you have not
2  completed the requirements.
3       So are you saying you don't have to
4  complete them?
5  A   That's correct, but I have to so state it
6  in my report.
7  Q   And that's the guidelines of the --
8  A   Appraisal Institute.
9  Q   -- Appraisal Institute.
10      Is that a federal institute or is that
11 a --
12 A   No. No. It's a national -- it's a
13 national appraisal organization like the CPAs have
14 theirs.
15 Q   Sure.
16 A   This is the absolute as far as appraisers
17 are concerned.
18 Q   All right. We were talking about your
19 meeting that you had yesterday that you had with Mr.
20 Domb that lasted about an hour.
21      Who else was in the room?
22 A   No one.
23 Q   Okay.
24      MR. DOMB:  Can we take a break for a
25 second?

1  lifetime membership thing. That'd be
2  okay.
3       THE WITNESS:  But you are too young.
4       MR. KELLOGG:  Ed's not.
5       MR. SHEPPARD:  Ed still has to do 12
6  hours a year.
7  BY MR. KELLOGG:
8  Q   You have, I think, in your new June 18
9  letter 2004 that you have not completed the
10 requirements under the continuing education program
11 of the Appraisal Institute?
12      MR. DOMB:  What part are you
13 referring to?
14 BY MR. KELLOGG:
15 Q   Sorry. This is page two attached to your
16 June 18, 2004, letter. All the way to the bottom.
17 And it says appraiser's certification.
18 A   Oh, one of my initial conversations with
19 Mr. Domb beyond discussing this letter, he also
20 wanted a copy of my qualifications and I sent him a
21 current copy that has that change in it.
22 Q   Okay.
23 A   But when I did the job initially, I
24 couldn't say that. I said I have continuing
25 education requirements.

1       MR. KELLOGG:  Sure.
2       (THEREUPON, THERE WAS A DISCUSSION
3       OFF THE RECORD.)
4  A   There was two people. It was Mr. Domb and
5  Jonathan Boman. I made a mistake.
6  BY MR. KELLOGG:
7  Q   Okay. And you talked about -- the only
8  thing you seem to have testified so far at this
9  point is in that meeting that occurred yesterday you
10 talked about the appraiser certification.
11      What else did you talk about?
12      MR. DOMB:  Objection to the form.
13      I think there was a general comment
14 that we talked about the report generally.
15 He couldn't remember specifics.
16      But with that, go ahead and answer as
17 best you can.
18 A   It was a very general conversation
19 concerning the report and I guess probably were
20 concerned that I'm familiar enough with my old job
21 to be able to answer any questions intelligently.
22      And I told them the report speaks for
23 itself basically. That's basically it.
24 BY MR. KELLOGG:
25 Q   Okay. All right. Have you reviewed

29

1  anybody else's reports that have been prepared in
2  this case?
3      A   No.  I'm not aware of any.
4      Q   Okay.  Are you familiar with
5  Mr. Schachter?
6          Is that how you --
7              MR. DOMB:  Schachter.
8  BY MR. KELLOGG:
9      Q   Mr. Schachter that has been designated in
10 this case?
11     A   No.
12         Where is he from?
13             MR. KELLOGG:  Where is he from?
14             Is he local?
15             MR. DOMB:  I'm not sure.  I don't
16         know where he resides, but he spends time
17         in Connecticut and New York City.
18 BY MR. KELLOGG:
19     Q   So you've never met him?
20     A   I don't think so.
21     Q   And you've never read any of his reports?
22     A   I don't think so.
23     Q   What about Mr. Shapiro?
24     A   Doesn't ring a bell with me.  I know all
25 the local appraisers over the years.  Most of them.

30

1  Especially from the state of Connecticut.
2      Q   What about Mr. O'Sullivan?
3      A   That doesn't ring a bell either.
4      Q   All right.  So if I take a look at your
5  report, Mr. Shawah, I'm going to turn to the June 3,
6  1997, page.
7              MR. DOMB:  It's -- right after the
8          title page, Mr. Kellogg?
9              MR. KELLOGG:  Yes.
10             MR. DOMB:  Okay.
11             MR. KELLOGG:  Hold on a second.  Got
12         to turn off my cell phone.
13             MR. DOMB:  Go right ahead.
14 BY MR. KELLOGG:
15     Q   It appears you were making three opinions.
16         Is that correct?
17     A   That's right.
18     Q   The first opinion is the market value of
19 1.77 acres of land was 530,000?
20     A   That's correct.
21     Q   The second opinion is a rental value of
22 the same land of 53,000?
23     A   Yes.
24     Q   And the third opinion is the rental value
25 of the first floor of the terminal building, the

31

1  building we're in right now --
2      A   Correct.
3      Q   -- for 30,000.
4          Do you have any other opinions that you
5  are expressing at this time?
6      A   Only what's contained in this report.
7      Q   These are the only opinions that you are
8  going to be testifying at trial?
9      A   That's right.
10     Q   You haven't been asked to do anything
11 else?
12     A   No, sir.
13     Q   Okay.  Just a quick question here, I
14 notice that you don't have a market value of the
15 terminal building itself.
16         And why is that?
17     A   I wasn't asked to.
18     Q   All right.  So you were given specific
19 instructions as to what you were to appraise?
20     A   Same as any appraisal assignments,
21 specific things that are going to be covered in my
22 report.
23     Q   Okay.
24     A   Those are the three items.
25     Q   You would agree, though, that this

32

1  building has some sort of market value?
2      A   Yes.
3      Q   And that that market value is not
4  expressed in your opinions right here?
5      A   That's right.
6      Q   Okay.  Now, I want to turn back to your
7  June 18th letter.
8      A   Okay.
9      Q   In the very first paragraph, the second
10 sentence you write, "This letter will confirm that
11 my conclusions as to value dated February 1, 1997,
12 were correct and remain unchanged."
13         Do you see that?
14     A   Yes, I do.
15     Q   So are you saying that your appraisal is
16 only for the value -- the value of the land back in
17 1997?
18     A   No.  I'm saying that the -- yeah.  The --
19         (THEREUPON, THE COURT REPORTER
20         REQUESTS CLARIFICATION.)
21     A   I'm confirming the fact that my valuations
22 in the 1997 appraisal still remain unchanged as far
23 as that date is concerned.
24 BY MR. KELLOGG:
25     Q   As far as that date is concerned?

33

1    A    That's right.
2    Q    So you are not saying that the value of --
3  let me go back to your words here.  You are not
4  saying that the market value of 1.7 acres of land
5  today is 530,000?
6    A    No, I'm not.
7    Q    And you are not saying that the rental
8  value of 1.77 acres of land is 53,000 as of today?
9    A    No.
10    Q    And you are not saying that the rental
11  value of the first floor as of today is 34,000?
12    A    No, I'm not.
13    Q    Is it fair to say that you don't know what
14  those values are as of today?
15    A    I have given it no consideration.
16    Q    You've done no appraisal, a current
17  appraisal --
18    A    That's correct.
19    Q    -- of these three items?
20    A    That's correct.
21    Q    All right.  What I'd like you to do before
22  we get into the specifics of your June 3rd report,
23  June 3rd, 1997, report, I want you to kind of walk
24  me through how you actually do an appraisal.  I
25  mean, the various steps, the things you look at

34

1  before you reach a final conclusion.
2    A    You evaluate the specific appraisal
3  problem and that determines what approaches to value
4  you are going to use.
5    Q    Okay.
6    A    There are three classic approaches to any
7  appraisal.  The market approach which is current
8  sales data if you can find it; the income approach;
9  and the third would be the cost approach.
10        Now, in this case, market approach, the
11  value is the key for the value of the land.
12    Q    Okay.  So you've -- let me make sure I
13  follow you so far.  One, you are going to identify
14  what is to be appraised?
15    A    That's correct.
16    Q    I think you called that you got to know
17  what the problem is?
18    A    Correct.
19    Q    So you are trying to identify what needs
20  to be appraised?
21    A    Correct.
22    Q    How do you do that?
23    A    Many things come into play.  One of the
24  things that come into play is what is the purpose of
25  the appraisal.

