UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, et al.,

CASE NO. 3:03 CV 599 (CFD)

Plaintiffs,

- against -

BRIDGEPORT PORT AUTHORITY,                    February 22, 2005

Defendant.

_____/

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION IN LIMINE TO EXCLUDE
EXPERT WITNESS ALAN A. SCHACHTER**

HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

*and*

COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

**ORAL ARGUMENT REQUESTED**

{NY035913.1 }

# Table of Contents

Page

Introduction ................................................................................................................1

ARGUMENT

A.    Mr. Schachter Properly Assumed the Applicable Legal Standard .......................................2

    1.    An Expert's Testimony Must Be Supported by the *Factual* Record ........................2

    2.    The Applicable Legal Standard Should
        Not Be Determined on a Motion in Limine ................................................................4

    3.    Mr. Schachter Has Assumed the Correct Legal Standard........................................5

B.    Mr. Schachter Based His Report on Adequate
    Data as Supplied by the Port Authority Itself  ...................................................................10

    1.    The Record Strongly Supports Mr. Schachter's Assumption
        that the Port Authority Provides Ferry Related Services and
        Facilities Only at the Water Street Dock ..................................................................10

    2.    Mr. Schachter's Other Conclusions Concerning the Port Authority's
        Ferry Related Costs Are Amply Supported by the Record.......................................10

        (a)    Information Considered by Mr. Schachter Generally....................................11

        (b)    Mr. Schachter's First Scenario.......................................................................11

        (c)    Mr. Schachter's Second and Third Scenarios ...............................................12

    3.    The Port Authority Itself is Responsible for Any
        Gaps in its Own Financial and Accounting Records ...............................................14

C.    The Exclusion of Mr. Schachter's Testimony in *Kammerman*
    Does Not Support the Exclusion of His Testimony in this Case ..........................................16

Conclusion .................................................................................................................18

Plaintiffs submit this memorandum of law in opposition to the motion in limine of defendant, Bridgeport Port Authority (the "Port Authority"), to exclude the testimony and opinions of plaintiffs' designated accounting expert, Alan A. Schachter.

## Introduction

The Court is familiar with this action, having issued pretrial rulings on two substantive motions.[1]  Briefly, plaintiffs – Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company") and two of its passengers – claim that the per-trip tariff imposed by the Port Authority on ferry passengers (the "Passenger Fee") is excessive and therefore illegal.  Plaintiffs seek compensatory damages with respect to excessive collections to date and injunctive and declaratory relief with respect to future collections.

Mr. Schachter is a certified public accountant ("CPA") with many years of varied experience.  He also is certified as a fraud examiner ("CFE") and valuation analyst ("CVA"), is accredited in business valuation ("ABV"), and is a Diplomat of the American Board of Forensic Accounting (Schachter Report Ex. 1 [*curriculum vitae*], p. 7).[2]  He has consulted on behalf of government agencies (*id.*), and lectured and published in his field (*id.*, pp. 8-9).  His c.v. lists some 38 cases in which Mr. Schachter has served as forensic investigator and testifying or non-testifying expert witness (*id.*, pp. 10-11).

---

[1]     Bridgeport [and] Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 2004 WL 840140 (D. Conn., Apr. 15, 2004) (denying motion for preliminary injunction); and Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 335 F. Supp. 2d 275 (D. Conn., Sept. 8, 2004) (denying motions to dismiss and for partial summary judgment).

[2]     References herein are as follows:  "**Domb Decl.**" means the accompanying Declaration of Martin Domb (to which copies of documents referred to herein are attached); "**Port Auth. Mem.**" means the Port Authority's memorandum of law in support of its motion in limine as to Mr. Schachter; "**Schachter Report**" means the Report of Alan A. Schachter dated June 30, 2004, a copy of which is attached as Exhibit A to the Port. Auth. Mem., as corrected on July 26, 2004 (see Domb Decl. Ex. C); and "**Schachter Dep.**" means the transcript of Mr. Schachter's deposition, a copy of which is attached as Exhibit B to the Port. Auth. Mem.

Mr. Schachter's role in this case has been to review all of the available accounting and financial records of the Port Authority, as well as depositions and other available evidence, in order to determine, in his words:

> the amount, if any, by which the tariff imposed by the defendant [the Port Authority] on the passengers of the Bridgeport-Port Jefferson Ferry exceeds the reasonable cost of the facilities and services that the defendant provides to the ferry operation.

