UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, ET AL.,

CASE NO. 3:03 CV 599 (CFD)

Plaintiffs,

- against -

BRIDGEPORT PORT AUTHORITY,                    September 1, 2006

Defendant.

_____/

**PLAINTIFFS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

AKERMAN SENTERFITT LLP
335 Madison Avenue, 26th Floor
New York, New York 10017
Tel. (212) 880-3800
Fax (212) 880-8965

*and*

COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

## <u>Table of Contents</u>

<u>Page</u>

**INTRODUCTION**..............................................................................................................1

**PROPOSED FINDINGS OF FACT**...................................................................................3

    A.    The Parties.................................................................................................3

    B.    The Trial Witnesses...................................................................................5

    C.    The Water Street Dock and the Ferry Terminal..........................................7

    D.    The Leases................................................................................................9

        •    The Current Lease.............................................................................9

        •    Market Value....................................................................................10

        •    The Food Services Lease....................................................................11

    E.    The Ferry Company's Activities at the Dock..............................................12

    F.    The Ferry Company's Investments.............................................................14

    G.    The Passenger Fee.....................................................................................15

    H.    The $1 Surcharge......................................................................................17

    I.    The Port Authority's Broad Purposes and Jurisdiction................................18

    J.    Lack of Time Records................................................................................19

    K.    The Port Authority's Ferry-Related Activities............................................20

    L.    The Port Authority's *Non* Ferry-Related Activities....................................21

        •    Steel Point......................................................................................22

        •    Cartech..........................................................................................23

        •    BRMC............................................................................................24

        •    Derecktor........................................................................................27

        •    High Speed Ferry............................................................................29

        •    Barge Feeder Service.......................................................................31

        •    Foreign Trade Zone.........................................................................32

        •    Cilco and Other Commercial Terminals............................................33

        •    Dredging.........................................................................................34

|   |   | Boat Pump-Out Service | 35 |
|   |   | Projects Affecting Land | 35 |
|   |   | Other Non Ferry-Related Activities and Expenses | 38 |
|   |   | 2004-2006 Activities Also Focused on Non Ferry Activities | 41 |

M. The Port Authority's Audited Financial Statements ................................ 41

N. The Port Authority's Operating Revenues .................................................. 42

O. Government Grants to the Port Authority ................................................... 44

P. The Port Authority's Operating Expenses .................................................. 45

Q. The Port Authority's Computations of Its
Net Operating Income from the Dock ......................................................... 48

R. The Overcharge, as Determined by Schachter ......................................... 54

•   Model 1 ................................................................................................ 56

•   Model 2 ................................................................................................ 57

•   Model 3 ................................................................................................ 60

S. Damages – the Ferry Company ..................................................................... 63

T. Damages – the Individual Plaintiffs ............................................................ 68

U. The Port Authority Experts' Biased and Flawed Testimony ................... 70

•   Deak's and Arnold's Biases ............................................................... 71

•   Deak's Lack of Analysis, Generally ................................................... 73

•   Deak's Flawed Analysis of Increased Ferry Ridership ................... 74

•   Deak's and Arnold's Flawed Loss of Profits Analysis .................... 75

•   Arnold's Flawed Analysis of the Port Authority's Costs ............... 78

•   Other Errors and Flaws in Arnold's Report and Testimony ......... 83

*(Cont'd)*

**PROPOSED CONCLUSIONS OF LAW** ..................................................................86

    A.    Introduction ..................................................................86

    B.    Elements and Legal Standards of Plaintiffs' Claims .................................87

          Claim I – The Rivers and Harbors Appropriation Act.............................87

          Claim II – The Commerce Clause ...............................................88

          Claim III – The Right to Travel ...............................................92

          Claim IV – The Tonnage Clause ...............................................93

          Claim V – Unjust Enrichment, Duplicate Charges................................94

          Claim VI – Violation of Conn. Gen. Stat. §§ 7-329a to 7-329u ...............95

          Claim VII – Unlawful Tax or User Fee Under Connecticut Law............97

          Claim VIII – Connecticut Unfair Trade Practices Act............................97

    C.    Damages..................................................................102

          1.    The Overcharge is a Reasonable and Accurate
                Estimate of the Ferry Company's Damages .................................102

          2.    D&D's Damages .......................................................105

    D.    Declaratory and Injunctive Relief .............................................106

          1.    Declaratory Judgment ................................................106

          2.    Injunction ..........................................................107

**CONCLUSION** ..................................................................109

## Table of Authorities

**Page**

**Cases**

Ace-Federal Reporters, Inc. v. Barram, 226 F.3d 1329 (Fed. Cir. 2000) ........................................ 103

American Trucking Associations, Inc. v. Scheiner,
483 U.S. 266, 107 S.Ct. 2829 (1987) ................................................................................................ 89

Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin,
247 Conn. 48, 717 A.2d 724 (1998) ....................................................................................... 104, 105

Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority,
335 F. Supp. 2d 275 (D. Conn. 2004) ..................................................................................... 64, 104

Broadview Chemical Corp. v. Loctite Corp., 417 F.2d 998 (1969),
cert. denied, 397 U.S. 1064 (1970) .................................................................................................. 106

Broadview Chemical Corp. v. Loctite Corp., 474 F.2d 1391 (2d Cir. 1973) .................................. 106

Callam County v. Dep't of Transp. of the State of Washington, 849 F.2d 424
(9th Cir. 1988), cert. denied, 488 U.S. 1008, 109 S.Ct. 790 (1989) ................................................ 79

Charts v. Nationwide Mutual Ins. Co., 397 F. Supp. 2d 357 (D. Conn. 2005) .......................... 98, 102

Cheshire Mortgage Service, Inc. v. Montes,
223 Conn. 80, 612 A.2d 1130, 1143 (1992) ..................................................................................... 98

Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744 (1939) ........................................................... 89

Clyde Mallory Lines v. State of Alabama ex rel. State Docks Commission,
296 U.S. 261, 56 S.Ct. 194 (1935) ................................................................................................... 93

Commonwealth Edison Co. v. Montana, 453 U.S. 609, 101 S.Ct. 2946 (1981) ............................... 90

Covino v. Patrissi, 967 F.2d 73 (2d Cir. 1996) .............................................................................. 108

Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.,
405 U.S. 707, 92 S.Ct. 1349 (1972) ......................................................................................... 88-90, 92

Exclusive Tug Arrangements in Port Canaveral, Florida,
2003 WL 1017732 (F.M.C. March 4, 2003) ..................................................................................... 72

Fabri v. United Technologies Intern., Inc., 387 F.3d 109 (2d Cir. 2004) ......................... 98, 101, 102

Frillici v. Town of Westport, 2001 WL 1330008
(Conn. Super., Oct. 12, 2001) ........................................................................ 97

Gargano v. Heyman, 203 Conn. 616, 525 A.2d 1343 (1987) ........................................ 101

Goldberg v. Sweet, 488 U.S. 252, 109 S.Ct. 582 (1989) ............................................ 90

Gozlon-Peretz v. U.S., 498 U.S. 395, 111 S.Ct. 840 (1991) ........................................ 88

Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,
231 Conn. 276, 283 A.2d 518 (1994) .............................................................. 94

Hawaiian Navigable Waters Preservation Soc. v. State of Hawaii,
823 F. Supp. 766 (D. Hawaii 1993) ............................................................. 93-94

Hinchliffe v. American Motors Corp., 184 Conn. 607,
440 A.2d 810 (1984) .................................................................................. 100

Holup v. Gates, 544 F.2d 82 (2d Cir. 1975), cert. denied, 430 U.S. 941 (1977) ............................ 106

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8 (2d Cir. 2000) ...................... 103

Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439 (1937) ............................................... 89

Int'l Telepassport Corp. v.USFI, Inc., 89 F.3d 82 (2d Cir. 1996) ................................ 105

Jacques All Trades Corp. v. Brown, 57 Conn. App. 189,
752 A.2d 1098 (2000) .................................................................................. 101

Jewell v. Medical Protective Co., 2003 WL 22682332 (D. Conn. 2003 ........................... 94

Jones v. Helms, 452 U.S. 412, 101 S.Ct. 2434 (1981) ........................................... 92

Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480,
656 A.2d 1009 (1995) .................................................................................. 97

Locke v. United States, 283 F.2d 521 (1960) ..................................................... 103

Murphy v. McNamara, 36 Conn. Supp. 183, 416 A.2d 170 (1979) .............................. 101

Nastro v. D'Onofrio, 263 F. Supp. 2d 446 (D. Conn. 2003) ...................................... 97

New Orleans S.S. Ass'n v. Plaquemines Port, Harbor and Terminal Dist.,
874 F.2d 1018 (5th Cir. 1989) .................................................................... 89-90

New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339 (2d Cir. 1989) .................. 108

Northwest Airlines, Inc. v. County of Kent, Mich.,
510 U.S. 355, 114 S.Ct. 855 (1994)...............................................................88-90

Reader v. Cassarino, 51 Conn. App. 292, 721 A.2d 911 (1998) .......................... 100

Samaritan Inns, Inc. v. District of Columbia, 114 F.3d 1227 (D.C. Cir. 1997).............................. 103

Shanks v. City of Dallas, 752 F.2d 1092 (5th Cir. 1985) ................................ 108

Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033 (2d Cir. 1992)......................................... 101

Story Parchment Co. v. Paterson Parchment Paper Co.,
282 U.S. 555, 51 S.Ct. 248 (1931)................................................................... 103

Thames River Recycling, Inc. v. Gallo, 50 Conn. App. 767,
720 A.2d 242, 259 (1998).............................................................................. 98

The Daniel Ball, 77 U.S. (10 Wall.) 557 (1870)............................................ 87

Town of Manchester v. United Stone America, 2000 WL 872459
(Conn. Super., June 15, 2000)........................................................................ 97

U.S. v. Appalachian Elec. Power Co., 311 U.S. 377, 61 S.Ct. 291 (1940) ........................ 87

United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894 (1953) ............................ 108

Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446 (1980)...................... 91

Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309 (1982)...................................... 92

**Constitution, Statutes and Rules**

Anti-Head Tax, 49 U.S.C. App. § 1513........................................................... 88

Bridgeport City Code, Chapter 2.28 .......................................................... 4, 18

Conn. Gen. Stat. §§ 7-329a to 7-329u (port authorities enabling statute):

§§ 7-329a to 7-329u ........................................................................ 4, 95
§ 7-329c(10)................................................................................95-96
§ 7-329i ...................................................................................... 96

Conn. Gen. Stat. § 37-3a (pre-judgment interest)............................................. 63

Conn. Gen. Stat. §§ 42-110a *et seq.* (Conn. Unfair Trade Practices Act) ("CUTPA") ..................... 97

> § 42-110b(a) ..................................................................................................... 97
> § 42-110g(a) ........................................................................................... 100, 101
> § 42-110g(d) ................................................................................................. 102
> § 42-110g(h) ................................................................................................. 100

Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 .......................................... 106

Federal-Aid Highway Act of 1956, as amended, 23 U.S.C. § 101 *et seq* .......................... 79

> § 129(c) ........................................................................................................... 79

Fed. R. Civ. P. 57 ....................................................................................................... 106

Maritime Transportation Security Act of 2002, Pub. L. 107-295 (Nov. 25, 2002) ........................... 87

Rivers and Harbors Appropriation Act of 1884, as amended, 33 U.S.C. § 5(b) ...................... 87-88

U.S. Constitution:

> Art. I, § 8, clause 3 (Commerce Clause) ................................................... 88
> Art. I, § 10, clause 3 (Tonnage Clause) ................................................... 93
> Amend. V (Takings Clause)  ................................................................. 91
> Amend. XIV, § 1 (Privileges and Immunities Clause) ............................... 92

## Other Authorities

78 A.L.R. 858 "Distinction between uncertainty as to whether substantial damages resulted and uncertainty as to amount" (1932 and Cumulative Supp.) ............................................ 103

22 Am. Jur. 2d Damages:

> § 332 .............................................................................................................. 103
> § 446 .............................................................................................................. 105

E. Borchard, Declaratory Judgments 299 (2d ed. 1941) ......................................... 106

R. Dunn, Recovery of Damages for Lost Profits (4th ed. 1992) .................................... 104

10B C. Wright, A. Miller & M. Kane, Federal Practice and Procedure 3d § 2751 ...................... 106

*"We don't work for the Port Jefferson Ferry Company or the Port Jefferson ferry passengers. . . ."*

Joseph Riccio, Executive Director,
Bridgeport Port Authority
(Tr. 282:12-16.)

\*   \*   \*

*"Q.   Is it the Port Authority's view that whenever the Port Authority needs more operating funds it has the right to increase the ferry passenger tariff in order to obtain those funds?*

*A.   Yes.  We have the right to do that. . . ."*

Joseph Savino, Director and former
Chairman, Bridgeport Port Authority
(Tr. 573:4-12.)

*"Q.   If the ferry company earns a profit, does that mean that the Port Authority tariff is not excessive?*

*A.   No, they're unrelated."*

John Arnold, Port Authority expert
on port economics and finance
(Tr. 949:2-4.)

## <u>INTRODUCTION</u>

The trial in this case having been held before the Court without a jury on April 17, 18, 19, 20 and 24, 2006, plaintiffs respectfully submit the following proposed findings of fact and conclusions of law.

The proposed findings of fact ("PFF") (pp. 3-85 below) are comprehensive, not because the essential facts are complicated, or even disputed; they are neither.  They are comprehensive because plaintiffs wish to present to the Court a reasonably thorough description of the material evidence admitted at trial, including references to the record.  A detailed table of contents is provided to enable the Court to focus in on specific topics.

The essential facts are simple and substantially undisputed.  Since its inception in 1993, the Port Authority has funded essentially all of its operating expenses from revenues it receives from the ferry operation – principally from the Passenger Fee and secondarily from the leases with the Ferry Company (PFF ¶¶ 163-66).  Yet the activities of the Port Authority, by design and in fact, have ranged far beyond the ferry operation at the Bridgeport dock.  These *non* ferry-related activities have included:  the development of Steel Point, Cartech (now known as BRMC) and Derecktor; extensive planning work for a barge feeder service and a high speed ferry service; supervision of commercial shipping terminals; and the exercise of jurisdiction over all lands on Bridgeport and Black Rock harbors and their navigable tributaries.  These activities have consumed enormous amounts of time and other resources, which the Port Authority has paid for from proceeds of the ferry operation (PFF ¶¶ 69-159).  The evidence at trial clearly established that the proceeds of the Passenger Fee have greatly exceeded the Port Authority's reasonable cost of the facilities and services it has actually provided to the ferry operation (PFF ¶¶ 202-21).

That excess, or overcharge, is illegal, as shown in the proposed conclusions of law ("PCL") (pp. 86-108 below).  Although plaintiffs allege various claims – under a federal statute, constitutional clauses and state law – the legal standard underlying each claim is essentially the same:  a government agency's user fee, such as the Passenger Fee, must not exceed the agency's reasonable cost of the services or facilities it provides to the fee payers.  In this respect, user fees are starkly different from taxes, which are enacted by duly elected legislatures pursuant to constitutional authority, and whose proceeds may be used for any legitimate government purpose (*see* PCL ¶¶ 9-10).

The Port Authority has perverted the concept of a user fee; it has "taxed" a captive audience – the ferry passenger – excessively in order to fund a broad range of activities wholly

unrelated to the ferry operation.  The law properly places limits on user fees to prevent such abuse.  The Port Authority clearly has exceeded those limits in this case, and in so doing, it has harmed the Ferry Company as well as its passengers.

Plaintiffs are entitled to damages for past violations as well as declaratory or injunctive relief to prevent ongoing and future violations.  The Ferry Company has been damaged because, as the Port Authority's experts conceded, if the Passenger Fee had been less than it was in fact, the Ferry Company would have carried more vehicles and earned higher profits.  The Ferry Company's damages are reasonably estimated as the excess amount of the Passenger Fee (the "Overcharge") (PFF ¶¶ 222-37; PCL ¶¶ 52-59).  The damages incurred by plaintiff D & D Wholesale Flowers Inc. ("D&D") are straight-forward:  the Overcharge multiplied by the number of times that D&D paid it (PFF ¶¶ 238-43).  The Port Authority's persistent and intentional violations also warrant punitive damages under Connecticut law (PCL ¶¶ 49-50).  Finally, declaratory or injunctive relief is essential to prevent further violations (PCL ¶¶ 61-69).

## PROPOSED FINDINGS OF FACT[1]

### A.    The Parties

1.    Plaintiff Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company") is a Connecticut corporation with a principal office in Port Jefferson, New York.  (Stip. ¶ 1.)

---

[1]  The following abbreviations are used herein:  "**Tr. ___:___ [witness]**" refers to the page(s) and line(s) of the trial transcript and the surname of the witness then testifying; "**Pl. Ex. ___**" refers to a Plaintiffs' Trial Exhibit; "**Def. Ex. ___**" refers to a Defendant's Trial Exhibit; "**Joint Trial Memo.**" refers to the Proposed Joint Trial Memorandum dated February 1, 2005; "**Stip. ¶ ___**" refers to a numbered stipulation of fact contained in the Joint Trial Memo.; "**Baron Dep.**" and "**Oppel Dep.**" refer to the depositions of Jerome Baron and Edward Oppel, designated portions of which were admitted as Joint Trial Exhibits 1 and 2, respectively.

2.      The Ferry Company operates a public ferry service for passengers and vehicles between Bridgeport, Connecticut and Port Jefferson, Long Island, New York.  It has provided this service since 1883.  The ferry operates every day throughout the year according to published schedules.  (Stip. ¶ 2; Tr. 412:23 to 413:2 [Hall].)

3.      Plaintiff D&D is a corporation owned by Greg Rose, who originally was named as a plaintiff in this action.  The Court substituted D&D as a plaintiff in place of Mr. Rose.  (Stip. ¶ 4; Tr. 387:4-16 [Rose].)

4.      Plaintiff Frank C. Zahradka is a natural person.  (Stip. ¶ 5.)

5.      Defendant Bridgeport Port Authority ("Port Authority") is a port authority created and existing pursuant to Connecticut law, Conn. Gen. Stat. §§ 7-329a to 7-329u, with its principal place of business at 330 Water Street, Bridgeport, Connecticut 06604.  (Stip. ¶ 6.)

6.      The Port Authority also is governed by Chapter 2.28 of the Bridgeport City Code. (Joint Trial Memo. pp. 27-30; Pl. Ex. 208.)

7.      The affairs of the Port Authority are directed by a five-member Board of Commissioners, three of whom are appointed by the Mayor of Bridgeport, and two of whom serve by virtue of their positions as the City's Director of Economic Development and Harbor Master, respectively.  (Pl. Ex. 208 [Bridgeport City Code], § 2.28.030.)

8.      The Port Authority has been in operation since 1993 (Tr. 357:14-15 [Riccio]). Edward Oppel served as its first Executive Director, from 1993 until February 1996.  Oppel was succeeded by Joseph A. Riccio, who was named Acting Executive Director in February 1996 and Executive Director in November 1996.  Riccio has continued to serve as Executive Director through the present.  (Tr. 122:10-17 [Riccio].)

9.      As Executive Director, Riccio directs the day-to-day activities of the Port

Authority.  The Port Authority has two additional employees, Martha Klimas and Charmaine

Johnson, who, among other things, assist Riccio in his day-to-day duties.  (Stip. ¶ 8.)

**B.      The Trial Witnesses**

10.      The Court received testimony at trial from a total of eighteen witnesses:  (a)

twelve fact witnesses who testified in court, (b) two fact witnesses who testified by deposition,

and (c) four expert witnesses who also testified in court (two for each side).  All such witnesses

are listed below, in alphabetical order, along with a brief description of each.

**Arnold, John** (expert).  Port economist, self-employed.  Testified on behalf of the Port

Authority.  The Court deemed him an expert in port economics and finance.  (Tr. 832:11-22

[Arnold].)

**Baron, Jerome** (by deposition).  Chief Director of Finance for the City of Bridgeport

from 1993 until 2003.  (Baron Dep. at 4:3-17.)

**Deak, Edward** (expert).  Professor of economics at Fairfield University since 1970.

Testified on behalf of the Port Authority.  The Court accepted him as an expert in the area of

economics.  (Tr. 689:9-12; 706:5-12 [Deak].)

**Freimuth, Michael**.  Commissioner of the Port Authority from 1993 until 2003, while he

also served as Director of the Office of Economic Development for the City of Bridgeport.  (Tr.

6:2-15 [Freimuth].)

**Hall, Fred**.  Vice President and General Manager of the Ferry Company since 1985.  Has

been employed by the Ferry Company since 1976 (part time) and 1982 (full time).  (Tr. 410:10

to 411:5 [Hall].)

**Johnson, Charmaine**.  Port Authority employee since 1993 (part time) and 1995 (full time).  Her principal responsibilities include administrative assistance to the Executive Director, reporting for board meetings, financial reporting and other office functions.  (Tr. 465:9-18 [Johnson].)

**Klimas, Martha**.  Port Authority employee since 1997.  She performs many functions for the Port Authority and has several titles, including Development Associate, Foreign Trade Zone Administrator, Project Coordinator and Project Manager.  (Tr. 489:8-17 [Klimas].)

**McAllister, Brian**.  President of Ferry Company.  President and principal owner of Ferry Company's parent company, McAllister Towing and Transportation Company, Inc.  Was first employed by the Ferry Company in the late 1950s or early 1960s as a captain, first acquired a part ownership interest in 1955, and became sole owner in 1998.  (Tr. 586:5-25, 587:13-25, 588:22 to 590:24 [McAllister].)

**Merritt, William**.  Acting Chief Financial Officer of Ferry Company (and its affiliates) since 1996.  Owner of or partner in various real estate and other investment companies.  (Tr. 100:11 to 101:11 [Merritt].)

**O'Malley, Denis**.  Commissioner of Port Authority since April 2004 and Chairman since February 2005.  (Tr. 982:2-6; 990:5-7; 993:2-7 [O'Malley].)

**Oppel, Edward** (by deposition).  Former Executive Director of Port Authority, from 1993 until February 1996.  (Oppel Dep. at 15:21 to 16:16.)

**Riccio, Joseph**.  Executive Director of Port Authority since February 1996 to the present. (Tr. 122:10-17 [Riccio].)

**Rinaldo, Louis**.  Operations Manager for the Ferry Company in Bridgeport.  (Tr. 78:25 to 79:1 [Rinaldo].)

**Rose, Greg**.  Sole owner of plaintiff D&D.  (Tr. 387:4-16 [Rose]; *see also* ¶ 3 above.)

**Savino, Jospeh**.  Commissioner of Port Authority from 1993 to date, Chairman from 1999 until 2005, and Harbor Master of the City of Bridgeport for the past 17 years.  (Tr. 562:10 to 563:3 [Savino]; Stip. ¶ 7.)

**Schachter, Alan** (expert).  CPA and forensic accountant, currently employed as managing director of Willamette Management Associates and head of forensic accounting services in its Stamford, Connecticut, and New York City offices.  Testified on behalf of plaintiffs.  The Court deemed him an expert on accounting, auditing and financial analysis and investigations.  (Tr. 746:24 to 748:3, 753:22 to 754:3 [Schachter]; *see also* Pl. Ex. 218, Ex. 1 [*curriculum vitae*].)

**Shawah, George** (expert).  Real estate appraiser based in Bridgeport since 1958.  Testified on behalf of plaintiffs.  The Court determined him to be a real estate expert in appraisals in the commercial Bridgeport area.  (Tr. 610:5 to 611:19, 613:5-6 [Shawah]; *see also* 612:2-23 and Pl. Ex. 219, second page [qualifications].)

**Verrilli, Joseph**.  CPA and principal in Dworkin, Hillman, LaMorte & Sterczala, P.C. (the "Dworkin Firm"), the Port Authority's outside auditors.  In charge of Port Authority's audits since fiscal year 1996.  (Tr. 40:22 to 41:15 [Verrilli].)

## C.    The Water Street Dock and the Ferry Terminal

11.    The Ferry Company boats dock on the Bridgeport side at the Water Street Dock (formerly known as the Union Square Dock) (the "Dock"), as they have done since before 1980. (Tr. 78:25 to 79:9 [Rinaldo].)

12.    The property comprising the Dock is "about three acres," according to Riccio (Tr. 129:17-23 [Riccio]).  According to a 1997 appraisal (before construction of a new access road in 2002), it was 1.77 acres (Pl. Ex. 219, fourth page).

13.    The location and present configuration of the Dock are shown in aerial photographs of the harbor (Pl. Ex's 201-A) and the Dock (Pl. Ex. 201-L).  (Tr. 128:3-9.)

14.    Before the Port Authority was established in 1993, the Ferry Company leased the dock and other facilities at the Dock from the City of Bridgeport (the "City").  (Pl. Ex. 14 [Property Management Agreement], last "Whereas" clause at p. 1 and ¶ 5 at p. 4.)

15.    At that time, the City-provided facilities at the Dock included a concrete block building with a small office, public restrooms, little or no indoor shelter for passengers, and a food and beverage cart.  (Tr. 417:18-23; 454:21 to 455:14 [Hall]; Def. Ex. 8 [photograph].)

16.    On March 1, 1993, the City and the Port Authority entered into a Property Management Agreement under which, among other things, the Port Authority undertook to make improvements to the Dock and the City agreed to transfer ownership of the Dock to the Port Authority.  (Pl. Ex. 14.)

