UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIDGEPORT AND PORT JEFFERSON | ) | |
| STEAMBOAT COMPANY, *et al.*, | ) | Case No. 03-CV-599 (CFD) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRIDGEPORT PORT AUTHORITY, | ) | September 1, 2006 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

MURTHA CULLINA LLP

Richard L. Rose, #CT23291
177 Broad Street
Stamford, CT  06901
203-653-5400
Fax 203-653-5444
rrose@murthalaw.com

Everett E. Newton, #CT02508
CityPlace I, 185 Asylum Street
Hartford, Connecticut 06103-3469
860-240-6000
Fax 860-240-6150
enewton@murthalaw.com

THOMPSON COBURN LLP

Edward J. Sheppard, #CT24760
1909 K Street, NW, #600
Washington, DC 20006
202-585-6900
Fax 202-585-6969
esheppard@thompsoncoburn.com

Timothy F. Noelker, #CT26291
Mary Catherine Hodes, #phv01235
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6091
Fax 314-552-7091
tnoelker@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port Authority

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FINDINGS OF FACT .......................................................................................................... 1

    I.  **The Bridgeport Port Authority**

        A.  Legal Status, Mission and Jurisdiction .................................................. 1

        B.  Assets ...................................................................................................... 3

        C.  Human Resources ................................................................................... 3

        D.  Funding .................................................................................................... 4

        E.  Responsibilities of the Port Authority ................................................... 5

        F.  Port Authority Obligations ..................................................................... 6

        G.  Property Management Agreement with the City of Bridgeport ............. 8

        H.  Port Authority Audited Finances ......................................................... 11

    II.  **The Bridgeport & Port Jefferson Steamboat Company**

        A.  Ownership ............................................................................................. 12

        B.  Leases with the Port Authority ............................................................ 13

        C.  Previous control of Water Street Dock ................................................ 13

        D.  Effect of Port Authority on Ferry Company ....................................... 15

        E.  Ferry Fares ............................................................................................ 17

        F.  Desire to move across harbor ............................................................... 18

    III.  **Plaintiff D & D Wholesale Flowers** ...................................................... 18

    IV.  **Plaintiff Frank Zahradka** ....................................................................... 20

    V.  **Valuing Port Authority activities "related to" the Ferry**

        A.  Mr. Alan Schachter ............................................................................. 20

B.  Mr. John Arnold ........................................................................... 25

C.  "Related to" the ferry ................................................................... 26

**VI.  The Port Authority's Development Projects** ................................. 27

A.  The Terminal Building ................................................................. 28

B.  Bulkhead and Dock Repair .......................................................... 30

C.  Access Road ................................................................................ 30

D.  Multi-level Parking facility ......................................................... 32

E.  Advanced Port Security Systems ................................................. 33

F.  Pump-out Boat ............................................................................ 33

G.  High-speed ferry ......................................................................... 34

H.  Barge Feeder Service ................................................................... 35

I.  Steel Point Peninsula ................................................................... 36

J.  Cilco Shipping Terminal ............................................................. 37

K.  Foreign Trade Zone ..................................................................... 37

L.  Bridgeport Regional Maritime Complex ("BRMC") and Derecktor Shipyard ..... 38

M.  Dredging the Bridgeport Harbor ................................................. 40

**VII.  The Passenger Fee** ............................................................................ 41

**VIII.  Damages** ........................................................................................... 45

A.  There is no evidence that ridership has decreased as a result
of the passenger fee. ................................................................... 46

B.  The passenger fee does not prevent the Ferry Company from
raising its rates to increase revenues. ......................................... 48

C.  There is no evidence quantifying alleged lost profits. ................ 50

D.  The evidence establishes that the passenger fee has not adversely
affected the Ferry Company. ...................................................... 51

E.  Expert testimony supports the conclusion that the Port Authority
and its passenger fee have increased, rather than diminished,
demand for the ferry. ............................................................................... 53

**CONCLUSIONS OF LAW** ......................................................................................... 54

**I.  The Port Authority has constitutional authority to charge the passenger fee.** ...... 54

A.  The passenger fee is valid under the Commerce Clause and does not
infringe upon the fundamental right to travel.  (Counts II and III) ...................... 55

1.  The passenger fee "is based on some fair approximation of use
or privilege for use" of the "facilities for whose benefit [it is]
imposed." ................................................................................................ 56

2.  The passenger fee does not discriminate against interstate commerce. ........... 60

3.  The passenger fee is not excessive in relation to the costs incurred
by the Port Authority in providing services and facilities to the
ferry passengers. .................................................................................... 60

a.  Applicable legal principles ...................................................... 61

b.  Applying the foregoing legal principles to the passenger fee ................... 64

c.  The Ferry Company's proposed test based on "ferry-related"
expenditures ...................................................................... 66

d.  Conclusion .......................................................................... 67

4.  The passenger fee is valid under the Commerce Clause and does
not infringe upon the fundamental right to travel. ........................................... 67

B.  The passenger fee does not constitute a prohibited "Duty of Tonnage."
(Count IV) ...................................................................................... 68

**II.  Federal statute does not prohibit the passenger fee. (Count I)** ........................... 71

A.  The MTSA codifies pre-existing Commerce Clause jurisprudence. ..................... 72

B.  The MTSA is inapplicable to the Port Authority's passenger fee. ........................ 75

C.  The Port Authority's passenger fee fully satisfies the MTSA. .............................. 77

D.  The RHA, as amended by the MTSA, does not prohibit
the passenger fee. ................................................................................... 79

**III.  The passenger fee is valid under Connecticut law.  (Counts V, VI and VIII)** ... 79

A.  The Port Authority is not unjustly enriched by the passenger fee. (Count V) ..... 79

B.  Connecticut statutes authorize the passenger fee.  (Count VI)............................ 82

C.  The passenger fee is not an "unfair trade practice" under the Connecticut
Unfair Trade Practices Act.  (Count VIII)............................................................ 86

**CONCLUSION**  .................................................................................................................... 90

## Table of Authorities

**Pages**

**Cases**

Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 906 F.2d 516 (11th
Cir. 1990) ..............................................................................................................passim

Bailey Employment System v. Hahn, 545 F.Supp. 62 (D.Conn. 1982)........................ 86

Barber v. State of Hawai'i, 42 F.3d 1185 (9th Cir. 1994)....................................... 69, 70

Cannon v. New Orleans, 87 U.S. 577 (1874)................................................................ 69

Capitol Greyhound Lines, 339 U.S. 542 (1950) ............................................... 56, 57, 58

Captain Andy's Sailing, Inc. v. Johns, 195 F.Supp.2d 1157 (D. Haw. 2001) .............. 70

Center for Auto Safety v. Athey, 37 F.3d 139 (4th Cir. 1994) ............................... 55, 60

Chem-Tek v. General Motors Corp., 816 F.Supp. 123 (D.Conn. 1993).......... 86, 87, 88, 89

Clyde Mallory Lines v. Alabama, 296 U.S. 261 (1935) .........................................passim

Eadie v. McMahon & Titan Sports, Inc., 1997 WL 289679 (D.Conn. 1997)............... 87

Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, 405 U.S. 707
(1972).....................................................................................................................passim

Fabri v. United Technologies Intern., 387 F.3d 109 (2d Cir. 2004) ....................... 89, 90

Gargano v. Heyman, 525 A.2d 1343 (Ct. 1987) ..................................................... 89, 90

Hartford Whalers Hockey Club. v. Uniroyal Goodrich Tire Co., 231 Conn. 276
(1994)...................................................................................................................... 80, 81

Hawaiian Navigable Waters Preservation Soc'y v. Hawaii, 823 F. Supp. 766 (D.
Haw. 1993) ............................................................................................................. 54, 69

Jorling v. U.S. Dep't of Energy, 218 F.3d 96 (2d Cir. 2000)................................. 59, 62

Massachusetts v. United States, 435 U.S. 444 (1978)................................. 57, 59, 62, 63

Minnesota v. Clover Leaf Creamery, 449 U.S. 456 (1981) ......................................... 79

New Orleans Steamship Ass'n v. Plaquemines Port, Harbor and Terminal District,
874 F.2d 1018 (5th Cir. 1989) .................................................... 68, 70, 71, 73

Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736 (2d Cir. 1998) ....................... 80

Packet Co. v. St. Louis, 100 U.S. 423 (1879) ........................................................ 69, 71

Plaquemines Port, Harbor and Terminal Dist. v. FMC, 838 F.2d 536 (D.C. Cir 1988) ............................................................................................... passim

United States v. Guest, 383 U.S. 745 (1966) ...................................................... 55

United States v. Sperry, 493 U.S. 52 (1989) ....................................................... 56

Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n, 390 U.S. 261 (1968) .............................................................................................. 59, 62

Wallach v. Brezenoff, 930 F.2d 1070 (3d Cir. 1991) ....................................... 55, 60, 62

Weisman v. Kaspar, 233 Conn. 531 (1995) ....................................................... 80

## Statutes

33 U.S.C. § 2236 .................................................................................... 72

49 U.S.C. § 40116(b) (2000) ........................................................................ 54

Conn Gen. Stat. § 7-329i (1999) ............................................................. 84, 85, 86

Conn. Gen. Stat. § 7-329b (1999) ........................................................ 83, 84, 85, 86

Conn. Gen. Stat. § 7-329c (1999) ............................................................ 82, 83

Conn. Gen. Stat. §§ 7-329a – 7-329u (1999) ....................................................... 82

Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq ............. 86, 87, 89, 90

Maritime Transportation Security Act of 2002, Pub. L. 107-295, 116 Stat. 2064 ................ passim

Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5 ........................... 71, 72, 79

## Other Authorities

House Conf. Rep. 107-777, 2002 U.S.C.C.A.N. 1315, 1349 ...................................... 74, 75

House Conf. Rep. on § 1214, Maritime Safety and Transportation Act of 2002, 148 Cong. Rec. E2143-04, 2002 WL 31633117 (Nov. 22, 2002) ...................................... 74, 76

## Constitutional Provisions

Commerce Clause, U.S. Const. art. I, § 8, cl. 3 ................................................ 55

Tonnage Clause, U.S. Const. art. I, § 10, cl. 3 ............................................................................68

## INTRODUCTION

Plaintiff Bridgeport & Port Jefferson Steamboat Company (the "Ferry Company") has challenged Defendant Bridgeport Port Authority (the "Port Authority")'s right to charge ferry passengers a user fee. The Ferry Company, D&D Wholesale Flowers, Inc., and individual plaintiff Frank L. Zahradka (collectively, "plaintiffs") allege that the user fee violates three provisions of the United States Constitution, federal statute, and Connecticut statutory and common law.

Plaintiffs' allegations were the subject of a trial before the Court from April 17 until April 24, 2006. Pursuant to the Court's standing Trial Memorandum Order, the Port Authority hereby submits its Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I.    The Bridgeport Port Authority

#### A.    Legal Status, Mission and Jurisdiction

1.    The Port Authority is a quasi-independent agency of the City of Bridgeport, formed in 1993 under the laws of the State of Connecticut, Conn. Gen Stat. §§ 7-329a–u, which govern the operation and management of the Port Authority, and pursuant to Bridgeport Code Chapter 2.28. (Defendant's Exhibits 220 and 197; 301:4-302:18; 303:5-16; 982:25)

2.    Prior to the creation of the Port Authority, the City did not have a master plan for the operation of the waterfront, which is a major asset of the City of Bridgeport. (27:4-10)

3.    The Port Authority has a broad public mandate. According to the Bridgeport Municipal Code, the Port Authority was created

> to foster and stimulate the shipment of freight and commerce through the ports of Bridgeport, Connecticut; to develop and promote port facilities with the district in order to create jobs, increase the city's tax base and provide special revenues to the city; to work with the government of the city to maximize the usefulness of

> available public funding by consolidating and coordinating private efforts to assist the city's waterfront and industrial development program, to cooperate with the state and federal agencies in the maintenance, development, improvement and use of district harbors, waterways and industrially zoned properties.

(Plaintiffs' Exhibit 208; 124:6-22)

4.      According to its audited financial statements, the Port Authority's general purpose "is to develop strategies and initiatives to promote and create port facilities with the district, participate in the economic development of the harbor and waterfront areas, and expand the shipment of freight and commerce through the Port of Bridgeport." (Plaintiffs' Exhibit 9; 77:18-24) Mr. Joseph A. Riccio, Executive Director of the Port Authority, described its mission: "We're developing the port as our mission, bringing other maritime interest and business to the Port of Bridgeport." (282:14-16)

5.      The Port Authority's mission of promoting port facilities and economic development of waterfront areas is typical of port authorities throughout the country. (862:6-14)

6.      The Port Authority has jurisdiction over a specific geographic area known as the Port District. (125:18-22) The Port District extends approximately 1000 feet inland from the waterways of the Bridgeport Harbor, Black Rock Harbor, Pequonnock River, and Yellow Mill River, excluding property zoned residential and park land. It also includes other areas not within 1000 feet of the waterways, including the Remington Woods and G.E. factory in Bridgeport. (125:21-126:25; 305:7-16; 567:10-568:18) Within the Port District are located, *inter alia*, the Bridgeport Regional Maritime Complex (formerly the Carpenter Technology site), which includes Derecktor Shipyard; Cilco Shipping Terminal; and Steel Point peninsula. (130:15-131:7; 132:7-23) The Port Authority's jurisdiction extends to all shipping and terminal facilities within the Bridgeport and Black Rock Harbors, including the Motiva terminal and two PCGNE terminals. (196:11-197:8; 316:4-6)

**B.** **Assets**

7.      In 1993, ownership of the Water Street Dock (formerly the Union Square Dock) was transferred from the City of Bridgeport to the Port Authority.  (29:4-8; 296:13-297:9; Plaintiffs' Exhibit 14)

8.      The Port Authority also owns the 48-acre parcel known as the Bridgeport Regional Maritime Complex (formerly the Carpenter Technology property).  (7:12-16; 304:7-11; 305:17-25)

**C.** **Human Resources**

9.      The Port Authority currently has three full-time employees.  (123:2-7)

10.      Joseph A. Riccio, Executive Director since 1996, is responsible for day-to-day operations.  (122:10-20)

11.      Martha Klimas holds multiple titles and has been with the Port Authority since 1997.  She supervises the maintenance of Port Authority facilities, primarily the ferry terminal building and grounds, and handles paperwork associated with the Port Authority's many projects.  Ms. Klimas also monitors and reports on ferry activity and ridership, recording significant events and trends.  (490:7-491:5; 497:15-498:20; 544:7-545:10)

12.      Charmaine Johnson, the Office Manager, has worked for the Port Authority since 1993.  She provides Mr. Riccio with administrative assistance, performs general office functions, reports on Board of Commissioners meetings, and maintains the Port Authority's financial records.  (465:11-466:11; 486:18-488:7)

13.      The executive body of the Port Authority is the Board of Commissioners. (Plaintiffs' Exhibit 208)  The Board is made up of five unpaid commissioners appointed by the Mayor of Bridgeport and confirmed by the Bridgeport City Council.  Two members are City

employees—the Harbor Master and the Director of Economic Development—and three are "at-large" members.  (122:23-24; 563:6-8; 983:1-5; Plaintiffs' Exhibit 208)

14.    Mr. Riccio interacts frequently with the Board of Commissioners and reports to them at their monthly meetings.  (122:18-22; 223:7-18; 319:14-320:12; 983:17-984:4)  Ms. Klimas attends Board of Commissioners meetings and provides the Board with requested information and services.  (543:5-23)

15.    The current Chairman of the Board of Commissioners is Denis O'Malley. (319:18-21; 982:2-3)

16.    The Board makes decisions on matters brought before it by the Executive Director and approves all contracts or matters that obligate the Port Authority. (27:19-22; 319:14-320:6; 983:17-984:4)

17.    The Board receives monthly and year-to-date financial reports from the Port Authority's auditors on a monthly basis.  (984:5-19)

**D.    Funding**

18.    The Port Authority receives no operational funding from the federal government, the State of Connecticut, or the City of Bridgeport.  (994:24-995:2; Plaintiffs' Exhibits 1-11A)

19.    To facilitate its purpose, Connecticut statute and the Bridgeport City Code authorize the Port Authority to collect fees, rates and rentals sufficient to support its projects. (Defendant's Exhibits 220 (esp. Conn. Gen. Stat. §§ 7-329c(10), 7-329i) and 197; 320:13-17)

20.    The Port Authority's budget is financed through several revenue streams, including: lease revenue generated from leases with the Ferry Company, Steamboat Concessions, Inc., as well as other facilities in the harbor such as Derecktor Shipyard; a property management

fee from Derecktor Shipyard; dockage fees; and a passenger fee.  (31:3-10; 304:2-6; 485:18-22; Plaintiffs' Exhibits 28-30, 66, 85)

21.     Mr. John Arnold, an M.I.T. trained expert in port economics and finance who has evaluated port systems all over the world on behalf of such institutions as the World Bank, testified that the Port Authority's combination of lease and fee financing, or "rent and royalty," is typical of public port authorities.  (834:4-835:12)  Port authorities choose to finance through user fees or taxes on cargo or goods moved in part to share commercial risk with their tenants and to tailor charges to value received.  (834:19-835:12; Defendant's Exhibit 67 ¶ 40)

22.     The Port Authority also receives substantial grant income from state and federal government.  (Defendant's Exhibits 49 and 50; 32:19-21, 33:17-18; 135:20-21; 135:22-136:7; 307:14-312:6)

23.     These grants are uniquely available to the Port Authority as a quasi-governmental agency.  Neither a ferry company nor ferry passengers would be eligible to receive these grants. (318:4-319:4)

### E.      Responsibilities of the Port Authority

24.     The Port Authority is responsible for the development of the Port District and to foster development, trade and commerce within the Port of Bridgeport, attract maritime development opportunities, create specific revenues for the City, act as the City's development agency for certain harbor and waterfront projects, and attempt to generate employment for the City.  (303:5-16)

25.     The Port Authority is an advocate for the Ferry Company in community matters, promotes the ferry, and helps solve problems experienced by the Ferry Company and its passengers.  Such problems have included limited access as a result of highway construction,

parking concerns, signage and community advertising, and coordination with other local construction projects. (530:11-531:19)

26.     The Port Authority is responsible for the day-to-day operation, maintenance, and security of the ferry terminal. (321:2-18) The Port Authority provides and pays for guard services at the dock from 7:00 a.m. to 11:00 p.m. (87:19-88:5; 321:8-10; 369:5-8) Port Authority personnel oversee the maintenance and upkeep of the terminal building on a daily basis. (534:5-23)

27.     Port Authority personnel also deal with passenger concerns, particularly in emergency situations. (531:20-533:22)

28.     The Port Authority is responsible for supervision of the security and cleaning personnel, and snow removal on the dock and walkways around the terminal building. (150:17-22; 151:14-152:4; 321:2-18)

29.     The Port Authority also applies for and obtains government grants to fund development projects. (316:14-317:4) To accomplish this end, Mr. Riccio identifies and attempts to obtain potential sources of income, including state and federal grants, and business opportunities the Port Authority could pursue to develop port projects. (316:14-317:2)

30.     The Port Authority is part of an intermodal transportation center which will put the Amtrak station, Interstate 95, the bus terminal, and Ferry terminal within a central area in downtown Bridgeport. (332:11-333:8)

**F.    Port Authority Obligations**

31.     The Port Authority's standard operating expenses generally approach or exceed the amount it collects from the passenger fee, particularly when passenger fee revenues are

reduced by credit card fees and the collection fee the Port Authority pays the Ferry Company. (Plaintiffs' Exhibits 1-11A)

32.     Mr. Riccio and his two staff members receive salaries, health insurance, and pension benefits.  (Plaintiffs' Exhibit 214; Vol. 285:3-4; 288:18-289:4)  Mr. Riccio's salary is less than the salaries of executive directors of comparable port authorities in other cities. (291:11-19; 985:12-25)

33.     The Port Authority's office expenses are standard and ordinary, including the costs of telephone service and utilities, office supplies, plant service, and water and coffee for employees and guests.  (483:3-22; Plaintiffs' Exhibits 1-11A)

