UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY, ET AL.,

CASE NO. 3:03 CV 599 (CFD)

Plaintiffs,

- against -

BRIDGEPORT PORT AUTHORITY,                September 22, 2006

Defendant.

_____/

**PLAINTIFFS' REPLY TO THE PORT AUTHORITY'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

AKERMAN SENTERFITT LLP
335 Madison Avenue, 26th Floor
New York, New York 10017
Tel. (212) 880-3800
Fax (212) 880-8965

*and*

COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821
Tel. (203) 368-0211
Fax (203) 576-8504

*Attorneys for Plaintiffs*

{NY005956;1}

## Table of Contents

Page

INTRODUCTION................................................................................................1

I.     THE FACTUAL RECORD

    A.    The Court's Ruling Should Be Based on the Facts and the Law,
        Not on its Overstated Potential Effect on the Port Authority....................................2

    B.    "Fiscal Responsibility" Cannot Absolve the Port Authority......................................4

    C.    Revenues from the Ferry Operation
        Fund *All* Port Authority Operations .......................................................6

    D.    Most Port Authority Activities Neither Relate to nor Benefit the Ferry...................6

    E.    The Port Authority's Expenses on Non-Ferry Projects Are Not "Minimal" .............8

    F.    The Port Authority Fails in its Efforts
        to Disavow Its Own Net Income Reports .................................................9

    G.    Ferry Ridership Has Increased *Independently* of the Port Authority.......................12

    H.    The Parking Garage Is Designed to Benefit
        the Port Authority, Not the Ferry Passengers...........................................14

    I.    The Ferry Company Lease Is At Fair Market Value..................................15

    J.    Schachter Properly Determined the Overcharge........................................15

    K.    The Port Authority Has Not Even Attempted
        to Justify Arnold's Phantom Capital Costs ..............................................18

    L.    The Ferry Company Clearly Has Been Damaged
        by the Excessive Passenger Fee ...........................................................18

    M.    D&D Has Established Its Damages .........................................................25

    N.    Zahradka's Prospective Claims Should Not Be Dismissed ................................26

    O.    Other Inaccuracies in the Port Authority's Proposed Findings of Fact ...................27

          •    Eligibility for government grants ................................................27

          •    Road traffic effect on ferry passengers from non-ferry projects ..................28

          •    BRMC revenues and expenses ...................................................29

          •    Dredging ..............................................................................29

## II.    LEGAL ISSUES

A.    The Commerce Clause ..................................................................................31

      1.    Excessiveness...............................................................................31

      2.    Deference to State Agencies .........................................................36

      3.    Past and Future Costs....................................................................37

      4.    "Costs" versus "Value"................................................................38

      5.    Fair Approximation of Use ...........................................................40

B.    The Rivers and Harbors Act ......................................................................41

C.    The Right to Travel....................................................................................43

D.    The Tonnage Clause ..................................................................................43

E.    The Connecticut Port Authorities Statute .................................................46

F.    Unjust Enrichment .....................................................................................49

G.    CUTPA ......................................................................................................50

**CONCLUSION** ..........................................................................................................52

**APPENDIX A – SUMMARY RESPONSES TO THE PORT
AUTHORITY'S NUMBERED PROPOSED FINDINGS OF FACT** ......................................A-1

CERTIFICATE OF E-SERVICE ...........................................................................last page

## Table of Authorities

**Page**

**Cases**

Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.,
906 F.2d 516 (11th Cir. 1990) ............................................................... 35

American Trucking Associations, Inc. v. Scheiner,
483 U.S. 266, 107 S.Ct. 2829 (1987) ..................................................... 38

Automobile Club of New York, Inc. v. Port Auth. of New York and New Jersey,
706 F. Supp. 264 (S.D.N.Y. 1989) ......................................................... 33

Automobile Club of New York, Inc. v. Port Auth. of New Yorkand New Jersey,
887 F.2d 417 (2d Cir. 1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168 (1990).......................... 33

Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority,
335 F. Supp. 2d 275 (D. Conn. 2004) ..................................................... 46

Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority,
2004 WL 840140 (D. Conn., April 15, 2004) ............................................. 4

Callam County v. Dep't of Transp. of the State of Washington,
849 F.2d 424 (9th Cir. 1988) *cert. denied*, 488 U.S. 1008, 109 S.Ct. 790 (1989).......................... 39

Cargill v. Federal Maritime Commission, 530 F.2d 1062 (D.C. Cir. 1976)................. 36

Center for Auto Safety v. Athey, 37 F.3d 139 (4th Cir. 1994) ......................... 35

Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744 (1939)........................... 38

Clyde Mallory Lines v. Alabama, 296 U.S. 261, 56 S.Ct. 194 (1935).................... 43

Connecticut Ex Rel. Blumenthal v. Crotty, 346 U.S. 84 (2d Cir. 2003) ................. 49

DeBartolo Corp. v. Fla. Gulf Coast Trades Council,
485 U.S. 568, 108 S.Ct. 1392 (1988)...................................................... 49

Evans Cooperage Co. v. Board of Commissioners of the Port of New Orleans,
6 F.M.B. 415 (1961) ....................................................................... 35

Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.,
405 U.S. 707, 92 S.Ct. 1349 (1972)....................................................31-33

Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,
231 Conn. 276, 283 A.2d 518 (1994) ..................................................... 49

Hawaiian Navigable Waters Preservation Soc. v. State of Hawaii,
823 F. Supp. 766 (D. Hawaii 1993) ............................................................... 43

Hendrick v. Maryland, 235 U.S. 610 (1915) ................................................... 36

Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439 (1937)......................................... 38

In re Texaco, Inc., 254 B.R. 536 (Bankr. S.D.N.Y. 2000)................................. 4

Massachusetts v. United States, 435 U.S. 444 (1977) ...................................... 37

New Orleans S.S. Ass'n v. Plaquemines Port, Harbor and Terminal Dist.,
874 F.2d 1018 (5th Cir. 1989) ......................................................................... 38

Northwest Airlines, Inc. v. County of Kent, Mich.,
510 U.S. 355, 114 S.Ct. 855 (1994).......................................................... 38, 40

Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 107 S.Ct. 1519 (1987). ...................... 4

Plaquemines Port, Harbor and Terminal Dist. v. FMC,
838 F.2d 536 (D.C. Cir. 1988)......................................................................... 45

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001)........................ 5

U.S. Shoe Corp. v. United States, 114 F.3d 1564 (Fed. Cir. 1997)............... 39, 40

Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,
390 U.S. 261, 88 S.Ct. 929 281 (1968)........................................................... 35

Wallach v. Brezenoff, 930 F.2d 1070 (3d Cir. 1991) ....................................... 33

Western Oil and Gas Association v. Cory, 726 F.2d 1340 (9th Cir. 1984) ....... 36

**Constitution, Statutes and Rules**

Conn. Gen. Stat. §§ 7-329a to 7-329u (port authorities enabling statute):

    § 7-329b(4).................................................................................... 46
    § 7-329c(10)................................................................................46-47
    § 7-329i ................................................................................46, 47-48

Conn. Gen. Stat. §§ 42-110a et seq. (Conn. Unfair Trade Practices Act) ("CUTPA").................. 50

Federal-Aid Highway Act of 1956, as amended, 23 U.S.C. § 101 *et seq.*

23 U.S.C. § 129(c)(4)..............................................................................................39
23 U.S.C. § 129(a)(3)..............................................................................................39

Maritime Transportation Security Act of 2002, Pub. L. 107-295 (Nov. 25, 2002) ........................ 41

Rivers and Harbors Appropriation Act of 1884, as amended, 33 U.S.C. § 5(b) ........................41-43

Shipping Act, 1916, as mended, 46 U.S.C. § 801 *et seq.* ........................................................ 35, 36

U.S. Constitution

Art. I, § 8, clause 3 (Commerce Clause).........................................................31-41

Art. I, § 10, clause 3 (Tonnage Clause) .........................................................43-46

# INTRODUCTION[1]

The Port Authority proposes a highly skewed, and incorrect, view of both a key fact issue and a central legal issue in this case. Factually, it claims, against the objective evidence and all common sense, that *all* Port Authority activities throughout the port district somehow relate to or benefit the ferry operation (Def. PFC ¶ 128 [citing Riccio and Oppel testimony]). Under this extreme view, everything and anything the Port Authority does – Riccio's monthly car washes (Tr. 283:2-10 [Riccio]), his frequent trips to places like St. Thomas for a "cruise ship seminar" (Tr. 565:19 to 566:19 [Savino]), a commercial barge shipping project, and numerous other non-ferry activities (*see generally* Pl. PFF ¶¶ 69-159) – relates to or benefits the ferry operation and, therefore, justifies its being funded by the Passenger Fee. There is no factual justification for forcing the ferry passenger to pay essentially all operating costs of *all* Port Authority activities, most of which are located away from the Dock, to which the ferry operation is confined.

Legally, the Port Authority interprets federal law to allow a state agency essentially unfettered leeway to charge user fees, so long as the total revenue from the fees does not exceed the agency's overall costs – whether or not the costs are logically connected to the facilities it provides to the fee payers (Def. PFC pp. 61-64 [discussing Commerce Clause cases]). The Port Authority misinterprets the cases to argue that the Passenger Fee is not excessive simply because the Port Authority spends all of the funds it collects from the Passenger Fee (*see, e.g.*, Def. PFC p. 64 ["the total amount the Port Authority collects through the passenger fee does not exceed the

---

[1] We use the same abbreviations as in Plaintiffs' Proposed Findings of Fact and Conclusions of Law dated September 1, 2006 ("**Pl. PFC**") (*see id.* at p. 3, n.1). In addition: "**Pl. PFF**" means plaintiffs' proposed findings of fact in Pl. PFC; "**Pl. PCL**" means plaintiffs' proposed conclusions of law in Pl. PFC; and "**Def. PFC**" means Defendant's Proposed Findings of Fact and Conclusions of Law dated September 1, 2006. "**Reply**" means this reply.

Port Authority's expenses for developing the port"]).  Under this misreading of the law, the Port Authority could legally triple the Passenger Fee tomorrow, so long as it found ways to spend the funds on some new project to "develop the port" – for example to build a skyscraper on the BRMC or a commercial terminal on Steel Point – whether or not the project had any real connection to the Dock or the ferry operation.  That is not the correct legal standard.

In Part I below, we address the principal areas of factual dispute, arranged by topic.  In Part II, we address the legal issues.  In the Appendix, we provide summary responses to each of the Port Authority's numbered proposed findings of fact, with citations to the portions of the record or of plaintiffs' post-trial submissions at which the subject at issue is discussed.

## I.    THE FACTUAL RECORD[2]

### A.    The Court's Ruling Should Be Based on the Facts and the Law, Not on its Overstated Potential Effect on the Port Authority

1.    The Port Authority ominously warns that, if the Passenger Fee were eliminated, "the Port Authority would be unable to continue providing services for the ferry passengers and the other users of the Port, and would likely be forced out of existence" (Def. PFC ¶ 225).

2.    This statement is a blatant attempt to influence the Court's ruling by an appeal to a dubious and irrelevant factor.  The Court's ruling is bound to have a profound effect on both sides – for example, a ruling against plaintiffs would give the Port Authority *carte blanche* to continue funding all its operations from the Passenger Fee and to raise it whenever it needed more funds.  The Court nevertheless should base its decision on the facts and the applicable law, not on a potential, and unproven, effect of its ruling.

---

[2]    *See also* Appendix A hereto, which contains summary responses to each of the Port Authority's 268 proposed findings of fact.

3.      The Port Authority's statement is unproven hyperbole.  As support, it cites:  (a) very brief testimony of Freimuth, and (b) Verrilli testimony concerning a footnote to the Port Authority's audited financial statements.  Freimuth's entire cited testimony was:

> Q.      Do you have an opinion of what would happen if this wharfage charge, this passenger tariff, were removed?
>
> A.      I'm not sure the ferry terminal and dock program could maintain itself.

(Tr. 37:4-7 [Freimuth].)

4.      This merely shows that Freimuth was "not sure" what would happen "to the terminal and dock program" if the Passenger Fee were *entirely removed*.  But plaintiffs seek, not the elimination of the Passenger Fee outright, but rather its substantial reduction.  Further, Freimuth comments only on the terminal and dock program, not the Port Authority itself.

5.      The footnote, which has appeared in the Port Authority's financial statements each year since 1995 (Tr. 66:3-9 [Verrilli]), states:

> Substantially all tariff revenues were generated from one user of the port facility, and the loss of this customer would have a material adverse effect [on] the operations of the Authority.

(Pl. Ex. 11A, at BPA 1000024, n.12 [2004 financials]; *see also*, *e.g.*, Pl. Ex. 3, p. 8, n.12 [1995 financials].)

6.      The footnote also addresses the possible loss of the customer *outright*, not a reduction of the tariff revenue from that one customer.

7.      A ruling by the Court in favor of plaintiffs need not bankrupt the Port Authority. In the event of such a ruling, the Port Authority would need to do what any entity, public or private, must do on a daily basis in order to stay in business:  reduce expenses to match revenues, or find other, legitimate, sources of revenue to support its expenses.

8.    Plaintiffs do not dispute that the Port Authority may charge a Passenger Fee *to the extent that it is based on the Port Authority's reasonable cost of the facilities and services it actually provides to the ferry operation*.  Reduction of the Passenger Fee to that extent would not, by definition, affect the Port Authority's ability to continue providing services to the ferry operation.  What it would affect is the Port Authority's ability to conduct its other activities, away from the Dock and not related to the ferry operation, without finding a way to fund those activities from sources other than the ferry operation.

9.    Therefore, the Court should not be swayed by the Port Authority's appeal based on the supposedly dire consequences that would befall it if the Court ruled in plaintiffs' favor.[3]

## B.    "Fiscal Responsibility" Cannot Absolve the Port Authority

10.    At least four times in its submission, the Port Authority cites, like a mantra, this Court's statement in its April 15, 2004, decision, that the Port Authority has been "fiscally reliable and responsible" (Def. PFC ¶¶ 53, 57, pp. 80, 88-89).  But fiscal responsibility cannot absolve the Port Authority from liability for charging excessive Passenger Fees.

11.    The Court's statement must be seen in the context in which it was made.[4]  The Court based its statement on limited testimony in connection with plaintiffs' motion for a preliminary injunction concerning a 50-cent surcharge to the Passenger Fee.  The Court was

---

[3]   Even when consequences may be dire, courts are bound to apply the law, as the Supreme Court did, for example, in the Texaco-Pennzoil case, holding that federal courts should have abstained from a case filed by Texaco seeking to enjoin enforcement of a $10.5 billion judgment against it pending appeal, absent which it would have no choice but to file for bankruptcy given its inability to post a bond for that amount.  Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 107 S.Ct. 1519 (1987).  *See also* In re Texaco, Inc., 254 B.R. 536, 541 (Bankr. S.D.N.Y. 2000) ("Texaco filed under Chapter 11 for the sole purpose of compromising a $10.5 billion judgment").

