UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON      )
STEAMBOAT COMPANY, *et al.*,       )     Case No. 03-CV-599 (CFD)
                                       )
              Plaintiffs,      )
                                       )
v.                                       )
                                       )
BRIDGEPORT PORT AUTHORITY,     )     September 22, 2006
                                       )
              Defendant.      )
_____  )

## DEFENDANT'S REPLY TO PLAINTIFFS'
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MURTHA CULLINA LLP

Richard L. Rose, #CT23291
177 Broad Street
Stamford, CT  06901
203-653-5400
Fax 203-653-5444
rrose@murthalaw.com

Everett E. Newton, #CT02508
CityPlace I, 185 Asylum Street
Hartford, Connecticut 06103-3469
860-240-6000
Fax 860-240-6150
enewton@murthalaw.com

THOMPSON COBURN LLP

Edward J. Sheppard, #CT24760
1909 K Street, NW, #600
Washington, DC 20006
202-585-6900
Fax 202-585-6969
esheppard@thompsoncoburn.com

Timothy F. Noelker, #CT26291
Mary Catherine Hodes, #phv01235
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6091
Fax 314-552-7091
tnoelker@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port Authority

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FINDINGS OF FACT ......................................................................................................... 2

CONCLUSIONS OF LAW ................................................................................................. 6

    **I. Introduction.** ......................................................................................................... 6

    **II. Analysis** ............................................................................................................... 8

        A. The passenger fee is fully valid under the Commerce Clause, the Right
        To Travel, and the Rivers and Harbors Appropriations Act (Counts I,
        II, and III). ................................................................................................... 8

            1. Plaintiffs' citations are inapposite. ................................................... 9

            2. Plaintiffs ignore important precedent ............................................. 12

            3. Plaintiffs invent a standard for "excessiveness" that has no basis in law ........ 12

            4. Conclusion .................................................................................... 13

        B. The Port Authority's use of passenger fee proceeds to pay the Port Authority's
        operating expenses is a straightforward application of explicit statutory
        authority, not a "fleecing [of] the captive ferry passenger and Ferry Company.". 14

        C. Plaintiffs have not proven damages ...................................................... 16

            1. There is no evidence of any damages to the Ferry Company ......... 16

            2. Plaintiffs cannot prove the amount of damages by relying on "hunches" and
            profoundly flawed expert testimony. ............................................. 18

            3. Conclusion .................................................................................... 20

        D. Declaratory and injunctive relief are inappropriate ............................... 20

            1. Declaratory relief is inappropriate in these circumstances ............ 20

            2. Plaintiffs have not made a case for injunctive relief ..................... 21

CONCLUSION ................................................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

<u>**Pages**</u>

<u>**Cases**</u>

<u>American Trucking Association v. Scheiner</u>, 483 U.S. 266 (1987)..............................11

<u>Broadview Chemical Corp. v. Loctite Corp.</u>, 417 F.2d 998 (2d Cir. 1969).................20

<u>Doran v. Massachusetts Turnpike Authority</u>, 348 F.3d 315 (1st Cir. 2003)................11

<u>Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines</u>, 405 U.S. 707
    (1972)...............................................................................................7, 8, 9, 10, 11, 12, 13

<u>New York State Nat'l Org. for Women v. Terry</u>, 886 F.3d 1339 (2d Cir. 1989) .........22

<u>Northwest Airlines v. County of Kent</u>, 510 U.S. 355 (1994)..............................9, 10, 11

<u>S.E.C. v. First Jersey Securities, Inc.</u>, 101 F.3d 1450 (2d Cir. 1996) ..........................23

<u>**Statutes**</u>

Conn. Gen. Stat. § 7-329a *et seq.* .................................................................................14

Conn. Gen. Stat. § 7-329c .......................................................................................14, 15

Conn Gen. Stat. § 7-329i .................................................................................................3

<u>**Other Authorities**</u>

Anti-Head Tax Act ("AHTA"), 49 U.S.C. §40116 (2000) ..............................................9

Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.*....................................................20

### **INTRODUCTION**

Plaintiff Bridgeport & Port Jefferson Steamboat Company (the "Ferry Company") has brought this legal challenge to Defendant Bridgeport Port Authority's (the "Port Authority") right to charge ferry passengers a user fee. The Ferry Company, D&D Wholesale Flowers, Inc., and individual plaintiff Frank L. Zahradka (collectively, "plaintiffs") allege that the user fee imposed by the Port Authority (the "passenger fee") violates three provisions of the United States Constitution, federal statute, and Connecticut statutory and common law.

The Port Authority is a small, local, quasi-governmental agency that has had a significant and positive impact upon the community of Bridgeport in its short lifetime. The three employees of the Port Authority, guided by their governing Commissioners, have won grants to fund the significant development activities that have taken place within the Port Authority's jurisdiction, and have thereby held the Port Authority's budget to a minimum. The Port Authority has funded the general operating expenses not covered by grant funds by charging a user fee to ferry passengers and rents to tenants, as explicitly authorized and anticipated in its enabling statutes, and as is standard practice for port authorities. As the Port Authority's development projects continue, new sources of revenue such as a new parking garage and future tenants of newly developed properties will also contribute to its operating budget.

By bringing this suit, the Ferry Company, the lead plaintiff and currently the Port Authority's main tenant, is attempting to have its cake and eat it too. The Ferry Company enjoys ever-increasing profits as a result of the Port Authority's improvements to the port. Central to the Port Authority's improvements has been a complete transformation of every aspect of the Ferry Company's Bridgeport operating facilities, all with minimal impact on the Ferry Company's lease obligations. The improvements to ferry facilities and the Port Authority's other

3429584

1

projects have contributed to remarkable growth in the Ferry Company's business during the Port Authority's existence, and future improvements such as the parking garage and additional, complementary ferry services promise to continue increasing demand for the ferry.

