# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON    :
STEAMBOAT COMPANY et al.,       :
        Plaintiffs,           :
                          :       Civil Action No. 3:03 CV 599 (CFD)
      v.                   :
                          :
BRIDGEPORT PORT AUTHORITY,     :
        Defendant.         :

## MEMORANDUM OF DECISION

### I.      Introduction

This action was brought by the Bridgeport and Port Jefferson Steamboat Company (the "Ferry Company"), a corporation that provides a public ferry service for passengers and vehicles between Bridgeport, Connecticut and Port Jefferson, New York, and by two of its frequent passengers (collectively the "plaintiffs"),[1] against the Bridgeport Port Authority (the "Port Authority"). The Ferry Company leases dock facilities in Bridgeport for its ferry boat operation from the Port Authority. The subject of this action is the validity of a passenger wharfage fee ("Passenger Fee") that the Port Authority imposes on all ferry passengers. The Passenger Fee - which has been in effect since 1993 - is collected by the Ferry Company and then turned over to the Port Authority.[2] The plaintiffs challenge the legality of the Passenger Fee, claiming it

---

[1]The two passenger plaintiffs are D & D Wholesale Flowers (substituted as plaintiff for the individual Greg Rose) and Frank Zahradka. A third passenger plaintiff, Robert Heller, was voluntarily dismissed from this action.

[2]The Ferry Company also collects ticket charges from its passengers, but keeps those funds.

violates the Commerce Clause of the U.S. Constitution, the right to travel under the U.S. Constitution, the Tonnage Clause of the U.S. Constitution, the Rivers and Harbors Appropriation Act of 1884, and several Connecticut statutes.  The plaintiffs also asserted a claim for unjust enrichment.  The basis for these claims by the Ferry Company is its contention that the Port Authority uses too small a portion of the Passenger Fee proceeds to support activities related to ferry operations, and spends most of such proceeds for purposes unrelated to the ferry.

This Court presided over a bench trial and the following are the Court's findings of fact and conclusions of law.

## II.    The Parties' Claims

### A.    Findings of Fact

The Court finds the following facts with respect to the parties' claims:

#### 1.    The Parties

The Ferry Company is a Connecticut corporation with a principal office in Port Jefferson, New York.  Since 1883, the Ferry Company has provided a public ferry service for passengers and vehicles traveling between Bridgeport, Connecticut and Port Jefferson, New York.

Plaintiff D & D Wholesale Flowers ("D&D") is a corporation owned by Greg Rose, who was originally named as a plaintiff in this action.  Rose has taken the ferry at least twice a week since April 2001 for D&D business purposes.  Plaintiff Frank Zahradka is a natural person.[3]

The Port Authority is a quasi-independent agency of the City of Bridgeport, formed in

_____

[3]Zahradka withdrew his claim for past damages as he did not testify at trial, but remains a plaintiff for purposes of prospective relief.

1993 under Connecticut state law.[4]  The Port Authority's affairs are directed by a five-member

Board of Commissioners, three of whom are appointed by the Mayor of Bridgeport, and two

serve by virtue of their positions as the City's Director of Economic Development and Harbor

Master.   Joseph Riccio served as Executive Director from November 1996 until the time of trial.

 Riccio directs the daily operations of the Port Authority.  The Port Authority has two additional

employees, Martha Klimas and Charmaine Johnson, who assist Riccio in his daily duties.

The Port Authority's mission is to promote port facilities and economic development of

its waterfront areas.  The Port Authority's jurisdiction is over the Port District, a geographically

defined area which extends approximately 1000 feet inland from the waterways of the Bridgeport

Harbor, Black Rock Harbor, Pequonnock River, and Yellow Mill River, excluding property

zoned as residential and park land. The Port District also includes other areas not located within

1000 feet of the waterways, including the Remington Woods and the General Electric factory in

Bridgeport.  The Port Authority owns the Water Street Dock, as well as the Bridgeport Regional

Maritime Complex ("BRMC"), which includes the Derecktor Shipyard, the Cilco Shipping

Terminal, and the Steel Point Peninsula.  The Port Authority's jurisdiction extends to all shipping

and terminal facilities within the Bridgeport and Black Rock Harbors, including the Motiva

terminal and two other terminals.

## 2.    The Dock and the Ferry Operation

The Ferry Company boats use the Water Street Dock (the "Dock"), and has done so since

before 1980.  Before the Port Authority was created in 1993, the Ferry Company leased the the

---

[4]The Port Authority was created pursuant to Conn. Gen. Stat. §§ 7-239a to 7-329u, and governed by Chapter 2.28 of the Bridgeport City Code.

Dock and other facilities at the Dock from the City of Bridgeport (the "City"). The City provided a concrete block building with a small office and public restrooms, a food and beverage cart, and no shelter for passengers.  In 1993, when the Port Authority was created, the City of Bridgeport transferred control of the Dock to the Port Authority under a Property Management Agreement. The agreement requires the Port Authority to pay the City fifteen percent of all net operating income related to the operation of the Dock.

The Ferry Company leases the Dock facilities from the Port Authority pursuant to a lease agreement dated December 1, 1998, and amended on July 29, 2002 (the "Current Lease").  The Current Lease expires on November 30, 2011, and may be extended by the Ferry Company for two additional terms of ten years each.  Under the Current Lease, the Ferry Company has a "non-exclusive preferential use" of the Dock, and may use the dock facilities and vehicle staging areas for scheduled ferry services.  The Ferry Company also has access to "such office space and waiting room space at the Premises as the Port Authority may from time-to-time make available to the Company" and up to four parking spaces for the Ferry Company's employees.   The Port Authority reserves for itself all other uses of the Dock.  The Ferry Company is also required to purchase and maintain insurance covering the Premises, to indemnify the Port Authority with respect to any claim arising from the activities of the Ferry Company, and to undertake snow removal at the Dock.  The Current Lease requires the Ferry Company to pay monthly rent to the Port Authority at annual rates that increase each year, ranging from $100,000 for the initial year to $158,956 for the final year.  These rates are at or over the market rental value of the land.

The Ferry Company is responsible for the day-to-day operations at the Dock.  Louis Rinaldo, the Dock Manager, and his staff of fifteen to twenty-two dock hands and reservation

clerks are responsible for docking and undocking the ferryboats, staging vehicles waiting to board the ferries, directing passengers and vehicles on and off of the ferries, shuttling passengers in vans and golf carts to and from nearby parking lots, snow removal on the Dock, and garbage disposal from the Dock and the Port Authority Office.

The Ferry Company personnel perform security functions in both Bridgeport and Port Jefferson, and are trained in homeland security procedures by the Ferry Company's security officer.   These security functions include selectively searching vehicle trunks, vetting trucks, and reporting suspicious activities.  The Port Authority provides additional security functions at the Dock on the Bridgeport side; however, if it did not, the Ferry Company would perform all security functions as it does on the Port Jefferson side.[5]  The Ferry Company also maintains insurance covering the Dock, as required by the Current Lease.

The Ferry Company's wholly owned subsidiary, Steamboat Concessions, Inc. ("Concessions"), entered into a lease in August 1996 with the Port Authority, under which Concessions operates a restaurant and food services facility in the Ferry Terminal.  Under the Lease and Food Services Agreement, Concessions is required to pay the Port Authority $1000 per month base rent, plus additional rent equal to 1% of Concessions' annual gross receipts above $100,000 and up to $200,000, plus additional rent of up to $700 per month to defray the Port Authority's costs incurred in cleaning the Terminal premises.  Concessions also must pay for its use of electricity, gas, telephone services, as well as for cleaning and maintenance of the area it occupies in the Terminal.

### 3.    The Passenger Fee

---

[5]The City of Bridgeport funds police services and a harbor master.

Since 1993, the Port Authority has imposed a Passenger Fee (also referred to as a "wharfage fee" or "tariff") on passengers and vehicles embarking on or disembarking from the Ferry Company ferries at the Dock.  As mentioned, this fee is in addition to the ticket price for the ferry.  The Passenger Fee is collected from passengers by the Ferry Company on behalf of the Port Authority at the time passengers purchase their ferry tickets.  The Passenger Fee was fifty cents per passenger and one dollar per vehicle in 1993.  In 2003, the rates were two dollars for cars including a driver and one dollar per passenger, and other fees for other categories of passengers.  A one dollar surcharge, in addition to the Passenger Fee, was imposed beginning in February of 2006 in order to pay for the Port Authority's fees and costs in this litigation.[6]  This Fee is a relatively small portion of the total ferry ticket price to passengers.  For example, in 2005, a one-way passenger ticket vehicle with unlimited passengers was $51.25, while the corresponding Passenger Fee was $2.75.  The Ferry Company increased its one-way ticket price for a vehicle with unlimited passengers by $14.25 from 1993 to 2003.

Each month, the Ferry Company remits the amount collected the previous month to the Port Authority, along with a written report of the number of tickets sold and amounts collected in the various categories of passengers and vehicles.  The Port Authority pays the Ferry Company a fee for collecting the Passenger Fee.  This fee was $22,500 per year until May 2003, when it was increased to $32,500 per year.

