Domb Declaration

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY,
ROBERT HELLER,                                          CASE NO. 3:03 CV 599 (CFD)
GREG ROSE, and
FRANK C. ZAHRADKA,

                    Plaintiffs,                         AMENDED COMPLAINT

        - against -

BRIDGEPORT PORT AUTHORITY,                              June 18, 2003

                    Defendant.
_____/

        Plaintiffs, by their undersigned attorneys, for their amended complaint herein, allege as

follows:

### Introduction

        1.      This action challenges the legality of a tariff imposed by the Bridgeport Port

Authority (the "Port Authority") with respect to passengers and vehicles traveling on the

Bridgeport-Port Jefferson ferry.

        2.      The Port Authority provides certain dock and terminal facilities for the use of the

ferry and its passengers, pursuant to leases with the company that operates the ferry and an

affiliate of the ferry company that operates a food concession at the ferry terminal.  The Port

Authority collects substantial rent payments, under such leases, at negotiated rates at or above

the market value of the facilities and services which the Port Authority provides to the ferry

operation.

{NY014748.1 }

3.     Through its tariff, in the form of a "head tax" on passengers and vehicles, the Port Authority collects additional revenues totaling approximately eight times as much as it collects under the leases. The tariff thus greatly exceeds the value of the facilities and services which the Port Authority provides for the use of the ferry and its passengers. The tariff also discriminates against interstate commerce in that (among other things) the Port Authority does not collect any substantial revenue from other vessels using its docks or other persons or entities using public facilities in Bridgeport Harbor.

4.     Plaintiffs, the private company which operates the ferry and three of its passengers, allege that the tariff is excessive and illegal under a federal statute, various clauses of the United States Constitution, and statutory and common law of Connecticut. Plaintiffs seek injunctive and declaratory relief barring the continued imposition of the tariff in whole or in part, as well as compensatory damages.

## Parties

5.     Plaintiff Bridgeport and Port Jefferson Steamboat Company ("B&PJ") is a corporation organized under the laws of Connecticut, with a principal place of business at 102 West Broadway, Port Jefferson, New York 11777. B&PJ operates a public ferry service for passengers and vehicles between Bridgeport, Connecticut and Port Jefferson, Long Island, New York. The ferry operates every day throughout the year according to published schedules.

6.     Plaintiff Robert Heller is a natural person who is a citizen and resident of the State of New York. Mr. Heller has been, and continues to be, a frequent user of the B&PJ ferry service.

7.     Plaintiff Greg Rose is a natural person who is a citizen and resident of the State of New York. Mr. Rose has been, and continues to be, a frequent user of the B&PJ ferry service.

8.     Plaintiff Frank C. Zahradka is a natural person who is a citizen and resident of the State of New York.  Mr. Zahradka has been, and continues to be, a regular user of the B&PJ ferry service.

9.     Defendant, Bridgeport Port Authority (the "Port Authority"), is a port authority created and existing pursuant to Connecticut law, Conn. Gen. Stat. §§ 7-329a to 7-329u, with a principal place of business at 330 Water Street, Bridgeport, Connecticut 06604.

## Jurisdiction and Venue

10.    This Court has:  (a) original jurisdiction over this action with respect to Claims I through IV, pursuant to 28 U.S.C. § 1331, in that such claims arise under the Constitution or laws of the United States, and (b) supplemental (or pendent) jurisdiction with respect to the remaining claims (V through VIII), pursuant to 28 U.S.C. § 1367, in that such claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.    Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b), in that the action is not founded on diversity of citizenship, the sole defendant resides in this district, and a substantial part of the events or omissions giving rise to the claims occurred and continue to occur in this district.

## Common Factual Allegations

12.    Regular ferry service between Bridgeport and Port Jefferson began in 1872.  B&PJ was formed in 1883 to operate such ferry service and has continued to operate such service through the present.

13.    Since the 1960's, B&PJ has leased docking facilities in Bridgeport under a series of leases, initially with the City of Bridgeport and later with the Port Authority.

14.    Currently, B&PJ leases such dock facilities in Bridgeport at the Water Street Dock (the "Dock") pursuant to a lease agreement between the Port Authority and B&PJ dated as of December 1, 1998, as supplemented by a first amendment to such lease agreement dated as of July 29, 2002 (the "Current Lease").