35

1    Q    Okay.
2    A    And that comes into play.  And what is
3  involved physically.
4        Are there any leases that have to be taken
5  into consideration?  Is the cost approach going to
6  be a valid factor?
7        If it's an old property and nothing around
8  it, no sites available, obviously the cost approach
9  wouldn't be a valid indicator.  If there's a
10  long-term lease then it's conceivable there could be
11  leasehold interest which could have a negative
12  effect on value.
13        So every one -- every appraisal problem is
14  different, but depending on what is the problem.
15    Q    Once you have determined the problem -- I
16  guess whenever you say determine the problem, you
17  are really looking at what with respect to the land?
18        You are looking at what encumbrances are
19  there.
20        What else?
21    A    Well, if it's just vacant land, it's
22  relatively simple.  You would only be concerned
23  about any environmental conditions which may exist
24  or any easement or any other problems.  Aside from
25  that it would be a straight, relatively simple job

36

1  to find comparable sales which is the best indicator
2  and arrive at a value.
3        If there are buildings on it, there again,
4  is a building the highest best use or should it be
5  converted to something else, should it be
6  demolished?
7        All these are factors that you have to
8  take into consideration.
9    Q    Would another factor be what your
10  instructions are, what the client wants you to do?
11    A    Well, the client tells me what he needs
12  the appraisal for.  In other words, most cases they
13  need it for financing or they need it because they
14  are appealing the taxes or there's a divorce case or
15  etc.  And based on that information I'll make a
16  determination as to what approaches to values I'll
17  use.
18    Q    But in this case, back in 1997 for this
19  case, you didn't do a market value of this building
20  itself?
21    A    No, sir.
22    Q    Is that because you weren't asked to?
23    A    That's right.  It wasn't part of the
24  appraisal problem.
25    Q    Why is that?

37

```
1    A    Because they told me exactly what they
2  needed.
3    Q    So in our case, this is a situation where
4  they came to you and they said we need you to do A,
5  B and C only?
6    A    That's right.
7    Q    And that's what you did?
8    A    That's right.
9    Q    And you didn't do anything extra that they
10 didn't ask you to do?
11   A    No.
12   Q    Okay.  So you define the problem and then
13 you determine the approach I think is what you said?
14   A    That's right.
15   Q    And then you list all three approaches:  A
16 market approach, an income approach and a cost
17 approach?
18   A    That's right.
19   Q    Can you -- you know, I'm not an appraiser,
20 so can you kind of fill me in on what all those are?
21   A    Very simply the cost approach basically
22 is --
23   Q    You are on the cost approach?
24   A    We'll start with that.  And basically the
25 market value of the land plus the replacement cost
```

38

```
1  of the building.
2        If it's an older building you have to take
3  into consideration depreciation, whether it be
4  functional, physical or economical depreciation.
5  Wide figures of land and sound value of the building
6  would be approached by the cost approach.
7    Q    Okay.
8    A    Normally that would represent the highest
9  value.
10   Q    Normally represents what?
11   A    Normally reflects the highest end of the
12 valuation scale.
13   Q    Okay.
14   A    All three approaches, 90 percent of the
15 time the cost approach is the highest figure.
16   Q    Can you explain that approach to me.  I
17 wasn't following you.
18   A    It's land value plus the depreciated value
19 of the improvements.
20   Q    Okay.  Why didn't you use that approach
21 here?
22   A    Because I wasn't concerned with the value
23 of the building.  My clients weren't concerned with
24 the value of the building.
25   Q    On a property like this, if you had not
```

39

```
1  been given instructions by your client what to do,
2  would you have normally utilized the cost approach
3  given the existence of a structure?
4    A    It's possible, but one problem would be a
5  difficulty of finding another site like this.  It's
6  a unique -- it's a unique property.
7    Q    I guess because there's two parts to this
8  equation.
9        Right?
10       The value of the land --
11   A    Correct.
12   Q    -- and then the value of the depreciation
13 of the improvements?
14   A    Correct.
15   Q    So ultimately if you do the cost approach
16 you've got to ultimately do the market approach
17 first.
18       Right?
19   A    Or land value.
20   Q    The land value.  Right.
21       You did that in this case, did you not?
22   A    I established that in this case.
23       MR. DOMB:  Hold on a second.
24       Would you please let Mr. Shawah
25 finish his answers?
```

40

```
1        I find that, sometimes, in the normal
2  course of conversation, you're cutting him
3  off.
4        MR. KELLOGG:  I think that's very
5  fair.  I have a bad habit of that.  So if
6  you see that, just feel free to interrupt
7  me at any time.  It's not a problem.
8        MR. DOMB:  Just try.
9        MR. KELLOGG:  I will.  I will.
10       MR. DOMB:  Okay.  Thanks.
11 BY MR. KELLOGG:
12   Q    So if you were not given instructions by
13 the client for this particular property that's
14 subject here, subject to this lawsuit, you think you
15 would have probably utilized the cost approach?
16       MR. DOMB:  Objection to the form.
17 It's been asked.
18       You may answer it again.
19   A    It's possible.  It's a unique scenario.
20 An office building down on the foot of the harbor.
21 I would have to give that some thought as to
22 whether I would use the replacement cost.
23 BY MR. KELLOGG:
24   Q    Would that have been a more accurate
25 assessment?
```

41

1   A   No.
2   Q   But you end up getting different results?
3   A   Right.
4   Q   Is there one that's more accurate than the
5   other?
6   A   It depends on the facts in place.  In this
7   case I don't think the replacement cost would be a
8   good indicator.
9   Q   Why is that?
10  A   Well, because it's a two-story office
11  building located in a heavy industrial zone in the
12  foot of the harbor.  It's not a typical office
13  building location.
14      The question comes into play is we would
15  call economic obsolescence.  How does the
16  environment and location affect the value of the
17  building?
18  Q   It's something you would have considered?
19  A   Probably would have considered it.
20      MR. DOMB:  Off the record.
21      (THEREUPON, THERE WAS A DISCUSSION
22      OFF THE RECORD.)
23  BY MR. KELLOGG:
24  Q   So just to summarize, the cost approach is
25  the fair market value of the land plus the

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

42

1   depreciated value of the improvements?
2   A   That's right.
3   Q   Okay.  How do you find the land value?
4   A   Usually comparable sales.
5       (THEREUPON, THE COURT REPORTER
6       REQUESTS CLARIFICATION.)
7   A   The market approach would be comparable
8   sales.  Comparable land sales would be the best
9   indicator of land value.
10  BY MR. KELLOGG:
11  Q   And that's what you did in this case?
12  A   That's right.
13  Q   Okay.  And what is the income approach?
14  A   Usually if there's an income stream being
15  projected you would derive what the net income is
16  and capitalize it with the prevailing rate of
17  interest.
18      If it's $10,000 of income, we use ten
19  percent value would be hundred thousand dollars of
20  market value.  Over simplified of course.
21  Q   Why didn't you use that approach here?
22  A   Because I wasn't appraising the building.
23  Q   Because you were told not to?
24      MR. DOMB:  Objection to the form.
25      It's been asked.