(Schachter Report, p. 1.)  Mr. Schachter's analysis and conclusions, as described in his report, constitute a proper application of established accounting methods to the evidence in this case, as shown below.  Accordingly, his proposed testimony falls well within the standard of Federal Rule of Evidence 702.

## ARGUMENT

### A.    Mr. Schachter Properly Assumed the Applicable Legal Standard

#### 1.    An Expert's Testimony Must Be Supported by the *Factual* Record

The Port Authority argues that Mr. Schachter's expected testimony is "not relevant" because it is based on a "false assumption or incorrect data" (Port Auth. Mem., pp. 4-7, at 4). This argument itself is fallacious because the supposedly "false assumption or incorrect data" on which Mr. Schachter bases his analysis does not relate to facts or factual data; rather, it relates to the applicable legal standard in this case.  As Mr. Schachter stated in his report:

> I have been asked to assume that the ferryboat tariff is legal and proper only to the extent that the tariff proceeds are used to pay the reasonable cost of the facilities and services that the Port Authority provides to the ferry operation.

(Schachter Report, p. 3.)  This is a legal standard, not a set of facts or factual data.

All four cases cited by the Port Authority to the effect that expert testimony should be excluded if it is based on a false assumption involved assumptions about facts, not law.

Lightfoot v. Union Carbide Corp., 175 F.3d 1008 (Table), 1999 WL 110424 (2d Cir. March 1, 1999) (accountant's testimony was properly excluded because it was "based on the flawed assumption that [plaintiff] had been improperly denied salary upgrades while still employed by Union Carbide – a basis for recovery that, as discussed above, had been rejected");[3] Raskin v. Wyatt Co., 125 F.3d 55, 67 (2d Cir. 1997) (expert erroneously assumed that "no one over the age of 50 was promoted" during relevant period, whereas in fact two such persons were promoted); Elcock v. Kmart Corp., 233 F.3d 734, 755-56 (3d Cir. 2000) (economist made several factual assumptions for which there was no support in the record, including the percentage of plaintiff's disability and plaintiff's pre- and post-accident earnings); Wilkinson v. Rosenthal & Co., 712 F. Supp. 474, 479 (E.D. Pa. 1989) (commodities expert assumed "information which is contrary to the established facts of the case").

The factual bases for Mr. Schachter's analysis and conclusions are discussed in Point B below (at pages 10-16).

Courts have recognized that a damages expert may assume that liability will be established and what legal standard the court will apply in the case. As the court stated in Avery Dennison Corp. v. Four Pillars Enterprise Co., 45 Fed. Appx. 479, 2002 WL 2020041 (6th Cir. Sept. 3, 2002):

> Although a *Daubert* challenge may certainly include arguments that the expert theory is invalid because it has no basis in fact, we do not conclude that the district court abused its discretion by determining that Neels's [the damages expert's] theories were sufficiently factually supported. The "facts" challenged by FP here are not scientific facts to be evaluated under *Daubert,* but are rather the central questions of liability in the case, which were properly presented to the jury.

---

[3]    Lightfoot, the first case cited by the Port Authority, is an unpublished opinion of the Second Circuit, whose rules provide that such decisions "shall not be cited or otherwise used in unrelated cases before this or any other court." U.S. Ct. of App. 2d Cir. Rules, § 0.23.

45 Fed. Appx. at 487 (emphasis added) (not recommended for full text publication),[4] *citing*

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).  *See also*

Maiz v. Virani, 253 F.3d 641, 666-67 (11th Cir. 2001) (district court properly allowed testimony

of forensic accountant who assumed legal effect of agreements at issue).

    Thus, Mr. Schachter properly assumed the applicable legal standard in this case.

### 2.    The Applicable Legal Standard Should Not Be Determined on a Motion in Limine

    To the extent that the Port Authority wishes to challenge the legal standard on which

plaintiffs' claims are based, an in limine motion is not the appropriate vehicle by which to do so.[5]

    The legal premise of plaintiffs' claims, since the outset of this case, has been that the Port

Authority may not fund essentially all of its activities – both ferry related and non-ferry related –

from the Passenger Fee, as it has consistently done from 1993 to date.  The Port Authority could

have challenged that legal premise by a motion to dismiss for failure to state a claim, but it chose

not to do so, although it did move to dismiss on various other grounds.  *See* Bridgeport and Port

Jefferson Steamboat Co. v. Bridgeport Port Authority, 335 F. Supp. 2d 275 (D. Conn. 2004)

(denying Port Authority's motions to dismiss under the doctrine of primary jurisdiction and for

lack of standing).