17.    The building now at the Dock was constructed mostly in 1995 and was completed in 1996 (Tr. 134:25 to 135:15 [Riccio].)  Several photographs depicting the building's interior (first floor only) and exterior were admitted into evidence.  (Pl. Ex. 201-L; Def. Ex's 6, 7 and 9.)

18.    The terminal building consists of two floors.  The ground floor has a public waiting area, public restrooms, a ferry service information counter, a cafeteria, and a small office for the Ferry Company (Tr. 91:8-13; 85:4-14 [Rinaldo]).  The second floor houses the Port Authority and Connecticut World Trade Association ("CWTA") offices; it has a reception area, a

conference room, several offices, a kitchen and restroom; it is not open to the public (*id.* at 91:14-24; Tr. 417:12-17; 158:24 to 159:9 [Riccio]).

**D.     The Leases**

**The Current Lease**

19.     The Ferry Company leases facilities at the Dock pursuant to a lease agreement between the Port Authority and the Ferry Company dated December 1, 1998, as amended by a first amendment to such lease agreement dated July 29, 2002 (together, the "Current Lease"). (Stip. ¶ 9; Pl. Ex's 28 and 29.)

20.     Under the Current Lease, the Ferry Company has "a non-exclusive preferential use" of the Dock – *i.e.*, the use of dock facilities and vehicle staging areas for regularly scheduled ferry service.  The Ferry Company also has access to "such office space and waiting room space at the Premises as the Port Authority may from time-to-time make available to the Company," and up to four parking spaces for the Ferry Company's employees.  The Port Authority "reserves for itself all other uses" of the Dock.  (Stip. ¶¶ 10, 12, 19; Pl. Ex. 28, first "Whereas" clauses and ¶ 1(a) and 1(b) at pp. 2-3.)

21.     The term of the Current Lease commenced on December 1, 1998, and continues until November 30, 2011, and may be extended by the Ferry Company for two additional terms of ten years each.  (Stip. ¶ 17; Pl. Ex's 28 and 29.)

22.     The Current Lease requires the Ferry Company to pay monthly rent to the Port Authority at annual rates that increase each year, ranging from $100,000 for the initial year (December 1, 1998 to November 30, 1999) to $158,956 for the final year prior to any extensions (December 1, 2010 to November 30, 2011).  (Stip. ¶ 18; Pl. Ex. 28, p. 4 and Pl. Ex. 29, p. 3.)

23.    If the Ferry Company were to extend the Current Lease for one or both of the additional ten-year terms, the rental for those periods would be set at "then current market rates." (Pl. Ex. 29, ¶ 4.)

24.    The Current Lease also requires the Ferry Company to (among other things):

(a)    purchase and maintain insurance covering the Premises;

(b)    indemnify the Port Authority with respect to any claim arising from the activities of the Ferry Company; and

(c)    undertake snow removal.

(Stip. ¶ 20; Pl. Ex. 28, ¶¶ 5-6; Pl. Ex. 29, ¶ 6.)

25.    Under the Current Lease, the Port Authority has the obligation to maintain the Dock in reasonable repair and to maintain the portions of the terminal building used by the Ferry Company or its passengers.  (Tr. 168:8-15 [Riccio].)

## Market Value

26.    Before it entered into the December 1, 1998, lease that forms part of the Current Lease (Pl. Ex. 28), the Ferry Company retained Shawah to appraise the rental value of the land and the first floor of the building at the Dock.  In his report dated June 3, 1997, Shawah concluded that the "[r]ental value of the land and building combined is $83,000 per year, tenant to pay for their own utilities and operating expenses" (Pl. Ex. 219, 4th page; *see also* Tr. 614:9 to 616:16 [Shawah]).

27.    The annual fair rental value of the leased premises according to Shawah's 1997 appraisal ($83,000) was below the annual rental of $100,000 that the Ferry Company agreed to pay under the Current Lease for the first year (December 1998 to November 1999, *see* Pl. Ex. 28, at p. 4).

28.     Merritt (the Ferry Company's CFO) negotiated the Current Lease, both initially in 1998 and when it was amended in 2002.  Based on his own experience and knowledge of the real estate market, Merritt independently concluded that the rental payments thereunder were above market rates.  (Tr. 102:25 to 103-6; 104:24 to 105:7; 106:23 to 107:2 [Merritt].)

29.     Riccio negotiated the Current Lease on behalf of the Port Authority.  Both he and Merritt testified that it was negotiated "at arms' length."  (Tr. 167:5-10 [Riccio]; Tr. 104:21-23; 106:20-22 [Merritt].)

30.     Riccio believed, at the time he negotiated and signed the Current Lease, that the rentals thereunder reflected the fair rental value of the property.  (Tr. 167:11-14 [Riccio].)

### The Food Services Lease

31.     A restaurant and food services facility is operated in the terminal building by Steamboat Concessions, Inc. ("Concessions"), a wholly-owned subsidiary of the Ferry Company, pursuant to a Lease and Food Services Agreement entered into in August 1996 between the Port Authority, as landlord, and Concessions, as tenant (the "Food Services Lease").  Pursuant to the Food Services Lease, Concessions is required to pay to the Port Authority:

   (a)     a basic rent of $1,000 per month;

   (b)     additional rent equal to (i) 1% of Concessions' annual gross receipts above $100,000 and up to $200,000, plus (ii) 2% of its annual gross receipts above $200,000; and

   (c)     additional rent of $700 per month to defray the Port Authority's cost of regular cleaning of the Terminal premises.

(Stip. ¶ 21; Pl. Ex. 30, Section 2.)

32.     Pursuant to the Food Services Lease, Concessions also is required to pay for its use of electricity, gas and telephone and to clean, maintain and make repairs to the premises it occupies at the Terminal.  (Stip. ¶ 22; Pl. Ex. 30, ¶¶ 3.02(d) and 3.03.)

E.    **The Ferry Company's Activities at the Dock**

33.    **Day-to-day operations**.  The Ferry Company, through its own employees, is responsible for day-to-day ferry operations at the Dock, under the supervision of an Operations Manager, Louis Rinaldo, and a staff of fifteen to twenty-two dock hands and reservation clerks. (Tr. 79:22 to 80:8 [Rinaldo].)

34.    Rinaldo and his staff are responsible for (among other things):

    (a)    docking and undocking the ferryboats (*id.* at 82:15-17; 84:23-25);

    (b)    staging vehicles waiting to board the ferry (*id.* at 82:9-12);

    (c)    directing vehicles and passengers on and off the ferryboats (*id.* at 82:18-25; 84:23 to 85:3);

    (d)    shuttling passengers in vans and golf carts to and from nearby parking lots (at no cost to the passengers for parking or the shuttle) (*id.* at 84:4-22);

    (e)    snow removal on the Dock (*id.* at 83:10-12; *see also* Tr. 151:14 to 152:7 [Riccio]); and

    (f)    garbage disposal from the Dock and the Port Authority office on the second floor of the terminal building (Tr. 83:13-18 [Rinaldo]).

(*See also* Tr. 419:21 to 420:23 [Hall].)

35.    Rinaldo has been the Ferry Company's operations manager in Bridgeport since before the Port Authority was established.  His functions have not changed significantly since the Port Authority was established.  (Tr. 90:25 to 91:7 [Rinaldo].)

36.    **Security**.  Hall, the Ferry Company's general manager, has been personally involved in formulating and implementing the homeland security regulations as they affect ferry vessels throughout the country, in his role as former President of the Passenger Vessel Association.  He also has delivered papers on that subject.  (Tr. 423:11-24 [Hall].)

37.     Ferry Company personnel perform security functions in both Bridgeport and Port Jefferson.  Ferry Company dock hands in both ports are trained in homeland security procedures by the Ferry Company's security officer, Donald Fromm, who is also the Port Captain in Port Jefferson.  (Tr. 89:10 to 90:6 [Rinaldo]; Tr. 422:7 to 423:10, 174:5-17 [Hall]; *see also* Tr. 580:15 to 581: 6 [Savino] [Savino works closely with Fromm on security plan in Bridgeport].)

38.     On the Port Jefferson side, Ferry Company personnel perform all security functions pursuant to a security plan filed with, approved by and audited by the United States Coast Guard.  (Tr. 422:7 to 423:10 [Hall].)

39.     On the Bridgeport side, Ferry Company dock hands, trained in security measures by Port Captain Fromm, perform security functions such as selectively searching vehicle trunks, carefully vetting trucks, and reporting suspicious activities.  Terminal staff also are trained in and perform security functions.  (Tr. 89:10 to 90:6 [Rinaldo]; Tr. 423:25 to 425:17; *see also* Tr. 796:3-22 [Schachter] [car trunk searched by Ferry Company dock staff, not by Port Authority security guard in booth].)

40.     If the Port Authority did not provide security functions on the Bridgeport side, the Ferry Company would provide all such security functions, as it does on the Port Jefferson side and as it partly does on the Bridgeport side.  (Tr. 426:6-10 [Hall].)

41.     **Insurance**.  The Ferry Company maintains liability and insurance covering the Dock, as required by the Current Lease, in amounts that meet or exceed the lease requirements.  (Tr. 428:20 to 429:6 [Hall].)

F.     **The Ferry Company's Investments**

42.     The Ferry Company has invested substantial amounts to improve and expand the ferry operation, acquiring new ferry boats and improving facilities on both sides of its route; for example:

(a)     In the 1980s, the Ferry Company built two new boats, the Grand Republic (1983) and the Park City (1986), for a total cost of about $12 million.  (Tr. 418:7-10 [Hall]; Tr. 590:25 to 592:4 [McAllister].)

(b)     In the 1980s, the Ferry Company invested about $250,000 of its own funds and another $600,000 that it obtained from a Connecticut state grant to rebuild the concrete pier at the Dock (in Bridgeport).  (Tr. 415:21 to 416:3, 457:4-16 [Hall]; Tr. 595:25 to 596:6 [McAllister].)

(c)     The Ferry Company has made "a series of renovations" to the terminal building in the Port Jefferson side from the 1980s to date.  (Tr. 415:21 to 416:10; 456:6-16 [Hall]; Tr. 596:7 to 597:10 [McAllister].)

(d)     In 1999, the Ferry Company invested about $15.5 million to acquire a new vessel, the P.T. Barnum, thereby increasing its fleet from two to three ferryboats.  (Tr. 107:8 to 108:19 [Merritt]; Tr. 592:5 to 593:13 [McAllister].)

(e)     In 2003, the Ferry Company invested another approximately $15.5 million to acquire a new boat, the "second" Grand Republic, to replace the older and smaller Grand Republic.  (*Id.*)

(f)     Over the past few years, the Ferry Company has invested about $1.8 million to install a new, second ramp in Port Jefferson.  (Tr. 456:8-11 [Hall]; Tr. 597:10-22 [McAllister].)

43.     The Ferry Company's representatives testified that the investments in the ferry boats, which have increased capacity and frequency of service, have been the driving force behind the increase in the number of vehicles and passengers carried by the Ferry Company.  (Tr. 594:25 to 595:15 [McAllister]; Tr. 417:24 to 418:6 [Hall].)

44.     Port Authority employee Klimas attributed the significant increase in vehicles carried between 1998 and 2000 to the addition of the third vessel in mid-1999.  (Tr. 559:7 to 561:10 [Klimas].)

45.     The Port Authority's expert economist, Deak, conceded that increases in the number of vehicles carried by the Ferry Company have resulted mainly from the additions and improvements to the fleet, rather than from the new terminal or other improvements to the Dock.  (Tr. 728:21 to 729:11 [Deak]; Def. Ex. 68, ¶ 22 at p. 14; Pl. Ex. 227.)

## G.    The Passenger Fee

46.     Since 1993, the Port Authority has imposed a "tariff" or fee on passengers and vehicles embarking on or disembarking from the Ferry Company ferries at the Dock (the "Passenger Fee") (Stip. ¶ 23).

47.     The Port Authority's purpose in instituting the Passenger Fee was "to create a source of revenue to support the operations of the Port Authority."  That purpose has not changed since 1993.  (Tr. 569:14-23 [Savino].)

48.     From 1993 through 2004 (the last year for which figures were available at the time of trial) the Port Authority collected more than $9.5 million in Passenger Fees (*see* Table at ¶ 165 below).

49.     The Port Authority set the initial Passenger Fee, in 1993, at 50 cents per passenger and $1 per vehicle.  (*See*, *e.g.*, Pl. Ex. 168, Rates, "Bpt. PA TAX".)

50.    The Port Authority increased the Passenger Fee in 1996.  It increased the fee for "Auto including driver" to $1.50, increased the fee for "Adult, walk-on" to 75 cents, and set fees for various other categories of vehicles and passengers (*e.g.*, "cars with unlimited passengers" – $2.50).  (Stip. ¶¶ 29-30, 34; *see also* Pl. Ex. 107 [Feb. 15, 1996, board minutes], p. 2.)

51.    The Port Authority again increased the Passenger Fee effective January 15, 2003.  It increased the fee for "Auto including driver" from $1.50 to $2.00 and the fee for "Foot passenger adult" from 75 cents to $1, and it increased the fee for other categories by varying amounts.  (Pl. Ex. 156, pp. 1-2 [minutes of board meeting on Dec. 12, 2002]; Pl. Ex. 31 [Memorandum of Understanding]; Stip. ¶ 30.)

52.    Since 1993 and continuing through the present, the Ferry Company has collected the Passenger Fee from the passengers, on behalf of the Port Authority, under the following procedures (*see generally* Tr. 435:6 to 441:2 [Hall]):

(a)    The Ferry Company collects the Passenger Fee at the time that the passengers purchase their ferry tickets.  (*Id.* at 435:6-14.)

(b)    On or about the tenth day of each month, the Ferry Company remits to the Port Authority the amounts of the Passenger Fee that it collected the previous month.  (*Id.* at 440:20-24.)

(c)    Along with the remittance, the Ferry Company provides to the Port Authority a written report of the number of tickets sold, and the amounts collected, in the various categories of passengers and vehicles.  (*Id.* at 435:15 to 437:10; Pl. Ex. 82.)

(d)    The Port Authority pays the Ferry Company a fee for collecting the Passenger Fee; that fee was $22,500 per year until May 2003, when it was increased to

$32,500 per year.  (Pl. Ex. 31, ¶ 2; Stip. ¶ 27; Tr. 295:11-14 [Riccio].)  (By comparison, in 2003 Passenger Fee collections totaled about $1.3 million; *see* table at ¶ 165 below.)

53.    The Ferry Company has continued to collect the Passenger Fee despite its contention that it is unlawful, without waiving the right to challenge its legality.  In the February 21, 2003, Memorandum of Understanding – in which the Ferry Company agreed to collect the Passenger Fee at the higher rates that became effective on January 15, 2003 – the parties agreed as follows:

> This Memorandum of Understanding is without prejudice to either party's position regarding the Port Authority's right or power to impose the Tariff (including any increases in the rates thereof) or the validity of the Tariff in whole or in part.

(Pl. Ex. 31, ¶ 6; Stip. ¶¶ 32, 33.)

## H.    **The $1 Surcharge**

54.    On December 14, 2005, the Port Authority decided to collect a $1 surcharge from ferry passengers.  The purpose of the $1 surcharge was to raise funds to pay the Port Authority's legal costs in this action.  (Pl. Ex's 236, 238 at p. 4.)

55.    On February 1, 2006, the Port Authority began to collect the $1 surcharge from passengers at the Dock, as vehicles or passengers boarded or exited the ferryboats.  This caused great disruption to the ferry schedule and operation as well as anger and confusion among passengers, who had already paid their full fare (including the Passenger Fee) in advance or onboard the ferry, but were being compelled, by force if necessary, to pay an additional dollar at the Dock.  (Tr. 645:3-15; 678:22 to 679: [McAllister]; Tr. 987:20-24 [O'Malley].)

I.      **The Port Authority's Broad Purposes and Jurisdiction**

56.     Since its formation in 1993, the Port Authority has been engaged in some activities related to the ferry operation, and many activities not so related, as discussed in this section and the three sections that follow it (J, K and L).

57.     The Port Authority's purpose is broadly defined in the Bridgeport City Code:

> The purpose of the authority shall be: to foster and stimulate the shipment of freight and commerce through the ports of Bridgeport, Connecticut; to develop and promote port facilities with the district in order to create jobs, increase the city's tax base and provide special revenues to the city; to work with the government of the city to maximize the usefulness of available public funding by consolidating and coordinating private efforts to assist the city's waterfront and industrial development program, to cooperate with the state and federal agencies in the maintenance, development, improvement and use of district harbors, waterways and industrially zoned properties.

(Joint Trial Memo. at 27 [Stipulation of Law]; Tr. 123:17 to 124:25 [Riccio].)

58.     As both Savino and Verrilli (the Port Authority's outside auditor) testified, the purpose and function of the Port Authority are "a lot broader" than supervising the Bridgeport Port Jefferson ferry. (Tr. 563:13-16 [Savino]; Tr. 65:17-20 [Verrilli].)

59.     The Port Authority has, and exercises, jurisdiction over all lands (except residential property) within 1,000 feet of the high water mark of Bridgeport Harbor and its navigable tributaries, including the waters and tributaries of Black Rock Harbor, and including certain lands beyond the 1,000 foot limit, such as Steel Point and the BRMC. (Tr. 566:20 to 568:18 [Savino]; Tr. 125:18 to 127:5 [Riccio].)

60.     The Port Authority's jurisdiction includes lands within 1,000 feet of the Pequonnock and Yellow Mill Rivers, both of which extend for some distance from Bridgeport Harbor, as seen in an aerial photograph of the harbor. (Pl. Ex. 201-A; Tr. 129:8-16 [Riccio].)

61.     Plaintiffs' accountings expert, Schachter, determined, based on his review of copious records, that the Port Authority has been engaged in extensive activities unrelated to the ferry operation.  (Tr. 762:22 to 763:14 [Schachter]; Pl. Ex. 218, ¶ 2.0.)

62.     The Port Authority's port expert, Arnold, testified that the Port Authority's role is not only to develop port activity, but to "act as an incubator for growth of economic activity that supports the city itself" (Tr. 862:7-9 [Arnold]); and that the Port Authority has spent time and other resources on activities other than the ferry operation (*id.* at 959:23 to 960:1).

63.     The Port Authority deems itself a "quasi-independent" agency, answerable neither to the Mayor of Bridgeport nor to any other elected officials.  (Tr. 982:23 to 983:5 [O'Malley]; *see also* Tr. 662:17 to 664:17 [McAllister].)

## J.      Lack of Time Records

64.     The Port Authority generally has not maintained records of the time that its employees have devoted to specific projects or the time that they have devoted to ferry-related versus non ferry-related activities.  (Tr. 221:16 to 222:7 [Riccio]; Tr. 525:15 to 526:7, 527:22 to 528:23 [Klimas]; Tr. 466:16 to 467:10 [Johnson]; Oppel Dep. at 31:7-25; Pl. Ex's 54, 64.)

65.     Klimas is unable to estimate how much time she has devoted to ferry related activities versus non-ferry related activities, throughout the years that she has worked at the Port Authority (Tr. 528:24 to 529:24 [Klimas]).

66.     The Port Authority's port expert, Arnold, did not consider how much time Riccio, Klimas or Johnson actually spend on ferry-related as opposed to non ferry-related activities.  He did not consider it relevant.  (Tr. 909:2 to 910:2 [Arnold].)

**K.**    **The Port Authority's Ferry-Related Activities**

67.    Since it began operations in 1993, the Port Authority has performed the following activities relating to the ferry operation:

(a)    Terminal building.  The Port Authority built the terminal building, which was completed in 1996.  According to Riccio, construction costs were about $3 to $4 million, which were funded mostly by federal, state and city grants, and the Port Authority spent about $300,000 of its own funds. (Tr. 134:25 to 135:15 [Riccio].)  The federal funding, under the Ferry Boat Discretionary Program, was obtained at the Ferry Company's initiative by the City of Bridgeport and the Greater Bridgeport Regional Planning Agency (Tr. 431:15 to 432:13 [Hall]).

(b)    Bulkhead repairs.  In 1997 or 1998, the Port Authority asked the State to repair the bulkhead at the Dock, to correct problems with the State's earlier work on the bulkhead in the early 1990s.  The State and federal government, not the Port Authority, funded that work.  (Tr. 143:4-23; 308:4-6 [Riccio].)

(c)    Access road.  The Port Authority, together with the Ferry Company, asked the State to construct a secondary access road at the Dock, in 2002.  The State, not the Port Authority, performed and substantially funded that work.  (Tr. 145:5-10; 146:13 to 147:20 [Riccio]; Tr. 432:14 to 433:3 [Hall]; Pl. Ex. 10, Note 11 at p. 12.)

(d)    Garage.  In 1997 or 1998, the Port Authority began to design and since then has tried to fund construction of a garage facility at the Dock.  Construction has not begun.  If the garage were built, ferry passengers would be required to pay to park there, and the garage would be yet another ferry-related source of revenue for the Port Authority.  (Tr. 147:21 to 150:16 [Riccio]; Tr. 971:16 to 972:1 [Arnold].)

(e)    <u>Security equipment</u>.  The Port Authority has applied for and received federal grants to procure security equipment for the Dock (as well as for the BRMC and the harbor generally).  (Tr. 310:2 to 311:19 [Riccio]; Tr. 986:4-16, at 984:12 [O'Malley] [security grants benefit "the ferry company as well as the rest of the port"].)

(f)    <u>Day-to-day activities</u>.  The Port Authority has performed limited day-to-day activities relating to the ferry operation.  According to Riccio, this consists of "[j]ust supervision of the security and the cleaning personnel" (Tr. 150:17-22 [Riccio]; *see also* Tr. 321:2-18 [Riccio]).  According to Klimas, she spends a portion of each day on ferry-related issues such as checking with security guards and maintenance staff and checking terminal facilities, and (as she testified in response to the Court's question) "the rest of the day [she spends] on the other projects that the Port Authority has" (Tr. 536:6-8 [Klimas]; *see also* 534:24 to 536:8, 490:17 to 491:8 [Klimas]).  Johnson's work involves all operations of the Port Authority, not just matters relating to the Ferry Company (Tr. 466:12-15 [Johnson]).

68.    Arnold, the Port Authority's port expert, testified that the Port Authority's ferry-related functions are "relatively simple" and "straightforward" (Tr. 902:22 to 903:17 [Arnold]; Def. Ex. 67, ¶ 40), and even "minimal" (*id.* at 911:24 to 913:20).  Arnold was not familiar with the Port Authority's day-to-day activities as they relate to the ferry, either at the time he wrote his report or at trial (*id.* at 903:21 to 906:16).

## L.    **The Port Authority's *Non* Ferry-Related Activities**

69.    Since it began operations in 1993, the Port Authority has been engaged in numerous and extensive activities *not* related to the ferry operation, including:

- Steel Point
- Cartech
- BRMC
- Derecktor
- High Speed Ferry
- Barge Feeder Service
- Foreign Trade Zone
- Cilco and Other Commercial Terminals
- Dredging
- Boat Pump-Out Service
- Projects Affecting Land
- Other Non Ferry-Related Activities and Expenses

Each of these is discussed separately, in ¶¶ 70-158 below.

### Steel Point

70.     The Steel Point peninsula is a tract of land of about 50 acres located to the east and across the Pequonnock River from the Dock.  The Port Authority does not own any part of it, but has and exercises jurisdiction over it.  (Tr. 132:5-8; 172:2 to 173:4 [Riccio]; Tr. 8:12-14 [Freimuth]; Pl. Ex's 201-A and 201-I.)

71.     During Oppel's tenure as Executive Director, from 1993 until early 1996, the Port Authority actively pursued various projects relating to Steel Point, including efforts to acquire the property and to promote casinos (Oppel Dep. 24:16-21; 28:12 to 29:9).   The casino project "was so huge that it just about put everything else on hold for almost two and a half years" (*id.* at 28:24 to 29:1).

72.     The Port Authority spent some of its operating funds on Steel Point.  For example, in 1993, it paid $10,000 for a design study for Steel Point (Oppel Dep. 110:2-20; Pl. Ex. 89, p. 6, ¶ 4), and in 1995 it helped finance a design competition for Steel Point (Oppel Dep. 132:13 to 133:5; Pl. Ex. 97, p. 5).

73.     After Riccio became Executive Director in 1996, the Port Authority continued to work on Steel Point.  It issued and administered requests for proposals ("RFPs") for the development of Steel Point, installed a new computer program in connection with such solicitations, mailed out over 500 packages to bidders, and reviewed each of the proposed projects.  (Tr. 173:12 to 174:19; 335:24 to 336:21 [Riccio]; Pl. Ex. 116 at 3, ¶ 3; Pl. Ex. 117 at p. 4; Pl. Ex. 118 at 2, ¶ 1; Pl. Ex. 121 at pp. 1-2.)

74.     The Port Authority has assisted in the relocation of marinas located on Steel Point.  (Tr. 7:25 to 8:6 [Freimuth]; Tr. 174:20-22 [Riccio].)

75.     The development of Steel Point has been the subject of discussion at Port Authority board meetings on numerous occasions.  (Tr. 174:23-25 [Riccio]; *e.g.*, Pl. Ex's 116, p. 3; 117, p. 4; 118, p. 2; 121, p. 1; 122, p. 2; 123, p. 1.)