34.     As Executive Director of the Port Authority, Mr. Riccio takes periodic business trips in connection with the Port Authority and ferry operations.  (276:23-278:4)  Travel expenses incurred by Mr. Riccio on these business trips are reimbursed by the Port Authority, and checks are signed by the chairman of the Board of Commissioners.  (277:23-25; 278:22-279:1; 483:23-485:4)  Each of these business trips and the travel expenses incurred relate to or benefit the ferry operation.  (278:1-7; 282:6-8)

35.     The Port Authority makes occasional charitable contributions to organizations that focus on water or harbor development.  (36:21-37:3; 271:1-11)  These include, for example, Barnum Sails the Sound and Swim Across the Sound, a cancer program in association with Saint Vincent's Medical Center, both of which the Ferry Company also supports.  (271:1-11; 346:10-25)  The amount the Port Authority donates to such charitable organizations is less than one half of one percent of the Port Authority's annual operating budget.  (271:20-22)  The charitable contributions of the Port Authority enhance the visibility of the Port Authority and benefit all

users of the port. (347:1-6)  All charitable contributions of the Port Authority are approved by the Board of Commissioners. (349:2-10)

36.     The Port Authority provides the Connecticut World Trade Association with a small office on the second floor of the terminal building without charge. (158:24-159:5; 571:9-13)  The Connecticut World Trade Association promotes international trade. The office space provided by the Port Authority is minimal. (986:20-987:4)

37.     The Port Authority provides the Harbor Master, currently Mr. Joseph Savino, an office on the second floor of the terminal building without charge. (565:6-11)  The Harbor Master supervises and polices all navigation in Bridgeport Harbor, including the ferry boats. (563:17-564:16; 581:9-16)

38.     Mr. Savino also serves as the Civil Security Officer for the ferry terminal complex and the BRMC, which has entailed working with the Coast Guard, the Port Authority and the Ferry Company on security assessments and facility and vessel security plans that comply with new homeland defense laws. (580:17-581:6)

39.     The Harbor Master's presence in the terminal building and directly on the waterfront provides a direct benefit to the ferry passengers, the Ferry Company, and all harbor users who benefit from his policing services. (581:23-582:8)

40.     The Harbor Master contributes his own office supplies to the Port Authority's offices. (582:9-18)

**G.     Property Management Agreement with the City of Bridgeport**

41.     Prior to 1993, the City of Bridgeport owned the Water Street Dock and received rent for its use. (29:18-20; 575:4-8)

42.     After the Port Authority was created, the City and the Port Authority executed a

Property Management Agreement whereby the City transferred the Water Street Dock to the Port Authority.  (Plaintiffs' Exhibit 14)

43.    The Property Management Agreement provided that the Port Authority pays the City fifteen percent (15%) of the Port Authority's "net operating income" related to the Water Street Dock.  (241:25-242:11; Plaintiffs' Exhibit 14)

44.    The amount the Port Authority pays to the City each year under the Property Management Agreement is stated in the Port Authority's audited financial statements.  (224:9-12)

45.    In order to determine the "net operating income" of which fifteen percent (15%) would be remitted to the City, certain percentages of the Port Authority's total "operating expenses" were allocated to the "net operating income" calculation.  (Plaintiffs' Exhibits 17-25, 25-A)  Each category of expenses was subject to an arbitrary percentage allocation.  Most of the allocations were fifty percent (50%) (23:7-10; 50:8-19); a few allocations were eighty percent (80%) or labeled "actual."  (Plaintiffs' Exhibits 17-25, 25-A).

46.    Mr. Edward Oppel, the first executive director of the Port Authority, sought approval from the City's Chief Director of Finance of the percentage allocations used to calculate "net operating income" in 1994.  Mr. Oppel's letter stated that the formula was meant to reflect "the spirit of the agreement" between the City and the Port Authority with respect to compensation for the Water Street Dock.  (22:4-7; 296:13-297:9; Plaintiffs' Exhibit 15)  Since submission of that letter, Mr. Oppel's proposed percentages, with few adjustments, have been used to calculate "net operating income" each year.  (Plaintiffs' Exhibits 17-25, 25-A)

47.    The percentages bear no relation to the actual expenditures of the Port Authority in connection with the operating of the Water Street Dock.  (51:6-14; 52:6-23; 76:8-16; 245:23-

246:1; 297:4-5; 66:25-67:8)  Indeed, the percentages were developed before the Port Authority ever operated the ferry terminal and have changed only slightly since they were first submitted to the City.  (296:21-297:9; 577:21-23; Plaintiffs' Exhibits 14, 17-25, 25-A)

48.    In this regard, the Port Authority's accountant, Joseph Verrilli, C.P.A., testified "[t]here's no correlation between the two, to my knowledge, at all."  (67:7-8)  In other words, the allocation of fifty percent (50%) of a category of expenses does not mean that only fifty percent (50%) of that category of expenses was related to the Water Street Dock. (74:25-75:4)

49.    Mr. Michael Freimuth, a former commissioner of the Port Authority and Director of the Bridgeport Office of Planning and Economic Development, confirmed that the calculation of these allocations was a "mystery."  (23:21-25)

50.    In fact, the percentages were chosen such that the amount due the City each year would approximate the amount of rent the City was earning for the Dock prior to transferring it to the Port Authority.  Thus, the "allocations" of operating expenses were merely a mechanism to "back into" paying the City a fair amount for the dock.  (29:21-30:4; 30:19-31:1; 58:23-59:16; 296:24-297:5; 298:11-22; 303:17-304:1; 574:20-575:8; 577:4-23)

51.    Thus, an allocation of 50% of a certain category of "operating expenses" for purposes of calculating the 15% payment to the City does not mean that only 50% of the monies expended by the Port Authority actually relate to the Port Authority's operation of the Water Street Dock.

52.    Because the percentage allocations do not reflect the actual allocation of Port Authority resources, the Port Authority has never used the percentage allocations for any purpose other than to calculate the amount due the City each year under the Property Management Agreement.  (51:6-14; 76:8-16; 40:20-41:2; 52:8-11).  Thus, the Port Authority's 2003 and 2004

financial statements contain a footnote stating "The percentage allocation of operating expenses were determined by the City of Bridgeport officials in arriving at the net operating income. These percentages are utilized solely in determining the fees due the City of Bridgeport and are not used for any other purpose." (63:8-14; Plaintiffs' Exhibit 25-A)

### H.    Port Authority Audited Finances

53.    Throughout its existence, the Port Authority has proven to be both fiscally reliable and responsible, never financially mismanaged. (28:22-29:3; Plaintiffs' Ex. 1-11-A) The audited financial statements of the Port Authority state: "In our opinion, the financial statements of Bridgeport Port Authority present fairly in all material respects, the financial position of Bridgeport Port Authority . . . and the results of its operations and its cash flow for the years then ended and in conformity with the accounting principles generally accepted in the United States of America." (Plaintiffs' Exhibits 1-11-A; 70:10-16)

54.    The Port Authority is subject to annual audits by its accounting firm Dworken, Hillman, LaMorte and Sterczala, and its partner, Joseph Verilli, C.P.A., both of its regular finances and of the grants that it administers. (Plaintiffs' Exhibits 1-11-A, Defendant's Exhibits 134, 135) No problem has ever been discovered with the Port Authority's finances. (70:5-71:3)

55.    Mr. Verrilli testified in relation to the financial statements of the Port Authority, "we have opined on the financial statements for those years prior to and subsequent to those years and validated that the expenditures of the Port Authority were in relation to their primary purpose or they were valid documents supporting the costs associated with the Port Authority and its purpose." (53:17-22)

56.     The current Chairman of the Port Authority Board of Commissioners, Denis O'Malley, testified that the auditors had never questioned that the Port Authority was properly run.  (984:16-19)

57.     Notably, this Court has found that "the Port Authority has proven to be fiscally reliable and responsible."  (Order Denying Preliminary Injunction, April 15, 2004)

58.     In addition, audits have confirmed that the Port Authority has expended its grant funds in accordance with the terms of the related grants, and no material weaknesses have ever been discovered with the Port Authority's internal controls.  (Defendant's Exhibits 134, 135; 73:9-74:3)

## II.     The Bridgeport & Port Jefferson Steamboat Company

### A.     Ownership

59.     Plaintiff Bridgeport & Port Jefferson Steamboat Company ("the Ferry Company"), operates the ferry service that runs between Bridgeport, Connecticut and Port Jefferson, New York.  (412:6-10)

60.     The Ferry Company is a wholly-owned subsidiary of McAllister Towing & Transportation ("MT&T").  (586:8-9, 586:17-18)  McAllister Towing & Transportation runs tugs and barges in approximately 12 ports between Maine and Puerto Rico.  (586:12-16)

61.     Brian McAllister is the sole owner of MT&T, with the exception of recent transfers of some shares to his sons.  (586:23-25; 590:2-24)  As such, Brian McAllister is *de facto* sole owner of the Ferry Company.  (590:2-5)  He also serves as president of the Ferry Company and MT&T.  (586:5-7; 586:19-20)

62.     Brian McAllister's family has had an ownership interest in the Ferry Company since 1955, and has also owned other ferry and tugboat operations in that period.  (588:10-17;

588:22-589:6)  McAllister himself has had an ownership interest in MT&T, along with family members, since 1974.  (589:7-12)  He became the sole owner in 1998.  (590:20-24)

### B.    Leases with the Port Authority

63.    The Ferry Company has a lease with the Port Authority for the non-exclusive use of the Dock, the right to occupy a portion of the terminal building, and use of a staging area for vehicles on the roadway.  (102:25-103:2; 103:15-22; 107:3-7; 167:15-168:7; 416:20-25; Plaintiffs' Exhibits 28, 29)  The Ferry Company has an office on the first floor of the terminal building.  (417:8-11)

64.    This lease and a subsequent extension were entered into after arms-length negotiations and reflect the fair market value of the Ferry Company's use of the facility. (104:21-23; 106:20-107:2; 167:5-14)

65.    An affiliate of the Ferry Company, Steamboat Concessions, has also entered into a lease with the Port Authority for the operation of the food concessionaire in the terminal building.  (169:18-22; 420:6-9; Plaintiffs' Exhibit 30)  Under this lease, Steamboat Concessions pays the Port Authority monthly rent, a monthly cleaning charge, and percentage of override on its food sales.  (170:14-171:6)

### C.    Previous control of Water Street Dock

66.    Before the creation of the Port Authority, the Ferry Company controlled the Water Street Dock.  (671:1-6)

67.    At that time, the dock was an unpleasant and unsafe place to wait for the ferry boats.  (324:9-13)

68.    The structure on the dock at that time offered minimal, negligible services and amenities to its passengers in the Bridgeport Harbor.  (669:15-671:8, Defendant's Exhibit 8)  It

contained only toilet facilities and a small office. (417:18-23)  The facilities in the existing

structure did not always function. (417:21-23; 455:4-9)  Several port-a-potties were placed

outside the existing structure on the dock to serve as restrooms for ferry passengers. (324:1-6;

455:4-14)

69.  The ferry loading area was arranged such that cars queued up out to Water Street,

the dock was in a serious state of disrepair, and there was no security. (324:7-13)

70.  Mr. Savino, who was Harbor Master during the period the Ferry Company

controlled the dock, described the conditions of the dock:

> In one word, deplorable.  The dock was just a [mishmash][1] of steel plates over
> various holes, rotted timbers.  Outside of the small platform, not the small
> platform, but the platform for the ferry operation, there wasn't a safe place to
> walk.  We had barriers up keeping people off the wooden decks.  At night, I
> mean, the place was just a haven for people breaking into cars, prostitution.

(578:21-579:2)

71.  Mr. Edward Oppel, first executive director of the Port Authority, described the

dock:  "There was a tremendous amount of distress about the condition of the docking areas . . .

and the ferry operation with regard to passengers being besieged by wharf rats, and all kinds of

terrible things.  Very dark, very hostile landing area, and we were determined to turn that image

around.  That was my primary responsibility."  (Joint Exhibit 2 at 19:24-20:6)

72.  Auto access to the ferry dock was very limited, which was inconvenient for

passengers and threatened public safety, according to the Harbor Master:

> It was a low underpass viaduct, if you will, from the railroad station with a ten
> foot I believe, approximately ten foot vertical clearance.  One lane in, one lane
> out, with a very tight turn coming in to the dock, very tight right-hand turn and,
> obviously, in the opposite direction very tight left-hand turn leaving.

---

[1] Although the transcript reads "mismatch," we believe that the witness stated "mishmash" at trial.

(579:3-10)

> [W]e always had a concern with . . . the fact we always had one way in and one way out. And we always looked to address that issue. We couldn't even get fire apparatus up there if we wanted to.

(579:14-18)

73.    This narrow underpass was locally referred to as "the hole in the wall." (703:7-12)

74.    On busy days, this limited auto access caused traffic to spill out onto Water Street in downtown Bridgeport. (330:13-23; 340:17-20)

**D.    Effect of Port Authority on Ferry Company**

75.    Since the creation of the Port Authority, the Ferry Company's passenger ridership has increased steadily. (654:20-22) Mr. McAllister testified that the Ferry Company has "grown by leaps and bounds." (596:20)

76.    Total passenger and vehicle ridership of the ferry increased from 920,681 in 1997 to 1,424,003 in 2005. (Defendant's Exhibit 69; 358:16-24) Notably, total ferry passenger and vehicle activity has increased every year since 1997. (Defendant's Exhibit 69)

77.    The facilities, benefits, and services provided by the Port Authority have contributed to these increases in ferry passenger and vehicle ridership. (359:13-360:1; Defendant's Exhibit 67 ¶¶ 35-39)

78.    For example, the Port Authority's construction and maintenance of the terminal facility has contributed to demand for the ferry. Mr. Riccio testified:

> Q.    As the Executive Director [of] the Port Authority, do you attribute any of the benefits and services provided by your Port Authority to this increase in traffic?
>
> A.    Oh, I would think that [the Ferry Company's] growth in large part is due to the improvements that we made in

> Bridgeport.  Again, before the Port Authority existed the
> place was, for lack of a better term, a dump.  It was scary.
> There was no facilities, no security, no services.  And once
> the Port Authority took over and developed its terminal,
> the facilities, and continues to do so, make improvements,
> I think that's one of the large  reasons why the Port
> Jefferson Ferry Company has grown.  People were literally
> afraid to come down to that terminal – not that terminal,
> that dock.  There was no terminal there.

(359:13-360:1)

79.     Moreover, the Port Authority's construction of a new access road allowed

improved access to the ferry facilities by vehicle and shortened loading and unloading times.

This allowed the Ferry Company to add a third ferry boat, the P.T. Barnum, and increase sailing

times, to satisfy increasing demand for the ferry.  (705:12-19; Defendant's Exhibit 67 ¶¶ 35-39)

This expansion of services contributed to a substantial increase in overall ridership.  (560:5-

561:10; 595:11-15; 705:12-19; Defendant's Exhibit 228)

80.     The Ferry Company's annual operating revenues and profits have increased

substantially since the creation of the Port Authority in 1993.  Operating revenues of the Ferry

Company increased from $9,774,666 in 1992 to $26,801,121 in 2005.  That is an increase of

approximately 175%.  (Defendant's Exhibit 130; Plaintiffs' Exhibit 229)

81.     The Ferry Company's profits have increased as well, from $659,375 in 1992, to

$2,395,832 in 2005.  That is an increase of approximately 260%  (Defendant's Exhibit 130;

Plaintiffs' Exhibit 229)

82.     Since 1999, the Ferry Company has invested approximately thirty-one million

dollars ($31,000,000) in two new ferry vessels, the P.T. Barnum and Grand Republic. (107:13-

108:10; 592:5-593:13)

E.    **Ferry Fares**

83.    The Ferry Company's charges for ferry service have increased approximately every year for the past fifteen years.  (97:25-98:5; 351:10-21; Defendant's Exhibits 225, 20)

84.    As a result of these yearly increases, ticket prices (exclusive of the passenger fee) have risen enormously since the Port Authority has been existence.  For example, from the years 1997 to 2003, the price of a one-way ferry ticket for the category of "auto with unlimited passengers" rose 39%; for "vehicles 20 to 25 feet with driver," the percentage increase was 32%.  (356:17-23; Defendant's Exhibit 20)  Those percentages translate to real-dollar price increases of $14.25 and $12.50, respectively.  Both of those types of ticket now cost over $50.00 one way.  Ticket prices in other categories rose substantially as well.  (Defendant's Exhibit 20)

85.    The Ferry Company's schedules list the hours of operation, ferry schedules, ferry rates, and separately identify the Port Authority's passenger fee.  (Plaintiffs' Exhibits 162-186)

86.    The Ferry Company's rates and schedules, which identify the Port Authority's passenger fee, are published and publicly available in the Ferry Company's Schedules and on the Internet.  (639:1-3; 442:4-11; Plaintiffs' Exhibits 162-186)

87.    The Ferry Company's operation manager, Mr. Louis Rinaldo, testified that passengers complain of the increase in the Ferry Company's ticket rates, and sometimes complain of the high overall cost of a ferry ticket.  (92:10-12; 98:10-12)  Mr. Hall has also witnessed people inquire as to the ferry rates and then turn around and leave the terminal.  (446:6-9; 452:17-453:1)  Mr. McAllister has received letters from passengers complaining about ferry rates.  (646:6-23, Plaintiffs' Exhibit 197, Defendant's Exhibit 17)

88.    Neither Mr. Hall, nor Mr. McAllister, nor Mr. Rinaldo, nor any other representative of the Ferry Company testified to witnessing passenger complaints about the

passenger fee.  Indeed, Mr. Rinaldo specifically denied having witnessed passengers choosing not to ride the ferry as a result of the passenger fee.  (453:5-8)

89.     No one at the Port Authority has received complaints about the cost of the passenger fee.  (585:10-15)

**F.     Desire to move across harbor**

90.     The Ferry Company has indicated that it wants to move within the Bridgeport harbor.  (363:2-14)

91.     Significantly, Mr. Merritt testified that the Ferry Company's desire to move across the harbor "could be a motivating factor" in the Ferry Company's decision to bring this lawsuit.  (119:8-16)

**III.     Plaintiff D & D Wholesale Flowers**

92.     Gregory Rose is the owner of plaintiff D & D Wholesale Flower Importers ("D & D").  (387:4-6)  D & D reimburses Mr. Rose for the cost of his ferry tickets.  (395:9-11)

93.     Mr. Rose rides the ferry in connection with the operation of D & D, and previously rode the ferry for his employment with Mankers Wholesale.  (388:14-389:14) Although he indicated that he uses the ferry twice a week for business purposes, Mr. Rose did not quantify the number of ferry trips he has made in connection with the business of D & D or Mankers Wholesale.  (389:4-6)

94.     Mr. Rose's use of the ferry is "more often" a one-way trip from Connecticut to Long Island.  (388:14-20; 390:8-14)

95.     The "main factors" Mr. Rose considers in determining whether to use the ferry for D & D are speed and expediency of traveling to and from Connecticut.  (394:19-395:3)

96.     In addition, Mr. Rose testified that it is the increase in the "overall" costs of taking the ferry that affects his decision to ride the ferry.  (397:13-16)  The overall cost includes the almost annual increases by the Ferry Company for the cost of a ferry ticket.  (404:25-405:2; 405:17-21)

97.     Mr. Rose admitted that the passenger fee alone does not affect his decision to ride the ferry in the future.  On cross examination, Mr. Rose conceded:

> Q.     So isn't it true that at the time of your deposition, the increase in the passenger fee did not in fact affect your decision to ride the ferry?
>
> A.     That is correct.
>
> *        *        *
>
> Q.     [Restated by the Court]  Based on your deposition testimony when you testified, is it not true that the increase in the passenger fee does not affect your decision to ride the ferry in the future?  Can you answer that question?
>
> A.     I'd have to say from the deposition, yes.