[4]   The ruling is available on Westlaw, Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 2004 WL 840140 (D. Conn., April 15, 2004) (the "April 15, 2004 Ruling").  The phrase "fiscally reliable and responsible" appears at *2.

weighing whether plaintiffs would be *irreparably harmed* by the surcharge.  Plaintiffs argued that the Port Authority could become insolvent and, therefore, unable to repay the surcharge. The Court acknowledged that the Passenger Fee at issue in this litigation constitutes "a significant portion of the Port Authority's budget," but pointed to the federal grants that the Port Authority also has received, to the regular audits of its finances (including grants), and to its financial stability, in stating that it has been "fiscally reliable and responsible."  April 15, 2004 Ruling at *2.  It therefore concluded that plaintiffs did not establish a likelihood of irreparable harm, in the event the Court found the surcharge to be unlawful, based on the Port Authority's potential insolvency.  *Id.*

12.    Ironically, now it is not the plaintiffs but the Port Authority that warns that, if the Passenger Fee were eliminated, the Port Authority "would likely be forced out of existence." (Def. PFC ¶ 225, discussed in ¶¶ 1-9 above.)

13.    However, the Port Authority's "fiscal responsibility" is not at issue in this case. The Court does not have to find that the Port Authority has been fiscally irresponsible in order to conclude that the Passenger Fee has been excessive.  Fiscally responsible entities can, and often do, violate the law or others' rights, and are held legally accountable for it.[5]  Similarly here, that the Port Authority may be "fiscally responsible" would not absolve it from liability if the Court concludes, as its should, that the Passenger Fee has been legally excessive.

---

[5]   For example, when Microsoft Corporation was held liable for antitrust law violations, no one suggested that its financial statements were deceptive, or that Microsoft otherwise had been fiscally irresponsible.  *See* <u>United States v. Microsoft Corp.</u>, 253 F.3d 34 (D.C. Cir. 2001).

**C.     Revenues from the Ferry Operation**
       **Fund *All* Port Authority Operations**

14.     The Port Authority concedes that the revenues it receives from the Ferry

Operation – the Passenger Fee and the Ferry Company lease rentals – fund substantially *all* of

the Port Authority's operations (Def. PFC ¶¶ 224, 222; *see also* Pl. PFF ¶¶ 163-166).

15.     Other funding for Port Authority activities either has consisted of government

grants for ferry- and non ferry-related capital projects (Def. PFC ¶¶ 22, 141, 148, 177), or has

been *de minimis* (*see* Def. PFC ¶ 211, Pl. PFF ¶¶ 100-104 [Derecktor lease rental and

management fee]; Pl. PFF ¶ 166 [non-Ferry dock fees]).

**D.     Most Port Authority Activities Neither Relate to nor Benefit the Ferry**

16.     The Port Authority continues to maintain, contrary to objective evidence and

common sense, that *all* its activities relate to or benefit the Ferry Company or its passengers

(*e.g.*, Def. PFC  ¶ 128 ["all the Port Authority's activities 'relate to' the ferry"]).

17.     The "evidence" that the Port Authority cites for this proposition consists entirely

of self-serving testimony by Port Authority officials (*e.g.*, Tr. 339:22-24 [Riccio] ["I think

anything that helps business and commerce in the State of Connecticut is going to indirectly

benefit the ferry passengers]; Joint Ex. 2 at 110:21 to 112:10, 138:10 to 139:3 [Oppel]; *see also*

*id.* at 139:9-18 [Oppel] ["Any economic stimulus that provided jobs, and brought more tourism

into that area [the community at large] would have been a benefit"]; and Tr. 276:15-22 [Riccio]).

18.     Port Authority officials repeatedly admitted at trial, however, that its activities

away from the Dock do not relate to or benefit the ferry operation (*see* Pl. PFF ¶¶ 77 [Steel

Point]; 82 [Cartech]; 93 [BRMC]; 107 [Derecktor]; 117 [high speed ferry]; 127 [barge feeder

service]; 136 [FTZ]; 157(f) [sports tickets]).

19.     Furthermore*, it is undisputed on the record that the Port Authority provides no facilities or services to the Ferry Company or its passengers at any location other than the Dock* (Pl. PFF ¶ 185 [citing testimony of Verrilli, Hall, Deak and Riccio]).

20.     Given the overwhelming evidence of the Port Authority's extensive non-Dock activities (*see* Pl. PFF ¶¶ 69-159), the Port Authority has no alternative but to argue – in conclusory fashion and against all common sense – that projects such as the BRMC, Derecktor, the barge feeder service, and the high speed ferry (among many others), somehow "relate to" or "benefit" the ferry operation.[6]

21.     The explanations by Port Authority officials of *how* its far-flung activities benefit the ferry operation make no sense and are legally inadequate.  For example, Port Authority officials say that the barge feeder service and the high speed ferry will benefit ferry passengers by reducing highway traffic, but they do not explain how.  Simple analysis shows that this claim is specious (*see* ¶¶ 94-97 below).

22.     Port Authority officials also claim that dredging the harbor will benefit the ferry operation, but that claim, too, does not withstand analysis and is contrary to fact (*see* ¶¶ 101-102 below).

23.     Yet another explanation offered by Port Authority officials is that their non-Dock projects beautify the port, and thus ferry passengers benefit from the "aesthetic experience of traveling through the port" (Def. PFC p. 77); this presumably would include, for example, looking out from the ferryboat and seeing the Derecktor shipyard at the BRMC, instead of vacant

---

[6]   The Port Authority mentions several, but by no means all, of its non-ferry activities.  *Compare* Def. PFC, Proposed Findings of Fact, sections F through M, *with* Pl. PFF section L, especially ¶¶ 154-159 ("Projects Affecting Land," "Other Non Ferry-Related Activities and Expenses," and 2004-2006 activities).

land.  But improvements in aesthetics – assuming a shipyard is an aesthetic improvement over vacant land – like other "improvements" away from the Dock, can be said to benefit the ferry passenger only in the sense that they benefit *the entire Bridgeport community* (*see also* Tr. 37:17 to 38:14 [Freimuth] [FTZ, barge feeder service, and other non-ferry projects benefit the City and "the entire community"].)  These projects are too remote from the ferry operation, factually and legally, to justify their being funded from the Passenger Fee.  (*See* Legal Issues, below, Point A.)

24.     In its September 1 submission, the Port Authority discusses several, but by no means all, of its non-ferry activities.[7]  The nonsensical nature of the Port Authority's position that *all* its activities benefit the ferry operation or its passengers is illustrated by some of the projects it fails to mention, to which the Port Authority has devoted personnel time and overhead, including:  a methanol plant, a dog kennel, an emission testing facility, a paper recycling plant, an asphalt manufacturing plant, an automobile and marine service facility; and a commercial laundry.  (Pl. PFF ¶¶ 154-158.)

25.     Far from benefiting the ferry operation, the Port Authority's extensive activities away from the Dock *hurt* the ferry operation, because, through the Passenger Fee, the Port Authority compels ferry passengers, and therefore the ferry operation as a whole, to fund those projects, which are completely unrelated to the ferry operation.

E.     **The Port Authority's Expenses on Non-Ferry Projects Are Not "Minimal"**

26.     Repeatedly, the Port Authority states that it has incurred only "minimal" operating expenses in connection with its non-ferry projects (Def. PFC ¶¶ 178, 184, 189, 197).

---

[7]     *Compare* Def. PFC, Proposed Findings of Fact, sections F through M, *with* Pl. PFF section L, especially ¶¶ 154-159 ["Projects Affecting Land," "Other Non Ferry-Related Activities and Expenses," and 2004-2006 activities].

27.     To the contrary, the Port Authority's operating expenses on the non-ferry projects

have been substantial, not minimal.  They include:

(a)     Large portions of Riccio's, Klimas's and Johnson's time, and therefore, of

their salaries, including pension, health insurance, and other benefits.  (Pl. PFF ¶¶ 76

[Steel Point], 81, 91 [Cartech], 84-85, 90 [BRMC], 106 [Derecktor], 115 [high speed

ferry], 125 [barge feeder service], 134 [FTZ].)

(b)     Travel expenses of Riccio, Klimas and Savino, most of whose trips have

been in connection with the barge feeder service, the high speed ferry project, and the

FTZ.  (Pl. PFF ¶¶ 110-111, 119-121, 157(k).)

(c)     Marketing and advertising, most of which has been devoted to the BRMC,

Derecktor and commercial shipping, *e.g.*, at the Cilco terminal.  (Pl. PFF ¶¶ 113, 141,

212(b).)

(d)     Legal and accounting fees (other than in connection with this litigation).

(Pl. PFF ¶¶ 97, 212(e).)

(e)     Overhead, including insurance, telephone, utilities and supplies.  (Pl. PFF

¶¶ 157(g), 157(i), 157(j), 157(l), 157(m).)

28.     These expenses on non ferry-related projects have accounted for a very

substantial share of the Port Authority's operating expenses each year, as reflected in its financial

records and Schachter's analysis.  (Pl. PFF ¶¶ 202-221.)

**F.     The Port Authority Fails in its Efforts to Disavow Its Own Net Income Reports**

29.     Predictably, the Port Authority tries to disavow its own Net Income Reports (Def.

PFC ¶¶ 45-52; *see also* Pl. PFF ¶¶ ).

30.     The Net Income Reports set forth, for each year from 1993 to date: (a) the Port Authority's Passenger Fee income *from the Dock*, and (b) the share of the Port Authority's expenses attributable *to the Dock* (Pl. Ex's 15-25 and 25A).

31.     The Port Authority *must* try to disavow its own Net Income Reports, because they show that the Port Authority's Dock-related expenses each year have been substantially less than its Passenger Fee income (although the difference is not as large as that found by Schachter; *compare* Pl. PFF ¶¶ 206-209 [Model 1] *with* ¶¶ 210-221 [Models 2 and 3]).

32.     Plaintiffs already have shown in their initial submission that, contrary to the Port Authority's *post hoc* arguments, the Net Income Reports do reflect an effort by the Port Authority to allocate its expenses between those related to the Dock and those not so related (*see* Pl. PFF ¶¶ 199-201).

33.     Additionally, the Port Authority witnesses who testified that the Net Income Reports do not mean what they say – Riccio and Verrilli – were not present when the Port Authority and its auditors created the Net Income Reports.  The initial reports and allocations were prepared in 1993 and 1994 by Edward Oppel (the Port Authority's first Executive Director); he sent them for review to Jerome Baron (then the City's Director of Finance); and they were audited by Ray Schwarz (the lead outside auditor at that time).  Riccio and Verrilli did not become involved with the Port Authority until 1996 (Tr. 122:10-17, 298:23 to 300:25 [Riccio]; Tr. 41:10-12 [Verrilli]).

34.     Oppel testified that, in creating the Net Income Reports, he intended "to allocate some of the expenses of the Port Authority from 1993 to those . . . activities that did not relate to the Union Square Dock" (Oppel Dep. 50:9-20).

35.     Baron claimed to have no recollection of the allocations in the Net Income Reports or of any discussions with Oppel or anyone else concerning that topic (Baron Dep. 21:11 to 22:13; 27:9-21; 29:18 to 30:1; 30:11-15; 30:21 to 31:5; 42:20 to 44:14).

36.     Schwartz did not testify, but his written communication and handwritten notes of his conversation with Oppel, in which he confirmed the allocations for the second year, 1994, were admitted into evidence (Pl. PFF ¶ 193; Pl. Ex. 16).

37.     None of the Port Authority witnesses who now disavow the Net Income Reports, based on a supposed but vague oral agreement between the Port Authority and the City, was a party to any conversation with any City official concerning such a supposed agreement.  (Tr. 243:16-19 [Riccio]; Tr. 45:19-21, 55:4 to 56:22 [Verrilli]; Tr. 574:20 to 575:22 [Savino, questioned by Court].)

38.     Riccio claims that he concluded that the Net Income Reports were flawed as soon as he learned of them, in 1996 (Tr. 246:2-6 [Riccio]).  Yet thereafter he made several changes to the allocations, without radically altering them (Pl. PFF ¶ 196 and table therein).

39.     Tellingly, Riccio explained that he did not scrap the supposedly flawed Net Income Reports because, if he did so and the City took notice, "[w]e could end up owing a lot more money" (Tr. 297:17 [Riccio]).  The only way that the Port Authority could end up owing more money to the City, based on its obligation to pay the City 15% of the net income from the Dock, would be if the Dock-related expenses were even *lower* than what the Port Authority has allocated to them in the Net Income Reports – as Schachter concluded they should be.  Riccio thus implicitly conceded that, if the City examined the allocations in the Net Income Reports, it would find, as Schachter did, that the allocations of expense to the Dock are too high, and accordingly, that the payments to the City have been too low.

40.    The Net Income Reports are "flawed" only in the sense that they overstate the Port Authority's Dock-related expenses, and understate the amounts payable to the City.  The Net Income Reports thus represent, as Schachter concluded, "a base case, . . . the floor for the overcharge" (Tr. 772:1-3 [Schachter]).  They are written, contemporaneous and audited records of the Port Authority's own Dock expense allocations; the Court should not allow the Port Authority to disavow them now.

## G.    Ferry Ridership Has Increased *Independently* of the Port Authority

41.    The Port Authority contends that ferry usage has increased, and the Ferry Company therefore has thrived, because of the improvements that the Port Authority has made to the ferry operation, *i.e.*, the terminal building, the access road, and increased security and amenities at the Dock (Def. PFC ¶¶ 75-81).

42.    This contention is supported by no *objective* evidence; it is based solely on the say-so of the Port Authority's own officials (*see* record references in Def. PFF ¶¶ 77-78), and of its biased expert, Deak, who performed no study of this question (Tr. 729:18 to 730:6 [Deak]; *see also* Pl. PFF ¶¶ 262-267).  Deak nevertheless admitted, as did Klimas, that the most significant increase in ferry usage during the period they looked at (1997-2002) occurred in 1999 and 2000, and most likely resulted from the introduction of a new ferryboat in mid-1999, rather than from Port Authority improvements (Pl. PFF ¶ 263).

43.    *Objective* evidence shows that ferry use consistently has increased *both before and since* the Port Authority was established in 1993 (shaded years):

| Year | Number of Cars Carried | % Increase Over Prior Year |
|------|------------------------|----------------------------|
| 1985 | 119,165 | |
| 1986 | 167,898 | 40.90% |
| 1987 | 210,301 | 25.26% |
| 1988 | 214,021 | 1.77% |
| 1989 | 213,639 | -0.18% |
| 1990 | 232,950 | 9.04% |
| 1991 | 235,449 | 1.07% |
| 1992 | 248,074 | 5.36% |
| 1993 | 266,025 | 7.24% |
| 1994 | 282,843, | 6.32% |
| 1995 | 290,382 | 2.67% |
| 1996 | 295,505 | 1.76% |
| 1997 | 292,128 | -1.14% |
| 1998 | 302,698 | 3.62% |
| 1999 | 344,282 | 13.74% |
| 2000 | 392,066 | 13.88% |
| 2001 | 410,379 | 4.67% |
| 2002 | 427,139 | 4.08% |
| 2003 | 430,523 | 0.79% |
| 2004 | 452,234 | 5.04% |
| 2005 | 460,646 | 1.86% |

(Pl. Ex. 227; *see also* Pl. Ex. 239 [contemporaneous record from which Ex. 227 was compiled].)