Despite all these benefits at virtually no cost to the Ferry Company, the Ferry Company sees in the Port Authority's modest operating revenues the possibility of additional profit. Thus, it has brought this lawsuit in order to seize from the Port Authority most of the past proceeds of the passenger fee, which is the modest fee the Port Authority has had to charge port users in order to bring about these many improvements.

Unfortunately for the Ferry Company, it cannot have it both ways. As the Port Authority has thoroughly briefed in its Proposed Findings of Fact and Conclusions of Law, the law fully authorizes the Port Authority to charge a fee to users of the port in order to fund improvements to the port and facilities and services it provides to those port users. In other words, the law affords the Ferry Company no right to the proceeds of a legitimate user fee collected by the Port Authority from port users.

Plaintiffs' allegations were the subject of a trial before the Court from April 17 until April 24, 2006. Pursuant to the Court's standing Trial Memorandum Order, the parties submitted Proposed Findings of Fact and Conclusions of Law on September 1, 2006. The Port Authority hereby submits its Reply to Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The Port Authority refers the Court to its comprehensive presentation of the relevant facts in this case in its previously submitted Proposed Findings of Fact ("DPFF"). Although, as plaintiffs rightly point out, few facts are disputed in this case, a few representations in plaintiffs'

Proposed Findings of Fact ("PPFF") and Conclusions of Law ("PPCL") warrant clarification by the Port Authority.

1.      First, although Ferry Company employees are trained in some security procedures, see PPFF ¶ 37, the Port Authority is responsible for and provides security at the ferry terminal and the other property used by ferry passengers to access the ferry terminal, such as the access road.  To that end, in fact, the Port Authority has received $4.3 million dollars in federal homeland port security grants to upgrade security measures in the port.  See DPFF Section VI.E. Although the Ferry Company may claim to be capable of bearing sole responsibility for security on the Bridgeport side, see PPFF ¶ 40, it is not and would not be equipped to provide the level of security currently provided by the Bridgeport Port Authority.

2.      Contrary to plaintiffs' assertion, the Port Authority does not "deem itself" a quasi-independent agency that does not answer to the Mayor of Bridgeport or other elected officials. See PPFF ¶ 63; PPCL ¶ 43.  Instead, Bridgeport ordinances establish that the Port Authority is quasi-independent of the Mayor of Bridgeport.  Specifically, the Port Authority is not a branch of city government and receives no funding from the City, but the mayor's views are represented on the Board of Commissioners by two *ex officio* members who are city employees.  DPFF ¶ 13.  In addition, the Mayor appoints all five members of the Board of Commissioners, and they are confirmed by the Bridgeport City Council.  Id.  Moreover, Connecticut statute explicitly provides that the Port Authority's fees and rates are not subject to supervision by any instrumentality of the state other than the Port Authority itself:  "[R]ates, rents, fees and charges [charged by the Port Authority] shall not be subject to supervision or regulation by any department, commission, board, body, bureau or agency of this state other than the port authority."  Conn. Gen. Stat. § 7-329i.  Accordingly, by the power of state law, not by assertion, the Port Authority is indeed a

quasi-independent agency of the City of Bridgeport that sets rates that are not subject to supervision by any elected official.

3.     The testimony of Mr. John Arnold, so thoroughly examined by plaintiffs, is of limited relevance to the issues before the Court. Mr. Arnold's central contribution was to offer an alternative calculation of "ferry-related expenses" to Mr. Schachter's fiction, demonstrating the arbitrariness of the extremely narrow interpretation of "ferry-related expenses" employed by Mr. Schachter at plaintiffs' counsel's direction. See DPFF Section V. As the Port Authority pointed out in its previous submission, Mr. Schachter's assumed definition of "ferry-related," which was adopted by Mr. Arnold for purposes of his responsive testimony, was absurdly narrow, including only expenses for services provided directly and exclusively to the ferry operations and excluding all expenses related to myriad other Port Authority activities that benefit the Ferry Company and ferry passengers (the payers of the fee). As such, Mr. Schachter's testimony applying this standard, and Mr. Arnold's responding to Mr. Schachter, are ultimately irrelevant to the issues before the Court. See DPFF Section V.C. Moreover, the very idea of calculating an "overcharge" that measures the excessiveness of the passenger fee on the basis of "ferry-related expenses" is a creation of plaintiffs' counsel and has no basis in law, which also renders the related testimony irrelevant. See supra Sections I and II.A3.

4.     Mr. Arnold, an expert in port economics and finance, also testified that the Port Authority's financing structure, and particularly its use of a combination of rents and user fees to fund its operations, is typical of the industry. DPFF ¶ 21. Plaintiffs do not appear to dispute Mr. Arnold's testimony on that point. In addition, Mr. Arnold agreed with Professor Edward Deak of Fairfield University in concluding that the evidence does not support the Ferry Company's claim to have been damaged by the passenger fee. DPFF ¶¶ 236, 267.

5.     Most of plaintiffs' efforts to characterize the Bridgeport Port Authority as profligate spenders of passenger fee proceeds do not merit response, but the Port Authority must point out, as a matter of general knowledge, that "limousine companies" do not often provide actual "limousines," and that $900 is only enough to transfer a group by mini-bus from Bridgeport to New York City and back, offering them sandwiches and potato chips en route.  See PPFF ¶ 110.