4.      The Port Authority's Operating Revenues and Expenses

---

[6]Because the Ferry Company refused to collect this surcharge, it is collected directly from passengers embarking or disembarking from the ferry by a firm hired by the Port Authority.  An earlier surcharge of 50 cents was the subject of a motion for a preliminary injunction that this Court denied on April 15, 2004.

The Port Authority collected a total of approximately $9.5 million in Passenger Fees from 1993 to 2004, and slightly over $1 million in rental revenues from the lease agreements with the Ferry Company and Concessions.   The Passenger Fee, together with the rent generated from the lease agreements, constitutes the primary source of operating revenues for the Port Authority.  Revenues from the Passenger Fee finance the operation and maintenance of the Dock and Ferry Terminal, as well as operating costs for other Port Authority projects described below.[7]  The following table illustrates that the Port Authority's annual revenues from the ferry operation (between the Passenger Fee and the Lease) actually exceed the total operating expenses of the Port Authority.  In fact, the total amount of Passenger Fees collected alone from 1993 to 2004 correlates very closely with the Port Authority's total operating expenses during the same period:

| Year | Total Passenger Fees Collected by Port Authority(a) | Port Authority's Income from Ferry Company Lease(b) | Port Authority's Credit Card Fees and Passenger Fee Collection Costs (c) | Port Authority's Net Income from Ferry (a + b - c ) | Port Authority's Total Operating Expenses for All Activities |
|---|---|---|---|---|---|
| 1993 | $261,342 | | 17,036 | 244,306 | $200,531 |
| 1994 | 449,682 | 56,666 | 33,761 | 472,587 | 351,597 |
| 1995 | 461,396 | 82,584 | 34,590 | 509,390 | 442,531 |
| 1996 | 649,015 | 85,000 | 41,352 | 692,663 | 609,052 |
| 1997 | 678,134 | 95,000 | 41,855 | 731,279 | 532,735 |

---

[7]The Port Authority receives minimal income from collecting dockage fees from other Port Users.  The Port Authority also receives some income from its lease and management agreement with Derecktor Shipyards; however, as discussed below, this money is remitted to the City and is thus not included in the rental income column in the table.

| 1998 | 712,190 | 97,911 | 42,514 | 767,587 | 671,287 |
| 1999 | 804,287 | 90,672 | 46,492 | 848,467 | 813,275 |
| 2000 | 901,518 | 114,167 | 45,017 | 970,668 | 876,643 |
| 2001 | 947,591 | 110,421 | 47,399 | 1,010,613 | 937,228 |
| 2002 | 984,926 | 114,507 | 49,544 | 1,049,889 | 1,134,234 |
| 2003 | 1,292,383 | 118,193 | 63,909 | 1,346,667 | 1,516,650 |
| 2004 | 1,372,031 | 122,433 | 71,423 | 1,423,041 | 1,773,141 |
| **Total** | **$9,514,495** | **1,087,554** | **534,892** | **10,067,157** | **9,858,904** |

The Port Authority has applied for and received government grants which fund a majority of the capital costs for its development projects, including those at the Dock. These awards totaled almost $30 million dollars as of 2004, much of which has yet to be spent. The grants are only available to government entities, and must be spent according to specific terms.[8]

For example, the Ferry Terminal was built with federal grants and municipal funds, but is maintained by funds from the Passenger Fee. Thus, the Port Authority cannot properly include the grant funds spent on projects, like the Terminal, which benefit the ferry operation, in its accounting of expenses for projects benefitting passengers. Likewise, it does not fund the capital costs for other numerous development projects away from the Dock with its operating revenues. Rather, the Port Authority's resources spent on these projects consist of personnel time, overhead, advertising, and other tangential costs to pursuing the projects, as described below. In other words, the controversy between the parties centers mainly on the Port Authority's allocation of its operating expenses, not capital costs.

Each year, the Port Authority prepares a report setting forth the net revenue earned from

---

[8]The Port Authority's auditors have found that the Port Authority obeyed the grant terms.

the operation of the Dock (the "net revenue report").  The purpose of the net revenue report is to calculate fifteen percent of the net operating income from the Dock that the Port Authority is required to pay to the City each year under the 1993 Property Management Agreement with the City.   The amount payable under the Property Management Agreement in 1993, the first year of the Port Authority's existence, was calculated by Edward Oppel, then Executive Director of the Port Authority.  Oppel prepared the calculation in a manner he believed complied with the Property Management Agreement, allocated some expenses to activities that did not relate to the Dock, and sent a letter to the City presenting his formula, which was meant to reflect the "spirit of the agreement" between the City and the Port Authority.  Oppel allocated 50% of the Port Authority's expenses to its activities that did not relate to the Dock, except for the cost of defending an earlier lawsuit by the Ferry Company, which he allocated entirely to the Dock.  The amount payable to the City in Oppel's calculation for 1993 coincides with the audited financial statements of the Port Authority that year.

With a few minor exceptions, the Port Authority, in conjunction with their auditor, has continued since 1993 to allocate 50% of the Port Authority's total costs to the Dock.[9]  The Port Authority's auditors reviewed the allocations and computed the amounts payable to the City under the Property Management Agreement based on the allocations which were included in the Port Authority's financial statements.  The auditors believed the calculations in the net revenues

---

[9] The Port Authority made several exceptions to the 50% allocation of expenses to the Dock.  A category named "Contributions" was allocated 100% to the Dock from 1994 to 2004, the latest year for which allocations are available.  All of the "Legal and Accounting" expenses were allocated to the Dock from 1996 to 2002. Since 2003, 80% of the Legal and Accounting expenses have been allocated to the Dock.  Since 1998, "Building Services" and "Security" are allocated 80% to the Dock.

reports were correct and complied with the agreement with the City, and testified that their favorable opinions as to the financial statements of the Port Authority would not have been issued had they known otherwise.

Port Authority witnesses and the auditor, however, testified that the net revenue reports were not true statements of the Port Authority's net income attributable to the Dock and were based on allocations which were artificial computations of the yearly amounts payable to the City to reflect an unspecified agreement between the Port Authority and the City as to how such payments were to be computed.  The Port Authority, however, has not provided any evidence of this agreement, and continued to use the allocation method over a course of many years without giving any different instruction to its auditors.  Thus, the Court finds that the Port Authority's repeated use of the 50% allocation method over a long period of time, in addition to the periodic adjustments it made to the allocations, is tantamount to an admission on the part of the Port Authority that its expenditures were largely not related to the ferry operation or the Dock.[10]  In fact, the expert analyses of the Ferry Company of the Port Authority's activities indicate that the Port Authority spent considerably less money on the Dock than these reports indicate, not more.[11] For example, the Port Authority allocated a far larger portion of its personnel, advertising, automobile costs, contributions, professional fees, and expenses from other projects to the Dock.

---

[10]In 2004, the Port Authority's financial statements for the first time contain a footnote stating  "The percentage allocation of operating expenses were determined by the City of Bridgeport officials in arriving at the net operating income.  These percentages were utilized solely in determining the fees due the City of Bridgeport and are not used for any other purpose." However, this note was only added after the net revenue reports came under scrutiny in this litigation, and it does not effect the Court's conclusion that the percentage allocations are relevant.

[11]The expert reports are discussed further below.

### 5.    Port Authority Services Benefitting Ferry Passengers

The Port Authority engages in several activities that benefit ferry passengers:

#### A.    The Ferry Terminal

The Port Authority built the Ferry Terminal, which was completed in 1996.  The new building was a dramatic upgrade from the preexisting structure.  The Ferry Terminal consists of two floors: the ground floor, which has a public waiting area, public restrooms, a ferry service information counter, a cafeteria, and a small office for the Ferry Company; and the second floor, which houses the Port Authority and Connecticut World Trade Association offices, a reception area, conference room, and several other offices, and is not open to the public.  Construction of the Terminal cost between three and four million dollars and was funded mostly by city, state, and federal grants.   This type of funding is only available to government agencies such as the Port Authority, and thus could not have been awarded to the Ferry Company.[12]  Maintenance of the Terminal is funded by the Port Authority's operating budget.  The Ferry Terminal directly benefits the ferry passengers because it provides them shelter and services while they wait for the ferry boats to arrive.

#### B.    Repair of Bulkhead

In addition, the Port Authority asked the State of Connecticut to repair the bulkhead of the Dock, and the state and federal government subsequently funded the construction.  This service benefits the ferry passengers because it ensures the continued viability of the Dock from

---

[12] The federal funding for the Ferry Terminal came from the Ferry Boat Discretionary Fund, which is a federal grant program earmarked for ferry operations.  The funds are only available to government or quasi-public agencies, but may only be used for purposes related to ferry operations.  In spite of this, the second floor of the Ferry Terminal is used solely by the Port Authority and the Connecticut World Trade Association.

which the ferry boats embark.

### C.     The Access Road

The Port Authority initiated the construction of an access road which made the Dock considerably more accessible and safe to passengers.  The construction was funded by the State of Connecticut.