15.    Under paragraph 1(a) of the Current Lease, the Port Authority conveys to B&PJ "a non-exclusive preferential use" of certain port facilities and related rights.  Said paragraph provides in relevant part:

> The Port Authority hereby conveys to the Company [B&PJ] a non-exclusive preferential use of the dock on the Premises during the times regularly scheduled for arrivals and departures of the Company's ferry boats, for the embarking and debarking of passengers and vehicles between its ferry boats and the Premises, together with the appurtenant right to permit the Company's passengers to stage their vehicles in adjacent staging areas owned by the Port Authority and designated for their use solely while such passengers are waiting to embark on such regularly scheduled ferry boats ….

16.    The "Premises" which are the subject of Current Lease are described therein as follows:

> WHEREAS, the Port Authority is the owner of the dock designed for the docking of vessels and loading and unloading of cargo and passengers, and the shoreline of premises at 330 Water Street, Bridgeport, Connecticut, known as the Water Street Dock (the "Premises"); ….

17.    Under paragraph 1(b) of the Current Lease, B&PJ is entitled to make use of the Premises in the following additional respects: (a) a food concession which is the subject of a separate lease between the Port Authority and an affiliate of B&PJ (further described in paragraph 27 below),   (b) "such office space and waiting room space at the Premises as the Port Authority may from time-to-time make available to the Company," and (c) up to four parking spaces which the Port Authority may make available to the Company's employees.

18.    The Premises includes a two-story terminal building which was built in 1995 (the "Terminal"). The food concession, office space and waiting room space referred to in the preceding paragraph are contained in the Terminal.

19.    Construction of the Terminal was financed entirely or in substantial part by a grant in the amount of $1,869,900 provided by the United States Department of Transportation, Federal Highway Administration, as part of its Ferry Boat Discretionary ("FBD") Program. The FBD Program was established pursuant to federal legislation which authorizes federal funding for the construction of ferry boats and ferry terminal facilities.

20.    The Port Authority sought funding for the Terminal under the FBD Program, and the federal government provided such funding, on the premise that the funds were to be used for construction of a ferry terminal and related facilities.

21.    In 1999, the Port Authority received additional federal grants under the FBD Program in the amounts of (a) $2 million, for construction of a parking garage at the Terminal, and (b) $1.5 million, for improvements to the Dock.

22.    The term of the Current Lease commenced on December 1, 1998, and extends until November 30, 2011, and may be extended by B&PJ for two additional terms of ten years each.

23.    The Current Lease requires B&PJ to pay rent to the Port Authority at annual rates in equal monthly installments. The annual rental payments increase each year, ranging from $100,000 for the initial year (December 1, 1998 to November 30, 1999) to $158,956 for the final year prior to any extensions (December 1, 2010 to November 30, 2011).

24.    The Current Lease also requires B&PJ to (among other things):

(a)    purchase and maintain insurance covering the Premises;

     (b)    indemnify the Port Authority with respect to any claim arising from the activities of B&PJ; and

     (c)    undertake snow removal.

25.    B&PJ has timely paid all rent payments and has complied with all its other obligations under the Current Lease.

26.    Although not expressly provided for in the Current Lease, B&PJ also has provided and continues to provide at its own cost (among other things): (a) electric lighting in the parking area where vehicles are staged while waiting to board the ferry; and (b) overtime police security in and around the Terminal.

27.    A restaurant and food services facility is operated at the Terminal by Steamboat Concessions, Inc. ("Concessions"), an affiliate of B&PJ, pursuant to a Lease and Food Services Agreement entered into in August 1996 between the Port Authority, as landlord, and Concessions, as tenant (the "Food Services Lease"). Pursuant to the Food Services Lease, Concessions is required to pay to the Port Authority:

     (a)    a basic monthly rent of $1,000 per month;

     (b)    additional rent equal to (i) 1% of Concessions' annual gross receipts above $100,000 and up to $200,000, plus (ii) 2% of its annual gross receipts above $200,000; and

     (c)    additional rent of $700 per month to defray the Port Authority's cost of regular cleaning of the Terminal premises other than the space leased to Concessions.

28.    Pursuant to the Food Services Lease, Concessions also is required to pay for its use of electricity, gas and telephone and to clean, maintain and make repairs to the premises it occupies at the Terminal.

29.    Concessions has paid all rent and complied with all its other obligations under the Food Services Lease.

30.    Since 1993, the Port Authority has imposed a tariff on passengers and vehicles embarking on or disembarking from the B&PJ ferries at the Dock (the "Ferry Tariff").