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

43

1           You may answer again.
2   A   The appraisal problem was rental values
3   first floor and market value of the land.
4   BY MR. KELLOGG:
5   Q   Okay.
6   A   That's what I did.
7   Q   All right.  Now, in your opinion, would
8   the income approach yield a higher value than the
9   market approach?
10  A   I couldn't say because I didn't do a
11  market approach on the property.
12      MR. DOMB:  You mean an income
13      approach?
14  A   I didn't do an income approach on the
15  property.
16  BY MR. KELLOGG:
17  Q   Let's go back to the gas station that you
18  just appraised.  What approach did you take there?
19  A   Sales market data approach.
20  Q   Was that an income approach?
21  A   No.
22  Q   What's that?
23  A   Comparable sales.
24  Q   Comparable sales?
25  A   The market approach is comparable sales.

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

44

1   Q   Okay.  Gotcha.
2       Now, have you done appraisals before where
3   you utilized all three?
4   A   Oh, yes.
5   Q   Generally, does the income approach tend
6   to be more than the market approach or have you ever
7   formed an opinion on that?
8   A   It varies from case to case.  If there's a
9   favorable lease, there's a landlord's lease who is
10  getting top dollar, say, over time.  And that's
11  going to have an impact on value.
12      The opposite story is if the lessee has a
13  favorable lease it's going to have a negative impact
14  on value.  If there's no lease then you're going to
15  try to establish what that value is.  So it varies
16  from case to case.
17  Q   And the final one is the market approach.
18  And, just for the record, what is that again?
19  A   Comparable sales.
20  Q   And how do you find comparable sales?
21  A   You try to find property with some
22  similarity.  Size, zoning, amenities.
23  Q   Within what geographic region does it need
24  to be?
25  A   Well, the closer so the subject the

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

45

1  better.
2      Q    Have you had to do appraisals in the past
3  where you looked at properties in other states?
4      A    No.
5      Q    Why is that?
6      A    Why is that?
7      Q    Yeah.  Why have you never looked at
8  properties in other states?
9      A    Because I think it's -- it's extremely
10  difficult to compare one property to another in your
11  own neighborhood, but to try to compare it with a
12  different state it would be extremely difficult.
13      Q    Okay.
14      A    In fact, in this area appraising property
15  in Bridgeport and using sales in Fairfield would be
16  bad news because the area is completely different
17  than Bridgeport.
18      Q    Is there any way of factoring in those
19  differences, though?
20      A    The most important thing is the judgment
21  of the appraiser as he compares one property with
22  another.
23      Q    Right.  I guess what I'm saying is can you
24  as an appraiser ever take a look at a property here
25  and take a look at a similar property down in

46

1  Fairfield and then adjust it for any other economic
2  factors that seem reasonable?
3      A    It would be very difficult to adjust a
4  property for location.  Post Road, Fairfield,
5  location comparing with State Street location would
6  be extremely difficult.
7      Q    What if you have a hard time finding
8  comparable sales, comparable properties?
9      A    Then you may have to look -- you might
10  have to give most weight to the income approach or
11  you use the strongest indicators that you can find.
12      Q    So is it fair to say that if you can't
13  find comparable sales or comparable properties that
14  you go to the next method of valuation?
15      A    In most cases I would.  If I didn't have
16  any market data I would have to rely on another
17  approach.
18      Q    All right.  Do you -- is there anything
19  else that you do whenever you are preparing your
20  appraisal other than identifying the problem what
21  needs to be appraised and then determining the
22  approach that you use?
23      A    You check -- you check a lot of other
24  information such as tax assessments, taxes.  Zoning
25  is a factor.  What utilities are available is a

47

1  factor.
2      Q    Do you interview people?
3      A    Rarely.  On occasion we may interview an
4  owner or a property manager on a large complex.
5      Q    Did you interview anybody for this
6  appraisal?
7      A    No, I did not.
8      Q    But you did speak with Mr. Hall?
9      A    I believe he was at a meeting when we
10  first -- when I first got involved.  I don't
11  remember the conversations at all, but I know he was
12  here.
13      Q    And when you were at those meetings you
14  take notes?
15      A    On occasion I take notes.  Not as detailed
16  as you do.
17      Q    Sure.  And those notes would be in your
18  file?
19      A    That's right if I took them.
20      Q    All right.  I'm going to go into detail
21  now on your 1997 report.
22          MR. KELLOGG:  So we have been going
23      for about an hour.  Does anybody want to
24      take a five-minute break?
25          THE WITNESS:  I'm okay.

48

1          MR. KELLOGG:  Well, I'll take a
2      five-minute break.
3          (THEREUPON, THERE WAS A RECESS
4          TAKEN.)
5          (THEREUPON, MR. ROSE LEFT THE
6          DEPOSITION.)
7  BY MR. KELLOGG:
8      Q    All right.  The first thing I want to do,
9  Mr. Shawah, is go to the definition of market value
10  that you have in your report.  I think it's Section
11  6.
12      A    Okay.
13      Q    Now, where do you get this definition of
14  market value?
15      A    That's a standard from the Appraisal
16  Institute.  That's a standard textbook definition.
17      Q    Okay.  And is the definition you've always
18  used whenever determining market value?
19      A    Yes.
20      Q    This definition hasn't changed over the
21  years?
22      A    It may have slightly, but it's basically
23  the same.
24      Q    And on the next page you have highest and
25  best use?

49

1    A    Yup.
2    Q    And that comes from the dictionary of real
3 estate appraisal?
4    A    I think I cited that. That's right. Yes.
5    Q    So is that something different?
6    A    No. Same thing, same definition of market
7 value would be.
8    Q    What's the difference between highest and
9 best use and market value?
10        How do those two relate?
11    A    Usually the highest value is usually the
12 optimum. The highest and best use reflects market
13 value.
14    Q    So are they similar, is that what you are
15 saying?
16    A    No. Market value is what a willing buyer
17 and willing seller will exchange for, but highest
18 and best use is usually reflected in the market
19 value.
20        In other words, if it was a prime corner
21 location which would be a Burger King or a Wendy's
22 would probably be optimum use. That would reflect
23 the highest market value. Some other secondary use,
24 a pawn shop or something, the value would be much
25 lower.