---

[4]    The Sixth Circuit's rule concerning unpublished decisions allows their citation in certain cases.  *Compare* U.S. Ct. of App. 6th Cir. Rule 28(g) (citation "disfavored" except in certain circumstances) *with* the Second Circuit's rule (see note 3 above).  A copy of the Sixth Circuit's decision in Avery Dennison is attached at Domb Decl. Ex. N.

[5]    Under the Court's standard Trial Memorandum Order (Non-Jury Cases), the parties are not required to submit their proposed conclusions of law until after the trial.  Plaintiffs provide herein a brief summary of the legal basis for their claims (Point A.3 below, at pages 5-9) only because the Port Authority has raised the issue in their in limine motion.  Plaintiffs respectfully submit that the appropriate time for the Court to determine the legal standard applicable to this case is after trial and upon consideration of both sides' proposed conclusions of law, not in the context of an in limine motion to exclude an expert witness.

Furthermore, the Port Authority's treatment of the legal standard is woefully superficial and incomplete (*see* Port Auth. Mem., pp. 5-7, discussing three cases).  If the Court were to accept the Port Authority's simplistic view of the law, as expressed in its in limine motion, it would mean that the Port Authority could raise the Passenger Fee to any amount, without any legal restraint, because (according to the Port Authority) the Passenger Fee "does not have to match dollar for dollar the outlaying expenses directly attributable to the operation of the Port" (Port Auth. Mem., p. 6), and the Port Authority could use surpluses generated from the Passenger Fees to "offset against actual deficits of past years and perhaps against projected deficits in future years" (*id.*, *quoting* Massachusetts v. U. S., 435 U.S. 444, 449, 98 S. Ct. 1153 (1978)) (emphasis added).[6]  Thus, the Port Authority could pursue any grandiose scheme in the port, whether or not it related to the ferry, and force the ferry passengers to pay for it.  That is not the law.

### 3.    Mr. Schachter Has Assumed the Correct Legal Standard[7]

In any event, Mr. Schachter has assumed the correct legal standard.  The Port Authority does not even cite the Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5(b) (the basis for the first of plaintiffs' seven claims), which provides in relevant part:

> (b)    No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for—

---

[6]    The Port Authority has never operated at a deficit, according to its audited financial statements, because it has always collected enough in Passenger Fees to fund all of its operations.

[7]    For the sake of brevity, we address in this section only the first two legal grounds for relief alleged in the amended complaint, the Rivers and Harbors Appropriations Act and the Commerce Clause.  *See* footnote 5 above.

(1)     fees charged under section 208 of the Water Resources
        Development Act of 1986 (33 U.S.C. 2236);

(2)     reasonable fees charged on a fair and equitable basis that—

        (A)     are used solely to pay the cost of a service to the
                vessel or water craft;

        (B)     enhance the safety and efficiency of interstate and
                foreign commerce; and

        (C)     do not impose more than a small burden on interstate or
                foreign commerce; or

(3)     property taxes on vessels or watercraft, other than vessels
        or watercraft that are primarily engaged in foreign
        commerce if those taxes are permissible under the United
        States Constitution.

(Emphasis added.)  The underlined text supports plaintiffs' position, and Mr. Schachter's

assumption, that the Passenger Fee is excessive to the extent that the Port Authority has used it to

fund its substantial and costly non-ferry related activities.

Nor does the Port Authority adequately treat the case law on user fees under the

Commerce Clause, U.S. Const., art. I, § 8, clause 3 ("The Congress shall have Power . . . To

regulate Commerce among the several States . . .").  Under the Commerce Clause, user fees

imposed by a state or its subdivision on persons traveling or providing transportation between

states must (among other requirements):  (a) not be excessive in relation to the cost of the

governmental benefit conferred on the paying users, and (b) reflect a fair approximation of use of

the facilities and services for whose benefit the fees are imposed.  Northwest Airlines, Inc. v.

County of Kent, Mich., 510 U.S. 355, 369-370, 114 S. Ct. 855 (1994) ("Northwest") (holding

that airport user fees were not unreasonable or discriminatory in violation of Commerce Clause

or Anti-Head Tax Act ["AHTA"], 49 U.S.C. App. § 1513); Evansville-Vanderburgh Airport

Authority Dist. v. Delta Airlines, Inc., 405 U.S. 707, 716-19, 92 S. Ct. 1349 (1972)

("Evansville") ($1 head tax on airline passengers did not violate Commerce Clause because "the

airlines have not shown these fees to be excessive in relation to costs incurred by the taxing

authorities").