76.     The Port Authority has devoted its personnel's time and other resources, including salaries and overhead expenses, to these activities relating to Steel Point.  (Tr. 174:17-25; 175:14-16; 222:8 to 223:6 [Riccio]; Tr. 8:21 to 9:9 [Freimuth]; Oppel Dep. at 30:24 to 31:6.)

77.     The Port Authority's activities concerning Steel Point do not relate to the ferry operation.  (Tr. 9:10 to 10:8 [Freimuth].)

## Cartech

78.     The Cartech property (now known as the Bridgeport Regional Maritime Complex, or "BRMC") is a tract of land of about 48 acres located to the east and across the Yellow Mill River from Steel Point, and across the harbor from the Dock.  (Tr. 130:19-22; 132:15-19 [Riccio]; Pl. Ex's 201-A and 201-G.)

79.     The Port Authority, working with the City of Bridgeport, acquired the Cartech property in 1999 by condemnation (Tr. 176:5-18 [Riccio]; Pl. Ex. 7, note 11 at p. 10; Pl. Ex. 128

at p. 4 [board approval of acquisition by eminent domain]).  The Port Authority set a price of $2.5 million for the property (and borrowed $2.7 million from the City to cover the purchase price and expenses), but following litigation, the Port Authority agreed to pay the former owner an additional $6.75 million, bringing the total acquisition cost to $9.45 million (Pl. Ex. 11, note 12 at p. 12 and note 9 at p. 9).  Riccio attended court hearings, gave a deposition and otherwise participated in that litigation (Tr. 177:11-18 [Riccio]; Pl. Ex. 141 at p. 1 [board discussion of depositions in Cartech litigation]).

80.    The acquisition and development of the Cartech property has been the subject of discussion at Board meetings on numerous occasions.  (*E.g.*, Pl. Ex's 128, p. 4; 129, pp. 2-3; 131, p. 2; 133, pp. 1-2; 134, p. 1-2; 135, p. 3; 136, p. 3; 137, pp. 1-2, 3-4; 139, pp. 2, 3; 140, p. 1; 155, p. 2; 232 pp. 5-6; 237 pp. 1-2.)

81.    The Port Authority devoted its personnel's time and other resources, including salaries and overhead expenses, to the acquisition of the Cartech property.  (Tr. 10:25 to 11:6 [Freimuth]; Tr. 177:11-18; 179:7-23; 221:8-15 [Riccio]; 506:17-25, 509:11 to 510:17 [Klimas]; 961:11-23 [Arnold].)

82.    The Port Authority's condemnation and acquisition of the Cartech property did not relate to the ferry operation; the Cartech property does not even indirectly benefit the ferry operation.  (Tr. 11:7-14, 26:2-6 [Freimuth]; *see also* Tr. 507:20-23 [Klimas].)

## BRMC

83.    Since it acquired the Cartech property and renamed it the BRMC (Tr. 175:17-25 [Riccio]), the Port Authority has been heavily involved in its development (*id.* at 179:25 to 180:1).  The Port Authority has issued and administered multiple RFPs and has entered into multiple contracts for its environmental cleanup and development, including the following:

(a)    A July 2000 grant, for $50,000, to prepare a study under the Connecticut Environmental Policy Act.  The Port Authority selected the contractor and processed its invoices under this study.  (Tr. 512:3-10 [Klimas] and Pl. Ex. 55.)

(b)    A January 2001 agreement stating the scope of work for an environmental study for a portion of the Cartech site to be used by Derecktor – signed by Riccio and witnessed by Klimas and Johnson.  (Tr. 512:8 to 513:1 [Klimas] and Pl. Ex. 56.)

(c)    A $6.4 million grant from the State of Connecticut to the City and the Port Authority for pre-development work for a portion of the Cartech site to be used for Derecktor.  The Port Authority placed ads for contracts under this grant, reviewed bids, ensured that payments were made, and otherwise administered this grant.  (Tr. 513:10 to 514:18 [Klimas] and Pl. Ex. 57.)

(d)    A $2.5 million grant from the Connecticut Department of Economic and Community Development, for environmental remediation of the Cartech site, under the Urban Sites Remedial Action Program.  The Port Authority was involved in applying for the grant, selecting contractors for this work, arranged to pay invoices, and physically inspected the site.  (Tr. 514:19 to 516:11 [Klimas] and Pl. Ex. 58.)

(e)    A January 2002 agreement, for about $595,000 (later increased to over $1 million), to prepare part of the Cartech site for development.  (Tr. 516:12 to 517:8 [Klimas] and Pl. Ex. 59.)

(f)    An April 2002 agreement, for $3.3 million (later increased), to install a bulkhead on the BRMC, to be used by Derecktor Shipyards.  (Tr. 517:9 to 518:8 [Klimas] and Pl. Ex. 60.)

(g)     A January 2003 agreement, for over $1.6 million (later increased to more than $2.5 million), to remediate and prepare part of the BRMC for development.  (Tr. 518:9 to 519:20 [Klimas] and Pl. Ex. 61.)

(h)     A December 2002 agreement, for about $425,000, to prepare other areas of the BRMC for development.  (Tr. 519:21 to 520:15 [Klimas] and Pl. Ex. 62.)

84.     Port Authority employees have physically gone to the BRMC property on numerous occasions to inspect the work of contractors and perform other duties there.  (Tr. 508:7 to 509:7 [Klimas].)

85.     The Port Authority reviewed and approved numerous invoices from, and made numerous payments by check to, contractors involved in the development of the BRMC.  (Tr. 180:12 to 182:9 [Riccio]; Tr. 509:8-10 [Klimas]; Pl. Ex. 32 at pp. 40-42.)

86.     The Port Authority has arranged and paid for security, plowing and snow removal at the BRMC.  (Tr. 179:15-20 [Riccio].)

87.     The Port Authority arranges and pays for insurance on the BRMC.  (Tr. 473:8 to 474:17 [Johnson]; Tr. 5071-7 [Klimas].)

88.     The Port Authority has discussed the development of the BRMC with residents of the "East End" of Bridgeport, on which the BRMC is located, and funded a study for such development.  (Tr. 182:19 to 183:8; 233:15 to 234:4 [Riccio]; Pl. Ex. 133 at pp. 4-5.)

89.     The development of the BRMC has been the subject of discussion at Board meetings on numerous occasions.  (Tr. 183:9-15 [Riccio]; *see also* Pl. Ex's 230, p. 6; 231, pp. 2, 4; 234, p. 2; and additional references to discussions of Cartech in ¶ 80 above and of Derecktor in ¶ 105 below.)

90.    The Port Authority has devoted its personnel's time and other resources, including salaries and overhead expenses, to these activities relating to the BRMC.  (Tr. 183:16-19; 221:8-15; 222:8 to 223:6 [Riccio]; 509:11 to 510:17 [Klimas].)

91.    There have been days when the primary focus of Klimas's working day was the development of the Cartech property.  (Tr. 510:24 to 511:6 [Klimas].)

92.    To date the Port Authority has derived no revenue from all its activities relating to the BRMC (apart from certain revenue from the Derecktor Lease, discussed in ¶¶ 100-104 below).  (Tr. 183:20-23 [Riccio].)

93.    The Port Authority's activities relating to the BRMC do not relate to the ferry operation.  (Tr. 10:18-24, 11:7-14 [Freimuth]; 507:20-23 [Klimas].)

### Derecktor

94.    The Port Authority has been involved in the development and leasing of a portion of the BRMC, comprising about 23 acres, to a private shipyard known as Derecktor Shipyards ("Derecktor").  (Tr. 11:15 to 12:1 [Freimuth]; Tr. 132:15-23; 183:24 to 184:2 [Riccio]; Pl. Ex's 66, 201-G.)

95.    The Port Authority applied for and administered government grants for developing the property for Derecktor.  (Tr. 185:1-4 [Riccio].)

96.    The Port Authority arranged for environmental clean-up and other work in getting the land ready for development for Derecktor.  (Tr. 184:22-25 [Riccio]; see also ¶ 83 above [contracts for BRMC].)

97.    The Port Authority retained and paid for attorneys to advise it in connection with Derecktor.  In 2002, for example, the Port Authority borrowed $90,000 to pay legal and accounting fees "for the Derecktor project so far," as discussed at a board meeting (Pl. Ex. 153 at

pp. 2-3; *see also* Tr. 185:8 to 186:7 [Riccio]).  In the same paragraph in those board minutes, Riccio stated:  "now would be a good time to consider increasing the [ferryboat] tariff" (*id.*).

98.     The Port Authority hosted a forum at a hotel to garner support for the Derecktor project.  (Tr. 186:8-13 [Riccio]; Pl. Ex. 131 at BPA 000477.)

99.     The Port Authority has arranged and paid for security at the Derecktor site.  (Tr. 186:14-21 [Riccio].)

100.     **The Derecktor Lease**.  The Port Authority entered into a lease with Derecktor dated September 11, 2000 (the "Derecktor Lease") (Pl. Ex. 66; Tr. 12:8-20).  The Derecktor Lease calls for an initial term of 25 "Lease Years," with an option by Derecktor to renew for two consecutive 15-year terms (Pl. Ex. 66, §§ 3.01, 3.02).

101.     The Derecktor Lease sets forth the annual rent payable by Derecktor to the Port Authority for each of the 55 Lease Years.  The annual rent for each of the first three Lease Years is zero.  The annual rent is $50,000 in Lease Year 4, and increases for subsequent Lease Years, reaching an annual rental of $589,486.90 during Lease Years 53 through 55.  (Pl. Ex. 66, § 4.01.)

102.     The first Lease Year under the Derecktor Lease began in late 2001 (Tr. 187:24 to 189:9 [Riccio]).  Thus, the Port Authority did not receive any rent payments under the Derecktor Lease until late 2004, when it received payments of $16,667.  (Pl. Ex. 11, Note 12 at p. 12.)

103.     The Derecktor Lease also requires Derecktor to pay the Port Authority an annual management fee of $15,000 per Lease Year, which will increase by 10% every five Lease Years.  (Pl. Ex. 66, § 4.04; Tr. 190:4-15.)

104.     The rentals and management fees received by the Port Authority under the Derecktor Lease are essentially a "pass through," as the Port Authority has agreed to use such payments to repay to the City the amounts that the City advanced to the Port Authority to enable

the Port Authority to acquire the Cartech site. The Port Authority does not know how many Lease Years of rent it will have to collect from the Derecktor Lease in order to complete repaying the loans to the City. (Tr. 570:17 to 571:5 [Savino]; Tr. 190:23-24 [Riccio] ["Most of the rent from the lease has to go back to the City of Bridgeport to pay off the loan"]; Tr. 963:10 to 964:3 [Arnold].)

105.    The Derecktor project has been the subject of discussion at Board meetings on numerous occasions. (*E.g.*, Pl. Ex's 131, p. 3; 134, pp. 1-2; 136, p. 3; 137, pp. 1-2; 141, p. 1; 142, pp. 2, 4; 145, p. 4; 147, p. 2; 149, pp. 2, 3, 4; 151, pp. 2-3; 153, pp. 1-3; 154, pp. 3-5; 158, p. 1; 159, p. 1; 160, p. 3; 161, p. 1; 230, p. 3; 231, p. 2; 233, pp. 1-2; 235, p. 2.)

106.    The Port Authority has devoted its personnel's time and other resources, including salaries and overhead expenses, to these activities relating to Derecktor (Tr. 13:5-10 [Freimuth]; 498:1-5 [Klimas]). Riccio at times spent "a lot of hours" on the Derecktor project. (Tr. 187:1-7 [Riccio]; *see also id.* at 221:8-15; 222:8 to 223:6.)

107.    The Port Authority's activities relating to Derecktor do not relate to the ferry operation. (Tr. 13:11 to 14:3 [Freimuth]; Tr. 511:10-17 [Klimas].)

### **High Speed Ferry**

108.    For several years, the Port Authority has pursed a project to establish a high speed ferry service linking Bridgeport, Stamford and New York City, among other possible locations. (Tr. 213:11-24 [Riccio]; Pl. Ex. 128 at 3-4 [July 16, 1998 board minutes].)

109.    The high speed ferry service would be for passengers only, not vehicles. (Tr. 18:21-25 [Freimuth]; Tr. 213:25 to 214:4 [Riccio].)

110.    Freimuth, Riccio and other Port Authority personnel have traveled to New York City to investigate the high speed ferry project (Tr. 18:14-20 [Freimuth]). On one trip they paid

a limousine company $900 to take City officials to the New York ferry dock (Pl. Ex. 38 at AD 001416, ¶ E).

111.    The Port Authority has paid for Riccio to travel to various other cities (in addition to New York), including Washington, D.C., Seattle and San Francisco, in connection with the high speed ferry project.  (Tr. 214:17 to 215:2 [Riccio].)

112.    The Port Authority has retained and paid a lobbyist to promote the high speed ferry project.  (Tr. 215:18 to 216:5 [Riccio]; Pl. Ex. 150 at pp. 2-3 [board approval]; Tr. 781:21 to 782:1 [Schachter]; Pl. Ex. 38 at AD 001416, ¶ A.)

113.    The Port Authority has issued RFPs, paid for advertisements, applied for government grants and consulted with counsel in connection with the high speed ferry project.  (Tr. 502:25 to 503:1, 503:2-24, 504:13 to 505:7, 553:6-14 [Klimas].)

114.    The high speed ferry has been the subject of discussion at Board meetings on numerous occasions.  (Tr. 217:10-13 [Riccio]; *e.g.*, Pl. Ex's 128, p. 3; 150, p. 2; 151, p. 4; 153, p. 4; 159, pp. 1-2; 160, pp. 2-3; 161, p. 2; 232, pp. 4-5; 233, p. 2; 234, p. 2.)

115.    The Port Authority has devoted its personnel's time and other resources, including salaries and overhead expenses, to these activities relating to the high speed ferry.  (Tr. 19:3-9 [Freimuth]; Tr. 215:12-17; 217:14-16; 221:8-15; 222:8 to 223:6 [Riccio]; 498:1-5, 503:25 to 504:8 [Klimas]; Tr. 968:5-8 [Arnold].)

116.    To date, the Port Authority has derived no revenue from the high speed ferry project.  (Tr. 217:17-19 [Riccio]; Tr. 968:8-10 [Arnold].)

117.    The Port Authority's activities relating to the high speed ferry do not relate to the ferry operation.  (Tr. 19:10 to 20:12 [Freimuth].)

**Barge Feeder Service**

118.    For the past several years, the Port Authority has pursed a project to ship containers by barge from the port of New York and New Jersey to Bridgeport (the "barge feeder service").  (Tr. 14:4-16 [Freimuth]; Tr. 200:1 to 201:7 [Riccio]; Pl. Ex's 68, 69, 70.)

119.    The Port Authority has paid for Riccio to travel to other cities "several times" to research this project; he has attended meetings, selected contractors, and given presentations, all in connection with the barge feeder service.  (Tr. 200:20 to 201:7; 202:19 to 207:1 [Riccio]; Pl. Ex's 68, 69, 70.)

120.    Savino accompanied Riccio on at least one out-of-town trip (to Sarasota, Florida) in connection with this project; his expenses were paid by the Port Authority.  (Tr. 201:15-20 [Riccio]; Tr. 565:19 to 566:8 [Savino].)

121.    The Port Authority also has paid for Klimas to travel to other locations in connection with the barge feeder service.  (Tr. 501:25 to 502:6 [Klimas]; Pl. Ex. 45.)

122.    The Port Authority has issued RFPs for various contracts involving different aspects of the barge feeder service, and has reviewed bids submitted in response thereto.  (Tr. 209:1 to 210:24 [Riccio]; Pl. Ex. 215 [Public Notices].)

123.    The Port Authority has lobbied and done other work to try to exempt the barge feeder service from a federal harbor maintenance tax, the proceeds of which are used for dredging of harbors.  (Tr. 211:16 to 212:15 [Riccio]; Pl. Ex. 68, p. 15.)

124.    The barge feeder service has been the subject of discussion at Board meetings on numerous occasions.  (*E.g.*, Pl. Ex's 158, p. 2; 160, p. 5; 161, pp. 2, 3; 231, pp. 2, 3-4; 232, p. 5; 233, pp. 2, 4; 234, p. 3.)

125.     The Port Authority has devoted its personnel's time and other resources, including salaries and overhead expenses, to these activities relating to the barge feeder service. (Tr. 15:12-23 [Freimuth]; Tr. 200:17 to 202:18; 213:4-7; 221:8-15; 222:8 to 223:6 [Riccio]; 498:1-5, 505:8-17, 505:8-19 [Klimas]; Tr. 967:24 to 968:2 [Arnold].)

126.     The barge feeder service has been delayed, has not gone into operation, and the Port Authority has derived no revenue from that project. (Tr. 221:16 to 213:10 [Riccio]; Tr. 968:3-4 [Arnold].)

127.     The Port Authority's activities relating to the barge feeder service do not relate to the ferry operation. (Tr. 15:24 to 16:1 [Freimuth]; Tr. 505:22-24 [Klimas].)

### Foreign Trade Zone

128.     The Port Authority has been involved in the operation of a foreign trade zone ("FTZ") in Bridgeport. The FTZ is a geographic area within about one hour's drive from central Bridgeport, in which manufacturers and distributors can obtain tariff benefits under U.S. law. (Tr. 16:2-7 [Freimuth]; Tr. 219:6-17 [Riccio].)

129.     The FTZ has had a facility on Barnum Avenue in Bridgeport (not on the Dock), but it is being closed and will be moved to another location. (Tr. 219:18 to 220:4 [Riccio].)

130.     The Port Authority has paid attorneys to advise it in connection with the FTZ. (Tr. 220:12-14 [Riccio].)

131.     Klimas, one of whose titles is Foreign Trade Zone Administrator, has made at least two out-of-town trips (one to Florida) to attend seminars relating to the FTZ. (Tr. 220:15-23 [Riccio]; Tr. 489:12-17; 498:25 to 500:9, 502:7-11 [Klimas]; Pl. Ex. 45.)

132.     The Port Authority has hired James Nicholas, head of the CWTA, for a six-month trial period to market the FTZ. (Tr. 1000:11 to 1001:6 [O'Malley]; Pl. Ex. 238, p. 3.)

133.    The FTZ has been the subject of discussion at Board meetings on numerous occasions.  (Tr. 220:24 to 221:1 [Riccio]; *e.g.*, Pl. Ex's 102, p. 2; 120, p. 2; 124, p. 2; 137, p. 3; 143, pp. 3-4; 161, p. 4; 231, p. 2; 234, p. 3; 238, pp. 2-3.)

134.    The Port Authority has devoted its personnel's time and other resources, including salaries and overhead expenses, to these activities relating to the FTZ.  (Tr. 16:14-22 [Freimuth]; Tr. 221:2-4; 221:8-15; 222:8 to 223:6 [Riccio]; 498:1-5 [Klimas].)

135.    To date, the Port Authority has derived no revenue from the FTZ.  (Tr. 221:5-7 [Riccio].)

136.    The Port Authority's activities relating to the FTZ do not relate to the ferry operation.  (Tr. 16:23-25 [Freimuth].)

## Cilco and Other Commercial Terminals

137.    The Cilco terminal is a commercial shipping terminal located on land east of the BRMC.  (Tr. 133:2-7; 193:5-13 [Riccio]; Pl. Ex's 201-A and 201-F.)

138.    The Cilco terminal and the land on which it is located are not owned by the Port Authority, but the Port Authority has and exercises jurisdiction over the terminal and the ships that call at the terminal.  (Tr. 194:4-13 [Riccio]; Oppel Dep. 22:19 to 23:9.)

139.    The Port Authority has performed functions and activities relating to the Cilco terminal.  (Oppel Dep. at 22:19 to 23:9.)

140.    The Port Authority has lobbied for government grants relating to the Cilco terminal.  (Tr. 195:9-12 [Riccio].)

141.    The Port Authority has paid for advertisements and otherwise has promoted the Cilco terminal.  (Tr. 194:14 to 195:8; Tr. 257:18 to 258:6, 258:16-19, 261:7-13, 262:12-14, 264:4-18, 267:11-21; Pl. Ex. 49, at p. 6; Pl. Ex. 47.)

142.    The Cilco terminal has been the subject of discussion at Board meetings on numerous occasions.  (*E.g.*, Pl. Ex's 100, p. 2; 101, pp. 5-6; 115, p. 3; 113, p. 3; 115, 3d page; 149, p. 2 [sometimes referred to as Logistec or New Haven Terminal].)

143.    The Port Authority exercises jurisdiction over other commercial shipping in the Bridgeport area, including ships that call at the Motiva and PSE&G terminals.  (Tr. 196:11 to 197:15 [Riccio]; *see also* Tr. 563:17 to 565:11 [Savino] [Savino's duties as harbor master also extend to all commercial shipping in Bridgeport and Black Rock harbors].)

144.    The Port Authority has devoted its personnel's time and other resources, including salaries and overhead expenses, to these activities relating to the Cilco, Motiva and PSE&G terminals, and the commercial ships that use these facilities.  (Tr. 195:17 to 196:4; 196:11 to 197:15; 222:8 to 223:6 [Riccio].)

145.    The Port Authority has not derived any revenue from the activities of Cilco or the other commercial terminals in Bridgeport over which it exercises jurisdiction.  (Tr. 197:16-20 [Riccio].)

## Dredging

146.    The Port Authority has been involved in efforts to dredge Bridgeport harbor.  (Tr. 198:7-10 [Riccio].)

147.    The Port Authority has devoted its personnel's time and other resources to these activities relating to dredging.  (Tr. 198:11-13; 222:8 to 223:6 [Riccio].)

148.    The Port Authority's activities relating to dredging mainly benefit the commercial shipping terminals that service deep-draft vessels, which require channel depths of 35 feet or more, such as Cilco, Motiva and PSE&G, and only indirectly, if at all, benefit the Ferry

Company, whose ferryboats need no more than 15 feet of depth.  (Tr. 650:17 to 651:7 [McAllister]; Tr. 198:14 to 199:25 [Riccio].)

## Boat Pump-Out Service

149.    For several years, the Port Authority has operated a seasonal boat pump-out service.  This service entails the cleaning of septic tanks in pleasure boats, and is provided free of charge.  (Tr. 217:20 to 218:7 [Riccio]; Tr. 520:19 to 521:1, 553:23 to 554:5 [Klimas]; Pl. Ex. 63.)

150.    The pump-out service is not provided to the Ferry Company's ferryboats.  (Tr. 218:8-10 [Riccio].)

151.    Up to 75% of the Port Authority's cost of this service is funded by a grant from the State of Connecticut; the remaining 25% or more of the cost is funded by the Port Authority from its operating funds.  (Tr. 218:19-24 [Riccio]; Tr. 522:25 to 525:11, 539:20-24 [Klimas]; Pl. Ex. 63.)

152.    The Port Authority has devoted its personnel's time and other resources to the boat pump-out service, but derives no revenue from it.  (Tr. 218:25 to 219:5; 222:8 to 223:6 [Riccio]; 498:1-5 [Klimas].)

153.    The Port Authority's activities relating to the boat pump-out service directly benefit the boats that are serviced and indirectly benefit all other users of Bridgeport harbor (including Black Rock Harbor).  (Tr. 675:22 to 676:4 [McAllister].)

## Projects Affecting Land

154.    One of the Port Authority's functions – also not related to the ferry operation – is to review and vote on any projects affecting land within its jurisdiction, which includes all land

on or within 1,000 feet of the Bridgeport harbors and their tributaries (*see* ¶¶ 59-60 above).  (Tr. 566:20 to 568:22 [Savino].)

155.    Savino testified that the Port Authority takes this function "seriously" (Tr. 568:19 to 569:2).  Each project usually entails a review of the project and a recommendation by the Executive Director, a presentation and submission of documents to the board, discussion at board meetings, and a vote.  (Tr. 568:19 to 569:13 [Savino]; Tr. 223:19 to 224:18; Tr. 234:9-22 [Riccio]; *see also, e.g.*, Pl. Ex. 234 at pp. 3-4 ["Referrals from Planning & Zoning"].)

156.    The Port Authority has devoted its personnel's time and other resources to reviewing and voting on numerous such projects, none related to the ferry operation, including the following:

(a)    **Methanol plant** (1994).  Proposal for methanol plant "within the Port District" to recycle sludge into methanol (Pl. Ex. 90 at pp. 1-2).  The material was to go "through Black Rock Harbor, not the main harbor" (Oppel Dep. 115:15 to 116:24, at 116:13-14).

(b)    **Marina** (1994).  Proposed expansion of marina located on Waterview Avenue (north of Route I-95 on Yellow Mill River).  (Pl. Ex. 91 at p. 2.)

(c)    **Dog kennel** (1995).  Proposal to construct a dog kennel complex for the dog track, consisting of multiple buildings, on Evergreen and River Streets (well up the Pequonnock River) (Pl. Ex. 95 at pp. 1-2; Oppel Dep. 126:5 to 127:12).  Shawah's 1997 appraisal of the Dock referred to the "greyhound kennels" (Pl. Ex. 219, p. 9), which were not successful and eventually were "shut down" (Tr. 627:18 to 628:3 [Shawah]).