(402:23-403:1; 404:12-16)

98.     Mr. Hall of the Ferry Company solicited Mr. Rose to become involved in this litigation.  (397:17-398:4; 406:10-18; 459:10-15)  The Ferry Company is paying Mr. Rose's attorneys' fees and expenses associated with this case.  (398:7-14)

99.     In the twelve years he has taken the ferry, Mr. Rose has never spoken with anyone at the Port Authority concerning increases in the passenger fee.  (405:3-6; 407:17-408:1)

100.    Mr. Rose did not present any evidence of damages sustained by D&D Wholesale Flowers by the imposition of the passenger fee, nor any evidence, apart from generalized conclusions regarding the overall costs of the ferry ticket, that the imposition of the passenger fee affects D & D Wholesale Flowers' use of the ferry.

## IV.    Plaintiff Frank Zahradka

101.    Frank Zahradka, a named plaintiff in this litigation, did not appear at trial. Therefore, there is no evidence that Mr. Zahradka has sustained any damages as a result of the passenger fee or that the passenger fee affects Mr. Zahradka's use of the ferry.  Accordingly, Mr. Zahradka should be dismissed as a plaintiff in this lawsuit.

## V.    Valuing Port Authority activities "related to" the Ferry

### A.    Mr. Alan Schachter

102.    Plaintiffs' counsel retained Alan Schachter, a forensic accountant, to analyze the Port Authority's spending on "ferry-related" expenses.  Specifically, Mr. Schachter testified that plaintiffs' counsel instructed him to assume that "the tariff can be used to pay the reasonable costs to provide services and facilities *to the ferry* at the Union Square Dock."  (790:8-18 (emphasis added))

103.    Mr. Schachter testified to his conclusion that the Port Authority had overcharged the ferry passengers, because it collects more from the passenger fee than it spends on expenses "related to" the operation of the ferry.  (Plaintiffs' Exhibit 218; 763:18-25)

104.    In arriving at this conclusion, Mr. Schachter attempted to isolate those expenses of the Port Authority that are "related to" the ferry.  Mr. Schachter then compared those "ferry-related" expenses with the amount the Port Authority has collected through the passenger fee. Where the passenger fee exceeded the "ferry-related" expenses, Mr. Schachter designated that amount an "overcharge."  (763:18-25)

105.    Mr. Schachter offered three "models" for calculating the amount the Port Authority has spent on "ferry-related" expenses.  (764:2-765:11)

106.    Mr. Schachter's first model adopts the percentage allocations included in the "net operating income" calculations that the Port Authority uses to calculate its yearly payment to the City under the Water Street Dock Property Management Agreement.  (764:5-765:5; Plaintiffs' Exhibit 218 Ex. 3; supra Findings of Fact 41-45)  Because the allocations in those "net operating income" calculations do not reflect the Port Authority's actual use of resources, Mr. Schachter's first model is groundless.  (Supra Findings of Fact 46-52)

107.    Mr. Schachter's second model also adopts percentage allocations from the Port Authority's irrelevant "net operating income" calculations.  However, Mr. Schachter revises the allocations in his second model according to his evaluation of the Port Authority's actual expenses.  Not surprisingly, since the percentage allocations do not correspond to the Port Authority's actual use of resources, Mr. Schachter changed the allocations of many of the expense categories.  (Plaintiffs' Exhibit 218 Ex. 4)  However, where Mr. Schachter could not find any reason to change the allocations from the Port Authority's "net operating income" calculations, he retained the same irrelevant percentages.  (775:8-15)

108.    Mr. Schachter's second model, though based in part on his review of relevant documents, employee depositions and discussions with the Ferry Company, uses the Port Authority's "net operating income" percentage allocations as the default basis for determining what constitutes a "ferry-related" expense.  (775:8-15)  Those percentage allocations have been shown to be unreliable as measures of the Port Authority's actual use of resources.  (Supra Findings of Fact 46-52)  As such, Mr. Schachter's second model is unreliable.

109.    Finally, in this third model, Mr. Schachter purports to do "an independent build up of the expenses from the ground up as to what it really takes to operate out of the Union Square Dock by the ferry."  (787:24-788:2)

110. Mr. Schachter's third model is anything but "independent." Instead, Mr. Schachter employs three main approaches:

(a) He relies on the same irrelevant percentages from the Port Authority's "net operating income" calculation in some necessary categories, like "Building Services," "Utilities," and "Outside Services." (Plaintiffs' Exhibit 218, Exhibit 5, Endnotes (b), (e); supra Findings of Fact 46-52)

(b) He adopts the Ferry Company's preferences about what it would like to pay in other categories, like "Salaries," in which the Ferry Company advised Mr. Schachter that every employee of the Port Authority, including security personnel, could be sufficiently replaced by adding two dock-hands starting in 1998 and half of an administrative office employee. (Plaintiffs' Exhibit 218, Exhibit 5, Endnotes (f), (k))

(c) Finally, he wholly eliminates certain categories of expenses, like Advertisement and legal fees, simply because the Ferry Company indicated it would prefer not to pay them. (Plaintiffs' Exhibit 218, Exhibit 5, Endnotes (r), (x))

111. Not surprisingly, Mr. Schachter's third, "a la carte" model yields the highest "overcharge." (787:17-788:2)

112. However, Mr. Schachter's third model is a marked departure from the terms of his engagement and what he purports to be accomplishing with his testimony. In his retention statement, he describes his engagement:

> In particular, I was asked to calculate the amount, if any, by which the tariff imposed by the defendant on the passengers of the Bridgeport-Port Jefferson Ferry exceeds the reasonable cost of *the facilities and services that the defendant provides* to the ferry operation.

(Plaintiffs' Exhibit 218, Page 1) (emphasis added).

113.    Consistent with these terms of his engagement, Mr. Schachter's first two models analyze "the facilities and services that the defendant provides" to the Ferry Company (albeit on the basis of irrelevant data).

114.    However, in his third model, Mr. Schachter is no longer analyzing "the facilities and services that the defendant provides to the ferry operation."  Instead, he is analyzing the vastly fewer facilities and services the Ferry Company claims it would have provided if it could have dispensed with the Port Authority.

115.    Put another way, Mr. Schachter represented at trial that he assumed "that the tariff can be used to pay the reasonable costs to provide services and facilities to the ferry at the Union Square Dock."  (790:12-15)  In his first two models, he assumed exactly that.  In his third model, Mr. Schachter assumed instead "that the tariff can be used to pay the reasonable costs to provide services and facilities [the Ferry Company would choose to provide] to the ferry at the Union Square Dock."

116.    This is problematic simply as a matter of logic.  Mr. Schachter purports to be evaluating the costs of services "related to" the ferry operations.  However, he eliminates expenses solely on the basis of the Ferry Company's preference.  Obviously, just because the Ferry Company would choose not to provide a service does not mean that that service, when provided by the Port Authority, was not "related to" the ferry.

117.    For example, the Ferry Company told Mr. Schachter that they would prefer not to provide daytime security at the Water Street Dock, relying instead on the addition of two dock-hands.  (Plaintiffs' Exhibit 218, Ex. 5, endnote (m))  Totally apart from the wisdom and legality of such a choice, the Ferry Company's mere preference not to pay for such a service does not mean that the Port Authority's provision of security services has not been "related to" the ferry.

118.    Moreover, Mr. Schachter's analysis compares the Ferry Company's estimated costs of drastically reduced services in the past with what the Port Authority has actually received in passenger fee income in the past.  Such a comparison is counterfactual, as it assumes that none of the slashed services affected the amount of income from the passenger fee.  In other words, it assumes that just as many people would have ridden the ferry even in the absence of many of the services the Port Authority actually provided.

119.    Indeed, instead of reducing the number of passengers as a result of fewer services and improvements under the Ferry Company, Mr. Schachter apparently assumes the existence of all the services and improvements brought about by the Port Authority, even while it assumes the non-existence of the Port Authority (at least as an authority over the Ferry Company).  For example, Model 3's salary costs explicitly account for the introduction, in 1998, of additional security as a result of the new access road.  (Plaintiffs' Exhibit 218, Ex. 5, endnote (f)) However, Mr. Schachter does not account for where the new access road would come from.  If the Port Authority is still responsible for that road (which, as recipient of the grant, it presumably would be), Mr. Schachter's model does not explain how the Port Authority would bring about such an improvement with a mere fraction of the revenues it currently receives from the passenger fee.

120.    Moreover, some of the assumptions Mr. Schachter accepts from the Ferry Company are entirely unrealistic.  For example, Mr. Schachter largely adopts the Ferry Company's estimation that it would not have incurred any legal expenses during the entire relevant period, when, to the contrary, its record indicates a ready willingness to initiate litigation.

121.    In sum, Mr. Schachter's third model, which takes an "a la carte" approach to valuing ferry-related services, is factually irrelevant and unreliable for each of the following reasons:

(a) because it is based in part on irrelevant percentages taken from the Port Authority's "net operating income" calculations;

(b) because it departs from the terms of his engagement by failing to evaluate the costs of "the facilities and service that the defendant provides to the ferry operation;"

(c) because it is logically inconsistent and counterfactual; and

(d) because it is based on self-serving preferences offered by the Ferry Company, some of which are unfounded and unrealistic.

**B.** **Mr. John Arnold**

122.    Mr. John Arnold, an expert in port economics, provided an alternate valuation of the benefits received by the ferry operations from the Port Authority.

123.    Like Mr. Schachter, Mr. Arnold estimated the value of the benefits the Port Authority provides to the ferry operation.  (866:7-867:16)

124.    Also like Mr. Schachter, Mr. Arnold adopted the point of view of the ferry operator, estimating the value of Port Authority services and facilities to the ferry operator. (867:23-868:3)

125.    In order to isolate ferry-related activities, Mr. Arnold trimmed the Port Authority's operations down to what they would be if the Port Authority did nothing but directly support the ferry operations.  (867:3-16)

126.    Unlike Mr. Schachter, Mr. Arnold estimated the value of *all* the benefits received by the ferry operation from the Port Authority, including those the Port Authority provides by obtaining and administering grants.  (868:4-23)

127.    Mr. Arnold concluded that the value of the Port Authority's services to the ferry operation exceeds the amount of revenue the Port Authority receives from that operation, including both the passenger fee and the lease revenue.  (869:5-15; 869:21-873:23; Defendant's Exhibit 67 Tables 9 & 10)

### C.    "Related to" the ferry

128.    Although Mr. Schachter was instructed to restrict his analysis to benefits the Port Authority provides directly to the ferry operations (and Mr. Arnold therefore similarly restricted his corresponding analysis), in fact, all the Port Authority's activities "relate to" the ferry. Because the Port Authority's other development projects occupy the Port District along with the ferry terminal, their environmental remediation, physical development, and efficient operation impact ferry traffic, the passengers' experience in the harbor, and the availability of services and economic opportunities to the passengers.  By improving the experience of traveling through the Port and specifically creating reasons for traveling to the Port, the Port Authority's development projects increase demand for the ferry's services.  As such, even though they are not directly provided to the ferry operations, they are "related to" the ferry.  (337:16-338-6; Joint Exhibit 2 at 110:21-112:10; 138:10-139:3)

129.    Because these development projects all "relate to" the ferry and more than a million ferry passengers, the Port Authority considers the ferry passengers and the Ferry Company in all of its development plans.  (Joint Exhibit 2 at 25:3-26:4)

## VI.    **The Port Authority's Development Projects**

130.    The Port Authority has received grant funds from state and federal agencies for numerous projects that benefit the ferry passengers and the Ferry Company, including:

(a)    Terminal Building - approximately $3,000,000 (32:19-21, 33:17-18; 135:20-21; 135:22-136:7);

(b)    Bulkhead repairs and reconstruction of the ferry dock - $1,444,480;

(c)    Parking facility and ferry dock extension - $3,550,700;

(d)    Security systems for the Water Street Dock and BRMC, including a patrol boat - $2,900,000 and $1,400,000 (310:2-311:10);

(e)    Remediation of the Cartech property - $6,400,000;

(f)    Maritime Business Park - $2,000,000 and $1,250,000;

(g)    Derecktor Shipyard - $2,500,000;

(h)    Pump-out boat - $115,823;

(i)    High-speed ferry - approximately $9,000,000.

(Defendant's Exhibits 49 and 50; 215:3-11; 307:14-309:4; 310:2-311:10; Plaintiffs' Exhibit 63)

131.    As of 2004, the amount of grant income received by the Port Authority in connection with the ferry terminal, dock, and parking garage, including a loan from the Port Authority for the parking garage, was in excess of $14,000,000.  (366:11-24; 379:12-16; 383:6-11, Defendant's Exhibit 213)

132.    All the projects for which the Port Authority receives grants directly or indirectly benefit the ferry passengers.  (312:20-316:13; Joint Exhibit 2 at 110:21-112:10; 138:10-139:3) Specifically, the Port Authority's development projects have benefited, or stand to benefit, the ferry passengers by securing their comfort and safety while waiting for and using the ferry,

providing them with convenient parking, improving the environmental and aesthetic conditions of the Port, bringing economic development to Bridgeport, reducing traffic on I-95, and offering additional ferry sailings, among other things.  (Infra Findings of Fact Section VI(A)-(M))

133.    The development projects of the Port Authority have benefited the Ferry Company by increasing demand for the ferry and, in the case of the access road, allowing the Ferry Company to expand its operations in order to meet increased demand.  (35:3-8; 698:10-699:12; 700:4-701:22; 702:11-705:19; Defendant's Exhibit 67 ¶¶ 35-39; Defendant's Exhibit 68 pp. 14, 18)  A fully developed port has a greater potential for increasing ferry passenger traffic in Bridgeport.  (337:16-338-6)

134.    The Port Authority has secured sufficient grant funding to cover most development projects in their entirety.  (317:18-20)  Thus, the Port Authority does not expend significant operating revenues in connection with these projects.  (316:24-317:1)  Instead, the Port Authority's contribution to these projects is limited to the time of the Port Authority personnel and overhead expenses associated with the projects.  (34:6-18)

A.    **The Terminal Building**

135.    One of the Port Authority's earliest projects was constructing the current terminal building.  (133:10-16)

136.    Prior to the creation of the Port Authority, there was no terminal building at the Water Street Dock.  (33:3-5).  The red cinderblock structure that did exist was in a state of disrepair, and there were no indoor facilities or room for ferry passengers.  (33:5-6; 322:24-323:5; Defendant's Exhibit 8)

137.    Mr. Edward Oppel, first executive director of the Port Authority, described the dock:  "There was a tremendous amount of distress about the condition of the docking areas . . .

and the ferry operation with regard to passengers being besieged by wharf rats, and all kinds of

terrible things. Very dark, very hostile landing area, and we were determined to turn that image

around. That was my primary responsibility." (Joint Exhibit 2 at 19:24-20:6)

138. The new terminal building houses an office for the Ferry Company's operations

manager, a cafeteria/snack bar, restroom facilities, a ticketing office, an information counter, and

a waiting area, as well as Port Authority offices, the offices of the Harbor Master and the

Connecticut World Trade Center, and a conference room. (33:11-14; 91:8-13; 322:4-8; 417:1-

11; 565:6-11; Defendant's Exhibits 7, 9)

139. Outside the terminal building are picnic tables, a deck, an awning providing

shade, a walkway around the northern part of the property, and landscaped grounds. (322:8-16;

325:7-10; Defendant's Exhibit 6)

140. The terminal building provides shelter, is weather-resistant, and provides a

comfortable heated and air-conditioned place for passengers to wait for the Ferry. (33:9-11;

322:4-16).

141. The terminal building was funded with federal grant income as well as some

municipal funds. (32:19-21, 33:17-18; 135:20-21; 320:18-321:1) Specifically, the Port

Authority received approximately $2,000,000 in federal highway funds, and about $1,000,000 in

state grants. (135:22-136:7)

142. These grants were available to governmental agencies only. The Ferry Company

could not have obtained the federal grant to build a terminal building without the Port Authority

or another quasi-governmental agency. (318:4-17)

143. The terminal building is a dramatic upgrade from the pre-existing structure.

(33:13-14)

144.    The construction and maintenance of the terminal building directly benefit the ferry passengers.  (32:22-33:1)

145.    Mr. McAllister testified that the current terminal building is an improvement over building that existed when the Ferry Company controlled the dock, and is a benefit for ferry passengers.  (672:22-24)

146.    By increasing the comfort and security of passengers, the ferry terminal has increased demand for the ferry, thereby benefiting the Ferry Company.  (860:5-17)

**B.    Bulkhead and Dock Repair**

147.    Before the creation of the Port Authority, the pier, dock, and tie-up area of the Water Street Dock were in a state of disrepair.  (33:6-8)  The dock was failing due to problems with the design of the bracing and subsurface construction which occurred in the early '90's.  (143:10-18; 144:9-12; 145:2-4; 329:4-13)  These repairs included parts of the landing where the vehicles drive off and on to the ferry vessels.  (144:22-24)

148.    In 1997 or 1998, Port Authority went to the State and received approximately $2,000,000 from the State of Connecticut to make improvements and rebuild the dock.  This amount also included funds to construct the secondary access road.  (143:10-18; 329:4-13)

149.    In addition to the reconstruction, the dock was reconfigured to realign the queuing lines for automobiles.  (144:2-3)

**C.    Access Road**

150.    When the State approached the Port Authority to shut down the Water Street entrance in connection with a road construction project, the Port Authority petitioned the State of Connecticut and received funds to construct a permanent secondary access road to the Dock.  (133:16-18; 146:13-25; 340:7-21; 579:21-580:3)

151.     Prior to the new access road, the Dock was accessible only via a street, one-lane each way, that narrowed to go under an "underpass viaduct" and involved a sharp turn into and out of the ferry area.  That access— locally referred to as "the hole in the wall"—was inconvenient and a threat to public safety.  (579:5-18; 703:7-12)  It also caused ferry traffic to back up onto Water Street in downtown Bridgeport.  (330:13-23; 340:17-20)

152.     The new secondary access road provides a lighted, landscaped entrance to the ferry terminal with two and three lanes for passenger vehicles that widens as it approaches the ferry terminal.  It offers staging for sufficient vehicles to meet the capacity of each of the ferry boats.  (331:8-13; 341:2-3; 580:5-14)

153.     The access road has video surveillance and other security measures, including a guard booth for port security.  (340:23-341:3; 580:5-14)

154.     The access road provides space for a long queue of vehicles, eliminating the problem of overflow ferry traffic spilling onto city streets.  (321:22-322:3)

155.     In all of these ways, the paved access road benefits the ferry passengers.  (674:8-11)

156.     The access road allows access to the ferry for buses and tractor trailers that previously could not fit through the "hole in the wall."  Thus, it has allowed the Ferry Company to offer service to these types of commercial vehicles for the first time.  (580:5-14; Defendant's Exhibit 67 ¶ 36)

157.     Moreover, the room for vehicles on the new access road allowed the Ferry Company to shorten boarding and disembarking times, which in turn permitted them to add a third ferry boat and increase the number of daily sailings.  (705:12-19; 858:25-860:5;

Defendant's Exhibit 67 ¶ 36)  The addition of the new ferry boat is partly responsible for substantial growth in ferry ridership.  (560:5-561:10)

158.     Thus, the new access road has significantly benefited the Ferry Company.

**D.     Multi-level Parking facility**

159.     Throughout its existence, the Port Authority has spent significant resources trying to resolve parking issues for the ferry passengers.  (341:6-8; 530:15-22; 541:24-542:11)  In 1997 or 1998, the Port Authority began the process of developing a parking facility to provide permanent parking primarily for the ferry passengers at the Water Street Dock.  (133:18-19; 148:1-6; 345:11-16)

160.     Ferry passengers have never had a permanent parking facility at the Dock; rather, they have parked at a variety of lots owned by the City or privately-controlled lots located outside the Dock.  (148:7-10)

161.     The Port Authority was successful in obtaining property that abuts the ferry terminal from an energy company.  (341:17-23)

162.     At the same time, the Port Authority petitioned the federal government and was awarded $3,550,700 from the Ferry Boat Discretionary Fund to construct a multi-level parking garage and dock extension.  (341:23-342:20)  To date, the Port Authority has spent approximately $1,100,000 in Port Authority funds in soft pre-development costs for the construction of the parking facility. (343:23-344:1)

163.     However, the parking facility is not complete because the City of Bridgeport would not agree to guarantee a loan from a local bank to the Port Authority because of this litigation.  (147:24-25;343:11-344:17)

164.    When complete, the parking facility will be an additional source of revenue for the Port Authority.  (150:14-16)

165.    The successful completion of the parking garage will directly benefit the ferry passengers.  (675:19-21; 345:11-16)

### E.    **Advanced Port Security Systems**

166.    The Port Authority has applied for and received a $2,900,000 grant through the Department of Homeland Security for improvements to port security, including terminal upgrades, improved lighting, surveillance system, access key systems, and a new port security boat manned by the Harbor Master and Marine Police unit.  (310:2-311:10)

167.    In addition, the Port Authority will receive another approximately $1,400,000 in grant funds through the Department of Homeland Security to be used for state-of-the-art equipment to detect improvised explosive devices.[2]  (311:1-10)

168.    These grant funds will allow the Port Authority to provide a greater level of security for the ferry passengers and all people in and around Bridgeport Harbor.  (313:7-10)

### F.    **Pump-out Boat**

169.    The Port Authority operates a pump-out boat in the warmer months of the year to pump waste out of recreational vessels. (217:23-218:5)  The boat operates three days a week and holidays from May through October.  (553:21-554:5)

170.    Costs associated with operating the pump-out boat are shared with the Connecticut Department of Environmental Protection.  (217:23-218:5; Plaintiffs' Exhibit 63) Each year, the Port Authority receives approximately $30,000 in grant funds from the

---

[2] The relevant testimony in the transcript reads "itinerant implosive devices, IEDs."  We believe the phrase "itinerant implosive devices" probably reflects transcription error, given that the acronym IED refers to the common phrase "improvised explosive device."