44.     As the table shows, the most dramatic increases occurred when the Ferry

Company added new and bigger ferries, in 1986-87 and 1999-2000 (Pl. PFF ¶ 42(a), (d) and (e)).

There were two decreases, the more significant of which occurred in 1997, the year after the

terminal was completed and the Port Authority increased the Passenger Fee (Pl. PFF ¶¶ 17, 50).

45.     Plaintiffs do not dispute that improvements to the Dock – the terminal, the access road and dock repairs – have enhanced the ferry experience and contributed somewhat to the observed increases in ferry usage since 1993.  However, the objective evidence, as well as the testimony of Ferry Company witnesses and Rose, indicate that ferry traffic has increased consistently since well before the Port Authority was created, and largely *independently* of the Port Authority's ferry-related activities (Tr. 593:25 to 595:15 [McAllister] [increased ferry use driven by increases in capacity and frequency]; Tr. 390:25 to 391:14 [Rose] [rarely uses terminal building]).

**H.     The Parking Garage Is Designed to Benefit
the Port Authority, Not the Ferry Passengers**

46.     The Port Authority cites a parking garage on the Dock, still in the planning stages, as one of the significant improvements of the ferry operation justifying the Passenger Fee (Def. PFC ¶¶ 159-165).

47.     The evidence shows, however, that the Port Authority would be the main beneficiary of the garage, if and when it were completed.  Currently and historically, the Ferry Company has provided free parking for ferry passengers at various lots near the Dock, and has transported passengers to and from the lots, at no extra cost.  The Port Authority would charge ferry passengers between $6 and $8 a day (if not more), on top of the ferry fare and Passenger Fee, to park at the garage (Tr. 149:20 to 150:13 [Riccio]).  The Port Authority thus views and designed the garage as an additional source of revenue for the Port Authority which, like the Passenger Fee, would be funded by the ferry passenger.  (Tr. 147:21 to 150:16 [Riccio]; Tr. 971:16 to 972:1 [Arnold].)

## I.      The Ferry Company Lease Is At Fair Market Value

48.     The Port Authority now, finally, concedes that the Current Lease (including its extension) was entered into "after arms' length negotiations," and that it reflects "the fair market value of the Ferry Company's use of the facility [the Dock]" (Def. PFC ¶ 64; *see also* Pl. PFF ¶¶ 26-30).

49.     Although at trial the Port Authority tried to challenge George Shawah, plaintiffs' real estate expert, concerning the Dock's fair market value at the time the Current Lease was negotiated (Tr. 617:5 to 637:1 [extensive cross-examination of Shawah]), it now implicitly accepts his assessment of the property's value at that time and does not even mention Shawah in its September 1 submission.

50.     The Ferry Company pays fair market value for its use of the Dock facilities, which the Port Authority is contractually obligated to maintain (Pl. PFF ¶¶ 22, 24-25).  Yet the Port Authority "double dips" by citing these very facilities, and the cost of maintaining them, as partial justification for the excessive Passenger Fee (Pl. PFF ¶ 278(h) and (i)).

## J.      Schachter Properly Determined the Overcharge

51.     The Port Authority challenges each of the three models used by Schachter to analyze the Port Authority's ferry-related revenues and costs and compute the Overcharge (Def. PFC ¶¶ 102-121).  These challenges are unpersuasive.

52.     The challenge to both Models 1 and 2 is based on the claim that the allocations in the Port Authority's own Net Income Reports "do not reflect the Port Authority's actual use of resources" (Def. PFC ¶ 106-108).  This argument parallels the Port Authority's equally flawed argument that its own Net Income Reports do not mean what they say in black and white.

Plaintiffs have already refuted this argument in detail (Pl. PFF ¶¶ 199-201; *see also* ¶¶ 29-40 above).

53.     Further, as noted above, Riccio testified that he knowingly has continued to approve these reports each year, although he considered them flawed from the moment he first saw them in 1996, because, if he corrected them, the Port Authority "could end up owing a lot more money" to the City (Tr. 297:17 [Riccio]; *see also* ¶ 39 above).  Thus, in order to accept the Port Authority's argument, the Court would have to find that, throughout its 13-year existence, the Port Authority and its outside auditors have knowingly issued false statements of the revenues and costs attributable to the Dock, the effect of which has been to reduce the amounts that the Port Authority was contractually obligated to pay to the City.

54.     Thus, it was reasonable and proper for Schachter:

(a)     to *begin* his analysis of the Port Authority's revenues and costs attributable to the Dock (Model 1) by analyzing the Port Authority's own annual accounting of such revenues and costs, which were reviewed by the Port Authority's outside auditors, and which Schachter found in their audit files (Tr. 764:2-22 [Schachter]; *see also* Pl. PFF ¶¶ 206-209); and

(b)     to adjust certain of the allocations in the Net Income Reports (Model 2) based on Schachter's professional analysis of the factual record, including financial records, minutes of the Board of Commissioners' meetings, and depositions of Port Authority personnel (Tr. 764:23 to 765:5 [Schachter]; *see also* Pl. PFF ¶¶ 210-214).

55.     The Port Authority challenges Schachter's third model on the grounds that:  (a) Schachter supposedly exceeded "the terms of his engagement" (Def. PFC ¶ 112), and (b) he analyzed, not the facilities and services that the Port Authority actually has provided to the ferry

operation, but rather, "the vastly fewer facilities and services the Ferry Company claims it would have provided if it could have dispensed with the Port Authority" (*id.* ¶ 114). Neither ground is valid.

56.     Plaintiffs did not instruct or confine Schachter to perform his analysis in any given way. Schachter is an experienced forensic accountant (Pl. PFF ¶ 203), and he, not plaintiffs, determined how he performed his analysis. (Tr. 764:2 to 765:11 [Schachter's explanation of why he used three different models].)

57.     In his Model 3 analysis, Schachter eliminated certain costs, not at the whim of the Ferry Company (as the Port Authority claims), but only to the extent Schachter concluded, in his professional opinion, that they "were a result of the bureaucracy created by the Port Authority" (Pl. Ex. 66, ¶ 3.3 at p. 5), or needlessly duplicated costs already incurred, or functions already provided, by the Ferry Company. (Tr. 784:17 to 785:9; 786:17 to 787:12 [Schachter]; *see also* Pl. PFF ¶¶ 215-218 [summarizing Schachter's Model 3], and Pl. Ex. 218, ¶ 3.3 and Ex. 5.)

58.     For example, Schachter properly concluded that it is not reasonable for the Port Authority to incur the cost of liability insurance for the ferry operation at the Dock and fund that cost from the Passenger Fee, when the Current Lease requires the Ferry Company to provide, and the Ferry Company does provide, full and adequate liability insurance for the ferry operation at the Dock. (*See* Pl. PFF § 216(c).)

59.     Schachter also properly evaluated the personnel and other resources that the Ferry Company provides to operate the ferry at Bridgeport, and the extent to which they are needlessly duplicated by Port Authority personnel and resources (Pl. PFF ¶¶ 202-205).

60.     Schachter performed an independent, detailed and professional evaluation of the Port Authority's *reasonable* ferry-related costs and expenses, and of the Overcharge.

**K.    The Port Authority Has Not Even Attempted**
**to Justify Arnold's Phantom Capital Costs**

61.    The Port Authority relies on Arnold's analysis of ferry-related revenues and

expenses in arguing – in stark contrast to Schachter's analysis – that the value of the services it

provides to the ferry operation *exceeds* the revenues it takes in from the ferry operation (*i.e.*, the

Passenger Fee and Ferry Company leases) (Def. PFC ¶ 127).

62.    Arnold testified for most of a day and was cross-examined at length, especially

concerning his analysis of ferry-related costs and expenses (Tr. 821 to 979 [entire testimony]; *id.*

at 910:3 to 917:22, 922:3 to 947:5 [cross-examination on cost and expense analysis]).  Yet the

Port Authority devotes a mere half-page to this topic (Def. PFC ¶¶ 122-127), and does not even

attempt to deal with the weaknesses in Arnold's analysis as revealed at trial.

63.    The flaws in Arnold's analysis of ferry-related revenues and costs – especially

Arnold's inclusion in the Port Authority's "costs" of capital costs of $691,000 per year that the

Port Authority did not incur and are not reflected in its audited financial statements – were set

forth at length in plaintiffs initial submission (Pl. PFF ¶¶ 276-281), and will not be repeated here.

In its initial submission, the Port Authority did not even mention, much less justify, these

phantom costs.

**L.    The Ferry Company Clearly Has Been Damaged**
**by the Excessive Passenger Fee**

64.    The record as a whole clearly shows, contrary to the Port Authority's view, that

the Ferry Company has sustained monetary damages as a result of the excessive Passenger Fee.

65.    **Evidence of decreased ridership**.  The Port Authority wrongly claims that there

is "no evidence whatsoever of decreased ridership" caused by the Passenger Fee (Def. PFC

¶ 241).  Precisely such evidence was presented by the Port Authority's own experts, Deak and

Arnold, both of whom opined that, if the Passenger Fee had been less than what it was, the Ferry Company would have carried more vehicles and earned higher revenues and profits (Pl. PFF ¶ 232(a) and (b)).  That conclusion flows directly from the economic truism that, if price elasticity is greater than zero (which is undisputed), a decrease in cost raises demand, and vice versa.  Arnold graphically illustrated this fact in his own spreadsheet, which showed that, if the Passenger Fee for car and driver had been $1 instead of $2 in 2002, the Ferry Company would have carried an additional 7,522 vehicles, and earned an additional $284,000, without any significant increase in costs (Pl. PFF ¶ 232(a) and 233, citing Def. Ex's 217 and 67 [Arnold's spreadsheet and report] and testimony of Arnold and McAllister]).

66.     Ferry Company officials also testified that the Passenger Fee has decreased ridership.  (Pl. PFF ¶¶ 226, 228.)

67.     **Fact versus amount of damage**.  The few excerpts of testimony by McAllister and Hall that the Port Authority quotes (Def. PFC ¶¶ 241-244) – to argue that the Ferry Company has no specific evidence that it has sustained losses – show merely that the Ferry Company officials themselves did not try to *quantify* the loss of ridership or profits caused by the Overcharge.  But that does not mean that there was no such loss.  Hall, McAllister and Merritt all unequivocally testified that the Ferry Company lost revenues and profits by reason of the Passenger Fee:

(a)     Merritt testified that the Passenger Fee has "affected the Ferry Company's ability to earn a profit" (Tr. 110:20-22); that the Passenger Fee and the need to stay competitive with the Cross Sound Ferry causes the Ferry Company to leave "some excess cash on the table" (*id.* 111:2); and that if the Passenger Fee had been lower, the Ferry Company "would have had a much higher revenue and substantially higher profit" (*id.*

111:8-9), but that he has not personally tried to measure the amount of the loss (*id.* 111:15 to 112:1).

(b)     Hall testified that the Ferry Company has lost revenue or profit due to the Passenger Fee (Tr. 450:2-4); that if the Passenger Fee had been lower, "we would have raised them [our rates] higher.  There's no doubt in my mind" (*id.* 464:3-4); and that the Ferry Company lost profit because "we could have raised our rates and pocketed everything or, in the alternative, we could have left our rates low and attracted additional ridership because the rates were lower" (*id.* 449:17 to 450:9).

(c)     McAllister, when asked whether the ferry company has lost revenue or profit due to the Passenger Fee, answered "Absolutely" (Tr. 650:4-7); he testified that the Passenger Fee "either takes money out of our pockets or it reduces our traffic" (*id.* 642:20-21); that as a result of the Passenger Fee, "[w]e carry less people.  Less cars" (*id.* 649:22); and that the loss consists of the "[s]even to ten million dollars they've taken away from the ferry boat company" (*id.* 650:9-12) (*see also* Pl. PFF, ¶ 165 [table showing that Passenger Fee collections from 1993 through 2004 totaled over $9.5 million]).

68.     Thus, based on the testimony of Deak, Arnold, Merritt, Hall and McAllister, the *fact* that the Ferry Company was damaged by the Passenger Fee is indisputable.  Ferry Company officials did not *quantify* the loss; that was done by Schachter, who determined the Overcharge.

69.     **Measure of damages**.  As explained in plaintiffs' initial submission (Pl. PFF ¶¶ 234-237), the Ferry Company measures its damages based on the Overcharge, rather than on an economic model that would attempt to correlate elasticity and loss of ridership, because the economists (including the Port Authority's experts) were unable to determine a *precise* figure for

the elasticity of demand for this ferry service, although all agreed that it is greater than zero.

Thus, there is no doubt that a lower Passenger Fee would have resulted in higher profits for the

Ferry Company, through higher fares, increased ridership, or a combination of both.  The

Overcharge therefore represents the best available and a legally appropriate measure of the Ferry

Company's damages (*see* Pl. PCL section C.1, ¶¶ 52-59).

70.    The Port Authority claims that "[t]he passenger fee is particularly small relative to

the total cost of a ferry ticket" (Def. PFC ¶ 230).  There are three problems with this argument.

First, relative size is subjective; what may seem "small" to the Port Authority can be "large" to

the plaintiffs (*see* Tr. 399:13-16 [Rose]), especially when the supposedly small individual

charges aggregate to nearly $1.5 million annually (*see* table in Pl. PFF ¶ 165) .  Second, the ferry

ticket must be sufficient to pay for the substantial costs of running a ferry operation, including

fuel, salaries, rent, overhead and the considerable investments in the ferryboats (*see* Tr. 109:7-16

[Merritt]).  Third, and most importantly, any overcharge, whether large or small, is illegal, and

should be redressed.

71.    **Ferry fares and damages**.  The Port Authority argues that the Passenger Fee did

not harm the Ferry Company because, according to Deak and Arnold, the Ferry Company can

raise its own fares (as it has done) and earn more profits (Def. PFC ¶¶ 247-248).  Plaintiffs have

already pointed out the deep flaws in this position:  no matter how high the Ferry Company

might have raised its fares, it still would have lost the revenue resulting from the excessive

portion of the Passenger Fee (*see* Pl. PFF ¶¶ 268-271, 275).

72.    The Port Authority misrepresents the testimony concerning whether, and to what

extent, the Ferry Company would have raised its own fares if the Passenger Fee had been less

than it was, selectively quoting brief excerpts of testimony by McAllister and Merritt (Def. PFC ¶¶ 249-252). A more complete summary of this testimony is as follows:

(a)     Hall testified, "we would have raised them [our rates] higher. There's no doubt in my mind" (Tr. 464:3-4).

(b)     McAllister, on the other hand, testified that he tries to keep Ferry Company fares as low as possible (Tr. 641:17-18), and therefore, "I would have set them the same. However, if I did raise them to what their tax is I would have pocketed that money" (Tr. 650:1-3).

(c)     Merritt "personally" does not consider the Passenger Fee, but he made clear that, because of the Passenger fee, the Ferry Company leaves "some excess cash on the table" (Tr. 111:2) – the strong inference is that ferry rates would have been higher if the Passenger Fee had been lower.