6.     Finally, plaintiffs imply, by pointing to the lack of a passenger fee in Port Jefferson, Long Island, and two other ports, that the Port Authority and its passenger fee are superfluous.  See PPFF ¶ 230 (incorrectly stating that the Port Authority imposes a fee on the "ferry operation," rather than on passengers).  However, the evidence is all to the contrary.  Trial evidence established, and Ferry Company officials admit, that the situation at the Bridgeport dock prior to the Port Authority's creation was dire.  Ferry Company officials also admit that the Port Authority's radical improvements to the dock, and its construction and operation of the terminal and access road have benefited ferry passengers, and that the planned parking garage will further benefit passengers.  Trial evidence established that these improvements, by benefiting passengers, have likely increased demand for the ferry.  Moreover, the new access road and its improved access to the ferry have allowed the Ferry Company to reduce turnaround times and introduce a third ferry boat, thereby increasing the frequency of ferry sailings.  The parties agree that this increase in capacity, which would have been impossible without the Port Authority, has been a major factor in increasing ridership and improving the Ferry Company's profitability.  Because the Bridgeport Port Authority and its passenger fee are responsible for all of these improvements, plaintiffs' position that the Port Authority is superfluous is groundless, regardless of circumstances at other ports.

**CONCLUSIONS OF LAW**

I.    **Introduction**

Plaintiffs' Proposed Conclusions of Law ("PPCL") correctly sets forth the legal question central to the matter before the Court: what limit does the law place on user fees imposed by a governmental entity?  See PPCL at p. 86.  The seven counts of plaintiffs' complaint invoke seven distinct legal authorities that contribute to answering that question.  Central among those authorities is the Commerce Clause of the United States Constitution, but plaintiffs also allege that the Port Authority's user fee violates two other constitutional provisions, one federal statute and three areas of Connecticut statutory and common law.

However, despite their invocation of seven distinct legal authorities, in their Proposed Conclusions of Law, plaintiffs attempt to persuade the Court that these authorities are all "essentially the same."  Id.  As such, according to plaintiffs, the Court should apply a single standard, formulated by the plaintiffs, that captures the essence of the seven claims.  Id.

Plaintiffs' argument suffers from two related flaws.  First, it is a profound oversimplification to suggest that all seven of the federal and state, constitutional, statutory and common law claims at issue in this case could be encapsulated in a single legal standard.  In fact, plaintiffs' suggested standard is merely a somewhat altered version of the third element of the applicable Commerce Clause standard.  Even if plaintiffs had reiterated that element verbatim, one element of one test is far from a complete articulation of the law's limits on user fees imposed by government entities.

Second, plaintiffs urge the Court to apply their proposed standard—that "the proceeds from the user fee may not be excessive in relation to the reasonable cost of the services or facilities provided to the fee payers"—in a manner that is wholly unsupported by legal authority.

As noted above, the test plaintiffs propose is in fact one version of the third element of the

Commerce Clause standard applicable to the user fee.  Specifically, in Evansville-Vanderburgh

Airport Auth. Dist. v. Delta Airlines, 405 U.S. 707 (1972), the Court established, *inter alia*, that

a valid user fee must not be excessive "in comparison to the governmental benefit conferred."

Evansville-Vanderburgh, 405 U.S. at 716-17.  Instead of citing the multitude of cases applying

this "excessiveness" standard, however, plaintiffs propose, with no legal support, and through the

deeply flawed testimony of Mr. Alan Schachter, that the Court adopt the extremely narrow view

that only costs that are directly related to the ferry operations may be compensated through a user

fee.  Compare PPFF Section R with DPFF Section V.A (discussing the testimony of Mr. Alan

Schachter); see DPCL Section I.A.2 (discussing the cases applying the "excessiveness" standard

under the Commerce Clause).  Since the plaintiffs' proposed standard based on "ferry-related"

costs cannot replace the actual legal authorities applicable to "excessiveness" under the

Commerce Clause, much less replace all the legal standards applicable under all seven legal

authorities in the Complaint, the standard plaintiffs propose the Court apply to all seven counts in

this case is actually irrelevant to the issues before the Court.

　　　　Try as they might to "simplify" the case for the Court by proposing a single standard that

has no basis in law but purportedly captures the "essence" of all seven counts, plaintiffs simply

cannot prevail in this lawsuit unless they demonstrate that the Port Authority's user fee violates

one or more of the actual legal standards applicable under the seven authorities invoked in their

Complaint.  The Port Authority has thoroughly articulated how the passenger fee satisfies each

of these legal standards in its previously submitted Proposed Conclusions of Law ("DPCL").

Thus, in this Reply, the Port Authority will simply clarify and respond to specific points raised in

plaintiffs' Proposed Findings of Fact and Conclusions of Law.

II.    **Analysis**

    A.    **The passenger fee is fully valid under the Commerce Clause, the Right to Travel, and the Rivers and Harbors Appropriations Act.  (Counts I, II, and III)**

Although plaintiffs are wrong in urging that one standard applies under all seven counts in the Complaint, three counts in the Complaint do require application of the same legal standard.  For reasons articulated in the Port Authority's earlier submission, Count I under the Rivers and Harbors Appropriations Act and Count III invoking the constitutional Right to Travel both require application of the Commerce Clause standard articulated in Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, 405 U.S. 707 (1972), and its progeny.  See DPCL Sections I.A (explaining that Right to Travel and Commerce Clause employ same test under Evansville-Vanderburgh) and II.A (demonstrating that the MTSA, amending the RHA, is merely a codification of existing Commerce Clause jurisprudence and requires a straightforward application of Commerce Clause precedent).  The Port Authority refers the Court to its Proposed Conclusions of Law for a full articulation of the Commerce Clause standard as it has been applied in cases similar to that before the Court.  See DPCL Section I.A.