### D.     The Planned Parking Facility

The Port Authority has plans to construct a parking facility in which ferry passengers would be required to park.  The Port Authority was able to obtain property that abuts the terminal from an energy company, and sought and was awarded $3,550,700 from the Ferry Boat Discretionary Fund.   Construction has not begun, although the Port Authority has spent over one million dollars in pre-development costs.  Since passengers would have to pay in order to park in the garage, the parking facility will generate additional revenue for the Port Authority.  At the same time, it will benefit ferry passengers by making parking more convenient than under the current system, in which passengers park in remote lots and must walk or be shuttled to the Dock.

### E.     Security Measures

The Port Authority applied for and received federal grants of $2.9 million through the United States Department of Homeland Security in order to procure security equipment for the Dock, as well as for the BRMC and the harbor generally.  These funds have been used to upgrade the terminal, improve lighting and surveillance, implement key access systems, and for a new port security boat.  The Port Authority will also receive an additional $1.4 million with which to purchase equipment to detect improvised explosive devices.   These security measures benefit the

ferry passengers by ensuring their safety and security once upon the ferry boats.

F.    Daily Operations

Finally, the Port Authority performs limited daily operations - mainly the supervision of security and cleaning personnel -  relating to the ferry operation and which benefit the ferry passengers.

**6.    Port Authority's Activities Not Benefitting Ferry Passengers**

The Port Authority is also involved in many projects that do not benefit ferry passengers:

A.    Steel Point

The Port Authority has pursued development projects on the Steel Point Peninsula, which is a tract of about fifty acres of land located within the Port Authority's jurisdiction but not owned by the Port Authority.  The projects include efforts to acquire the property and to promote the construction of casinos, as well as the relocation and management of the Hitchcock Marina. The Port Authority has spent some of its operating funds on Steel Point.  For example, in 1993, it paid $10,000 for a design study for Steel Point.  In addition, the Port Authority has issued and administered requests for the development of Steel Point, installed a new computer program in connection with these solicitations, and mailed out more than five hundred packages to bidders, and reviewed the proposals.  The Port Authority's employees have spent considerable time working on the Steel Point projects, and Steel Point as been discussed at many Port Authority Board meetings.

B.    Cartech, the BRMC, and Derecktor Shipyard

The Cartech property is a tract of about forty eight acres of land located within the Port Authority's jurisdiction, and acquired by the Port Authority in 1999 by condemnation.  The

-13-

acquisition process was the subject of numerous Board meetings and personnel time.  When the Cartech property was acquired, it was renamed the BRMC.  The Port Authority has been involved with the BRMC's development and has administered multiple requests for development proposals and entered into several contracts for its environmental cleanup and development. These contracts have been made with funds from government grants.[13]  Port Authority employees have made trips to the BRMC, done paperwork, obtained insurance, placed ads seeking bids, and arranged for the payment of invoices.   The BRMC has been the subject of discussion on Board meetings on multiple occasions.  The Port Authority has discussed the development of the BRMC with residents of the east end of Bridgeport, where the BRMC is located, and funded a study regarding such development.

The Port Authority has been involved in the development and leasing of a portion of the BRMC, consisting of about twenty-three acres, to a private shipyard known as Derecktor Shipyards ("Derecktor").  The Port Authority applied for and administered government grants for developing the property for Derecktor, and arranged for environmental remediation of the area. The Port Authority retained and paid for attorneys to advise it in connection with Derecktor.  The Port Authority hosted a forum at a hotel to garner support for the Derecktor project, and has arranged and paid for security on the Derecktor site.

Riccio negotiated and signed a lease on behalf of the Port Authority with Derecktor.  The Derecktor lease calls for an initial term of twenty-five years and an option for Derecktor to renew for two consecutive fifteen-year terms, and sets out payment for each of the fifty-five years,

---

[13]The Port Authority has been awarded approximately $11 million in government grants in connection with the BRMC and Derecktor.

which increases from zero for the first three years to $589,486.90 for the last two years. The Derecktor lease also required Derecktor to pay the Port Authority a $15,000 annual management fee, and this fee will increase by 10% every five years. A significant portion of the revenue earned from the Derecktor lease is remitted to the City of Bridgeport in order to repay the amount the City advanced to the Port Authority in order to acquire the Cartech site. The Derecktor Shipyard has been the subject of discussion at multiple Board meetings. The Port Authority has devoted its personnel time and other resources including salary and overhead expenses to activities related to Derecktor.

None of the above-described development benefits ferry passengers nor is it available for their use.

### C.    High-Speed Ferry to Stamford and New York City

For several years, the Port Authority has pursued a project to establish a high-speed ferry service linking Bridgeport with Stamford, Connecticut, and New York, New York. This high-speed service would be for passengers only, not vehicles. The objective of the high-speed ferry is to alleviate congestion on Interstate 95 and the trains to Stamford and New York by providing an alternative mode of transportation. Port Authority personnel have traveled to New York City, Washington, D.C., San Francisco, California, and Seattle, Washington to investigate possibilities for this project using Port Authority funds. The Port Authority has retained and paid a lobbyist to promote the high speed ferry service. The Port Authority has issued requests for development proposals, paid for advertisements, applied for government grants and consulted with counsel in connection with this project. The high-speed ferry has been discussed at numerous Board meetings.

The high speed ferry will not benefit passengers on the Bridgeport to Port Jefferson ferry, because the two ferries would have entirely different routes and presumably service different commuters. Indeed, the high speed ferry will not accommodate vehicles, which compromise the majority of the traffic on the Bridgeport to Port Jefferson ferry.

D.    Barge-Feeder Service

The Port Authority is currently pursuing the development of an inland distribution network for cargo containers, which would ship containers by barge from the Port of New York and New Jersey to Bridgeport. The purpose of the project is to relieve congestion on Interstate 95. The Port Authority has spent personnel time and monetary resources on the project, including for employee travel. For example, it has issued numerous requests for proposals and reviewed bids, lobbied for the project to be exempt from a federal harbor maintenance tax, and discussed the project at multiple Board meetings. The Port Authority has received about $1.5 million from the State of Connecticut in connection with the feeder services, but the project is not operational and has not created any revenue for the Port Authority. The barge feeder service does not benefit ferry passengers.

E.    Foreign Trade Zone

The Port Authority is involved in the operation of a foreign trade zone in Bridgeport. The foreign trade zone is an area, approximately one hour away from Bridgeport, in which manufacturers and distributors can obtain tariff benefits under federal law. The Port Authority has expended resources in the form of employee time, travel, and legal fees in connection with the trade zone. The foreign trade zone project does not benefit ferry passengers.

F.    Cilco and Other Commercial Terminals

_____The Cilco terminal is a commercial shipping terminal located on land near the BRMC within the Port District, but not owned by the Port Authority. The Cilco terminal is used for overseas cargo, mainly the importation of fruit. The Port Authority has lobbied for government grants relating to the terminal, paid for advertisements, and otherwise promoted the terminal. The Cilco terminal does not benefit ferry passengers.

### G.    Dredging of Bridgeport Harbor

The Port Authority has obtained federal funds to dredge the Bridgeport harbor. Dredging will increase the depth of the harbor from its current level, twenty-seven to twenty-nine feet, to its maximum depth of thirty-five feet. The ferry boats only require a harbor depth of fifteen feet; however, some of the commercial shipping boats requires a deeper harbor. The dredging of the harbor will not affect the ferry boats and will thus not benefit the ferry passengers.

### H.    Pump-out Service

The Port Authority operates a seasonal boat pump-out service, in which it cleans the septic tanks of pleasure boats free of charge. Approximately 75% of the cost of this service is funded by government grants, and the remaining 25% is funded from the Port Authority's operating funds. The pump-out service is not provided to the ferry boats and does not benefit ferry passengers beyond the minimal effect it has on the general cleanliness of the harbor.

### I.    Other Projects on Port District Land

The Port Authority reviews and votes on any projects affecting land within its jurisdiction in the Port District. This entails a review of the project and a recommendation by the Executive Director, a presentation and submission of documents to the board, discussion at Board meetings, and a vote. This process utilizes personnel time and other resources. The projects that the Port

Authority has reviewed include: (1) a methanol plant; (2) expansion of a marina on the Yellow Mill River; (3) construction of a dog kennel; (4) an emission testing facility; (5) a plastics manufacturing plant; (6) a paper recycling plant; (7) an asphalt plant; (8) an automobile and marine service and sales facility; (9) a commercial laundry facility; and (10) purchase and redevelopment of property on the Pequonnock River.  None of these projects would benefit ferry passengers.

### J.      Miscellaneous Activities

The Port Authority has also devoted time and resources to the following activities which are not related to the ferry and do not benefit ferry passengers: (1) retention and payment of attorneys and other professionals to create, select, and register a new trademark for the Port Authority; (2) management of the Hitchcock Marina and the Captain's Cove Marina; (3) a proposal to exercise the Port Authority's condemnation power to acquire land in Bridgeport to be used by Sikorsky Aircraft to expand its helicopter manufacturing facilities; (4) providing free office space to the Connecticut World Trade Association**;** (5) purchasing season tickets to local minor league baseball and hockey games; (6) obtaining directors' and officers' liability insurance; (7) making charitable contributions; (8) long-distance telephone calls; (9) meals for the Executive Director; (10) employee travel on business unrelated to the ferry; (11) a leased automobile and gas for the Executive Director; and (11) other miscellaneous expenses such as club memberships and Christmas gifts.