31.    Plaintiffs Heller, Rose and Zahradka have been charged and have paid the Ferry Tariff each time they have used the B&PJ ferries since the Port Authority imposed the Ferry Tariff.

32.    Paragraph 7 of the Current Lease requires B&PJ to collect the Ferry Tariff from ferry users and remit the proceeds thereof to the Port Authority.  That paragraph provides in full:

> The Company will continue to act as the agent of the Port Authority in collecting tariff charges imposed upon users of the ferry service under the same terms and conditions as heretofore in effect.

33.    The Ferry Tariff charges which were in effect at the time the Current Lease became effective, on December 1, 1998, are set forth in the table in paragraph 34 below.

34.    By letter dated December 10, 2002, the Port Authority informed B&PJ that the Port Authority intended to increase the Ferry Tariff charges as set forth in the table below, and requested that B&PJ begin collecting the increased Ferry Tariff on January 15, 2003:

| Categories | Ferry Tariff in 1998 | Increase | New Ferry Tariff |
|---|---|---|---|
| Senior citizens and children, walk-on | $0.50 | $0.10 | $0.60 |
| Adult, walk-on | 0.75 | 0.25 | 1.00 |
| Auto including driver | 1.50 | 0.50 | 2.00 |
| Trucks over 25 feet | 2.00 | 0.25 | 2.25 |
| Cars with unlimited passengers | 2.50 | 0.25 | 2.75 |
| Monthly passes | 5.00 | 0.25 | 5.25 |

35.    By letter dated January 13, 2003, B&PJ informed the Port Authority that it would not begin collecting the increased Ferry Tariff amounts on January 15, 2003.

36.    At a meeting on February 21, 2003, the Port Authority and B&PJ agreed on terms under which B&PJ would begin to collect the Ferry Tariff at the increased rates. Such agreement was confirmed in a Memorandum of Understanding signed by representatives of the Port Authority and B&PJ. The Memorandum of Understanding provided (among other things):

> This Memorandum of Understanding is without prejudice to either party's position regarding the Port Authority's right or power to impose the Tariff (including any increases in the rates thereof) or the validity or reasonableness of the Tariff in whole or in part.

37.    According to the Port Authority's audited financial statements for the fiscal years ended December 31, 1997, 1998 and 1999 (which are the most recent Port Authority financial statements available to plaintiffs), during each of those fiscal years the Ferry Tariffs collected from B&PJ's passengers and the rentals paid by B&PJ and Concessions accounted for all but a small percentage of the Port Authority's revenues, as the following table shows:

| Fiscal Year | 1997 | 1998 | 1999 |
|---|---|---|---|
| (1)  Ferry Tariff | $678,134 | $712,190 | $804,287 |
| (2)  Rental income | 95,000 | 97,911 | 90,672 |
| (3)  Grant income | 6,727 | 30,273 | 4,850 |
| (4)  Other income | 14,053 | 56,969 | 19,309 |
| (5)  Total Operating Revenues | $793,914 | $896,969 | $919,118 |
| (1) + (2) as a percentage of (5) | 97.4% | 90.3% | 97.4% |

38.    Upon information and belief, the Ferry Tariff collected from B&PJ's passengers and the rentals paid by B&PJ and Concessions during each of the Port Authority's last three

fiscal years (2000, 2001 and 2002) accounted for a similarly high percentage of the Port

Authority's total operating revenues for each such fiscal year.

39.    B&PJ collected and paid to the Port Authority the following Ferry Tariff amounts

over the past three fiscal years (ended December 31 of each year):

| Fiscal Year | 2000 | 2001 | 2002 |
|---|---|---|---|
| Ferry Tariff | $856,500 | $900,280 | $934,104 |

40.    The Port Authority has spent the proceeds from the Ferry Tariff, or significant

portions thereof, on activities which are unrelated to and/or which have not provided any benefits

to B&PJ, its ferry service or its passengers.

41.    Upon information and belief, the Port Authority has spent portions of the proceeds

from the Ferry Tariff on activities that are unrelated to the legitimate functions or purposes of the

Port Authority.

42.    Only the ground floor of the two-story Terminal is used for ferry operations,

including the food concession.  The Port Authority occupies the entire second floor, except for a

portion thereof which it leases to the Bridgeport World Trade Center.

43.    Upon information and belief, the Bridgeport World Trade Center has not paid any

rent to the Port Authority for the space it occupies at the Terminal.

44.    The Port Authority has acquired title to at least one other parcel of land adjoining

the Bridgeport Harbor and has leased such property to Derecktor Shipyards ("Derecktor"), a

company engaged in the maintenance, repair and new construction of marine vessels, which

derives benefits from the use of the harbor.