50

1    Q    Okay.
2    A    So there's a direct relationship between
3 highest and best use and market value.
4    Q    So if I understand you highest and best
5 use is really a component of the definition of
6 market value.
7    A    Yes. I would say yes.
8    Q    Okay. And we'll talk about those
9 definitions in detail a little later.
10        The first place I wanted to go to is your
11 Section 11, site data.
12    A    Okay. All right.
13    Q    All right. And then at the very bottom
14 the last paragraph you write, "The triangular shape
15 and easements severely restrict the development
16 potential of this site."
17    A    That's right.
18    Q    Can you flush that out for us a little
19 bit?
20    A    Well, the maps which you have as part of
21 your reports shows the easement extending the full
22 length of the site and also another easement along
23 the water site.
24        So that anyone other than the ferry people
25 would have difficulty getting maximum utilization of

51

1 this property.
2    Q    And what is the easement for?
3    A    I think both U.I. easements. Power lines,
4 I think. I'm not sure.
5    Q    Oh, they're power lines.
6        Are they laid underneath there already?
7    A    I'm not sure. I may have copies of those
8 easements, but I know they are there. And they
9 impact the use of the development of the site.
10    Q    Do you know if these easements have ever
11 been used by -- what's the name --
12    A    United Illuminating Company.
13    Q    Okay.
14    A    I don't know that.
15    Q    You don't know?
16    A    No.
17    Q    Okay. And what is it about the triangular
18 shape that restricts the potential development of
19 this site?
20    A    Well, any long, narrow site is going to be
21 not as flexible as a rectangular site. It's a
22 simple mathematics. It's long and narrow which
23 limits the use.
24    Q    Okay. What did you -- did you consider
25 what types of other uses this could have other than

52

1 what it's currently being used for?
2    A    Well, I felt, and I so stated, the highest
3 and best use is the existing use is the optimum use.
4    Q    Okay. We'll get to that in just a second.
5        Let's go to Section 12 where you look at
6 land value.
7        Back in 1997 you stated that -- this is in
8 the first paragraph of Section 12 -- that waterfront
9 sales are limited in the entire Connecticut area?
10    A    That's true.
11    Q    Were you talking about the entire state of
12 Connecticut?
13    A    Well, the shoreline. Yeah.
14    Q    Yeah?
15    A    Very few sales.
16    Q    And you note three in your report land
17 offering one, land sale number two and land sale
18 number three. Were these the only three --
19    A    That's right.
20    Q    -- that were available at the time to
21 review?
22    A    That's right. That's right. It's very,
23 very difficult to find waterfront sites.
24    Q    All right. The land offering number one
25 has a total land area of three point--

53

```
1          (THERUPON, THE COURT REPORTER
2          REQUESTS CLARIFICATION.)
3   BY MR. KELLOGG:
4       Q    -- two two as you say in your report.
5            Is that correct?
6       A    That's right.
7       Q    How did you determine that?
8       A    Determine what, the area?
9       Q    Yeah.  How did you investigate -- let me
10  back up --
11      A    That was the active offering.  There was a
12  broker that was offering this property for sale.
13  And I simply called them -- in fact, many times they
14  sent me mailings because we are brokers also.
15           So I have it on an offering sheet
16  somewheres or I know the broker and I call the
17  broker and get the information.  Basic size, no
18  problem.
19      Q    Okay.  And did that 3.224 acres include
20  the land that housed the structure?
21      A    Yes.  The entire site.
22      Q    Okay.  And you've got here that the asking
23  price is three million?
24      A    Uh-huh.
25      Q    Do you know if they sold that?
```

54

```
1       A    They did not sell it.
2       Q    Is it still for sale?
3       A    I understand talking to a broker yesterday
4   the owner would still be interested in selling it.
5   It was an overpriced listing at that time which
6   was --
7       Q    Okay.  What did you think --
8            MR. DOMB:  Wait a minute.  Please let
9            him -- I think he was in the middle of his
10           answer.
11  BY MR. KELLOGG:
12      Q    Okay.  Go ahead.
13           It was an overpriced listing at that time.
14      A    It's seven years ago and by the -- and it
15  hasn't been sold which seems to bear out my feeling
16  about the property.  As I understand it, talking to
17  the broker, the owner would still be interested in
18  selling the site.  It's never changed hands.
19      Q    Okay.  Now, since this wasn't a sale, this
20  land offering number one, is that something that you
21  could actually look at for comparison purposes?
22      A    Well, you can.  How much weight you give
23  to it depends on the circumstances.  In this
24  particular case I gave very little weight to it as I
25  stated.
```

55

```
1       Q    Okay.
2       A    When a property has been sitting on the
3   market for a long, long time, you have to look at it
4   twice.
5       Q    All right.  So whenever -- and, generally
6   speaking, not necessarily talking about land
7   offering number one, but, generally, whenever you
8   are doing an appraisal and you are looking at
9   comparable sites, how do you value one that is
10  currently for sale when you are trying to compare it
11  to the current site?
12           What process do you go through?
13      A    Well, you look at each site and try to --
14  first, if it's land usually you look at it on a per
15  square foot basis.  And you've got your two or three
16  sales.
17           You are going to give more weight to the
18  actual sales than the offering typically when the
19  sales are relatively current.  But because it is on
20  the market you should be aware of it and give it
21  some consideration.
22      Q    I guess my question, and maybe I didn't
23  ask the right question.
24           What I'm wanting to know is whenever you
25  have, for example, this property that's for sale or
```

56

```
1   this property that you are appraising, the subject
2   property, and then you look at two or three other
3   properties out there for comparison, and one of
4   them, it's not a sale but it's for sale.
5            How do you determine the value of that
6   property -- the one that's for sale?
7       A    Initially you take the offering price and
8   see how it compares with the sales that you have.
9       Q    Okay.  And so in this case for land
10  offering one, the asking price was three million?
11      A    That's right.
12      Q    Or 930,000 per acre?
13      A    Yeah.
14      Q    Now, in this particular case for land
15  offering number one, did you compare it to other
16  sales to see if that three million figure was a good
17  approximation of the value?
18      A    I only had two other sales to compare with
19  and those are cited in the report.
20      Q    Okay.  So is that a no, you didn't compare
21  it to --
22           MR. DOMB:  Objection to the form.
23           I think he said he had two sales that
24           are mentioned in the report.
25           MR. KELLOGG:  Right.  I was just
```

57

1   asking, though --
2        MR. DOMB:   What's the question? I've
3   lost you, then.
4        MR. KELLOGG:   The question was
5   because he has an asking price here of
6   $3 million for land offering number one.
7        He did state he would try to compare
8   that to other sales to see if that was a
9   legitimate figure or a reasonable figure.
10  BY MR. KELLOGG:
11       Q    And I'm asking if that's what you did
12  whenever analyzing land offering number one in your
13  report.
14       A    Well, my opinion of this offering is that
15  the asking price is very high and I cited for
16  information because it has waterfront property. But
17  I gave very little weight in comparison.
18       Q    Okay. Then you in your report here in
19  land offering number one you mention a five-year
20  lease that was never executed?
21       A    That's right.
22       Q    What can you tell us about that?
23       A    Well, I know very little other than the
24  broker involved at the time told me they reached an
25  agreement and the lease was drawn and prepared at

58

1   that figure, but for some reason it was never
2   executed.
3        Q    Okay.
4        A    I suspect, I'm not sure, but I suspect
5   there are some environmental problems on that site.
6        Q    Did you ever get a copy of the lease?
7        A    No.
8        Q    And you don't know the terms other than --
9        A    No. I know very little about it.
10       Q    I guess what confuses me is you use an
11  average rental of $84,000 a year and I guess I don't
12  understand what you mean by average rental.
13       A    Well, that's the rental value I allocated.
14  It could be started out lesser figure and ended up
15  with a higher figure, but the overall average or it
16  could be a straight $84,000 a year.
17       Q    You just don't recall?
18       A    No.
19       Q    Okay. Then how did you come up with the
20  $260,000 per acre figure that you ultimately
21  attributed to land offering number one?
22       A    I used the $84,000 a year rental value and
23  the ten percent overall cap rate. And then I
24  divided -- then I divided by the 3.224 and you come
25  up with $260,000 land value.