    The Supreme Court in Northwest relied heavily on the standard expressed in Evansville.[8]

The court upheld the user fees at issue in Northwest because the record showed that "the Airport

charged the Airlines 'the break-even costs for the areas they use.'"  510 U.S. at 370 (emphasis

added).  Accordingly, the fees met the requirement that they not "'be excessive in relation to

costs incurred by the taxing authorities' for benefits conferred on the user."  Id. at 371 (emphasis

added), quoting Evansville, supra, at 719.  See also American Trucking Associations, Inc. v.

Scheiner, 483 U.S. 266, 290, 107 S. Ct. 2829 (1987) (holding that fees imposed by state on

trucks using its highways violated Commerce Clause because, inter alia, the fees "do not even

purport to approximate fairly the cost or value of the use of Pennsylvania's roads"); Ingels v.

Morf, 300 U.S. 290, 57 S. Ct. 439 (1937) (holding that $15 per vehicle permit fee was excessive

and therefore violated Commerce Clause, where record showed that the state's cost of providing

the road services for which the fee was imposed was not more than one-third of the proceeds of

the fee); Clark v. Paul Gray, Inc., 306 U.S. 583, 599, 59 S. Ct. 744 (1939) (user fee may not be

manifestly disproportionate to the cost of the services rendered); New Orleans S.S. Ass'n v.

Plaquemines Port, Harbor and Terminal Dist., 874 F.2d 1018, 1021 (5th Cir. 1989)

("Plaquemines") (to satisfy Commerce Clause, port fee "must be used to pay for the service

[provided]").

---

[8]    Although Evansville was superseded by the AHTA with respect to air travel, its standard for determining the reasonableness of fees continues to be applied in other contexts, and even under the AHTA.  Northwest, 510 U.S. at 368 ("The formulation in Evansville has been used to determine "reasonableness" in related contexts") (citing cases).

In <u>Commonwealth Edison Co. v. Montana</u>, 453 U.S. 609, 101 S. Ct. 2946 (1981), the Supreme Court distinguished a state's general revenue tax from "a specific charge imposed by the State for the use of State-owned or State-provided transportation or other facilities or services." 453 U.S. at 622. As to the latter, the court stated:

> Because such charges are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services, we have required a showing, based on factual evidence in the record, that "the fees charged do not appear to be manifestly disproportionate to the services rendered . . . ."

<u>Id.</u> at 622 n. 12 (*quoting* <u>Clark</u>, *supra*, 306 U.S. at 599, and *citing* <u>Ingels</u>, *supra*, 300 U.S. at 296-97).[9]

The Passenger Fees in this case are not general revenue taxes; rather, they are user fees imposed for the use of the Port Authority-owned terminal and related services. The record shows that the proceeds of the Passenger Fees have been and continue to be substantially higher than the cost of the facilities and services that the Port Authority has provided and provides to the Ferry Company and its passengers. Therefore, the Passenger Fees have been and continue to be excessive and in violation of the Commerce Clause.

With respect to the "fair approximation of use" requirement, the apportionment of the fees and any exemption from the payment of fees must also be fair and reasonable. <u>Northwest</u>, 510 U.S. at 369; <u>Evansville</u>, 405 U.S. at 717-18. In <u>Northwest</u>, the airlines challenging the fee claimed that it violated this requirement because the airport allocated its entire costs of "air operations" to the airlines and did not allocate any portion of it to terminal concessions (such as car rental companies, restaurants and gift shops), which, the airlines argued, benefited from

---

[9]    When the challenged measure is a <u>tax</u>, rather than a user fee, the Commerce Clause does not bar the state from spending some of the tax revenues on general government services, from which the individual taxpayers arguably derive no direct benefit. <u>Goldberg v. Sweet</u>, 488 U.S. 252, 266-67, 109 S. Ct. 582 (1989).

customer flow generated by the air operations.  The Supreme Court held that the allocation of all

air operation costs to the airlines did not violate the "fair approximation" requirement because

"[o]nly the airlines . . . actually use the runways and navigational facilities of the Airport."  510

U.S. at 369.

In this case, by contrast, the Ferry Company and its passengers do not use many of the

facilities and services that the Port Authority provides to others – such as the Bridgeport

Regional Maritime Complex ("BRMC," also known as the Car Tech property), the Derecktor

shipyard, the high speed ferry project, and the barge feeder project – and that the Port Authority

has funded (and continues to fund) with proceeds of the Passenger Fees.[10]

Accordingly, the Passenger Fees also violate the "fair approximation of use" requirement

under the Commerce Clause to the extent that the Port Authority uses the proceeds of such fees

to fund operations and facilities that are not used by and confer no benefit on the passengers or

the ferry operation.