(d)    **Emission testing facility** (1995).  Proposal to build an emission testing

facility on River Road, "in the upper reaches of the Pequonnock River."  (Pl. Ex. 98, p. 3;

Oppel Dep. 133:6 to 134:8.)

(e)    **Manufacturing plant** (1996).  Proposed construction and renovation of

properties at Union and Webster Avenues for multiple uses including a plastics

manufacturing plant and an environmental storage facility.  (Pl. Ex. 114 at pp. 1-2.)

(f)    **Paper recycling plant** (1996).  Planned construction of a paper recycling

plant at the Cartech site, including holding a reception in 1997 regarding that proposal.

(Pl. Ex. 114 at p. 2; Tr. 228:2-18 [Riccio].)

(g)    **Asphalt plant** (1998).  Proposed construction of asphalt manufacturing

plant at Seaview Avenue (on Cartech site).  (Pl. Ex. 124 at p. 5, ¶ 4; Tr. 230:6 to 231:4

[Riccio].)

(h)    **Auto/marine shop** (1999).  Proposed renovation of property on Knowlton

Street (north of Steel Point, on east side of Pequonnock River), to be used as an

automobile and marine service and sales facility.  (Pl. Ex. 132 at pp. 4-5; Tr. 231:22 to

232:7 [Riccio].)

(i)    **Commercial laundry** (2001).  Proposal to build a commercial laundry

facility at Seaview Avenue (on Cartech site).  (Pl. Ex. 145 at pp. 1-2; Tr. 234:5-25

[Riccio].)

(j)    **Acme property** (2006).  Proposed purchase and redevelopment of the

former Acme property, located "off the main harbor up along the Pequonnock River."

(Tr. 1001:7-11 [O'Malley]; Pl. Ex. 238 at pp. 3-4.)

**Other Non Ferry-Related Activities and Expenses**

157.    The Port Authority has devoted time and resources to numerous other activities not related to the ferry, as reflected by the minutes of the meetings of its Board of Commissioners, or as its representatives testified at trial, including the following:

(a)    **Logo and service mark** (1997-1999).  Retention and payment of attorneys and other professionals to create, select and register a new service mark for the Port Authority.  (Pl. Ex. 123 at 2, ¶ 3; Pl. Ex. 132 at p. 3; Tr. 231:5-21 [Riccio]; *see also* Tr. 264:19-25 and Pl. Ex. 48 [showing new Port Authority logo].)

(b)    **Hitchcock Marina**.  Management of this marina, on behalf of the City, located on Steel Point.  (Tr. 20:13-23 [Freimuth]; Tr. 235:1-14 [Riccio]; 498:13-24 [Klimas].)

(c)    **Captains' Cove Marina** (1999).  Retention and payment of attorneys and negotiations to purchase Captains' Cove Marina, located in "the western side of the city, in another harbor."  (Tr. 21:7 [Freimuth]; *see also id.* at 20:24 to 21:12; Pl. Ex. 133 at p. 3; Pl. Ex. 136 at pp. 4-5; Tr. 232:8 to 233:14 [Riccio].)

(d)    **Land condemnation for Sikorsky** (2002).  Proposal to exercise Port Authority's condemnation power to acquire land in the South End of Bridgeport to be used by Sikorsky Aircraft to expand its helicopter manufacturing facilities.  (Pl. Ex. 152 at pp. 2-3; Tr. 235:20 to 236:10 [Riccio].)

(e)    **Connecticut World Trade Association**.  For the past ten to eleven years, the Port Authority has provided office space to this organization on the second floor of the terminal building, at no charge.  (Tr. 158:24 to 159:8 [Riccio]; Tr. 571:6-14 [Savino].)

(f)    **Sports tickets**.  The Port Authority has paid thousands of dollars each year to purchase season tickets to the local minor league baseball and hockey teams. Those purchases do not benefit the ferry operation.  (Tr. 21:13-20 [Freimuth]; Tr. 269:14 to 270:19 and Pl. Ex. 39.)

(g)    **Insurance**.  The Port Authority pays for directors' and officers' liability insurance.  (Tr. 473:8 to 474:17 [Johnson].)

(h)    **Charitable contributions**.  The Port Authority has made charitable contributions each year in varying amounts to different entities, which it has funded from its operating revenues.  (Tr. 270:21 to 272:7 [Riccio]; *see also* "contributions" in revenue and expense statements in the Port Authority's annual audited financial statements, Pl. Ex's 1 through 11 and 11A.)

(i)    **Personal telephone calls**.  Riccio and other Port Authority staff have spent time and incurred charges on personal long-distance telephone calls.  (Tr. 160:18-21; 165:12-13 [Riccio]; Pl. Ex. 218 [Schachter Report], Ex. 4 Endnote (f) at p. 37 ["I found many calls to private homes, restaurants and stores"]; Pl. Ex's 41, 43 [telephone bills]; Pl. Ex's 202 and 203 [analyses of telephone bills].)

(j)    **Meals**.  Riccio charged $1,745 in meals on his Port Authority credit card during the 16-month period January 2003 to April 2004 (Pl. Ex. 204 and Tr. 276:2-12 [Riccio]).  Riccio claims that all of these meals related "directly or indirectly" to the ferry operation only because of his view – which is contrary to the evidence – "that anything and everything that [the] Port Authority does, regardless of where or relating to what subject, does in one way or another benefit the ferry operation" (Tr. 276:15-22 [Riccio]).

(k)    **Travel time and expenses**.  The Port Authority has paid for its staff and commissioners to take many out-of-town trips in connection with non ferry-related activities.  Riccio estimates that he travels to Washington, D.C. "maybe once a month," and to other places "maybe every other month" (Tr. 277:2-22 [Riccio]).  Klimas has taken several out-of-town trips, none of them ferry-related (Tr. 499:5 to 502:18 [Klimas]; Pl. Ex. 45).  Savino also has taken such trips, including one to Sarasota relating to the barge feeder service and another to St. Thomas for a cruise ship seminar, both with Riccio (Tr. 565:22 to 566:19 [Savino]).  Riccio has not submitted travel expense reports stating where he went, the purpose of the trip, or itemizing any expenses (Tr. 278:8 to 279:13 [Riccio]; Tr. 484:4 to 485:7 [Johnson]).  During the 16-month period January 2003 to April 2004, Riccio took 15 to 20 trips to the following cities (including multiple trips to some of these cities):  Washington, D.C., Seattle, Tacoma, Curaçao, Sarasota, Arlington, New York and Miami (Pl. Ex. 204 [last two pages] and Tr. 279:14 to 282:8).  When asked whether it is fair for ferry passengers to pay for Riccio's travel, such as trips to Washington, D.C. to lobby for the high speed ferry, Riccio testified:

> We don't work for the Port Jefferson Ferry Company or the Port Jefferson ferry passengers.  We're a Port Authority and this is what we do.  We're developing the port as our mission, bringing other maritime interest and businesses to the Port of Bridgeport.

(Tr. 282:12-16 [Riccio] [emphasis added].)

(l)    **Auto expense**.  The Port Authority provides Riccio with a leased automobile and pays not only the lease expense, but also for maintenance and repair and for his purchases of gasoline and car washes.  Riccio uses the car to commute to work as well as for personal reasons.  (Tr. 282:17 to 283:15 [Riccio]; Pl. Ex. 204 [first page].)

(m)    **Miscellaneous expenses**.  The Port Authority also uses its operating funds derived from the Passenger Fee to pay for miscellaneous non ferry-related items such as: holiday dinner and gifts for commissioners, Riccio's membership in the Rotary Club, and coffee, bottled water and plant service for the Port Authority's second-floor offices.  (Tr. 283:16-23 [Riccio]; Tr. 474:24 to 475:14, 483:3-22 [Johnson]; *see also* Pl. Ex. 38 at AD 001417, ¶ F [$2,200 for Christmas dinner and gifts in 2002].)

158.    Riccio attempted to justify the Port Authority's use of the Passenger Fee revenue for all its activities, whether ferry-related or not, by stating that "anything that helps business and commerce in the State of Connecticut is going to indirectly benefit the ferry passengers" (Tr. 339:22-24 [Riccio]).  Riccio thus admitted that the Port Authority uses the Passenger Fee revenues to fund *all* of its activities in and around Bridgeport harbor.

**2004-2006 Activities Also Focused on Non Ferry Activities**

159.    Since O'Malley became a Port Authority commissioner in April 2004, "the discussion at board meetings has centered on Cartech and the BRMC, the barge feeder service, the high speed ferry, dredging, the Foreign Trade Zone, the Seaview Avenue property, Derecktor Shipyards, port security at both the Water Street Dock and BRMC, and the one dollar surcharge to pay for the legal fees in this case."   (Tr. 994:8-16 [O'Malley].)

**M.    The Port Authority's Audited Financial Statements**

160.    From 1993 to the present, the Dworkin Firm has audited the annual financial statements of the Port Authority.  (Pl. Ex. 15, p. 2; Tr. 41:5-7 [Verrilli]; Pl. Ex's 1 through 11 and 11A [audited financial statements].)

161.    Verrilli, a principal at the Dworkin Firm, has been in charge of the Port Authority's audits since the audit of the 1996 financial statements.  Ray Schwartz of the Dworkin Firm was in charge of the audits for the years 1993 through 1995.  (Tr. 41:10-20 [Verrilli].)

162.    At the time of the trial in this case, the latest year for which audited financial statements of the Port Authority were available was 2004.  (Tr. 137:14-18; 141:3-21 [Riccio]; Pl. Ex. 11A.)

## N.    The Port Authority's Operating Revenues

163.    The Passenger Fee and the rentals paid by the Ferry Company and its food concession affiliate have accounted for substantially all of the Port Authority's operating revenue from 1993 to date, as confirmed by several Port Authority officials and its outside auditor.  (Tr. 65:21 to 66:9 [Verrilli]; Tr. 237:21 to 238:4 [Riccio]; Tr. 569:24 to 570:4 [Savino]; Oppel Dep. 33:17-24.)

164.    Plaintiffs' expert accountant, Schachter, also so testified based on his analysis of the Port Authority's audited financial statements.  (Tr. 762:7-21 [Schachter].)

165.    The following table confirms that the Passenger Fee and the rentals received from the ferry operation (under the Current Lease and the Food Services Lease) have accounted for substantially all of the Port Authority's operating income each year since the Port Authority began operations in 1993:

[*Table appears on following page.*]

**Port Authority's Operating Revenues, 1993-2004**

| Year | Ferryboat tariffs (Passenger Fee) | Rental Income | Grant Income | Other Income | Total Operating Revenues |
|------|-----------------------------------|---------------|--------------|--------------|--------------------------|
| 1993 | $ 261,342 | | | $ 1,195 | $ 262,537 |
| 1994 | 449,682 | $ 56,666 | | 4,503 | 510,851 |
| 1995 | 461,396 | 82,584 | | 16,006 (a) | 559,986 |
| 1996 | 649,015 | 85,000 | | 11,200 | 745,215 |
| 1997 | 678,134 | 95,000 | $ 6,727 (b) | 14,053 | 793,914 |
| 1998 | 712,190 | 97,911 | 30,273 (b) | 56,595 | 896,969 |
| 1999 | 804,287 | 90,672 | 4,850 (b) | 19,309 | 919,118 |
| 2000 | 901,518 | 114,167 | | 23,522 | 1,039,207 |
| 2001 | 947,591 | 110,421 | | 16,253 | 1,074,265 |
| 2002 | 984,926 | 114,507 | | 54,649 | 1,154,082 |
| 2003 | 1,292,383 | 338,623 (c) [118,193] | | 38,811 | 1,669,817 (c) [1,449,387] |
| 2004 | 1,372,031 | 342,863 (c) [122,433] | | 32,390 | 1,747,284 (c) [1,526,854] |
| TOTALS | $ 9,514,495 | $ 1,769,040 (c) [$ 1,087,554] | $ 41,850 | $ 266,782 | $11,508,467 (c) [$ 10,932,385] |

*Source*:  Statements of income and expense in Pl. Ex's 1 through 11 and 11A.

*Notes*:

(a)    Includes "Inspection service income" of $9,240.  (Pl. Ex. 3, p. 3, and Note 11 at p. 7.)

(b)    In 1997, 1998 and 1999, the Port Authority included "grant income" under "Operating revenue" (*see* income statements in Pl. Ex's 5, 6 and 7).  There was no "grant income" in 2000 (Pl. Ex. 8).  In 2001 and subsequent years, the Port Authority included grant income as "Non-operating revenues, grant income," which did not affect operating revenue or net operating income (*see* income statements in Pl. Ex's 9, 10, 11 and 11A).

(c)    The rental income from 1994 through 2002 consisted of the rent payments made by the Ferry Company and its affiliate under the Current Lease and the Food Services Lease, respectively (*see* explanatory notes to "Rental income" in the income statements of the audited financial statements for each of those years, Pl. Ex's 2 through 10).  In 2003 and 2004, rental income includes $220,430 under the Derecktor Lease, even though the Port Authority actually received payments of zero and $16,667, respectively, those years (*see* Pl. Ex. 11, Note 12 at pp. 11-12).  The figures in brackets show the actual rental income and total operating revenue for 2003 and 2004 (*i.e.*, subtracting $220,430 in each case).

166.    The Port Authority also, supposedly, charges a fee for users of the Dock other than the Ferry Company, but its collections of such fees have been minimal; Johnson was able to find only a handful of such payments throughout its existence, which totaled only $3,750.  (Tr. 485:8 to 486:1 [Johnson]; Pl. Ex. 85.)

**O.    Government Grants to the Port Authority**

167.    The Port Authority has applied for and has been awarded substantial amounts in grants from federal and state government agencies.  The amounts of such grants for the *non* ferry-related projects (such as Cartech, BRMC, Derecktor, barge feeder service and high speed ferry) have far exceeded those for the ferry-related projects (the terminal building, bulkhead repairs, access road and garage), as summarized below.

168.    According to its auditors' schedule prepared in July 2003 (the latest such schedule introduced at trial), as of December 31, 2002, the Port Authority had been awarded $15,028,026 in grants, of which $10,032,846 (more than two-thirds) related to Cartech, BRMC and Derecktor (Def. Ex. 50).  As of the same date the Port Authority had spent a total of $4,687,253, of which $3,686,440 (more than three-fourths) related to those non ferry projects (*id.*).

169.    The Port Authority has been awarded additional grants since 2002.  For example, it has been awarded about $9 million in grants for the high speed ferry, although to date it has spent less than $200,000 of such grants (Tr. 215:3-11 [Riccio]).  It has also received grants for port security devices for the BRMC and the Dock (Tr. 541:11-20 [Klimas]).

170.    Arnold's report, prepared in 2004, reflects grants of about $6.7 million for the ferry-related projects (bulkhead, access road and terminal), and more than $22 million for the *non* ferry-related projects (Cartech, BRMC, Derecktor, high speed ferry and container barge).

(Dep. Ex. 67, Table 7 at p. 13 and Table 8 at p. 17; Tr. 964:4 to 965:15; 928:14 to 929:9 [Arnold].)

171.    The grants for the terminal at the Dock were awarded, not to the Port Authority, but rather to the Greater Bridgeport Regional Planning Agency (Tr. 367:15 to 368:2 [Riccio]; Tr. 431:22 to 432:13 [Hall]).  Any government or agency, not necessarily the Port Authority, can be involved in applying for and obtaining federal grants for ferry-related projects (Tr. 433:4-19 [Hall]).

172.    The federal grants under the Ferryboat Discretionary Program, such as the one for the terminal building, are earmarked for ferry operations and may not be used for other purposes. Yet the Port Authority used those funds to construct a building that includes a second floor used for Port Authority and CWTA offices.  (Tr. 368:3-24 [Riccio].)  As McAllister testified when questioned by the Port Authority's counsel:

> This building is a very nice thing.  The United States Government paid for it and you took half of it away from us.  You weren't supposed to do that. That was for the ferry company.  We're not allowed up there unless Joe [Riccio] says it's okay.

(Tr. 677:12-16 [McAllister].)

P.    **The Port Authority's Operating Expenses**

173.    Riccio admitted at trial that, from 1993 to the present, the Port Authority has used the revenues from the Passenger Fee and the ferry-related leases to pay for essentially all of its operating expenses, including all salaries, health benefits, pension payments, payroll taxes, telephone, utilities, office equipment, building services, travel, season tickets, charitable contributions and Riccio's automobile expenses.  (Tr. 238:5-14 [Riccio]; *see also* Tr. 888:13 to 889:1 [Arnold]; Oppel Dep. 34:5 to 35:14 [to the same effect].)

174.    Riccio's admission is borne out by the following table, which shows that the Port Authority's total operating expenses *for all its activities* – ferry and non ferry – from 1993 to the present (column (e)) have closely tracked the net operating income *from the ferry operation alone* (column (d)):

**Port Authority Income from Ferry Operation and Total Operating Expenses, 1993-2004**

| Year | (a) Ferryboat Tariffs (Passenger Fee) | (b) Rent Income | (c) Credit Card Fees and Collection Costs | (d) Net Income from Ferry Operation (a + b – c) | (e) Total Operating Expenses |
|------|------|------|------|------|------|
| 1993 | $ 261,342 | --- | $ 17,036 | $ 244,306 | $ 200,531 |
| 1994 | 449,682 | $ 56,666 | 33,761 | 472,587 | 351,597 |
| 1995 | 461,396 | 82,584 | 34,590 | 509,390 | 442,531 |
| 1996 | 649,015 | 85,000 | 41,352 | 692,663 | 609,052 |
| 1997 | 678,134 | 95,000 | 41,855 | 731,279 | 532,735 |
| 1998 | 712,190 | 97,911 | 42,514 | 767,587 | 671,287 |
| 1999 | 804,287 | 90,672 | 46,492 | 848,467 | 813,275 |
| 2000 | 901,518 | 114,167 | 45,017 | 970,668 | 876,643 |
| 2001 | 947,591 | 110,421 | 47,399 | 1,010,613 | 937,228 |
| 2002 | 984,926 | 114,507 | 49,544 | 1,049,889 | 1,134,234 |
| 2003 | 1,292,383 | 118,193 | 63,909 | 1,346,667 | 1,516,650 |
| 2004 | 1,372,031 | 122,433 | 71,423 | 1,423,041 | 1,773,141 |
| TOTALS | $ 9,514,495 | $ 1,087,554 | $ 534,892 | $ 10,067,157 | $ 9,858,904 |

*Source*:  Statements of income and expense in Pl. Ex's 1 through 11 and 11A.

*Note*:  Column (d) equals columns (a) plus (b), less column (c).  Rent income in column (b) excludes the rentals from Derecktor that the Port Authority recorded as income under an accounting rule, but that it did not actually receive, in 2003 and 2004 (*see* table in ¶ 165 above and Note (c) thereto).

175.     Riccio also has stated publicly, and confirmed at trial, that the Port Authority has the right to collect the Passenger Fee in order to fund all of the Port Authority's activities "throughout the harbor."  (Tr. 238:15-19 [Riccio].)

176.     Savino similarly testified that "whenever the Port Authority needs more operating funds it has the right to increase the ferry passenger tariff in order to obtain those funds" (Tr. 573:4-12 [Savino]), and he conceded that the Port Authority's revenue from the Passenger Fee has increased steadily since 1993 and has been used to fund *all* of the Port Authority's costs, not just ferry-related costs (Tr. 573:13 to 574:19 [Savino]).

177.     The Port Authority has never attempted to calculate what portion of the Passenger Fees it spends on activities that do not relate to or directly benefit the passengers.  Riccio testified, "I don't think we've ever taken paper to pencil to figure out what it is . . . .  There would be no reason to do so" (Tr. 240:2-4 [Riccio]).

178.     Nevertheless, Riccio has given such estimates to the press "off the top of [his] head" (*id.* at 240:8).  On some occasions, Riccio told newspaper reporters that, although some of the more than $1 million that the Port Authority collects from passengers goes to uses other than ferry service, "80 percent is used to benefit passengers" (Tr. 239:5-10 [Riccio]); conversely, he has stated that "around 20 percent is for projects that do not directly benefit passengers" (*id.* at 238:20 to 239:4).  On another occasion, he told a reporter that the amounts spent that do not benefit passengers was only 10% (*id.* at 240:9-13).  Riccio explained:  "I've probably been all over the lot with that.  I went anywhere from 20 percent to five percent" (*id.* at 240:12-13).

179.     At trial, Riccio disavowed his own prior estimates to reporters and agreed with the conclusion of the Port Authority's expert, Arnold, "that the percentage is actually negative, that

the Port Authority spends *more* on the ferry operation than it receives from the ferry passengers by the fee." (Tr. 241:7-19 [Riccio] [emphasis added].)

180.    Riccio admitted at trial, however, that the Port Authority has devoted its time and resources, including salaries, benefits, and overhead expenses, to the various non ferry-related activities summarized above, such as Steel Point, Cartech, BRMC, high speed ferry, barge feeder service and FTZ (among others) (*see* ¶¶ 76, 81, 90, 106, 115, 125, 134, 144, 147, 152, 155 and 157 above). The Port Authority's board minutes and financial statements also confirm these expenditures of time and resources by the Port Authority (*see* ¶¶ 75, 80, 89, 105, 124, 133, 142, 156 and 157 above; Pl. Ex's 1-11 and 11A).

181.    The proper allocation of the Port Authority's expenses, between its activities that benefit or relate to the ferry and those that do not, is discussed in the remaining sections of these proposed findings of fact.

## Q.    The Port Authority's Computations of Its Net Operating Income from the Dock

182.    Each year since 1993, the Port Authority, in conjunction with its outside auditors, has computed the Port Authority's net operating income derived from the Dock (the "Net Income Reports"). (Tr. 48:7-25 [Verrilli]; Tr. 243:16-25 [Riccio]; Pl. Ex's 15 through 25 and 25A.)

183.    The Port Authority has prepared the Net Income Reports in order to calculate the amount payable each year by the Port Authority to the City under the Property Management Agreement. (Tr. 49:8-13; 57:3-16 [Verrilli]; Tr. 243:16-25 [Riccio]; Pl. Ex. 14.)

184.    Paragraph 5 of the Property Management Agreement requires the Port Authority to pay to the City 15% of the Port Authority's net operating income from the Dock. (Pl. Ex. 14 at pp. 4-5.)

185.    The Port Authority does not provide any services to the ferry operation at any location other than the Dock (Tr. 65:13-16 [Verrilli]; Tr. 420:24 to 421:2 [Hall]; Tr. 722:1-3 [Deak]).  The Dock does not include the BRMC, Steel Point, the Cilco terminal or any other property over which the Port Authority has jurisdiction (Tr. 243:6-15 [Riccio]).

186.    The amount payable under the Property Management Agreement for the year 1993 was calculated by Oppel, then Executive Director of the Port Authority.  (Pl. Ex. 15, third page; Oppel Dep. 44:10-22; Tr. 45:2-10; 45:19 to 46:4 [Verrilli].)

187.    Oppel prepared the 1993 calculation, and made the allocations therein, in a manner that he believed complied with the Property Management Agreement.  The same was true with respect to the 1994 calculation and allocations, which he also reviewed and approved in 1995.  (Oppel Dep. 54:7-24, 61:22 to 62:7.)

188.    Oppel forwarded his 1993 calculation to Jerome Baron, then the City's Director of Finance, with a cover letter dated February 25, 1994, in which Oppel explained his calculation.  (Pl. Ex. 15; Oppel Dep. 42:8-16.)

189.    Oppel sent a copy of his letter and calculation to Ray Schwartz, the auditor at the Dworkin Firm then in charge of the Port Authority's audits.  (Pl. Ex. 15, p. 2; Tr. 43:19 to 44:7; 46:5-11 [Verrilli].)

190.    Oppel's intention, in making the allocations in the 1993 calculation of the amount due to the City, was to allocate some of the Port Authority's expenses to its activities that did not relate to the Dock and, therefore, did not relate to the Port Authority's ferry-related activities, which were confined to the Dock.  (Oppel Dep. 50:9-20.)

191.    In his letter to Baron, Oppel explained that he had allocated 50% of the Port Authority's operating expenses to the Dock, except that "the one time cost for defending the

lawsuit brought by the Ferryboat Company was charged [entirely] to the Union Square Dock activity." (Pl. Ex. 15 at p. 1.)

192.    The amount stated in Oppel's calculation as payable to the City under the Property Management Agreement for 1993 – $20,190 – coincides with the audited financial statements of the Port Authority for 1993. (*Compare* Pl. Ex. 15, third page [Oppel calculation] *with* Pl. Ex. 1 at p. 3 and Note 6 thereto at p. 6 [audited financial statements]; *see also* Tr. 44:16 to 45:10 [Verrilli].)

193.    During the audit of the 1994 financial statements, Schwartz forwarded to Oppel, by fax, a computation of the amount payable to the City for 1994. By handwritten note on the fax cover sheet, Schwartz asked Oppel to provide percent allocations for certain categories of expense (including a new category, "Contributions"), and whether the 50% allocations for the other categories were "still good." A handwritten "yes" appears immediately below these questions in the fax cover page maintained in the Dworkin Firm's file. (Pl. Ex. 16, first and third pages; Tr. 46:12 to 48:6 [Verrilli].)

194.    Oppel confirmed that, in 1994, the Port Authority was engaged in various activities not at the Dock, and that, for purposes of the amount payable to the City, about 50% of its expenses were properly allocable to such non-Dock activities. (Oppel Dep. 60:8-16.)