Connecticut Department of Environmental Protection in connection with the operation of the pump-out boat. (554:6-13; Plaintiffs' Exhibit 63) For its part, the Port Authority contributes approximately twenty-five percent of the overall costs associated with operating the pump-out boat. (218:22-24; 522:25-525:11; 539:5-24)

171. Port Authority employees spend little time on the pump-out boat, as evidenced by time sheets they keep for the purpose of grant reimbursement. (Plaintiffs' Exhibit 64)

172. The operation of the pump-out boat benefits the ferry passengers and all users of the Bridgeport Harbor. (554:16-24)

173. Mr. McAllister recognized that a clean, environmentally safe harbor is a benefit to ferry passengers. (675:22-676:2).

**G.    High-speed ferry**

174. For several years, the Port Authority has been working with the State of Connecticut in connection with the introduction of a high-speed ferry service. (213:11-14; 213:23-24)

175. The high-speed ferry would transport walk-on passengers from southwestern Connecticut west to Stamford, Connecticut, and then into the Wall Street and East 34th Street ferry terminals in Manhattan. (213:15-22; 214:3-4)

176. The objective of the high-speed ferry project is to alleviate traffic congestion on both Interstate 95 and the trains by providing another transportation alternative for Connecticut citizens. (26:14-19; 213:15-22; 314:2-15)

177. To date, the Port Authority has received approximately $9,000,000 in government grants in connection with the high-speed ferry service. (215:3-5)

178.    The Port Authority has spent "minimal" amounts of its own funds in connection with the high-speed ferry service.  (215:12-14)  Specifically, Port Authority funds were used to purchase ads seeking bids for the project.  (503:18-21)

179.    The Port Authority has spent some employee time in connection with the high-speed ferry service, in that Ms. Klimas has worked on the project "now and again."  (502:19-23)  Ms. Klimas's related duties have included filling out a one-page grant application, placing ads for bids, "doing paperwork," and following up with the Department of Transportation.  (504: 505:1-5, 553:6-14)  Her current duties related to the high-speed ferry involve the "pass-through" function of arranging for the payment of invoices.  (552:16-553:3)

180.    The high-speed ferry service will benefit the Ferry Company and ferry passengers by increasing use of the Port District, growing and developing the Bridgeport harbor, and reducing vehicle traffic on Interstate 95.  (19:10-14; 20:4-8; 25:15-26:1)

**H.     Barge Feeder Service**

181.    The Port Authority is currently participating with the Port Authority of New York and New Jersey in developing a port inland distribution network for cargo containers.  (200:7-16)  This "barge feeder service" would utilize barges operating out of the terminals of New York and New Jersey, as well as Bridgeport, to distribute maritime containers to Bridgeport via barge in an effort to reduce traffic on the roadways.  (14:4-16; 133:21-25; 200:7-16; 338:7-15)  Projections foresee transporting the cargo of 40,000 trucks in the first year, with limitless potential.  (338:21-23; 372:4-7)

182.    The Port Authority anticipates using approximately 17 acres of the BRMC, located north of Derecktor Shipyard, in connection with the barge feeder service.  (210:25-211:15)

183.    The Port Authority has applied for and received approximately $1,500,000 from the State of Connecticut in connection with the barge feeder service.  (201:21-202:1)  In addition, the State Transportation Strategy Board has "promised" the Port Authority an additional $5,500,000 if the project proves successful.  (202:2-202:8)

184.    The Port Authority has expended "minimal" amounts of its own funds connection with developing the barge feeder project.  (202:9-15)

185.    In connection with the barge feeder service, Ms. Klimas has handled paperwork and submitted budgets for grants.  (505:11-14)

186.    The objective of the barge feeder project is to improve the operation of the interstate (I-95).  (26:14-19)  The barge feeder project will benefit users of the port and the ferry passengers to the extent that it would reduce traffic on the roadways to and from the Bridgeport terminal by removing trucks from the highways, mitigate wear and tear on highways, and reduce pollution.  (26:14-19; 313:13-314:2; 338:16-21; 371:24-372:3)

## I.    Steel Point Peninsula

187.    Steel Point peninsula is a 50-acre parcel not owned by the Port Authority, but located within the jurisdiction of the Port Authority, across the Pequonnock River from the Water Street Dock.  (8:12-14; 172:9-173:4)

188.    The Port Authority was involved in the selection process to find a developer of the peninsula and in a study to find locations for water-dependent users.  The Port Authority has not itself generally been involved in developing the Steel Point peninsula.  (8:7-11; 173:5-8; 173:12-18; 336:2-21)

189.    The Port Authority has expended minimal amounts of its own funds in connection with Steel Point peninsula.  (336:22-25)

190.    The Port Authority has received income from managing the Hitchcock Marina located within Steel Point peninsula.  (20:13-18; 175:1-5)

191.    The Port Authority's activities in connection with the development of the Steel Point peninsula benefit the ferry passengers in that development will increase activity within the Port District.  (24:16-22)  Moreover, the aesthetic improvements and redevelopment of the Steel Point peninsula benefit all users of the port, including ferry passengers who ride past the site. (337:1-15)

### J.     Cilco Shipping Terminal

192.    The Cilco terminal consists of two plots of land totalling approximately 26 acres within the Port District.  (130:23-131:7; 194:11-13)

193.    The Cilco terminal is a blue water terminal used for overseas cargo, principally the importation of fruit.  (193:10-13)  The current tenant of Cilco is also planning on importing additional fruits, containers, and more products into the Port of Bridgeport.  (193:14-19)

194.     With the exception of some undefined time spent lobbying for improvements to the Cilco bulkhead and certain advertisements, the Port Authority has not devoted time or resources to the Cilco terminal.  (195:11-19)

195.    General improvements to the Bridgeport Harbor, like dredging and improved security, will benefit Cilco Terminal along with other users of the port.  (709:9-23)

### K.     Foreign Trade Zone

196.    At the request of the City of Bridgeport, the Port Authority is the grantee of Foreign Trade Zone #76, which was originally granted to the City.  (339:2-12)  Foreign goods entered into a Foreign Trade Zone are considered to be outside United States Customs territory

for the purpose of tariffs until such goods are removed from the Foreign Trade Zone.  (16:2-7; 219:6-17; 339:14-19)

197.    The Port Authority has expended minimal funds in connection with the Foreign Trade Zone.  (220:9-11; 340:1-6)

198.    The Foreign Trade Zone benefits the City and users of the port in creating commerce in the State of Connecticut, and could generate a management fee or rental income for the Port Authority.  (26:20-25; 39:22-40:1; 339:20-24)

**L.    Bridgeport Regional Maritime Complex ("BRMC") and Derecktor Shipyard**

199.    The Bridgeport Regional Maritime Complex (formerly known as the Carpenter Technology, or "Cartech," site) is a 48-acre property located within the jurisdiction of the Port Authority.  (130:19-131:7; 175:21-176:4)

200.    Almost twenty years ago, Carpenter Technology abandoned the site, leaving it a disaster.  (334:12-22)  Buildings were left damaged and knocked down, and oil contaminated the ground.  (334:18-335:16)

201.    The Port Authority has received approximately $11,000,000 in government grant funds in connection with the BRMC, including funds for Derecktor Shipyard.  (32:13-17; 177:19-179:6; Plaintiffs' Exhibits 55, 57, 58)  The Port Authority obtained grant funds for the environmental remediation of the BRMC and construction necessary to prepare the property for development.  (184:22-25)  In addition, the Port Authority has received another $1,500,000 in grants for port security improvements related to BRMC.  (179:3-6)  In total, the Port Authority has received almost $13,000,000 for the BRMC.  (179:5-6)

202.    The Cartech property has been the subject of several contracts, which have been entirely funded by grant income.  (512:24-513:1; 516:12-517:8; 517:9-518:8; 518:9-519:17;

519:21-520:12; 538:9-23; Plaintiffs' Exhibits 56, 59, 60, 61, 62)  Currently, the Cartech property has been partially environmentally remediated.  (335:17-18)

203.    A cleaner, environmentally safe harbor and port benefits ferry passengers and all users of the Bridgeport port.  (26:7-13; 335:17-20)

204.    The Port Authority has spent insignificant amounts of its own funds on the BRMC.  (179:7-10; 335:21-23)

205.    With respect to redeveloping the BRMC, Ms. Klimas has done paperwork, obtained appropriate insurance, placed some ads seeking bids, visited the site during contract performance, and arranged for payment of invoices.  (507:5-509:10)  Mr. Riccio and Ms. Johnson have also spent some time on the project.  (510:14-17)

206.    There have been discussions concerning the Ferry Company moving its operations to the BRMC.  (11:7-11)

207.    Derecktor Shipyard is located on a 23-acre parcel in the BRMC within the jurisdiction of the Port Authority.  (11:21-24; 130:19-131:7; 132:15-23; 184:10-12)

208.    Derecktor Shipyard employs on average 130 people and enjoys a world-wide reputation for construction and repair of quality aluminum ferries, luxury yachts, and sailboats.  (184:13-15; 345:23-346:1-7)  Mr. Riccio testified that they "make some of the finest ships in the world."  (346:1-2)

209.    Derecktor Shipyard was chosen as a developer for the BRMC, and is currently a tenant on the BRMC.  (179:24-180:3; 183:24-184-2)  Mr. Riccio negotiated and signed a lease on behalf of the Port Authority with Derecktor Shipyard.  (12:5-7; 187:8-10; Plaintiffs' Exhibit 66)

210.    Derecktor Shipyard is currently in operation and generating revenues.  (179:7-10)

211.    The Port Authority receives revenues from Derecktor Shipyard.  Specifically, under the lease agreement Derecktor Shipyard pays a graduated annual rent, a portion of which is remitted to the City to satisfy the Port Authority's obligation to the City.  (189:10-190:3; 190:23-192:6; Plaintiffs' Exhibit 66)  The Port Authority also collects a management fee of $15,000 annually from Derecktor.  (190:4-8; 190:24-191:2; Plaintiffs' Exhibit 66)

212.    All users of the port, including ferry passengers, benefit from Derecktor Shipyard, inasmuch as it advances the economic viability of the Port of Bridgeport.  (335:4-16; 345:17-346:9)

### M.    Dredging the Bridgeport Harbor

213.    The Port Authority has obtained federal funds to assist the Army Corps of Engineers to prepare and dredge the Bridgeport Harbor, which has not occurred in the last forty (40) years.  (17:1-3; 198:7-10; 314:19-315:14)

214.    Currently, the harbor is shoaled up to approximately twenty-seven and twenty-nine feet; however, the channel is authorized for a depth of thirty-five (35) feet.  (198:14-21; 315:15-24)

215.    Although the draft of the ferry boats is approximately twenty to twenty-two feet, vessels that dock at the Motiva terminal require the full depth of the channel (thirty-five feet), and vessels currently docking at the Cilco terminal are "barely" clearing the channel.  (198:14-23)

216.    Dredging the Bridgeport harbor at depths greater that the minimum draft necessary for the operation of the ferry boats is necessary to maintain a clear channel, because if a vessel entering Bridgeport Harbor runs aground in the channel due to insufficient depth, it

could impede the ferry boats from getting in and out of Bridgeport Harbor or cause an environmental problem if there is a gasoline spill.  (199:10-15; 315:18-316:9)

217.     Therefore, dredging the Bridgeport Harbor at the authorized depth benefits the Ferry Company and ferry passengers.  (24:23-25:8; 316:10-13)

## VII.     The Passenger Fee

218.     Since 1993, the Port Authority has imposed a fee (referred to in various places as a "wharfage charge" or tariff) upon individuals and vehicles riding the ferry boats.  (Plaintiffs' Exhibit 83; 31:22-25)

219.     This passenger fee is collected by the Ferry Company along with the ferry ticket charge.  (295:3-7)  The Ferry Company fare schedules refer to the fee as the "Bridgeport Port Authority Tax."  (Plaintiffs' Exhibit 186)

220.     The passenger fee is identified in the ferry schedules and price lists published by the Ferry Company.  (35:10-16; 295:8-10; 360:13-361:24; Plaintiffs' Exhibits 162-186)  Thus, passengers are aware of the passenger fee when they purchase a ferry ticket.  (35:10-16)

221.     The passenger fee is imposed equally on all ferry passengers regardless of the passengers' state of origin.  (32:10-12; 358:11-16)

222.     The purpose of the passenger fee is to provide revenue to support the operations of the Port Authority.  (569:14-23)

223.     From 1993 to 2004, the passenger fee yielded the following revenues for the Port Authority:

| Year | Passenger Fee Revenues ($)[3] |
|---|---|
| 1993 (July through December) | 261,342 |
| 1994 | 449,682 |
| 1995 | 461,396 |
| 1996 | 649,015 |
| 1997 | 678,134 |
| 1998 | 712,190 |
| 1999 | 804,287 |
| 2000 | 901,518 |
| 2001 | 947,591 |
| 2002 | 984,926 |
| 2003 | 1,292,383 |
| 2004 | 1,372,031 |

(Plaintiffs' Exhibits 1-11A)

224.    The passenger fee, together with the rent generated from lease agreements with the Ferry Company and its subsidiary, Steamboat Concessions, constitutes the primary source of operating revenues of the Port Authority.  (Plaintiffs' Exhibits 1-11A; 65:21-66:2; 237:21-238:4) Revenues generated from the passenger fee finance the operation and maintenance of the dock and ferry terminal.  (32:1-5; 33:19-22)

225.    The Port Authority would be materially adversely affected by the elimination of the passenger fee.  Without the income generated by the passenger fee, the Port Authority would be unable to continue providing services for the ferry passengers and the other users of the Port, and would likely be forced out of existence.  (37:4-7; 66:3-9)

---

[3] These figures represent the total amount collected from the passengers.  The amount actually received by the Port Authority is this amount less credit card fees and the fee the Ferry Company receives for collecting the passenger fee.  (Plaintiffs' Exhibits 1-11A)

226.    Currently, the passenger fee ranges from $0.60 to $2.75 depending on whether the payor is a walk-on passenger, a vehicle, a vehicle with passengers, or some other classification. (Plaintiffs' Exhibit 186)

227.    Since its inception in 1993, the Port Authority has increased the passenger fee only twice (excluding a recent surcharge related to this litigation (997:25-998:2)), in 1996 and 2003.  (118:10-12; 352:1-14; 357:14-19; Defendant's Exhibits 85-107; Plaintiffs' Exhibits 162-186; Plaintiffs' Exhibit 74)

228.    When considering increasing the passenger fee, the Port Authority determines "the minimum it can raise the rates without having to get a negative impact on either the ferry passenger or the ferry company itself."  (583:23-584:4)

229.    The minimal amount of the increases is easily seen when charted:

| Categories of Passengers | Original Passenger Fee | Total Increase | Current Passenger Fee[4] |
|---|---|---|---|
| Senior citizens and children, walk-on | $0.50 | $0.10 | $0.60 |
| Adult, walk-on | 0.50 | 0.50 | 1.00 |
| Auto including driver | 1.00 | 1.00 | 2.00 |
| Trucks over 25 feet, including driver | 1.50 | 0.75 | 2.25 |
| Cars with unlimited passengers | 2.00 | 0.75 | 2.75 |
| Monthly passes | 5.00 | 0.25 | 5.25 |

(Plaintiffs' Exhibits 167, 186, Defendant's Exhibit 226)

230.    The passenger fee is particularly small relative to the total cost of a ferry ticket. (32:6-9)  For example, as of May 2005, a one-way passenger ticket for a vehicle with unlimited passengers from the Water Street Dock to Port Jefferson cost $51.25, while the corresponding passenger fee was merely $2.75.  A one-way passenger ticket for a truck over 20-25 feet cost $51.50; the corresponding passenger fee was $2.00.  (Plaintiffs' Exhibit 186)

---

[4] The current passenger fees exclude a temporary surcharge instituted in 2005, since that surcharge is necessary only to defray the expense of this litigation.  (377:19-378:1; 997:25-998:2)

231.    The minor role of the passenger fee in ferry prices is also obvious when one compares the passenger fee to the increases in ticket price introduced by the Ferry Company in the time the fee has been in place.  For example, from 1997 to 2003, the price of a one-way passenger ticket for a vehicle with unlimited passengers increased by a total of $14.25. (Defendant's Exhibit 20)  The applicable passenger fee, at its current and highest rate, is only $2.75, and it increased only 25 cents in the same period of time. (Plaintiffs' Exhibits 174, 185) In other words, the ferry fare increased 57 times as much as the passenger fee increased over a seven year period.  In the same period, the Ferry Company increased the ferry fare in an amount that equals 520% of the total current passenger fee.  (852:22-854:23)

232.    Like the surcharge this Court considered at the preliminary injunction stage, both the overall passenger fee and increases in the passenger fee have been "modest compared to the overall price of a ferry ticket."  (Order Denying Preliminary Injunction, April 15, 2004)

233.    Moreover, like the preliminary injunction stage, plaintiffs have not offered evidence proving that the passenger fee has resulted "in a reduction in the quantity of ferry tickets demanded."  (Order Denying Preliminary Injunction, April 15, 2004)

234.    There is no evidence that any ferry passenger has decided to not ride the ferry because of the imposition of the passenger fee.

235.    To the contrary, Mr. Louis Rinaldo, the Ferry Company's operation manager, testified that no ferry passenger has ever told him that they are refusing to ride the ferry because of the passenger fee.  (99:3-6)  Mr. Hall, the Ferry Company's vice-president and general manager, testified similarly:

> Q.    So nobody ever said I'll pay 39 dollars but, boy, I'm not paying
> that extra dollar, I'm turning around and driving away because of
> that?