(d)     Hall and McAllister jointly set the fares, as they have done since before 1993 (Tr. 444:1-5 [Hall]).

73.     Of course, no one can be certain exactly what fares the Ferry Company would have set if there had been no Overcharge each year from 1993 to date. What *is* certain, however, is that the Ferry Company would have had higher profits due to (a) higher rates, (b) increased ridership, or (c) a combination of both.

74.     **Ferry Company ridership and profits**. The Port Authority continues to argue, incorrectly, that the Ferry Company was not damaged by the Passenger Fee because ferry ridership has increased and the Ferry Company has earned profits since 1993 (Def. PFC ¶¶ 257-259).

75.    Initially, as Arnold conceded, there is no connection between the Ferry Company's profits and the question whether the Passenger Fee is excessive; the two are "unrelated."  (Tr. 949:2-4 [Arnold].)  If the Passenger Fee was excessive and it hurt the Ferry Company, as plaintiffs maintain, the Ferry Company's profitability cannot deprive it of a remedy (*see* Pl. PCL ¶¶ 58-59).

76.    In addition, ferry ridership has increased both before and since the Port Authority was created and the Passenger Fee was imposed (*see* ¶¶ 41-45 above).  The fact that ridership has increased despite the Passenger Fee does not mean that it would not have increased even more without it.  Deak and Arnold both conceded that a lower Passenger Fee would have resulted in increased ridership (¶ 65 above).

77.    The same holds true with respect to profit:  that the Ferry Company has earned profits despite the Passenger Fee does not mean that it would not have earned higher profits without it, as Arnold testified and his own spreadsheet confirms (¶ 65 above).

78.    **<u>Impact of Passenger Fee increases</u>**.  The Port Authority also incorrectly claims that increases in the Passenger Fee have not affected Ferry Company ridership or profits (Def. PFC ¶¶ 260-261).  As the table in ¶ 43 above shows, the number of cars carried increased very little in 1996 and had a rare decrease in 1997, following an increase in the Passenger Fee in 1996.  Profitability also was very poor in 2003, the year the Port Authority again raised the Passenger Fee (as explained in ¶¶ 78-83 below).

79.    In the excerpt from Merritt's testimony quoted by the Port Authority (Def. PFC ¶ 261), it is obvious that Merritt was off by one year, mistakenly referring to 2003 and 2004 instead of 2002 and 2003, as the documentary evidence makes clear.  The Ferry Company's best year was 2002, not 2003, as its financial statements and the table in the Port Authority's

submission (at ¶ 259) show.  The net income for 2003 ($6.7 million) is higher than that for 2002 ($4.1 million) only because the 2003 figure includes a $6.4 million net gain on the sale of the Grand Republic, which was replaced that year by the second Grand Republic.  Merritt clearly so testified under questioning by the Port Authority's counsel, correctly identifying 2003 as the year in which that sale took place, while reviewing that year's financial statements (Tr. 117:3-14 [Merritt]; Def. Ex. 131 at BPJ 3053).[8]

80.    Without the $6.4 million net gain on the sale of the Grand Republic, the Ferry Company's profitability in 2003 was very substantially worse than it had been in 2002 or in the several preceding years (*see* table at Def. PFC ¶ 259 and Def. Ex's 130-131 [Ferry Company's audited financial statements]).

81.    It is also a matter of record that the increase in the Passenger Fee, to which Merritt referred in the excerpt quoted by the Port Authority, took effect in May of 2003, not 2004 as Merritt mistakenly stated.  As stated in the Memorandum of Understanding dated as of February 1, 2003, the Ferry Company agreed to begin collecting the higher Passenger Fees in May 2003 (not 2004) (Pl. Ex. 31, ¶ 2).

82.    Thus, Merritt's testimony quoted by the Port Authority, with the obvious mistake in the years corrected, would read as follows:

> Well, ironically, the best year that we had in the eight years that we've been operating since Brian McAllister took complete control of the company was 2002 [not 2003].  And I believe the last ferry tariff was implemented I think in May of 2003 [not 2004], and our pre-tax earnings have dropped since then.

---

[8]    The Port Authority acknowledges in a terse footnote that the Ferry Company's 2003 "was elevated by the sale of an asset" (Def. PFC at p. 52, n.5), but does not mention the net gain on that sale ($6.4 million), and misleadingly presents a quote from Merritt's testimony, in which Merritt obviously and inadvertently was off by one year, in an effort to prove, contrary to fact, that the 2003 Passenger Fee increase had no effect on the Ferry Company.

(Tr. 110:15-19 [Merritt].)

83.    Ridership also was lackluster in 2003, increasing by less than 1% over 2002, compared to the generally larger percentage increases in prior years, both before and since the Port Authority was created (Pl. Ex. 227).

84.    Thus, the Passenger Fee increase in 2003 had a negative effect on both the Ferry Company's ridership and its profitability, as shown by actual car counts and the Ferry Company's financial statements, and by Merritt's testimony (as corrected).

85.    In sum, contrary to the Port Authority's view, there is abundant evidence in the record to show that the Ferry Company has been monetarily damaged by the Passenger Fee, in the amount of the Overcharge.

**M.    D&D Has Established Its Damages**

86.    The Port Authority incorrectly claims that Rose "did not quantify the number of ferry trips he has made in connection with the business of D&D or Mankers Wholesale" (Def. PFC ¶ 93).  On the contrary, Rose clearly testified that he has taken the ferry "at least twice a week . . . for D&D":

> Q.    About how many times or how often do you take the ferry *for D&D*?
>
> A.    At least twice a week.
>
> Q.    And how long have you been following that pattern *for D&D*?
>
> A.    *For D&D*, about five years, five and a half years.

(Tr. 389:4-9 [Rose], emphasis added.)  His damages, accordingly, are computed on the basis of

two trips per week for the five years preceding trial (Pl. PFF ¶ 239; *see generally id.* ¶¶ 238-43).[9]

87.    The Port Authority also states categorically, and incorrectly, that the Passenger

Fee has played no role in Rose's decision whether to take the ferry or drive around (Def. PFC

¶¶ 96-97 [quoting Rose's testimony selectively]; *id.* ¶ 100).  However, Rose testified:

> What I said earlier, and I'll repeat, is a total overall cost *including the
> wharfage charge* is what's going to make my determination on whether I
> ride the ferry or not.

(Tr. 404:21-24 [Rose], emphasis added.)

88.    Finally as to Rose, the Port Authority wrongly claims that he "did not present any

evidence of damages sustained by [D&D] by the imposition of the passenger fee" (Def. PFC

¶ 100).  Yet there is no dispute that D&D paid the Passenger Fee each time that Rose took the

ferry, and plaintiffs did present evidence, through Schachter, as to the portion of the Passenger

Fee that was excessive (the Overcharge).  Rose therefore has been damaged by the Overcharge

that his company, D&D, actually has paid (Pl. PFF ¶¶ 238-243).

**N.    Zahradka's Prospective Claims Should Not Be Dismissed**

89.    The Court should not dismiss Zahradka's claims in their entirety, as the Port

Authority requests (Def. PFC ¶ 101).  Plaintiffs agree that, because Zahradka did not testify at

trial, there is no evidence that he sustained damages *in the past*, and they have withdrawn such

claims (Pl. PFF ¶ 244).  However, the Port Authority does not (and cannot) legitimately dispute

that Zahradka has taken the ferry or that he expects to continue to do so.  Like all ferry

passengers, he is damaged to the extent that the Passenger Fee is excessive.  Zahradka still seeks

---

[9]    Rose makes no claim at all with respect to earlier years when he was employed by Mankers
Wholesale, which was mentioned only once at trial (*see* Tr. 389:4-19 [Rose]).

and is entitled to *prospective* relief, as well as damages he sustains for any ferry trips he may have taken since the trial (*id.*).

**O.    Other Inaccuracies in the Port Authority's Proposed Findings of Fact**

90.    **Eligibility for government grants**.  The Port Authority misleadingly states that federal and state government grants "are *uniquely* available to the Port Authority as a quasi-governmental agency" and that "[n]either a ferry company nor ferry passengers would be eligible to receive these grants" (Def. PFC ¶ 23, emphasis added).

91.    Government grants are not "uniquely available to the Port Authority."  They are available to *any* government entity.  Riccio admitted that the City and the Greater Bridgeport Regional Agency, not the Port Authority, were awarded the federal grant for constructing the terminal building at the Dock (Tr. 367:15 to 368:2 [Riccio]).  Hall testified that he, through his association with the Passenger Vessel Association, identified the federal Ferry Boat Discretionary Program and brought it to the attention of City and State officials, who applied for the grant with the Ferry Company's assistance (Tr. 431:22 to 432:13 [Hall]).

92.    The grant for the terminal building at Bridgeport was made under the Ferry Boat Discretionary Program, which requires that the funds be used solely for ferryboats, terminals or other ferry-related projects (Tr. at 368:3-20 [Riccio]).

93.    The Ferry Company obtained government grants for its facilities in Port Jefferson, although there is no port authority in that port (Tr. 415:25 to 416:3 [Hall]), and it also lobbied for and obtained grants for the Bridgeport pier before the Port Authority was created (Tr. 457:12-16 [Hall]).  Thus, while a ferry operation is essential to the receipt of ferry-related funds, a port authority is not; *any* government agency may partner with a ferry operation to apply for and administer such grants (Tr. 433:4 to 433:19 [Hall]).

94.     **Road traffic effect on ferry passengers from non-ferry projects**.  Port
Authority officials incorrectly claim, without objective support, that projects such as the barge
feeder service and the high speed ferry would benefit ferry passengers because they would
reduce highway traffic (Def. PFC ¶¶ 176, 180, 181, 186).  That claim does not withstand simple
analysis.

95.     The barge feeder service would transport containers from New York to
Bridgeport by barge, instead of by truck.  That would reduce truck traffic on highways between
New York and Bridgeport.  The ferry passenger already avoids that traffic congestion by taking
the ferry.  The ferry passenger traveling by car from Port Jefferson to Bridgeport exits the ferry
at Bridgeport and takes highways leading away from Bridgeport (mostly north and east).  The
containers that would arrive at Bridgeport by barge would have to be picked up by trucks at
Bridgeport and they, too, would take highways leading away from Bridgeport.  The analysis for
passengers traveling from Bridgeport to Port Jefferson would be similar:  they would share the
highways with trucks heading to Bridgeport to pick up containers.  The barge feeder service thus
would *not* reduce traffic congestion *for ferry passengers*.  (*See* Tr. 371:24 to 375:2 [Riccio].)

96.     The same analysis holds with respect to the high speed ferry.  Many foot
passengers wanting to use that ferry service would drive (or be driven) to and from the high
speed ferry landing at Bridgeport, and would use the same highways leading to and from
Bridgeport that the ferry passengers now use.

97.     Thus, the barge feeder service and high speed ferry would reduce traffic between
New York and Bridgeport, and would benefit drivers on that stretch of road, but would not
benefit ferry passengers, who bypass that stretch of road by taking the ferry.  These projects also
would increase traffic in the harbor, posing new risks for the vehicle ferryboats.

98.    **BRMC revenues and expenses**.  The Port Authority states that it "has spent insignificant amounts of its own funds on the BRMC," relying on Riccio's self-serving testimony (Def. PFC ¶ 204).  However, Riccio acknowledges having spent at least "a couple [of] hundred thousand dollars" on the BRMC (Tr. 179:7-14 [Riccio]), and that does not include salaries and benefits, travel expenses, legal and accounting expenses, marketing and advertising, or overhead (*see* ¶¶ 27-28 above).  Riccio's and the Port Authority's efforts to minimize their expenses on BRMC are unconvincing.

99.    The Port Authority also refers to Derecktor as a source of revenue (Def. PFC ¶ 210 [Derecktor "is currently in operation and generating revenues"]; *see also id.* ¶ 20).  However, the rentals scheduled to be paid by Derecktor – low as they are (Pl. Ex. 66, § 4.01) – will not support Port Authority operations, but rather will be "passed through" to the City to pay for the cost of acquiring the Cartech property (Pl. PFF ¶ 104), for which the City paid $9.45 million (Pl. Ex. 11, note 12 at p. 12 and note 9 at p. 9; Tr. 960:13 to 961:10 [Arnold]).

100.    The rentals that the Port Authority granted to Derecktor are so low that, by the time that lease reaches its fiftieth year, around 2051, the annual rental for that 23-acre parcel will reach barely one-third of the approximately $1.5 million per year that the Port Authority collects annually from the Passenger Fee and Ferry Company leases *at present* (not counting the $1 surcharge) for their *partial* use of the two- to three-acre Dock.  (*Compare* Pl. Ex. 66, § 4.01 [Derecktor rentals] *with* Table in Pl. PFF ¶ 165 [Passenger Fee and rental income]).

101.    **Dredging**.  The Port Authority incorrectly states that the Ferry Company boats have a draft of "twenty to twenty-two feet," citing Riccio's testimony that that is his "understanding" (Tr. 198:14-21 [Riccio]).  When asked to state the source of his understanding,

Riccio deferred to McAllister and Hall (*id.* at 199:4-6). McAllister testified quite clearly that the ferry boats have only 11 to 12 feet of draft and need 14 feet of depth.

102.    More importantly, the Port Authority's dredging efforts are of no benefit to the ferry operation. As McAllister testified, the Coast Guard requires, for all vessels, a minimum of two feet of clearance between the keel and the harbor bottom; if the clearance is not there, a ship will not be allowed to enter the harbor (Tr. 651:14 to 652:7 [McAllister]). If the harbor depth at present is only 27 feet, as Riccio states (Tr. 315:23-24 [Riccio]), then, currently, up to 25-foot draft vessels may enter the harbor. Dredging to 35 feet would allow up to 33-foot draft vessels to enter the harbor. The safety factor for the ferryboats will not improve, and can only worsen, with bigger rather than smaller commercial ships navigating the same harbor as the ferryboats (Tr. 651:14 to 652:7 [McAllister]).

103.    Thus, not only is the Port Authority incorrect about the ferryboats' draft, but its assertion that dredging will benefit the ferry operation is "totally fallacious" (Tr. 652:4-7 [McAllister]).

*    *    *

## II.     LEGAL ISSUES

### A.     The Commerce Clause

The Port Authority misapplies the Commerce Clause cases, especially Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc., 405 U.S. 707, 92 S.Ct. 1349 (1972) ("Evansville"), upon which it heavily relies (Def. PFC pp. 54-68).  Plaintiffs also prominently cited that case in their initial submission (Pl. PCL  ¶¶ 7-8, 11).  The parties do not disagree with the broad principles stated in Evansville, but they sharply disagree with the application of those principles to the facts of this case.