In brief, in Evansville-Vanderbugh the Supreme Court concluded that a user fee is constitutional if it (1) "is based on some fair approximation of use or privilege for use" of the "facilities for whose benefit [it is] imposed"; (2) does not discriminate against interstate commerce; and (3) is not "excessive in comparison to the governmental benefit conferred." Evansville-Vanderburgh, 405 U.S. at 716-17.  Plaintiffs do not cite the second element of the Evansville-Vanderburgh test in their Proposed Conclusions of Law, but they claim that the Port Authority's passenger fee runs afoul of both the first and the third prongs.  However, plaintiffs' arguments are flawed in a number of important respects.

### 1.     Plaintiffs' citations are inapposite.

The cases plaintiffs cite do not support their argument and, instead, are basically irrelevant to the Court's consideration of the Port Authority's passenger fee.  For example, plaintiffs rely primarily on <u>Northwest Airlines v. County of Kent</u>, 510 U.S. 355 (1994), in which the Supreme Court interpreted the Anti-Head Tax Act ("AHTA"), 49 U.S.C. § 40116 (2000) (originally codified at 49 U.S.C.App. § 1513).[1]  Because the Supreme Court in <u>Northwest Airlines</u> was involved in applying the AHTA to an airport's proposed tax, the case is generally inapplicable to the case before the Court.  However, the Supreme Court imported <u>Evansville-Vanderburgh</u>'s Commerce Clause standard in order to interpret a central term of the AHTA.  Accordingly, elements of the case's reasoning are potentially relevant to discerning the current state of the law under <u>Evansville-Vanderburgh</u>.

Plaintiffs specifically cite <u>Northwest Airlines</u>'s holding that the fee in question in that case was not "excessive" because it was calculated on the basis of "'the break-even costs for the areas they use.'"  PPCL ¶ 8.  Although the Court did hold that such a user fee was not "excessive," that determination was fact-specific and so uncontroversial that it did not require, in the Court's view, so much as an explanation of the "excessiveness" standard.  Indeed, <u>Northwest Airlines</u> includes all of two sentences on "excessiveness."  The Court simply noted the District Court's finding that the airport's fees in that case were modest, and held that, in such circumstances, the Court could not conclude that they were "excessive" under <u>Evansville-Vanderburgh</u>.  <u>Northwest Airlines</u>, 510 U.S. at 370.

---

[1] As noted in the Port Authority's Proposed Conclusions of Law, Congress passed the AHTA following the Supreme Court's decision in <u>Evansville-Vanderburgh</u> in order to prohibit airport authorities from imposing "head taxes" such as the ones upheld in <u>Evansville-Vanderburgh</u>.  <u>See</u> DPCL Section I n.6.  The statute had no impact on <u>Evansville-Vanderburgh</u>'s general Commerce Clause holding, however, which courts still apply to user fees imposed by authorities not subject to the Anti-Head Tax Act, such as port authorities, as well as to other types of user fees.  <u>See id.</u>

Thus, the Northwest Airlines Court did not conduct any inquiry into Evansville-Vanderburgh's "excessiveness" requirement, nor even attempt to articulate the standard. In other words, it made no claim that the "excessiveness" standard *required* a charging authority to charge only "break-even costs" to users. Instead, it concluded simply that a fee calculated on that basis is an example of a fee that would satisfy the excessiveness standard. Since no one contends that the fee in the instant case is calculated on the basis of "break-even costs," and the Court in Northwest Airlines offered no opinion or guidance with respect to the "excessiveness" of other types of fees, the Supreme Court's conclusion in Northwest Airlines will not assist the Court's determination of "excessiveness" in the instant case.

Plaintiffs similarly rely on the "fair approximation" holding of Northwest Airlines as if it articulated a generally applicable standard, when in fact it reflects a fact-specific conclusion that is inapplicable in the instant case. In Northwest Airlines, the Court concluded merely that "[t]he Airport's decision to allocate costs according to a formula that accounts for [different uses of the Airport by the different users in that case] appears to 'reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed.'" Id. at 369. Again, simply as a matter of logic, just because the Supreme Court held that the apportionment in Northwest Airlines did satisfy Evansville-Vanderburgh's "fair approximation" standard does not mean that other apportionments do not. Similar to its "excessiveness" analysis (or lack thereof), the Court did not set forth any general principle by which future courts may judge whether a particular apportionment between users would or would not satisfy the "fair approximation" standard articulated in Evansville-Vanderburgh. Instead, it made a brief, fact-specific determination. Since it articulated no general standard, and since the circumstances in the instant case are not

the same as those in <u>Northwest Airlines</u>, that case will not assist the Court in its "fair

approximation" determination.

Other cases cited by plaintiffs are equally inapposite. For example, they cite <u>American</u>

<u>Trucking Associations v. Scheiner</u>, 483 U.S. 266, 290 (1987), in which the Court observes that a

fee "do[es] not even purport to approximate fairly the cost or value of the use of Pennsylvania's

roads." However, that quote refers to a flat tax, not a user fee, so the tax did not even purport to

correspond to use in any respect, and is not analogous to the instant case. Moreover, <u>Scheiner</u>

relied overwhelmingly on the Court's conclusion that the flat tax in question disproportionately

impacted out-of-state residents, unlike the user fee imposed by the Bridgeport Port Authority.