### 7.      **Damages for Ferry Company**

While it is possible that the Ferry Company sustained economic loss as a result of the addition of the amount of the Passenger Fee to its ticket prices, it has not provided any

substantial evidence of its damages to the Court.   The Ferry Company contends that if there were

no Passenger Fee or the amount of the Passenger Fee were less, it would have raised the prices

for its tickets and been able to keep the entire amount rather than remitting the Fee to the Port

Authority.  However, it has not presented evidence of this proposition except the general

testimony of several employees that they would have raised rates, which is too speculative to

prove the fact of these damages by a preponderance of the evidence.

In the alternative, the Ferry Company contends that if its rates remained the same, without

the Passenger Fee, there would have been greater demand for the ferry service because of the

decreased cost, and thus the Ferry Company would have carried more passengers and vehicles

and made more profits. It is undisputed that the price elasticity[14] for the ferry service is greater

than zero but less than one, indicating on a theoretical level that a change in price at a given point

in time would lead to slightly decreased demand.  However, the Ferry Company has not

presented any credible evidence of any decrease in demand or a corresponding loss in profits.  It

has not presented any significant modeling or expert opinion as to how this economic principle

actually applies to the facts here, especially considering all of the variables that factor into this

equation.  For example, factors such as the economy, gasoline prices, traffic and weather

conditions, the replacement of an older ferry boat with a bigger boat, the addition of a new ferry

boat, the new access road, and the improvement in Dock conditions and security, all had an effect

on demand for the ferry and ridership since 1993.

Indeed, the Ferry Company has not presented any evidence that it lost ridership because

---

[14]Price elasticity of demand measures the nature and percentage of the relationship between changes in quantity demanded of a good and changes in its price (% change in demand/% change in price).  A price elasticity of less than 1.0 is considered relatively inelastic.

of the Passenger Fee. Ferry ridership has risen steadily since 1993.[15] In addition, the ferry operation has been highly profitable since the creation of the Port Authority. Its operating revenues increased from $9,774,666 in 1992 to $26,801,121 in 2005, and its profits increased from $659,375 in 1992 to $2,395,832 in 2005.[16] The following chart presents those increases through 2003:

| Year | Operating Revenues | Net Income | Rate of Profitability |
|---|---|---|---|
| 1992 | $9,744,666 | $659,375 | 6.7% |
| 1993 | 10,511,787 | 1,027,695 | 9.7 |
| 1994 | 11,385,376 | 1,641,585 | 14.4 |
| 1995 | 11,784,365 | 1,838,248 | 15.6 |
| 1996 | 13,144,918 | 1,616,755 | 12.3 |
| 1997 | 13,627,372 | 2,157,375 | 15.8 |
| 1998 | 14,667,617 | 2,334,208 | 15.9 |
| 1999 | 16,867,142 | 2,389,810 | 14.2 |
| 2000 | 20,173,217 | 2,130,524 | 10.6 |
| 2001 | 22,419,228 | 3,533,667 | 15.8 |
| 2002 | 23,595,012 | 4,104,452 | 17.4 |
| 2003 | 24,109,912 | 6,730,220[17] | 27.9 |

Furthermore, the Ferry Company has not presented any evidence that it was unable to

---

[15]This increase in ridership is partly attributable to both the Ferry Company's addition of another ferry boat, and the Port Authority's construction - through government grants - of improved and safer facilities at the Dock.

[16] While the increase in profitability does not mean that the Ferry Company *could not have* shown that it would have been more profitable without the Passenger Fee, the Court has found the Ferry Company has not presented sufficient evidence of this effect.

[17]The Ferry Company's income was inflated in 2003 because of the sale of an asset.

further increase its ticket prices, and indeed did increase the ticket prices on a near annual basis since the Port Authority's creation. For example, from 1997 to 2003, the price of a one-way passenger ticket for a vehicle with unlimited passengers increased by $14.25. In contrast, the Passenger Fee has been raised only twice. For example, from 1997 to 2003, the Fee was raised from $2.50 to $2.75, an increase of only twenty-five cents. The increase in the ticket price was thus fifty-seven times greater than the corresponding increase in the Passenger Fee over the same seven-year period. The Ferry Company conceded that the Passenger Fee does not affect its decisions to adjust ticket rates, and the general manager of the Ferry Company stated that he would have set the same rates without the additional Passenger Fee.

Finally, the Ferry Company considers the rates charged by a competitor, the Cross Sound Ferry between New London, Connecticut and Orient Point, New York on Long Island, as one factor when it sets its rates. However, it has not shown any evidence that passengers choose one ferry over the other based on a de minimus difference in its rates.

### 8.    Damages for Individual Plaintiffs

Greg Rose, an employee of Plaintiff D&D, rode the ferry twice a week for at least five years preceding the trial date, or since April 2001. During this time, D&D paid the full ticket price including the Passenger Fee. Thus, D&D was damaged to the extent that this fee was excessive under the Commerce Clause during those years. To determine excessiveness for purposes of the individual damages only, the Court relies on the expert testimony presented below.

The plaintiffs' expert forensic accountant, Alan Schachter, created three different models in order to, in the plaintiffs' words, determine "the amounts, if any, by which the Passenger Fees

received by the Port Authority have exceeded the reasonable cost of the facilities and services that the Port Authority has actually provided to the ferry operation."[18]  In the first model, Schachter simply adopted the figures used by the Port Authority in its own net income reports, discussed above, and calculated an "overcharge" of $2,732,200 from 1993 to 2003.  Schachter concluded that the Port Authority's own figures represented a "floor" for the total overcharge because his review of its financial records suggested the figures in many categories were not accurate and overstated the allocations to the Dock and thus the ferry.

 In the second model, Schachter used the Port Authority's calculations as a base, and then adjusted the allocations for those categories for which he had sufficient information to determine that the allocation used by the Port Authority was inappropriate.  For example, he reduced the allocations for personnel costs, advertising and marketing, automobile expenses, contributions, and professional fees based on his review of the available documents.  The overcharge under the second model, from 1993 to 2003, was $4,360,700.  However, Schachter was unsatisfied with this model because he did not wish to be fettered by the Port Authority's accounting and the "layer of bureaucratic authority" between the ferry operation and the Port Authority.

Finally, in the third model, Schachter made his own calculation of the overcharge by comparing the proceeds of the Passenger Fee each year with the reasonable cost to the Port Authority of what it actually provided to the ferry operation that year.  Because the Ferry Company already provides some of the services and facilities at the Dock, such as dock hands,

---

[18]In undertaking his analysis, Schachter reviewed the records kept by the Port Authority's auditor, the minutes of the Port Authority's board meetings, the Port Authority's available general ledgers, the Port Authority's available telephone and credit card bills, copies of the Port Authority's advertising materials, and the relevant deposition transcripts.

office and telephone expenses, insurance, snow removal, and some security, Schachter

eliminated duplication by discounting the Port Authority's allocations to these same expense

categories.  If there was a documentary basis for the Port Authority's allocation, Schachter

accepted it.  Under the third model, the overcharge from 1993 to 2003 was $6,728,300.

The Court acknowledges that none of these models represents a completely accurate

application of the correct legal standard for user fees, discussed below, to the Port Authority's

use of the Passenger Fee revenues.  However, the standard that Schachter relied on is reasonably

close to the constitutional standard such that the Court will rely on it solely for purposes of

computing the amount by which D&D overpaid the Port Authority in the five years preceding the

trial.  For this purpose, the Court credits the second model, because it starts from the Port

Authority's own accounting system and records and adjusts it based on the available evidence,

reflecting an approximation of which of  the Port Authority's actual expenditures do or do not

benefit the ferry passengers.[19]

Under the second model, in 2001, the overcharge was 49% of the Passenger Fee revenue,

and in 2002, the overcharge was 46% of Passenger Fee revenue.[20]   In those years, D&D paid a

Passenger Fee of $1.50 (for a vehicle and driver) on each ferry ride.  In 2003, the overcharge was

---

[19]Because the first model is based solely on the Port Authority's inaccurate reports, it is
less accurate than the second model.
The third model represents how Port Authority and the Ferry Company would allocate the
expenses of operating the ferry and Dock most efficiently, but does not reflect actual practice.
While it might be preferable and more efficient for the Port Authority not to duplicate
expenditures already paid for by the Ferry Company, such as insurance at the Dock, this decision
seems to the Court to be within the discretion of the Port Authority as a government agency.

[20]These figures were computed by comparing the total amount of Passenger Fee revenue
in a given year and the total amount of the overcharge in that year.