45.     Upon information and belief, the Port Authority does not impose any tariffs or other fees on, or collect any tariffs or fees from, customers of Derecktor with respect to the use of Bridgeport Harbor and related public facilities.

46.     Another property adjoining Bridgeport Harbor is occupied by the Cilco Terminal ("Cilco"), a terminal facility owned and operated by Logistec Connecticut Inc.

47.     Ships dock at Cilco's facility in Bridgeport Harbor on a regular basis for the purpose of unloading bananas and other fruits for import and loading used automobiles, trucks and other equipment for export.  These ships and Cilco thus make ample use of Bridgeport Harbor and related public infrastructure and services.

48.     Upon information and belief, the Port Authority does not impose any tariffs or other fees on, or collect any tariffs or other fees from, either Cilco or the vessels docking at Cilco with respect to such vessels' use of Bridgeport Harbor and related public facilities.

49.     Under the Current Lease, B&PJ is granted only "a non-exclusive preferential use" of the Dock and related facilities and the Port Authority "reserves for itself all other uses" thereof.  The tariff published by the Port Authority (the "Terminal Tariff") provides for the imposition and collection of (a) the Ferry Tariff, with respect to ferry passengers and vehicles, and (b) a fee on all other vessels which use the Dock, calculated on a daily pro-rata basis according to the length of such vessels (the "Other Vessels Tariff").  However, upon information and belief, the Port Authority has not enforced or collected any fees with respect to the Other Vessels Tariff, or has only sporadically and selectively done so.  By contrast, the Port Authority has enforced and collected the Ferry Tariff.

50.     The Port Authority does not impose or collect any fees with respect to any vessels using any terminal facilities that are not owned or operated by the Port Authority.

51.    The Port Authority does not restrict access by any vessels to any terminal facilities that are not owned or operated by the Port Authority.

52.    The Port Authority does not impose or collect any fees with respect to any vessel that is a "common carrier" as defined in the Shipping Act, 49 U.S.C. App. § 1702(6).

53.    No vessel that is a "common carrier" as defined in the Shipping Act, 49 U.S.C. App. § 1702(6), uses the facilities at the Dock.

54.    The services or benefits which the Port Authority has provided to B&PJ or its passengers have been financed or paid for largely, if not entirely, from sources other than proceeds of the Ferry Tariff.  For example:

(a)    The Terminal was financed largely or entirely by a grant of federal funds to the Port Authority, in the amount of $1,869,900.

(b)    A parking garage adjacent to the Terminal, recently completed, also was financed largely or entirely by a grant of federal funds to the Port Authority, in the amount of $2 million.

(c)    Improvements to the Dock were financed largely or entirely by a grant of federal funds to the Port Authority, in the amount of $1.5 million, and by capital improvements paid for by B&PJ.

(d)    B&PJ pays rent to the Port Authority at or above market value, under the Current Lease, for the use of the Dock and related facilities.

(e)    Concessions pays rent to the Port Authority at or above market value, under the Food Services Lease, for the use of a portion of the Terminal and related services.

55.     Pursuant to Conn. Gen. Stat. § 7-329a, the Port Authority has no jurisdiction, and therefore does not provide any services, with respect to the licensure of pilots, the safe conduct of vessels, the protection of Bridgeport Harbor or its waters, or any other matters set forth in chapter 263 of the Connecticut General Statutes, Conn. Gen. Stat. § 15-1 *et seq.*, which are under the authority of the Department of Transportation of the State of Connecticut.

56.     Upon information and belief, passenger and vehicle ferries operating between Connecticut and other states, other than B&PJ's ferries, are not subject to any head tax or other comparable charge.  For example, the Cross Sound Ferry provides passenger and vehicle ferry service between New London, Connecticut and Orient Point, Long Island, New York.  Upon information and belief, neither the New London Port Authority nor any other state or local government entity imposes a head tax or comparable charge with respect to that ferry service.

57.     Each of the plaintiffs has been damaged and continues to be damaged by the wrongful imposition and collection of the Ferry Tariff.

58.     Each individual plaintiff has been damaged by the amount of the Ferry Tariff he has actually paid each time he has taken the B&PJ ferry, and will continue to be damaged in like manner with respect to future ferry trips.  Plaintiffs will prove the amount of such damages at trial.