59

1        Q    Is that something you normally do whenever
2   you are trying to do comparable sales data?
3        A    It depends on what information is
4   available. In this case it was an offering and I
5   knew the offering price at over $20 a foot was
6   outrageous. So I tried to arrive at a more
7   realistic value.
8        And I used that known fact which was a
9   proposed lease and using that I arrived at a figure
10  of $6 per square foot. So that was the thinking
11  behind that, but it varies from site to site
12  depending what information you have and what the
13  problem is.
14       Q    Was there ongoing business on this site?
15       A    Many years ago. At that point it was
16  vacant. Sat idle.
17       Q    It was vacant.
18       A    It was a tank farm.
19            (THEREUPON, THE COURT REPORTER
20            REQUESTS CLARIFICATION.)
21       A    Texaco, I think.
22  BY MR. KELLOGG:
23       Q    Hence the environmental problems?
24       A    That's why I suspected. You have to read
25  between the lines. The property is sitting there

60

1   for seven years. It hasn't sold. You gotta suspect
2   something particularly when sites like this are hard
3   to come by.
4        Q    Nobody wants that liability, do they?
5        A    That's right.
6        Q    Okay. All right. How often do you use
7   this ten percent cap rate to try to value a piece of
8   property when there's already an asking price?
9        A    It depends on the circumstances. It could
10  be 8 percent cap rate. It could be 12 or 14 percent
11  depending on. This particular case I had
12  information that indicated that land rentals were
13  pretty much around 10 percent and that's way I used
14  that as a cap rate.
15       Or if it was a building that was maybe at
16  that time some apartment houses were selling 12 or
17  13 or 14 percent. Or some blue chip strip centers
18  were selling at 18 percent. So it depends on the
19  market and the inclusions that your appraiser is
20  going to take and the specifics of the site.
21       Q    Where did you get the 10 percent in this
22  case?
23       A    In that case, as I stated before, I
24  understood that some of the fellows dealing with the
25  state, DOT, Department of Transportation, was paying

61

1  approximately 10 percent for land equity on
2  short-term rentals where they needed to store stuff
3  on the site. So that was a known figure to me. Ten
4  percent.
5       And I also had indication where the dog
6  pound kennels was on a lease land site and that was
7  about ten percent. So that was two good indicators
8  supporting my conclusion.
9       Q   Is that all in your file, that
10 information?
11      A   I don't think so. The only thing in my
12 file is in this report. Because I didn't get
13 anything in writing from anyone. This is based on
14 my talking to people. Bird dogging and things.
15      Q   So you would have interviewed people with
16 respect to getting this ten percent rate?
17      A   Yup. And I looked around. For instance,
18 I spoke to a broker yesterday about this site number
19 one. And I lost track of it and he confirmed that
20 the property was still available.
21      If I hadn't made that phone call. I've
22 been around long enough so I know a lot of people.
23 And ferreting out information is part of the job.
24      Q   Did he tell you what the value of the land
25 is now by any chance?

63

1  five years earlier in 1992?
2       A   That's right.
3       Q   Okay. And the sale was for an amount of
4  $5,000, but then they also took over the -- they
5  assumed the mortgages?
6       A   Yeah. They bought all the paper.
7       Q   And the outstanding mortgages was a little
8  over a million dollars?
9       A   That's right.
10      Q   So is the mortgage itself a fair
11 reflection of the market value?
12      A   I would say yes. This particular buyer is
13 a sophisticated buyer. There were no other sites
14 available. He was a budding owner and that's what
15 he ended up paying.
16      Q   Okay. I mean, was this -- I noticed in
17 here, for example, in your definition of market
18 value that the price is not affected by undue
19 stimulus. Your definition of market value?
20      A   That's true.
21      Q   Would somebody who is asking -- would a
22 seller who is asking a buyer to simply assume the
23 mortgage -- okay? -- is that something that's an
24 undue stimulus?
25      Is that an undue stimulus in that

62

1       A   No. He did not.
2       Q   What do you think it is or do you know?
3       A   I would state that -- yes, I wouldn't even
4  hesitate. There's three acres there. I would be
5  afraid -- the last sale has been coming down is the
6  Carpenter steel site and that was much larger than
7  that waterfront property. But I would think seven,
8  eight dollars a foot.
9       Q   What did you say it was, the copper what?
10 Sales property or you just mentioned another sales
11 property that just occurred?
12      A   Carpenter steel site.
13      Q   Carpenter steel site.
14      A   That's one of the few current sales on the
15 water, but it's about 30 some odd acres.
16      Q   Is that riverfront property?
17      A   Right on the Sound.
18      Q   Okay. How much did that go for per acre?
19      A   I don't know. The Port Authority bought
20 the property and they leased part of it to the
21 Derecktor Shipyards.
22      Q   Okay.
23      A   But I don't remember how much it was.
24      Q   Okay. All right. Let's go to land sale
25 number two. This is a sale that occurred I guess

64

1  equation?
2       A   In this case he didn't assume the
3  mortgage. He bought them all. He didn't ask
4  anybody for anything. He put money on a barrel head
5  and bought all the paper.
6       That's a tough way to acquire a piece of
7  property, but when there's limited amount of
8  waterfront property you do what you have to do.
9       Q   Would you consider this land sale number
10 two to be somewhat affected by an undue stimulus?
11      A   I would think that it would -- it's kind
12 of hard to say. I don't know how many owners would
13 go through what O&G did, buy up all the existing
14 notes on the property to acquire it.
15      Q   Well, would there be some undue stimulus
16 on a seller I guess is what I'm asking to try to get
17 rid of the property?
18      A   Yeah. The seller in this case, I didn't
19 think he had any choice.
20      Q   Yeah. Why is that?
21      MR. DOMBS  Had any what?
22      A   No choice. The lenders had acquired all
23 the paper on it.
24 BY MR. KELLOGG:
25      Q   Sure. Okay. So is this a situation in

65

1  which the buyer and seller are typically motivated?
2      A   No.
3      Q   Okay.  Let's go to land sale number three.
4  There you state that this is the former Silco
5  terminal?
6      A   Yeah.  Right across the way.
7      Q   And they were faced with bankruptcy and
8  foreclosure?
9      A   Yeah.
10     Q   And that was the reason for the sale?
11     A   That's right.
12     Q   So, again, I'm going to ask you about the
13  definition of the market value.  Was the price of
14  that sale affected by an undue stimulus?
15     A   It could have been.  It could be.  But
16  here again, the local bank, People's Bank which gave
17  the Teamsters the financing was a major element of
18  this deal.
19     Q   Sure.
20     A   And I think they wanted to keep the
21  industry here and keep the port operating so they
22  supported the Teamsters in the sale.
23     Q   Okay.
24     A   How much of a factor I couldn't -- if
25  there were more sales activity, it could make it.