Thus, Mr. Schachter's assumption of the legal standard – that the Passenger Fee is legal

only to the extent that it is used to fund the reasonable cost of the facilities and services that the

Port Authority provides to the ferry operation – is fully supported by the Rivers and Harbors Act

and the Commerce Clause (among other applicable law).

---

[10]     Evidence of these non-ferry related activities was introduced at the preliminary injunction
hearing on April 1, 2004, and additional such evidence will be proffered at trial.

**B.      Mr. Schachter Based His Report on Adequate
          Data as Supplied by the Port Authority Itself**

**1.      The Record Strongly Supports Mr. Schachter's Assumption
          that the Port Authority Provides Ferry Related Services and
          Facilities Only at the Water Street Dock**

The Port Authority disputes Mr. Schachter's assumption "that the Port Authority provides

facilities and services [to the ferry operation] only at the [Water Street] Dock" (Port Auth. Mem.,

p. 2), even though the Port Authority's own outside auditor, Jospeh Verrilli, has so testified:

> Q.      Is the Port Authority involved in any activity elsewhere than the
>         Water Street Dock that relates to the ferry operations?
>
> A.      Not to my knowledge, no.

(Domb Decl. Ex. D [Verrilli Dep.], p. 36, lines 4-7.)  Mr. Verrilli gave the same testimony at the

preliminary injunction hearing on April 1, 2004 (Domb Decl. Ex. E, p. 16, line 1-9).  Frederick

Hall, Vice President and General Manager of the Ferry Company, also testified at that hearing

that the Port Authority does not provide any facilities or services to the ferry operation anywhere

other than at the Water Street Dock (*id.*, p. 89, lines 5-11).  In fact, there is no evidence of any

facilities or services provided to the ferry operation, on the Bridgeport side, other than at the

ferry terminal and dock located at the Water Street Dock.  Therefore, it is simply specious for the

Port Authority to question Mr. Schachter's "assumption" of that fact.

**2.      Mr. Schachter's Other Conclusions Concerning the Port Authority's
          Ferry Related Costs Are Amply Supported by the Record**

The Port Authority incorrectly claims that there is no factual support for Mr. Schachter's

conclusions concerning the Port Authority's ferry related expenses in four categories – "(1)

personnel costs, (2) development and promotional costs, (3) professional services, and (4) other

expenses" (Port Auth. Mem. pp. 9-10) – and thus that his conclusions concerning those areas of

expense constitute "unsupported speculation" (*id.*, p. 9).  In fact, there is a wealth of record

support for all of Mr. Schachter's conclusions, including those in the cited areas.

### (a)    Information Considered by Mr. Schachter Generally

As a general matter, the Port Authority fails to refer to Mr. Schachter's listing of the

information he considered in preparing his report (Schachter Report, Ex. 2, p. 12).  As that list

shows, Mr. Schachter reviewed all available financial and accounting data produced by the Port

Authority, including:  (i) audited financial statements, (ii) the outside accounting firm's audit

work papers,[11] (iii) general ledgers, (iv) net revenue reports for the Water Street Dock, (v) leases,

(vi) advertisements, (vii) depositions of the three Port Authority employees, and (viii) the Port

Authority's credit card and telephone bills.  Mr. Schachter also reviewed the minutes of the Port

Authority's board of commissioners' meetings, in which he found discussions of, and listed,

"numerous activities and projects that do not appear to have any relation to the ferry operation"

(Schachter Report, p. 2).

### (b)    Mr. Schachter's First Scenario

As the Port Authority points out (Port Auth. Mem., pp. 2-3), Mr. Schachter analyzed the

Port Authority's costs under three different scenarios.  The Port Authority's argument that his

conclusions are not supported by the record does not even apply to the first scenario, in which

Mr. Schachter simply adopted the Port Authority's own allocations of its costs to the Water

Street Dock (*see* Schachter Report, section 3.1, at pp. 3-4).  The factual support for this scenario

consists of the Port Authority's own "Net Revenue Reports" for the Water Street Dock for 1993

---

[11]    The audit work papers alone comprise 4,459 pages (*see* Domb Decl. Ex. F).  By contrast, the Port Authority's designated expert who proposes to testify about the Port Authority's expenses, John H. Arnold, reviewed only a few of the audit work papers, and cannot recall which ones (Domb Decl. Ex. G [Arnold Dep.], p. 11, line 19 to p. 14, line 8).

through 2002, which Mr. Schachter attached to his report (Schachter Report Ex. 3, pp. 14-23), and which he summarized in a spread sheet (*id.*, p. 13).