195.    With a few exceptions as stated in the next paragraph, the Port Authority, in conjunction with the Dworkin Firm, has continued to allocate 50% of the Port Authority's total costs to the Dock with respect to most categories of expense, from 1994 through the present. (Pl. Ex's 17 through 25 and 25A; Tr. 62:3-15 [Verrilli].)

196.    The following exceptions to the 50% allocations are reflected in the Net Income Reports:

**Exceptions to 50% Allocation in the Port Authority's Net Income Reports**

| Year | Expense Category | Nature of Change | Record Reference |
|------|------------------|------------------|------------------|
| 1994 | Contributions | New category, allocated 100% to the Dock (has remained 100% through 2004, latest year for which an allocation is available). | *Compare* Pl. Ex's 15 (third page) and 16 (third page) *with* Pl. Ex's 17 through 25 and 25A. |
| 1996 | Legal and accounting | Allocation to the Dock stated as "Actual." From 1996 through 2002, the amount allocated to the Dock was 100% of the total expenses in that category. | Pl. Ex's 19 through 25; *see also* Tr. 248:17 to 249:3 [Riccio]. |
| 1998 | Building Services | New category, allocated 80% to the Dock (has remained 80% through 2004). | *Compare* Pl. Ex's 20 and 21; see also Pl. Ex's 22 through 25 and 25A. |
| 1998 | Security | Increased from 50% to 80% allocated to Dock (has remained 80% from 1998 through 2004). | *Compare* Pl. Ex's 20 and 21; see also footnote (A) in Pl. Ex. 22; Pl. Ex's 23 through 25 and 25A; Tr. 247:13-15 [Riccio]. |
| 2003 | Legal and accounting | "Actual" changed to 80% allocated to Dock (remained 80% in 2004). | Pl. Ex. 25A. |

197.    The Dworkin Firm reviewed the Port Authority's allocations and computed the amounts payable to the City under the Property Management Agreement, based on those allocations. The initials of the Dworkin Firm auditors appear on the schedules in their work papers in which the allocations and calculations are set forth, and the amounts payable to the City as so computed are included in the Port Authority's audited financial statements. (Tr. 48:23

to 49:7; 62:3-10 [Verrilli]; *compare* Pl. Ex's 15 through 25 and 25A [annual calculations from auditors work papers] *with* Pl. Ex's 1 through 11 and 11A [audited financial statements], income statements, "Fees to City of Bridgeport"].)

198.    Verrilli testified that he has no reason to believe that the calculations in the Net Income Reports are incorrect or that they do not comply with the property Management Agreement.  If someone from the Port Authority had told him that these calculations were flawed or incorrect, he would not have issued clean opinions as to the financial statements of the Port Authority.  (Tr. 58:7-22 [Verrilli].)

199.    Port Authority witnesses and Verrilli took the position that the Net Income Reports are not what they purport to be – *i.e.*, that they are not true statements of the Port Authority's net income attributable to the Dock.  These witnesses testified that the Net Income Reports, and the allocations on which they are based, are artificial computations of the yearly amounts payable by the Port Authority to the City, to reflect an unspecified agreement between the Port Authority and the City as to how such payments were to be computed.  (Tr. 51:8-14; 52:8-23 [Verrilli]; Tr. 245:23 to 246:25 [Riccio].)

200.    This explanation is not credible because:

(a)     It is simply not comprehensible.  For example, Verrilli explained his understanding of the Net Income Reports, based on his discussion with Riccio, as follows:

> It was our understanding that -- because discussions have evolved since this became a topic of discussion as to why there was percentages used and why wasn't there a less complicated calculation.  And it was my understanding that there was, as Mr. Freimuth had previously testified, that there was -- there were amounts that were remitted over from the Port Jefferson ferry over to the city which approximated these amounts, and that the percentages were -- the allocation of expenditures based on these

percentages were a mere mechanism to back into what those amounts originally were before the Port Authority was in existence.  Again, that was a discussion.  (Tr. 59:4-16 [Verrilli].)

(b)    The Port Authority provided no documentary evidence of an alleged agreement apart from the Property Management Agreement (which plainly requires the Port Authority to pay the City 15% of the net operating income from the Dock, *see* Pl. Ex. 14, § 5) or what is stated in the letter from Oppel to Baron concerning the 1993 computation (Pl. Ex. 15).  (Tr. 55:4-15 [Verrilli].)

(c)    There is no evidence of any *oral* agreement, or even discussion, between Port Authority and City officials regarding the way in which the Port Authority should compute the amount payable to the City under the Property Management Agreement. (Tr. 55:16-20 [Verrilli]; Baron Dep. at 27:9-21, 37:5 to 39:19, 42:20 to 44:14; 574:20 to 576:6 [Savino].)

(d)    Savino is aware that the Port Authority is required to pay an annual amount to the City under the Property Management Agreement and has no basis for believing that the Port Authority's own calculations of those amounts are incorrect in any way.  (Tr. 571:15 to 572:6 [Savino].)

(e)    Verrilli claimed that he recommended to the Port Authority that it scrap the method of calculating the amount due to the City pursuant to the Net Income Reports and that it use, instead, a "percentage or revenues and/or a flat rate" (Tr. 56:8-10 [Verrilli]); yet there is no memo or other evidence that he ever made such a recommendation (*id.* at 11-22), and the Dworkin Firm continued to use the Net Income Reports every year (Pl. Ex's 15 through 25 and 25A).

(f)     Riccio claimed that he concluded in 1996, when he first saw the calculations, that they were "flawed" and had "no relation to real life," yet he has continued to approve such calculations each year until the present.  (Tr. 245:23 to 247:4 [Riccio].)

(g)     Riccio claimed that he did not change the calculations, even though he considered them flawed, because "[w]e could end up owing a lot more money [to the City]," and "frankly, this is enough small potatoes to the city that I don't think they really care"  (Tr. 297:17-23 [Riccio].)

(h)     Riccio nevertheless admitted that he made some changes in the allocations from time to time (these are detailed in the chart in ¶ 196 above), but testified that he "[p]robably should not have done it."  (Tr. 247:8 [Riccio].)

(i)     The Dworkin Firm added a self-serving explanatory note to the 2004 Net Income Report (Pl. Ex. 25A, 2004 report, note A) – well after plaintiffs raised the significance of these reports in this litigation – but no such note appeared in the ten previous annual Net Income Reports prepared by the Dworkin Firm (Pl. Ex's 17 through 25A).  (Tr. 63:1 to 65:4 [Verrilli].)

201.    In short, the Port Authority's and Verrilli's attempts to explain away the Net Income Reports – pursuant to which the Port Authority calculated contractually required payments to the City, the amounts of which tie in to the Port Authority's audited financial statements – is entirely unconvincing.

### R.    The Overcharge, as Determined by Schachter

202.    Plaintiffs retained Schachter to investigate and determine the amounts, if any, by which the Passenger Fees received by the Port Authority have exceeded the reasonable cost of

the facilities and services that the Port Authority actually has provided to the ferry operation.

Schachter prepared a report (the "Schachter Report") concerning his investigation and

conclusions. (Tr. 744:25 to 755:7 [Schachter]; Pl. Ex. 218 [Schachter Report].)

    203.    Schachter is highly qualified in the fields of accounting, auditing and financial

analysis and investigations, in which the Court accepted him as an expert at trial (Tr. 753:22 to

754:3 [Schachter]). Among his many qualifications, Schachter:

    (a)    Received a Bachelor of Science in Economics from the Wharton School, University of Pennsylvania; a Masters in Business Administration from Pace University; and an Advanced Certificate of Taxation, also from Pace University;

    (b)    Has been a CPA since 1969, and holds licenses or certificates in various specialties, including business valuation, fraud examinations and forensic accounting;

    (c)    Has been a member of numerous professional associations;

    (d)    Has published numerous articles;

    (e)    Has testified many times as an expert in his field, including as a court-appointed expert; and

    (f)    Supervises the forensic accountants in the Connecticut and New York City offices of Willamette Management Associates, the national consulting firm by which he is currently employed as a managing director.

(Tr. 746:24 to 753:21 [Schachter]; Pl. Ex. 218 at pp. 7-11 [*curriculum vitae*].)

    204.    As part of his investigation, Schachter reviewed many thousands of pages of

deposition transcripts and documents, including all of the Port Authority's financial records that

the Port Authority produced in this action (Tr. 755:8 to 756:14, 759:18 to 760:2 [Schachter]).

Unlike the two experts retained by the Port Authority (Deak and Arnold), Schachter reviewed:

    (a)    the Dworkin Firm's audit work papers (consisting of over 4,000 pages) (Tr. 756:15 to 757:12 [Schachter]);

    (b)    the minutes of the Port Authority's board of commissioners' meetings (*id.* at 757:13-20);

(c)     the Port Authority's general ledgers (to the extent available) (*id.* at 757:21 to 758-18; *see also* Tr. 471:15 to 472:21 [Johnson] [Port Authority did not keep general ledgers before 2002]);

(d)     the bills from the Port Authority's three telephone service providers and from a bank credit card issuer covering a 16-month period (*id.* at 758:19 to 759:17); and

(e)     copies of the Port Authority's advertising materials (*id.* at 778:11-25).

(*See also* Pl. Ex's 41-43 [telephone bills], Pl. Ex. 44 [credit card bills]; Pl. Ex's 202-203 [analyses of telephone and credit card bills]; Pl. Ex's 89-161 [board minutes]; Pl. Ex's 33 and 34 [general ledgers, 2003 and 2002]; Pl. Ex. 218 [Schachter Report], p. 12 [list of information considered].  *Compare* ¶¶ 259 and 277 below [documents reviewed by Deak and Arnold].)

205.    Mr. Schachter calculated the excess of Passenger Fee collections over the Port Authority's ferry-related costs (the "Overcharge"), for each year from 1993 through 2003, using three different models (Tr. 763:15 to 764:1 [Schachter]; Pl. Ex. 218, ¶¶ 3.0 through 3.3 and Ex's 3-5 thereto).  Schachter concluded that the third model is the most accurate (*see* ¶ 220 below).  Each model is separately discussed below.

### Schachter's Model 1

206.    In the first model, Schachter simply adopted the figures used by the Port Authority in its own Net Income Reports, *i.e.*, its calculations of the amount it is contractually bound to pay to the City of Bridgeport each year, equal to 15% of the net operating revenue from the Dock (*see* ¶¶ 182-201 above).  (Tr. 764:2-22 [Schachter]; Pl. Ex. 218, ¶ 3.1 and Ex. 3.)

207.    Schachter used this model first because, in reviewing the audit work papers early in his investigation, he discovered that the Port Authority had already created an accounting designed to capture its Dock-related revenue (*i.e.*, the Passenger Fee) and the costs associated with it.  It therefore made sense to Schachter to chart out and analyze the Port Authority's own

accounting of ferry-related revenue and expense.  In this model, Schachter did not change any of the Port Authority's figures or allocations as stated in its own Net Income Reports.  (*Id.*; *see also* Tr. 765:12 to 770:3 [full discussion of Model 1].)

208.    The Overcharge under this first model for each year from 1993 through 2003 is shown in Ex. 3 to the Schachter Report; the total Overcharge for that period was $2,732,200. (Tr. 769:17 to 770:3 [Schachter]; Pl. Ex. 218, ¶ 3.1 and Ex. 3.)

209.    Schachter concluded that the Net Income Reports do not accurately reflect the Port Authority's net income from ferry operations.  In reviewing this model analytically, he noted, for example, that of the $4.9 million that the Port Authority allocated to Dock expenses over an 11-year period, a very large share, about $1.2 million, went to legal and professional fees.  He also was concerned about the allocations to salary and office overhead.  Schachter concluded that the Port Authority's own figures in this first model represent "a base case, . . . the floor for the overcharge because of the aggressiveness of the expense allocations" (Tr. 772:1-3). He therefore proceeded with his second model.  (Tr. 770:5 to 772:3 [Schachter].)

**Schachter's Model 2**

210.    In the second model, Schachter began with the Port Authority's calculations as in Model 1, but then adjusted certain of the Port Authority's allocations between ferry-related and non ferry-related expenses, based on his review of the financial records and the deposition testimony of Port Authority staff.  (Tr. 772:10-22 [Schachter]; Pl. Ex. 218, ¶ 3.2 and Ex. 4.)

211.    Schachter changed the Port Authority's allocations only with respect to those expense categories for which he had sufficient information to determine that the allocation used by the Port Authority in its Net Income Reports was not appropriate.  For example, Schachter did not change any allocation with respect to the seven expense categories that he grouped under

"Building and Grounds" and "Office Expenses."  (Tr. 774:16 to 775:15 [Schachter]; Pl. Ex. 218, ¶ 3.2 and Ex. 4, at p. 34 [also paginated "11 of 16"].)

212.    In detailed "Endnotes" to Exhibit 4 of his report, Schachter explained the factual basis for each of his allocation adjustments in this second model (Tr. 777:4-21 [Schachter]; Pl. Ex. 218, Ex. 4, at pp. 36-39).  For example:

(a)    **Personnel costs**.  Schachter reduced the ferry-related allocation for salaries and other personnel costs (health insurance, payroll taxes and pensions) from 50% to 33%, because he concluded that not more than "one full-time employee's time is reasonably spent on the ferry operation" (*id.*, endnote "f" at pp. 36-37).  This conclusion was based mainly on Schachter's review of the deposition testimony of the Port Authority's three full-time employees, the minutes of the Port Authority's board meetings, and records of the Port Authority's telephone bills, travel and other expenses (*id.*; Tr. 775:16 to 777:3 [Schachter]).  The evidence supports Schachter's conclusions in this regard (*see* ¶¶ 67-68 above; *compare* Arnold's analysis, ¶¶ 281(a) below).

(b)    **Advertising and marketing**.  Schachter reduced the allocation for advertising and marketing from 50% to 10% because, after reviewing the Port Authority's advertising and promotional materials, he concluded that "very little, if any, of the advertising done by the Port Authority relates to the ferry" (*id.* endnote "g" at pp. 37-38; Tr. 778:11-25 [Schachter]).  The Port Authority's advertising materials and trial testimony bear out this conclusion.  (Pl. Ex.'s 47, 49, 215; Tr. 257:6 to 259:18 [Riccio].)

(c)    **Auto expense**.  Schachter reduced the allocation for Riccio's automobile expenses – which include lease payments, tolls, gasoline and even car washes – from 50% to 10% because Riccio uses the car for commuting, and thus "the auto expenses are

not directly related to the ferry operation" (*id.*, endnote "g" at p. 38; Tr. 779:2-8 [Schachter]). The Port Authority's expert agreed and concluded that *none* of Riccio's automobile expenses are properly chargeable to the ferry. (Tr. 871:22-23; 915:20 to 916:7 [Arnold]; Def. Ex. 66, ¶ 75 and Table 9 at p. 18 [reducing "equipment rental" by 100%].)

(d)     **Contributions**. Schachter reduced this allocation from 100% to 0% because, in his professional opinion, it is inappropriate for a government agency to fund its charitable contributions from specific user fees such as the Passenger Fee (*id.*, endnote "h" at p. 38; Tr. 779:9 to 780:13 [Schachter]).

(e)     **Professional fees**. Schachter reduced this allocation from "Actual" (which in fact was 100% from 1996 until 2002, and 80% in 2003) to 50% because, as his review of the audit work papers showed, the audit work related to all Port Authority activities (not just the ferry operation), and the auditors' analyses of the legal fees show that the Port Authority has incurred fees in connection with a variety of legal matters unrelated to the ferry (*id.*, endnote "i" at pp. 38-39; Tr. 780:16 to 781:10 [Schachter]). As Schachter added at trial, his review of "extensive work papers from Mr. Verrilli's office" analyzing legal fees showed that "a great deal of the legal fees dealt with Cartech property, the other issues that had nothing to do, in my opinion, with the ferry" (Tr. 781:1-6; *see also* Pl. Ex's 26 and 27 [auditor's analyses of legal invoices]).

(f)     **Other**. Schachter reduced the allocation of expenses to other categories such as "Cartech security" ("for the life of me I couldn't understand why Cartech security was allocated to . . . the ferry") (Tr. 781:14-16 [Schachter]; *see also* Pl. Ex. 38 at AD 001417, ¶ I ["security" and "Cartech security" expenses combined into one account as of

2002]), and consulting services for the high speed ferry ("Why should a competing ferry project be charged to the ferry at the Union Square Dock?") (*id.* at 781:24-25; *see also* Pl. Ex. 38 at AD 001416-17, ¶¶ A and E [lobbying and limousine expenses for high speed ferry]).

213.    The Overcharge under this second model for each year from 1993 through 2003 is shown in Ex. 4 to the Schachter Report; the total Overcharge for that period was $4,360,700. (Tr. 783:23 to 784:16 [Schachter]; Pl. Ex. 218, ¶ 3.1 and Ex. 4.)

214.    Schachter concluded that the second model, although more accurate than the Net Income Reports, still does not adequately reflect the Port Authority's net income from ferry operations.  As Schachter testified:

> I didn't want to be fettered with the accounting by the Port Authority.  I wanted to find out what the real incremental necessary out of pocket expenses would have been to the ferry if there wasn't this bureaucratic layer of authority in between them.

(Tr. 765:7-11 [Schachter].)  Schachter therefore proceeded with his third model.  (*Id.*)

### Schachter's Model 3

215.    In the third model, which he considered the most accurate, Schachter made his own calculation of the Overcharge by comparing the proceeds of the Passenger Fee each year with the Port Authority's reasonable cost of what it actually provided to the ferry operation that year.  The Ferry Company already provides many of the services and facilities at the Dock, such as dock hands, office and telephone expenses, insurance, snow removal, and some security. Schachter eliminated duplication and bureaucracy by "looking at what additional expenses would the ferry company incur over and above what it is already paying," and comparing that to the Passenger Tariff.  (Tr. 784:17 to 785:9, at 785:7-8 [Schachter]; Pl. Ex. 218, ¶ 3.3 and Ex. 5; *see also* Tr. 786:17 to 787:12 [discussing expenses already incurred by Ferry Company].)

216.    In analyzing the ferry-related costs under this model, Schachter accepted certain of the Port Authority's expense figures and allocations if they were reasonable and necessary to the ferry operation, and he eliminated other figures or allocations if they were duplicative or "were the result of the bureaucracy created by the Port Authority" and not necessary to the ferry operation.  (Pl. Ex. 218, ¶ 3.3 and Ex. 5.)

217.    As he did with respect to Model 2, Schachter explained the factual basis for each of his conclusions under Model 3 in detailed endnotes to the relevant exhibit in his report.  (Pl. Ex. 218 [Schachter Report], Ex. 5, at pp. 41-43; Tr. 786:2-9 [Schachter]).  For example:

(a)    **Building services, utilities**.  Schachter accepted the Port Authority's expenses for building services (such as maintenance, repair, janitorial), and their 80% allocation to the ferry operation, because he did not find evidence to indicate that they were unreasonable, even though the allocation could have been lower given that only the first floor of the terminal building is available to the ferry operation  (*id.*, endnote "c" at p. 41).  He similarly accepted the figures for utilities, and their 50% allocation (*id.*, endnote "d").

(b)    **Personnel**.  Schachter did not accept most of the Port Authority's personnel costs (wages, health insurance, payroll taxes, pension ), because he concluded that most of these costs were duplicative of the costs already incurred by the Ferry Company to staff the Bridgeport operation, including a Bridgeport operations manager (Rinaldo) and a full complement of staff for the dock and the reservations desk (*id.*, endnotes "f" through "k" at pp. 41-32; *see also* ¶¶ 33-40 above).

(c)    **Insurance**.  Schachter did not include the Port Authority's insurance costs because, under the Current Lease, the Ferry Company is required to and does provide

adequate insurance and indemnification with respect to all ferry operations at Bridgeport (Schachter Report, endnote "l" at p. 42; *see also* Tr. 428:20 to 429:6 [Hall]).  Arnold, the Port Authority's expert, was not even aware of the existence of this duplicate insurance (Tr. 923:4 to 924:14 [Arnold]).

(d)    **Other overhead costs**.  Schachter also eliminated or reduced various other items of overhead – such as office supplies, travel and entertainment, automobile, advertising, and contributions – because these are duplicative of costs already incurred by the Ferry Company to provide the same services in Bridgeport (Pl. Ex. 218 [Schachter Report], endnotes "o" through "y" at p. 43; *see also* Tr. 429:20 to 431:14 [Hall]).

218.    The Overcharge under this third model for each year from 1993 through 2003 is shown in Ex. 5 to the Schachter Report; the total Overcharge for that period was $6,278,300. (Tr. 787:17-20 [Schachter]; Pl. Ex. 218, ¶ 3.3 and Ex. 5.)

219.    In all three models, Schachter followed a conservative approach by including as ferry-related revenue only the net Passenger Fees; he did not include the income from the ferry-related leases (the Current Lease and the Food Concession Lease).  The Overages under each of the models would have been higher (by the amount of the lease rentals) if Schachter had included such lease income.  (Tr. 768:12 to 769:4 [Schachter].)

220.    Schachter concluded that, of the three models he analyzed, the third is the most accurate and reliable, "because it's an independent build up of the expenses from the ground up as to what it really takes to operate out of the Union Square Dock by the ferry."  (Tr. 787:21 to 788:2 [Schachter].)

221.    Schachter also calculated pre-judgment interest on the Overcharge amounts under each model, at the rate of 10% per year (not compounded), with interest commencing, for each

year, on January 1st of the *following* year, through the date of the report (*see* Conn. Gen. Stat.

§ 37-3a).  The Overage amount, interest, and total under each model, as Schachter calculated

them, are as follows:

**Overcharge and Pre-Judgment Interest as of June 2004**

|  | **Model 1** | **Model 2** | **Model 3** |
|---|---|---|---|
| Overage | $ 2,732,200 | $ 4,360,700 | $ 6,278,300 |
| Interest | 1,393,600 | 1,999,500 | 2,760,200 |
| TOTALS | $ 4,125,800 | $ 6,360,200 | $ 9,038,500 |

(Tr. 788:3-18 [Schachter]; Pl. Ex. 218 at pp. 5-6.)

**S.     Damages – the Ferry Company**

222.    As discussed in this section S, the Ferry Company's damages consist of:  (a) the

total of the Overcharge for the years 1993 through 2003, as determined by Schachter; plus (b) the

Overcharge from 2004 to date  in amounts yet to be determined (the Ferry Company did not

quantify these losses at trial because the Port Authority's records needed to compute the

Overcharge in and after 2004 were not yet available during the pretrial discovery period); plus

(c) the total amount of the $1 surcharge collected since February 1, 2006 (which collection is still

ongoing).

223.    In a pretrial decision denying the Port Authority's motion to dismiss the Ferry

Company's claims for lack of standing to assert damages, the Court stated:

> The harm to the Ferry Company is fairly traceable to the Passenger Fee:  it
> increases the real cost of ferry transportation to its customers, thereby
> depressing demand for such transportation.  In the absence of the
> Passenger Fee, the Ferry Company could either charge the same rates it
> charges now but attract more customers because of the lower real cost to
> the passengers or charge a higher rate for ferry passage without depressing
> demand from its current level (or some combination).

Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 335 F. Supp. 2d 275, 283 (D. Conn. 2004).

224.    Several witnesses at trial – Merritt, Hall, McAllister and even the Port Authority's own experts, Deak and Arnold – confirmed the soundness of the Court's statement.

225.    Merritt, the Ferry Company's CFO, testified that, if there had been no Overcharge, "[w]e would have had a much higher revenue and substantially higher profit" (Tr. 111:8-9 [Merritt]).  Merritt further testified:

> [I]f we're competing with another ferry company [Cross Sound Ferry] that, say, charges 40 dollars, and we have a two dollar tax, we can really only justify a 38 dollar fee.  So we are leaving some excess cash on the table, so to speak, as a result of our competition.

(Tr. 110:24 to 111:3 [Merritt].)

226.    Hall,  the Ferry Company's general manager, similarly testified that, if the Passenger Fee had been substantially lower, "we could have raised our rates and pocketed everything or, in the alternative, we could have left our rates low and attracted additional ridership because the rates were lower."  (Tr. 450:2-9 [Hall].)

227.    Hall and McAllister, the Ferry Company's President, have set the Ferry Company's rates since at least 1993 (Tr. 444:1-5 [Hall]).  Hall testified that, if the Passenger Fee had been substantially lower, "we would have raised them [the rates] higher.  There's no doubt in my mind."  (Tr. 464:3-4 [Hall]; *see also id.* at 462:24 to 463:12.)

228.    McAllister testified that he tries to keep Ferry Company fares as low as possible (Tr. 641:17-18; 649:23 to 650:3 [McAllister], and that the Passenger Fee "either takes money out of our pockets or it reduces our traffic" (*id.*, 642:20-21).

229.    The Ferry Company tries to keep its rates competitive with those of the Cross Sound Ferry (which travels between Orient Point, Long Island and New London, Connecticut).

Neither the Cross Sound Ferry nor its passengers pay a tariff or other fee to any agency on either side of its route. Since the Passenger Fee was instituted, the Ferry Company's rates (including the Passenger Fee) have been consistently higher than the Cross Sound Ferry's rates. (Tr. 641:7-10, 642:12 to 643:1 [McAllister]; Tr. 109:17-21 [Merritt]; Tr. 444:14 to 445:24 [Hall].)