        A.        Nobody said that to me, no.

(453:5-8)

236.     Neither Edward J. Deak, Roger M. Lynch Professor of Economics and former chair of the Economics Department at Fairfield University, nor Mr. John Arnold, an M.I.T. trained economics expert, identified any negative impact from the passenger fee on the volume of passengers or vehicles that debark from the Water Street Dock. (836:21-837:6; Defendant's Exhibits 67 ¶ 33, 68 )

237.     The Ferry Company does not pay any passenger fee or wharfage charge. (458:12-16)

238.     The Ferry Company collects the passenger fee from ferry passengers along with its ticket charges and remits the monies collected from ferry passengers to the Port Authority. (661:15-662:1; 440:19-21; 458:8-11)

239.     For this service, the Port Authority has paid the Ferry Company an administrative fee of $22,500 annually.  In May 2003, the Port Authority increased that amount to $32,500 annually.  (295:11)

**VIII.**   **Damages**

240.     The Ferry Company disapproves of how the Port Authority spends the proceeds it collects from the passenger fee.  At trial, Mr. McAllister characterized his view of how the Port Authority expends funds it collects via the passenger fee:

        Q.       When you say, Mr. McAllister, that your losses really are the
                 million three or the million four that you referred to as the amount
                 being collected, at least being collected last year, is any of that put
                 to good use in your estimation?

        A.       Is any of that what?

        Q.       Put to good use by the Port Authority, in your estimation?

> A.     In my estimation?
>
> Q.     Yes, sir.
>
> A.     Zero.  The Port Authority is a detriment to our company.  They do more harm than good.  Everything that's on that terminal is redundant. . . .  It's a total waste. . . .

(657:4-21)  Mr. McAllister's disapproval does not entitle him to damages.  Moreover, there is no evidence of any legally cognizable form of injury.

### A.     <u>There is no evidence that ridership has decreased as a result of the passenger fee.</u>

241.     The Ferry Company did not present any evidence whatsoever of decreased ridership or other injury to its operations.

242.     Mr. McAllister described plaintiffs' only evidence of damages:

> Q.     Right.  Isn't it true that you are simply presuming that if the Bridgeport Port Authority's tariff did not exist, you could either make more money or get more passengers.  But you don't have any evidence of that, do you?
>
> A.     My evidence is the one million four that I give you.  If you came to me and said to me, Mr. McAllister, next year I want you to raise a million four on your tariffs, and when you get the money in your pocket, I want you to call me up and give it to me, and if you don't, I'm going to blow your brains out.  That's what it is.  I mean, what's the difference?  You understand that?
>
> Q.     Do you have any evidence of damages other than that argument?  That's it, isn't it?  That's your argument?
>
> A.     Oh, gee, I don't need – I don't need any more evidence to see you taking a million four out of my pocket.

(655:3-18)

243.     Moreover, Fred Hall, the Ferry Company's vice-president and general manager, candidly admitted that the Ferry Company has no evidence whatsoever that the passenger fees has caused either a loss of passenger ridership or lost profits:

> Q.     The ferry company does not have specific evidence that it has suffered damages, either loss of profits or loss of ridership by virtue of the passenger fee for the Port Authority, correct?
>
> A.     Yes.
>
> Q.     It's just your hunch?
>
> A.     Yes.

(459:3-9)

Mr. Hall later continued:

> Q.     Do you have any evidence of fewer passengers because of the rates that are charged specifically because of the passenger fee that's charged?
>
> A.     I have no specific way of knowing that, no.

(464:5-8)

244.     There is no data or evidence, and the Ferry Company has conducted no study, to substantiate Mr. Hall's "hunch" that the passenger ridership is diminished by the imposition of the passenger fee.  (458:17-19)  In this regard, Mr. McAllister testified:

> Q.     Have you ever, for the ferry company, have you ever conducted any studies to see if your ridership has actually been reduced because of the Port Authority tariff?
>
> A.     You mean go out an[d] tell some consultant to tell us?
>
> Q.     Yes.  Or in any other manner done any study to show that your ridership has decreased because of the Port Authority tariff separate from your own regular almost annual raising of your own prices?

> A.  We have not made that study because we know the answer to it.  If we didn't know the answer to it maybe we'd get somebody.  We know that as the price goes up we carry less people.  I don't need to go out and hire somebody to do that, to tell me that.  That's my job.

(667:14-668:1)

245.    Neither Mr. McAllister's annoyed insistence nor Mr. Hall's "hunch" amounts to evidence that the Ferry Company has suffered economic damage or experienced a decrease in passenger ridership as a result of the imposition of the passenger fee.

246.    In other words, as this Court found at the preliminary injunction stage, plaintiffs have not demonstrated that the passenger fee has resulted or "will result in a reduction in the quantity of ferry tickets demanded."  (Order Denying Preliminary Injunction, April 15, 2004)

**B.    The passenger fee does not prevent the Ferry Company from raising its rates to increase revenues.**

247.    Mr. John Arnold, expert in port economics and finance, pointed out that, even if there were evidence of decreased ridership as a result of the passenger fee, that alone would not establish that the Ferry Company has been damaged by the passenger fee.  Instead, the Ferry Company must also show that it could not have increased its own fares to make up any lost revenue.  (837:7-24)

248.    That the Ferry Company has not been deterred from raising ferry rates is obvious from the many, many increases in rates, totaling many, many times the level of the passenger fee, that the Ferry Company has imposed during the time the passenger fee has been in place. (Plaintiffs' Exhibits 174, 185; Defendant's Exhibit 20; 837:11-24)

249.    In addition, the Ferry Company admitted at trial that the passenger fee does not affect the Ferry Company's decision to adjust its passenger ticket rates.  (109:7-110:12; 649:4-17)

250.    Mr. McAllister testified:

Q.    Now turning to the Port Authority passenger fee, sometimes called a tariff.  If that fee did not exist or were significantly lower, would the fares you've set in the past have been different?

A.    If that tax did not exist?

Q.    Or were significantly lower.  Let me give you a example.  If it [the passenger fee] didn't exist, I think you understand what that means, or to take an example, if the fee on a car and driver instead of two dollars were one dollar, would that have affected your rate setting in the past?

A.    No, I think I said that we charge what we have to charge.  We charge as low as we can.  And whatever they put on it just hurts the traveling public and we got to live with it.

*      *      *

Q.    If, in the past, say the two dollar car and driver fee did not exist, would your rates that you set for car and driver have been the same, higher, or lower?

A.    Well, I would have set them the same.  However, if I did raise them to what their tax is I would have pocketed that money.

(649:4-650:3)

251.    Similarly, Mr. Merritt, the Ferry Company's CFO, considers factors such as profit margin, wages, interest, fuel, and obligations to financial institutions in setting ferry passenger ticket rates.  However, he does not take into consideration the passenger fee.  (109:7-110:12) Mr. Merritt testified:

Q.    Now, I was asking a different thing.  In your input on the setting of rates, do you consider the Port Authority's fee, sometimes called the tariff or tax or wharfage fee, that is added to the cost of the ferry company's price?

A.    I don't personally consider that.  I need a certain return from the operation and that's what my main consideration is.

(110:6-12)

252.    Thus, representatives of the Ferry Company admit that the passenger fee has never prevented the Ferry Company from raising its rates in order to increase profits.

**C.    There is no evidence quantifying alleged lost profits.**

253.    Obviously, it is not sufficient merely to claim lost profits without presenting evidence of the amount of alleged lost profits.

254.    The Ferry Company has not introduced any expert witness testimony, data, or evidence of any kind to prove the amount of alleged lost profits suffered by the Ferry Company as a result of the passenger fee.

255.    Instead, at trial Mr. McAllister offered the following quantification of the Ferry Company's alleged damages:

>    Q.    How [has the Ferry Company lost revenue or profit]?
>
>    A.    How?  Just add it up.  That's what they took out of our pocket. That's what this lawsuit is about.  Seven to ten million dollars they've taken away from the ferry boat company.
>
>    Q.    What was the source of that amount of money that you just referred to?
>
>    A.    That's the money that they took out of the pockets of our passengers.

(650:8-16)

256.    Nor did Mr. Merritt provide any evidence of the Ferry Company's alleged lost profit:

>    Q.    Have you personally tried to measure the increased revenue or profit that would have occurred in that past as a result of the tariff?
>
>    A.    Well, our average profit after taxes for the eight years that we operated under Brian McAllister was 2.3 million.  And if we would have taken absolute – factor into our ticket prices of the tariff it would almost double what we were earning now.

Q.    But beyond doing that kind of rough computation, have you personally done any?

A.    No, I have not done any analysis on the elasticity and inelasticity of our pricing.

(111:15-112:1)

**D.    The evidence establishes that the passenger fee has not adversely affected the Ferry Company.**

257.    All evidence at trial establishes that the passenger fee has not had an adverse effect on the Ferry Company's business.

258.    For example, total ferry ridership has increased every year since 1997.

(Defendant's Exhibit 69)

259.    Moreover, the Ferry Company's operating revenues, net income and rate of profitability have substantially increased since the Bridgeport Port Authority began operating. (Defendant's Exhibits 130, 131)  The following chart presents those increases through 2003:

| Year | Operating Revenues | Net Income | Income Percent |
|------|--------------------|------------|----------------|
| 1992 | $9,774,666 | $659,375 | 6.7% |
| 1993 | $10,511,787 | $1,027,695 | 9.7% |
| 1994 | $11,385,376 | $1,641,585 | 14.4% |
| 1995 | $11,784,365 | $1,838,248 | 15.6% |
| 1996 | $13,144,918 | $1,616,755 | 12.3% |
| 1997 | $13,627,372 | $2,157,375 | 15.8% |
| 1998 | $14,667,617 | $2,334,208 | 15.9% |
| 1999 | $16,867,142 | $2,389,810 | 14.2% |
| 2000 | $20,173,217 | $2,130,524 | 10.6% |

| 2001 | $22,419,228 | $3,533,667 | 15.8% |
| 2002 | $23,595,012 | $4,104,452 | 17.4% |
| 2003 | $24,109,912 | $6,730,220[5] | 27.9% |

(Defendant's Exhibits 130, 131)

260.    Nor has the Ferry Company experienced negative impacts after the two increases in the passenger fee.  In 1996, the year the passenger fee was increased, the Ferry Company's revenues grew to approximately $13,144,000, with profits of $1.6 million – a 12.2% profit rate. (664:19-665:16).  In the year following that increase, 1997, the Ferry Company's revenues increased to about $13,627,000, with a realized profit of about $2,157,000 – a 15.8% profit rate. (665:17-666:1).

261.    In 2003, the year of the second passenger fee increase, the Ferry Company experienced its "best year" since Mr. McAllister took over the company.  Mr. Merritt admitted as much, though he mistakenly believed that the fee increase took place in 2004:

> Q.    Has the Port Authority's passenger fee affected the ferry company's ability to earn revenues or make a profit?
>
> A.    Well, ironically, *the best year that we had in the eight years that we've been operating since Brian McAllister took complete control of the company was 2003.*  And I believe the last ferry tariff was implemented I think in May of 2004, and our pre-tax earnings have dropped since then.

(110:13-17 (emphasis added))  Mr. Merritt is incorrect – the passenger fee increase was implemented in January of 2003, the Ferry Company's "best" year.  (Defendant's Exhibit 226)

---

[5] The Ferry Company's income in this year was elevated by the sale of an asset.  (117:7-16)

**E.    Expert testimony supports the conclusion that the Port Authority and its passenger fee have increased, rather than diminished, demand for the ferry.**

262.    Professor Edward J. Deak found "no evidence presented of economic harm to the ferry company from the imposition of the passenger wharfage fee."  (697:17-19).

263.    Dr. Deak's analysis demonstrated that the Ferry Company cannot establish injury by relying solely on the basic economic principle that, in general, an increase in price will decrease demand at a single point in time.  (699:24-700:11; Defendant's Exhibit 68, pp. 12-16)

264.    Dr. Deak explained that supply-and-demand theory supports the evidence that demand for the ferry has expanded during the Port Authority's existence, in spite of the passenger fee.  He observed that the demand curve for the ferry has shifted outward, partly as a result of the Port Authority's many improvements to ferry-related facilities and services. (698:10-699:12; 700:4-701:22; 702:11-705:19; Defendant's Exhibit 68, pp. 12-16)

265.    This accounts for the increase in demand for the ferry despite substantial increases in the overall price of a ferry ticket (most of which increases are attributable to the Ferry Company's repeated increases in ferry fares).  (698:10-699:12; 700:4-701:22; 702:11-705:19; Defendant's Exhibit 68, pp. 12-16)

266.    The Ferry Company offered no expert testimony refuting Dr. Deak's analysis, nor any other expert testimony on the subject of damages.

267.    Port economics expert John Arnold agreed with Dr. Deak, in that he could not discern any negative impact on ridership as a result of the passenger fee.  (836:21-837:6)

268.    Any Findings of Fact that the Court judges to be applicable as Conclusions of Law, we respectfully request be applied as Conclusions of Law.

## CONCLUSIONS OF LAW

Contrary to plaintiffs' assertions, the United States Constitution, federal statute, and Connecticut law fully permit the Port Authority to charge the passenger fee.

**I.      The Port Authority has constitutional authority to charge the passenger fee.**

The Port Authority's passenger fee is constitutionally valid.  The Supreme Court has long recognized that the state and local transportation authorities may charge reasonable fees in return for facilities and services they provide to vessels and passengers.  Fees asking travelers to "bear a fair share of the costs" of providing public facilities "for the purpose of aiding interstate . . . travel" do not offend the right to travel or the Commerce Clause.  See Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, 405 U.S. 707, 722 (1972).[6]  Moreover, a "fee attributable to the general service rendered by [a port authority]" does not violate the Commerce Clause or the constitutional prohibition on duties of tonnage.  Clyde Mallory Lines v. Alabama, 296 U.S. 261, 265-66 (1935) (approving a fee imposed upon all vessels for State Dock Commission's "service . . . in securing the benefits and protection of the rules to shipping in the harbor"); see also Plaquemines Port, Harbor and Terminal Dist. v. FMC, 838 F.2d 536, 544-46 (D.C. Cir 1988) (a "reasonable charge for general services" is valid under the Tonnage Clause); Hawaiian Navigable Waters Preservation Soc'y v. Hawaii, 823 F. Supp. 766, 776 (D. Haw. 1993) (holding fees charged by Hawaii for the "use of restroom facilities, parking, trash disposal, and security" valid under the Tonnage Clause).  These holdings and their progeny establish that the Port

---

[6] In response to the Court's decision in Evansville-Vanderburgh, Congress moved to prohibit airport authorities from imposing this type of assessment.  See 49 U.S.C. § 40116(b) (2000).  However, Evansville's constitutional holdings, which apply generally to user fees imposed by transportation authorities, remain valid.  See Center for Auto Safety v. Athey, 37 F.3d 139, 142 n.6 (4th Cir. 1994) ("Evansville-Vanderburgh is still valid, binding precedent."); Alamo Rent-A-Car v. Sarasota-Manatee Airport Auth., 906 F.2d 516, 519 n.2 (11th Cir. 1990) ("The congressional action left the Court's commerce clause analysis undisturbed."); see also Jorling v. U.S. Dep't of Energy, 218 F.3d 96, 102-03 (2d Cir. 2000) (quoting substantially from Evansville-Vanderburgh's commerce clause and right to travel analysis).

Authority's passenger fee is fully valid under the Commerce Clause, does not violate the fundamental "right to travel," and does not constitute a prohibited "Duty of Tonnage."

> **A.    The passenger fee is valid under the Commerce Clause and does not infringe upon the fundamental right to travel.  (Counts II and III)**

Supreme Court precedent demonstrates that the passenger fee meets the constitutional requirements of the Commerce Clause[7] and the fundamental right to travel.[8]  In Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, 405 U.S. 707 (1972), the Supreme Court established a test for determining whether a user fee imposed by a transportation authority is valid under the Commerce Clause and adequately protects the constitutional right to travel.  The Court considered its precedent testing user fees under the Commerce Clause and the right to travel, and it concluded that a charge comports with both constitutional requirements if it (1) "is based on some fair approximation of use or privilege for use" of the "facilities for whose benefit [it is] imposed"; (2) does not discriminate against interstate commerce; and (3) is not "excessive in comparison to the governmental benefit conferred."  Evansville-Vanderburgh, 405 U.S. at 716-17; see also Center for Auto Safety v. Athey, 37 F.3d 139, 142-43 (4th Cir. 1994) (applying Evansville-Vanderburgh to approve a Maryland user fee imposed on charitable organizations); Wallach v. Brezenoff, 930 F.2d 1070, 1072 (3d Cir. 1991) (applying Evansville-Vanderburgh to hold that a toll increase does not infringe on the constitutional right to travel); Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 906 F.2d 516, 518 (11th Cir. 1990) (applying Evansville-Vanderburgh to uphold an airport authority's imposition of a user fee on "off-airport" rental car companies).  The Port Authority's passenger fee satisfies all three elements of the

---

[7] The Commerce Clause provides:  "The Congress shall have Power . . . [t]o regulate Commerce . . . among the several states."  U.S. Const. art. I, § 8, cl. 3.

[8] The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union.  It is a right that has been firmly established and repeatedly recognized."  United States v. Guest, 383 U.S. 745, 757 (1966).

Evansville-Vanderburgh test.  Accordingly, the fee offends neither the Commerce Clause nor the

right to travel.

> **1.    The passenger fee "is based on some fair approximation of use or privilege for use" of the "facilities for whose benefit [it is] imposed."**

The amount and allotment of the Port Authority's passenger fee "is based on some fair

approximation of use or privilege for use" of the "facilities for whose benefit [it is] imposed."

Evansville-Vanderburgh, 405 U.S. at 716.  To satisfy this requirement, Evansville-Vanderburgh

requires that a user fee be apportioned among users based on distinctions between groups of

users that are not "wholly irrational."  Id. at 719.  To be based on a "fair approximation"

expressly does *not* require that the amount and allotment of a user fee precisely reflect the

benefits received by each user:

> Complete fairness would require that a state tax formula vary with every factor
> affecting appropriate compensation . . . .  These factors, like those relevant in
> considering the constitutionality of other state taxes, are so countless that we must
> be content with "rough approximation rather than precision."  Each additional
> factor adds to administrative burdens of enforcement, which fall alike on
> taxpayers and government.  We have recognized that such burdens may be
> sufficient to justify states in ignoring . . . key factor[s] . . ., although the result may
> be a tax which on its face appears to bear with unequal weight upon different
> [users].

Evansville-Vanderburgh, 405 U.S. at 716 (quoting Capitol Greyhound Lines, 339 U.S. 542, 546-

47 (1950) (approving a fee for use of Maryland's roads that was based in part on fair market

value of vehicles)) (citations omitted); see also United States v. Sperry, 493 U.S. 52, 60 (1989)

("This Court has never held that the amount of a user fee must be precisely calibrated to the use

that a party makes of the Government services.") (applying Massachusetts v. United States, 435

U.S. 444, 463-64 (1978) (quoting Capitol Greyhound Lines)); Alamo Rent-A-Car, 906 F.2d at

520 (quoting Capitol Greyhound Lines).[9]

Thus, under Evansville-Vanderburgh, a user fee must "fairly approximate" the use of a

facility or service by being apportioned among users based on rational distinctions between

groups. For example, the Court in Evansville-Vanderburgh upheld airport user fees that were

imposed solely on passengers enplaning commercial flights. The Court found that that

apportionment of user fees was not "wholly irrational" even though the airport authorities had

"exempt[ed] in whole or in part a majority of the actual number of persons who use facilities of

the airports involved." Id. at 717. The Court reasoned that exceptions for non-passengers,

passengers on noncommercial flights, and de-planing passengers were "not wholly

unreasonable" since each group used the airport differently. Id. at 718; cf. Plaquemines Port,

Harbor and Terminal Dist., 838 F.2d at 545 n.8 (noting that a fee was a legitimate charge for

services rendered even where some who received benefits were not charged, where those

charged received proportionate benefits, and no one who received no benefit was charged).

Like the fee in Evansville-Vanderburgh, the user fee charged by the Port Authority

reflects a "fair approximation" of the use of the facilities and services provided by the Port

Authority. The Port Authority's imposition of the user fee only on ferry passengers reflects

rational distinctions between users of the facilities and services provided by the Port Authority.

The Port Authority's activities benefit the ferry passengers, other users of the port, and

the general public. Obvious administrative realities prevent the Port Authority from attempting

to charge fees from the last of these groups, which consists mainly of those who benefit from the

---

[9] Capitol Greyhound Lines is no longer valid precedent in the road tax context, but it continues to be applied by the Supreme Court and lower federal courts in the context of user fees, primarily via its incorporation into Evansville-Vanderburgh. See Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 906 F.2d 516, 519 n.4 (11th Cir. 1990) (explaining the continued relevance of Capitol Greyhound Lines in user fee cases).