Evansville involved challenges to a $1 per passenger head tax imposed (a) by an airline authority in Indiana, and (b) by the State of New Hampshire with respect to five public airports in that state.  The Court stated that such user fees would pass constitutional muster if they met three standards, two of which are at issue in this case:  (1) whether the fees "are excessive in relation to the costs incurred by the taxing authorities," 405 U.S. at 720, and (2) whether the charges "reflect a fair, if imperfect, approximation of the use of the facilities for whose benefit they are imposed." Id. at 717.[10]

### 1.     Excessiveness

The discussion in Evansville of whether the fees were excessive is of most relevance to our case.  405 U.S. at 719-21.  The Court stated that, in both the Indiana and New Hampshire cases, "the airlines have not shown these fees to be excessive *in relation to costs incurred by the taxing authorities*." *Id.* at 719 (emphasis added).  The Court based its conclusion on the fact that,

---

[10]   The third standard, whether the fee discriminates against interstate commerce, is not at issue here, because the Passenger Fee is equally imposed on residents of all states.  *See* Evansville, 405 U.S. at 717.

in each case, the total fees collected were less than the total costs incurred on the airport facilities.[11] Thus, the passenger tax in both states was being used to fund the cost of *airport facilities* – a narrow set of facilities that directly and logically related to and benefited the fee-paying passengers.

The facts in this case are very different, because the Port Authority spends the Passenger Fee revenue on a broad range of activities that do not directly or logically relate to or benefit the ferry passenger.  In <u>Evansville</u>, the relevant set of facilities was the airport.  In our case, the equivalent relevant set of facilities is the *Dock*, not the entire port district, as the Port Authority claims it should be.

The Port Authority provides services and facilities to the ferry operation only at the Dock (Pl. PFF ¶ 185).  The Port Authority itself created an accounting system to allocate its revenue and expenses associated with the Dock, the Net Income Reports (Pl. PFF ¶¶ 182-201; *see also* Reply ¶¶ 29-40 above).  Although the Port Authority now disavows those reports as inaccurate, they nevertheless show, at a minimum, that the Dock is the relevant unit that relates to the Passenger Fee.  The ferry operation has no logical connection to the Port Authority's many activities away from the Dock, such as a shipyard on a different plot of land (Derecktor), a project to ship containers by barge from New York to Bridgeport (the barge feeder project), commercial shipping terminals in other parts of the harbor (Cilco, among others), or real estate

---

[11]    In Indiana, total head tax collections each year were less than the airport authority's bond requirement costs for airport capital improvements.  In New Hampshire, the collections went to the state, which allocated 50% to the state aeronautical fund (which plaintiffs did not challenge) and the other 50% among the five municipalities or authorities owning the landing areas. Although these funds were "unrestricted," the amounts allocated to each municipality did not exceed its *airport* costs.  405 U.S. at 719-20.

development projects at BRMC, Steel Point or the many other geographic areas over which the Port Authority exercises jurisdiction (Pl. PFF ¶¶ 69-159).

Cases applying Evansville confirm that the Dock, rather than the entire port, is the appropriate unit or set of facilities to consider in evaluating the legality of the Passenger Fee. Particularly instructive in this regard are the cases involving tolls imposed by the Port Authority of New York and New Jersey ("PANYNJ") on the Hudson River crossings.  Wallach v. Brezenoff, 930 F.2d 1070 (3d Cir. 1991); Automobile Club of New York, Inc. v. Port Auth. of New York and New Jersey, 887 F.2d 417 (2d Cir. 1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168 (1990); and Automobile Club of New York, Inc. v. Port Auth. of New York and New Jersey, 706 F. Supp. 264 (S.D.N.Y. 1989) (the "Auto Club" cases).

In these cases, plaintiffs challenged an increase from $2 to $3 on the bridges and tunnels crossing the Hudson River between New York and New Jersey.  PANYNJ imposed the increase in order to meet the costs of its integrated Hudson River crossing facilities, consisting of four bridges, two tunnels, a bus terminal and the PATH train (which crosses the Hudson by tunnel). Wallach, 930 F.2d at 1071.  Plaintiffs claimed that it was improper for PANYNJ to use toll revenue from the tunnels and bridges to fund the PATH train.  The courts disagreed, because:

> the Port Authority's bridges, tunnels, PATH and bus terminal facilities were *sufficiently functionally related* to justify PATH's toll-rate base in computing the rate-base for the entire trans-Hudson system.

Wallach, 930 F.2d at 1072 (emphasis added) (citing the Second Circuit's affirmance in the Auto Club cases, 887 F.2d 417).  *See also* the New York district court's decision, rejecting plaintiffs' Commerce Clause claims on the same ground, 706 F. Supp. at 277.

The Auto Club courts used a "spillover" analysis to determine whether the PATH train was "sufficiently functionally related" to the bridges and tunnels to justify their common funding

through user fees. The evidence was clear that "an interruption of service on PATH would disrupt the flow of traffic on the bridges and tunnels," 887 F.2d at 420, and thus it was just and reasonable for PANYNJ to use bridge and tunnel tolls to fund PATH, and vice versa. *Id*.

The Auto Club cases are instructive because, as is well known (and the Court may take judicial notice), PANYNJ owns or operates many facilities *beyond* its trans-Hudson system, including:

- Airports – Kennedy, LaGuardia, Newark and Teterboro;

- A heliport in downtown Manhattan;

- Seaports and marine terminals – at Newark, Elizabeth, Bayonne and Jersey City, New Jersey; Red Hook, Brooklyn; and Howland Hook, Staten Island;

- "AirTrain" service to Newark and Kennedy airports;

- The World Trade Center site (and formerly the buildings thereon); and

- Various other ventures, including a communications center in Staten Island, an industrial park in the Bronx, a resource recovery facility in Essex County, New Jersey, a legal center in Newark, and development projects in Queens, New York and at the waterfront in Hoboken, New Jersey.

(*See* http://www.panynj.gov/AboutthePortAuthority/FacilitiesandServices/ [accessed Sept. 15, 2006] [PANYNJ web page showing map of its facilities and links thereto].)

As the Auto Club cases make clear, PANYNJ funds *only* its trans-Hudson unit with the tolls and fees it collects from users of the facilities comprising that unit. It does not use those tolls and fees to fund its many other, unrelated, activities. Nor could it do so, under the Commerce Clause, because airports, seaports, marine terminals, and business centers are too remote from – not "sufficiently functionally related" to – the trans-Hudson unit, to justify their being funded with the tolls and user fees collected from that unit.

Yet that is precisely what the Port Authority in this case claims the Commerce Clause cases allow it to do:  to place *all* of its activities and projects into a single functional unit and fund them form a single captive group – the ferry passengers – even though it provides facilities to the passengers *only* at the Dock.

None of the cases cited by the Port Authority supports such an extreme interpretation of the Commerce Clause cases.  For example, In <u>Center for Auto Safety v. Athey</u>, 37 F.3d 139, 143 (4th Cir. 1994) (Def. PFC p. 55), it was undisputed that the total user fees collected – under a Maryland statute providing for state oversight of charitable entities – did not exceed the state's costs of administering and enforcing *that statute*.  The state did not use the funds to administer other statutes, or for other unrelated purposes.  And in <u>Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.</u>, 906 F.2d 516, 518 (11th Cir. 1990) (Def. PFC p. 55), the court upheld an airport authority's user fee imposed on car-rental companies because, as in <u>Evansville</u>, the fee was tied to the authority's cost of providing the airport facilities, from which the car rental company directly benefited.  The authority did not use the funds to pursue projects beyond the airport.[12]

---

[12]  The Port Authority twice cites <u>Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission</u>, 390 U.S. 261, 281, 88 S.Ct. 929 281 (1968) (Def. PFC p. 59 n.11 and p. 62), which was decided under the Shipping Act, 1916, as mended, 46 U.S.C. § 801 *et seq.*, not the Commerce Clause.  The Port Authority compounds the error by misleadingly omitting the italicized words in the following quote from that decision:  "*It may be that* a relatively small charge imposed uniformly for the benefit of an entire group can be reasonable *under § 17* [of the Shipping Act], even though not all members of the group receive equal benefits."  The Court cited <u>Evans Cooperage Co. v. Board of Commissioners of the Port of New Orleans</u>, 6 F.M.B. 415 (1961), which the Port Authority cites three times (Def. PFC pp. 59 n.11, 62 and 67), although that case, too, concerned the Shipping Act, not the Commerce Clause.  Further, as the Supreme Court stated, <u>Evans Cooperage</u> upheld "a wharfage charge which was imposed on all who used the wharf," 390 U.S. at 281 n.33, which supports plaintiffs' position that the relevant unit in this case is the Dock (*i.e.*, wharf), not the port district as a whole.

Other cases applying <u>Evansville</u> confirm that user fees, in order to meet the requirement that they not be excessive, must be logically related to the benefits actually provided, *and may not be designed as general revenue measures*.  For example, in <u>Western Oil and Gas Association v. Cory</u>, 726 F.2d 1340 (9th Cir. 1984), the court invalidated a California easement fee imposed on oil refineries, based on the volume of oil transported through pipes located in state-owned tidal and submerged lands, because there was no correlation between the fee as calculated and the benefits conferred by the state.  726 F.2d at 1345.  The court added that the fee, as calculated, was "a disguised revenue raising measure" that did not "reflect the value to the state of its land, but the maximum amount of revenue California can extract from interstate commerce by utilizing its strategic geographic position."  *Id.  See also* other cases invalidating fees under the Commerce Clause, cited in plaintiffs' initial submission (Pl. PCL ¶ 8).

## 2.    Deference to State Agencies

The Port Authority relies to a considerable degree on the principle that courts should "defer to a charging authority's judgment" (Def. PFC p. 61).  The source of this principle is a 1915 Supreme Court decision, <u>Hendrick v. Maryland</u>, 235 U.S. 610 (1915), in which there was no evidence concerning the cost of the facilities or services provided by the state.  <u>Evansville</u>, 405 U.S. at 712-13 (quoting <u>Hendrick</u>).[13]

By contrast, in this case the Court at trial heard and received voluminous evidence concerning the Port Authority's costs of the facilities and services it provides to the ferry

---

[13]   The Port Authority also cites <u>Cargill v. Federal Maritime Commission</u>, 530 F.2d 1062, 1068 (D.C. Cir. 1976), for this proposition, but that case was decided under § 17 of the Shipping Act, not the Commerce Clause, and the Port Authority hides that fact by omitting key words from its quote from that decision (omitted words in italics):  "*the proper inquiry under § 17 is, in a word,* whether the charge levied is reasonably related to the service rendered."  (Def. PFC p. 61; *see also* n.12 above.)

operation.  Courts may defer to an agency and uphold its charges as correct "unless the contrary

is made to appear."  Evansville, 405 U.S. at 713, quoting Hendrick, 235 U.S. at 624.  In this case,

the contrary has been made to appear; the evidence shows that the Passenger Fee is excessive,

and thus the Court should not, and certainly is not required to, defer to the Port Authority.

### 3.     Past and Future Costs

The Port Authority argues that the Passenger Fee is not excessive, even if its proceeds

exceed the Port Authority's costs for a given year, because "[a]ny surplus can be offset against

deficits from previous years, or against projected future deficits" (Def. PFC p. 63, citing

Massachusetts v. United States, 435 U.S. 444, 470 n.25 (1977)).

In Massachusetts the Court did not go quite that far; it stated that "a surplus of revenue

over outlays in any one year can be offset against *actual deficits* of past years and *perhaps*

against projected deficits of future years."  *Id.* (emphasis added).  The Port Authority

conveniently omitted the word "perhaps."  In addition, the record does not show any deficits in

past years (Pl. Ex's 1-11 and 11A).

In any event, the comparison of revenue and outlays must be with respect to the relevant

set of facilities.  It is improper to compare revenue from the Dock with outlays for the entire port

district, as the Port Authority proposes (*see* discussion of Auto Club cases in Point A.1 above).

In addition, looking at past years is of no help to the Port Authority – in its thirteen years of

operations, its outlays for the Dock have never come close to matching its revenue from the

Passenger Fee (*see* Pl. Ex. 218 [Schachter report] and discussion of the Overcharge in Pl. PFF

¶¶ 202-221) – and even if it were appropriate to speculate about future years, there is no

evidence of any plans by the Port Authority to increase its outlays at the Dock in the future to a

level approaching, much less exceeding, Passenger Fee revenue.

4.     **"Cost" versus "Value"**

The Port Authority would like the Court to compare Passenger Fee revenues to the "value," rather than the "cost," of the facilities it provides to the ferry operation, so that the capital costs of the terminal, dock and access road can be included in the analysis, as Arnold did, even though those costs were not incurred by the Port Authority, but rather were funded through government grants (Def. PFC p. 66).

However, the cases analyzing whether user fees are excessive under the Commerce Clause overwhelmingly do so by reference to the agency's *costs* of providing the relevant facilities and services to the fee payers.[14] Evansville, 405 U.S. at 720 ("the airlines have not shown these fees to be excessive in relation to the *costs* incurred by the taxing authorities" ) (emphasis added); Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 371, 114 S.Ct. 855 (1994) ("Northwest") ("the Airlines are charged only for the *costs* of benefits they receive") (emphasis added); Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439 (1937) (appellant agency "does not show that the fees collected are used to meet the *cost* of the construction or maintenance of its highways") (emphasis added); Clark v. Paul Gray, Inc., 306 U.S. 583, 599, 59 S.Ct. 744 (1939) (highway user fee may not be manifestly disproportionate to the *cost* of the services rendered); New Orleans S.S. Ass'n v. Plaquemines Port, Harbor and Terminal Dist., 874 F.2d 1018, 1021 (5th Cir. 1989) ("Plaquemines") (approving port fees "tied to the *costs* of providing the service") (emphasis added); *cf.* American Trucking Associations, Inc. v. Scheiner, 483 U.S. 266, 290, 107 S.Ct. 2829 (1987) (user fees on trucks "do not even purport to approximate fairly the *cost or value* of the use of Pennsylvania's roads") (emphasis added).

---

[14]   Even the Port Authority, in its concluding paragraph on this point, uses the widely accepted formulation, "excessive in relation to the *costs*" incurred by the Port Authority (Def. PFC p. 67) (emphasis added)

The Federal Circuit addressed this precise question, and concluded that "the cost of the benefits, rather than the value, is the appropriate measure" in evaluating the constitutionality of user fees. U.S. Shoe Corp. v. United States, 114 F.3d 1564, 1574 (Fed. Cir. 1997). The court in that case held that a harbor maintenance tax was not a valid user fee because it "bears no reasonable relationship to the cost of the use of the port facilities." *Id.* at 1566.

The limitation on user fees set forth in the Rivers and Harbors Act (discussed in section II.B below) also is tied to the "cost" of the service provided, not its "value" (*see* pp. 42-43 below).

In addition, the Ferry Boat Discretionary Program, under which the Port Authority has received the bulk of its grant money for the ferry-related facilities, was established under the Federal-Aid Highway Act of 1956, as amended ("FHA"), 23 U.S.C. § 1 *et seq.*, which prohibits agencies from collecting user fees to the extent that the facilities were funded by such grants. Section 129(c)(4) of the FHA provides that an operating authority must apply all revenues from ferry facilities to the "actual and necessary *costs*" of the facility's operation, maintenance and debt service (emphasis added). Under the analogous provision of that statute applicable to bridges, § 129(a)(3), a government entity that receives federal funds may charge bridge tolls only to recover its own, and not the federal government's, funding contributions. Callam County v. Dep't of Transp. of the State of Washington, 849 F.2d 424, 430 (9th Cir. 1988) ("In order to collect tolls pursuant to section 129(a), the State must have expended its own funds in reconstructing the bridge."), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 790 (1989).