Indeed, the First Circuit has refused to apply the user fee discussion in <u>Scheiner</u> to user fees that

are uniformly applied to in-state and out-of-state residents because <u>Scheiner</u> relied so heavily on

the holding that the tax in question disproportionately impacted out-of-state drivers. See <u>Doran</u>

<u>v. Massachusetts Turnpike Authority</u>, 348 F.3d 315, 319-20 (1st Cir. 2003) (refusing to apply

<u>Scheiner</u>, and applying <u>Evansville-Vanderburgh</u>, to reject a Commerce Clause challenge to the

"Fast Lane" program of collecting tolls electronically on the Massachusetts Turnpike).

Moreover, <u>Scheiner</u>'s user fee analysis appears to confuse the "excessiveness" and "fair

approximation" elements of <u>Evansville-Vanderburgh</u>. See <u>Scheiner</u>, 483 U.S. at 290. As a

result, it is not clear which prong the Court means to apply in the brief excerpt selected by the

plaintiffs. Accordingly, the quote does not support plaintiffs' argument that the user fee is

"excessive." For all of these reasons, <u>Scheiner</u> is irrelevant to the Court's Commerce Clause

determination.

### 2.    Plaintiffs ignore important precedent.

Plaintiffs' citation omissions are even more revealing.  For example, plaintiffs avoid citing any of the myriad cases in which courts have meaningfully considered <u>Evansville-Vanderburgh</u>'s  "excessiveness" or "fair approximation" requirements.  By contrast, the Port Authority has offered a detailed analysis of the legal authorities interpreting those two requirements and demonstrated, based on those cases, that the Port Authority's user fee fully satisfies the Commerce Clause standard.  <u>Compare</u> DPCL Sections I.A.1 and 1.A.3 <u>with</u> PPCL ¶¶ 6-15.

### 3.    Plaintiffs invent a standard for "excessiveness" that has no basis in law.

Having omitted all relevant case citations, plaintiffs invent their own standard for "excessiveness" that is conveniently restrictive of the Port Authority.  Namely, plaintiffs assume, without argument or legal authority, that the phrase "governmental benefit conferred" is synonymous with "the Port Authority's actual costs of providing facilities and services to the Ferry Company and its passengers."  PPCL ¶ 10.  Elsewhere in their brief, this unfounded assumption offers a basis for plaintiffs' insistence, through the testimony of Mr. Alan Schachter, that only "facilities and services" provided directly and immediately to the ferry operations should be considered an "actual cost."  <u>See</u> PPFF Section R; DPFF Section V.A.  Indeed, in Mr. Schachter's testimony, they proceed even one step further, urging the Court to define "facilities and services provided to the Ferry Company and its passengers" as only those facilities and services that the Ferry Company itself would choose to provide (<i>i.e.</i>, a grossly stripped down version of the services and facilities the Port Authority actually provides).  <u>See</u> DPFF Section V.A. (discussing particularly Mr. Schachter's "Model 3").

With each of these progressive steps, the Ferry Company's fictional "actual costs" or "reasonable cost" standard narrows the permissible amount of the Port Authority's passenger fee and correspondingly increases the amount by which it imagines the Port Authority is "fleecing" the Ferry Company.  See DPFF Section V.A.  However, no standard based on the "actual cost" of expenditures solely and directly related to ferry operations, in any of its progressively narrow forms throughout plaintiffs' argument, has any basis in law.  Plaintiffs can only suggest this standard because they ignore all cases and legal authority actually interpreting the "excessiveness" prong of the Evansville-Vanderburgh test.  Compare DPCL Section 1.A.3 with PPCL ¶¶ 6-15.

### 4.    Conclusion

As the Port Authority carefully lays out in its Proposed Conclusions of Law, the applicable legal authorities fully validate the Port Authority's user fee under the "excessiveness" test and the other prongs of the Commerce Clause standard set forth in Evansville-Vanderburgh. See DPCL Section I.A.  In satisfying the Evansville-Vanderburgh standard, moreover, the passenger fee also fully satisfies the requirements of the constitutional Right to Travel and the Rivers and Harbors Appropriations Act.

**B.    The Port Authority's use of passenger fee proceeds to pay the Port Authority's operating expenses is a straightforward application of explicit statutory authority, not a "fleecing [of] the captive ferry passenger and Ferry Company."[2]**

Throughout their Proposed Findings of Fact and Conclusions of Law, plaintiffs make much of the Port Authority's use of the passenger fee's proceeds for purposes other than providing services directly and exclusively to the ferry operation.  See, e.g., PPFF ¶¶ 47, 158, 163-65, 173-76, 180, Sections L, Q-R.  The Port Authority has previously demonstrated that the Port Authority's use of passenger fee proceeds for projects other than those that directly and exclusively benefit the ferry operations per se does not violate the Commerce Clause or other federal law, because (1) the Port Authority has the legal authority to use the passenger fee for projects not directly related to the ferry operations and (2) the Port Authority's development projects do benefit the ferry passengers, who pay the fee.  See DPCL Sections I-II.  In addition, the Connecticut statutes that authorize the creation of the Port Authority explicitly anticipate and authorize the Port Authority's use of the passenger fee to fund its general operating expenses.

Connecticut General Statute § 7-329c authorizes the Port Authority to, inter alia:

(10) Fix fees, rates, rentals or other charges for the purpose of all port facilities owned by the port authority and collect such fees, rates, rentals and other charges for such facilities owned by the port authority, which fees, rates, rentals or other charges shall at all times be sufficient to comply fully with all covenants and agreements with the holders of any bonds issued under the provisions of sections 7-329a to 7-329f, inclusive;

(11) Operate and maintain all port facilities owned or leased by it; use the revenues therefrom for the corporate purposes of the port authority, and in

---

[2] In their Count VI, plaintiffs argue that Connecticut statute prohibits the Port Authority from charging the passenger fee at all.  The Port Authority has demonstrated that it is fully authorized to charge the passenger fee by the Connecticut statutes authorizing the creation of the Port Authority.  See DPCL Section III.B; Conn. Gen. Stat. § 7-329a et seq.  Rather then re-create the Port Authority's earlier submission, this section specifically addresses the Connecticut statutory scheme's authorization of the Port Authority's use of the proceeds from the passenger fee for purposes not directly and exclusively related to the ferry operations.

accordance with any covenants or agreements contained in the proceedings authorizing the issuance of any bonds hereunder; . . . .