57% of Passenger Fee revenue, and D&D paid a $2.00 Passenger Fee for each ferry ride. After February 1, 2006, when the $1.00 surcharge was implemented, D&D paid a $3.00 Passenger Fee per ticket.  Using these percentages, applying the 2003 percentage to the ensuing periods up until April 19, 2006,[21] when Greg Rose testified, and assuming two ferry trips per week, D&D incurred total damages of $494.63, computed as follows:

| Period | Number of Trips (a) | Passenger Fee per Trip (b) | Total Passenger Fee Paid (c) = (a) x (b) | % Passenger Fee Was Excessive (d) | Excess Amount Paid (D&D's Damage) (e) = (c)x(d) |
|---|---|---|---|---|---|
| Apr. 2001-Dec. 2001 | 75 | $1.50 | $112.50 | 49 | $55.13 |
| 2002 | 100 | 1.50 | 150.00 | 46 | 69.00 |
| Jan. 2003 - Jan 2006 | 308 | 2.00 | 616.00 | 57 | 351.12 |
| Feb 2006 to March 2006 | 17 | 2.00 | 34.00 | 57 | 19.38 |
| TOTALS | 500 | | $912.50 | | $494.63 |

## III.    Conclusions of Law

The plaintiffs brought claims for damages or injunctive relief under seven different legal theories.  The following are the Court's conclusions of law:

### A.    Claims under the Commerce Clause and Right to Travel

The Commerce Clause provides: "The Congress shall have Power. . .[t]o regulate Commerce. . .among the several states."  U.S. Const. Art. 1, § 8.  Although the Constitution's

---

[21] The 2003 percentage was the latest available when Schachter prepared his report.

text does not explicitly limit the power of states to regulate commerce, the United States

Supreme Court has long interpreted the Commerce Clause as an implicit restraint on state

authority, even in the absence of a conflicting federal statute.  United Haulers Ass'n, Inc. v.

Oneida-Herkimer Solid Waste Management Authority, 127 S.Ct. 1786, 1793 (2007) (citing

cases).  The Commerce Clause thus prevents states from passing laws or engaging in activities

that discriminate against interstate commerce.  See West Lynn Creamery, Inc. v. Healy, 512 U.S.

186, 201 (1994).

In Evansville-Vanderburgh Airport Authority District. v. Delta Airlines, Inc., the United

States Supreme Court ruled that the Commerce Clause did not prohibit states or municipalities

from charging commercial airlines $1 per passenger at airports within their jurisdiction in order

to defray costs related to airport facilities.  405 U.S. 707, 716-17 (1972).  "[A] facility provided

at public expense aids rather than hinders the right to travel.  A permissible charge to help defray

the cost of the facility is therefore not a burden in the constitutional sense."  Evansville, 405 U.S.

at 714.  The Court established a three-part test for determining whether a user fee imposed by a

government transportation authority is valid under the Commerce Clause and adequately protects

the right to travel.[22]  A user fee comports with both constitutional clauses if (1) it does not

discriminate against interstate commerce; (2) it is based on a fair approximation of use or

privilege for use of the facilities for whose benefit they are imposed; and (3) it is not excessive in

comparison with the government benefit conferred or in relation to the costs incurred by the

---

[22]The constitutional right to travel from one state to another. . .occupies a position
fundamental to the concept of our Federal Union.  It is a right that has been firmly established
and repeatedly recognized."  United States v. Guest, 383 U.S. 745, 757 (1966).  The Ferry
Company brought a separate claim for a violation of its right to travel; however, the parties agree
the standard is the same as for the Commerce Clause and both will be addressed in this section.

charging authority.[23]  Id. at 716-17.  An application of this test to the Passenger Fee follows.

1.    Discrimination Against Interstate Commerce

It is clear the Passenger Fee does not discriminate against interstate commerce or travel, as it does not distinguish among citizens of different states or between intrastate and interstate travel.  See id. at 717.

2.    Fair Approximation of Use

The Court finds that the second requirement of Evansville, that the user fee must be based on a fair approximation of use or privilege for use of the facilities for whose benefit they are imposed, is not met by the Port Authority's Passenger Fee.  In its application of the fair approximation prong in Evansville, the Supreme Court concluded that the charges on emplaning passengers "reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed;" id. at 717; despite exemptions for certain classes of passengers and aircraft and for non-passenger users of airport facilities, because "distinctions based on aircraft weight or commercial versus private use do not render these charges wholly irrational as a measure of the relative use of the facilities for whose benefit they are levied." Id. at 719.

The Passenger Fee is charged to all passengers embarking or disembarking in Bridgeport, and its amount varies according to the passenger's age and whether the passenger has a vehicle. Other Port users, such as those dropping off passengers at the Dock, or eating in the Terminal, are not charged any fees by the Port Authority.  Thus, the Port Authority argues that the Passenger Fee is based on a fair approximation of use of the Port facilities since it is permissible

---

[23] The Evansville test has also been referred to by courts as the "Massachusetts test" because it was relied on by the Supreme Court in Massachusetts v. United States, 435 U.S. 444 (1978).  Jorling v. United States Dept. of Energy, 850 F. Supp. 132, 142 n.8 (N.D.N.Y. 1994).

to draw rational distinctions among different classes of Port users, and the ferry passengers are an administratively easier group to charge than users of other Port facilities.

However, even if the Port Authority may charge ferry passengers rather than other Port users, it still cannot charge a fee that is not based on a fair approximation of the ferry passengers' general or at least potential use of the facilities for which the fee is imposed.[24]  In Northwest Airlines, Inc. v. County of Kent, the United States Supreme Court found that an airport's decision to allocate costs according to a formula which charged the airlines only their allocated share of the airfield and terminal costs, and which did not allocate a portion of aircraft costs to airport concessionaires reflected a "fair, if imperfect, approximation" of the use of facilities for whose benefit they are imposed" because only the airlines and general aviation actually use the runways and navigational facilities.  510 U.S. 355, 369 (1994); see also Massachusetts v. United States, 435 U.S. 444, 467-49 (1978) (federal tax on noncommercial aircraft flying in navigable airspace of United States based on gallons of fuel used, pounds per aircraft tire, pounds per tube, and annual aircraft registration fee is fair approximation of costs of benefits each aircraft receives from navigational assistance and other special services supplied by United States).

One district court elaborated on the fair approximation requirement:

> [The fair approximation prong] of the . . . test does not require an exact correlation, in terms of dollars and cents, between the costs of the overall services provided and the fees assessed for such services.  Nor does it require that a governmental entity adopt a formula that results in a 1:1 relationship between the actual use of the services by a particular entity and the cost of providing those services to that entity.  Rather, it requires only a rational relationship between the method used to calculate the fees and the benefits available to those who pay

---

[24]There is no dispute as to whether the different charges for different categories of passengers is a fair approximation of use.  Rather, the dispute here centers on whether it is fair to charge the ferry passengers for the use of the entire Port District.

them.

Jorling v. United States Dept. of Energy, 850 F. Supp. 132, 142-43 (N.D.N.Y. 1994), aff'd, 218 F.3d 96 (2d Cir. 2000).

The Court finds there is no such rational relationship between the method used to calculate the Passenger Fee and the benefits available to the Passenger Fee-payers.  The Passenger Fee appears to be calculated according to a method which ensures the Passenger Fee revenues will cover all of the Port Authority's operating costs and development projects throughout the Port District, as almost all of the Port Authority's revenues and all of their operational funding come from the Passenger Fee.  The Port Authority has not presented sufficient evidence that it calculates the fee based on any method meant to even roughly approximate the ferry passengers' use of the Port District.

The ferry passengers may use only the access road, the Ferry Terminal, and the Dock when they visit the Port District.  The Passenger Fee is thus imposed for the benefit of all of the facilities in the Port District, but the ferry passengers only use one specific area of the Port District, and the passengers are being charged for the privilege of using the entire Port District, when in fact they may only use a small portion of the District.

The Port Authority correctly notes that in calculating the fee, it may consider more than the cost of the services actually used by each person, but also the services available for use. Jorling v. United States Dept of Energy, 218 F.3d 96, 103 (2d Cir. 2000) (hereinafter "Jorling II.").  However, many of the other Port District activities funded by the fee are not even available to the ferry passengers (such as Derecktor, BRMC, harbor dredging, the barge feeder service, and the foreign trade zone).  Nor are the development projects or activities away from the Dock

intended to facilitate travel on the ferry or travel by passengers in and out of the Port District generally. Rather, they are intended to develop completely separate areas of the Port. This differs from the airport in <u>Evansville</u>, because while each emplaning passenger did not necessarily use all of the different airport facilities, the vast majority of them were available for the passengers' use or intended to facilitate air travel in general. The ferry passengers should not be charged for the use of the entire Port District, because the other Port Authority activities are not available to them and do not benefit them.[25]  510 U.S. at 369.

Thus, the Passenger Fee is not based on a fair approximation of the use or privilege for use of the facilities for whose benefit they are imposed.

---

[25]As the Second Circuit noted in <u>Jorling II</u>, cases applying the "fair approximation" requirement test in the Commerce Clause context reflect some disagreement as to whether the focus is on use or cost. The <u>Jorling II</u> court concluded that:

> Ultimately, of course, the Massachusetts test is concerned with whether the challenged method for imposing charges fairly apportions the cost of providing a service, but by framing the second component of the test in terms of "use," the Court made clear that a method for imposing charges based on each payer's approximate use will pass muster as an adequate apportionment of costs. The alternative. . .is to engage in a detailed cost accounting analysis that endeavors to determine the cost, properly allocated to each payer, of every person, product, and facility involved in providing the service. The Court evidently was satisfied that a fair approximation of the use of the service adequately serves as a surrogate for an otherwise complicated and expensive attempt to allocate costs.