59.     B&PJ has been damaged in one or more of the following ways.  If the Port Authority had not imposed or collected the Ferry Tariff, then:

    (a)     B&PJ would have been able to raise fares by the total amount of the Ferry Tariff, without raising the out-of-pocket cost to its passengers, thereby increasing its revenue and profit by the total amount of the Ferry Tariff; or

(b)     B&PJ would have been able to raise fares by a portion of the amount of

the Ferry Tariff, thereby (i) increasing its revenue and profit by such portion of the Ferry

Tariff; (ii) lowering the out-of-pocket cost to its passengers by the remaining portion of

the Ferry Tariff; and (iii) increasing its revenue and profit by reason of an increase in

ferry usage which would have resulted from such lower out-of-pocket cost to ferry

passengers; or

(c)     B&PJ would not have raised fares by any amount in respect of the Ferry

Tariff (*i.e.*, it would have charged its actual historical fares), thereby (i) lowering the out-

of-pocket cost to its passengers by the total amount of the Ferry Tariff; and (ii) increasing

its revenue and profit by reason of an increase in ferry usage which would have resulted

from such lower out-of-pocket cost to ferry passengers.

60.     B&PJ will continue to be damaged in the above ways so long as the Port

Authority continues wrongfully to impose the Ferry Tariff.

61.     B&PJ will prove at trial the amount of the damages it has sustained.

## Claim I
(Violation of Rivers and Harbors Appropriation Act of 1884, as Amended, 33 U.S.C. § 5(b))

62.     Plaintiffs incorporate the allegations of paragraphs 1 through 61 above as though

fully set forth herein.

63.     The Maritime Transportation Security Act of 2002, Pub. L. 107-295 (Nov. 25,

2002), added the following subsection to the Rivers and Harbors Appropriation Act of 1884, 33

U.S.C. § 5:

> (b) No taxes, tolls, operating charges, fees, or any other
> impositions whatever shall be levied upon or collected from any vessel or
> other water craft, or from its passengers or crew, by any non-Federal
> interest, if the vessel or water craft is operating on any navigable waters

subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for—

    (1)  fees charged under section 208 of the Water Resources Development Act of 1986 (33 U.S.C. 2236); or

    (2)  reasonable fees charged on a fair and equitable basis that—

        (A)  are used solely to pay the cost of a service to the vessel or water craft;

        (B)  enhance the safety and efficiency of interstate and foreign commerce; and

        (C)  do not impose more than a small burden on interstate or foreign commerce.

64.    The B&PJ ferries operate at all times on navigable waters subject to the authority of the United States and under the right to freedom of navigation on those waters.

65.    The Ferry Tariff is not imposed under section 208 of the Water Resources Development Act of 1986 (33 U.S.C. 2236).

66.    The Ferry Tariff amounts collected or sought to be collected by the Port Authority:

    (a)    do not constitute reasonable fees charged on a fair and equitable basis;

    (b)    are not used solely to pay the cost of services to ferries operated by B&PJ or its passengers;

    (c)    do not enhance the safety and efficiency of interstate commerce; and

    (d)    impose a significant burden on interstate commerce.

67.    By reason thereof, the Ferry Tariff imposed and/or sought to be imposed by the Port Authority violates the Rivers and Harbors Appropriation Act of 1884, as amended, 33 U.S.C. § 5(b).

**Claim II**
(Violation of Commerce Clause of United States Constitution)

68.    Plaintiffs incorporate the allegations of paragraphs 1 through 67 above as though fully set forth herein.

69.    The Commerce Clause of the United States Constitution, U.S. Const., art. I, § 8, clause 3, provides in relevant part that "The Congress shall have Power … To regulate Commerce among the several States …."

70.    In order to comply with the Commerce Clause, a tax or fee imposed by a state or subdivision thereof must, among other requirements, (a) not discriminate against interstate commerce, and (b) be fairly related to the services provided by the state.

71.    The Ferry Tariff, including the manner in which the Ferry Tariff is applied by the Port Authority, discriminates against interstate commerce.

72.    The amounts of and collections under the Ferry Tariff are not fairly related to the services provided to B&PJ or its passengers by the Port Authority or the State of Connecticut.

73.    By reason thereof, the Ferry Tariff imposed and/or sought to be imposed by the Port Authority is excessive and otherwise violates the Commerce Clause of United States Constitution.