66

1  But the market was so thin and those are the three
2  sales I had.
3      Q   Sure.
4      A   That every one --
5      Q   Oh, I understand.
6          MR. DOMB:  Hold it.  Hold it.  Let
7  him finish.
8      A   How much of a factor the financial status
9  of the seller it may have had a slight impact on
10  that.
11  BY MR. KELLOGG:
12     Q   Okay.  So, in other words, in this
13  particular case, this was not a situation in which
14  the buyer and seller are typically motivated?
15     A   That's correct.
16     Q   And that would have an impact on the sales
17  price?
18     A   It could have.
19     Q   Okay.  So is it fair to say, Mr. Shawah,
20  that at least with respect to land sale number two
21  and land sale number three that the prices reflected
22  there may not represent a true market value?
23     A   Well, I don't -- I wouldn't make that
24  statement.  I wouldn't agree with that statement.
25  The normal circumstances, yes, but in these

67

1  circumstances they are two one-of-a-kind properties
2  and there's a definite market for them.
3      Q   Okay.  Well, I'm just simply going by your
4  definition of market value.
5      A   Well, I understand.  It's not a textbook
6  scenario.  Neither sale is a textbook scenario.
7  Both cases they involve a seller who is in financial
8  difficulty which is the part you're trying to break
9  out.
10     Q   Sure.
11     A   But because of the characteristics of the
12  property, I don't think the stigma was as bad.
13  People wanted the site.  So it would be hard for me
14  to say how much of an impact it had, the financial
15  situation of the seller.
16     Q   That's something you didn't take into
17  consideration?
18     A   I gave no special consideration for it.
19     Q   Okay.  Now I want to go to page eight of
20  your report.  Before I do that back to land sale
21  number three.  You made a number of adjustments
22  there.
23     A   That's right.
24     Q   How did you arrive at those figures --
25  well, let me back up.

68

1      You state in the middle of that paragraph,
2  "In order to arrive at a unit sale price for the
3  main parcel of land your appraiser," that's you,
4  "allocated a value of 500,000 for the eight extra
5  lots across the street from the terminal."
6      A   That's right.
7      Q   How did you come up with that figure?
8      A   Basically my knowledge of the marketplace.
9  I estimated that's what those lots would sell
10  for.
11     Q   How big were those lots?
12     A   Not very big.  I remember I have the
13  footage here.
14     No.  I don't have the footage here.  They
15  weren't very large lots.
16     Q   Combined would they be what, an acre?
17     A   I would say probably both.
18     Q   And that's five hundred thousand for all
19  eight?
20     A   Yeah.
21     Q   Okay.  And just based upon --
22     A   My knowledge of the marketplace.
23     Q   And did you do any special -- did you --
24     A   No.
25     Q   Did you look at any other properties?

69

```
 1     A    No.
 2     Q    It's just --
 3     A    That's right.
 4     Q    Is there anything on the lots?
 5     A    There wasn't at the time.
 6     Q    Were those waterfront lots?
 7     A    No.  They are across the street.
 8     Q    And then you assigned a value of 750,000
 9  for the warehouse?
10     A    Yup.
11     Q    How did you come up with that?
12     A    Well, these are metal buildings.  And I
13  allocated a depreciated value.  I think at the time
14  maybe the replacement costs of those metal buildings
15  maybe 15 or 18 dollars a foot, I took and
16  depreciated what I thought was a conservative figure
17  of six dollars.
18     Q    Okay.  And then 700,000 for the 700 lineal
19  feet of concrete bulkhead.  Thousand bucks per foot.
20           How did you come up with that?
21     A    That's -- that's the -- they call it the
22  Marshall & Stevens.  Marshall valuation data.
23  That's pretty much the figure they allocated for
24  bulkhead.
25     Q    I'm sorry, what's the name of that?
```

70

```
 1     A    Marshall.  It's an industry standard.
 2  Marshall Valuation.
 3     Q    Why were you trying to remove these
 4  additions from your overall equation of --
 5     A    Because I was comparing it with a property
 6  that didn't have it.
 7     Q    Okay.
 8     A    That's why.
 9     Q    Well, I guess would it be fair to say you
10  were comparing it to a property as you were
11  instructed to evaluate or appraise?
12     A    No.
13           MR. DOMB:  Objection to the form.
14     A    No.  That's not correct.  They didn't
15  instruct me to valuate that sale that way.  I'm
16  trying to -- there's so few sales when the -- the
17  optimum would be to have three or four nice clean
18  land sitting on water edge.
19           You can't find it.  Every one has peculiar
20  problems to it.  And you try to adjust each one so
21  it has some similarity with the subject.  In this
22  case I deducted for the 700 lineal feet of bulkhead
23  and for the buildings and the spare lots.
24           The bulkhead was based on a replacement
25  cost of Marshall Valuation Service.  And then I come
```

71

```
 1  up with the value of the land itself without any
 2  improvements on it.
 3  BY MR. KELLOGG:
 4     Q    All right.  Did you ever consider going to
 5  a different appraisal method given the limited data
 6  you had in the market?
 7     A    There's no other methods I could use.
 8     Q    Earlier we talked about two other methods.
 9     A    Well --
10     Q    An income approach and a cost approach.
11     A    The cost approach.
12           The cost approach, here again I have to
13  arrive at land value.
14     Q    Right.
15     A    See, we are back at the same boat again.
16  And income, there is no credible income stream other
17  than what I allocate for the first floor.
18           So, here again, it would be based upon
19  hypothetical rentals and leases.  So I felt the
20  strongest approach was the one I used.
21     Q    Now, on the income approach, though, you
22  wouldn't take into consideration the tariff that
23  they charge or anything like that?
24     A    I had no knowledge of anything.  If I was
25  to appraise the building I had no -- no basis to use
```

72

```
 1  anything like that.
 2           If you had generated an income stream for
 3  several years where it's relatively stable, it's
 4  conceivable you could make adjustments, but I did
 5  not do that.
 6     Q    I guess what I'm asking is you are aware
 7  that they charge the ferry company certain tariffs,
 8  the port does?
 9     A    What I read in the paper, that's what the
10  litigation is about.
11     Q    If you had done, I guess, an income
12  valuation you would have taken that into
13  consideration?
14     A    Well --
15           MR. DOMB:  Objection to the form.
16     A    I don't think so because unless there had
17  to be something -- unless we made the assumption
18  that that was a stable, relatively permanent income
19  stream perhaps you could.  But that would be making
20  some assumptions that I couldn't support.
21  BY MR. KELLOGG:
22     Q    Okay.  Now, you state in your report on
23  page eight that you, first of all, gave the most
24  weight to land sale number three.
25     A    That's right.
```