**(c)      Mr. Schachter's Second and Third Scenarios**

The conclusions Mr. Schachter reached with respect to his other two scenarios are also fully supported by the record.  Each of the four expense areas cited by the Port Authority, in which Mr. Schachter reduced the percentages that the Port Authority allocated to them, is addressed below.

**Personnel costs**.  Mr. Schachter explains the basis for his reduction of the Port Authority's allocation of this item to the Water Street Dock, from 50% to 33%, in a long footnote (Schachter Report, footnote (f) at pp. 36-37).  Mr. Schachter based his conclusion on (among other things):  (a) the job functions of the three Port Authority employees as described in their depositions, (b) Mr. Riccio's travel as reflected in the Port Authority's credit card bills, (c) the Port Authority's non-ferry related activities as reflected in its board minutes, (d) Ms. Klimas's few communications with Ferry Company personnel, (e) the lack of time sheets by any of the Port Authority employees, and (f) the Port Authority's telephone bills.  As Mr. Schachter testified at his deposition, his conclusion that only 33%, rather than 50%, of the Port Authority's personnel costs reasonably relate to ferry operations was not "pulled out of a hat," but rather was a "judgment call based on taking a look at the available data" (Schachter Dep., p. 61, lines 20-22).

**Development and promotional costs**.  The Port Authority allocated 50% of such costs to the Water Street Dock.  In his second scenario, Mr. Schachter reduced this to 10%.  Mr. Schachter's explanation is found in his report (Schachter Report, footnote (g) at pp. 37-38).  Mr. Schachter reviewed the advertising expenses posted by the Port Authority in its general ledger,

copies of all the advertisements that the Port Authority produced in discovery, and the Port

Authority's website.  As explained by Mr. Schachter, this area also included expenses incurred

for Mr. Riccio's travel and entertainment and his use of an automobile (including tolls, car

washes and gasoline).  Mr. Schachter noted that Mr. Riccio does not submit travel or

entertainment expense reports.  It is noteworthy that the Port Authority's own expert, Mr.

Arnold, in making his own assessment of the Port Authority's ferry related costs, allocated <u>none</u>

of the automobile expense to the ferry operation (Domb Decl. Ex. H [Arnold Report], ¶¶ 75, 80

and Table 9 [discounting "Equipment Rental" by 100%];[12] Domb Decl. Ex. G [Arnold Dep.], p.

330, line 15 to p. 331, line 7).  Mr. Arnold also stated that it would be unusual for an employee

who is reimbursed by a company for travel not to submit expense reports (*id.*, p. 323, line 16 to

p. 325, line 19).

     **Professional services**.  The Port Authority allocated 100% of its professional services

expense (legal and accounting fees) to the Water Street Dock; in his second scenario Mr.

Schachter reduced this figure to 50%.  The record is clear that a substantial portion of the Port

Authority's legal and accounting fees have had no relation to the ferry operation.  As Mr.

Schachter states, having reviewed nearly 4,500 pages of audit work papers, "[t]he audit covers

the entirety of the operations of the Port Authority and therefore relates to both ferry and non-

ferry operations" (Schachter Report footnote (i) at p. 38).  Mr. Schachter also reviewed the

auditors' analyses of the Port Authority's legal fees (*id.*).  Those analyses on their face prove that

much of the legal expense has been unrelated to the Water Street Dock or the ferry operation

(*see, e.g.*, Domb Decl. Ex. I [Dep. Exs. 524 and 529]).  Mr. Verrilli, the Port Authority's outside

---

[12]    Only the first page and cited portions of the Arnold Report are attached to the Domb Decl., as that report elsewhere contains Ferry Company financial information that is subject to a stipulation and order of confidentiality; inclusion of the entire report would have required a motion to seal it, an unnecessary procedural step for purposes of this motion.

auditor, confirmed at his deposition that many of the legal expenses were unrelated to the Water Street Dock or the ferry operation (Domb Decl. Ex. D, p. 74, line 15 to p. 84, line 20, and p. 104, line 17 to p. 109, line 16).