230.    On the Port Jefferson side, no government entity charges any tariff or other fee to the Ferry Company or its passengers. Thus, of the four ports served by the Ferry Company and the Cross Sound Ferry (Bridgeport, Port Jefferson, New London and Orient Point), only Bridgeport imposes a fee on the ferry operation. (Tr. 416:16-19 [Hall].)

231.    McAllister testified that the Ferry Company has lost revenues and profits directly as a result of the Passenger Fee. When asked by the Port Authority's counsel whether, and how, the Ferry Company had been damaged, McAllister pointed to the "seven to ten million dollars" of total collections since the Passenger Fee was instituted. (Tr. 650:4-12 [McAllister]; *see also* table in ¶ 165 above [Passenger Fee collections from 1993 through 2004 totaled over $9.5 million].)

232.    Both expert economists retained by the Port Authority, Deak and Arnold, testified that, if the Passenger Fee had been lower than it was, then the Ferry Company would have carried more vehicles and earned more revenue and profit:

(a)    **Deak.**  Deak so testified in response to a hypothetical question, in which he was asked to assume three things: (i) that the Port Authority has spent approximately one-half of the proceeds from the Passenger Fee on activities unrelated to the ferry operation, (ii) that in 2003, the Ferry Company fare for auto and driver was $37.75 and the Passenger Fee was $2, for a total cost to the passenger of $39.75, and (iii) that in

2003, the Ferry Company carried 400,000 cars.[2]  He was then asked:  If the Passenger

Fee in 2003 had been $1 instead of $2 – and all other things remained the same – would

the Ferry Company have carried more than 400,000 cars, fewer, or the same number?

Deak answered that the Ferry Company would have carried more cars and would have

earned higher revenues.  (Tr. 723:11 to 724:18 [Deak].)

(b)     **Arnold**.  Not only did Arnold also so testify, but one of his own work

sheets, prepared before trial, graphically illustrates the direct cause and effect between an

excessive Passenger Fee and the Ferry Company's loss of profit.  In that work sheet (Def.

Ex. 217), Arnold used *his own estimate* of elasticity of demand for ferry service (0.70),

and *actual* figures in 2002 for the Ferry Company's fare for auto and driver ($37.75), the

corresponding Passenger Fee ($2.00), and the number of vehicles carried (427,139).  He

then computed how much revenue was generated for each of the Ferry Company and the

Port Authority, both under the "current situation" and under various assumed scenarios.

Under his first scenario – if the Passenger Fee had been reduced by $1 – Arnold

determined that the Ferry Company would have carried an additional 7,522 vehicles (*i.e.*,

434,661 instead of 427,139) and would have earned an additional $284,000 in revenue

(*i.e.*, $16.408 million instead of $16.124 million) from the auto and driver category alone.

(Tr. 892:23 to 899:22 [Arnold]; Def. Ex. 217; *see also* 950:11 to 951:2 [Arnold] [Ferry

Company would have earned higher profits if Passenger Fee had been lower by one-

half].)

---

[2]   The first assumption uses a round number (50%) instead of the actual Overcharge percentages
as determined by Schachter (*see* ¶¶ 202-221 above).  The second assumption is true (Pl. Ex.
185).  The third assumption uses the round number of 400,000 instead of the actual number of
430,523 (Pl. Ex's 227, 239).

233.    Arnold also testified, and stated in his report, that the Ferry Company's costs are largely fixed (Tr. 947:6-21 [Arnold]; Def. Ex. 67 [Arnold Report], ¶ 43), and that the Ferry Company operates at about 50% of its ferryboats' capacity (Tr. 947:22 to 948:3 [Arnold]; *see also* Tr. 668:17-18 [McAllister] [same]).  Therefore, the Ferry Company can carry (and could have carried) additional vehicles without significantly increasing its costs (Tr. 948:4-24 [Arnold]).

234.    Neither Deak nor Arnold was able to state with precision the price elasticity of demand for ferry service.[3]  Both agreed, however, that the number is greater than zero (Tr. 716:4-16 [Deak]; Tr. 951:3-8 [Arnold]; Def. Ex. 67 [Arnold Report], ¶ 14).  Therefore, at any point in time, if the cost of taking the ferry increases, the number of cars and passengers carried by the ferry will decrease (Tr. 717:6-11 [Deak]).  A chart in Deak's report so confirms (Tr. 717:12-21 [Deak]; Def. Ex. 68, p. 11).

235.    Arnold changed his opinions, between the dates of his report and deposition and the date of his trial testimony, as to what the elasticity is likely to be, and whether the number can be computed at all.  In his report, he stated that the "more reasonable" estimate of price elasticity would be 0.7, but by the time of trial he believed it was lower than that (*compare* Def. Ex. 67, ¶ 14, *with* Tr. 889:8 to 891:13 [Arnold]).  At his deposition, he testified that he had not done and would be unable do a regression analysis to compute actual price elasticity; at trial he testified that, after his deposition, he nevertheless attempted such an analysis (Tr. 900:12 to 901:21 [Arnold]).

---

[3]   Deak defined price elasticity of demand as "a quantitative technique designed to determine the sensitivity of the aggregate of consumer's (i.e. passenger's) response to a change in the price (i.e. fare) of a specific good or service."  (Def. Ex. 68 [Deak Report], ¶ 11.)

236.    Because a precise elasticity figure cannot be determined (although it is greater than zero), the Ferry Company calculates its loss of profit as the amount of the Overcharge itself. In the absence of the Overcharge, the Ferry Company could have increased its fares by the amount of the Overcharge without raising the overall cost to passengers, in which event the Ferry Company would have carried the same number of vehicles and passengers that it actually carried; it would have incurred no additional costs; and it would have earned additional revenue and profit equal to the Overcharge.

237.    If the Ferry Company had not raised its fares by the full amount of the Overcharge, then the overall cost to passengers would have been less than it was, and the Ferry Company would have carried more vehicles and passengers, at no incremental cost, and earned higher profits. The increase in traffic and profits cannot be precisely determined, however, in the absence of a precise elasticity figure. Therefore, the Overcharge itself represents the best and most reasonable estimate of the Ferry Company's loss of profit due to the Overcharge (*see also* PCL, Point C.1 [when the <u>fact</u> of injury is shown with reasonable certainty, the <u>amount</u> of damages may be shown by reasonable approximation]).[4]

**T.    Damages – the Individual Plaintiffs**

238.    **D&D**. D&D paid the Passenger Fee (or reimbursed Rose therefor) each time that Rose took the ferry while on D&D business. (Tr. 395:4-14 [Rose].)

239.    Rose has taken the ferry on D&D business at least twice a week for five to five-and-a-half years (Tr. 389:4-9 [Rose]). Therefore, D&D has paid the Passenger Fee on each of at

---

[4]    Because the Passenger Fee is excessive, it follows that the $1 surcharge, which the Port Authority has imposed since February 1, 2006, is also excessive and illegal (*see* ¶¶ 54-55 above).

least 500 ferry trips (*i.e.*, 2 per week times 50 weeks times 5 years = 500).  As the trial took place

in April 2006, the five-year period runs approximately from April 2001 through March 2006.

240.    To compute D&D's damages, plaintiffs assume that the part of the Passenger Fee

paid by D&D that was legally excessive each time that Rose took the ferry was in the same

proportion to his total Passenger Fee as the proportion of total Overcharges to total Passenger

Fee revenue for that year.

241.    The percentages of total Overcharges to total Passenger Fee revenues in 2001,

2002 and 2003 (the latest year for which financial information was available to Schachter at the

time he prepared his report), under each of the three models analyzed by Schachter, are as

follows:

|  | | Model 1 | | Model 2 | | Model 3 | |
|---|---|---|---|---|---|---|---|
|  | Passenger Fee Revenue ($000) | Overcharge ($000) | Overcharge as % of Passenger Fee Revenue | Overcharge ($000) | Overcharge as % of Passenger Fee Revenue | Overcharge ($000) | Overcharge as % of Passenger Fee Revenue |
| 2001 | 947.6 | 319.9 | 34% | 460.3 | 49% | 705.0 | 74% |
| 2002 | 984.9 | 217.4 | 22% | 452.5 | 46% | 742.0 | 75% |
| 2003 | 1,292.4 | 294.0 | 23% | 736.9 | 57% | 1,040.0 | 80% |

(Pl. Ex. 218 [Schachter Report], at Ex's 3, 4 and 5.)

242.    The Passenger Fee paid by D&D for a vehicle with driver was (a) $1.50 in 2001

and 2002, (b) $2.00 from 2003 until January 31, 2006, and (c) $3.00 from February 1, 2006 until

the date of Rose's testimony on April 19, 2006 (including the $1.00 surcharge that became

effective February 1, 2006).  (Pl. Ex's 182-186; Tr. 377:19 to 378:23 [Riccio].)

243.    Using the percentages under Model 3 (which Schachter testified is the most

accurate) for 2001 through 2003, and applying the 2003 percentage (80%) to the ensuing periods

(for which the Port Authority's financial records were not available at the time Schachter prepared his report), D&D incurred total damages in the principal amount of $715.75 through the date of trial, computed as follows:

**D&D's Damages**

| Period | Number of Trips | Passenger Fee Per Trip | Total Passenger Fee Paid | % Excessive | Excess Amount Paid (D&D's Damages) |
|---|---|---|---|---|---|
| Apr. 2001 to Dec. 2001 | 75 | $ 1.50 | $ 112.50 | 74% | $ 83.25 |
| 2002 | 100 | 1.50 | 150.00 | 75% | 112.50 |
| Jan. 2003 to Jan. 2006 | 308 | 2.00 | 616.00 | 80% | 492.80 |
| Feb. 2006 to Mar. 2006 | 17 | 2.00 | 34.00 | 80% | 27.20 |
| TOTALS | 500 | | $ 912.50 | | $ 715.75 |

244.  **Zahradka**.  As Zahradka did not testify at trial, there is no evidence as to the number of times he has taken the ferry.  Accordingly, Zahradka withdraws his claim for *past* damages.  However, Zahradka does not relinquish his claim for declaratory or injunctive relief or for any damages he has incurred since trial and may incur in the future.

**U.     The Port Authority Experts' Biased and Flawed Testimony**

245.  The Port Authority's expert economists, Deak and Arnold, both testified that the Ferry Company suffered no damages.  However, as shown below, their testimony was biased and seriously flawed.

## Deak's and Arnold's Biases

246.   **Deak**.  Deak is biased in favor of the Port Authority because of his position as a director of Coastline Terminals since 1997.  Coastline owns the Cilco terminal.  Coastline is owned by its stevedore-employees, who supply the labor force to operate Cilco.  (Tr. 707:22 to 708:14 [Deak].)

247.   Deak admitted that, as a director of Coastline, he has a fiduciary duty to act in the best interests of Coastline and its stevedore-employee owners.  (Deak initially claimed, incredibly, not to be certain of the meaning of "fiduciary duty," even though he has been an economics professor for many years and has served on the Coastline board since 1997.)  (Tr. 711:16 to 712:2 [Deak].)

248.   The Port Authority has and exercises jurisdiction over Cilco.  (Tr. 194:11-13 [Riccio]; Tr. 708:15-23 [Deak].)

249.   Cilco benefits from various non ferry-related activities of the Port Authority:  (a) efforts to provide security in the harbor for commercial shipping; (b) efforts to raise funds to dredge the harbor, especially to accommodate the more than 35 feet of draft needed by vessels serviced by Cilco; and (c) promotion of Cilco in its advertisements.  (Tr. 708:24 to 710:21 [Deak]; Pl. Ex. 48.)

250.   Deak admitted that Cilco stands to benefit from the Port Authority's extensive efforts to establish a barge feeder service in Bridgeport (Tr. 712:3-7 [Deak]).  The Port Authority plans to use land adjacent to Cilco for that project, and Coastline expects and has lobbied the Port Authority to use its stevedore-owners to provide the labor for the barge feeder service.  (Tr. 711:1 to 713:18 [Deak].)

251.    The Port Authority collects no fees or charges of any kind from Cilco or from the commercial ships that use Cilco's services.  (Tr. 196:5-10, 197:16-20 [Riccio].)

252.    Deak claimed that he somehow cured his obviously conflicted position by recusing himself from discussions by Coastline's board concerning the Port Authority (Tr. 696:14 to 697:1 [Deak]).  Such recusals mean only that his bias in favor of the Port Authority did not affect Coastline's decisions at those meetings, but they do not mean the converse:  that his bias in favor of Coastline – as its director and fiduciary – did not affect his analysis and testimony in favor of the Port Authority.

253.    It is in Coastline's interest, and therefore in Deak's interest, for the Port Authority to continue to devote as many resources as possible to the above-mentioned non ferry-related activities that benefit Coastline, and for the Port Authority to continue to fund those activities from the Passenger Fee.

254.    **Arnold**.  Arnold's bias stems from his work experience on behalf of ports and his relationship with and prior testimony for the Port Authority's counsel in this case.  Arnold's professional experience has been largely one of representing ports, not users of port services (Tr. 826:4 to 827:21 [Arnold]; Def. Ex. 67, pp. 25-33 [Arnold's *curriculum vitae*]).

255.    In the only other case in which he testified as an expert, Arnold was retained by the same counsel that is representing the Port Authority in this case, and he testified in favor of a port authority (Port Canaveral).  The decision in that case, by an administrative law judge of the Federal Maritime Commission, was adverse to the position advocated by Arnold, the port and its counsel.  (Tr. 881:4-19; 828:23 to 829:5 [Arnold]; *see also* Exclusive Tug Arrangements In Port Canaveral, Florida, 2003 WL 1017732 (F.M.C. March 4, 2003).)

256.    Arnold also has co-authored an article with the Port Authority's counsel in this case (Def. Ex. 67, p. 33 [co-author Edward Sheppard]).

### Deak's Lack of Analysis, Generally

257.    Deak's "principal responsibility" in this case was to critique a report of Steven Shapiro, Ph.D., submitted by the Ferry Company in connection with a pretrial motion.  (Tr. 715:6-23 [Deak]; Def. Ex. 68, ¶ 2.)

258.    Deak performed no independent calculation of the elasticity for ferry service in this case.  (Tr. 715:24 to 716:3, 716:21 to 717:5 [Deak].)

259.    Deak did not review, and was not aware of, the amount of the Passenger Fees received by the Port Authority from 1993 to date, nor did he know how the Port Authority has spent those funds.  (Tr. 717:22 to 720:14 [Deak].)

260.    Deak had no opinion as to whether the Port Authority's proceeds from the Passenger Fee are related to the reasonable cost of the facilities and services it has actually provided to the ferry operation.  Nor did Deak examine or reach any conclusions concerning Schachter's analysis of that question  (Tr. 720:15 to 721:22 [Deak].)

261.    Deak admitted that the Port Authority spends time and other resources, such as overhead, on its various projects unrelated to the ferry, such as Cartech, BRMC, Derecktor, barge feeder service and high speed ferry (Tr. 722:1 to 723:3 [Deak]).  But Deak had no opinion on whether the Port Authority's activities relating to those projects improve the ferry operation (Tr. 735:18 to 736:10 [Deak]).

**Deak's Flawed Analysis of Increased Ferry Ridership**

262.     In his report, Deak charted the number of autos carried each year from 1997 through 2002 and opined that the Port Authority's use of the Passenger Fee income to improve ferry service "potential[ly]" contributed to the general increases in autos carried:

> The expenditure of ferry tariff revenues by the Port Authority on the convenience, quality, accessibility, security, safety and marketing of the ferry service are all <u>potential</u> factors contributing and influencing the demand shift over time.

(Pl. Ex. 68, ¶ 22 at p. 14, emphasis added.)  He similarly testified on direct examination by the Port Authority's counsel (Tr. 702:11-22 [Deak] ["non-price factors" have affected demand for ferry service]).

263.     Deak conceded in his report, however, that the most significant increases in auto traffic during the years he charted, which occurred in 1999 and 2000, "most likely reflect the introduction of a third steamboat, the P.T. Barnum, in the summer of 1999" (Pl. Ex. 68, ¶ 22 at p. 14). Klimas also so admitted (Tr. 560:5 to 561:10 [Klimas]).

264.     On cross-examination, Deak further conceded that he made "no independent statistical study indicating how much of the rise in vehicle carriage was due to the introduction of the new ferry and how much was due to the other factors" (Tr. 729:18 to 730:6 [Deak]).

265.     Thus, by his own admissions, Deak's opinion that the Ferry Company carried more cars because of improvements by the Port Authority funded by the Passenger Fee is based on no study or analysis by Deak and can carry no weight whatsoever.

266.     In addition, when shown the substantial increases in vehicles carried by the Ferry Company during the 1980s – *before the Port Authority existed* – Deak conceded that the addition of new and larger ferries during that period, along with a strong economy, led to those increases.

(Tr. 732:18-25 [Deak]; *see also id.* at 730:18 to 732:25 and Pl. Ex. 227; *see also* ¶¶ 42(a) above [introduction of new ferries in 1983 and 1986].)

267.    The Ferry Company consistently achieved substantial increases in the number of cars carried from the 1980s through 1996, the year the new terminal building was completed; during that long period of growth in vehicles carried, the terminal facilities at the Dock consisted of the red concrete building depicted in Def. Ex. 8.  The number of vehicles carried *decreased* from 1996 to 1997, the first full year that the new terminal building was open (which was also a year in which the Port Authority increased the Passenger Fee, *see* ¶ 50 above).  (Tr. 733:1 to 734:23 [Deak]; Pl. Ex. 227.)

## Deak's and Arnold's Flawed Loss of Profits Analysis

268.    **Deak**.  Deak opined that the Ferry Company did not lose any revenue or profits by reason of the Passenger Fee because the Ferry Company has carried more vehicles most years and has earned higher revenues each year that the Passenger Fee has been in effect.  In his opinion, even if the Passenger Fee had been excessive, the Ferry Company could have earned higher profits anyway by raising its own fares, because demand for ferry service is relatively inelastic.  According to Deak, although raising fares would have decreased vehicle and passenger traffic, and thus reduced revenue, that loss would have been more than made up for by the increased revenue from higher fares.  (Def. Ex. 68, ¶¶ 21-27 [Deak Report]; Tr. 698:10 to 700:22 [Deak].)

269.    This opinion by Deak is deeply flawed.  First, the fact that the Ferry Company earned profits each year from 1993 to date does not mean that it was not damaged by the excessive Passenger Fee; Deak himself conceded that, if the Passenger Fee had been lower, the Ferry Company's revenues and profits would have been higher (*see* ¶ 232(a) above).  Second,

Deak failed to take into account that, no matter how high the Ferry Company would have been able to raise its fares without decreasing its overall revenues, it still would have lost the revenue that went to the Port Authority in the form of excessive Passenger Fees.

270.    In any event, Deak performed no analysis and has no opinion as to how high the Ferry Company could have raised its fares without decreasing its overall revenue.  For example, he had no opinion as to whether, if the Ferry Company raised its fares by 50% – *e.g.*, from $40 to $60 for car and driver – that would have a positive, negative or no effect on the Ferry Company's revenues or profits (even though he addressed this very question in his report).  (Tr. 727:20-24 [Deak]; *see also id.* at 724:19 to 727:24 and Def. Ex. 68, ¶ 18.)

271.    Finally, Deak conceded – by omitting any mention of the Ferry Company's profits in his report – that the Ferry Company's profitability is completely irrelevant to the question whether the Ferry Company has been damaged by the excessive Passenger Fees.  When Deak testified at the preliminary injunction hearing, on April 1, 2004, he stated that he needed to see the Ferry Company's financial statements in order to be able to opine whether it had not been harmed by the Passenger Fee.  Yet in his report, dated August 26, 2004 – submitted after he reviewed the Ferry Company's financial statements, tax returns and other financial records – Deak stuck to his flawed opinion without any mention whatsoever of the Ferry Company's profitability or financial statements.  (Tr. 736:11 to 739:23 [Deak].)

272.    **Arnold**.  Arnold's opinion that the Passenger Fee has not caused the Ferry Company to lose profits was based on two premises:

(a)    The Ferry Company consistently has earned "reasonable" or "very healthy" profits, despite the existence of the Passenger Fee (Tr. 850:3 to 853:1, at 850:23 ["reasonable"] and 851:20 ["very healthy"] [Arnold]).

(b)     Because demand for ferry service is not very price sensitive, the Ferry Company can simply raise its fares, and thereby increase its profits, despite the existence of or increases to the Passenger Fee (Tr. 858:6-9 [Arnold]; *see also* Tr. 891:14 to 892:22 and Def. Ex. 67, Figure 1 at p. 3 [illustrating, "hypothetically" (Tr. 892:15), that the Ferry Company would earn higher profits if it raised its auto and driver fare from about $40 to $56]).

273.    The first basis for Arnold's opinion – that the Ferry Company was not damaged because it earned healthy profits – has several serious flaws:

(a)     Arnold contradicted this opinion in his own work sheet (Def. Ex. 217) and trial testimony, in which he graphically showed that, if the Passenger Fee had been less than it actually has been, the Ferry Company would have (a) carried more vehicles, and (b) earned higher revenues.  (Tr. 898:18 to 899:10 [Arnold]; *see also id.* at 950:11 to 951:2; ¶ 232(b) above).  The converse also is true:  if the Passenger Fee were higher, the Ferry Company would carry fewer vehicles and earn less revenue (*id.* at 899:11-22).

(b)     Arnold admitted that the Ferry Company's profitability in 2003, when the Port Authority increased the Passenger Fee early that year, was significantly worse than in prior years, and that the increase in the Passenger Fee "in theory and intuitively" had a negative effect on the Ferry Company's profits that year.  (Tr. 952:13 to 953:20.)

(c)     Arnold arbitrarily excluded the Ferry Company's "general and administrative" expenses from his analysis, thereby exaggerating the Ferry Company's profit ratios.  (Tr. 953:21 to 956:12 [Arnold]; Def. Ex. 67, Table 5 at p. 11.)

(d)     Arnold compared the Ferry Company's rate of return to those of enormous and "vastly different" multinational shipping lines, for example A.P. Moeller, whose

annual revenues of $21 billion are 1,000 times larger than the Ferry Company's.  (Tr. 958:7 to 959:14 [Arnold]; Def. Ex. 67, Table 6 at p. 11.)

274.    Thus, that the Ferry Company has earned profits is completely beside the point; Arnold (like Deak) admitted that the Ferry Company would have earned higher profits if the Passenger Fee did not exist or had been lower.  (*See also* PCL ¶¶ 58-59 [there is no rule of law that a company that has earned profits may not seek to recover additional profits that it did not earn due to defendant's wrongful conduct].)

275.    The second basis for Arnold's opinion – that the Ferry Company can raise its fares essentially at will – is factually incorrect.  Ferry Company officials testified that their ability to raise fares is directly limited by the Cross Sound Ferry's rates (*see* ¶¶ 225-229 above). Arnold failed to consider competition between the Ferry Company and the Cross Sound Ferry, even though he admitted that there is some competition between them (Tr. 901:22 to 902:21 [Arnold]).

### Arnold's Flawed Analysis of the Port Authority's Costs

276.    Arnold testified and stated in his report – in stark opposition to Schachter's testimony – that the cost of the facilities and services that the Port Authority provides to the ferry operation exceeds the Port Authority's revenues from the Passenger Fee and ferry-related leases. (Tr. 833:5-10; 8695-15 [Arnold]; Def. Ex. 67, ¶¶ 61-83.)  His analysis in this regard is deeply flawed.

277.    It is flawed, initially, because Arnold chose not to review key Port Authority records highly relevant to any analysis of the Port Authority's costs:  (a) the Dworkin Firm's audit work papers (over 4,000 pages), (b) any of the Port Authority's general ledgers, (c) any of its telephone bills or credit card bills, (d) any minutes of the Port Authority Board of

Commissioners, and (e) Riccio's travel records (Tr. 879:22 to 881:3; 915:16-19 [Arnold]).  By

contrast, Schachter reviewed all of these documents, which he considered essential to his

analysis (*see* ¶ 204 above and record references therein).

278.    Arnold's major *substantive* flaw in his analysis of the Port Authority's ferry-

related costs is that he included about $691,000 *per year* of costs that the Port Authority did not

actually incur at all (*see* "Capital" and "Maintenance" lines in Pl. Ex. 67, Table 10 at p. 19; Tr.

930:5 to 931:9 [Arnold]).  There are may flaws in this analysis:

(a)    Arnold computed these alleged costs based on the capital cost of three

ferry-related projects – bulkhead repairs, access road and passenger terminal – that were

funded by government grants, not by the Port Authority.  Arnold *assumed* – contrary to

fact – that the Port Authority borrowed approximately $6.7 million to fund these

projects.[5]  (Tr. 869:22 to 870:12 [Arnold]; Pl. Ex. 67, ¶¶ 65-71 and Table 8 at p. 17.)

(b)    In fact, these projects were funded with *government grants*, which were

gifts, and which the Port Authority is not required to repay to anyone.  (Tr. 925:1-19;

928:14-22 [Arnold].)