Port Authority's activities without directly entering the port.[10] Evansville-Vanderburgh and

Capitol Greyhound Lines explicitly acknowledge these administrative difficulties and hold that

local authorities are justified in imposing user fees or taxes that seem unequal as a result of such

obstacles:  "[A]dministrative burdens of enforcement . . . may be sufficient to justify states in

ignoring . . . key factor[s] . . ., although the result may be a tax which on its face appears to bear

with unequal weight upon different [users]."  Capitol Greyhound Lines, 339 U.S. at 546-47

(quoted in Evansville-Vanderburgh, 405 U.S. at 716).  Thus, Evansville-Vanderburgh does not

require the Port Authority to attempt to spread its user fee over the entire group of beneficiaries

of its work when it would be impossible or administratively difficult to do so.  In this case, the

Port Authority has rationally determined that it cannot seek user fees from absent beneficiaries.

Administrative realities also keep the Port Authority from charging users of the port other

than the ferry passengers.  The ferry passengers are the largest and most uniform group of port

users, so in charging them a user fee the Port Authority closely approximates charging a user fee

to all current port users.  Other users of the port, such as crews of private boats approaching

Derecktor Shipyards or other private terminals, use the port in so many different manners that it

would be administratively inefficient to impose appropriate user fees on them.  Moreover, many

of those users pay fees to entities in the port who in turn pay rent to the Port Authority.  As such,

distinguishing between passengers, who are the large majority of port users, and other users of

the port, is clearly "rational" under the standard articulated above.

Other features also distinguish the ferry passengers from other beneficiaries of the Port

Authority's facilities and services.  For a number of reasons, the ferry passengers benefit more

---

[10] Unreachable beneficiaries of the Port Authority's activities include, *inter alia*, all citizens of Bridgeport who benefit from economic development of the area, users of I-95 who benefit from reduced traffic, and future users of facilities developed by the Port Authority.

extensively from the Port Authority's activities than any other group.  For example, the ferry

passengers all embark or disembark at the area of the port that has been subject to the most

development and maintenance by the Port Authority, while other users of the port access the port

at less improved areas that have thus far benefited from fewer of the Port Authority's resources.

In addition, many ferry passengers are repeat users of the port, and therefore stand to benefit

from the Port Authority's continued improvement of the port over time.  Moreover, as the most

extensive current users of the port, the ferry passengers are the primary beneficiaries of the Port

Authority's many activities benefit that the general public.  For example, the passengers most

directly benefit from public goods like environmental remediation, dredging, economic

development, and beautification of the port.  They will also be the most direct beneficiaries of

new parking garage, the soon-to-be high-speed ferry, and other projects for the public good that

are currently in development.[11]  These services benefit the ferry passengers not merely in their

capacity as ferry passengers, but also as citizens who conduct business or enjoy recreation in or

near the Port of Bridgeport, passengers on I-95 as they depart and arrive at the Port of

Bridgeport, and, in many cases, citizens of Bridgeport and neighboring communities.[12]  As

---

[11] It is irrelevant that ferry passengers make unequal use of the Port Authority's facilities and services.  The United States Supreme Court, applying Evansville-Vanderburgh in the context of the federal government charging user fees to the states, has held that users benefit from the availability of services, even if they do not avail themselves of all of those services.  See Massachusetts v. United States, 435 U.S. 444, 468 (1977); see also Jorling v. U.S. Dep't of Energy, 218 F.3d 96, 103 (2d Cir. 2000) (applying the holding from Massachusetts to hazardous waste fees charged by the state of New York to the federal government); cf. Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n, 390 U.S. 261, 281 (1968) (A "relatively small charge imposed uniformly for the benefit of an entire group can be reasonable . . . even though not all members of the group receive equal benefits.").  This is consistent with Evansville-Vanderburgh's requirement that the fee reflect a "fair approximation of use *or privilege for use*" of the benefited facilities.  See Evansville-Vanderburgh, 405 U.S. at 716 (emphasis added).

[12] The Port Authority's development activities have improved the overall condition of the Port of Bridgeport, attracted business activity to abandoned areas in the Port of Bridgeport, secured the entire Port area, and improved access to and transportation through the Port of Bridgeport.  In the future, these development activities promise also to promote the coordination of various modes of passenger transportation within the Port of Bridgeport and to introduce passenger and cargo ferries to improve travel conditions in Bridgeport and surrounding areas.  See supra Findings of Fact Section VII.

regular users of the port, the ferry passengers benefit uniquely from the Port Authority's development activities.

For all of these reasons, the Port Authority's imposition of a user fee solely on ferry passengers "reflect[s] rational distinctions among different classes" of port users. See Evansville-Vanderburgh, 405 U.S. at 718 ("Certainly passengers as a class may be distinguished from other airport users, if only because the boarding of flights requires the use of . . . facilities not occasioned by nonflight activities."). In other words, exempting other users of the port from the user fee the Port Authority charges the ferry passengers is by no means "wholly irrational." See id. at 719. As such, charging a user fee solely to the ferry passengers reflects a "a fair, if imperfect, approximation of the use of facilities for whose benefit [it is] imposed." Evansville-Vanderburgh, 405 U.S. at 717.

### 2. The passenger fee does not discriminate against interstate commerce.

The passenger fee does not discriminate against interstate commerce because it does not distinguish between interstate and intrastate travel or between citizens of different states. See Evansville-Vanderburgh, 405 U.S. at 717; Center for Auto Safety, 37 F.3d at 143; Wallach, 930 F.2d 1072; Alamo Rent-A-Car, 906 F.2d at 518. Moreover, like maintaining an airport, assuring adequate port facilities "facilitates rather than burdens interstate commerce," because the port facilitates the flow of transportation, which permits passengers to travel to various locations in furtherance of interstate commerce. See Alamo Rent-A-Car, 906 F.2d at 518.

### 3. The passenger fee is not excessive in relation to the costs incurred by the Port Authority in providing services and facilities to the ferry passengers.

Like in Evansville-Vanderburgh, the plaintiffs here have "failed to offer proof of excessiveness" with respect to the Port Authority's passenger fee. See id. at 720. The passenger

fee is not excessive in relation to the costs incurred by the Port Authority in providing and

paying for numerous services and facilities that benefit the ferry passengers.  Like the fees at

issue in Evansville-Vanderburgh, the passenger fee merely imposes on ferry passengers "a fair

share of the costs" of providing public facilities "for the purpose of aiding interstate . . . travel."

Evansville-Vanderburgh, 405 U.S. at 722.

### a.     Applicable legal principles

Several principles guide the Court's inquiry into whether the passenger fee is excessive.

First, courts generally defer to a charging authority's judgment of what fee is appropriate

compensation for the facilities and services that it provides:

> [W]here a state at its own expense furnishes special facilities for the use of those
> engaged in commerce, interstate as well as domestic, it may exact compensation
> therefore.  The amount of the charges and the method of collection are primarily
> for determination by the state itself; and so long as they are reasonable and are
> fixed according to some uniform, fair, and practical standard, they constitute no
> burden on interstate commerce.  The action of the state must be treated as correct
> unless the contrary is made to appear.

Evansville-Vanderburgh, 405 U.S. at 712-13 (quoting Hendrick v. Maryland, 235 U.S. 610

(1915)) (citations omitted); cf. Cargill v. Federal Mar. Comm'n, 530 F.2d 1062, 1068 (D.C. Cir.

1976) (asking only "whether the charge levied is reasonably related to the service rendered");

Evans Cooperage v. Board of Commissioners of the Port of New Orleans, 6 F.M.B. 415, 418-19

(1961) ("The commission has made a charge to help defray its costs of operating facilities as

measured by cargo handled in the area and the only question is whether its facilities are being

used and the commission is performing a service reasonably related to its charges.").  Applying

this standard to a limousine company's protest that a tax on its gross receipts from airport

business was unrelated to benefits it received or costs incurred by the charging airport authority,

the Eastern District of New York refused even to consider the claim:  "We reject this cost-benefit

analysis as requiring an improper inquiry into the internal affairs of a state agency; it is not for the court to substitute its judgment for the specialized experience and expertise of the Port Authority." Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y. & N.J., 571 F.Supp. 576, 583 (E.D.N.Y. 1983). Accordingly, the Court should defer to the Port Authority's judgment in setting a fee that reasonably compensates it for the benefits it provides.

Second, in establishing a reasonable user fee, the Port Authority may consider more than the cost of services actually and directly used by each patron. User fees should compensate charging authorities for the costs of facilities and services that they make available for the benefit of users, even if each user does not avail himself of all such benefits. See, e.g., Clyde Mallory Lines, 296 U.S. at 266 ("The benefits which flow from the enforcement of regulations, such as the present, to protect and facilitate traffic in a busy harbor inure to all who enter it."); see also Massachusetts v. United States, 435 U.S. 444, 468 (1977) (applying Evansville-Vanderburgh in the analogous context of user fees charged against the states by the federal government, and measuring the "cost of the benefits each aircraft receives" by the services it "has available to it"); Jorling v. U.S. Dep't of Energy, 218 F.3d 96, 103, 106 (2d Cir. 2000) (applying same principle to hazardous waste fees charged by the state of New York to the federal government); cf. Volkswagenwerk Aktiengesellschaft v. Federal Mar. Comm'n, 390 U.S. 261, 281 (1968) (A "relatively small charge imposed uniformly for the benefit of an entire group can be reasonable . . . even though not all members of the group receive equal benefits."); Evans Cooperage, 6 F.M.B. at 418 (finding that boat and cargo enjoyed "substantial benefits" from services available but not directly used). Moreover, where a charging authority maintains a system of services and benefits that impact one another, the charging authority may charge user fees that reflect the cost of the system "as a whole." See Wallach, 930 F.2d at 1072 (holding that increased tolls for the

use of some modes of transportation were "not excessive in relation to the costs of the Port Authority's Interstate Transportation Network as a whole," though they exceeded the costs of providing the particular transportation used).

Third, an exact and precise correlation between the current benefits offered and the total amount of the fee collected by the Port Authority is not necessary.  Instead, the U.S. Supreme Court has held that a valid fee may bring in revenues that exceed the charging authority's outlays during a particular period.  See Evansville-Vanderburgh, 405 U.S. at 719-20; see also Massachusetts, 435 U.S. at 470 n.25 (noting that the validity of a tax should be determined "by comparing total revenue with total outlays" (citing Evansville-Vanderburgh)).  Any surplus can be offset against deficits from previous years, or against projected future deficits.  See Massachusetts, 435 U.S. at 470 n.25 (citing Evansville-Vanderburgh, 405 U.S. at 719-20).  Authorities can also take into account future development plans when setting fees, given the long term nature of maintaining and developing facilities; to hold otherwise would increase rather than mitigate the burden on interstate commerce.  See Alamo Rent-a-Car, 906 F.2d at 522.

Fourth, under Evansville-Vanderburgh, the Port Authority may measure the reasonableness of any user fees by its costs for developing a viable port, including the past and current costs of capital improvements within the port and planned future development, without regard for whether the particular improvements and developments will directly benefit the ferry passengers as opposed to other port users.  In other words, a "user fee" is not excessive simply because it covers the costs of services and improvements for public benefit that are not directly aimed at or delivered to those who pay the fee.  In Evansville-Vanderburgh, the Court held that a fee was not excessive because it did not meet the total past and current bond obligations incurred by the airport authority for capital improvements.  The Court did not consider whether all of

those capital improvements directly benefited enplaning passengers, even though enplaning passengers were the sole payers of the fee.  Instead, Evansville-Vanderburgh held that the user fee on enplaning passengers was not excessive, at least insofar as it did no more than compensate the airport authority for its deficits in meeting past and current obligations for developing a viable airport for public use.  See Evansville-Vanderburgh, 405 U.S. at 719-20.

Finally, courts have clearly held that whether the passengers are able to pay the passenger fee has no bearing on whether the fee is reasonable or excessive under the Commerce Clause. See Transport Limousine of Long Island, 571 F.Supp. at 583.  A fortiori, the Ferry Company's claims of hardship as a result of the passenger fee are irrelevant to the Court's Commerce Clause analysis, particularly since the Ferry Company does not actually pay the fee, and in fact retains a portion of the fee income.

### b.    Applying the foregoing legal principles to the passenger fee

Applying the foregoing principles, the passenger fee imposed by the Port Authority is not excessive.  First, the total amount the Port Authority collects through the passenger fee does not exceed the Port Authority's expenses for developing the port.  See supra Findings of Fact Section I(D), (F),(G), Section VI, 223.  Under Evansville-Vanderburgh, this alone is sufficient to support the Court's finding that the passenger fee is not excessive.  See Evansville-Vanderburgh, 405 U.S. at 719-20 (finding that fee charged to enplaning passengers was not excessive because it did not meet all past and current obligations of the charging authority, whether or not specifically related to those who paid the fee).

Further inquiry into the cost-benefit analysis conducted by the Port Authority in setting the passenger fee would be not only unnecessary under Evansville-Vanderburgh, but also,

according to some courts, inappropriate.  See Transport Limousine of Long Island, 571 F.Supp. at 583.

Nevertheless, should the Court dig further into the Port Authority's financial structure, it will find that the Port Authority's passenger fee is far from excessive, because it charges passengers far less than it is entitled to under the Commerce Clause.  For example, the principles outlined above allow the Port Authority to use the passenger fee to fund all the costs of the Port Authority, including the costs of non-ferry-related services that are available to the ferry passengers, the costs of providing other transportation services interrelated with the ferry, and the past, current, and future costs of capital improvements to the port without regard to whether such improvements specifically benefit the ferry passengers.  Moreover, the Port Authority may collect more from the passenger fee in a particular year than it expends on all of the above.

Despite these principles allowing it to pass on most expenses to port users, the Port Authority has minimized as much as possible the costs covered by the passenger fee.  Most notably, even though the law allows the Port Authority to roll the costs of future and past capital improvements into the passenger fee, the Port Authority has obtained grant income to fund the vast majority of its capital expenses. See supra Findings of Fact 130-134.  It also covers some of its expenses by collecting rent from tenants within the Port, including primarily the Ferry Company.  See supra Finding of Fact 20.  Accordingly, unlike the airport authority in Evansville-Vanderburgh, the Port Authority has thus far avoided passing on the costs of bond service or capital improvements to port users.  Instead, the passenger fee covers the much smaller expenses associated with maintaining the ferry-related infrastructure of the port and maintaining a minimal operational staff of three employees.

       **c.**      **The Ferry Company's proposed test based on "ferry-related" expenditures**

Despite the principles outlined in the cases above, which allow the Port Authority to charge a passenger fee that compensates it for a wide variety of its expenses, the Ferry Company urges the Court to measure whether the fee is excessive by comparing the fee income to the Port Authority's costs for providing what the Ferry Company deems are "ferry-related" services. Unfortunately, the Ferry Company's expert testimony on this issue is compromised by unfounded reliance on data taken out of context from the Port Authority's audit files and the self-serving assumption that only a service the Ferry Company would choose to provide constitutes a "ferry-related" service. See supra Findings of Fact Section V(A) (summarizing the testimony of Mr. Alan Schachter).

As a matter of fact, however, the Port Authority has so minimized the costs it passes on to passengers that the passenger fee satisfies a less compromised version of the plaintiffs' proposed test. Specifically, income from the passenger fee does not exceed the value of benefits to the passengers that are solely "ferry-related," when one considers the actual value not only of services but also of "ferry-related" infrastructure such as the ferry terminal, the access road, and the pending parking garage. See supra Findings of Fact Section V(B). Moreover, as noted above, even if the Port Authority collected somewhat more from the passenger fee than it expended on "ferry-related" services in a particular year, the excess could be set off against past and future expenses on "ferry-related" services such as the construction of the parking garage, deferred maintenance of "ferry-related" infrastructure, etc., and thus would not render the fee "excessive."

Of course, this comparison between the passenger fee income and the costs of "ferry-related" services is not dispositive because, as established in Evansville-Vanderburgh and all the

related cases previously cited, the plaintiffs' proposed test has no basis in law.  See also, e.g., Evans Cooperage, 6 F.M.B. at 418 (finding that boat and cargo enjoyed "substantial benefits" from services provided by commission, despite evidence that fee "does not cover expenses and services directly rendered to the cargo").

Nor does the "ferry-related" expenditures test meet the "common sense test," since the Port Authority obviously offers more benefits to the ferry passengers, who use the port prior to or after using the ferry, than those services related directly to the ferry itself.  See supra Conclusions of Law Section I.A.1 (listing some of the Port Authority's activities that benefit the ferry passengers).  Indeed, plaintiffs' suggestion that the fee be evaluated by comparison to the Port Authority's expenditures related to the ferry *per se*, rather than relative to expenditures that benefit the ferry *passengers*, reflects plaintiffs' unfounded focus throughout this litigation on the supposed effect of the passenger fee on the Ferry Company, rather than on those who actually pay the disputed fee, *i.e.*, the ferry passengers.

### d.    Conclusion

Even applying the plaintiffs' proposed test for "excessiveness," which has no basis in law, the Port Authority's passenger fee is not "excessive in relation to the costs" incurred by the Port Authority.  Applying the relevant valid legal principles, which grant the Port Authority discretion to pass on the vast majority of its costs to the passengers, the Court will find that the passenger fee is, in fact, modest in comparison to what the Port Authority could charge.  Thus, the passenger fee is far from "excessive in relation to the costs" incurred by the Port Authority.

### 4.    The passenger fee is valid under the Commerce Clause and does not infringe upon the fundamental right to travel.

Based on the foregoing, the passenger fee (1) "is based on some fair approximation of use or privilege for use" of the "facilities for whose benefit [it is] imposed"; (2) does not discriminate

against interstate commerce; and (3) is not "excessive in comparison to the governmental benefit

conferred." Evansville-Vanderburgh, 405 U.S. at 716-17. Accordingly, it does not offend the

Commerce Clause or the fundamental right to travel.

### B.   The passenger fee does not constitute a prohibited "Duty of Tonnage." (Count IV)

The Tonnage Clause[13] of the United States Constitution "prohibits reliance on tonnage

duties to raise general revenues, to regulate trade, or to charge for the privilege of entering, lying

in, or trading in a port." New Orleans Steamship Ass'n v. Plaquemines Port, Harbor and

Terminal District, 874 F.2d 1018, 1020, 1023 (5th Cir. 1989).[14]  However, the Tonnage Clause

does not prohibit charges that are paid in exchange for services provided by a Port Authority.

See Clyde Mallory Lines v. Alabama, 296 U.S. 261, 265-66 (1935) (approving a fee imposed

---

[13] The Tonnage Clause provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage . . .." U.S. Const. art. I, § 10, cl. 3.

[14] In their Amended Complaint, plaintiffs claim that in order to be permissible under the Tonnage Clause, the passenger fee must satisfy a three-part standard:

> (a) the proceeds of such duty are used for services rendered to and enjoyed by the vessel, such as pilotage, (b) such services enhance the safety and efficiency of interstate commerce, and (c) the duty places at most a small burden on interstate commerce

Amended Compl. ¶ 85. Plaintiffs do not identify the source of this test, but it appears to paraphrase a standard articulated by the Fifth Circuit Court of Appeals in New Orleans Steamship Assn. v. Plaquemines Port, Harbor and Terminal District, 874 F.2d 1018, 1021 (5th Cir.1989). In that case, the Fifth Circuit approved a port's charge on vessels for the provision of emergency response services under both the Commerce Clause and the Tonnage Clause. See New Orleans Steamship Assn., 874 F.2d at 1021-23. However, the standard excerpted by the plaintiffs is part of the court's commerce clause analysis, not a standard for applying the Tonnage Clause. See id. at 1021. In fact, the Court found that it did not need to apply the Tonnage Clause to the fee in question; nevertheless, it noted its finding that the Tonnage Clause did not prohibit the fee, because the fee was a payment for "services rendered to and enjoyed by the vessel." See id. at 1023 (citing Clyde Mallory Lines).