Thus, it is *illegal* for the Port Authority to collect Passenger Fees in order to pay for the capital costs of ferry-related projects that were funded by the federal government under the Ferry Boat Discretionary Program.

5.     **Fair Approximation of Use**

The Port Authority also misinterprets the "fair approximation of use" requirement established in <u>Evansville</u> and applied in subsequent cases.  Plaintiffs in this case do not contend that the Port Authority violates this element because it chooses not to charge other users *of the Dock*, *e.g.*, persons picking up or dropping off foot passengers, other boats using the landing dock, or non-passengers who eat at the terminal food concession.  These non-paying users are the equivalent of the non-paying users in <u>Evansville</u>, *e.g.*, deplaning passengers, non-passenger users and passengers on non-commercial flights.  405 U.S. at 717-18.

Instead, plaintiffs contend that the Port Authority violates the "fair approximation of *use*" requirement because the Passenger Fee funds facilities and services that ferry passengers *never use* and that *never were intended* for their use, such as Derecktor, the barge feeder service, the high speed ferry, and countless real estate and other development projects throughout the port district.  The issue is not whether certain passengers, like Rose, choose not to use the terminal building or other Dock facilities that are available for ferry passengers.  The issue is whether the facilities for which the Passenger Fee is extracted *legitimately* can be said to be provided for the passengers.

That the facilities must be intended for the *use* of the payer is made clear by the Supreme Court's decision in <u>Northwest</u>.  The Court applied the <u>Evansville</u> requirements in considering a challenge by commercial airlines to certain user fees imposed by a Michigan county airport.  The airlines claimed that the user fees were not fairly apportioned among different classes of airport users because the airlines were charged for the cost of the runways and navigational facilities, but concessions were not charged at all for those facilities, although they benefited from the customer flow provided by air travelers.  The Court held that the fees were fairly apportioned

because "[o]nly the airlines . . . actually *use* the runways and navigational facilities of the airport; the concessions *use* only the terminal facilities" (for which they paid rent at market rates). 510 U.S. at 369 (emphasis added). *See also* U.S. Shoe, 114 F.3d at 1574 (harbor maintenance tax did not meet "fair approximation of use" requirement because there was no correlation between the amount charged and the payers' *use* of the port).

Thus, "use" is a fundamental element of the "fair approximation of use" requirement – not in the sense that all fee payers must use all facilities provided for them, but in the sense that the facilities for which charges are imposed must be intended and made available for the fee payers' use. In the present case, compelling ferry passengers to pay for non-Dock facilities that are neither intended nor available for their use is a clear violation of the "fair approximation of use" requirement.

**B.    The Rivers and Harbors Act**

The parties agree that the provision of the Rivers and Harbors Act added by the Maritime Transportation Security Act of 2002, 33 U.S.C. § 5(b), was intended to *clarify*, not change, Commerce Clause jurisprudence concerning user fees (*see* Def. PFC pp. 71-74). However, plaintiffs *disagree* with the Port Authority's contention that the statute is inapplicable to the Passenger Fee (*id.* pp. 75-76), and with the Port Authority's application of the statute to the facts of this case (*id.* pp. 77-79).

The Passenger Fee – a charge that clearly falls within the text of § 5(b) – is not exempt from its application merely because ferry passengers disembark at, and therefore use, the Dock. If the Passenger Fee supported *only* the facilities and services that the Port Authority provides for passengers at the Dock, then the argument that § 5(b) does not apply to it would be more plausible. But the record is clear that the Port Authority uses the proceeds from the Passenger

Fee to pay for numerous non-Dock activities.  Indeed, the Port Authority proclaims (incorrectly) that Commerce Clause cases allow it to fund all its port activities – at and away from the Dock – from the Passenger Fee (Def. PFC p. 63) (arguing that Evansville entitles the Port Authority to charge ferry passengers for all "past and current costs of capital improvements within the port and planned future development, *without regard for whether the particular improvements and developments will directly benefit the ferry passengers as opposed to other port users*") (emphasis added).

Fees that support non-Dock activities, such as the barge feeder service, high speed ferry, Derecktor, dredging, and FTZ, among many others, are precisely the kinds of abusive charges by local communities that § 5(b) was enacted to prevent, according to the legislative history cited by the Port Authority (Def. PFC pp. 73-74).  To the extent that the Passenger Fee funds non-Dock activities, it is a fee imposed on passengers merely for traveling through the port on the ferryboats; it is "levied upon or collected from . . . passengers . . . by a non-Federal interest, if the vessel . . . is operating on any navigable waters," within the meaning of § 5(b).

Application of § 5(b) to the facts of this case is straight-forward.  The Passenger Fee must be "used *solely* to pay the *cost* of a *service* to the vessel or water craft" (emphasis added).  The Port Authority's non-Dock activities clearly do not meet this test.  The substantial costs incurred by the Port Authority in planning for a potential future barge feeder service or high speed service, for example, cannot legitimately be described as a *cost of a service to the ferry*.

The Port Authority misapplies § 5(b) by claiming that these non-Dock activities provide "benefits" to the ferry passengers.  It argues that the Passenger Fee is reasonable "given the benefits received by those who pay it" (Def. PFC p. 77), including "*developments throughout the port area* [that] have improved *the aesthetic experience of traveling through the port*" (*id.*,

emphasis added).  The Port Authority's own description of these supposed "benefits" shows that it seeks to justify the Passenger Fee, in large part, by supposed benefits enjoyed by passengers while they are "traveling through the port" – precisely what the Port Authority states § 5(b) was intended to prevent.

Furthermore, in clarifying Commerce Clause jurisprudence, § 5(b) does not refer to "benefits," but rather to the "cost" of the "service" provided.  The statute thus make clear that broad societal benefits, such as economic development, employment, or reduction of highway traffic for the benefit of the public as a whole, are not the kinds of "services" for which a valid user fee may be imposed.  This is consistent with plaintiffs' interpretation of the Commerce Clause cases.  (*See* pp. 31-35 above [distinction between services legitimately provided to the ferry operation, *i.e.*, at the Dock, and unrelated development activities in other geographic areas of the port]; and pp. 38-39 [distinction between "value" and "cost," the latter being the term used in § 5(b)].)

## C.    <u>The Right to Travel</u>

The parties agree that, if a user fee does not violate the Commerce Clause, it is not likely to infringe on the constitutional right to travel.  <u>Evansville</u>, 405 U.S. at 716-17.  In this case, as shown above, the Passenger Fee does violate the Commerce Clause and, accordingly, it also violates the right to travel.  (*See* Pl. PCL ¶¶ 16-17.)

## D.    <u>The Tonnage Clause</u>

The parties also agree with the broad principle of the Tonnage Clause, expressed in the leading case, <u>Clyde Mallory Lines v. Alabama</u>, 296 U.S. 261, 56 S.Ct. 194 (1935):  a state may, consistently with the Tonnage Clause, "charge reasonable fees *in return for services rendered*."  <u>Hawaiian Navigable Waters Preservation Soc. v. State of Hawaii</u>, 823 F. Supp. 766, 776 (D.

Hawaii 1993) (citing <u>Clyde Mallory</u>) (emphasis added), *aff'd*, 42 F.3d 1185 (9th Cir. 1994).  The parties' disagreement, again, concerns the application of this principle to the facts of this case.

As with the analysis under the Commerce Clause, the Court must decide which side's view is correct concerning the actual "services" that the Port Authority renders to the ferry passengers "in return" for the Passenger Fee.  Plaintiffs maintain, and the record is clear, that the Port Authority provides services to the ferry operation (including passengers) only *at the Dock*, and accordingly, the Dock is the relevant geographic and business unit for assessing the legality of the Passenger Fee under the Tonnage Clause, as is also true under the Commerce Clause.

The Port Authority, on the other hand, contends that *all* of its activities *throughout the port district* constitute "services rendered" to the ferry passenger.  For example, in its September 1 submission, the Port Authority states that such services include:

> the construction and maintenance of the terminal building, port security, parking, and the new access road, *as well as additional projects that promote the development of the port*.

(Def. PFC p. 71, emphasis added.)  Thus, according to the Port Authority, all of its activities throughout the extensive land areas within its jurisdiction supposedly constitute "services" to the ferry passenger, in return for which the Port Authority may extract the Passenger Fee.  These supposed services to the ferry passenger include (among many other things):

- barge feeder service
- high speed ferry
- Derecktor shipyard
- FTZ
- acquisition and development of the BRMC
- Cilco and other commercial shipping terminals
- dredging (needed for commercial shipping)
- new logo and service mark for Port Authority
- sports season tickets
- car rental, gasoline and car washes for Riccio

- charitable contributions
- travel expenses, meals, and gifts for Riccio and the commissioners
- a dog kennel, an asphalt plant, a commercial laundry, and numerous other real estate projects

These types of activities simply do not come within the well-established exception to the Tonnage Clause, which requires that the "services" for which the fee payer is charged be used or be available for use by the fee payer.  *E.g.*, Plaquemines Port, Harbor and Terminal Dist. v. FMC, 838 F.2d 536, 545 (D.C. Cir. 1988) (the services rendered must "inure to all" who pay the fee).  For example, courts have stated that the availability of fire-fighting facilities in a harbor does "inure to all" ships that enter the harbor, whether or not the facilities are ever used for a particular ship.[15]  *Id.*  But the Port Authority's activities listed above in no way can be said to be "services rendered" to the ferry operation or its passengers, as general services available to all who enter the harbor.  Ferry passengers receive no "services" from Derecktor (a private shipyard), from a container barge transportation system, from a competing high speed ferry that will not go anywhere near Port Jefferson, or from the Port Authority's many other non-ferry projects and activities.

The Port Authority defends the Passenger Fee under the Tonnage Clause by stating that it does not impose that fee "for the prohibited purpose[] of raising general revenues" (Def. PFC p. 69).  Yet the evidence is clear that the Passenger Fee serves precisely that purpose, and has always been intended to do so.  (Pl. PFF ¶¶ 56-63; Tr. 862:7-9 [Arnold] [Port Authority "act[s] as an incubator for growth of economic activity *that supports the city itself*"] [emphasis added]; Tr. 37:17 to 38:14 [Freimuth] [non-ferry projects benefit the City and "the entire community"];

---

[15]   The Port Authority does not provide fire-fighting other emergency services in the harbor; these are provided by the Harbor Master, whose salary is paid by the City, and other City personnel (Tr. 563:4-5, 563:17 to 564:5, 581:7 to 582:8 [Savino]).

Tr. 569:14-23 [Savino] [purpose of Passenger Fee has always been "to create a source of revenue to support the operations of the Port Authority"].)

Under the Tonnage Clause standard, which allows "reasonable fees in return for services rendered," the Port Authority may charge passengers only for ferry-related services, but not for the broad range of port development activities, such as those listed above, whose aim is to improve the economy for the City and the larger community as a whole.

**E.    The Connecticut Port Authorities Statute**

As there is virtually no case law under the Connecticut port authorities "Enabling Statute," Conn. Gen. Stat. §§ 7-329a to 7-329u,[16] its interpretation must be based on its text, a straight-forward reading of which shows that the Port Authority has exceeded its bounds by charging ferry passengers a fee in order to pay for non-ferry "projects."

The parties differ in their interpretation of the two sections dealing with fees:  §§ 7-329c and 7-329i.  We address them in turn.

Section 7-329c(10), quoted by both parties in their initial submissions (Pl. PCL ¶ 26; Def. PFC pp. 82-83), provides in relevant part that a port authority may "[f]ix fees . . . for the purpose of all *port facilities owned* by the port authority . . . (emphasis added)."  The Port Authority discusses this provision as if the word "owned" were not in the statute (Def. PFC pp. 83-84).  It points out that the definition of "port facilities" in § 7-329b(4) is broad, which is true, but ignores the requirement that port facilities for which it imposes charges must be *owned* by the Port Authority.

---

[16]    The only case cited in the Conn. Gen. Stat. Annotated, under § 7-329c, is this Court's September 8, 2004, ruling in this case on pretrial motions, <u>Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority</u>, 335 F. Supp. 2d 275 (D. Conn. 2004).

The Port Authority owns only two tracts of land – (1) the Dock, which it acquired from the City in 1993 pursuant to the Property Management Agreement (Pl. PFF ¶ 16), and (2) the BRMC, which it (with help from the City) acquired from the former Cartech owner in 1999 by condemnation (Pl. PFF ¶ 79). Riccio confirmed at trial, in response to the Court's questions, that these are the only two properties it owns (Tr. 304:15 to 305:25 [Riccio]). The Port Authority does not own Steel Point (Tr. 172:9-10 [Riccio]), the Cilco terminal (*id.* at 194:4-10), or "a thousand [other] properties within the district" (*id.* at 305:9-10 [Riccio]), many of which are within its jurisdiction.

Section 7-329c(10) makes clear that the Port Authority may charge fees only for the purpose of port facilities it *owns*. The record shows that the Passenger Fee funds Port Authority activities relating to Steel Point, Cilco, the FTZ, and numerous other projects affecting land, within its jurisdiction, but that the Port Authority does not own. Funding of these activities through he Passenger Fee is beyond the authority granted by § 7-329c(10).

In addition, even with respect to the facilities that the Port Authority does own – the Dock and BRMC – § 7-329c(10) does not authorize the Port Authority to collect fees for the purpose of one port facility (the Dock) in order to funds its activities relating to another facility (BRMC). This follows from a logical reading of the statute, which provides in relevant part that a port authority shall have the power to "collect such fees . . . *for* such facilities owned by the port authority" (emphasis added). Thus, the Port Authority may collect fees from Dock users *for* the Dock, and may collect fees from BRMC users *for* the BRMC.

This reading also is consistent with the other provision in the statute relating to fees, § 7-329i. That section authorizes port authorities to charge fees "for the use of and for the services furnished or to be furnished *by each project*," in amounts sufficient "(1) to pay the cost

of maintaining, repairing and operating *the project* and each and every portion thereof, to the extent that the payment of such cost has not otherwise been adequately provided for . . ." (emphasis added).[17]

This text of § 7-329i can only be interpreted to mean that fees charged for a given project must be sufficient to pay for the cost of *that project*. Fees imposed for use of or services to the Dock must be sufficient to maintain the Dock; and fees charged for another project, *e.g.*, the BRMC, must be sufficient, together with other funds (*e.g.*, government grants), to pay for the cost of that project.

The Port Authority quotes the phrase "each project," but omits the preceding word, "by" (Def. PFC p. 84). As noted, the statute authorizes charges "for the use of and for the services furnished or to be furnished *by* each project" (emphasis added); the word "by" indicates that, contrary to the Port Authority's interpretation, the charges must relate to a particular project.