Conn Gen. Stat. § 7-329c(10)-(11) (emphasis added).  These subsections explicitly anticipate that the Port Authority will fund its "corporate purposes," including, presumably, general operating expenses, by collecting fees from users of port facilities owned by the Port Authority. The Port Authority owns only the ferry terminal building and the Cartech property.  Tenants of each of those facilities pay rent, and the ferry passengers pay a user fee.  The Port Authority uses those revenue streams to fund its operating expenses.  Given the statutory authority above, and particularly given the undisputed fact that the ferry passengers are by far the most substantial users of port facilities, the Port Authority's use of passenger fee proceeds represents a straightforward application of explicit authority granted by the Connecticut legislature.

Plaintiffs object to the Port Authority's use of the passenger fee to fund all its operations, calling the Port Authority's practice an "overcharge" that is "unfair," "offends public policy," is an example of "unchecked advantage-taking," reveals "reckless indifference to the rights others," and, most colorfully, constitutes "fleecing the captive ferry passenger and Ferry Company."  See PPCL ¶¶ 42-43, 48.  However, not only are the Port Authority's practices fully authorized under federal law, see DPCL Sections I-II, they are precisely in line with the funding and spending practices anticipated and authorized by the Connecticut statutes authorizing the creation of the Port Authority and governing its operation.  Accordingly, such practices do not constitute the shocking abuse that plaintiffs assert.  Or, more precisely, if such funding practices are illegal and offensive to public policy, plaintiffs should have filed a complaint challenging the Connecticut statutes authorizing the creation and operation of port authorities.

C.    **Plaintiffs have not proven damages.**

1.    **There is no evidence of any damages to the Ferry Company.**

As the Port Authority laid out in much detail in its prior submission, plaintiffs have not proven that they have sustained any damages as a result of the Port Authority's imposition of the passenger fee.  See DPFF Section VIII.  Despite their insistence in their Proposed Conclusions of Law that they need not prove quantum with mathematical certainty, they must nevertheless carry the burden of proving that they have been damaged *at all* by the Port Authority's imposition of a passenger fee.  The evidence is entirely against such a showing.

First, there is no evidence that ridership or profitability have diminished as a result of the passenger fee.  See DPFF Section VIII.A.  Indeed, both ridership and profitability have increased substantially since the institution of the passenger fee, which is consistent with the conclusion that the Bridgeport Port Authority's use of the passenger fee has actually increased demand for the ferry and thereby improved the Ferry Company's profitability.  Moreover, all parties have noted that the introduction of a third ferry boat and the associated increase in the frequency of ferry sailings have been primary factors in increasing the Ferry Company's ridership and profitability, and there is no question that the Port Authority's port improvements, specifically the construction of a new access road, enabled the Ferry Company's expansion by allowing faster access to the dock and more room for queuing vehicles.  Thus, all evidence points to the Port Authority's use of the passenger fee actually enhancing, rather than diminishing, ferry ridership and the Ferry Company's profitability.  See DPFF Sections VIII.A, VIII.D, VIII.E.

In response to evidence demonstrating that the Ferry Company has only benefited from the passenger fee, plaintiffs offer a single theoretical economic principle that posits that, at one

moment in time, if "all other things remained the same," an increase in the price of a ferry ticket would decrease demand for the ferry. PPFF ¶ 232. There are a number of problems with this theoretical exercise; primarily, the evidence demonstrates that it has no bearing on the facts of this case. This was acknowledged by both of the experts who testified to the theoretical principle plaintiffs cite, and it is obvious as a practical matter as well.

Put simply, the problem with this theoretical model is that, with the disappearance of the passenger fee, "all other things" would not "remain the same," as posited. Instead, if the passenger fee had not existed at some theoretical moment in time, the benefits the Port Authority has afforded the ferry operations—the terminal, the access road, security for passengers, improved dock, etc.—would have been equally non-existent. Thus, demand at that theoretical moment in time would be impacted not merely by a reduced fare, but also by the absence of all the improvements brought about by the Port Authority—even those that the Ferry Company's owner admits are a great benefit to the passengers. In other words, because the facts require the Court to consider more factors than simply the overall cost of a ferry ticket, plaintiffs' basic theoretical model does not assist the Court's damages determination.

In sum, plaintiffs cannot rely on basic economic theory to prove damages, particularly when the facts of the case render that theory irrelevant to the instant circumstances. Plaintiffs rightly point out that the Court held at a pre-trial hearing that plaintiffs' supply-and-demand theory was sufficient to find that the Ferry Company could potentially have sustained damages "fairly traceable" to the passenger fee for the purpose of conferring standing. PPFF ¶ 2233. However, the Court's satisfaction with that theory for the purpose of its pre-trial standing determination, prior to any discovery, does not mean, as plaintiffs hope, that the same theory now outweighs unanimous trial evidence demonstrating that it has no application in these

circumstances.  The Ferry Company's financial records, ferry ridership records and witness testimony all establish that the passenger fee and the Port Authority's deployment of passenger fee income have augmented, rather than diminished, the profitability of the Ferry Company by increasing demand for the ferry and by enabling the Ferry Company to increase supply by adding an additional ferry boat to its schedule.  See DPFF Section VIII.  Accordingly, the Economics 101 theory plaintiffs urge upon the Court has no further relevance.