218 F.3d at 103. Here, the Passenger Fee is not a fair approximation of either the cost of the facilities provided to the ferry passengers, which is largely covered by the Lease and government grants, nor of the use of ferry passengers of the available facilities.

The Port Authority also contends that the <u>value</u> of the services it provides to the ferry passengers should be considered, rather than the cost. The Second Circuit, however, made clear in <u>Jorling II</u> that the concern is regarding use and cost. <u>Cf.</u> <u>United States Shoe Corp. V. United States</u>, 114 F.3d 1564, 1574 (Fed. Cir. 1997) ("cost of benefits, rather than the value, is the appropriate measure" in evaluating constitutionality of user fees under Export Clause).

3.    Excessiveness

Finally, the Court finds that plaintiffs have shown that the Passenger Fee is excessive in

comparison with the government benefit conferred and in relation to the costs incurred by the

taxing authority.[26]   In Evansville, the Supreme Court found that the airlines did not show the fees

were excessive in relation to the costs incurred by the taxing authority, where the total fees

collected were less than the total costs incurred on airport facilities.  405 U.S. at 720.

Subsequently, in Northwest Airlines, the Supreme Court found that, in light of the fact that the

airport charged the airlines the "break-even costs for the areas they use," it could not conclude

that the airlines charged fees excessive in comparison with the government benefit conferred.[27]

510 U.S. at 370; citing Brief for United States as Amicus Curiae ("As long as an airport's

charges to air carriers do not result in revenues that exceed by more than a reasonable margin the

costs of servicing those carriers. . .[the] charges [are] reasonable under federal law.").  See

Massachusetts, 435 U.S. at 422 (tax not excessive in relation to cost of government benefits

supplied when "revenues from user fees fell far short of covering the annual civil aviation

outlays"); Alamo Rent-A-Car v. Sarasota-Manatee Airport Auth., 906 F.3d 516, 522 (11th Cir

1990) (user fee on rental car agency receipts not excessive when total amount collected

constituted less than 5% of airport authority's annual operating expenses).

It is undisputed that the Passenger Fee covers all of the Port Authority's operating

---

[26]The Evansville court used the "government benefit conferred" language in announcing
the standard, and the "costs incurred by the taxing authority" language in applying the standard.
Courts applying the standard use the concepts interchangeably.

[27]In fact, the District Court in Northwest Airlines found that the airport overcharged the
airlines for aircraft parking and ordered the airport "to recalculate this fee to result in a true
break-even charge."  510 U.S. at 370 n.16, quoting 738 F. Supp. 1112, 1115 (W. Mich. 1990).

-30-

expenses and is almost the sole source of revenue for the Port Authority.[28]  The Port Authority

urges the Court to find that all of its activities at least indirectly benefit the ferry passengers

because they benefit the general public by developing the Port District, and thus the fees charged

are not excessive in relation to the government benefit conferred on the payers.  In making this

argument, the Port Authority analogizes the Port District to the Airport in Evansville, as the

revelant facility by which to measure costs and benefits.

The Court finds the Port Authority's argument unconvincing.   First, the Port District

differs significantly from the airport in Evansville: the vast majority of airport development is

intended to benefit the passengers traveling on airplanes leaving the airport, or to facilitate their

air travel; the Port District, however, includes many projects beyond the Dock that are not

functionally related to the ferry operation, and are not intended to benefit the travelers on ferries,

or to facilitate their boat travel from Connecticut to Long Island.  Cf. Auto. Club of New York v.

Port Auth. of New York and New Jersey., 887 F.2d 417, 422-23 (2d Cir. 1989) (Port Authority

could include toll revenue from tunnels and bridges to fund commuter train, when the bridges,

tunnels, train, and bus facilities were sufficiently functionally related because all facilities

contributed to Port Authority's performance of duty to provide transportation to travelers over

and under waterways between southern New York and northern New Jersey).

In addition, the benefits to the ferry passengers as members of the general public are too

attenuated to serve as the basis for the Passenger Fee.  None of the cases cited by the parties

suggests that a government benefit conferred on fee payers in their capacities as members of the

---

[28]The Port Authority's lease with Derecktor generates some income; however, these funds are remitted to the City in order to repay them for the costs of obtaining the land.  The Port Authority also covers some expenses by collecting rent from the Ferry Company.

general public, rather than of users of the government facilities, is sufficient to satisfy the

Evansille test.  See Northwest Airlines, 510 U.S. at 864-65 (government benefit to airlines as

users of airport); Massachusetts, 435 U.S. at 469 (government benefits to civil aircraft as users of

government provided civil aviation facilities); Evansville, 405 U.S. at 720 (government benefit

was use of airport facilities); Alamo Rent-A-Car., 906 F.3d at 521 (off-site rental car agency

received government benefit of improved airport facilities, including roads upon which its vans

travel).  Rather, the language in the relevant case law, cited throughout this opinion, implies that

user fees are sustainable in exchange for a benefit or service rendered to the payers.

The Port Authority, mainly through government grants, financed the construction of an

access road, new terminal, and repairs to the Dock, all of which benefit the Passenger Fee payers.

However, the costs to the Port Authority of the facilities used by, or that benefit, the ferry

passengers are far less than the total amount it collects from the Fee.[29]   Thus, the benefits

conferred by the Port Authority on the passengers are not even roughly proportional to the fees

paid.

Thus, it cannot be said that the Port Authority charges the ferry passengers "the break-

even costs for the areas they use," and the Court finds that the Port Authority's charges result in

revenues that exceed the costs of services to the ferry passengers by an unreasonable margin and

_____

[29]The Port Authority correctly argues that it may offset a surplus in revenues over outlays
in any one year against actual deficits of past years, and perhaps projected deficits of future years.
Evansville, 405 U.S. at 719-20, cited in Massachusetts, 435 U.S. at 470 n.24.  However, the
Court finds this principle inapplicable here, because it assumes the use of revenues from the Fee
for expenditures by the Port Authority on or at least related to the ferry operation. Rather, the
Port Authority spends all of the Passenger Fee revenues each year on all of its projects, regardless
of whether they benefit the ferry passengers.  In addition, the record does not reflect any Port
Authority deficits from past years, or any intention by the Port Authority to save excess fees
collected for future projects to benefit ferry users.

thus are excessive.[30]  See <u>Northwest</u>, 510 U.S. at 370.

Therefore, the Court finds that the Port Authority's imposition of the Passenger Fee

violates the Commerce Clause.  The Court recognizes that the great majority of the courts that

have previously considered similar user fees have reached the opposite conclusion and given the

government authorities wide discretion to spend user fees.  In this case, however, the vast

majority of the Port Authority's revenues come from the Passenger Fee, and so little of the Port

Authority's expenses, time, efforts, and resources go toward any benefits even available to the

ferry passengers, that it simply cannot be said that the Fee fairly approximates passenger use of

the Port, or that it is not excessive in relation to the government benefit conferred.  In short, the

<u>Evansville</u> test would be completely eviscerated if this activity was considered to be within its

bounds.

**B.    Tonnage Clause**

The Tonnage Clause provides "[N]o State shall. . .lay any Duty of Tonnage." U.S. Const.,

---

[30]The Ferry Company contends that the fact that most of the revenue generated by the Passenger Fee goes to projects that are not used by the ferry passengers also renders the Fee excessive.  In <u>Evansville</u>, the Supreme Court rejected the similar argument that charges were not based on use because half of the revenues generated were allocated to unrestricted general revenue. <u>See Evansville</u>, 405 U.S. at 720.  "[S]o long as the funds received by local authorities under the statute are not shown to exceed their airport costs, it is immaterial whether those funds are expressly earmarked for airport use." <u>Id</u>; <u>see also</u> <u>Jorling II</u>, 218 F.3d at 105 (New York does not violate the Massachusetts test by earmarking half of the hazardous waste fees for its superfund and using general revenues to pay for portions of the services available to hazardous waste producers); <u>Center for Auto Safety, Inc. v. Athey</u>, 37 F.3d 139, 144 (4th Cir. 1994) (immaterial that Maryland does not keep charity registration fees in separate fund but turns them over to state treasury).  However, the plaintiffs showed that the funds received from the Passenger Fee do indeed far exceed the Dock costs.   In addition, in the cases cited above, the funds for the services provided to the fee payers simply came from another revenue source, not exclusively from the fees paid, whereas here, the Passenger Fee is the only significant revenue source of the Port Authority.

Art 1, § 10, cl. 3.[31]  In <u>Clyde Mallory Lines v. Alabama</u>, the United States Supreme Court

explained the reach of the Tonnage Clause:

> [T]he prohibition against tonnage duties has been deemed to embrace all taxes
> and duties regardless of their name or form, and even though not measured by the
> tonnage of the vessel, which operate to impose a charge for the privilege of
> entering, trading in, or lying in a port.  But it does not extend to charges made by
> state authority, even though graduated according to tonnage, for services rendered
> to and enjoyed by the vessel, such as pilotage, or wharfage, or charges for the use
> of locks on a navigable river.