**Claim III**
(Violation of Right to Travel under the United States Constitution)

74.    Plaintiffs incorporate the allegations of paragraphs 1 through 73 above as though fully set forth herein.

75.    The right to travel is a fundamental right under the United States Constitution's Commerce Clause, U.S. Const., art. I,  § 8, clause 3, and/or under the Privileges and Immunities Clause, U.S. Const., Amend. XIV, § 1.

{NY014748.1 }                                                - 15 -

76.     A head tax or similar charge imposed on passengers engaged in interstate travel violates their right to travel if it (a) discriminates against interstate commerce, (b) is not based upon a fair approximation of use, or (c) is excessive in relation to the cost to the government of the benefits conferred.

77.     The Ferry Tariff, including the manner in which the Ferry Tariff is applied by the Port Authority, discriminates against interstate commerce.

78.     The amounts of and collections under the Ferry Tariff are not based upon a fair approximation of the use of local government services by B&PJ or its passengers.

79.     The Ferry Tariff is excessive in relation to the cost to the local government of the benefits it confers on B&PJ and its passengers.

80.     By reason thereof, the Ferry Tariff imposed and/or sought to be imposed by the Port Authority is excessive and otherwise violates the right to travel, which is a fundamental right as well as a privilege and immunity of national citizenship under the United States Constitution.

### Claim IV
(Violation of Tonnage Clause of United States Constitution)

81.     Plaintiffs incorporate the allegations of paragraphs 1 through 80 above as though fully set forth herein.

82.     The Tonnage Clause of the United States Constitution, U.S. Const., art. I, § 10, clause 3, provides in relevant part that "No State shall, without the Consent of Congress, lay any Duty of Tonnage ...."

83.     The constitutional prohibition against tonnage duties embraces all taxes and duties regardless of their name or form, even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port.

84.     The Ferry Tariff constitutes a charge for the privilege of entering, trading in, or lying in a port and, thus, is a duty of tonnage.

85.     A tonnage duty may be permissible under the Tonnage Clause only to the extent that (a) the proceeds of such duty are used for services rendered to and enjoyed by the vessel, such as pilotage, (b) such services enhance the safety and efficiency of interstate commerce, and (c) the duty places at most a small burden on interstate commerce.

86.     The amount of the Ferry Tariff greatly exceeds the value of services rendered to and enjoyed by B&PJ or its passengers, such as pilotage or the use of facilities at the Dock or the Terminal.

87.     The Port Authority uses the proceeds of the Ferry Tariff, or significant portions thereof, for purposes that do not enhance the safety and efficiency of interstate commerce.

88.     The Ferry Tariff, in whole or in part, places a significant burden on interstate commerce.

89.     By reason thereof, the Ferry Tariff imposed and/or sought to be imposed by the Port Authority is excessive and otherwise violates the Tonnage Clause of United States Constitution.

### Claim V
(Duplication of Charges; Unjust Enrichment)

90.     Plaintiffs incorporate the allegations of paragraphs 1 through 89 above as though fully set forth herein.

91.     Pursuant to the Current Lease, B&PJ pays rent to the Port Authority, at or above market value, for the use of the Dock and related facilities.  Said use includes the embarking and disembarking of passengers and vehicles from the B&PJ ferries.

92.    Pursuant to the Food Services Lease, Concessions pays rent to the Port Authority, at or above market value, for the use of the assigned space and facilities at the Terminal as a food concession serving the public, including ferry passengers.

93.    The Ferry Tariff imposed and collected by the Port Authority from passengers and vehicles embarking on or disembarking from the B&PJ ferries at Bridgeport constitutes a duplicate charge, in whole or in part, for the use of facilities and services for which B&PJ pays rent under the Current Lease and/or for which Concessions pays rent under the Food Concessions Lease.

94.    By reason thereof, the Port Authority has been unjustly enriched, in that the Port Authority has received the benefit of the Ferry Tariff, the Port Authority has unjustly failed to compensate plaintiffs, in whole or in part, for such benefit, such failure has been to the plaintiffs' detriment, and plaintiffs have no adequate contractual or other legal remedy.

95.    By reason, thereof, the Ferry Tariff has been and continues to be excessive and illegal in whole or in part.

<u>Claim VI</u>
(Violation of Conn. Gen. Stat. §§ 7-329a to 7-329u)

96.    Plaintiffs incorporate the allegations of paragraphs 1 through 95 above as though fully set forth herein.

97.    Pursuant to Conn. Gen. Stat. § 7-329c(10), the Port Authority has the power to:

> Fix fees, rates, rentals or other charges for the purpose of all port facilities owned by the port authority and collect such fees, rates, rentals and other charges for such facilities owned by the port authority, which fees, rates, rentals or other charges shall at all times be sufficient to comply fully with all covenants and agreements with the holders of any bonds issued under the provisions of sections 7-329a to 7-329f [*sic*, should be 7-329u], inclusive.