73

```
1        Q    In fact, based upon your calculations you
2   gave it all the weight?
3        A    Yup.
4        Q    And then you have what you call a negative
5   adjustment?
6        A    That's right.
7        Q    By 33 and a third percent?
8        A    Yup.
9        Q    How did you arrive at the 33 and a third
10  percent adjustment?
11       A    Just as I say in my report, subjective
12  adjustments based on my experience over the 40-some
13  odd years in the Bridgeport area.  The subject
14  had --
15          (THEREUPON, THE COURT REPORTER
16          REQUESTS CLARIFICATION.)
17       A    The subject has 18 feet.  The sale number
18  three has 31 feet.  It's one of the few deep water
19  facilities in -- one of three deep water facilities
20  in Connecticut.
21          So there's a major adjustment I had to
22  make there besides of the bulkhead 700 linear feet.
23  So I gave each one of those considerations I came up
24  with an adjustment of 33 and a third percent.
25
```

74

```
1   BY MR. KELLOGG:
2        Q    So I guess to go a little bit further into
3   that, I mean, how do you factor in the differences
4   in the depth of the water?
5          Mathematically how do you do it?
6        A    There's no mathematical formula that I
7   could -- it was just my adjustment based on my
8   experience.  A subjective adjustment that a facility
9   with deep water capability that's considerably more
10  valuable than one with 18 lineal feet.
11         I think everyone will agree to that.  But
12  how I arrived at it, I can't tell you that other
13  than I made a subjective adjustment.  It was better.
14  And I felt a negative adjustment should be made.
15       Q    And what did you say about the bulkhead?
16       A    There was much more bulkhead.  There was
17  700 feet.  Here there were none at the time.  So I
18  took those two factors and also the long, narrow
19  shape of it.
20       Q    Hadn't you already taken out the bulkhead,
21  though, in your calculation of land sale number
22  three?
23       A    I took that in coming to the land value,
24  but here now I'm comparing sites.
25       Q    Well, in land sale number three you arrive
```

75

```
1   at $450,000 per acre?
2        A    Right.
3        Q    To arrive at that $405,000 per acre you
4   removed the value of that bulkhead from the total
5   value?
6        A    That's right.
7        Q    But now you are telling us that you are
8   essentially devaluing ours even further because of
9   the bulkhead issue.  It seems like you are devaluing
10  it twice?
11       A    Could be.
12       Q    Okay.
13       A    I think the more appropriate adjustment
14  would be -- the major adjustment would be the depth
15  at mean level water, the 31 feet would be a major
16  adjustment.  The other adjustments would be the
17  shape.
18          What did I say here?
19          Shape, easement and water.
20       Q    So, in other words, what you are saying is
21  that the bulkhead does not factor in --
22       A    That's right.
23       Q    -- to the negative adjustment?
24       A    That's right.
25       Q    Okay.  All right.  Since you've done this
```

76

```
1   report there's been some changes around here, has
2   there not?
3        A    Where are you referring to?
4        Q    Just in the immediate area is there a new
5   ballpark?
6        A    The arena and the stadium.
7        Q    Those are new since you've done your
8   report?
9        A    Yes.
10       Q    I guess there's a new access now --
11       A    Yup.
12       Q    -- to the port?
13       A    Yup.
14       Q    Okay.  Do these impact the current value
15  of the port property here?
16       A    If I appraised the property today these
17  are factors I would take into consideration.  I
18  don't know whether the arena or the ballpark would
19  be plus factors.  They may not be.  But certainly
20  eliminating the low underpass, the 10-foot 7-inch
21  underpass is a major accomplishment.
22       Q    Okay.  But one of the things in your
23  report, Section 10, you noted neighborhood data.
24       A    Yup.
25       Q    So would --
```

77

1    A    In general, there's an upgrading of the
2  neighborhood.
3    Q    Okay.  All right.  So if you are doing an
4  appraisal today all of these adjustments and
5  improvements would factor in?
6    A    That's right.
7    Q    Okay.  And are you aware that they are
8  planning on putting a new parking facility here in
9  the --
10    A    I read articles in the paper.
11    Q    And would that impact your analysis as
12  well?
13    A    Any factor, anything like that would be
14  taken into consideration.
15    Q    Okay.  All right.  On the rental value of
16  the land which is Section 13 of your deposition.
17        MR. DOMB:  You mean the report.
18        MR. KELLOGG:  I'm sorry.  Yes.  The
19    report.
20        MR. DOMB:  Page nine.
21  BY MR. KELLOGG:
22    Q    Is that the same ten percent cap figure
23  that we were talking about earlier?
24    A    Yes.  Yes.
25    Q    And you base that upon a couple of

79

1  from them in the short term.
2    Q    Okay.  So they were paying ten percent for
3  storage purposes?
4    A    Well, most of the times I understand they
5  are relatively short-term leases, whether storing
6  the supplies or for some other -- temporary change
7  of route or something.
8        But the thing that slipped my mind was
9  that the rentals were pretty much ten percent of
10  value, market value.
11    Q    So is that transaction similar to the type
12  of transaction that would occur on this type of
13  property?
14    A    No, I don't think so.
15    Q    Is it fair, then, to compare how the State
16  of Connecticut rents its property with how this
17  property could be leased?
18    A    Well, it's -- the only thing I compared is
19  with two sources.  Both sources, the state and a
20  private owner, both cases the rentals were based on
21  ten percent of market value.  So I figured that's
22  strong enough for me to use it in justifying this
23  report.
24    Q    The percentage of the lease, would it be
25  typically dependent upon what they are doing on that

78

1  properties that the State of Connecticut --
2    A    Well, I was -- my sources tell me that at
3  that time, the State of Connecticut was paying ten
4  percent on land rentals.  And also another source
5  told me that we had a dog track here on the east
6  side they would call.
7        They leased the size of a piece of land
8  for the dog kennels.  And I was told that that
9  rental was based on ten percent of value.  So those
10  two tidbits of information is how I arrived at --
11  because it's difficult to get that.
12    Q    So when you say the State of Connecticut
13  usually pays a land rental based on ten percent of
14  the market value, that's when the state is leasing
15  it from a private owner?
16    A    Yeah.  Usually a construction job, a
17  highway job they need land to store their materials
18  and store their equipment and so forth.  My sources
19  told me at that time seven years ago the state
20  typically paid ten percent for land rent.
21    Q    How were they determining what the value
22  of the land was to begin with?
23    A    They have appraisers.  In fact, usually
24  they condemn land outright.  But there are cases
25  when the owners wanted to sell and they rented it

80

1  particular property?
2    A    It depends on the strength of the lessee
3  and the term of the lease, two major factors.  In
4  this case, I was looking for an indicator of some
5  kind to allocate to arrive at a cap rate and that's
6  what I did.
7    Q    Is it fair to say that if the port had
8  actually leased out the bottom portion they might
9  have gotten more than ten percent?
10    A    Leased out the bottom portion --
11        MR. DOMB:  In 1997.
12  BY MR. KELLOGG:
13    Q    In 1997.
14    A    The rental I used there was based on an
15  office rental across the street, first floor.  But I
16  didn't use ten percent in arriving --
17    Q    That's right because this is the rental
18  value of the land?
19    A    That's right.
20    Q    I'm with you.  Okay.
21        Going to the rental value of the terminal
22  building, you came to six dollars per square foot
23  for the ground floor?
24    A    That's right.
25    Q    And was based upon?