**Other expenses**.  The Port Authority does not identify or discuss these "other expenses" or state why Mr. Schachter's conclusions concerning them supposedly are unsupported.  In his report Mr. Schachter explains the factual basis and professional reasons for his conclusions concerning each expense area in which he has adjusted the Port Authority's own allocation of expense to the Water Street Dock (Schachter Report Ex. 4, footnotes (h), (j) through (n) at pp. 38-39, discussing charitable contributions, professional fees relating to this case, outside services for "Panuzio," security for Cartech, depreciation and amortization, and interest).

In sum, the conclusions reached by Mr. Schachter as to whether the Port Authority's expenses related to the Water Street Dock or the ferry operation are factually supported by the record, as explained by Mr. Schachter in his report and as supported by other evidence in the record on which he relied.

### 3. The Port Authority Itself is Responsible for Any Gaps in its Own Financial and Accounting Records

The Port Authority's claim that Mr. Schachter's analysis is based on "incomplete and limited data" (Port Auth. Mem., pp. 10-12) is the height of "chutzpah,"[13] as the gaps in the materials available to Mr. Schachter were caused by the Port Authority itself.

The first item of data cited by the Port Authority is its own telephone bills (Port Auth. Mem. p. 10).  Plaintiffs served the Port Authority with a request seeking production of all such bills, from 1993 to date (Domb Decl. Ex. J, Request 9; *see also* "Time period" at p. 1).  In its

---

[13]    The American Heritage Dictionary of the English Language (4th ed. 2000) defines "chutzpah" as follows:  "Utter nerve; effrontery: *'has the chutzpah to claim a lock on God and morality'* (New York Times)."

response, the Port Authority objected to the request as overbroad and burdensome and arbitrarily chose to produce its telephone bills only "for January 31, 2003 through the present" (Domb Decl. Ex. K, Response to Request 9). Now the Port Authority claims that it was insufficient for Mr. Schachter to review the telephone bills only for the period as to which the Port Authority chose to produce such bills. The Port Authority similarly, and arbitrarily, produced its credit card bills only for January 2003 to May 2004 (the date of production) (*id.*, Response to Request 10).

Next, the Port Authority complains that Mr. Schachter did not do a "year-by-year" analysis as to all expense areas, but rather extrapolated to earlier years based on his analysis of recent year expenses (Port Auth. Mem., p. 11). Again, it was the Port Authority's own failure to keep or produce documents that made it impossible for Mr. Schachter to review all expense areas year by year. Early in his review, Mr. Schachter asked to review all Port Authority general ledgers from 1993 to date.[14] However, the Port Authority has not retained its general ledgers. It lost or disposed of its computerized accounting files (including its general ledgers) in 2001, when it changed its accounting software and disposed of its computer hard drives; and the Port Authority was unable to find or produce complete paper copies of its general ledgers for 2000 or earlier years (Domb Decl. Ex. M [Johnson Dep.] p. 19, line 20 to p. 37, line 13). Mr. Schachter noted in his report that "[c]omplete general ledgers were not provided for the years 1995 through 2000" (Schachter Report Ex. 2, footnote 1, at p. 12). (Mr. Schachter was able to review the general ledgers for 1993 and 1994 only because copies of them were found among the more than 4,500 pages of the outside accounting firm's audit work papers, which plaintiffs subpoenaed. *See* note 10 at p. 11 above.)

---

[14]    A general ledger is a listing, generally computerized, of all accounting entries by date, account name and number, amount, and brief textual description. The Port Authority's 2003 general ledger, for example, is a 75-page printout containing thousands of entries (*see* Domb Decl. Ex. L [first and last pages of 2003 general ledger]).

In any event, an accounting expert may properly extrapolate to prior years based on his analysis of the available data. EFCO Corp. v. Symons Corp., 219 F.3d 734, 739 (8th Cir. 2000) (district court properly allowed testimony of damages expert who reviewed available data and "extrapolated [plaintiff's] past and future damages"); Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1021 (7th Cir. 2000) ("Trained experts commonly extrapolate from existing data") (*quoting* General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997)).

Thus, Mr. Schachter reviewed all of the financial data that the Port Authority was able or willing to produce, and where gaps existed, due to the Port Authority itself, he properly extrapolated from the data available to him, as accounting experts typically do.