---

[5]    Arnold's inclusion of these phantom "costs" in his analysis is also contrary to the Federal-Aid
Highway Act of 1956, as amended, 23 U.S.C. § 101 *et seq*., under which the Ferry Boat
Discretionary Program was instituted, *see* 23 U.S.C. § 129(c).  Section 129(c)(4) provides that an
operating authority must apply all revenues from ferry facilities to the "actual and necessary
costs" of the facility's operation, maintenance and debt service.  Further, a government entity
that receives federal funds for bridges, for example, may charge tolls for their use only to recover
its own, and not the federal government's, funding contributions.  Callam County v. Dep't of
Transp. of the State of Washington, 849 F.2d 424, 430 (9th Cir. 1988) ("In order to collect tolls
pursuant to [23 U.S.C.] section 129(a), the State must have expended its own funds in
reconstructing the bridge."), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 790 (1989).  In violation of
these well-established principles, Arnold's analysis would allow the Port Authority to recover,
through the Passenger Fee, "costs" that it did not incur, which were funded by the federal
government (*see, e.g.*, PFF ¶ 67(a) above).

(c)     Arnold conceded that his assumed annual costs of $691,000 are not shown or reflected anywhere in the Port Authority's audited financial statements. (Tr. 931:15-18 [Arnold].)

(d)     Arnold also conceded that his valuation of the ferry-related assets yielded values far greater than those stated for the same assets in the Port Authority's audited financial statements (under depreciation and amortization) (Tr. 925:20-25 [Arnold]; Def. Ex. 67, ¶ 66).  When asked to explain why the Port Authority would not state the full depreciation or amortization value for these assets, Arnold said that he is not qualified to answer because he is not an accountant (Tr. 927:12-19 [Arnold]).  His only explanation was his vague assertion that economic valuation differs from accounting valuation (Tr. 928:1-13 [Arnold]).

(e)     Arnold's analysis assumes that the cost of the terminal building was about $4 million.  Yet he has seen no evidence to substantiate that figure, and in the 2004 audit, the terminal building was valued at about $1.5 million.  (Tr. 970:24 to 971:15 [Arnold]; Def. Ex. 67, Table 8 at p. 17; Tr. 996:14 to 997:20 [O'Malley]; Pl. Ex. 234, p. 1.)

(f)     Arnold also glossed over the facts that the government grants were funded from tax revenues; that most ferry passengers pay taxes to federal and state taxing authorities; and therefore, that passengers already have contributed to the capital cost of the ferry-related projects.  By including these phantom capital "costs" in the Port Authority's ferry-related costs, Arnold in effect would require the tax-paying ferry passengers to pay twice for the same thing.  (Tr. 932:22 to 934:18 [Arnold]; *see also* Tr. 782:11-18 [Schachter] [improper to recover cost of tax-funded assets].)

(g)    Arnold's analysis similarly charges ferry passengers twice for the $150,000 that the Port Authority says it spent on the ferry terminal. Arnold concedes that the source of those funds was the Passenger Fee, but he nevertheless includes the $150,000 as part of the terminal's capital cost, which in his analysis is also charged to the ferry passenger. (Tr. 934:19 to 937:9 [Arnold]; Def. Ex. 67, tale 7 at p. 13.)

(h)    About $106,000 of the $691,000 of annual capital costs computed by Arnold represent capital "maintenance" costs, *i.e.*, the annual cost to maintain the terminal, bulkhead and access road. Yet Arnold was unable to state whether there is overlap between those annual maintenance costs (shown in Table 8 on p. 17 of his report) and the Port Authority's annual operating costs (shown in Table 9 on p. 18) – both of which Arnold included, and potentially double counted, in his comparison of the Port Authority's "stand-alone" ferry-related costs and expenses (Table 10 on p. 19). (Tr. 938:4 to 943:1 [Arnold].)

(i)    Arnold also conceded that the Current Lease requires the Port Authority to maintain the dock and other facilities covered by the lease, for which the Ferry Company pays annual rent well in excess of $100,000 (¶ 22 above). Yet Arnold maintains that the Port Authority nevertheless is entitled to recover the dock maintenance costs from the Passenger Fee. (Tr. 944:4 to 945:25 [Arnold].)

279.    If Arnold had not included $691,000 of assumed capital and maintenance costs each year in his computation of the Port Authority's ferry-related costs, then his own computation – despite his other admitted errors as stated in ¶¶ 281-282 below – would have shown that the ferry-related revenue *exceeded* the ferry-related costs by: (a) $435,680 in 2001,

(b) $409,350 in 2002, and (c) $621,110 in 2003.  (Tr. 931:19 to 932:21 [Arnold]; Def. Ex. 67,

Table 10 at p. 19 [deleting "Capital" and "Maintenance" from computation of "net income"].)

280.    Significantly, Arnold made no effort to analyze either the capital, maintenance or

operating costs of the Port Authority in relation to its *non* ferry-related activities:

(a)    Arnold did not try to determine how much money the Port Authority spent

each year in operations on *non* ferry-related activities.  (Tr. 943:2 to 944:3; 961:24 to

962:2 [Arnold].)

(b)    Arnold did not compute capital or maintenance costs for any of the Port

Authority's *non* ferry-related projects that were also funded by government grants, such

as the BRMC, Derecktor, the high speed ferry and the barge feeder service, even though

the total amount of such grants far exceeds the amount for the ferry-related projects (*see*

¶¶ 167-170 above).  Arnold conceded that the Port Authority will neither seek nor be able

to "recover" these non ferry-related capital costs.  (Tr. 965:25 to 967:18 [Arnold].)

281.    In addition to these flaws – which relate to Arnold's inclusion of $691,000 as

supposedly ferry-related costs that the Port Authority should recover from the ferry passenger –

Arnold's analysis of the ferry-related costs had various other flaws:

(a)    **Personnel costs**.  Arnold agreed with Schachter in principle that personnel

costs should be reduced, although his reduction was only 25% (Tr. 910:15 to 911:11

[Arnold]; Def. Ex. 67, Table 9 at p. 18).  But Arnold reduced only *salaries* and failed to

reduce the corresponding personnel costs such as pensions and payroll taxes; at trial, he

acknowledged that this was an error on his part (*id.* at 924:15-25; *compare* Schachter's

treatment in ¶¶ 212(a) and 217(b) above).  Arnold also admitted that he has "no idea how

much time Mr. Riccio, Ms. Klimas and Ms. Johnson have spent" on the non ferry-related activities (Tr. 968:11-16 [Arnold]).

(b)    **Professional fees**.  Arnold made no reduction in professional fees of $30,000 per year, even though he did not review the audit work papers (which contain analyses of legal expenses) and had no idea whether the fees concerned matters unrelated to the ferry (Tr. 916:8 to 917:5 [Arnold]; Def. Ex. 67, Table 9 at p. 18).  Arnold conceded that Schachter was in a better position than Arnold to determine what portion of the professional fees would have be reasonably spent on the ferry-related activities (Tr. at 917:1-5 [Arnold]).

(c)    **Insurance**.  Arnold reduced insurance costs by 20% in his "stand-alone" model.  Yet he admitted that (i) he does not know whether or to what extent the Port Authority's insurance duplicates the insurance that the Ferry Company provides under the Current Lease, (ii) he did not review any of the Port Authority's insurance policies, and (iii) he does not know how much of the Port Authority's insurance costs relate to the BRMC, officers' and directors' liability or Riccio's car.  (Tr. 923:4 to 924:14 [Arnold].)

### Other Errors and Flaws in Arnold's Report and Testimony

282.    Arnold's report and testimony were riddled with numerous other errors and flaws, large and small, which he admitted at trial, including the following:

(a)    In his report, Arnold stated that the Ferry Company's cash flow included $29 million in dividends paid to its parent company between 1998 and 2003 (Def. Ex. 67, ¶ 44).  At trial, he admitted that these "dividends" were not in the cash flow statement and did not involve any cash going out of the Ferry Company.  (Tr. 956:13 to 957:8; 958:3-6 [Arnold].)

(b)    Table 8 on page 17 of Arnold's report incorrectly states the total capital cost of three ferry-related projects as $9.418 million instead of $6.718 million – a nearly $3 million error (Def. Ex. 67 at p. 17, Tr. 929:1-9 [Arnold]).

(c)    In the same table, Arnold stated that the original cost of the access road was $1.25 million, even though he saw no evidence of and does not recall his basis for including that amount (Tr. 929:10 to 930:4 [Arnold]).

(d)    Arnold included all $2.9 million of "security equipment" under "Ferry Terminal" in his Table 7 on page 13, although he conceded at trial that some of that equipment is intended for the BRMC.  (Tr. 965:2-15 [Arnold]; *see also* Tr. 310:2 to 311:19 [Riccio] [$1 of $2.9 million devoted to ferry terminal].)

(e)    Paragraph 48 and Table 7 on page 13 of Arnold's report state that the cost of acquiring the BRMC site was $2.7 million, whereas the actual cost, following litigation, was $9.45 million.  (Tr. 960:13 to 961:10 [Arnold].)

(f)    The same table 7 on page 13 of Arnold's report states the amount of an LOCIP grant as $1.86 million, whereas ¶ 57 of the report states that it was $1.35 million. The latter is correct, according to Arnold.  (Tr. 970:7-16 [Arnold]; Def. Ex. 67, ¶ 57 and Table 7 at p. 13.)

(g)    In ¶ 56 of his report, Arnold stated that the cost of repairing the bulkhead in 2000 was $1.468 million, but in Table 7 on page 13, he stated that it was $1.482 million.  (Def. Ex. 67, ¶ 57 and Table 7 at p. 13; Tr. 969:21 to 970:6 [Arnold].)

(h)    In ¶ 77 of his report, Arnold states that he would reduce the Port Authority's ferry-related telephone expense by 50%; yet in Table 9 on page 18, the

reduction is only 25%.  (Def. Ex. 67, ¶ 77 and Table 9 at p. 18; Tr. 922:3 to 923:3 [Arnold].)

       (i)       In his report, Arnold states that the first year's rental under the Derecktor Lease is $55,000, but the correct figure is $50,000.  (Tr. 962:14 to 963:2 [Arnold.)

283.     Thus, Deak's and Arnold's reports and trial testimony were riddled with flaws, inconsistencies, bias and errors, as summarized above.  The Court therefore should give no weight to their conclusory – and incorrect – opinions that the Ferry Company was not harmed by the Overcharge and that the Port Authority's ferry-related costs have exceeded its ferry-related revenue.

*   *   *

## PROPOSED CONCLUSIONS OF LAW

### A.    Introduction

This case raises two fundamental legal issues:  (a) does the law place *any* limit on the amount of user fees that a government entity may impose?, and (b) if so, what is that limit?  The answer to the first question is self-evident; clearly, there is a legal limit on the amount of a user fee – otherwise, what would prevent a government entity from imposing an exorbitant fee for a given service – *e.g.*, a $1,000 fee for a court clerk to certify a judgment – and using the proceeds of that excessive fee to fund other activities, benefiting others, from whom it receives no fees?

The real legal issue, therefore, is the second question:  what is the legal standard that places limits on the amount of user fees that a government entity may impose?  The standard under the various claims alleged by plaintiffs – each discussed separately in Point B below – is essentially the same:  the proceeds from the user fee may not be excessive in relation to the reasonable cost of the services or facilities provided to the fee payers.  In this case, the evidence is clear that the Passenger Fee greatly exceeds, and bears no relation to, the reasonable cost of the facilities and services that the Port Authority provides to the ferry operation.

The remaining legal issues for the Court to determine are:

(a)    What portion of the Passenger Fees to date have been excessive, and therefore illegal (*i.e.*, the Overcharge)? (this is a largely factual issue, discussed in PFF ¶¶ 202-221 above);

(b)    What damages have the Ferry Company and the individual plaintiffs sustained as a result of the Overcharge? (*see* Points C.1 and C.2 below); and

(c)    What prospective relief is appropriate to prevent future violations? (*see* Point D below).

**B.** **Elements and Legal Standards of Plaintiffs' Claims**

**Claim I – The Rivers and Harbors Appropriation Act**

1.      The Maritime Transportation Security Act of 2002, Pub. L. 107-295 (Nov. 25, 2002), added a new subsection (b) to the Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5(b), which provides in relevant part (with emphasis added):

> (b)     No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, <u>or from its passengers</u> or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for—
>
> > (1)     fees charged under section 208 of the Water Resources Development Act of 1986 (33 U.S.C. § 2236);
> >
> > (2)     <u>reasonable fees charged on a fair and equitable basis that</u> —
> >
> > > (A)     <u>are used solely to pay the cost of a service to the vessel or water craft;</u>
> > >
> > > (B)     enhance the safety and efficiency of interstate and foreign commerce; <u>and</u>
> > >
> > > (C)     do not impose more than a small burden on interstate or foreign commerce; or
> >
> > (3)     property taxes on vessels or watercraft, other than vessels or watercraft that are primarily engaged in foreign commerce if those taxes are permissible under the United States Constitution.

2.      The Passenger Fees are subject to this provision because (a) the Port Authority is a "non-Federal interest"; and (b) the Ferry Company's ferry boats operate on the Long Island Sound and Bridgeport harbor, both of which are navigable waters subject to the authority of the United States.  *See* <u>U.S. v. Appalachian Elec. Power Co.</u>, 311 U.S. 377, 405 n. 21, 61 S.Ct. 291 (1940) (quoting the Court's definition of "navigable waters of the United States" in <u>The Daniel Ball</u>, 77 U.S. (10 Wall.) 557, 563 (1870)).

3.     The Passenger Fees violate 33 U.S.C. § 5(b) because such fees are not "reasonable fees [that are] charged on a fair and equitable basis"; and their proceeds exceed by a substantial amount the cost of the services and facilities that the Port Authority provides to the ferry or its passengers.

4.     33 U.S.C. § 5(b) became effective on November 25, 2002, when Pub. L. 107-295 was enacted.  Gozlon-Peretz v. U.S., 498 U.S. 395, 404, 111 S.Ct. 840 (1991) ("absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment").

5.     Accordingly, the Port Authority has violated 33 U.S.C. § 5(b) since November 25, 2002, to the extent of the Overcharge since that date.

## Claim II – The Commerce Clause

6.     The Commerce Clause of the United States Constitution, U.S. Const., art. I, § 8, clause 3, provides in relevant part that "The Congress shall have Power . . . To regulate Commerce among the several States . . . ."

7.     In order to comply with the Commerce Clause, user fees imposed by a state or its subdivision on persons traveling or providing transportation between states must (among other requirements):

(a)     not be excessive in relation to the cost of the governmental benefit conferred on the paying users, Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 370, 114 S.Ct. 855 (1994) ("Northwest") (holding that airport user fees in that case were not unreasonable or discriminatory in violation of Commerce Clause or Anti-Head Tax Act ["AHTA"], 49 U.S.C. App. § 1513); Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc., 405 U.S. 707, 719, 92 S.Ct. 1349 (1972) ("Evansville") ($1 head tax on airline passengers did not violate Commerce Clause

because "the airlines have not shown these fees to be excessive in relation to costs incurred by the taxing authorities"); and

        (b)     reflect a fair approximation of use of the facilities and services by those on whom the fees are imposed, Northwest, 510 U.S. at 369; Evansville, 405 U.S. at 716-17.

        8.     With respect to the reasonableness of the fees, the Supreme Court in Northwest relied heavily on the standard expressed in Evansville.[6]   The Supreme Court upheld the user fees at issue in Northwest because the record showed that "the Airport charged the Airlines 'the break-even costs for the areas they use.'"  510 U.S. at 370.  Accordingly, the Court held, the fees met the requirement that they not "'be excessive in relation to costs incurred by the taxing authorities' for benefits conferred on the user."  *Id.* at 371, *quoting* Evansville, *supra*, at 719. *See also* American Trucking Associations, Inc. v. Scheiner, 483 U.S. 266, 290, 107 S.Ct. 2829 (1987) (holding that fees imposed by state on trucks using its highways violated Commerce Clause because, *inter alia*, the fees "do not even purport to approximate fairly the cost or value of the use of Pennsylvania's roads"); Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439 (1937) (holding that $15 per vehicle permit fee was excessive and therefore violated Commerce Clause, where record showed that the state's cost of providing the road services for which the fee was imposed was not more than one-third of the proceeds of the fee); Clark v. Paul Gray, Inc., 306 U.S. 583, 599, 59 S.Ct. 744 (1939) (user fee may not be manifestly disproportionate to the cost of the services rendered); New Orleans S.S. Ass'n v. Plaquemines Port, Harbor and Terminal Dist., 874

---

[6]   Although Evansville was superseded by the AHTA with respect to air travel, its standard for determining the reasonableness of user fees continues to be applied in other contexts, and even under the AHTA.  Northwest, 510 U.S. at 368 ("The formulation in Evansville has been used to determine 'reasonableness' in related contexts") (citing cases).

F.2d 1018, 1021 (5th Cir. 1989) ("Plaquemines") (to satisfy Commerce Clause, port fee "must be used to pay for the service [provided]").

9.     In Commonwealth Edison Co. v. Montana, 453 U.S. 609, 101 S.Ct. 2946 (1981), the Supreme Court distinguished a state's general revenue tax from "a specific charge imposed by the State for the use of State-owned or State-provided transportation or other facilities or services." 453 U.S. at 622. As to the latter, the court stated:

> Because such charges are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services, we have required a showing, based on factual evidence in the record, that "the fees charged do not appear to be manifestly disproportionate to the services rendered . . . ."

Id. at 622 n. 12 (quoting Clark, supra, 306 U.S. at 599, and citing Ingels, supra, 300 U.S. at 296-97).[7]

10.     The Passenger Fees in this case are not general revenue taxes; rather, they are user fees imposed for the use of the Port Authority-owned terminal and related services. The record shows that the proceeds of the Passenger Fees have been and continue to be substantially higher than the Port Authority's actual costs of providing facilities and services to the Ferry Company and its passengers. Therefore, the Passenger Fees have been and continue to be excessive and in violation of the Commerce Clause.

11.     With respect to the "fair approximation of use" requirement (see ¶ 7(b) above), the apportionment of the fees and any exemption from the payment of fees must also be fair and reasonable. Northwest, 510 U.S. at 369; Evansville, 405 U.S. at 717-18. In Northwest, the

---

[7]  When the challenged measure is a tax, rather than a user fee, the Commerce Clause does not bar the state from spending some of the tax revenues on general government services, from which the individual taxpayers arguably derive no direct benefit. Goldberg v. Sweet, 488 U.S. 252, 266-67, 109 S.Ct. 582 (1989).

airlines challenging the fee claimed that it violated this requirement because the airport allocated

its entire costs of "air operations" to the airlines and did not allocate any portion of it to terminal

concessions (such as car rental companies, restaurants and gift shops), which, the airlines argued,

benefited from customer flow generated by the air operations.  The Supreme Court held that the

allocation of all air operation costs to the airlines did not violate the "fair approximation"

requirement because "[o]nly the airlines . . . actually use the runways and navigational facilities

of the Airport."  510 U.S. at 369.

12.     In this case, by contrast, the Ferry Company and its passengers do not use many

of the facilities and services that the Port Authority provides to others – such as the BRMC,

Derecktor, the high speed ferry project, and the feeder barge project – and that the Port Authority

funds with proceeds of the Passenger Fees.

13.     Accordingly, the Passenger Fees also violate the "fair approximation of use"

requirement under the Commerce Clause to the extent that the Port Authority uses the proceeds

of such fees to fund operations and facilities that are not used by and confer no benefit on the

passengers or the ferry operation.

14.     The analysis of the legality of a user fee under the Commerce Clause is analogous

to that under the Fifth Amendment's "Takings Clause," U.S. Const., Amend. V ("nor shall

private property be taken for public use, without just compensation").  Thus, for example, in

Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446 (1980), the

Supreme Court invalidated a Florida court clerk's retention of interest earned by private funds

deposited with the court, because the retained interest was in addition to a statutory fee also

charged by the clerk for the court's cost of administering the deposit.  The Court stated:  "the

exaction is a forced contribution to general governmental revenues, and it is not reasonably related to the costs of using the courts." 449 U.S. at 163.

15.    Likewise here, the Passenger Fee, to the extent of the Overcharge, is "a forced contribution to general governmental revenues" that "is not reasonably related to the costs of using the [Dock]." It is illegal under the Commerce Clause as it would be, by analogy, under the Takings Clause.

## **Claim III – The Right to Travel**

16.    The Supreme Court has long recognized that "the right to travel" is an important constitutional right, implicitly founded on the Commerce Clause, the Privileges and Immunities clause, U.S. Const., Amend. XIV, § 1, and/or other constitutional provisions. Evansville, 405 U.S. at 714 (holding that airport head-tax did not violate constitutional right to travel); id. at 723-25 (Douglas, J. dissenting) (citing numerous cases recognizing the constitutional right to travel). As the Supreme Court has stated:

> It is, of course, well settled that the right of a United States citizen to travel from one State to another and to take up residence in the State of his choice is protected by the Federal Constitution. Although the textual source of this right has been the subject of debate, its fundamental nature has consistently been recognized by this Court . . . . The right to travel has been described as a privilege of national citizenship, and as an aspect of liberty that is protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. Whatever its source, a State may neither tax nor penalize a citizen for exercising his right to leave one State and enter another.

Jones v. Helms, 452 U.S. 412, 417-18, 101 S.Ct. 2434 (1981) (citations and footnotes omitted, emphasis added); see also id. at 418 notes 12 and 13. See also Zobel v. Williams, 457 U.S. 55, 66, 102 S.Ct. 2309 (1982) (Brennan, J. concurring) (freedom to travel throughout the United States has long been recognized as a basic right under the Constitution).

17.    The Passenger Fees in this case impermissibly interfere with the constitutional right to travel between states – just as it violates the Commerce Clause – to the extent that the proceeds of such fees exceed the reasonable cost of the facilities and services that the Port Authority provides to the Ferry Company and its passengers.

## Claim IV – The Tonnage Clause

18.    The Tonnage Clause of the United States Constitution, U.S. Const., art. I, § 10, clause 3, provides in relevant part that "No State shall, without the Consent of Congress, lay any Duty of Tonnage. . . ."

19.    In <u>Clyde Mallory Lines v. State of Alabama ex rel. State Docks Commission</u>, 296 U.S. 261, 56 S.Ct. 194 (1935), the Supreme Court considered the legality under the Tonnage Clause of a harbor fee imposed on all ships entering the Port of Mobile.  After briefly tracing its history, the court explained the reach of the Tonnage Clause as follows:

> [T]he prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port. . . .  But it does not extend to charges made by state authority, even though graduated according to tonnage, for services rendered to and enjoyed by the vessel, such as pilotage, . . . or wharfage, . . . or charges for the use of locks on a navigable river.

296 U.S. at 265-66 (*citations omitted*).  The court upheld the harbor fee under the Tonnage Clause because (a) the amount of the fee ($7.50 per vessel above a certain tonnage) was conceded to be reasonable, *id.* at 264, (b) the fee was not "a charge for the use of the state docks or for mooring and shifting vessels," *id.*, and (c) the fee was "a reasonable charge for a service" provided to all vessels entering the harbor, namely, police and fire safety services.  *See also* <u>Plaquemines</u>, *supra*, 874 F.2d at 1023 ("<u>Clyde Mallory</u> holds that fees for 'services rendered to and enjoyed by the vessel' pass muster under the tonnage clause"); <u>Hawaiian Navigable Waters</u>

Preservation Soc. v. State of Hawaii, 823 F. Supp. 766, 776 (D. Hawaii 1993) (the Tonnage

Clause does not prohibit a state "from charging reasonable fees in return for services rendered")

(emphasis added), aff'd, 42 F.3d 1185 (9th Cir. 1994).

20.     Contrary to the fees in Clyde Mallory, Plaquemines and Hawaiian, a substantial

portion of the Passenger Fees in this case is spent, not to provide services to the ferry vessels or

their passengers, but rather for other Port Authority purposes that are unrelated to and provide no

benefit to the ferry operation; and while the fees in the three cases were either stipulated or found

to be reasonable, the record in this case shows that the Passenger Fees are not reasonable.  Thus,

to the extent that the proceeds of the Passenger Fees substantially exceed the Port Authority's

reasonable cost of providing facilities and services to the ferry operation, they violate the

Tonnage Clause, because they constitute a charge for the privilege of entering, trading in, or

lying in the Port of Bridgeport.

**Claim V – Unjust Enrichment, Duplicate Charges**

21.     In order to make out a claim for unjust enrichment under Connecticut law, a

plaintiff must prove:  "(1) that the defendants were benefited, (2) that the defendants unjustly did

not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs'

detriment."  Jewell v. Medical Protective Co., 2003 WL 22682332, at *2 (D. Conn. 2003),

quoting Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283, 649

A.2d 518 (1994).

22.     In this case, the evidence establishes all three elements of the claim of unjust

enrichment.  First, the Port Authority has received benefits in the form of monetary proceeds

from the Passenger Fees.  Second, the Port Authority unjustly has not "paid" the plaintiffs for the

benefits because the cost to the Port Authority of the facilities and services it has provided to the

ferry operation has been substantially less than the proceeds it has received from the Passenger Fees.  Third, the Port Authority's failure to provide consideration for the full amount of the Passenger Fees has been detrimental to plaintiffs because it has caused passengers to pay unnecessarily high Passenger Fees in relation to the cost of the facilities and services they have received from the Port Authority in return for such payments, which has resulted in monetary damages to both the Ferry Company and the passenger plaintiffs.