Incidentally, the Commerce Clause standard cited by plaintiffs, although not applicable in the Tonnage Clause context, does appear to be the foundation for the language of the Maritime Transportation Security Act of 2002 ("MTSA"), which is the subject of plaintiffs' federal statutory claim. See infra Conclusions of Law Section II. Therefore, the Court will find below an explanation of the Port Authority's compliance with this Commerce Clause standard as codified in the MTSA. See infra Conclusions of Law Section II.C. Finally, the fact that the MTSA explicitly adopted the language of this Commerce Clause standard from a Fifth Circuit decision supports the Port Authority's argument that that statute amounts to a codification of pre-existing Commerce Clause jurisprudence. See infra Conclusions of Law Section II.A.

upon all vessels for State Dock Commission's "service . . . in securing the benefits and

protection of the rules to shipping in the harbor"); Barber v. State of Hawai'i, 42 F.3d 1185,

1196 (9th Cir. 1994) ("Hawaii provides services in exchange for the mooring and anchorage

fees.  The fees are not a duty on tonnage.") (citing Clyde Mallory Lines); Plaquemines Port,

Harbor and Terminal Dist. v. FMC, 838 F.2d 536, 544-46 (D.C. Cir 1988) (holding that a

"reasonable charge for general services" is valid under the Tonnage Clause); Hawaiian

Navigable Waters Preservation Soc'y v. Hawaii, 823 F. Supp. 766, 776 (D. Haw. 1993) (holding

fees charged by Hawaii for the "use of restroom facilities, parking, trash disposal, and security"

were valid under the Tonnage Clause).  The Port Authority does not impose the passenger fee for

the prohibited purposes of raising general revenues, regulation, or a payment for the use of the

Port of Bridgeport.  Instead, the fee pays the operational costs of services and benefits the Port

Authority provides to ferry passengers.  Accordingly, the passenger fee is a "reasonable charge

for general services," rather than a prohibited tonnage duty.

> Since as early as 1874, the Supreme Court has
>
> expressly recognized, as essential to the interests of commerce and navigation,
> and as entirely consistent with the provisions of the national Constitution, the
> right of a municipal corporation, thereunto authorized by the State which created
> it, *to demand from those engaged in commerce just compensation for the use of
> wharves, or other artificial facilities, provided and maintained at its expense*.

See Packet Co. v. St. Louis, 100 U.S. 423, 428 (1879) (upholding a fee charged by the City of St.

Louis for the use of its improved wharf) (citing Cannon v. New Orleans, 87 U.S. 577 (1874)

(emphasis added)).  This principle has evolved in modern cases into the principle that "a

reasonable charge for general services is not a prohibited tonnage duty."  Plaquemines Port,

Harbor and Terminal Dist., 838 F.2d at 545.  Even more succinctly, the Ninth Circuit has held

"Hawaii provides services in exchange for the . . . fees.  The fees are not a duty on tonnage."  See

Barber, 42 F.3d at 1196. Applying this principle, courts have approved fees imposed by state and local authorities in exchange for such general services as securing the safety of vessels, facilitating the movement of vessels in the harbor, wharfage, pilotage, police and emergency services, use of locks on rivers, medical inspections, towage, loading and unloading, use of port facilities, parking, trash disposal, security, and harbor maintenance and improvement. See, e.g., Clyde Mallory Lines, 296 U.S. at 266; Barber, 42 F.3d at 1196; Captain Andy's Sailing, Inc. v. Johns, 195 F.Supp.2d 1157, 1174 (D. Haw. 2001) (upholding a use fee that pays for "harbor maintenance and improvement").

A "reasonable charge" for services rendered is one whose "[b]enefits and fees have been apportioned as closely as practicable."[15] See Plaquemines Port, Harbor and Terminal Dist., 838 F.2d at 545 n.8 (noting that a "slight divergence between the class that benefits and the class that pays seems of no significance" under Clyde Mallory Lines); see also Captain Andy's Sailing, 195 F.Supp.2d at 1175 (upholding a use fee even where evidence indicated that revenues from vessel could be nearly ten times higher than expenses on vessel's behalf). Moreover, a user fee does not become a prohibited tonnage duty if some who benefit do not pay. See Barber, 42 F.3d at 1196; Plaquemines Port, Harbor and Terminal Dist., 838 F.2d at 545 n.8. In addition, as long as the availability of a service inures to the benefit of all who pay a particular user fee, even vessels who never use a service may be charged the cost of making sure the service is available. See Clyde Mallory Lines, 296 U.S. at 266 ("It is not any less a service beneficial to appellant because its vessels have not been given any special assistance."); New Orleans Steamship Ass'n, 874 F.2d at 1023 (upholding fees to defray the costs of emergency services). The same facts that establish that the user fee reflects a "fair, if imperfect, approximation," of the passengers' use of

---

[15] This requirement echoes the "fair approximation" standard applied in Commerce Clause and right to travel cases. See supra Conclusions of Law Section I.A.1.

the port, supra Conclusions of Law Section I.A.1, support the conclusion that the user fee is reasonable because the "benefits and fees have been apportioned as closely as practicable."

Moreover, fees for services should "fairly remunerate" charging authorities for the cost of services provided. Packet Co., 100 U.S. at 427. The Port Authority's passenger fee constitutes "fair remuneration" for the Port Authority's costs for providing services to the ferry passengers and operating and maintaining facilities that benefit the passengers. These benefits and services include the construction and maintenance of the terminal building, port security, parking, and the new access road, as well as additional projects that promote the development of the port. The passenger fee is modest in comparison with the costs incurred by the Port Authority in providing these benefits and services. It is particularly modest when considered against the actual costs of providing those services, including costs covered by federal grants that could have been collected through a passenger fee. See supra Findings of Fact Section I(D), (F),(G), Section VI, 223; Conclusions of Law Section I.A.3. As such, it does no more than "fairly remunerate" the Port Authority for the costs of the services it provides.

In sum, the passenger fee is not a prohibited tonnage duty because it is not a charge levied for the "privilege of entering, lying in, or trading in a port." New Orleans Steamship Ass'n, 874 F.2d at 1020. Instead, the passenger fee is a reasonable charge that "fairly remunerates" the Port Authority for services rendered. See Clyde Mallory Lines, 296 U.S. at 265-66; Packet Co., 100 U.S. at 427; Plaquemines Port, Harbor and Terminal Dist., 838 F.2d at 545 n.8.

## II.    Federal statute does not prohibit the passenger fee.  (Count I)

The passenger fee does not violate the Rivers and Harbors Appropriation Act of 1884, 33 U.S.C. § 5 ("RHA").  The Rivers and Harbors Appropriation Act was amended in 2002 by the

Maritime Transportation Security Act of 2002, Pub. L. 107-295, 116 Stat. 2064 ("MTSA"),

which added the following subsection:

> (b)    No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for
>
> (1)    fees charged under section 2236 of this title;[16] or
>
> (2)    reasonable fees charged on a fair and equitable basis that—
>
> > (A)    are used solely to pay the cost of a service to the vessel or water craft;
> >
> > (B)    enhance the safety and efficiency of interstate and foreign commerce; and
> >
> > (C)    do not impose more than a small burden on interstate or foreign commerce.

33 U.S.C. § 5(b).  Plaintiffs claim that the passenger fee violates the RHA as amended by the

MTSA because (a) it is not reasonable; (b) it is not used solely to pay the cost of services to

ferries; (c) it does not enhance the safety and efficiency of interstate commerce; and (d) it

imposes more than a small burden on interstate commerce.

### A.    The MTSA codifies pre-existing Commerce Clause jurisprudence.

Because it is a new statute enacted following the events of September 11, 2001, there is

no case law interpreting the critical terms in subsection (b) of the RHA.  However, there is ample

evidence that, in passing the MTSA and enacting subsection (b), Congress intended to codify and

---

[16] Section 2236 permits fees to be levied in conjunction with harbor navigation projects where construction is complete and the charge is being imposed to finance the cost of construction, operation and maintenance or a navigation project for a harbor, or to provide emergency response services, so long as the fee is not assessed against vessels engaged in intraport movements.  See 33 U.S.C. § 2236.  The Port Authority's charge does not fall within this limited exception.

clarify pre-existing Commerce Clause jurisprudence in order to curb gross abuses by local taxing authorities. As such, the MTSA does not prohibit constitutionally valid user fees like the passenger fee.

The standard imposed in the MTSA echoes the Commerce Clause standard set forth in New Orleans Steamship Assn. v. Plaquemines Port, Harbor and Terminal District, 874 F.2d 1018, 1021 (5th Cir.1989). In that case, the Fifth Circuit approved a port's charge on vessels for the provision of emergency response services. Citing Clyde Mallory Lines, the court articulated the following test for identifying a user fee that complies with the Commerce Clause: "(1) the service funded by the fee must enhance the safety and efficiency of interstate and foreign commerce, . . . (2) the fee must be used to pay for the service, . . . [and] (3) the fee can place at most a small burden on interstate and foreign commerce." See New Orleans Steamship Assn., 874 F.2d at 1021. By passing the MTSA, Congress inserted this test directly into subsection (b) of the Rivers and Harbors Appropriations Act.

Legislative history confirms that the MTSA was meant to codify existing Commerce Clause jurisprudence, and further establishes that legislators were concerned mainly with curbing extreme abuses by local taxing authorities. In a House Conference Report, Representative Young of Alaska supports the MTSA because it clarified the limits on taxation already imposed by the Commerce Clause, and, by clarifying the Commerce Clause, it would minimize abusive taxes by local authorities and reduce costly litigation:

> Section 445 addresses the current problem, and the potential for greater future problems, of local jurisdictions seeking to impose taxes and fees on vessels merely transiting or making innocent passage through navigable waters . . . adjacent to the taxing community. We are seeing instances in which local communities are seeking to impose taxes or fees on vessels even where the vessel is not calling on, or landing, in the local community. *These are cases where no passengers are disembarking, in the case of passenger vessels,* or no cargo is being unloaded in the case of cargo vessels and where the vessels are not stopping

for the purpose of receiving any other service offered by the port.  In most
instances, *these types of taxes would not be allowed under the Commerce Clause
of the United States Constitution.*  Unfortunately, without a *statutory clarification,*
the only means to determine whether the burden is an impermissible burden under
the Constitution is to pursue years of litigation.

House Conf. Rep. on § 1214, Maritime Safety and Transportation Act of 2002, 148 Cong. Rec.

E2143-04, 2002 WL 31633117 (Nov. 22, 2002) (emphasis added).  Additional legislative history

confirms that the provision should not invalidate fees that are otherwise permissible under

federal law:  "This section does not prohibit those instances in which Federal law has permitted

the imposition of fees and recognizes those circumstances under which non-Federal interests

may charge reasonable port and harbor fees for services rendered."  House Conf. Rep. 107-777,

2002 U.S.C.C.A.N. 1315, 1349.

        The legislative history of this heretofore un-applied statute thus reveals that the MTSA is

meant to forestall attempts by local port authorities to impose charges that are totally unrelated to

services provided by the charging authority.  Unlike the targeted "case[] where no passengers are

disembarking," contemplated by Representative Young, the Port Authority's user fee applies

only to passengers who disembark and use its facilities.  See House Conf. Rep., 148 Cong. Rec.

E2143-04.  As such, the MTSA "does not prohibit" the Port Authority's user fee.  On the

contrary, in "recogniz[ing] those circumstances under which non-Federal interests may charge

reasonable port and harbor fees for services rendered," the MTSA's supporters specifically

distinguished the circumstances before the Court.  House Conf. Rep. 107-777, 2002

U.S.C.C.A.N. at 1349.

        The statute's text and its legislative history also establish that the MTSA meant to

provide "statutory clarification" of existing Commerce Clause jurisprudence by prohibiting fees

that constitute an "impermissible burden" on interstate commerce.  See House Conf. Rep., 148

Cong. Rec. E2143-04.  That jurisprudence is laid out in the <u>Evansville-Vanderburgh</u> case and its progeny.  <u>See</u> <u>supra</u> Conclusions of Law Section I.A.  Legislators explicitly did not intend to overturn charges that are valid under the Commerce Clause as outlined in this line of cases.  <u>See</u> House Conf. Rep. 107-777, 2002 U.S.C.C.A.N. at 1349.  As elaborated above, the Port Authority's user fee is perfectly consistent with the Commerce Clause.  <u>See</u> <u>supra</u> Conclusions of Law Section I.A.

Moreover, interpreting the MTSA to clarify existing jurisprudence is reasonable.  To interpret the MTSA as prohibiting user fees that have previously been authorized under the Commerce Clause would overturn decades of legal precedent and disrupt the financing schemes of port authorities all over the country.  The statute and its legislative history offer no evidence that legislators intended to introduce such upheaval.  Instead, the legislative history includes clear statements that Congress had the opposite intention—to clarify existing jurisprudence in order to minimize abusive taxes.  Thus, the MTSA imposes the same standard as that imposed under the Commerce Clause.  <u>See</u> <u>supra</u> Conclusions of Law Section I.A (elaborating the Commerce Clause standard and applying it to the passenger fee).

**B.     The MTSA is inapplicable to the Port Authority's passenger fee.**

Moreover, the MTSA does not apply to the Port Authority's passenger fee, because the Port Authority's "passenger fee" is actually a user fee charged to users of the port facilities, rather than a fee imposed on passengers of the ferry.

The MTSA prohibits many "impositions . . . upon or collected *from any vessel* or other water craft, *or from its passengers* or crew . . . if the vessel or water craft is operating on any navigable waters subject to the authority of the United States."  33 U.S.C. § 5(b).  Valid impositions on vessels or their passengers would, *inter alia*, "pay the cost of a service to the

vessel or water craft."  Id. § 5(b)(2)(A).  According to the legislative history, the regulation

closely ties vessel and passenger fees to services to the vessel in order to avoid the imposition of

fees where the vessels do not dock, unload cargo or allow passengers to disembark.  See House

Conf. Rep., 148 Cong. Rec. E2143-04.  As such, the "passengers" referred to in the MTSA are

merely that—passengers of a particular vessel—in relation to potential charging authorities.

      Although the Port Authority's fee has at times been referred to as a "passenger fee" or a

"wharfage charge," and although it is imposed upon the passengers of the ferry while they are

riding the ferry, it is not a fee imposed on mere passengers of a particular vessel.  Instead, it is a

fee imposed on users of port facilities.  As such, it does not fall within the prohibitions of the

MTSA.

      In other words, the Port Authority's "passenger fee" would more appropriately be styled

a "user fee," since it is charged to its payers in their capacities as users of port facilities.  It has

been called a "passenger fee" and a "wharfage charge" simply by reference to the manner in

which these users arrive at or depart the port, and to the Port Authority's use of the Ferry

Company to collect the fee.

      The legislative history of the MTSA makes clear that Congress was concerned with fees

imposed on vessels and passengers thereof who made no use of the port or any services provided

by the port.  As such, it prohibited fees charged to a vessel or its passengers *as mere passengers*.

It would value pure form over substance to apply the MTSA to the Port Authority's charge to

users of its facilities merely because these users are also passengers of the ferry, or because the

Port Authority chooses to collect the fee while they are arriving or departing by ferry, or because

the Port Authority imprecisely refers to the charge as a "passenger fee."

**C.     The Port Authority's passenger fee fully satisfies the MTSA.**

Finally, the Port Authority's passenger fee fully satisfies the terms of the MTSA.  The fee
is reasonable, and it is applied to pay the costs of services to the ferry and its passengers.  The
Port Authority's services make interstate commerce safer and more efficient, and the fee imposes
no burden on interstate commerce.

The fee is reasonable, particularly given the benefits received by those who pay it.  The
passenger fee is a standard user fee charged by a local transportation authority in exchange for
general services.  See supra Conclusions of Law Section I.A.  It is modest in amount, both
relative to the overall price of a ferry ticket and relative to the benefits received by those who pay
it.  See supra Findings of Fact 230-31, 122-27; Conclusions of Law Section I.A.3.  The Port
Authority's method of collecting the user fee minimizes inconvenience to the passengers and
compensates the Ferry Company in excess of the benefits they receive under their lease.  See
supra Findings of Fact 238-39.  Finally, there is no evidence that the passenger fee has had any
countervailing negative impact on the ferry company or those who pay the passenger fee.  See
supra Findings of Fact Section VIII.  In light of these facts, the fact and amount of the user fee,
as well the procedures by which it is implemented, are reasonable.

The Port Authority uses the fee income to provide services to the ferry.  The Port
Authority has dedicated the bulk of its resources to improving ferry-related facilities and
associated security, access and parking.  This has improved the safety of the ferry passengers and
the ferry operation.  Moreover, the Port Authority's developments throughout the port area have
improved the aesthetic experience of traveling through the port and provided additional services
and facilities to the passengers as users of the port.  As such, the Port Authority's development
activities have increased demand for travel through the port and enabled the rapid growth in

ridership the Ferry Company has experienced since the Port Authority began its operations.

Moreover, the Port Authority's enhancement of physical access to the ferry improved the

efficiency of the ferry operation by allowing faster boarding, which has allowed the Ferry

Company to meet growing demand by expanding its capacity by adding a new boat.  Access

improvements have also allowed the Ferry Company to expand its service to include larger

vehicles.  Finally, the many future developments the Port Authority plans will further enhance

demand for travel through the port area, which will further augment the ferry business.  As such,

all of the Port Authority's activities constitute services to the ferry.  See supra Findings of Fact

Section I(D)-(G), Section VI.

The passenger fee enhances, rather than inhibits, the flow of interstate commerce.  It

provides revenue that allows the Port Authority to ensure the operation of an adequate port

facility, thereby facilitating the safe and efficient flow of transportation.  This, in turn, permits

passengers to travel to various locations in furtherance of interstate commerce, and has an

obviously beneficial impact on the flow of interstate commerce.  See Alamo Rent-A-Car, 906

F.2d at 518.

Finally, there is no evidence that the passenger fee imposes any burden on interstate

commerce.  The fee is non-discriminatory, because it is charged equally to Connecticut and out-

of-state travelers, and the same facilities and services are available to all who pay it.  Nor is there

any evidence that the fee has the effect of deterring interstate travel.  On the contrary, there has

been a steady and substantial increase in ridership during the time the passenger fee has been in

place, despite considerable rises in the overall price of a ferry ticket.  See supra Findings of Fact

75-76, 258.  Finally, there is no evidence that the uniform imposition of a passenger fee on all

ferry passengers has the effect of favoring Connecticut businesses over out-of-state businesses.

See Minnesota v. Clover Leaf Creamery, 449 U.S. 456, 472-73 (1981) (holding that a statute imposed a "relatively minor" burden on interstate commerce where the regulation did not discriminate between interstate and in-state interests and the effect of the statute was likely to favor in-state businesses over out-of-state businesses only incidentally).  Thus, there is no evidence that the passenger fee imposes any burden on interstate commerce.

>      **D.      The RHA, as amended by the MTSA, does not prohibit the passenger fee.**

For three reasons, the MTSA does not prohibit the passenger fee.  First, the MTSA codifies existing Commerce Clause jurisprudence, under which the passenger fee is fully valid. Second, the terms of the MTSA are inapplicable to the passenger fee, since the MTSA prohibits fees imposed on passengers of vessels who have no other relation to a port, while the Port Authority's passenger fee is a fee imposed on users of port facilities that is only a "passenger fee" in its method of collection.  Finally, the passenger fee fully satisfies the terms of the MTSA.

**III.     The passenger fee is valid under Connecticut law.  (Counts V, VI and VIII)[17]**

>      **A.      The Port Authority is not unjustly enriched by the passenger fee.  (Count V)**

Plaintiffs allege that the Port Authority is "unjustly enriched" by the passenger fee under Connecticut common law.  Essentially, plaintiffs claim that the passenger fee duplicates income the Port Authority receives under its leases with Steamboat Concessions, Inc., and the Ferry Company.  Thus, according to plaintiffs, the Port Authority is paid twice for the same facilities and services.