The Port Authority also omits a key phrase in its quotation of the relevant portion of § 7-329i (Def. PFC pp. 84-85). The omitted phrase, where ellipses appear in the first line of the Port Authority's quotation, is "in respect of the aggregate of rates, rents, fees and charges *from such project*" (emphasis added). When the entire clause is read without the omission, it is clear that the authorization in § 7-329i is to set fees *for* a given project, the fees *from which* should be sufficient to pay for the cost of *that project*.

Thus, the Enabling Statute does not authorize the Port Authority to charge fees to one project (the Dock) in order to fund the cost of that *and all other projects*. A different interpretation not only would be contrary to the plain text of the statute, but it would also conflict

---

[17]    Section 7-329i(c)(2) and (3) also state that the fees must be sufficient to satisfy payment and reserve requirements under bonds issued "in respect of such project." As the Port Authority has not issued any bonds, the bond-related provisions of § 7-329i are not applicable here.

with the U.S. constitutional and statutory provisions discussed above.  *See* <u>Connecticut Ex Rel.</u>
<u>Blumenthal v. Crotty</u>, 346 F.3d 84, 93 (2d Cir. 2003) (cardinal principle of construction compels
courts to construe statutes so as to avoid constitutional problems, unless such construction is
plainly contrary to the legislative intent), citing <u>DeBartolo Corp. v. Fla. Gulf Coast Trades</u>
<u>Council</u>, 485 U.S. 568, 575, 108 S.Ct. 1392 (1988).

## F.    <u>Unjust Enrichment</u>

Once again, the parties agree on the legal standard on unjust enrichment – both sides cite
the standard as stated in the leading case, <u>Hartford Whalers Hockey Club v. Uniroyal Goodrich</u>
<u>Tire Co.</u>, 231 Conn. 276, 283 A.2d 518 (1994) (Pl. PCL ¶ 22; Def. PFC pp. 79-80) – but they
disagree on its application to the facts of this case.

If the Court agrees with the Port Authority's view, that it may use the Passenger Fee to
fund essentially all its activities throughout the port district, then there is no unjust enrichment.
However, if the Court determines that the Passenger Fee is excessive – under the Constitution,
statutes and common law as discussed above, as plaintiffs maintain, then it follows that all of the
elements of unjust enrichment are satisfied:  (1) the Passenger Fee has benefited the Port
Authority because its proceeds have far exceeded the Port Authority's costs of the services and
facilities it has provided in exchange for the fee (such excess is the Overcharge); (2) the
Passenger Fee has been "unjust," to the extent of the Overcharge; and (3) the Overcharge has
been detrimental to the plaintiffs – it has caused passengers to pay unnecessarily high Passenger
Fees, which has resulted in monetary damages to both the Ferry Company and the passenger
plaintiffs.  (*See* Pl. PCL ¶¶ 21-23.)

In addition, the Port Authority has not adequately answered plaintiffs' claim that the
Passenger Fee is, in part, duplicative of the Ferry Company's rental payments under the Current

Lease and the Food Services Lease (Pl. PCL ¶ 23; *see* Def. PFC pp. 81-82).  By including the

maintenance costs for the dock, first floor of the terminal, and vehicle staging facilities in its

analysis of the costs justifying the Passenger Fee, the Port Authority in effect is charging

passengers for the same costs that it is contractually required to provide to the Ferry Company in

exchange for the lease rentals (*see* Pl. PCL ¶ 23 and record citations therein).

## G.    CUTPA

The parties agree that a CUTPA claim must be evaluated under the three criteria

established by the Federal Trade Commission, and that it is not necessary to meet all three

criteria (Pl. PCL ¶¶ 37-38; *see also* Def. PFC p. 87).  Plaintiffs fully addressed these criteria and

their application to this case in their initial submission (Pl. PCL ¶¶ 34-51); they reply herein only

to a few points in the Port Authority's initial submission.

The Port Authority incorrectly claims that the CUTPA claim as alleged in the Amended

Complaint "does not identify any law or public policy offended by the passenger fee except the

public policy of "encourag[ing] the use of ferries" (citing Amended Compl. ¶ 115) (Def. PFC p.

87).  Suffice it to say that the CUTPA claim in the Amended Complaint begins by incorporating

by reference all prior claims, *i.e.*, under the Rivers and Harbors Act, the Commerce Clause, the

right to travel, the Tonnage Clause, and Connecticut common and statutory law (Amended

Complaint ¶ 111).  The violation of any of these certainly "offends public policy."

The Port Authority points to its ferry-related activities – improvements to and

maintenance of the Dock facilities – to argue that its conduct has not offended public policy

(Def. PFC p. 88).  But plaintiffs do not allege that the Passenger Fee is illegal to the extent that

the Port Authority uses its proceeds for ferry-related improvements; it is the Port Authority's use

of such proceeds for entirely *unrelated* projects, away from the Dock, that violates public policy and established concepts of fairness, and thus violates CUTPA.

The Port Authority also is factually incorrect in claiming that "[t]here is nothing oppressive or unscrupulous in the manner in which the Port Authority imposes or collects the passenger fee" (Def. PFC p. 88). The evidence is clear that the Ferry Company has no choice but to collect the Passenger Fee, if it wants to stay in business (*see* Pl. PCL ¶ 43, and record citations therein, concerning collection of $1 surcharge). The Port Authority's attitude, as McAllister colorfully put it, is: "if you don't [collect the fee], I'm going to blow your brains out." (Tr. 655:12-13 [McAllister]; also quoted in Def. PFC ¶ 242).

The Port Authority's by now long-ingrained practice of charging a fee to a single captive group – the ferry operation – in order to fund its costs of conducting far-flung and unrelated activities throughout the port district, is deeply and fundamentally unfair, as well as illegal. Its argument that all of its activities benefit the community at large, and therefore the ferry passenger, is not an adequate answer; it underscores the unfairness of its practices and warrants a finding of a CUTPA violation.

The Port Authority has long carried out a pernicious practice of exploiting one group, supposedly for the greater benefit of all, simply because it *can*. The courts and the law, including CUTPA, exist so that such practices can be stopped and redressed.

\*   \*   \*

## <u>CONCLUSION</u>

For the foregoing reasons and those set forth in their September 1, 2006, submission,

plaintiffs respectfully submit that they are entitled to entry of judgment in their favor, granting

them the relief set forth in their September 1, 2006 submission.

Dated:  September 22, 2006

                                               BRIDGEPORT AND PORT JEFFERSON
                                               STEAMBOAT COMPANY, D & D Wholesale
                                               Flowers Inc., and FRANK C. ZAHRADKA
                                               *Plaintiffs*
                                               By:

                                               /s/ *Martin Domb*
                                               _____
                                               Martin Domb (ct 09544)
                                               Jeremy Shure (phv 0938)
                                               AKERMAN SENTERFITT LLP
                                               335 Madison Avenue, 26th Floor
                                               New York, New York 10017
                                               Tel. (212) 880-3800
                                               Fax (212) 880-8965

                                               *and*

                                               Jonathan Bowman (ct 08526)
                                               Stewart I. Edelstein (ct 06021)
                                               COHEN AND WOLF, P.C.
                                               1115 Broad Street
                                               P.O. Box 1821
                                               Bridgeport, Connecticut 06601-1821
                                               Tel. (203) 368-0211
                                               Fax (203) 576-8504

**APPENDIX A**

**SUMMARY RESPONSES TO THE PORT
AUTHORITY'S NUMBERED PROPOSED FINDINGS OF FACT**[18]

Plaintiffs briefly respond below to each numbered paragraph in the Port Authority's

Proposed Findings of Fact dated September 1, 2006.

1.      Not disputed.

2.      Not disputed.

3.      Not disputed.

4.      Not disputed.

5.      Not disputed.

6.      Not disputed.

7.      Not disputed.

8.      Not disputed.

9.      Not disputed.

10.     Not disputed.

11.     Disputed in part, as to the word "primarily."  (*See* Pl. PFF ¶¶ 65; 67(f); 68; 91;

121; 131;157(k).)

12.     Not disputed.

13.     Not disputed.

14.     Not disputed.

---

[18]   "**Reply ¶ ___**" refers to a numbered paragraph in "The Factual Record" portion of this Reply,
above.  "**App. ¶ ___**" refers to a numbered paragraph in this Appendix.  "**Pl. PFF ¶ ___**" refers
to a numbered proposed finding of fact, and "**Pl. PCL ¶ ___**" refers to a numbered proposed
conclusion of law, in Plaintiffs' Proposed Findings of Fact and Conclusions of Law dated
September 1, 2006.

15.    Not disputed.

16.    Not disputed.

17.    Not disputed.

18.    Not disputed.

19.    Disputed in part, as a legal conclusion.  (*See* Reply Part II.E, at pp. 46-49; Pl. PCL ¶¶ 24-32.)

20.    Disputed in part, in that revenues from Derecktor and non-ferry dockage fees are minimal and/or passed through to the City.  (*See* Pl. PFF ¶¶ 100-104.)

21.    Disputed in part.  Arnold cited no specific examples.  In any event, what other port authorities may do is irrelevant, in the absence of a full factual context and without such activities having been legally tested.

22.    Not disputed.

23.    Disputed in part.  (*See* Reply ¶¶ 90-93; Pl. PFF ¶ 171-172.)

24.    Not disputed.

25.    Disputed in part; the extent of the Port Authority's ferry-related activities is in issue generally.  (*See* Reply ¶¶ 16-25; Pl. PFF ¶¶ 67-159.)

26.    *See* App. ¶ 25 above.

27.    *See* App. ¶ 25 above.

28.    *See* App. ¶ 25 above.  The Ferry Company is responsible for and takes care of snow removal at the Dock (Pl. PFF ¶ 24; Pl. Ex. 28, ¶¶ 5-6; Pl. Ex. 29, ¶ 6.)

29.    Not disputed.

30.    Disputed in part; there is no evidence of Port Authority jurisdiction over or involvement with Amtrak, I-95 or the bus terminal.

31.     Not disputed.

32.     Disputed in part, as to the second sentence, because it is based solely on the testimony of Denis O'Malley, a biased witness by virtue of his position as Chairman of the Port Authority, and is not based on or supported by any objective data.

33.     Disputed in part, because there is no evidence as to what are "standard and ordinary" expenses.

34.     Disputed in part, especially the allegation that Riccio's trips "relate to or benefit the ferry operation."  (Pl. PFF ¶¶ 157(k); *see also* Reply ¶¶ 16-25.)

35.     Disputed in part, especially the assertion that the Port Authority's charitable contributions "benefit all users of the port."

36.     Disputed in part, as to the characterization that the office space provided to the CWTA is "minimal."

37.     Not disputed.

38.     Not disputed.

39.     Not disputed.

40.     Disputed in part; the Harbor Master provides some of his own supplies, and obtains some others from the Port Authority.  (Tr. 565:6-18 [Savino]; Pl. PFF ¶ 173.)

41.     Not disputed.

42.     Not disputed.

43.     Not disputed.

44.     Not disputed.

45.     Disputed in part.  (Reply ¶¶ 29-40; Pl. PFF ¶¶ 182-201.)

46.     *See* response to App. ¶ 45 above.

47.    *See* response to App. ¶ 45 above.

48.    *See* response to App. ¶ 45 above.

49.    *See* response to App. ¶ 45 above.

50.    *See* response to App. ¶ 45 above.

51.    *See* response to App. ¶ 45 above.

52.    *See* response to App. ¶ 45 above.

53.    Disputed in part, to the extent that "fiscally reliable and responsible" implies that the Passenger Fee has not been excessive.  (*See* Reply ¶¶ 10-13.)

54.    Not disputed.

55.    Not disputed.

56.    Not disputed.

57.    Not disputed as to what the Court stated, *but see* response to App. ¶ 53 above.

58.    Not disputed.

59.    Not disputed.

60.    Not disputed.

61.    Not disputed.

62.    Not disputed.

63.    Not disputed.

64.    Not disputed.

65.    Not disputed.

66.    Disputed in part; the City owned the Dock and leased it to the Ferry Company, which operated the ferries and dock facilities.  (Pl. PFF ¶¶ 14-15.)

67.    Disputed.  Based on Riccio's biased, subjective and self-serving testimony.

68.    Disputed in part.  (*See* Pl. PFF ¶ 15.)

69.    Disputed in part.  Based on biased, subjective and self-serving testimony of Port Authority officials.

70.    Accuracy of quote not disputed, but *see* App. ¶¶ 67 and 69 above.

71.    Accuracy of quote not disputed, but *see* App. ¶¶ 67 and 69 above.

72.    Accuracy of quotes not disputed, but *see* App. ¶¶ 67 and 69 above.

73.    Not disputed.

74.    Not disputed.

75.    Disputed in part; ridership increased both before and since the creation of Port Authority.  (Reply ¶¶ 41-45.)

76.    *See* response to App. ¶ 75 above.

77.    Disputed in part.  (Reply ¶¶ 41-45; Pl. PFF ¶¶ 43-45.)

78.    *See* response to App. ¶ 77 above.

79.    *See* response to App. ¶ 77 above.

80.    Disputed in part; Ferry Company profitability increased both before and since the creation of Port Authority.  (Tr. 110:13 to 112:1 [Merritt]; Reply ¶¶ 74-85.)

81.    *See* response to App. ¶ 80 above.

82.    Not disputed.

83.    Not disputed.

84.    Disputed in part (as to subjective words such as "enormously").  Ferry Company fares are a matter of record.  (Def. Ex. 20; Pl. Ex's 162-186.)

85.    Not disputed.

86.    Not disputed.

87.     Not disputed.

88.     Disputed in part.  Rinaldo testified that he witnessed some prospective customers decide not to take the ferry when they learned the *total* cost of doing so.  (Tr. 452:17 to 453:8.)

89.     Disputed in part; by bringing this lawsuit the passenger plaintiffs have complained about the Passenger Fee.

90.     Not disputed

91.     Disputed in part; Merritt's full answer was:  "It could be a motivating factor, but not the only factor."  (Tr. 119:15-16.)

92.     Not disputed.

93.     Disputed in part.  Rose did quantify the number of times he has taken the ferry on D&D business.  (Reply ¶¶ 86-88; Pl. PFF ¶¶ 238-43.)

94.     Not disputed.

95.     Not disputed.

96.     Not disputed.

97.     Disputed in part.  (Reply ¶ 87.)

98.     Not disputed.

99.     Not disputed.

100.    Disputed.  (Reply ¶ 88; Pl. PFF ¶¶ 238-43 [Rose's damages computation]; *id.* ¶¶ 202-221 [Schachter's analysis of the Overcharge].)

101.    Disputed in part.  (Reply ¶ 89.)

102.    Not disputed.

103.    Not disputed.

104.    Not disputed.

105.    Not disputed.

106.    Disputed in part, as to second sentence.  (Reply ¶¶ 29-40 [discussing Net Income Reports] and ¶¶ 52-54 [discussing the Overcharge]; Pl. PFF ¶¶ 206-209.)