Moreover, the Ferry Company admits that it could have increased its fares at any time to increase profitability.  The owner/president and chief financial officer of the Ferry Company both testified that the passenger fee does not affect the amount they charge for a ferry ticket.  Thus, the passenger fee has not prevented them at any time from increasing their fares to increase revenues.  The Ferry Company's nearly unblemished record of significantly increasing its fares on a yearly basis also demonstrates that the passenger fee has been no deterrent to its increasing its fares.  Accordingly, even if the passenger fee had diminished the profitability of the Ferry Company, the Ferry Company could have remedied some or all of any shortfall by raising its fares further, and it did not do so.  See DPFF Section VIII.B.  Thus, it cannot attribute any alleged loss of profits to the Port Authority's passenger fee.

2.    **Plaintiffs cannot prove the amount of damages by relying on "hunches" and profoundly flawed expert testimony.**

Putting aside that plaintiffs have failed to prove the fact of damages with certainty, as explained above, plaintiffs have failed to offer even a reasonable approximation of damages allegedly sustained by the Ferry Company.  There is no direct evidence as to the amount of alleged damages.  Testimony on the subject was limited to the "hunches" of Ferry Company executives regarding how much the Port Authority "is taking out of [its] pocket."  See DPFF Sections VIII.A and VIII.C.  Indeed, Ferry Company executives admitted that they have

3429584                                              - 18 -

conducted no formal study or research into the amount of any damages the Ferry Company may have sustained.  See DPFF Section VIII.C.

In the absence of any other evidence, plaintiffs argue that the expert testimony of Mr. Alan Schachter regarding an "overcharge" by the Port Authority is sufficient, without more, to present "a reasonable estimate of the Ferry Company's damages."  See PPCL Section C.1, ¶ 221, Conclusion (a).  However, Mr. Schachter's testimony is profoundly flawed.  Compare PPFF Section R and PPCL Section C.1 with DPCL Section V.A.  For example, Mr. Schachter relied on expense calculations imported from Port Authority audit records that he himself recognizes do not correspond with actual Port Authority practice.  Accordingly, his calculations based on those figures are unreliable.  See DPFF ¶¶ 106-110.  Moreover, his favored "Model 3," on which plaintiffs base their ultimate request for damages, is based not only on those irrelevant expense calculations but also on a series of expense allocations Mr. Schachter adopts without question from the Ferry Company, rather than on the actual expenses of the Port Authority, which he purports to be analyzing.  See DPFF ¶¶ 110-121; PPFF ¶ 243; PPCL ¶ 221, Conclusion (a).

Most fundamentally, Mr. Schachter's testimony is irrelevant to the Court's inquiry because it applies a standard that has no basis in law.  Specifically, Mr. Schachter assumes, at the direction of plaintiffs' counsel, that only expenses directly and exclusively provided to the ferry operations are legitimate uses for passenger fee revenues, and that everything else represents an illegal "overcharge."  See DPFF ¶¶ 102-104.  Because this standard has no legal foundation, Mr. Schachter's three models applying the standard are irrelevant to the Court's inquiry.  See supra Sections I and II.A.3.

### 3.    Conclusion

Plaintiffs have offered only an irrelevant economic theory, the "hunches" of Ferry
Company executives, and the extremely flawed testimony of a single expert to convince the
Court of the fact and amount of damages to the Ferry Company.  None of these refutes the strong
countervailing evidence demonstrating that the Ferry Company has in fact benefited from the
Port Authority's collection and use of the passenger fee.  As such, plaintiffs have failed to
establish the fact or the amount of alleged damages.  See DPFF Section VIII.

### D.    Declaratory and injunctive relief are inappropriate.

#### 1.    Declaratory relief is inappropriate in these circumstances.

Although the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.*, vests the Court with
broad discretion to exercise its jurisdiction in order to afford declaratory relief, the criteria
generally applied by courts in determining whether to grant a declaratory judgment are not
present in this case.  The Second Circuit has stated that the primary considerations that guide
courts in determining whether to grant declaratory relief are "(1) when the judgment will serve a
useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate
and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."
Broadview Chemical Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969).

The declaratory judgment plaintiffs seek in this case will afford no clarification,
settlement of legal issues, relief from uncertainty, or termination of the existing controversy that
is not available from a straightforward holding interpreting the validity of the Bridgeport Port
Authority's passenger fee under applicable law.  Declaratory judgments are typically available to
litigants who have no claim for damages or past violations, and instead seek an interpretation of
whether a particular action violates an ambiguous or heretofore uninterpreted statute or legal

principle.  In such cases, a declaratory judgment allows the parties to structure their future

conduct under a definitive interpretation of the relevant law, thereby affording certainty and

largely forestalling any threat of future litigation.  In other words, a declaratory judgment offers

litigants standing to obtain a definitive interpretation of applicable law without requiring them to

act in potential violation of the law and await legal action.  See, e.g., id. at 1001 (holding that

declaratory judgment was available to litigant seeking determination whether particular products

infringed competitor's patents and thereby violated previous consent decree and injunction, and

noting that "a party in [plaintiff's] precarious position penalty-wise should not be compelled to

act at its peril when it has the foresight to seek declaratory relief").