296 U.S. 261, 265-66 (1935) (internal citations omitted).  The <u>Clyde Mallory</u> Court upheld a

harbor fee imposed on all ships entering the Port of Mobile because the fee was a reasonable

charge for a police and fire service provided to the vessels entering the harbor.  <u>Id</u>. at 266-67.

The Court reasoned that the general safety services "inure to all who enter [the harbor]" even if a

particular vessel is not given any special assistance.  <u>Id</u>.; <u>see also</u> <u>New Orleans Steamship Assoc.</u>

<u>v. Plaquemines Port, Harbor, & Terminal Dist.</u>, 874 F.2d 1018, 1023 (5th Cir. 1989) (tonnage

clause prohibits reliance on tonnage duties to raise general revenues, and thus permits fee for

available emergency services); <u>Plaquemines Port Harbor & Terminal Dist. v. Fed. Mar. Comm'n</u>,

---

[31]The <u>Clyde Mallory</u> Court explained the history and purpose of the Tonnage Clause:

It seems clear that the prohibition against the imposition of any duty of tonnage
was due to the desire of the Framers to supplement Art. I, § 10, Clause 2, denying
to the states power to lay duties on imports or exports . . . by forbidding a
corresponding tax on the privilege of access by vessels to the ports of a state, and
to their doubts whether the commerce clause would accomplish that purpose.  If
the states had been left free to tax the privilege of access by vessels to their
harbors the prohibition against duties on imports and exports could have been
nullified by taxing the vessels transporting the merchandise.  At the time of the
adoption of the Constitution "tonnage" was a well understood commercial term
signifying in America the internal cubic capacity of a vessel.

296 U.S. at 264-65.

838 F.2d 536, 545 (D.C. Cir. 1988) (reasonable fee to support emergency services rendered by Port inured to all who used Port because all vessels, whether or not they need rescue services, benefit from their availability); Hawaiian Navigable Waters Pres. Soc'y v. State of Hawaii, 823 F. Supp. 766, 776 (D. Haw. 1993) (reasonable mooring and anchoring fees charged for use of restroom facilities, parking, trash disposal, and security services rendered were not impermissible duty of tonnage).

The Passenger Fee imposed by the Port Authority is used for the impermissible purpose of raising general revenues and for projects which do not and could not benefit the ferry passengers. It is not used for emergency or other services available to, but not necessarily used by, all vessels and persons using the harbor. Instead, a significant portion of the Passenger Fee funds projects completely unrelated and unavailable to the fee payers, such as negotiations, legal fees, and development proposals for the BRMC, Derecktor, the foreign trade zone, the barge feeder service, harbor dredging, and the high-speed ferry.[32]  Thus, the difference between the amount of the fee and the benefits received by the ferry passengers is vast, and creates more than a "slight divergence between the class that benefits and the class that pays." Plaquemines; 838 F.3d at 545 n.8.  Thus, it is not a reasonable fee for general services rendered, but rather is an impermissible duty of tonnage.

**C.    The Rivers and Harbors Appropriation Act**

The Port Authority contends that the Maritime Transportation Security Act of 2002,

---

[32]The Port Authority suggests that the Fee is used for services such as the construction of the Ferry Terminal, access road, and the parking garage, when these projects were actually funded by government grants. Def.'s Proposed Findings at 71. While the costs of the Port Authority's efforts to obtain these grants are properly funded by the Passenger Fee, it is simply not accurate to state that the Fee funded these projects.

which added new subsection (b) to the Rivers and Harbors Appropriation Act of 1884, 33 U.S.C.

§ 5(b), codified the existing Commerce Clause jurisprudence with respect to user fees.  The

relevant provision reads:

> (b) No taxes, tolls, operating charges, fees, or any other impositions whatever
> shall be levied upon or collected from any vessel or other water craft, or from its
> passengers or crew, by any non-Federal interest, if the vessel or water craft is
> operating on any navigable waters subject to the authority of the United States, or
> under the right to freedom of navigation on those waters, except for. . .(2)
> reasonable fees charged on a fair and equitable basis that (A) are used solely to
> pay the cost of a service to the vessel or water craft; (B) enhance the safety and
> efficiency of interstate and foreign commerce; and (C) do not impose more than a
> small burden on interstate or foreign commerce.

33 U.S.C. § 5(b).  There is no case law applying this provision.  The language of the

requirements closely tracks the Commerce Clause and Tonnage Clause cases discussed above in

its focus on reasonable fees used to cover the cost of service to vessels, and the parties agree the

provision was intended to clarify, not change, the Commerce Clause jurisprudence concerning

legal fees.  It is not clear to the Court whether the RHAA applies to the ferry passengers, or

whether there is a private right of action under the statute, and the parties have not addressed

these questions.  However, since the Court has found violations of the Constitution and any relief

under this act would be duplicative, it need not reach these issues.

### D.     Unjust Enrichment under Connecticut Law

"Unjust enrichment applies whenever justice requires compensation to be given for

property or services rendered under a contract, and no remedy is available by an action on the

contract.... Indeed, lack of a remedy under the contract is a precondition for recovery based upon

unjust enrichment." Gagne v. Vaccaro, 766 A.2d 416, 424 (Conn. 2001) (internal quotation

marks omitted) (citing 12 S. Williston, Contracts (3d Ed.1970) § 1479, p. 272).  Plaintiffs

seeking recovery for unjust enrichment must prove '(1) that the defendants were benefited [sic], (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment.  Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283 (1994); see also 12 Williston, Contracts § 1479, p. 276 (3d ed. 1978).

The plaintiffs claim that the evidence has established all three required elements.  First, they claim that the Port Authority has received benefits in the form of monetary proceeds from the Passenger Fee.  Next, the plaintiffs argue that the Port Authority has unjustly not paid the plaintiffs for the benefits because the cost to the Port Authority of the facilities and services it has provided to the ferry operation has been substantially less than the proceeds it has received from the Passenger Fee.  Finally, the plaintiffs argue that the Port Authority's failure to provide consideration for the full amount of the Passenger Fee has been detrimental to the plaintiffs because it has caused passengers to pay an unnecessarily high fee in relation to the cost of the facilities and services they have received from the Port Authority, which has resulted in monetary damages to the Ferry Company and the passenger Plaintiffs.

As noted above, the Court finds that the Ferry Company has not proved any monetary damages, so the unjust enrichment claim fails as to the Ferry Company.[33]   As for the ferry passenger plaintiff, since the Passenger Fee only unjustly benefitted the Port Authority to the

---

[33]In addition, the plaintiffs argue the Port Authority has been unjustly enriched because it has charged the Ferry Company twice for the same services, namely the use of the Dock, because under the Lease, the Ferry Company is required to maintain the Dock area, yet the Port Authority attempts to justify the amount of the Passenger Fee by the cost of providing the same maintenance service.  However, since the Ferry Company did not itself pay the Passenger Fee, the Court finds this claim to be without merit.

degree that it violated the Constitution, any potential relief under the unjust enrichment theory would necessarily only duplicate the compensatory damages he will receive under the Constitution.  Thus, the Court will not reach the merits of this claim as to the passengers.

### E.    Conn. Gen. Stat. §§ 7-329a to 7-329u

The plaintiffs claim that the Port Authority has exceeded the authority to collect fees granted to it pursuant to Conn. Gen. Stat. §§ 7-329a to 7-329u, under which the Port Authority was created.  Section 7-329c(10) gives the Port Authority the power to

> Fix fees, rates, rentals or other charges for the purpose of all port facilities owned by the port authority and collect such fees, rates, rentals and other charges for such facilities owned by the port authority, which fees, rates, rentals or other charges shall at times be sufficient to comply fully with all covenants or agreements with the holders of any bonds issued under the provisions of sections 7-329a to 7-329f, inclusive.

In addition, section 7-329i authorizes the Port Authority to "fix, revise, charge and collect rates, rents, fees and charges for the use of and for the services furnished or to be furnished by each project."  "Project" means the acquisition, purchase, construction, reconstruction, improvement or extension of a port facility;.  § 7-329b(2).   "Port facilities" are defined quite broadly as:

> (A) wharves, docks, piers, vessels, air or bus terminals, railroad tracks or terminals, cold storage and refrigerating plants, warehouses, elevators, freight-handling machinery and such equipment as is used in the handling of freight, passengers and vessels, vehicles, and the establishment and operation of a port and any other works, vessels, vehicles, rolling stock, properties, buildings, structures or other facilities necessary or desirable for commerce and industry or waterfront development within a district or in connection with the development and operation of port facilities, or (B) manufacturing and industrial facilities, recreational and entertainment facilities, residential facilities or other commercial facilities necessary for commerce and industry or waterfront development within a district, and (C) located within or benefiting the district.

§ 7-329b(4).   Such charges may be imposed for the purpose of funding (1) the cost of

-38-

maintaining and operating the project; (2) payments of principal and interest on any bonds issued

in respect of such project; and (3) any reserves required to secure such bonds.

Because a substantial portion of the Passenger Fees imposed by the Port Authority is not

used to fund the cost of a particular project, but to fund general Port Authority activities, the

plaintiffs contend the Port Authority has exceeded its power under the Enabling Statute.