98.     Accordingly, pursuant to § 7-329c(10), the Port Authority is authorized to fix and collect "fees, rates, rentals or other charges" only (a) "for the purpose of all port facilities owned by the Port Authority," and (b) in amounts sufficient to comply fully with the requirements of bonds issued pursuant to Conn. Gen. Stat. §§ 7-329a to 7-329u.

99.     Upon information and belief, the Port Authority has not issued any bonds pursuant to Conn. Gen. Stat. §§ 7-329a to 7-329u.

100.   The Ferry Tariff imposed or sought to be imposed by the Port Authority is not imposed or collected, in whole or in part, for the purpose of port facilities owned by the Port Authority.

101.   Pursuant to Conn. Gen. Stat. § 7-329i, the Port Authority is authorized to impose charges in connection with a particular "project" (as that term is defined in § 7-329b(2)).  Section 7-329i further provides that such charges are authorized solely for the purpose of funding (i) the cost of maintaining and operating such project, (ii) payments of principal and interest on any bonds issued in respect of such project or (iii) any reserves required to secure such bonds.

102.   The Ferry Tariff imposed or sought to be imposed by the Port Authority is not imposed or collected, in whole or in part, for the purpose of funding any particular project or any bond payments or reserves in connection with any such project.

103.   No other provision of Conn. Gen. Stat. §§ 7-329a to 7-329u authorizes the Port Authority to impose or collect the Ferry Tariff.

104.   By reason thereof, imposition of the Ferry Tariff, in whole or in part, is beyond the power of the Port Authority under, and therefore violates, Conn. Gen. Stat. §§ 7-329a to 7-329u.

105. Alternatively, if or to the extent that Conn. Gen. Stat. §§ 7-329a to 7-329u were deemed to authorize the Port Authority to impose or collect the Ferry Tariff, then said statute would be contrary to and preempted by 33 U.S.C. § 5(b) (quoted in Claim I above).

## Claim VII
### (Unlawful Tax or User Fee Under Connecticut Law)

106. Plaintiffs incorporate the allegations of paragraphs 1 through 105 above as though fully set forth herein.

107. The revenue which the Port Authority generates from the Ferry Tariff substantially exceeds both (a) the value of the facilities and services which the Port Authority provides to the B&PJ ferry and its passengers, and (b) the Port Authority's legitimate operating costs.

108. Accordingly, the Ferry Tariff constitutes, in whole or in part, a tax rather than a user fee.

109. Under Connecticut law, the Port Authority is not authorized to levy taxes. Accordingly, the Ferry Tariff is illegal to the extent that it constitutes a tax.

110. Alternatively, if or to the extent that the Ferry Tariff were deemed to be a user fee rather than a tax, then it would also be illegal, in whole or in part, because the revenue which the Port Authority generates from the Ferry Tariff substantially exceeds both (a) the value of the facilities and services which the Port Authority provides to the ferry or its passengers, and (b) the Port Authority's legitimate operating costs.

## Claim VIII
### (Violation of Connecticut Unfair Trade Practices Act,
### Conn. Gen. Stat. § 42-110a *et seq*. ["CUTPA"])

111. Plaintiffs incorporate the allegations of paragraphs 1 through 110 above as though fully set forth herein.

112.   The Port Authority is a "person" as defined in CUPTA, Conn. Gen. Stat. § 42-110a(3).

113.   The Port Authority is engaged in "trade" and "commerce" as defined in CUPTA, Conn. Gen. Stat. § 42-110a(4), in that, among other things, it leases property and provides services pursuant to the Current Lease and the Food Services Lease.

114.   The Port Authority has engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of CUTPA, Conn. Gen. Stat. § 42-110b(a) *et seq*. Such conduct includes, but is not limited to, the following:

(a)   imposing and collecting the Ferry Tariff, which is invalid or excessive in whole or in part and therefore exceeds its authority under law to fix and collect charges;

(b)   using proceeds of the Ferry Tariff for purposes unrelated to the facilities and services which the Port Authority provides to B&PJ's ferry or its passengers;

(c)   using proceeds of the Ferry Tariff for improper purposes not related to other legitimate activities of the Port Authority;

(d)   imposing and collecting the Ferry Tariff, which constitutes, in whole or in part, a duplicate charge with respect to the facilities and services which the Port Authority provides pursuant to the Current Lease and the Food Services Lease, for which the Port Authority is fully compensated by the rental payments under such leases; and

(e)   failing to impose or to collect, in whole or in part, the Terminal Tariff or other charges with respect to vessels, persons or entities, other than B&PJ or its passengers, that use or drive benefits from Port Authority facilities in and around Bridgeport Harbor.