81

```
1        A    A rental we had just concluded across the
2   street at 945 Main Street.  We had just leased three
3   or four thousand feet.  And it's an over class B
4   office space.
5        Q    Is that on the riverfront?
6        A    No.  Right up on Main Street.
7        Q    If you rent office space on the riverfront
8   is that more valuable than renting space that's not
9   on the riverfront?
10       A    It would depend on the environment around
11  it.  We have nothing to compare it with around here
12  as far as office space on the riverfront.
13            I had simply used conventional office
14  space which was in the south end of town a stone's
15  throw from here.
16       Q    Well, generally.  I mean, you are an
17  appraiser of real estate.
18            Would you agree that office space that
19  overlooks water you can get more than for office
20  space that does not overlook water?
21       A    In general it would be difficult to rent
22  this space down here.
23       Q    I'm just talking about generally.
24       A    In general, the site location, which is
25  what you are talking about, is a prime factor for
```

82

```
1   class A office buildings.  With that in mind, I
2   would generally say yes.
3            But in this case, where there's a railroad
4   track and a viaduct and a few other things offset
5   the view, I don't think the view here is a factor in
6   this location.
7        Q    All right.  I just got a few more
8   questions for you.
9            Going back to the highest and best use in
10  Section 8.
11            MR. DOMB:  That's on page --
12            MR. KELLOGG:  Three.
13  BY MR. KELLOGG:
14       Q    The bottom of paragraph or bottom of
15  Section 8 you write that "The existing use of the
16  loading and unloading of the Port Jefferson ferry is
17  the optimum use of the property."
18            What I want to do -- is that right?
19       A    That's right.
20       Q    I want to look at the four elements that
21  are to be considered when estimating the highest and
22  best use that you've got listed there.
23       A    Yes.
24       Q    The first element is possible use.  What
25  uses of the site are physically possible?
```

83

```
1        A    That's right.
2        Q    What did you consider when evaluating that
3   factor?
4        A    I felt, as I so stated, that the existing
5   use is the highest and best use.
6        Q    Did you consider any other alternatives?
7        A    I could think of none that would fit into
8   that scenario.
9        Q    Is that the same thing with subparagraph
10  two, "permissible legal use"?
11       A    That's right.
12       Q    You didn't -- did you consider any other
13  uses for the site that are legally permissible?
14       A    Well, there are other sites legally
15  permissible, but the shape and size, as I point out
16  on there, are severely restrictive between the
17  easement and long, narrow shape.  You would have a
18  tough time using that site for anything else.
19       Q    Okay.  So does that factor back into the
20  first element what uses for the site are physically
21  possible?
22       A    That's right.
23       Q    I'm just trying to be very clear.  I want
24  to make sure that the record is clear on this, sir.
25  So are you saying you did not consider there to be
```

84

```
1   any other alternatives, any other physical
2   alternatives?
3        A    Under zoning I stated that there -- it's a
4   very permissive zoning classification.  So,
5   theoretically, there are many uses.
6            But because of the restrictions of size
7   and shape and easements, this particular use is
8   about the only one that I think makes sense.
9        Q    Based upon the zoning that you just talked
10  about, what other possible uses -- just disregard
11  the shape of it for just a moment.
12            What are the possible uses?
13       A    The heavy industrial zone, for instance.
14  A lot of things that's going on now between lawyers
15  is the asphalt plant.
16            Nobody wants it in their backyard.  But
17  theoretically a heavy industrial zone would permit
18  an asphalt plant.
19       Q    Okay.
20       A    But the size and shape would make it very
21  difficult.
22       Q    What else?
23       A    Any heavy uses which would -- allowed in
24  other areas would be on this site, but because it's
25  so long and narrow and right next to your downtown,
```

85

```
1   getting a really heavy industrial use.
2           Usually heavy industrial use emit noise,
3   smoke, smell, etc. Those are the general loose
4   definitions of "heavy industrial." You would have
5   difficulty getting it in down here even though,
6   technically, the zone permits it.
7       Q   Okay.
8       A   In fact, I think this site, as I stated,
9   was a special permit use. I think they had to get a
10  special permit to get the ferry dock in there.
11      Q   Do you know whether or not if it's zoned
12  heavy industrial, can you put property that's zoned
13  heavy industrial, can you put something that's less
14  than heavy industrial?
15      A   Oh, yes.
16      Q   So did you consider some of those
17  alternatives?
18      A   Generally, I did as a broker down here for
19  many years, but because of the limitations of the
20  site, it has to be -- to get optimum use it has to
21  be water-related.
22          I couldn't think of any other
23  water-related uses that would get the maximum use
24  such as the ferry does.
25      Q   Could there be any nonwater-related uses
```

86

```
1   the site could be used for?
2       A   There could, but it's long and narrow.
3   And it wouldn't be the highest and best use.
4       Q   You could put an office building here?
5       A   It wouldn't fly.
6       Q   Well, they put one here.
7       A   Who put one?
8       Q   Well, this?
9       A   This is just a two-story --
10      Q   Sure.
11      A   -- eleven, twelve thousand feet for a
12  user. Fine. But you couldn't put an office
13  building here, say, for investment purposes.
14      Q   What about a restaurant?
15          Was that a no?
16      A   That's right. That was a no.
17      Q   And why is that?
18      A   Because of the environment. The
19  accessibility.
20      Q   The accessibility just because of the low
21  railroad underpass?
22      A   That and even the improvement, even the
23  new one. Go down Main Street, turn down Ferry Road,
24  come back down. It's a long way around to come to a
25  restaurant at night.
```

87

```
1       Q   So you didn't consider that?
2       A   Nope.
3       Q   Were there any other types of businesses
4   that you considered and rejected?
5       A   Generally I could think of nothing else
6   that would be as good a use, an optimum use as the
7   subject.
8       Q   Okay. On Section 16, page 11 on your
9   report, first paragraph you write that "No opinion
10  is intended to be expressed for legal matters."
11          What do you mean by that?
12      A   Title, for instance.
13      Q   Title?
14      A   Right off the top of my head, I would say
15  title would be one of the things. Encroachments,
16  things of that nature.
17      Q   But you don't mean it for lawsuit
18  purposes?
19      A   No. This is standard boilerplate which
20  covers -- protects the appraiser's butt from things
21  such as --
22          (THEREUPON, THE COURT REPORTER
23          REQUESTS CLARIFICATION.)
24      A   -- cloudy title. Or things of that
25  nature.
```

88

```
1   BY MR. KELLOGG:
2       Q   All right. So it -- so by putting this
3   boilerplate language in here you are not saying that
4   the opinions cannot be expressed in a legal
5   proceeding, are you?
6       A   No. I'm not saying that.
7       Q   Okay. Just give me a few minutes.
8           Okay?
9       A   Okay.
10          (THEREUPON, THERE WAS A DISCUSSION
11          OFF THE RECORD.)
12          MR. KELLOGG:  Marty, I don't have any
13      more questions at this time.
14          I'm going to hold the deposition open
15      pending our resolution of the additional
16      documents that are in his file and us
17      getting access to those and if they reveal
18      new questions then I'd like to call him
19      again.
20          MR. DOMB:  We'll look into it. I'll
21      say for the record that I engaged in some
22      very brief correspondence with Mr. Shawah
23      so I have that. So I have that. It's
24      very brief.
25          As a matter of fact, if you don't
```