## C.  The Exclusion of Mr. Schachter's Testimony in *Kammerman* Does Not Support the Exclusion of His Testimony in this Case

Finally, the Port Authority argues that this Court should exclude Mr. Schachter because the Connecticut Superior Court excluded his testimony in Kammerman v. SCB Technologies, Inc., 2002 WL 31662367 (Conn. Super. Ct., Nov. 6, 2002) (Port Auth. Mem., pp. 7-8). However, the reasons for Mr. Schachter's exclusion in Kammerman are not present in this case.[15]

Kammerman involved a claim for expropriation of trade secrets concerning a new automobile airbag technology. Plaintiffs designated four expert witnesses: three engineers to testify concerning plaintiffs' contributions to the development and marketing of the new technology, and Mr. Schachter to testify concerning damages. The first ground on which the court excluded Mr. Schachter was that his testimony depended on the admissibility of the

---

[15]    An expert's exclusion in one case does not require his exclusion in all other cases. In his c.v., Mr. Schachter lists 37 cases, in addition to Kammerman, in which he has been retained to provide expert witness or consulting services (Schachter Report, Ex. 1, pp. 10-11). Mr. Schachter has informed us that he testified at trial in more than 30 of those cases.

testimony of one of the engineers [Foggiato], whose testimony the court excluded. 2002 WL 31662367 at *8. In this case, Mr. Schachter's proposed testimony does not depend on the testimony of any other proposed expert.

The court in <u>Kammerman</u> also held that three factual assumptions on which Mr. Schachter's testimony was based were unsupported by the record: (1) that the new airbag technology would become commercially viable for automobiles, (2) that it would achieve worldwide acceptance, and (3) that it would have a shelf life of 20 years (based on which Mr. Schachter calculated royalty damages for a period of 20 years). The court briefly described the factual bases for each of these assumptions and, finding them insufficient as a matter of law, excluded Mr. Schachter's testimony. *Id.* at *8-9.

In this case, by contrast, there is a great deal of support in the record for each of Mr. Schachter's assumptions and conclusions, as shown above. Mr. Schachter's first damages scenario is supported by the Port Authority's own Net Revenue Reports for the Water Street Dock, and the bases for his second and third scenarios are explained by Mr. Schachter in detailed notes in his report and are supported by the materials he reviewed and cited in his report. In contrast to <u>Kammerman</u>, in which Mr. Schachter had to rely largely on the testimony of engineering experts, in this case Mr. Schachter is relying principally on his own analysis of the financial and accounting records he reviewed. As he stated in his deposition:

> But in reaching those ultimate conclusions, as you are aware I'm sure, they were the result of my reviewing a whole host of documents including accountant's work papers, permanent files and the documents I relied on in the actual preparation of the report as spelled out in Exhibit D [sic, should be Exhibit 2] and the procedures that I performed on those documents.

(Schachter Dep., page 65, line 23 to page 66, line 7.)

### Conclusion

For the foregoing reasons, plaintiffs respectfully submit that the Court should deny the

Port Authority's in limine motion with respect to Mr. Schachter.

Dated:     February 22, 2005

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, D & D WHOLESALE
FLOWERS, INC., and FRANK C. ZAHRADKA
*Plaintiffs*

/s/

By:     _____

Martin Domb, Federal Bar No. ct 09544
E-mail:  mdomb@hillbetts.com
Eric M. Underriner, Federal Bar No. ct 26020
E-mail:  eunderriner@hillbetts.com
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
Tel. (212) 589-7577
Fax (212) 466-0514

Jonathan S. Bowman, Federal Bar No. ct 08526
E-mail:  jbowman@cohenandwolf.com
Stewart I. Edelstein, Federal Bar No. ct 06021
E-mail:  sedelstein@cohenandwolf.com
COHEN AND WOLF, P.C.
1115 Broad Street, P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2005, a copy of the foregoing was served via e-mail

and U.S. mail upon the following counsel for defendant Bridgeport Port Authority:

John W. Roberts. Esq.                    Edward J. Sheppard, IV, Esq.
Roberts, Rose & Bates, P.C.              Thompson Coburn
17 Hoyt Street                           1909 K Street, N.W., Suite 600
Stamford, CT 06905                       Washington, D.C. 20005-2010

Timothy F. Noelker, Esq.
Jason C. Rahoy, Esq.
Thompson Coburn
One US Bank Plaza
St. Louis, MO 63101

                          /s/
By:       _____
                          Martin Domb
                          Federal Bar No. ct 09544
                          E-mail:  mdomb@hillbetts.com
                          HILL, BETTS & NASH LLP
                          One World Financial Center
                          200 Liberty Street, 26th Floor
                          New York, New York 10281-1003
                          Tel. (212) 589-7577
                          Fax (212) 466-0514