23.    The Port Authority also has been unjustly enriched because it has, in effect, charged the ferry operation twice for the same things.  Port Authority officials and their expert admit that, in exchange for the rentals under the Current Lease (currently about $130,000 per year, Pl. Ex. 29, p. 3), it is required to provide and maintain the leased facilities at the Dock – the dock, the first floor of the terminal building, and the vehicle staging areas (PFF ¶¶ 25, 278(i)). Yet the Port Authority seeks to justify the Passenger Fee, in part, by the cost of providing and maintaining those very facilities (PFF ¶ 278(h), (i)).  The Port Authority thus has been unjustly enriched by charging passengers, as part of the Passenger Fee, for facilities and services already paid for by the Ferry Company.

## Claim VI – Violation of Conn. Gen. Stat. §§ 7-329a to 7-329u

24.    The Port Authority was established and exists pursuant to Conn. Gen. Stat. §§ 7-329a to 7-329u (the "Enabling Statute").  Section 7-329a provides in relevant part:  "Any town may, by vote of its legislative body, establish a port district which shall embrace such town.  The affairs of any such district shall be administered by a port authority . . . ."

25.    Only two provisions in the Enabling Statute give the Port Authority limited authority to impose and collect fees of any kind, §§ 7-329c(10) and 7-329i.

26.    Section 7-329c(10) gives the Port Authority the power to:

Fix fees, rates, rentals or other charges <u>for the purpose of all port facilities owned by the port authority</u> and collect such fees, rates, rentals and other charges for such facilities owned by the port authority, which fees, rates, rentals or other charges shall at all times be sufficient to comply fully with all covenants and agreements with the holders of any <u>bonds issued</u> under the provisions of sections 7-329a to 7-329f [*sic*, should be 7-329u], inclusive.  [*Emphasis added*.]

27.     Accordingly, pursuant to § 7-329c(10), the Port Authority is authorized to fix and collect fees or other charges only (a) "for the purpose of all port facilities owned by the Port Authority," and (b) in amounts sufficient to comply with the requirements of bonds issued pursuant to the Enabling Statute.

28.     The Port Authority has imposed and collected the Passenger Fees, in substantial part, for purposes other than port facilities owned and operated by the Port Authority (*e.g.*, Steel Point, barge feeder service, high speed ferry, commercial terminals, and exercising jurisdiction over other properties that the Port Authority does not own).  In addition, the Port Authority has not issued any bonds as of today.  Therefore, the Port Authority has acted beyond the authority of the Enabling Statute with respect to its imposition and collection of a substantial portion of the Passenger Fees (*i.e.*, the Overcharge).

29.     Pursuant to § 7-329i of the Enabling Statute, the Port Authority is authorized to impose charges for the use of a particular "project."  As defined in the statute, a "project" must relate to a "port facility," such as the Dock.  *See* § 7-329(b)(2) and (4).  Section 7-329i provides that a port authority may impose such charges solely for the purpose of funding (i) the cost of maintaining and operating such project, (ii) payments of principal and interest on any bonds issued in respect of such project or (iii) any reserves required to secure such bonds.

30.     A substantial portion of the Passenger Fees imposed by the Port Authority (the Overcharge) is imposed, not to fund the cost of a particular project (*i.e.*, the Dock), but rather, to

fund the Port Authority's general and far-ranging activities, most of which are not related to any port facilities as defined in the Enabling Statute.

31.    No other provision of Conn. Gen. Stat. §§ 7-329a to 7-329u authorizes the Port Authority to impose or collect the Passenger Fees.

32.    Therefore, imposition of the Passenger Fees, to the extent of the Overcharge, is beyond the power of the Port Authority under the Enabling Statute.

### Claim VII – Unlawful Tax or User Fee Under Connecticut Law

33.    Plaintiffs withdrew this claim before trial (*see* Joint Trial Memo. at p. 6).

### Claim VIII – Connecticut Unfair Trade Practices Act

34.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA"), provides that "[n]o person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce."  CUTPA, § 42-110b(a).

35.    The Port Authority is subject to CUTPA.  Frillici v. Town of Westport, 2001 WL 1330008, at *4 (Conn. Super., Oct. 12, 2001) (rejected claim that all municipalities and their agencies are exempt from CUTPA as a matter of law); Town of Manchester v. United Stone America, 2000 WL 872459 (Conn. Super., June 15, 2000) (same).

36.    The Ferry Company and the passenger plaintiffs are proper CUTPA claimants. Nastro v. D'Onofrio, 263 F. Supp. 2d 446, 457 (D. Conn. 2003) ("A person need not be a consumer to bring a CUTPA claim"), *citing* Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 496, 656 A.2d 1009 (1995).

37.    The Connecticut Supreme Court has adopted the three criteria established by the Federal Trade Commission for determining whether a practice is unfair:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].

Fabri v. United Technologies Intern., Inc., 387 F.3d 109, 120 (2d Cir. 2004), *quoting* Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 105-06, 612 A.2d 1130, 1143 (1992).

38.    "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Cheshire, 223 Conn. at 106, 612 A.2d at 1143-44 (citations omitted). *See also* Fabri, 387 F.3d at 120 (same).

39.    Neither deception nor intent to deceive are requisite elements of a CUTPA violation. A showing that a "practice amount[s] to a violation of public policy," even if not deceptive, is sufficient to make out a claim under CUTPA. Fabri, 387 F.3d at 120.

40.    This Court recently instructed a jury in accordance with these well-settled standards under CUTPA. Charts v. Nationwide Mutual Ins. Co., 397 F. Supp. 2d 357, 371-72 and n.12 (D. Conn. 2005) (Droney, J.). As the Court also stated, "Connecticut state courts read CUTPA broadly"; the statute "applies to a broad spectrum of commercial activity"; and, "because it is remedial in nature," it must "be liberally construed in favor of those whom the legislature intended to benefit." *Id.* at 371 (citations and internal quotations omitted).

41.    Whether a practice is unfair and thus violates CUTPA is an issue of fact, and the facts "must be viewed within the totality of circumstances which are uniquely available to the court." Thames River Recycling, Inc. v. Gallo, 50 Conn. App. 767, 794, 720 A.2d 242, 259 (1998) (citation omitted).

42.     In this case, all three criteria for determining whether a CUTPA violation occurred are satisfied, in varying degrees.  <u>First</u>, the Port Authority unfairly overcharges a captive group (ferry passengers) for the use of the Dock facilities and services, and it uses the proceeds to fund activities unrelated to the ferry.  These activities benefit other persons and entities from whom the Port Authority receives no revenues.  This practice clearly "offends public policy as it has been established by statutes [and] the common law" (*see* discussion of Claims I through VI above), as well as "established concept[s] of unfairness."

43.     <u>Second</u>, the Port Authority's conduct also can fairly be described as "immoral, unethical, oppressive, *or* unscrupulous" (emphasis added).  For thirteen years now, the Port Authority has been fleecing the captive ferry passenger and Ferry Company in order to fund its many non ferry-related activities, and also to pay for unjustified extravagances, including:  travel junkets; an automobile for the Executive Director to commute to work (including servicing, gasoline and car washes); season tickets to sports teams; charitable donations; and meals and holiday gifts for the commissioners.  The Port Authority deems itself a "quasi-independent" agency, answerable neither to the Mayor of Bridgeport nor to any other elected officials (PFF ¶ 63), and is effectively beyond check in its ability to impose, increase and force the collection of the Passenger Fee.  When the Ferry Company has not "agreed" to collect it, or any portion of it, the Port Authority has hired collectors to do so on the Dock, essentially bringing the ferry operation to a halt because of the inevitable traffic delays.  This occurred, for example, during the trial, when the Port Authority was collecting a $1 surcharge at the Dock because the Ferry Company (at that time) refused to collect it (PFF ¶ 54-55).  Immoral, unethical, oppressive, or unscrupulous behavior is not limited to felonious conduct; it includes the kind of unchecked

advantage-taking that the Port Authority has long practiced, and will continue to practice, until it is legally restrained from doing so.

44.   Third, the Overcharge undoubtedly has caused substantial injury to consumers or other businesses, namely the ferry passenger and Ferry Company.  The extent of the monetary injury suffered by plaintiffs was shown and quantified at trial (see PFF ¶¶ 222-237 [Ferry Company]; ¶¶ 238-243 [D&D]).  Thousands of additional passengers, not parties to this action, similarly have been forced to pay unfair Overcharges and sustained monetary losses.

45.   CUTPA provides up to four types of remedies when a violation is found:  (a) compensatory damages, (b) equitable relief, (c) punitive damages, and (d) attorneys' fees.

46.   Compensatory damages are recoverable under Conn. Gen. Stat. § 42-110g(a), which provides that "[a]ny person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by Section 42-110b, may bring an action . . . to recover actual damages."  A loss is ascertainable "if it is measurable even though the precise amount of the loss is not known."  Reader v. Cassarino, 51 Conn. App. 292, 299, 721 A.2d 911 (1998), quoting Hinchliffe v. American Motors Corp., 184 Conn. 607, 614, 440 A.2d 810 (1984).

47.   Thus, the Ferry Company and D&D are entitled to recover their actual damages as established at trial (see PFF ¶¶ 222-237 [Ferry Company] and ¶¶ 238-243 [D&D]).  However, because of CUTPA's three-year statute of limitations, Conn. Gen. Stat. § 42-110g(h), they may recover under CUTPA only for the losses they sustained on and after April 2, 2000 (i.e., three years before this action was commenced).  D&D's losses all occurred within the three-year limitations period (PFF ¶ 239).  The Ferry Company's losses within the CUTPA limitation period consist of the Overcharge for 2001 through 2003 plus the last nine months, or three-

fourths, of 2000.  As passenger traffic is highest during the extended summer season (Tr. 745:10-17 [Deak]), the losses during the period April through December 2000 necessarily were greater than three-fourths of the losses for that entire year.[8]

48.    Equitable relief also is available under § 42-110g(a), which states that the court "may provide such equitable relief as it deems necessary or proper."  This specific grant of equitable powers "demonstrates the legislature's intent to give the court wide discretion in determining the type of order necessary to remedy the unfair trade practice."  Murphy v. McNamara, 36 Conn. Supp. 183, 198, 416 A.2d 170 (1979).  Injunctions or other equitable relief are available under CUTPA either in addition to or in lieu of compensatory damages.  Jacques All Trades Corp. v. Brown, 57 Conn. App. 189, 197, 752 A.2d 1098 (2000).  CUTPA therefore provides additional authority for the Court to enter a declaratory judgment or injunction, which plaintiffs also seek pursuant to their other claims.  (See PCL Point D.1, ¶¶ 61-66, below.)

49.    Punitive damages.  Section 42-110g(a) also provides that "[t]he court may, in its discretion, award punitive damages."  Under Connecticut law, punitive damages may be awarded on a CUTPA claim if the evidence reveals "a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  Fabri, 387 F.3d at 124, quoting Gargano v. Heyman, 203 Conn. 616, 525 A.2d 1343, 1347 (1987).  The award of such damages rests in the court's discretion.  Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1040 (2d Cir. 1992).

50.    The Port Authority's conduct in this case does reveal a reckless indifference to the rights of others, namely, the Ferry Company and its passengers.  Since the initial imposition of

---

[8]   Using Schachter's figures in his third model (Pl. Ex. 218, Ex. 5 at p. 40), the Ferry Company's damages (before interest) for the period April 2000 through December 2003 were: .75($663,900) + $705,000 +  $742,000 + $1,040,000 = $2,984,925.  Interest, computed in the same manner as Schachter, adds another $513,800.  The Ferry Company is entitled to additional damages for the period from January 2004 through the date of judgment (see PFF ¶ 222).

the Passenger Fee in 1993, the Port Authority has funded essentially all of its operations (leaving aside grants) from the Passenger Fee.  It has embarked on long and costly projects unrelated to the ferry operation, from which it derives no revenue, but which it funds from the ferry operation; it also uses Passenger Fee revenue to fund unjustified extravagant expenses as described above (in ¶ 157).  Just as this conduct meets the criteria of an "unfair" practice under § 42-110b(a), it also meets the test for imposing punitive damages, in an appropriate amount to be set by the Court.

51.    <u>Attorneys' fees</u>.  CUTPA provides that a court "may award, to the plaintiff, . . . costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery."  Conn. Gen. St. § 42-110g(d).  Such an award, as with punitive damages, rests in the court's discretion.  <u>Fabri</u>, 387 F.3d at 128-29; <u>Charts</u>, 397 F. Supp. 2d at 382-85.  The evidence in this case warrants an award of attorneys' fees and costs to plaintiffs, in amounts to be set by the Court pursuant to post-trial submissions documenting such fees and costs, and such other proceedings as the Court may direct.

**C.    <u>Damages</u>**

### 1.    The Overcharge Is A Reasonable Estimate <u>of the Ferry Company's Damages</u>

52.    A plaintiff must prove the *fact* of injury with reasonable certainty, but once it has done so, it may show the *amount* of the loss by reasonable approximation.  Thus, a plaintiff that has established injury in fact will not be deprived of a substantial recovery, even though it may be unable to prove the amount of the damages with precision.  As the Supreme Court has stated:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.

> In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248 (1931).

53.    This long-standing principle has been applied by numerous courts, including the Second Circuit, other federal courts, and state courts in New York and Connecticut.  *E.g.*, Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 19 (2d Cir. 2000) ("It is well established that damages need not be calculated with mathematical precision."); Ace-Federal Reporters, Inc. v. Barram, 226 F.3d 1329, 1333 (Fed. Cir. 2000) ("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery") (*quoting* Locke v. United States, 283 F.2d 521, 524 (1960)); Samaritan Inns, Inc. v. District of Columbia, 114 F.3d 1227, 1235 (D.C. Cir. 1997) ("while a plaintiff seeking to recover lost profits must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable estimate").  *See also* 78 A.L.R. 858, "Distinction between uncertainty as to whether substantial damages resulted and uncertainty as to amount" (1932 and Cumulative Supp.) (*citing* New York and Connecticut state court decisions, among those of other states); 22 Am. Jur. 2d Damages § 332 ("The rule that uncertain damages will not be awarded applies to uncertainty as to the fact of damage and not as to its amount; where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.").

54.    As the Supreme Court of Connecticut has stated:

> A defendant will get away with its wrongdoing if the court requires the plaintiff to prove damages to the dollar. . . .  The wrongdoer has created the problem; its conduct has interfered with the plaintiff and caused damages.  The wrongdoer cannot now complain that the damages cannot be measured exactly.

Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 64, 717 A.2d

724 (1998), *quoting* 1 R. Dunn, Recovery of Damages for Lost Profits (4th ed. 1992), § 5.2, p.

314 (brackets omitted).

      55.    In this case, the evidence clearly shows the *fact* that the Ferry Company lost

revenues and profits by reason of the Overcharge.  If there had been no Overcharge, then the

Ferry Company would have earned higher profits because:  (a) it would have raised its rates by

the amount of the Overcharge while carrying the same number of vehicles and passengers; (b)

without raising its own rates, it would have carried additional vehicles and passengers; or (c) a

combination of the two.  The Court reached the same conclusion in its pretrial decision holding

that the Ferry Company has standing to pursue its claims:

> The harm to the Ferry Company is fairly traceable to the Passenger Fee:  it
> increases the real cost of ferry transportation to its customers, thereby
> depressing demand for such transportation.  In the absence of the
> Passenger Fee, the Ferry Company could either charge the same rates it
> charges now but attract more customers because of the lower real cost to
> the passengers or charge a higher rate for ferry passage without depressing
> demand from its current level (or some combination).

Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 335 F. Supp. 2d 275,

283 (D. Conn. 2004).  The analysis obviously is the same if the Passenger Fee were significantly

reduced, rather than eliminated altogether.

      56.    The Port Authority's expert economists confirmed the correctness of the Court's

analysis; they testified that, if the Passenger Fees had been lower than they were, the Ferry

Company would have earned higher revenues and profits.  (PFF ¶¶ 232.)

      57.    Having established the *fact* of its injury, the Ferry Company properly calculated

the amount of its loss of profits as the measure of the Overcharge.  This is a reasonable estimate

given that the price elasticity of demand for ferry service cannot be precisely determined (*see* PFF ¶¶ 234-37).

58.    The position of the Port Authority's experts, Deak and Arnold, that the Ferry Company suffered no damages because it has consistently earned profits, not only is contrary to fact (*see* PFF ¶¶ 268-275), but it also stands on its head the law on recovery of lost profits. Established businesses with a history of profitability not only are eligible, but are far more likely than unprofitable businesses, to recover for loss of profits. *See* Int'l Telepassport Corp. v.USFI, Inc., 89 F.3d 82, 85-86 (2d Cir. 1996) ("lost profits damages are recoverable by a new business only if more stringent requirements are met than in the case of an established business") (applying New York law); Beverly Hills Concepts, *supra*, 247 Conn. at 63-68 (companies with established records of profitability are more capable of demonstrating loss of profits than new businesses without such records). *See also* Am. Jur. 2d, Damages § 446 ("past experience usually demonstrates the success of the enterprise and provides a reasonably certain basis for the calculation of the plaintiff's probable loss of future profits").

59.    Thus, the fact that the Ferry Company has a track record of profitability in no way disqualifies it, legally or factually, from recovering the additional profits it would have earned but for the Port Authority's illegal Overcharges.

**2.    D&D's Damages**

60.    D&D sustained damages in the principal amount of $715.75 during the five-year period prior to the trial in this case (PFF ¶¶ 243). The computation of that amount is straight-forward, and certainly meets the legal standard for calculating damages as discussed in the preceding section with respect to the Ferry Company.

**C.    Declaratory and Injunctive Relief**

**1.    Declaratory Judgment**

61.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202, provides in

relevant part:

> In a case of actual controversy within its jurisdiction, . . . any court of the
> United States, upon the filing of an appropriate pleading, may declare the
> rights and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought.  Any such
> declaration shall have the force and effect of a final judgment or decree
> and shall be reviewable as such.

28 U.S.C. § 2201(a).  *See also* Fed. R. Civ. P. 57 ("The existence of another adequate remedy

does not preclude a judgment for declaratory relief in cases where it is appropriate.").

62.    The granting of a declaratory judgment rests in the trial court's sound discretion,

Holup v. Gates, 544 F.2d 82, 85 (2d Cir. 1975), *cert. denied*, 430 U.S. 941 (1977).  The court has

broad discretion to mold a declaratory judgment to fit the circumstances of a particular case.

Broadview Chemical Corp. v. Loctite Corp., 474 F.2d 1391, 1393 n.2 (2d Cir. 1973).

63.    The Second Circuit has stated that "[t]he two principal criteria guiding the policy

in favor of rendering declaratory judgments are (1) when the judgment will serve a useful

purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and

afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."

Broadview Chemical Corp. v. Loctite Corp., 417 F.2d 998, 1001 (1969), *cert. denied*, 397 U.S.

1064 (1970), *quoting* E. Borchard, Declaratory Judgments 299 (2d ed. 1941).  *See also* 10B C.

Wright, A. Miller & M. Kane, Federal Practice and Procedure 3d § 2751 (the remedy "helps

avoid a multiplicity of actions by affording an adequate, expedient, and inexpensive means for

declaring in one action the rights and obligations of litigants").

64.     In this case, a declaratory judgment is not only appropriate, but essential. Compensatory damages will only redress violations and compensate plaintiffs for losses that occurred in the past.  But the violations and losses have continued since trial and are continuing now.  The Port Authority continues to maintain, incorrectly, that it has the right to fund essentially all of its operations, even its extensive *non* ferry-related activities, from the proceeds of the Passenger Fee (*see*, *e.g.*, Savino testimony quoted in PFF ¶ 107).  A declaratory judgment will serve the essential purpose of settling the parties' legal relations, "afford relief from the uncertainty, insecurity, and controversy" that gave rise to this litigation, and avoid future litigation over these same issues.  In the absence of declaratory relief, the Ferry Company and its passengers will have no protection against ongoing and future violations by the Port Authority.

65.     A declaratory judgment will benefit, not only the plaintiffs in this case, but also ferry passengers *generally*.  McAllister testified that he tries to keep Ferry Company fares as low as possible (PFF ¶ 228).  Thus, elimination of the Overcharge most likely will allow the Ferry Company to raise its fares to some extent while still reducing the overall cost to the passengers. Passengers thus will benefit from the lower overall cost, while the Ferry Company will also benefit from higher fares *and* from increased ridership resulting from the lower overall cost.

66.     Accordingly, plaintiffs seek a declaratory judgment that the Port Authority is barred from imposing or collecting the Passenger Fee to the extent that it exceeds, or is calculated to exceed, the reasonable cost to the Port Authority of the facilities and services that the Port Authority actually provides to the ferry operation.

### 2.     <u>Injunction</u>

67.     The standard for obtaining a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff must actually succeed on the merits of the case

rather than merely demonstrate a likelihood of success at a future stage of the proceeding.  New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989) (to obtain a permanent injunction, a party "must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted").  To obtain a preliminary injunction in the Second Circuit, a party must establish:  "(1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) a balance of hardships tipping decidedly toward the party seeking injunctive relief."  Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1996).

68.     At trial, plaintiffs proved their case on the merits:  the Passenger Fee clearly is excessive (PFF Sections Q and R), and to that extent it is illegal (PCL, Point B [discussing elements of each claim]).

69.     Plaintiffs will be irreparably harmed if the Port Authority is not enjoined from imposing excessive Passenger Fees in the future.  An award of money damages is not a sufficient or adequate remedy for either the passenger plaintiffs or the Ferry Company, because it will redress only *past* violations, not *ongoing and future* violations.  Port Authority officials have affirmed that they have the right to impose and increase the Passenger Fee whenever they need more revenue for their overall operations (*see* PFF ¶ 176 [Savino testimony]); and the proceeds from the Passenger Fee continue to account for substantially all Port Authority operating expenses (PFF ¶¶ 163-166).  Thus, unless enjoined, the Port Authority will continue to impose excessive Passenger Fees in violation of law.  An injunction therefore is essential to prevent such continuing violations.  Shanks v. City of Dallas, 752 F.2d 1092, 1097 (5th Cir. 1985) ("To obtain permanent equitable relief, a party need only show that 'there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive'"), *quoting* United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894 (1953).

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully submit that they are entitled to entry of judgment in their favor, granting them the following relief:

**Compensatory Damages**:

(a)  Under Claims II through VI (the U.S. Constitutional clauses, the state Enabling Statute and state common law), compensatory damages in favor of the Ferry Company (i) in the amount of $9,038,500 with respect to the period 1993 through 2003, representing the total difference between the actual net proceeds of the Passenger Fee to the Port Authority and the Port Authority's reasonable cost of the facilities and services that the Port Authority actually has provided to the ferry operation (the "Overcharge"), with interest thereon through June 30, 2004, plus (ii) an additional amount to be determined with respect to the period January 1, 2004 until the date of judgment;

(b)  Under Claim I (the Rivers and Harbors Appropriation Act, as amended by the Maritime Transportation Security Act of 2002), compensatory damages in favor of the Ferry Company and in favor of D&D in amounts to be determined based on the Overcharge during the period November 25, 2002 (the effective date of the 2002 Act), until the date of judgment;

(c)  Under Claim VIII (CUTPA), compensatory damages in favor of the Ferry Company in the amount of $3,498,725, based on the Overcharge during the period April 2, 2000, through December 31, 2003, including interest thereon through June 2004 (*see* PCL ¶ 47 and note 8 thereto), plus (ii) an additional amount to be determined with respect to the period January 1, 2004 until the date of judgment;

(d)    Under Claims II through VIII, compensatory damages in favor of D&D (i) in the principal amount of $715.75, representing the Overcharge that it actually paid through the date of trial (April 24, 2006), plus (ii) an amount to be determined with respect to the period from trial until the date of judgment, including pre-judgment interest;

**Prospective Relief**:

(e)    A declaratory judgment that the Port Authority is barred from imposing or collecting the Passenger Fee to the extent that the amount thereof is calculated to or does in fact result in an Overcharge;

(f)    A permanent injunction enjoining the Port Authority from imposing or collecting the Passenger Fee to the extent that the amount thereof is calculated to or does in fact result in an Overcharge;

**Punitive Damages, Attorneys' Fees, and Other Relief**:

(g)    Under Claim VIII (CUTPA), punitive damages, pursuant to Conn. Gen. Stat. § 42-110g(a), in favor of all plaintiffs, to be allocated among them in proportion to the compensatory damages payable to each, in an amount to be determined by the Court based on the evidence presented at trial;

(h)    Under Claim VIII (CUTPA), plaintiffs' costs and attorneys' fees, in an amount to be determined by the Court pursuant to such further post-trial submissions and proceedings as the Court may direct; and

(i)    Under all claims, the costs of this action, and such further or different relief as the Court may deem just and proper.

Dated:  September 1, 2006

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, D & D Wholesale
Flowers Inc., and FRANK C. ZAHRADKA
*Plaintiffs*
By:

/s/ *Martin Domb*

_____

Martin Domb (ct 09544)
Jeremy Shure (phv 0938)
AKERMAN SENTERFITT LLP
335 Madison Avenue, 26th Floor
New York, New York 10017
Tel. (212) 880-3800
Fax (212) 880-8965

*and*

Jonathan Bowman (ct 08526)
Stewart I. Edelstein (ct 06021)
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504