To prove unjust enrichment, plaintiffs must demonstrate by a preponderance of the evidence that: (1) the Port Authority benefits from imposing the passenger fee; (2) the Port Authority's failure to compensate the plaintiffs for the benefit it receives from the passenger fee

---

[17] Plaintiffs voluntarily dismissed Count VII of their Amended Complaint prior to trial.

is unjust; and (3) the failure to pay is to plaintiffs' detriment.  See Hartford Whalers Hockey

Club. v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283 (1994); see also Nora Beverages, Inc.

v. Perrier Group of Am., Inc., 164 F.3d 736, 752 (2d Cir. 1998) (affirming district court's

holding that plaintiff could not recover for unjust enrichment); Weisman v. Kaspar, 233 Conn.

531, 538-39 (1995) (reversing trial court's decision that plaintiff was unjustly enriched).

Plaintiffs cannot satisfy any element of the Hartford Whalers test.

  First, the Port Authority does not benefit from the charge it collects from the ferry

passengers.  On the contrary, the Port Authority uses the passenger fee to benefit users of the

port and the general public, including primarily the passengers and the Ferry Company.  Indeed,

the Port Authority's sound use of passenger fee income was recognized by this Court, which

specifically found that "the Port Authority has proven to be fiscally reliable and responsible."

Order Denying Preliminary Injunction, April 15, 2004.

  Nor can plaintiffs establish the second prong of the Hartford Whalers test—*i.e.*, their own

injury.  Neither the Ferry Company nor the passengers have been harmed by the Port Authority's

financing arrangements.  Although the Ferry Company claims that it has been harmed, its

representatives admit that their damages are merely a "hunch."  See supra Findings of Fact

Section VIII esp. 243.  There is no evidence that the passenger fee decreases overall ridership,

and no evidence of the passenger fee deterring a single rider from using the ferry.  See supra

Findings of Fact Section VIII(A).  In addition, the passenger fee does not limit the Ferry

Company's ability to increase profits by raising its prices.  See supra Findings of Fact Section

VIII(B).  Thus, there is no basis for a finding that the Ferry Company has been harmed in any

way by the passenger fee.

Moreover, in return for all payments to the Port Authority, passengers and the Ferry Company receive benefits far more valuable.  In other words, all revenues collected by the Port Authority are, in effect, returned to those who pay the charges.  Accordingly, there is no harm to any of the plaintiffs.

Finally, since there is no injury to the Ferry Company or the passenger plaintiffs, there is no ground for compensation.  Thus, plaintiffs cannot establish the third element of the Hartford Whalers test.

Applying the Hartford Whalers test merely confirms what is obvious as a matter of logic and common sense:  there is nothing unjust or duplicative about the Port Authority making dissimilar financial arrangements with different groups of users.  See, e.g., Evansville-Vanderburgh, 405 U.S. at 718-19.  Steamboat Concessions, the Ferry Company, and the ferry passengers pay different fees because they utilize the Port Authority's services and facilities in different ways.  For example, under its lease, Steamboat Concessions pays for the use of an assigned space and facilities at the terminal.  See Amended Compl. ¶ 92.  The Ferry Company's lease provides for, among other things, the use of the dock and related facilities.  See id. ¶ 91. Passengers, on the other hand, pay for a variety of services and facilities associated with embarking and disembarking at the Port Authority (such as security, parking, and cleaning services), as well as the Port Authority's minimal operating expenses related to other development projects.  The minimal amount the Port Authority brings in through its leases would be insufficient to support provision of all the services it provides using the passenger fee.  Thus, if the passenger fee were eliminated, lease income would have to increase to compensate within the Port Authority's budget.  These principles alone establish that the leases and the passenger

fee are not duplicative charges, removing the alleged basis for plaintiffs' unjust enrichment claim.

Finally, the Port Authority's combination of lease and fee financing is typical of port authorities, and it offers tenants and users (*i.e.*, the Ferry Company and the passengers) advantages over alternative financing schemes such as relying exclusively on leases.  See supra Findings of Fact 21.  Thus, the Port Authority's imposition of a passenger fee in addition to collecting lease income is not duplicative and does not unjustly benefit the Port Authority; instead, it is part of a financing structure carefully chosen to serve the needs of the Port Authority and its tenants, including the Ferry Company.

### B.    Connecticut statutes authorize the passenger fee.  (Count VI)

Plaintiffs' sixth claim arises under the Connecticut statute granting authority to local port authorities, Conn. Gen. Stat. §§ 7-329a – 7-329u (1999).  Plaintiffs allege that the Port Authority violates provisions granting it the power to assess fees only pursuant to a bond, for the purpose of a "port facility" owned by the Port Authority, or as a charge for a "particular project."

Plaintiffs first contend that the Port Authority can only assess fees associated with the issuance of a bond.  They base their argument on Conn. Gen. Stat. § 7-329c (1999), which sets forth the powers and duties of port authorities.  It provides, in relevant part, that

> each port authority shall have power over the survey, development and operation of port facilities in its district as hereinafter specifically set forth, . . . with a view to the increase and efficiency of all such facilities and the furtherance of commerce and industry in the district.  It shall make a thorough investigation of port conditions in the district and such other places as it may deem proper and shall prepare a comprehensive plan for the development of port facilities in such district.  It may lease or acquire office space and equip the same with suitable furniture and supplies for the performance of the work of the authority, and may employ such personnel as may be necessary for such performance.  The authority also shall have power to:
>
> . . .

> (10) *Fix fees, rates, rentals or other charges for the purpose of all port facilities owned by the port authority* and collect such fees, rates, rentals and other charges for such facilities owned by the port authority, *which fees, rates, rentals or other charges shall at all times be sufficient to comply fully with all covenants and agreements with the holders of any bonds* issued under the provisions of sections 7-329a to 7-329f, inclusive;
>
> . . . .

Conn. Gen. Stat. § 7-329c (emphasis added).  Plaintiffs argue that subsection 10 authorizes the Port Authority to charge "fees, rates, rentals or other charges" only to the extent they are "sufficient to comply fully with all covenants and agreements with the holders of any bonds issued . . . ."  However, this subsection does not require a bond issuance as a pre-requisite to the fixing of "fees, rates, rentals or other charges."  Instead, it sets forth that, *if* "any bonds" have been issued, "fees, rates, rentals and other charges" must be sufficient to comply with agreements related to those bonds.  This interpretation is not only a clear reading of subdivision 10, it also is consistent with common sense, for plaintiffs' suggested interpretation would require the Port Authority to issue a bond even before charging "rentals" or "rates."

The Ferry Company also alleges that the Port Authority violates Conn. Gen. Stat. § 7-329c(10) because the passenger fee is not collected for the purpose of "port facilities" owned by the Port Authority.  However, Conn. Gen. Stat. § 7-329b(4) defines "port facilities" very broadly, as:

> (A) wharves, docks, piers, vessels, air or bus terminals, railroad tracks or terminals, cold storage and refrigerating plants, warehouses, elevators, freight-handling machinery and such equipment as is used in the handling of freight, passengers and vessels, vehicles, and the establishment and operation of a port and *any other works, vessels, vehicles, rolling stock, properties, buildings, structures or other facilities necessary or desirable for commerce and industry or waterfront development within a district or in connection with the development and operation of port facilities*, or (B) manufacturing and industrial facilities, recreational and entertainment facilities, residential facilities or *other commercial facilities necessary for commerce and industry or waterfront development within*

*a district*, and (C) *located within or benefiting the district.*

Conn. Gen. Stat. § 7-329b(4). The passenger fee covers expenses related to the passenger terminal, the access road, the future ferry passenger parking garage, and, to a lesser extent, grant-administration costs related to multiple port development projects. Contrary to plaintiffs' assertions, these qualify as "port facilities," because they are all "properties, buildings, structures or other facilities necessary or desirable for commerce and industry or waterfront development within [the Port of Bridgeport]," or "other commercial facilities necessary for commerce and industry . . . within [the Port of Bridgeport], and . . . located within or benefiting the district." Id.

Plaintiffs also contend that, under Conn. Gen. Stat. § 7-329i,[18] the Port Authority may only impose fees in the context of a "particular 'project.'" Moreover, according to plaintiffs, such fees are "authorized solely" to satisfy one of three limited purposes. See Amended Compl. ¶¶ 101-02. Contrary to plaintiffs' characterizations, the statute does not require that fees be associated with a "particular" project; instead, it provides that the Port Authority is authorized to charge fees associated with "each project" under its jurisdiction. See Conn. Gen. Stat. § 7-329i. Moreover, these fees are not "authorized solely" for three purposes. See Amended Compl. ¶ 101. Instead, the statute requires that the fees must at least be "sufficient" to satisfy three potential liabilities related to a project:

> Such rates, rents, fees and charges shall be fixed and adjusted . . . so as to provide funds sufficient with other revenues, if any, (1) to pay the cost of maintaining, repairing and operating the project and each and every portion thereof, to the extent that the payment of such cost has not otherwise been adequately provided for, (2) to pay the principal of and the interest on outstanding revenue bonds of the port authority issued in respect of such project as the same shall become due and payable, and (3) to create and maintain reserves required or provided for in

---

[18] Conn. Gen. Stat. § 7-329i provides, in relevant part, "The port authority is authorized to fix, revise, charge and collect rates, rents, fees and charges for the use of and for the services furnished or to be furnished by each project . . . ." Conn Gen. Stat. § 7-329i (1999).

> any resolution authorizing, or trust agreement securing, such revenue bonds of the port authority.

Conn. Gen. Stat. § 7-329i.

Significantly, the statute defines "project" broadly as "the acquisition, purchase, construction, reconstruction, improvement or extension of a port facility." Conn. Gen. Stat. § 7-329b(2). Moreover, it authorizes the Port Authority to fix, revise, charge and collect rates, rents, fees and charges for the use of and for the services furnished or to be furnished by each project . . . ." Id. § 7-329i. Thus, despite plaintiffs' allegations that the statute narrowly restricts the Port Authority's power to impose fees, the statute actually provides that the Port Authority is authorized to charge fees for the *current* or *future use* or *services* from any "project," which includes the construction, reconstruction or improvement of any port facility. A port facility, in turn, may include any "propert[y], structure[] or other facilit[y] . . . desirable for commerce . . . or waterfront development within a district . . . ." Id. §§ 7-329i, 7-329b(2),(4).

The Port Authority's many activities, which are documented in the record, come well within this broad mandate. For example, these provisions authorize the Port Authority to charge for maintenance of the ferry terminal and the many services to the ferry passengers it administers through the ferry terminal, which was one of its first "projects."

In addition, the Port Authority's many grant-funded development efforts, such as the BRMC, the high-speed ferry, the barge feeder project, and the dredging of Bridgeport Harbor qualify as "projects," because those facilities are "desirable for commerce . . . or waterfront development" within the Port of Bridgeport. As such, the Port Authority may charge fees for the "current or future use or services" from such projects. Moreover, such fees must "pay the cost of maintaining, repairing and operating the project, . . . to the extent that the payment of such cost has not otherwise been adequately provided for." Id. § 7-329i. In other words, these sections

authorize the Port Authority to charge a user fee for the future use of its largely grant-funded

projects, and that user fee should be sufficient to pay for development costs that are not provided

for by grants.  Thus, to the extent the court determines that the passenger fee has been used to

cover overhead associated with grant-related activities, such use of the passenger fee is

authorized by Connecticut General Statutes §§ 7-329i, 7-329b(2),(4).

   C.     **The passenger fee is not an "unfair trade practice" under the Connecticut
          Unfair Trade Practices Act.  (Count VIII)[19]**

   Plaintiffs claim that the Port Authority violates the Connecticut Unfair Trade Practices

Act, Conn. Gen. Stat. § 42-110a, *et seq*. ("CUTPA"), by the imposition of the passenger fee, the

use of the proceeds for purposes unrelated to maintenance of ferry-related facilities and services,

and the collection of the passenger fee only from the Ferry Company and its passengers and not

from other vessels, persons, or entities.

   CUTPA is designed to ensure that no person or entity engages in unfair methods of

competition, or unfair or deceptive practices in the course of trade or commerce.  See Conn. Gen.

Stat. § 42-110b(a).  To succeed on their CUTPA claim, Plaintiffs must prove: (1) that the

conduct constitutes an unfair or deceptive trade practice; and (2) a basis for a reasonable estimate

of damages.  See Chem-Tek v. General Motors Corp., 816 F.Supp. 123, 130 (D.Conn. 1993).

   To prove that the Port Authority engaged in a deceptive trade practice under CUTPA,

plaintiffs must identify "an act or practice" by the Port Authority that "has a tendency or capacity

to deceive."  See Bailey Employment System v. Hahn, 545 F.Supp. 62, 67 (D.Conn. 1982).

Plaintiffs have offered no evidence of such an "act or practice."

---

[19] Plaintiffs voluntarily dismissed Count VII of their Amended Complaint prior to trial.

Thus, plaintiffs must establish that the passenger fee qualifies as an "unfair," rather than "deceptive" trade practice under CUTPA.  To prove that the passenger fee is an "unfair" trade practice under CUTPA, plaintiffs must establish by a preponderance of the evidence that the imposition of the passenger fee (1) offends public policy as set forth by statute, common law, or some other established conduct of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and/or (3) causes substantial injury to consumers, competitors or businessmen. See Chem-Tek, 816 F.Supp. at 130; see also Eadie v. McMahon & Titan Sports, Inc., 1997 WL 289679, at *17 (D.Conn. 1997).  Unfair practices do not have to satisfy all elements of the three-part Chem-Tek test.  See Eadie, 1997 WL 289679, at *17.  Rather, a practice might be unfair if it is a serious violation of any one criterion.  See id.

As a general matter, the Port Authority's collection of the passenger fee does not offend public policy, and plaintiffs have failed to demonstrate that the passenger fee violates any statutory or common law principle of fairness.  On the contrary, as laid out above, the Port Authority's imposition of and use of the passenger fee is authorized under Connecticut statute and common law, federal statute and the United States Constitution.  Specifically, neither law nor public policy prohibits charging the passengers a user fee at the same time that the Ferry Company pays rent under its lease, as discussed above.  See supra Conclusions of Law Section III.A.  Nor does it offend law or public policy for the Port Authority to charge a user fee of the ferry passengers while exempting other users of the port from similar fees.  See supra Conclusions of Law Section I.A.1.

Tellingly, the CUTPA portion of plaintiffs' complaint does not identify any law or public policy offended by the passenger fee except the public policy of "encourag[ing] the use of ferries."  Amended Compl. ¶ 115.  Presuming that such a public policy exists, the Port

Authority's activities have in fact supported this public policy by encouraging the use of ferries in general, and specifically encouraging the use of the ferries operated by the Ferry Company. The Port Authority has used the passenger fee to offer passengers improved access to the ferry, safety and comfort while waiting for the ferry, and the promise of an enhanced parking facility, as well as the benefit of all the improvements the Port Authority has effected elsewhere in the port. These improvements have encouraged the use of the ferry such that the Ferry Company has increased its ridership substantially since the establishment of the Port Authority. Moreover, the Port Authority used the passenger fee to bring about improvements to the access road, which have enabled the Ferry Company to increase capacity and efficiency to keep up with increased passenger demand. The effect of all these improvements funded by the passenger fee has been to encourage and enhance an enormous increase in ferry ridership over the 13 years the Port Authority has been in existence. As such, the passenger fee does not offend, and in fact supports, the asserted public policy "encourag[ing] the use of ferries."

Moreover, the Port Authority's practice of charging a user fee is not "immoral, unethical, oppressive, or unscrupulous." Chem-Tek, 816 F.Supp. at 130. There is nothing oppressive or unscrupulous in the manner in which the Port Authority imposes or collects the passenger fee, as its amount has always been clearly published in the Ferry Company's own tariff schedules, and its collection has been the subject of arms-length negotiations with the Ferry Company. See supra Findings of Fact 220, 238-39. Moreover, imposition of a user fee is an established business practice among port authorities, and is justified in part by concern for leaseholders like the Ferry Company. See supra Finding of Fact 21. Indeed, nothing in the record establishes any immoral or unethical activity on the part of the Port Authority. Consistent with that conclusion,

this Court has held that the "the Port Authority has proven to be fiscally reliable and responsible." Order Denying Preliminary Injunction, April 15, 2004.

Finally, neither the Ferry Company, nor its passengers, nor consumers in general have been substantially injured by any aspect of the Port Authority's business conduct, including imposition of the passenger fee. To meet the "substantial injury" prong of CUTPA liability, the injury must satisfy all of the following criteria: "1) it must be substantial; 2) it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and 3) it must be an injury that consumers themselves could not have reasonably avoided." Chem-Tek, 816 F.Supp. at 130.

Plaintiffs are not substantially injured by imposition of the wharfage charge. Any harm that the plaintiffs allege in their Amended Complaint is not only unproven, see supra Findings of Fact Section VIII, it is also outweighed by the countervailing significant benefits they receive as a result of the services and facilities funded by the charge. These services and facilities have encouraged a steady and substantial increase in demand for ferry services over the Port Authority's lifetime. In light of this increased demand for the ferry, the Ferry Company's claim of "substantial injury" is particularly weak, given that the Ferry Company does not in fact pay the passenger fee, and in fact retains a portion of the income the fee generates.

Plaintiffs' complaint culminates in a request for punitive damages and attorney fees under CUTPA. See Amended Compl. p. 23. Fundamentally, to be awarded either type of damages, plaintiffs must prevail in their underlying CUTPA claim, which they cannot. In addition, punitive damages may be awarded on a CUTPA claim only if the evidence "reveal[s] a reckless indifference to the rights of others or an intentional and wanton violation of those rights." See Fabri v. United Technologies Intern., 387 F.3d 109, 124 (2d Cir. 2004) (exercising remittitur on

punitive damages award under CUTPA) (citing <u>Gargano v. Heyman</u>, 525 A.2d 1343, 1347 (Ct. 1987)).  "In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence."  <u>Gargano v. Heyman</u>, 525 A.2d 1343, 1347 (Ct. 1987).  No set of facts in the record could justify finding that the Port Authority has acted "wantonly," "maliciously," with "evil motive," or "violence."  As such, plaintiffs' plea for punitive damages must fail even if they somehow prevail on their underlying CUTPA claim.

Finally, CUTPA provides that the trial court "may award, to the plaintiff, . . . costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery."  Conn. Gen. Stat. § 42- 110g(d).  An award of attorney's fees is committed to the discretion of the trial court, "and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done."  <u>Gargano</u>, 525 A.2d at 1347, <u>cited in</u> <u>Fabri</u>, 387 F.3d at 128-29.  On the basis of the evidence before the Court, it would be an injustice to award attorneys' fees to the plaintiffs even if they could prevail on their underlying CUTPA claim.

## CONCLUSION

Based upon the foregoing, plaintiffs have failed to establish that the Port Authority's passenger fee violates any provision of constitutional law, federal statute, or Connecticut law. Accordingly, the Port Authority respectfully requests that this Court deny plaintiffs' claims in their entirety and award the Port Authority judgment in its favor as well as such other relief as the Court deems just and proper.

Dated:  September 1, 2006

Respectfully submitted,


MURTHA CULLINA LLP

    Richard L. Rose, #CT23291
    177 Broad Street
    Stamford, CT  06901
    203-653-5400
    Fax 203-653-5444
    rrose@murthalaw.com

    Everett E. Newton, #CT02508
    CityPlace I, 185 Asylum Street
    Hartford, Connecticut 06103-3469
    860-240-6000
    Fax 860-240-6150
    enewton@murthalaw.com

THOMPSON COBURN LLP


By_____

    Edward J. Sheppard, #CT24760
    1909 K Street, NW, #600
    Washington, DC 20006
    202-585-6900
    Fax 202-585-6969
    esheppard@thompsoncoburn.com

    Timothy F. Noelker, #CT26291
    Mary Catherine Hodes, #phv01235
    One US Bank Plaza
    St. Louis, Missouri 63101
    314-552-6091
    Fax 314-552-7091
    tnoelker@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port
Authority