107.    Disputed in part.  (Reply ¶¶ 52-54; Pl. PFF ¶¶ 210-214.)

108.    Disputed in part.  (*See* response to App. ¶ 107 above.)

109.    Not disputed.

110.    Disputed.  (Reply ¶¶ 55-59; Pl. PFF ¶¶ 215-221.)

111.    Disputed in part (as to subjective and sarcastic terms).

112.    Disputed in part, as to the first sentence.  (*See* response to App. ¶ 110 above.)

113.    Disputed in part, as to parenthetical.  (*See* responses to App. ¶¶ 106-108 above.)

114.    Disputed. (*See* response to App. ¶ 110 above and Reply ¶¶ 55-59.)

115.    Disputed.  (*See* response to App. ¶ 114 above.)

116.    Disputed.  (*See* response to App. ¶ 114 above.)

117.    Disputed.  (*See* response to App. ¶ 114 above.)

118.    Disputed.  (*See* response to App. ¶ 114 above.)

119.    Disputed.  (*See* response to App. ¶ 114 above.)

120.    Disputed.  (*See* response to App. ¶ 114 above.)

121.    Disputed.  (*See* responses to App. ¶¶ 110-120 above and Reply ¶¶ 51-60.)

122.    Not disputed.

123.    Disputed in part; Schachter examined the Port Authority's actual costs, whereas Arnold examined the value of facilities funded by government grants, for which the Port Authority incurred no costs.  (Pl. PFF ¶¶ 276-281; *see also* Reply ¶¶ 61-63.)

124.    *See* response to App. ¶ 123 above.

125.    Disputed in part.  Arnold made many mistakes in his analysis of the Port Authority's costs.  (Pl. PFF ¶¶ 276-282.)

126.    Disputed in part.  Schachter in his analysis gave credit for the time and expense incurred by the Port Authority in obtaining and administering ferry-related grants.  Schachter excluded the *capital* cost ferry-related improvements.  (Tr. 782:2-22 [Schachter]; Pl. PFF ¶¶ 278-280 [Arnold]; Pl. Ex. 218, p 39 n. M)

127.    Not disputed as to what Arnold concluded, but dispute his conclusion.  (Pl. PFF ¶¶ 276-281.)

128.    Disputed.  (Reply ¶¶ 16-25; Pl. PFF ¶¶ 77 [Steel Point]; 82 [Cartech]; 93 [BRMC]; 107 [Derecktor]; 117 [High Speed Ferry]; 127 [Barge Feeder service]; 136 [Foreign Trade Zone]; 157(f) [Sports Tickets]).)

129.    Disputed.  Oppel's testimony is biased and subjective.  The record as a whole contradicts this statement.  (*See*, *e.g.*, Pl. PFF ¶¶ 69-159.)

130.    Dispute that the following grants benefit the ferry passengers or the Ferry Company: (c) parking facility (Reply ¶¶ 46-47); (d) security for BRMC (Pl. PFF ¶¶ 86, 212(f); Tr. 781:14-16 [Schachter]); and (e) through (i) (Pl. PFF ¶¶ 83, 93, 107, 117, 150, 153, 167-172; Reply ¶¶ 16-25).

131.    Disputed in part.  The grants for the terminal were awarded, not to the Port Authority, but to the City and the Greater Bridgeport Regional Agency (Reply ¶ 91; Pl. PFF ¶ 171-172.)

132.    Disputed in part.  The grants for the BRMC, barge feeder service, high speed ferry, and numerous other projects away from the Dock neither relate to nor benefit the ferry operation.  (Reply ¶¶ 16-25; *see also* response to App. ¶ 128 above.)

133.    Disputed in part, especially as regards non-Dock facilities and projects.  *See* response to App. ¶ 132 above.

134.    Disputed in part.  The cost of the Port Authority personnel time and overhead is substantial.  (Reply ¶¶ 26-28.)

135.    Not disputed.

136.    Disputed in part.  (Pl. PFF ¶ 15.)

137.    Accuracy of quote not disputed, but dispute substance.  Based on biased, subjective and self-serving testimony of former Port Authority Executive Director Oppel.

138.    Not disputed.

139.    Not disputed.

140.    Not disputed.

141.    Not disputed.

142.    Disputed in part.  (Reply ¶ 90-93.)

143.    Not disputed.

144.    Not disputed.

145.    Disputed in part.  McAllister gave a more detailed opinion of the terminal building.  (Tr. 671:14 to 672:25.)

146.    Disputed in part; factors other than the terminal building have increased demand for ferry service, as evidenced by the growth in car traffic both before and since the terminal building was constructed.  (Reply ¶¶ 41-45.)

147.    Disputed in part.  Based on biased, subjective and self-serving testimony of Port Authority officials.

148.    Not disputed.

149.    Not disputed.

150.    Disputed in part.  The Ferry Company, through Hall and Rinaldo, also participated in the plans with the State for the new access road.  (Tr. 432:14 to 433:3 [Hall].)

151.    Not disputed.

152.    Not disputed.

153.    Not disputed.

154.    Not disputed.

155.    Not disputed.

156.    Disputed in part, as to "for the first time."

157.    Disputed in part.  Based on biased and subjective testimony of Port Authority's experts.  (Pl. PFF ¶¶ 246-256.)

158.    Disputed in part (as to the subjective word "significantly").

159.    Disputed in part.  The Port Authority designed and intends the new parking facility, if it is ever completed, to be another source of revenue for itself, and another cost to the ferry passenger.  (Reply ¶¶ 46-47; *see also* Def. PFC ¶ 164.)

160.    Not disputed.

161.    Not disputed.

162.    Not disputed.

163.    Disputed in part.  There are other reasons why the garage project has not gone forward.  (Tr. 375:13 to 376:12 [Riccio].)

164.    Not disputed.

165.    Disputed in part.  (*See* response to App. 159 above.)

166.    Disputed in part, to the extent it implies that these improvements are for the Dock or ferry operation only.  They are also for the BRMC and the port in general.

167.    *See* response to App. ¶ 166 above.

168.    *See* response to App. ¶ 166 above.

169.    Not disputed.

170.    Not disputed.

171.    Disputed in part, as to the subjective word "little."  Also, the time sheets cover the 2002 season only, and do not include part-time employees hired by the Port Authority for this project.  (Pl. Ex. 64; Tr. 528:3 to 529:6, 525:12-14 [Klimas].)

172.    Not disputed.

173.    Disputed in part.  McAllister's testimony was that a clean harbor is a benefit to *all* users of the harbor, the Long Island Sound and beyond, but he did not see why the ferry operation has to pay for it.  (Tr. 675:22 to 676:4.)

174.    Not disputed.

175.    Not disputed.

176.    Not disputed.

177.    Not disputed.

178.    Disputed.  (Reply ¶¶ 26-28.)

179.    Disputed in part.  (Pl. PFF ¶¶ 108-115.)

180.    Disputed.  (Reply ¶¶ 94-97, 16-25; Pl. PFF ¶¶ 116-117.)

181.    Not disputed.

182.    Not disputed.

183.    Not disputed.

184.    Disputed.  (Reply ¶¶ 26-28.)

185.    Disputed in part.  (Pl. PFF ¶¶ 121, 125.)

186.    Disputed in part, as to the second sentence.  (Reply ¶¶ 94-97.)

187.    Not disputed.

188.    Disputed in part.  (Pl. PFF ¶¶ 70-77.)

189.    Disputed.  (Reply ¶¶ 26-28.)

190.    Not disputed, although the income amounted to only "several thousand dollars."

(Tr. 175:8 [Riccio].)

191.    Disputed in part, as to the ferry passengers.  (Pl. PFF ¶ 77; *see also* Reply

¶¶ 16-25.)

192.    Not disputed.

193.    Not disputed.

194.    Disputed.  (Pl. PFF ¶¶ 137-145.)

195.    Not disputed, but dispute that Passenger Fee should be used to fund all general

harbor improvements.

196.    Not disputed.

197.    Disputed.  (Reply ¶¶ 26-28; Pl. PFF ¶¶ 128-136.)

198.    Not disputed.

199.    Not disputed.

200.    Disputed in part, as to the subjective terms such as "disaster."

201.    Not disputed.

202.    Disputed in part; although the contract amounts may have been funded by grant income, the requests for proposal ("RFPs"), bidding and administering of the contracts has consumed significant amounts of the Port Authority's operating funds.  (Pl. PFF ¶¶ 83-91.)

203.    Disputed in part to the extent implies that the environmental cleanup of the BRMC should be deemed a benefit to the ferry operation or its passengers.

204.    Disputed.  (Reply ¶¶ 26-28; Pl. PFF ¶¶ 83-93.)

205.    Disputed in part; statement does not fully describe involvement of Port Authority personnel.  (Pl. PFF ¶¶ 84-91.)

206.    Disputed; the cited reference (Freimuth testimony) is vague.

207.    Not disputed.

208.    Not disputed.

209.    Not disputed.

210.    Not disputed, although the revenues are small and mostly passed through to the City.  (Reply ¶ 99-100; Pl. PFF ¶¶ 100-104.)

211.    *See* response to App. ¶ 210 above.

212.    Disputed as to the ferry passengers.  Based on biased, subjective and self-serving testimony of Riccio.

213.    Not disputed.

214.    Not disputed.

215.    Disputed as to the ferryboats.  (Reply ¶¶ 101-103.)

216.    Disputed.  (Reply ¶¶ 101-103; Pl. PFF ¶ 148.)

217.    *See* response to App. ¶ 216 above.

218.    Not disputed.

219.    Not disputed.

220.    Disputed in part; although the Passenger Fee is identified in the ferry schedules, ferry passengers are not necessarily aware of it.  The cited testimony of Freimuth (Tr. 35:10-16) is inconclusive.

221.    Not disputed.

222.    Not disputed.

223.    Not disputed.

224.    Not disputed.

225.    Disputed, and also irrelevant.  (Reply ¶¶ 1-9.)

226.    Not disputed.

227.    Not disputed.

228.    Disputed in part.  Based on biased, subjective and self-serving testimony of Savino.  The Port Authority has raised the Passenger Fee to in order to meet all of its operating costs (Tr. 573:4 to 574:19 [Savino], including, for example, to pay legal fees relating to Derecktor (Pl. PFF   ¶ 97).

229.    Disputed as to the word "minimal."  For example, the Passenger Fee for auto and driver has doubled.  A fee increase is not "minimal" to one who must pay it.

230.    Disputed in part, as to subjective terms such as "relatively small."  The most common fare is for auto and driver, as to which the fare in 2005 was $37.75 and the Passenger Fee was $2.00, which amounts to over 5% of the fare.  (Pl. Ex. 186.)

231.    Disputed in part (as to subjective words such as "minor role").  Ferry Company fares are a matter of record.  (Def. Ex. 20; Pl. Ex's 162-186.)

232.    Disputed in part.  The surcharge at the preliminary injunction hearing was 50 cents.  Currently it is $1, on top of the regular Passenger Fee.  The proportion that the Passenger Fee bears to the ferry ticket is not relevant to the question of whether the Passenger Fee is excessive.

233.    Disputed.  Deak and Arnold so testified, as did Ferry Company representatives. (Reply ¶¶ 65-66.)

234.    *See* response to App. ¶ 233 above.

235.    Disputed in part.  *See* response to App. ¶ 88 above.

236.    Disputed.  *See* response to App. ¶ 233 above.

237.    Not disputed, but the Ferry Company is harmed by the Passenger Fee to the extent it is excessive.  (Reply ¶¶ 64-85.)

238.    Not disputed.

239.    Not disputed.

240.    Disputed as to the last sentence.  (Reply ¶¶ 64-85, 86-88; *see also* legal discussion in Pl. PCL generally, and in Reply Part II [Legal Issues] above.)

241.    Disputed.  (Reply ¶¶ 65-66.)

242.    Disputed (except as to the quoted testimony).  There is other evidence of damages.  (Reply ¶¶ 64-85.)

243.    Disputed (except as to quoted testimony).  (Reply ¶¶ 64-85.)

244.    Disputed (except as to quoted testimony).  (Reply ¶¶ 64-85.)

245.    Disputed in part.  (Reply ¶¶ 64-85.)

246.    Disputed in part.  The quoted text refers to the 50-cent surcharge, not to the Passenger Fee.  (*See also* Reply ¶ 65 [Deak and Arnold testimony].)

247.     Disputed.  Arnold's opinion is flawed because fare increases by Ferry Company would not capture losses from excessive Passenger Fee.  (Reply ¶ 71; Pl. PFC ¶¶ 272-275, 268-269.)

248.     Disputed in part.  McAllister testified that he tries to keep fares as low as possible, and he and other Ferry Company officials testified that their ability to raise fares is limited by the Cross Sound Ferry.  (Pl. PFF ¶¶ 225, 228-229.)

249.     Disputed.  (Reply ¶¶ 71-72.)

250.     Not disputed, although relevant text was omitted from quotation.

251.     Disputed in part.  (Reply ¶ 72.)

252.     Disputed.  (Reply ¶¶ 71-73.)

253.     Not disputed.

254.     Disputed; Schachter so testified, and there is other such evidence.  (Pl. PFF ¶¶ 202-221 [Schachter]; ¶¶ 222-237 [other evidence]; Reply ¶¶ 69-70; *see also id.* ¶¶ 51-60.)

255.     Disputed to the extent it implies that this was the only evidence presented regarding the Ferry Company's damages.  (Reply ¶¶ 64-85.)

256.     *See* response to App. ¶ 255 above.

257.     Disputed.  (Reply ¶¶ 64-85.)

258.     Not disputed, but ridership also increased all but one year before the Port Authority was created, and all but one year since then.  (*See* table at Reply ¶ 43.)

259.     Disputed in part, as to 2003.  (Reply ¶¶ 79-84.)

260.     Disputed in part.  (Reply ¶¶ 43-44.)

261.     Disputed.  The record shows and the Port Authority knows or should know that this statement is factually incorrect.  (Reply ¶¶ 79-84.)

262.   Not disputed as to what Deak's conclusion was , but his conclusion is incorrect. (Reply ¶¶ 64-85; Pl. PFF ¶¶ 262-271.)

263.   *See* response to App. ¶ 262 above.

264.   *See* response to App. ¶ 262 above.

265.   *See* response to App. ¶ 262 above.

266.   Disputed.  The cross-examinations of Deak and Arnold refuted Deak's conclusion, and Schachter provided expert testimony on the amount of the Ferry Company's damages.  (*See* response to App. ¶ 254 above.)

267.   Not disputed as to what Arnold's conclusion was , but his conclusion is incorrect. (Reply ¶¶ 64-85; Pl. PFF ¶¶ 272-282.)

268.   Disputed.  Vague.

## <u>CERTIFICATE OF E-SERVICE</u>

I hereby certify that on **September 22, 2006**, a copy of the foregoing **Plaintiffs' Reply to Port Authority's Proposed Findings of Fact and Conclusions of Law** was filed electronically and served by mail on anyone unable to accept electronic filing (all counsel were served electronically).  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ *Martin Domb*
_____
Martin Domb (ct 09544)
AKERMAN SENTERFITT LLP
335 Madison Avenue, 26th Floor
New York, New York 10017
Tel. (212) 880-3800
Fax (212) 880-8965
E-mail:  martin.domb@akerman.com