      In this case, plaintiffs have alleged substantial past violations of seven different legal

provisions.  The Court's determination of those claims will afford the parties a definitive

interpretation of the law governing the Port Authority's right to charge a user fee, which will

guide the parties' future conduct.  In such circumstances, a declaratory judgment reiterating the

Court's interpretation would neither add certainty nor prevent future litigation.  Since the

declaratory judgment requested by plaintiffs offers no relief from uncertainty beyond that

afforded by a standard holding in plaintiffs' favor, and since it would not eliminate any future

litigation regarding its terms, it would be inappropriate to afford declaratory relief in this case.

      **2.**       **Plaintiffs have not made a case for injunctive relief.**

      This case is not amenable to resolution by permanent injunction.  Plaintiffs can establish

none of the criteria necessary to establish the need for a permanent injunction.  In short, there is

no issue in this case that cannot be resolved by a straightforward holding interpreting the legal

scope of the Port Authority's revenue-raising authority.

In order to obtain a permanent injunction, plaintiffs must succeed on the merits of at least one of their claims, which they cannot do.  Moreover, the Second Circuit has held that a party seeking a permanent injunction must also show "the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  New York State Nat'l Org. for Women v. Terry, 886 F.3d 1339, 1362 (2d Cir. 1989).

Plaintiffs have not shown that there is no "adequate remedy at law" to redress their alleged injury, nor that they will suffer "irreparable harm" in the absence of a permanent injunction.  In support of both contentions, they point merely to the Port Authority's practice of using passenger fee proceeds to pay for its general operating expenses.  As noted above, this practice by the Port Authority is not an egregious abuse of authority, but instead is a straightforward application of the funding procedures authorized by Connecticut statute.  See supra Section II.B.  As such, that practice does not signal the threat of future violations of the law; instead, it signals the Port Authority's careful compliance with the law as its officers understand it applying to the Port Authority.  There is no reason to anticipate that the Port Authority will comply any less faithfully with the Court's interpretation of applicable law.  This is particularly true because, as a quasi-governmental entity with no regular source of public funds, the Port Authority does not have an unlimited budget to defend against the future litigation that would inevitably result from any abuse of its authority as outlined by the Court.

Put another way, although plaintiffs claim that money damages for past violations are not sufficient to prevent the Port Authority from perpetrating future violations of the laws limiting its taxing authority, the likelihood of future violations is no greater in this case than it would be in any other case.  Plaintiffs have offered no evidence that the Port Authority is more likely than any other litigant to flout a judgment restricting the scope of its taxing authority.  To distinguish

3429584                                          - 22 -

cases in which it is appropriate to enjoin a party to comply with the law in the future, the Second Circuit has looked for evidence that, "unless enjoined, the violations will continue." S.E.C. v. First Jersey Securities, Inc., 101 F.3d 1450, 1477 (2d Cir. 1996) (finding that injunction requiring compliance with securities statutes was appropriate where broker-dealers had history of repeated violations despite multiple misconduct charges and sanctions).  In this case, there is no such evidence.  Instead, the evidence points to the Port Authority's strict compliance with its understanding of local regulations, state enabling statutes, and industry practice, all within the limits imposed by the federal law.  Should the Court determine that the Port Authority's previous actions reflected a misinterpretation of the law, there is no reason to anticipate that the Port Authority would not alter its conduct to satisfy its new understanding of its legal obligations.

Because plaintiffs have not shown there is no "adequate remedy at law" for their alleged injury, nor that they will be "irreparably harmed" in the absence of an injunction, a permanent injunction would be inappropriate in this case, even if the plaintiffs should prevail on the merits of one or more of their claims.

<u>**CONCLUSION**</u>

Based upon the foregoing and the Port Authority's Proposed Findings of Fact and Conclusions of Law submitted September 1, 2006, plaintiffs have failed to establish that the Port Authority's passenger fee violates any provision of constitutional law, federal statute, or Connecticut law.  Accordingly, the Port Authority respectfully requests that this Court deny plaintiffs' claims in their entirety and award the Port Authority judgment in its favor on all seven counts of the Complaint, as well as such other relief as the Court deems just and proper.

Dated:  September 22, 2006


Respectfully submitted,


MURTHA CULLINA LLP

Richard L. Rose, #CT23291
177 Broad Street
Stamford, CT  06901
203-653-5400
Fax 203-653-5444
rrose@murthalaw.com

Everett E. Newton, #CT02508
CityPlace I, 185 Asylum Street
Hartford, Connecticut 06103-3469
860-240-6000
Fax 860-240-6150
enewton@murthalaw.com

THOMPSON COBURN LLP


By_____

Edward J. Sheppard, #CT24760
1909 K Street, NW, #600
Washington, DC 20006
202-585-6900
Fax 202-585-6969
esheppard@thompsoncoburn.com

Timothy F. Noelker, #CT26291
Mary Catherine Hodes, #phv01235
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6091
Fax 314-552-7091
tnoelker@thompsoncoburn.com

Attorneys for Defendant Bridgeport Port
Authority

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Defendant's Reply to Plaintiffs' Proposed

Findings of Fact and Conclusions of Law was served via Notice of Electronic Filing by the

CM/ECF system on September 22, 2006 to:

Martin Domb
Akerman Senterfitt
335 Madison Avenue
Suite 2600
New York, NY 10017

Jeremy A. Shure
Akerman Senterfitt
335 Madison Avenue
Suite 2600
New York, NY 10017

Jonathan S. Bowman
Cohen & Wolf, P.C.
1115 Broad Street
P. O. Box 1821
Bridgeport, CT 06604

Stewart I. Edelstein
Cohen & Wolf, P.C.
1115 Broad Street
P. O. Box 1821
Bridgeport, CT 06604

Eric Underriner
Hill, Betts & Nash
One World Financial  Center
200 Liberty Street
26th Floor
New York, NY 10281

3429584