It is not clear to the Court that there is a private right of action under the statute.

However, since the Court has found violations of the Constitution and any relief under this act

would be duplicative, it need not reach this issue.

### F.    Connecticut Unfair Trade Practices Act ("CUTPA")

The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq.,

provides that "[n]o person shall engage in unfair or deceptive acts or practices in the conduct of

any trade or commerce." § 42-110b(a).   To determine whether a practice is an unfair trade

practice under CUTPA, a Court weighs:

> (1) [W]hether the practice, without necessarily having been previously considered
> unlawful, offends public policy as it has been established by statutes, the common
> law, or otherwise - whether, in other words, it is within at least the penumbra of
> some common law, statutory, or other established concept of unfairness; (2)
> whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it
> causes substantial injury to consumers [(competitors or other businessmen)].

Fabri v. United Technologies Intern., Inc., 387 F.3d 109, 120 (2d Cir. 2004); quoting Cheshire

Mortgage Serv. Inc. v. Montes, 612 A.2d 1130, 1143 (Conn. 1992).  "A practice may be unfair

because of the degree to which it meets one of the criteria or because to a lesser extent it meets

all three.... Thus a violation of CUTPA may be established by showing either an actual deceptive

practice ... or a practice amounting to a violation of public policy.... Furthermore, a party need

not prove an intent to deceive to prevail under CUTPA.." Cheshire, 612 A.2d at 1143-44 (citations and internal quotation marks omitted).

The Court finds that the plaintiffs have not shown that the Port Authority's imposition of an excessive passenger fee is an unfair trade practice by the preponderance of the evidence. The fee does violate the Commerce Clause, so arguably it is contrary to public policy as established by the Constitution. However, the imposition of a user fee on ferry passengers is not in itself unconstitutional, but only becomes so because the Port Authority has used the revenues for overly broad purposes. Thus, the degree to which public policy is offended is slight. The imposition of the Passenger Fee cannot be said to be "immoral, unscrupulous, or oppressive." Finally, and importantly, the Passenger Fee has not caused substantial injury to consumers, competitors or businessmen. Indeed, the Ferry Company has failed to prove it has sustained monetary damages. The monetary damages to the passenger plaintiff likewise have been minimal. Thus, the Court finds the plaintiffs have not provided sufficient evidence to support their CUTPA claim.

### G.    Damages

The Ferry Company correctly cites the principle that if a reasonable probability of damages has been established, damages need not be calculated with mathematical precision, but rather may be approximated if there is a reasonable basis of computation. See, e.g. Storey Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931); Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 19 (2d Cir. 2000). Based on this principle, the Ferry Company urges the Court to award it $9,038,500, which is the amount of the overcharge calculated by their expert in his third model, described above, plus interest. However, as

discussed above, the Ferry Company has not proved by the preponderance of the evidence the fact that it has sustained damage or any economic losses as a result of the constitutionally excessive Passenger Fee.[34]    Thus, the Court declines to award the damages suggested by the Ferry Company.

However, "[i]f the wrong complained of is a mere technical violation of the plaintiff's constitutional rights and she is unable to prove actual damage, she would nevertheless be entitled to a recovery of nominal damages." Davis v. Village Park II Realty Co., 578 F.2d 46, 463 (2d Cir. 1978).  The right to engage in interstate commerce free of discriminatory taxes or fees has been recognized as an individual constitutional right.[35]  Dennis v. Higgins, 498 U.S. 439, 449 (1991).  The Passenger Fee is unconstitutional, and as the collector of the Fee, the unconstitutional nature of the Fee affects the Ferry Company.  Thus, the Ferry Company has

---

[34]The Ferry Company argues that this Court's ruling denying the Port Authority's motion to dismiss, which found that the Ferry Company had standing to pursue this claim, provides support for its claim that it has in fact been damaged, even if it could not prove the amount.  See Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth., 335 F. Supp. 2d 275, 283 (D. Conn. 2004).  However, the Court's ruling that the Ferry Company had standing only indicated that the Ferry Company alleged sufficient injury to pursue its claim in this Court, not that the Ferry Company had proved the fact of their damages for trial purposes.  See, e.g. Sierra Club v. Morton, 405 U.S. 727, (1972).  The Ferry Company proved constitutional injury at trial, but it did not prove any monetary damages resulting from that injury.

[35]Dennis v. Higgins held that a cause of action under 42 U.S.C. § 1983 existed for a violation of the dormant Commerce Clause because "the combined restriction on state power and entitlement to relief under the Commerce Clause amounts to a 'right, privilege, or immunity' under the ordinary meaning of those terms."  Although this case was not brought under § 1983, the same reasoning should apply to violations of the Commerce Clause brought by individuals under the Constitution itself pursuant to "federal question" jurisdiction conferred by 28 U.S.C. § 1331.  While lawsuits for violations of constitutional rights including economic rights such as those under the Commerce Clause are increasingly brought under § 1983, there continues to be a viable cause of action pursuant to § 1331.  See Michael G. Collins, 'Economic Rights,' Implied Constitutional Actions, and the Scope of Section 1983, 77 Geo. L. J. 1493 (1989).
The same damages analysis applies to the Tonnage Clause violations.

proved that it has in fact suffered nominal constitutional injury due to the Port Authority's

unconstitutional practice, and is awarded nominal damages.

The ferry passengers, however, who are the actually fee payers, were damaged by paying

fees in excess of constitutionally appropriate levels which were used to fund activities that did

not benefit them as Port users.   Thus, the passenger plaintiff D&D is awarded damages in the

amount of $494.63, representing the Court's best estimate, according to the calculation discussed

above, of the amount by which the Passenger Fees paid exceeded constitutionally appropriate

levels and thus benefitted the Port Authority to the detriment of the passengers.

### H.    Declaratory Judgment

The plaintiffs request a declaratory judgment that the Port Authority is barred from

imposing or collecting the Passenger Fee to the extent that it exceeds, or is calculated to exceed,

the reasonable cost to the Port Authority of the facilities and services that the Port Authority

actually provides to the ferry operation.

The Declaratory Judgment Act provides in relevant part:

> In a case or controversy within its jurisdiction. . .any court of the United States,
> upon the filing of an appropriate pleading, may declare the rights and other legal
> relations of any interested party seeking such declaration, whether or not further
> relief could be sought.   Any such declaration shall have the force and effect of a
> final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  The Second Circuit has stated that "two principal criteria guiding the

policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful

purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and

afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."

Broadview Chemical Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969).

Under these criteria, the Court finds that a declaratory judgment would be neither appropriate nor helpful in this case. The legal relationship between the parties does not require clarification, and the Court's findings on the substantive claims and the permanent injunction will provide the necessary relief to the plaintiffs.

### G.    Permanent Injunction

Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted. New York State Nat. Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n. 12 (1987). "To obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." Lusk v. Village of Cold Spring, 475 F.3d 480, 485 (2d Cir. 2007).

The Ferry Company and passenger plaintiffs have succeeded on the merits of their constitutional claims. This Court agrees with the plaintiffs, for the reasons discussed above, that the imposition of the Passenger Fee as currently charged and calculated is a violation of the Commerce Clause to the extent that it funds activities of the Port Authority unrelated to and that do not benefit the ferry passengers, and also violates the Tonnage Clause. The passenger plaintiffs, as well as any other future ferry passengers, will be irreparably harmed if the Port Authority were permitted to continue its practice of instituting a Passenger Fee in violation of the

Constitution.  There is no adequate remedy at law which would prevent the occurrence of this future constitutional harm, and the plaintiffs have succeeded on the merits of their claim.

The Court hereby enjoins the Port Authority from the further use of the revenues from the Passenger Fee to fund its activities that are unrelated to and do not benefit the ferry passengers or approximate their use of the Port.  The Port Authority shall not be allowed to collect a Passenger Fee in an amount that exceeds what is necessary for their expenses that benefit ferry passengers and fairly approximate their use of the Port.  The Court has made factual findings as to which of the Port Authority's activities were properly funded by the Passenger Fee revenues and which were not properly funded by the Passenger Fee based on the benefit of these activities to the ferry passengers.  These findings should serve as guidance to the Port Authority in its future in its future calculations of an appropriate Passenger Fee.

### H.    Affirmative Defenses

The Court finds the Port Authority's affirmative defenses to be without merit for the reasons detailed above.

## III.    Conclusion

The plaintiff Bridgeport & Port Jefferson Steamboat Company is awarded nominal damages in the amount of one dollar.  The plaintiff D&D Flowers is awarded damages in the amount of $494.63.

The Port Authority is enjoined from the further use of the revenues from the Passenger Fee to fund its activities that are unrelated to and do not benefit the ferry passengers or approximate their use of the Port, and the Passenger Fee shall be reduced accordingly.  The Port Authority shall not be allowed to collect a Passenger Fee in an amount that exceeds what is

necessary for their expenses that benefit ferry passengers and fairly approximate their use of the Port.

The defendant's Oral Motion for Judgment as a Matter of Law [Dkt. # 163] is DENIED as moot in light of this decision.

SO ORDERED this __3rd__ day of July 2008, at Hartford, Connecticut.


 /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**