115.    The Port Authority's conduct as alleged above (a) is contrary to public policy, which is to encourage the use of ferries; (b) is immoral, unethical, oppressive or unscrupulous, and/or (c) has caused and continues to cause substantial injury to B&PJ, to plaintiffs Heller, Rose and Zahradka, and to other customers of B&PJ.

116.    Plaintiffs have suffered ascertainable losses as a result of the Port Authority's violation of CUTPA.

WHEREFORE, plaintiffs demand judgment against the Port Authority as follows:

1.    Enjoining the Port Authority from imposing or collecting the Ferry Tariff, in any amount;

2.    Enjoining the Port Authority from imposing or collecting the Ferry Tariff to the extent that the amount thereof is excessive or otherwise impermissible;

3.    Declaring that the Port Authority is legally barred from imposing or collecting the Ferry Tariff, in any amount;

4.    Declaring that the Port Authority is legally barred from imposing or collecting the Ferry Tariff to the extent that the amount thereof is excessive or otherwise impermissible;

5.    Directing the Port Authority to pay compensatory damages:

(a)    to B&PJ, for the losses it incurred that were caused by the imposition of the illegal and/or excessive Ferry Tariff, including but not limited to expenses and loss of profit, in an amount to be determined at trial; and

(b)    to plaintiffs Robert Heller, Greg Rose and Frank C. Zahradka, in the amounts of the Ferry Tariff imposed and collected from them to date or the portion thereof determined to have been excessive or otherwise impermissible, said amounts to be determined at trial;

6.    With respect to Claim VIII (under CUTPA):

    (a)    awarding plaintiffs punitive damages, pursuant to Conn. Gen. Stat. § 42-110g(a), as against the Port Authority in an amount to be determined at trial; and

    (b)    awarding plaintiffs their reasonable attorneys' fees, pursuant to Conn. Gen. Stat. § 42-110g(d);

7.    Awarding plaintiffs the costs of this action; and

8.    Awarding plaintiffs such other relief as the Court may deem just and proper.

Dated:    Bridgeport, Connecticut
        June 18, 2003

                BRIDGEPORT AND PORT JEFFERSON
                STEAMBOAT COMPANY,
                ROBERT HELLER,
                GREG ROSE, and
                FRANK C. ZAHRADKA
                *Plaintiffs*

By:               _____
                Martin Domb
                Federal Bar No. ct 09544
                E-mail:  mdomb@hillbetts.com
                HILL, BETTS & NASH LLP
                99 Park Avenue, 20th Floor
                New York, New York 10016-1601
                Tel. (212) 589-7577
                Fax (212) 466-0514

                Jonathan S. Bowman
                Federal Bar No. ct 08526
                E-mail:  jbowman@cohenandwolf.com
                Stewart I. Edelstein
                Federal Bar No. ct 06021
                E-mail:  sedelstein@cohenandwolf.com
                COHEN AND WOLF, P.C.
                1115 Broad Street
                P.O. Box 1821
                Bridgeport, Connecticut 06601-1821
                Tel. (203) 368-0211
                Fax (203) 576-8504

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June, 2003, a copy of the foregoing was served

via DHL courier, next business day delivery, upon the following:

John W. Roberts. Esq.
Roberts, Rose & Bates, P.C.
17 Hoyt Street
Stamford, CT 06905

Suzanne L. Montgomery, Esq.
Thompson Coburn
One US Bank Plaza
St. Louis, MO 63101

Edward J. Sheppard, IV, Esq.
Thompson Coburn
1909 K Street, N.W., Suite 600
Washington, D.C. 20005-2010

Jonathan S. Bowman
Stewart I. Edelstein
COHEN AND WOLF, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, Connecticut 06601-1821

By: _____

Martin Domb
Federal Bar No. ct 09544
E-mail:  mdomb@hillbetts.com
HILL, BETTS & NASH LLP
99 Park Avenue, 20th Floor
New York, New York 10016-1601
Tel. (212) 589-7577
Fax (212) 466-0514